IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAJ DISTRIBUTORS, INC.<br>3017 North Midland Drive<br>Pine Bluff, Arkansas  71603<br><br>AND<br><br>STEPHEN L. LaFRANCE<br>HOLDINGS, INC.<br>3017 North Midland Drive<br>Pine Bluff, Arkansas  71603<br><br>Individually and on behalf of all<br>others similarly situated<br><br>    Plaintiffs,<br><br>v.<br><br>WARNER CHILCOTT HOLDINGS<br>COMPANY III, LTD.,<br><br>WARNER CHILCOTT<br>CORPORATION,<br><br>WARNER CHILCOTT (US) INC.,<br><br>GALEN (CHEMICALS) LTD.,<br><br>and<br><br>BARR PHARMACEUTICALS, INC.,<br><br>    Defendants. | Civil Action No.<br><br><br><br><br><br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

1.    Plaintiffs, SAJ Distributors, Inc. and Stephen L. LaFrance Holdings, Inc. (collectively "Plaintiffs"), bring this antitrust action against Defendants for

violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, in the market for generic Ovcon 35 ("Ovcon").

2. Plaintiffs bring this lawsuit as a class action on behalf of all individuals and entities that purchased Ovcon from April 22, 2004 to a date to be determined ("the Class Period") in the United States directly from Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (US) Inc., or Galen (Chemicals) Ltd. (collectively "Warner Chilcott"). Warner Chilcott and Barr Pharmaceuticals, Inc. ("Barr") are hereinafter referred to as "Defendants" unless otherwise specified. Plaintiffs allege that Defendants illegally agreed to keep a generic version of Ovcon off the market, preventing Plaintiffs from purchasing this less expensive product.

## JURISDICTION AND VENUE

3. The jurisdiction of this Court is based upon 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 15. Venue is proper within this District under 15 U.S.C. § 22.

## THE PARTIES

4. Plaintiff Stephen L. LaFrance Holdings, Inc. ("LaFrance") is a holding company with interests in retail and wholesale drug stores and distribution. LaFrance's corporate office is located in Pine Bluff, Arkansas.

5. Plaintiff SAJ Distributors, Inc. ("SAJ") is a wholly owned subsidiary of LaFrance and is LaFrance's distribution company with interests in retail and wholesale drug distribution. SAJ's corporate office is located in Pine Bluff,

Arkansas. SAJ and LaFrance ("Plaintiffs") are the assignees of McKesson Corp., which purchased Ovcon directly from the Defendant and was injured by the illegal conduct alleged herein.

6. Defendant Warner Chilcott Holdings Company III, Ltd. is a privately owned, for-profit company organized, existing, and doing business under and by virtue of the laws of Barbuda, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

7. Warner Chilcott Holdings Company III, Ltd., through its direct and indirect subsidiaries, is engaged in the discovery, development, manufacturing, and distribution of pharmaceutical products in the United States, including Ovcon.

8. Defendant Warner Chilcott Corporation is a wholly owned indirect subsidiary of Warner Chilcott Holdings Company III, Ltd., and is the direct 100% shareholder of Warner Chilcott (U.S.) Inc. Warner Chilcott Corporation is organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

9. Defendant Warner Chilcott (U.S.) Inc. is a wholly owned subsidiary of Warner Chilcott Corporation. Warner Chilcott (U.S.) Inc. is organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principle place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

10.   Defendant Galen (Chemicals) Ltd. is organized, existing, and doing business under and by virtue of the laws of the Republic of Ireland. Galen Chemicals is directly owned or controlled by Warner Chilcott Holdings Company III, Ltd. Galen Chemicals entered into the anticompetitive agreement that prevents Barr's generic Ovcon entry challenged herein.

11.   Collectively, Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (U.S.), and Galen (Chemicals) Ltd. are known hereinafter as the "Warner Chilcott Defendants."

12.   Defendant Barr is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware. Barr's office and principal place of business is located at 2 Quaker Road, P.O. Box 2900, Pomona, New York 10970-0519.

13.   Barr is engaged in the business of, among other things, developing, manufacturing, marketing, and distributing generic oral contraceptive products. In the twelve months ending June 30, 2004, Barr had net revenues of approximately $349 million and net income of approximately $123 million.

## RELEVANT MARKET

14.   The relevant product market is the market for the sale of Ovcon 35 and its AB rated generic equivalents.

15.   The relevant geographic market is the United States as a whole.

16.   At all relevant times, Warner Chilcott's market share in the relevant product and geographic markets was 100%.

## THE REGULATORY BACKGROUND

17. The Federal Food, Drug and Cosmetic Act ("FDCA") regulates the manufacture and distribution of drugs and medical devices in the United States, 21 U.S.C. § 301 *et seq.* Under the FDCA, premarket approval by the Food and Drug Administration ("FDA") is required before a company may begin selling a new drug, often referred to as a "pioneer" or "branded" drug, in interstate commerce in the United States. 21 U.S.C. § 355(a). Premarket approval for a new drug must be sought by filing a new drug application ("NDA") with the FDA under § 355(b) of the FDCA, demonstrating that the drug is safe and effective for its intended use.

18. Once the FDA approves the safety and effectiveness of a new prescription drug, it may be used in the United States only under the direction and care of a doctor who writes a prescription specifying the drug, which must be purchased from a licensed pharmacist. The pharmacist will then dispense the drug specified by the physician unless a generic version is available that has been approved by the FDA for substitution as the bioequivalent of the prescription drug.

19. Generic drugs are drugs that the FDA has found to be "bioequivalent" to their corresponding brand name drugs. A generic drug is bioequivalent if it provides the identical therapeutic benefits and has the same active chemical composition as its brand name counterpart. When a generic drug is completely equivalent to a brand name drug, the FDA assigns the generic drug an "AB" rating.

5

20.     Generic drugs are invariably priced substantially below the branded drugs to which they are bioequivalent. Typically, the first generic drug is sold at a modest discount compared to the brand name drug, with discounts increasing as more companies begin selling the generic. As additional generic competitors come to market, the price of the generic equivalents continues to fall, and the combined market share of the generic manufacturers continues to grow. In some cases, generic competitors sell products equivalent to brand name prescription drugs for as little as 15 percent of the price of the brand name drug, and capture as much as 90 percent of the market for that drug. Unless the branded manufacturer lowers prices to meet competition, a branded drug loses a significant portion of its market share to generic competitors less than a year after the introduction of generic competition.

21.     Moreover, if a lower-priced generic version of a brand name drug exists, and the physician has not specifically indicated on the prescription "dispense as written" (or a similar instruction), typically, the pharmacist will substitute, or at least offer to substitute, the generic drug.

22.     Once a physician writes a prescription for a brand name drug such as Ovcon, that prescription defines and limits the market to the brand name drug or its AB-rated generic equivalent. A pharmacist may substitute only drugs that carry the FDA's AB generic rating for a physician's prescription for a brand name drug.

23.     The Hatch-Waxman Amendments provide that companies may seek approval to produce and market a generic form of a previously approved or

"pioneer" drug by filing an Abbreviated New Drug Application ("ANDA") that relies on the safety and effectiveness findings reported in the NDA for the previously approved drug.

## FACTUAL ALLEGATIONS

24.   This case is about an illegal agreement not to compete in the market for the drug Ovcon 35 and its AB rated generic equivalents, made between a brand name drug manufacturer, Warner Chilcott, and its only prospective generic competitor, Barr.

25.   Ovcon 35, an oral contraceptive, was introduced in 1976.

26.   Warner Chilcott acquired the rights to Ovcon from Bristol-Myers Squibb Company in February 2000. Bristol-Myers Squibb Company agreed to and has supplied Ovcon to Warner Chilcott since that time.

27.   Ovcon is not subject to any patent protection.

28.   As one of Warner Chilcott's highest revenue-producing products, Ovcon is a valuable asset to the company. For the fiscal year ending September 30, 2003, product revenue for Ovcon was $58.6 million dollars, making Ovcon one of the company's top three performing products. In 2005, Ovcon product revenue for three months was $22.8 million dollars, up $5.4 million from 2004, which reflected a 30.8% increase in product revenue.

29.   Warner Chilcott sells Ovcon at a price considerably above its cost of acquiring the product.

7

30.  In September 2001, Barr filed an ANDA with the FDA for approval to sell an AB-rated generic version of Ovcon 35.

31.  In January 2003, planning to vie for a portion of the Ovcon market by selling its generic Ovcon at roughly 30% less than the price of Warner Chilcott's branded Ovcon, Barr publicly announced its intention to market generic Ovcon once it received FDA approval.

32.  The potential entry of Barr's lower priced generic Ovcon threatened to diminish Warner Chilcott's branded Ovcon sales by roughly 50% in the first year alone.

33.  By Warner Chilcott's projections, its net revenues from the sale of branded Ovcon would decline by at least $100 million over a three-year period as a result of prescriptions lost to generic Ovcon.

34.  Warner Chilcott planned to protect its Ovcon revenues from generic competition by introducing Ovcon Chewable, a chewable form of branded Ovcon, before generic entry occurred. However, it became unlikely that the FDA would finally approve the chewable product in time.

35.  In May 2003, Warner Chilcott's chief financial officer suggested to the company's Board of Directors that generic Ovcon entry was the "biggest risk to the company."

36.  In August 2003, Barr and Warner Chilcott discussed a possible business arrangement under which Barr would agree to refrain from competing in the United States with its generic Ovcon product.

8

37. On September 10, 2003, Warner Chilcott and Barr executed a letter of intent, which formed the basis of the anticompetitive agreement. Under the letter of intent, Warner Chilcott would pay Barr $20 million in exchange for Barr agreeing not to compete in the United States for five years with its generic Ovcon product when Barr received final FDA approval. Instead, Barr would agree to be available as a second supplier of Ovcon to Warner Chilcott with Bristol Myers Squibb if Warner Chilcott so requested.

38. In February 2004, Federal Trade Commission staff notified Warner Chilcott and Barr that it intended to investigate the agreement outlined in their letter of intent because of its significant potential to reduce competition by preventing the only generic alternative to Ovcon from entering the market.

39. In March 2004, Defendants signed their Final Agreement implementing the letter of intent. For $1 million, Barr granted Warner Chilcott an option to acquire a five-year exclusive license under Barr's ANDA for which Ovcon is the reference drug. If Warner Chilcott chose to exercise the option agreement, Warner Chilcott would pay Barr an additional $19 million.

40. The FDA approved Barr's ANDA to produce and market generic Ovcon on April 22, 2004 at which time Barr had the capability to market generic Ovcon in the United States. On April 23, 2004 Barr publicly announced its intention to market generic Ovcon if Warner Chilcott chose not to exercise its exclusive license option.

41.     On May 4, 2004, Warner Chilcott exercised its option and paid Barr the additional $19 million. At the same time, Warner Chilcott entered into a finished-product supply agreement with Barr under which Barr agreed to provide Warner Chilcott with its requirements for finished products throughout the term of the license. Barr has begun supplying Ovcon to Warner Chilcott and will be Warner Chilcott's sole source of supply for the product.

42.     Without the agreement, Barr would have started selling generic Ovcon shortly after receiving final FDA approval in April 2004.

43.     The Final Agreement prohibits Barr from selling generic Ovcon for five years, or until approximately May 2009. At the end of the five-year term, Warner Chilcott can extend the license on a non-exclusive basis for an additional five-year period.

44.     Instead of competing, Defendants agreed to a horizontal market allocation and have committed a *per se* violation of the Sherman Act. Defendants agreed to allocate the entire market for Ovcon to Warner Chilcott with Barr as the sole supplier. This agreement has robbed purchasers of the choice of a lower-cost generic alternative to Warner Chilcott's higher-priced branded Ovcon 35.

45.     No other pharmaceutical companies are approved by the FDA to sell a generic version of Ovcon.

46.     The agreement between Warner Chilcott and Barr has harmed class members by preventing them from purchasing a lower priced generic version of Ovcon and allowed Defendants to reap supra-competitive prices.

## CLASS ALLEGATIONS

47.  Plaintiffs bring this action on their own and, under Rule 23(b)(3) of the Federal Rules of Civil Procedure, with respect to damages sought herein, as representatives of a class (the "Class") defined as follows:

> All individuals or entities in the United States that directly purchased Ovcon 35 from the Warner Chilcott Defendants or their subsidiaries at any time from April 22, 2004 until at least the date of filing.

Excluded from the above classes are governmental entities and Defendants and their respective subsidiaries and affiliates.

48.  While the exact size of the Class is unknown to Plaintiffs at the present time, the members of the Class are believed to number in the hundreds and they are geographically dispersed throughout the United States. Thus, members of the Class are numerous and joinder is impracticable.

49.  Plaintiffs' claims are typical of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.

50.  Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs are not antagonistic to the Class.

51.  Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

52.  Questions of law and fact common to the Class include:

   (a) Whether the agreement is a *per se* violation of the Sherman Act;

   (b) Whether the agreement caused prices to be at artificially high and non-competitive levels; and

(c) Whether Plaintiffs and other Class members were injured by the agreement and, if so, the appropriate class-wide measure of damages.

53. Class action treatment is a superior method for the fair and efficient adjudication of the controversy.

54. Plaintiffs know of no difficulty to be encountered in the maintenance of this action as a class action.

## VIOLATION ALLEGED – SECTION 1 OF THE SHERMAN ACT

55. Defendants engaged in unlawful combination and conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, to allocate the market for Ovcon by eliminating generic competition, causing damage to Plaintiffs and the Class members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants and for the following relief:

(a) That the Court determine that this action may be maintained as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure;

(b) Judgment against Defendants in favor of Plaintiffs and members of the Class for three-fold the amount of damages sustained by Plaintiffs and the Class as allowed by law;

(c)     The costs of this suit, including reasonable attorney fees, as provided by law; and

(d)     That Plaintiffs and the Class members be granted such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Date: December 21, 2005

Respectfully submitted,

_____
Dianne M. Nast
RODANAST, P.C.
801 Estelle Drive
Lancaster, Pennsylvania 17601
(717) 892-3000
(717) 892-1200 facsimile


Michael L. Roberts
ROBERTS LAW FIRM, P.A.
P.O. Box 241790
20 Rahling Circle
Little Rock, Arkansas 72223-1790
(501) 821-5575
(501) 821-4474 facsimile

*Counsel for Plaintiffs SAJ Distributors, INC. and Stephen L. LaFrance Holdings, INC.*

_____
Michael D. Hausfeld (D.C. Bar No. 153742)
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
West Tower, Suite 500
1100 New York Avenue, N.W.
Washington, District of Columbia 20005
(202) 408-4600
(202) 408-4699 facsimile

*Local Counsel for Plaintiffs SAJ Distributors, INC. and Stephen L. LaFrance Holdings, INC.*