# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MEIJER, INC., 2929 Walker Avenue NW, Grand
Rapids, Michigan 49544

MEIJER DISTRIBUTION, INC., 2929 Walker Avenue
NW, Grand Rapids, Michigan 49544

LOUISIANA WHOLESALE DRUG CO., INC., 2085
I-49, South Service Road, Sunset, Louisiana 70584

ROCHESTER DRUG CO-OPERATIVE, INC., 50 Jet
View Drive, Rochester, New York 14624

VALLEY WHOLESALE DRUG COMPANY, INC.,
1401 West Fremont Street, Stockton, California 95203-
2627

AMERICAN SALES COMPANY, INC., 4201 Walden
Ave, Lancaster, New York 14086

SAJ DISTRIBUTORS, INC. 3017 N. Midland
Pine Bluff, Arkansas 71603

STEPHEN L. LaFRANCE HOLDINGS, INC. 3017 N.
Midland, Pine Bluff, Arkansas 71603

on behalf of themselves and all others similarly
situated,

Plaintiffs,
v.

WARNER CHILCOTT HOLDINGS COMPANY III,
LTD., 100 Enterprise Drive, Rockaway, NJ 07866-2129

WARNER CHILCOTT CORPORATION, 100
Enterprise Drive, Rockaway, NJ 07866-2129

WARNER CHILCOTT (US) INC., 100 Enterprise
Drive, Rockaway, NJ 07866-2129

WARNER CHILCOTT COMPANY, INC., Union
Street, Km 1.1, Fajardo, Puerto Rico 00738

GALEN (CHEMICALS), LTD., 10 Ardee Business
Park, hale Street, Ardee, County Louth, Ireland

BARR PHARMACEUTICALS, INC., 2 Quaker Road,
P.O. Box 2900, Pomona, NY 10970-0519

Defendants.

05 Civ. 2195 (CKK)

AMENDED CLASS ACTION
COMPLAINT

JURY TRIAL DEMANDED

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs American Sales Company, Inc., Louisiana Wholesale Drug Company, Inc., Meijer, Inc., Meijer Distribution, Inc., Rochester Drug Co-operative, Inc., SAJ Distributors, Inc., Stephen L. LaFrance Holdings, Inc., and Valley Wholesale Drug Company, Inc. (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this action on behalf of themselves and all others similarly situated, against Defendants Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (US) Inc., Warner Chilcott Company, Inc., and Galen (Chemicals), Ltd. (collectively referred to, with their predecessors, successors, parent and/or subsidiary corporations, as "Warner Chilcott"), and Barr Pharmaceuticals, Inc. ("Barr"). Plaintiffs make the following allegations based upon personal knowledge as to those matters relating to themselves and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.      This case involves a horizontal agreement between Warner Chilcott and Barr not to compete in the sale of Ovcon 35 ("Ovcon"), an oral contraceptive.

2.      Warner Chilcott is a pharmaceutical company that develops, manufactures, markets, and distributes proprietary women's healthcare and dermatological pharmaceutical products. Pursuant to an agreement with Bristol-Myers Squibb Company, Warner Chilcott is the exclusive marketer of Ovcon in the United States.

3.      Barr is a pharmaceutical company that develops, manufactures, markets, and distributes generic and proprietary pharmaceutical drugs. Barr developed a generic version of Ovcon, which was approved for sale by the United States Food and Drug Administration on or about April 22, 2004.

4.    Barr planned to market its generic drug in competition with Warner Chilcott's branded Ovcon. Both Warner Chilcott and Barr had predicted that the entry of Barr's lower-priced generic into the market would reduce Warner Chilcott's Ovcon sales, with generic versions of Ovcon capturing approximately 50% of Ovcon's sales in the first year alone.

5.    As alleged more fully herein, Warner Chilcott entered into an agreement with Barr, in which Barr agreed not to market its generic Ovcon for five years in exchange for Warner Chilcott's payment of approximately $20 million (the "Agreement").

6.    Defendants' Agreement denied Plaintiffs and other purchasers of Ovcon the benefits of competition and of less expensive, generic versions of Ovcon. As a result, Plaintiffs and members of the class defined below have paid supracompetitive prices for Ovcon and its generic equivalents.

## JURISDICTION AND VENUE

7.    This action is brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of suit, including reasonable attorneys' fees, for injuries sustained by Plaintiffs and members of the Class as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged herein.

8.    This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337(a).

9.    Venue is proper in this District under 15 U.S.C. §§ 15, 22, and 26 and under 28 U.S.C. § 1391, because (1) Warner Chilcott and Barr transact business and are found within this District; and (2) a substantial portion of the affected trade and commerce described below has been carried out in this District.

## PARTIES

10.     Plaintiff American Sales Company, Inc. ("American Sales") is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its principal place of business located at 4201 Walden Ave, Lancaster, New York 14086. American Sales purchased Ovcon directly from one or more of the named Defendants during the Class Period, as defined below.

11.     Plaintiff Louisiana Wholesale Drug Company, Inc. ("Louisiana Wholesale") is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Louisiana, with its principal place of business located at 2085 I-49, South Service Road, Sunset, Louisiana 70584. Louisiana Wholesale purchased Ovcon directly from one or more of the named Defendants during the Class Period, as defined below.

12.     Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. (collectively, "Meijer") are corporations organized under the laws of Michigan, with their principal place of business at 2929 Walker Avenue NW, Grand Rapids, Michigan 49544. Meijer is the assignee of the claims of the Frank W. Kerr Co., which purchased Ovcon directly from one or more of the named Defendants during the Class Period, as defined below.

13.     Plaintiff Rochester Drug Co-operative, Inc. ("Rochester Drug") is a pharmaceutical wholesale company, with its principal place of business located at 50 Jet View Drive, Rochester, New York 14624. Rochester Drug purchased Ovcon directly from one or more of the named Defendants during the Class Period, as defined below.

14.     Plaintiff Stephen L. LaFrance Holdings, Inc. ("LaFrance") is a holding company, with its corporate office located at 3017 N. Midland, Pine Bluff, Arkansas 71603. Plaintiff SAJ Distributors, Inc. ("SAJ") is a wholly-owned subsidiary of LaFrance, with its office also located

at 3017 N. Midland, Pine Bluff, Arkansas 71603. LaFrance and SAJ have interests in retail and wholesale drug distribution, and they are the assignees of McKesson Corporation, which purchased Ovcon directly from one or more of the named Defendants during the Class Period, as defined below.

15.     Plaintiff Valley Wholesale Drug Company, Inc. ("Valley Wholesale") is a corporation organized, existing, and doing business under and by virtue of the laws of the State of California, with its principal place of business located at 1401 West Fremont Street, Stockton, California 95203-2627. Valley Wholesale purchased Ovcon directly from one or more of the named Defendants during the Class Period, as defined below.

16.     Defendant Warner Chilcott Holdings Company III, Ltd. is a privately-owned, for-profit company organized, existing, and doing business under and by virtue of the laws of Bermuda, with its registered office located at Canon's Court, 22 Victoria Street, Hamilton HM 12 Bermuda. Its principal place of business is located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

17.     Defendant Warner Chilcott Corporation is a wholly-owned subsidiary of Warner Chilcott Holdings Company III, Ltd. and is the direct 100% shareholder of Warner Chilcott (U.S.) Inc. Warner Chilcott Corporation is a for-profit company organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

18.     Defendant Warner Chilcott (U.S.) Inc. is a wholly-owned subsidiary of Warner Chilcott Corporation. Warner Chilcott (U.S.) Inc. is a for-profit company organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

19.    Defendant Warner Chilcott Company, Inc. is a wholly-owned subsidiary of Warner Chilcott Holdings Company III, Ltd., and is organized, existing, and doing business under and by virtue of the laws of the Commonwealth of Puerto Rico.

20.    Defendant Galen (Chemicals) Ltd. ("Galen") is a for-profit enterprise organized, existing, and doing business under and by virtue of the laws of the Republic of Ireland. Galen is directly or indirectly owned or controlled by Warner Chilcott Holdings Company III, Ltd.

21.    Unless otherwise specified, Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (U.S.) Inc., Warner Chilcott Company, Inc., Galen (Chemicals) Ltd. and/or their predecessors, successors, parent corporations, and subsidiary corporations are referred to herein collectively as "Warner Chilcott" or the "Warner Chilcott Defendants." Warner Chilcott is engaged in the business of developing, manufacturing, marketing, and distributing women's healthcare and dermatological pharmaceutical products, including Ovcon.

22.    Defendant Barr Pharmaceuticals, Inc., is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its principal place of business located at 2 Quaker Road, P.O. Box 2900, Pomona, New York 10970-0519. Barr is engaged in the business of developing, manufacturing, marketing, and distributing generic oral contraceptive products.

## BACKGROUND

### The Regulatory System Governing Pharmaceuticals in the United States

23.    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, as amended by the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act"), and the Medicare Prescription Drug, Improvement and Modernization Act of 2003,

codified at 21 U.S.C. § 355(j) and 35 U.S.C. § 271(e) (2005), establishes procedures designed to facilitate competition from lower-priced generic drugs.

24.    Before a manufacturer can market a new drug in the United States, it must obtain approval from the United States Food and Drug Administration ("FDA").

25.    The FDA maintains a list of approved "Reference Listed Drugs" in a publication entitled, "Approved Drug Products with Therapeutic Equivalence Evaluations," which is commonly known as the "Orange Book."

26.    A manufacturer seeking to market a new drug must file with the FDA a New Drug Application (NDA), demonstrating the safety and efficacy of its product. 21 U.S.C. § 355(b) (2005). Once the FDA approves the NDA, the manufacturer may market the branded drug, and the branded drug may be listed in the Orange Book. The NDA process is typically time-consuming and expensive.

27.    In 1984, Congress enacted the Hatch-Waxman Act, which accelerated the approval process for generic drugs. Among other things, the Act permits a manufacturer seeking FDA approval for a generic drug to file an Abbreviated New Drug Application ("ANDA"). 21 U.S.C. § 355(j) (2005). An ANDA filer may rely on the safety and efficacy data previously provided in the NDA for its branded counterpart. FDA approval of an ANDA takes, on average, about 18 months.

28.    FDA-approved generic drugs are certified by the FDA as bioequivalent to the branded drug whose NDA the generic drug relied upon in its ANDA and are completely interchangeable with that branded drug. The FDA refers to such drugs as "AB-rated." A generic drug that is "AB-rated" may be listed in the Orange Book and dispensed by a pharmacist in lieu of its branded counterpart.

29.     Upon their introduction, generic drugs generally enter the market at prices 30 to
50 % (or more) below the price of their brand-name equivalents.  Because generic and branded
drugs are fully interchangeable in terms of safety and efficacy, the vast majority of patients are
switched to the less expensive generic in place of the brand-name drug.

30.     Almost all states (and the District of Columbia) encourage generic competition
through laws that allow pharmacists to substitute brand-name drugs with their "AB-rated"
generic equivalents, unless a physician directs or the patient requests otherwise.

31.     Many third-party payors of prescription drugs (*e.g.*, health insurance plans,
Medicaid programs) have adopted policies to encourage the substitution of available AB-rated
generic drugs for their branded counterparts.

### Ovcon 35

32.     Ovcon is an oral contraceptive, containing norethindrone and ethinyl estradiol as
its active ingredients.  It has been available to the general public as a prescription pharmaceutical
product since approximately 1976 and is not subject to patent protection.

33.     Prior to January 26, 2000, Bristol-Myers Squibb Company ("BMS")
manufactured, distributed, and marketed Ovcon in the United States.

34.     On January 26, 2000, Warner Chilcott purchased from BMS certain rights, title,
and interests in Ovcon products, including an agreement with Bristol Myers Squibb Laboratories
Company ("BMSLC"), a wholly-owned subsidiary of BMS, to supply Ovcon products to Warner
Chilcott.

35.     Warner Chilcott then began marketing Ovcon manufactured by BMSLC and
continues to be the exclusive marketer of Ovcon in the United States at the present time.

36.     Ovcon is highly profitable.  It is, and has been, one of Warner Chilcott's highest

revenue-producing products. Ovcon's net dollar sales have more than doubled since 2000, even as Warner Chilcott has raised Ovcon's price. For the twelve months ending September 30, 2004, Warner Chilcott's net sales of Ovcon were approximately $71.5 million.

### Generic Ovcon 35

37.    In September 2001, Barr filed an ANDA with the FDA for approval to market an AB-rated generic version of Ovcon.

38.    In January 2003, Barr publicly announced its intention to launch a generic version of Ovcon by the end of that year.

39.    Barr intended to sell its generic version of Ovcon at an initial price approximately 30% below the price Warner Chilcott charged for Ovcon.

40.    Warner Chilcott expected Barr to enter the market with its generic Ovcon product priced approximately 30% below the price Warner Chilcott charged for Ovcon.

41.    Barr projected that within its first year of introduction, generic Ovcon would capture approximately 50% of Warner Chilcott's branded Ovcon sales.

42.    Warner Chilcott projected that within its first year of introduction, generic Ovcon would capture at least 50% of Ovcon's new prescriptions. Warner Chilcott calculated that, as a result of these lost prescriptions, its net revenues from the sale of branded Ovcon would decline by at least $100 million over a three-year period.

43.    Warner Chilcott had planned to protect its Ovcon revenues from generic competition by introducing a chewable form of the product (Ovcon Chewable) before generic entry occurred. Warner Chilcott's strategy was to convert Ovcon patients to Ovcon Chewable, and to stop selling Ovcon once conversion was substantially complete. This is known as a "line extension" strategy. The January 17, 2003 publication of the IRISH TIMES quotes a Galen

spokesperson as saying: "At some stage there was going to be generic competition to Ovcon, which is why we took the step of filing the line extension."

44.     Prescriptions for Ovcon Chewable would not be able to be filled with a generic Ovcon product because any generic version of Ovcon would not be AB-rated to Ovcon Chewable.

45.     By mid-2003, however, Warner Chilcott's "switch" strategy of converting users from non-chewable Ovcon to Ovcon Chewable was in jeopardy. Warner Chilcott's planned Ovcon Chewable had not obtained FDA approval by the time that Barr's generic Ovcon entry appeared imminent.

46.     In May 2003, Warner Chilcott's chief financial officer warned the company's Board of Directors that generic Ovcon entry was the "biggest risk to the company."

### Defendants' Agreement Not to Compete

47.     By the summer of 2003, Warner Chilcott believed that Barr's generic Ovcon entry could occur as early as September of that year.

48.     In August 2003, Warner Chilcott and Barr discussed potential business arrangements under which Barr would refrain from competing with Warner Chilcott's branded Ovcon.

49.     On September 10, 2003, Warner Chilcott and Barr signed a Letter of Intent to enter into an agreement in which Warner Chilcott would pay Barr $20 million not to compete in the United States for a term of five years with its generic Ovcon product following Barr's final FDA approval for generic Ovcon. Rather than enter the market as a competitor, Barr would agree to be available as a second supplier of Ovcon to Warner Chilcott if Warner Chilcott so requested, and Warner Chilcott would pay a premium price for Barr's generic Ovcon of up to

200% of Barr's manufacturing costs.

50.    On March 24, 2004, Defendants signed their Agreement, as contemplated by their Letter of Intent, and Warner Chilcott paid Barr $1 million.

51.    Under the Agreement, within 45 days after FDA approval of Barr's generic Ovcon ANDA, Warner Chilcott could elect to pay the remaining $19 million to secure Barr's commitment to refrain from marketing generic Ovcon in the United States, either by itself, or through a license, for five years.

52.    On April 22, 2004, the FDA granted final approval of Barr's ANDA for generic Ovcon.

53.    On April 23, 2004, Barr announced its intent to begin marketing generic Ovcon under the name "Balziva" in the event Warner Chilcott chose not to exercise its option under the Agreement.

54.    On May 6, 2004, Warner Chilcott exercised its option under the Agreement. Warner Chilcott paid Barr $19 million in exchange for Barr's agreement not to compete with Warner Chilcott by introducing generic Ovcon into the market.

55.    Warner Chilcott did not begin purchasing Ovcon supply from Barr at that time, but instead continued to purchase its Ovcon requirements solely from Bristol-Myers Squibb Co. Barr began purchasing Ovcon supply from Barr approximately one year later in May 2005.

56.    Under the terms of the Agreement, Barr cannot sell generic Ovcon in the United States for five years, or until approximately May 2009.

57.    Absent this Agreement, Barr would have begun marketing its generic Ovcon after it received FDA approval of its ANDA on or about April 22, 2004.

58.    Barr has abided by the Agreement not to sell generic Ovcon in the United States.

To date, no other company has received FDA approval to market a generic version of Ovcon.

59.    If Barr had introduced its generic product, Plaintiffs and members of the Class,

defined below, would have substituted Barr's lower-priced generic Ovcon for all or a portion of

their purchases of branded Ovcon, and/or would have paid substantially less for branded Ovcon

because Warner Chilcott would have lowered net Ovcon prices in response to competition.

60.    As a consequence of Defendants' Agreement, Plaintiffs and members of the Class

have been deprived of the benefits of free and open competition in their purchases.  Purchasers

of Ovcon were required to continue purchasing brand name Ovcon when a less expensive

generic product would have otherwise been available.

## CLASS ACTION ALLEGATIONS

61.    Plaintiffs bring this action pursuant to Rule 23(b)(3) of the Federal Rules of Civil

Procedure, on behalf of themselves and the following Class (the "Class"):

> All persons and entities in the United States who purchased Ovcon
> directly from Warner Chilcott at any time from April 22, 2004,
> through the present and continuing until the effects of Defendants'
> anticompetitive conduct have ceased ("Class Period").  Excluded
> from the class are Defendants and their officers, directors,
> employees, subsidiaries, or affiliates, and all government entities.

62.    The Class is so numerous that joinder of all members is impracticable.  Class

members include wholesalers, hospitals, health maintenance organizations, and/or retail chain

drug stores.  Upon information and belief, the Class includes one hundred or more members, and

the exact identity of Class members is ascertainable from the records of Defendants.

63.    There are questions of law and fact common to the Class, including but not

limited to, the following:

> a.    whether Defendants combined, agreed, or conspired as alleged herein in
>
> restraint of trade;

b.      whether Defendants' agreement, combination, or conspiracy was lawful;

c.      whether Defendants' unlawful conduct as alleged herein has affected

interstate commerce;

d.      whether Defendants' unlawful conduct caused Plaintiffs and the other

members of the Class to pay more for Ovcon and its generic equivalents

than they would have paid absent Defendants' conduct;

e.      whether Defendants' unlawful conduct caused antitrust injury to the

business or property of Plaintiffs and the member of the Class and, if so,

the appropriate relief and/or measure of damages.

64.      These and other questions of law and fact are common to the members of the

Class and predominate over any questions affecting individual members because Defendants

have acted on grounds generally applicable to the entire Class.  Such generally applicable

conduct is inherent in Defendants' collusive conduct.

65.      Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and all

Class members suffered antitrust injury by the same wrongful conduct by the Defendants; they

have all paid artificially inflated prices for Ovcon and its generic equivalents resulting from

Warner Chilcott's agreement with Barr to exclude generic competition.

66.      Plaintiffs will fairly and adequately represent and protect the interests of the

Class.  Plaintiffs have retained counsel experienced in class action and antitrust litigation.

Plaintiffs have no interest in this litigation that is adverse to, or in conflict with, the interests of

the other members of the Class.

67.      A class action is superior to any other available methods for the fair and efficient

adjudication of this controversy.  Such treatment will permit a large number of similarly situated

persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would require.  The benefits of proceeding by way of class action, including providing injured persons or entities with a method for obtaining redress on claims that they might not be able to pursue individually, substantially outweigh any difficulties that may arise in the management of a class action.

68.     Plaintiffs know of no difficulty that would be encountered in the management of the claims advanced by the Class that would preclude certification.

## INTERSTATE TRADE AND COMMERCE

69.     During the period relevant to this litigation, Ovcon was sold throughout the United States.  Ovcon was manufactured and sold in a continuous and uninterrupted flow of commerce across state lines.  Defendants' unlawful activities alleged in this Complaint have occurred in and have had a substantial effect upon interstate commerce.

70.     In furtherance of their unlawful conduct, Defendants employed the United States mail and interstate and international telephone lines, as well as means of interstate and international travel.

## VIOLATION

## COUNT I: SHERMAN ACT § 1

71.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully stated herein.

72.     By entering into the Agreement, the purpose and effect of which was to restrain trade by keeping generic competition to Ovcon out of the market, the Defendants have engaged in a continuing contract, combination, or conspiracy in violation of Section 1 of the Sherman

Act, 15 U.S.C. § 1.

73.    The Defendants' contract, combination, and/or conspiracy has included concerted actions and undertakings among Defendants with the purpose and effect of fixing, raising, maintaining, or stabilizing the price of Ovcon and its generic equivalents.

74.    For the purpose of formulating and effectuating their contract, combination, and/or conspiracy, Defendants performed the following acts:

    a.    entering into an illegal agreement by which Barr agreed not to sell generic Ovcon in U.S. commerce in exchange for monetary payment by Warner Chilcott; and

    b.    depriving direct purchasers of the ability to purchase Ovcon and its generic equivalents at a competitive price.

75.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, and/or conspiracy were authorized, ordered or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

76.    Defendants' illegal contract, combination, and/or conspiracy to prevent the introduction into the U.S. marketplace of a generic version of Ovcon resulted in Plaintiffs and members of the Class paying more than they would have paid for Ovcon and its generic equivalents absent Defendants' illegal conduct.

77.    Defendants' contract, combination, and/or conspiracy is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

78.    In the alternative, Defendants' contract, combination and/or conspiracy violates Section 1 of the Sherman Act, 15 U.S.C. § 1, under the "quick look" and/or rule of reason

analyses, because the purpose and effect of Defendants' conduct was to unreasonably restrain competition in the sale of Ovcon and its generic equivalents. To the extent required by law, the relevant product market is Ovcon and its AB-rated generic equivalents and the relevant geographic market is the United States. Defendants had monopoly power in the relevant product market in that through the Agreement, (a) Warner Chilcott allocated 100% of that relevant market in the United States to themselves, and (b) Ovcon and its generic equivalents was sold at prices well above the competitive level without losing substantial sales.

## ANTICOMPETITIVE EFFECTS

79.     Defendants have undertaken the foregoing unlawful courses of conduct for the following purposes and with the following effects:

    a.    prices for Ovcon and its generic equivalents have been fixed, raised, maintained, or stabilized at artificially high and non-competitive levels;

    b.    buyers of Ovcon have been unable to purchase lower-priced generic versions of Ovcon;

    c.    buyers of Ovcon and its generic equivalents have been deprived of the benefits of free and open competition in their purchases; and

    d.    competition in the production and sale of Ovcon and its generic equivalents has been restrained, suppressed, and eliminated.

## DAMAGES

80.     During the relevant period, Plaintiffs and members of the Class purchased

substantial amounts of Ovcon from Defendants.  As a result of Defendants' illegal conduct, Plaintiffs and members of the Class were compelled to pay, and did pay, artificially inflated prices for Ovcon and its generic equivalents.  Those prices were substantially greater than the prices they would have paid absent the illegal agreement, combination, or conspiracy alleged herein, because they were deprived of the opportunity to: (1) pay lower prices for the generic versions of the drug; (2) pay lower prices for their Ovcon requirements by switching some of the volume of their purchases from the brand to the generic versions; and (3) pay lower prices for the brand name drug Ovcon.  Members of the Class have sustained substantial losses and damage to their businesses and property in the form of overcharges.  The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues so triable.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and members of the Class, respectfully request:

1.    Certification of this case as a class action;

2.    Judgment declaring Defendants' contract, combination, or conspiracy alleged herein to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

3.    Judgment in Plaintiffs' favor and against Defendants for damages representing three times the overcharge damages sustained by Plaintiffs and the other members of the Class defined herein;

4.    Joint and several judgment be entered against each Defendant in favor of

Plaintiffs and the other members of the Class;

     5.       An award to Plaintiffs of all costs incurred, including reasonable attorneys' fees;

     6.       Pre- and post-judgment interest;

     7.       Such other and further relief as the Court deems just and proper.

Dated: April 14, 2006               By:

                                        /s/
                _____

                Michael D. Hausfeld (D.C. Bar No. 153742)
                COHEN, MILSTEIN, HAUSFELD & TOLL P.L.L.C.
                1100 New York Avenue, N.W.
                Suite 500, West Tower
                Washington, DC 20005
                Tel: (202) 408-4600
                Fax: (202) 408-4699

                Linda P. Nussbaum (D.C. Bar No. 483254)
                Kanchana Wangkeo
                COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
                150 East 52nd Street, 30th Floor
                New York, NY 10022
                Tel: (212) 838-7797
                Fax: (212) 838-7745

                Joseph M. Vanek
                David P. Germaine
                VANEK, VICKERS & MASINI, P.C.
                225 W. Washington, 18th Floor
                Chicago, IL 60606
                Tel: (312) 224-1500
                Fax: (312) 224-1510

                ***Counsel for Plaintiffs Meijer, Inc. and Meijer Distribution, Inc.***

_____ /s/
Richard B. Drubel (D.C. Bar No. 334359)
Kimberly H. Schultz
BOIES, SCHILLER & FLEXNER LLP
26 South Main Street
Hanover, NH 03755
Tel: (603) 643-9090
Fax: (603) 643-9010

William Isaacson (D.C. Bar No. 414788)
Tanya Chutkan (D.C. Bar No. 420478)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave., NW, Ste. 800
Washington, DC 20015
Tel: (202) 237-2727
Fax: (202) 237-6131

*Counsel for Plaintiff Valley Wholesale Drug Co., Inc.*

_____ /s/
Bruce E. Gerstein
Barry S. Taus
Kevin S. Landau
GARWIN GERSTEIN & FISHER, LLP
1501 Broadway, Ste. 1416
New York, NY 10011
Tel: (212) 398-0055
Fax: (212) 764-6620

David U. Fierst (D.C. Bar No. 912899)
STEIN, MITCHELL & MEZINES LLP
1100 Connecticut Ave., NW
Suite 1100
Washington, DC 20036
Tel: (202) 737-7777
Fax: (202) 296-8312

*Counsel for Plaintiff Louisiana Wholesale Drug Co.,
Inc.*

_____ /s/ _____
Daniel Berger
David Sorensen
Eric L. Cramer
BERGER & MONTAGUE, P.C.
1622 Locust St.
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

David U. Fierst (D.C. Bar No. 912899)
STEIN, MITCHELL & MEZINES LLP
1100 Connecticut Ave., NW
Suite 1100
Washington, DC 20036
Tel: (202) 737-7777
Fax: (202) 296-8312

**_Counsel for Plaintiff Rochester Drug Co-operative, Inc._**


_____ /s/ _____
Dianne M. Nast
RodaNast, P.C.
801 Estelle Drive
Lancaster, PA 17601
Tel: (717) 892-3000
Fax: (717) 892-1200

Michael D. Hausfeld (D.C. Bar No. 153742)
Linda P. Nussbaum (D.C. Bar No. 483254)
COHEN, MILSTEIN, HAUSFELD & TOLL P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Tel: (202) 408-4600
Fax: (202) 408-4699

**_Counsel for Plaintiffs SAJ Distributors, Inc. and Stephen L. LaFrance Holdings, Inc._**

_____ /s/
Thomas M. Sobol
Hagens Berman Sobol & Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Tel: (617) 482-3700

Linda P. Nussbaum (D.C. Bar No. 483254)
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
150 East 52nd Street, 30th Floor
New York, NY 10022
Tel: (212) 838-7797
Fax: (212) 838-7745

***Counsel for Plaintiff American Sales Company, Inc.***