IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MEIJER, INC., MEIJER DISTRIBUTION, INC.,
LOUISIANA WHOLESALE DRUG CO., INC.,
ROCHESTER DRUG CO-OPERATIVE, INC.,
VALLEY WHOLESALE DRUG COMPANY,
INC., AMERICAN SALES COMPANY, INC., SAJ
DISTRIBUTORS, INC., and STEPHEN L.
LaFRANCE HOLDINGS, INC.,

On behalf of themselves and all others
similarly situated,

                Plaintiffs,

v.

WARNER CHILCOTT HOLDINGS COMPANY
III, LTD., WARNER CHILCOTT
CORPORATION, WARNER CHILCOTT (US)
INC., WARNER CHILCOTT COMPANY, INC.,
GALEN (CHEMICALS), LTD., and BARR
PHARMACEUTICALS, INC.,

                Defendants.

No. 05 Civ. 2195 (CKK)

DECLARATION OF JEFFREY J. LEITZINGER, PH.D.

Econ One Research, Inc.

July 14, 2006

5th Floor
601 W. 5th Street
Los Angeles, California 90071
(213) 624-9600
fax: (213) 624-6994

Suite 2825
Three Allen Center
333 Clay Street
Houston, Texas 77002
(713) 228-2700
fax: (713) 228-3296

Suite 1170
1215 K Street
Sacramento, California 95814
(916) 449-2860
fax: (916) 449-2870

Suite 230
106 E. 6th Street
Austin, Texas 78701
(512) 476-3711
(512) 476-9712

## I.    Introduction and Qualifications

I am an economist and President of Econ One Research, Inc., an economic research and consulting firm with offices in Los Angeles, Sacramento, Austin, and Houston. I have masters and doctoral degrees in economics from UCLA and a bachelor's degree in economics from Santa Clara University. While at UCLA, one of my areas of concentration was industrial organization, which involves the study of markets, competition, antitrust and other forms of regulation.

During the past 25 years of my professional career, industrial organization has remained the principal focus of much of my work. I have worked on numerous projects relating to antitrust economics, including analyzing issues involving market power, market definition, and the competitive effects of firm behavior. I also have frequently assessed damages resulting from anticompetitive conduct and have substantial experience in the calculation of damages in class action litigation. Additionally, I have significant experience with economic issues related to class certification in antitrust contexts.

I have testified as an expert economist in state and federal courts and before a number of regulatory commissions. A more detailed summary of my training, past experience and prior testimony is shown in Exhibit 1.

With respect to the pharmaceutical industry, I am familiar with the economic and academic literature on the subject of generic competition and impaired generic competition. I also have specific experience making economic assessments of the effects of AB-rated[1] generic competition in pharmaceutical markets. For instance, I have previously analyzed impact and damages issues, as well as issues relating to the allocation of aggregate damages to individual class members, in a number of antitrust cases that involve allegations very similar to this case -- *i.e.*, class actions involving direct purchasers of brand-name drugs who were overcharged as a result of impaired generic competition.

For example, in *In re: Relafen Antitrust Litigation*, Master File No. 01-12239-WGY (D. Mass.), I submitted three reports in which I (i) evaluated market power under Section 2 of the Sherman Act, as well as relevant market issues, (ii) estimated aggregate overcharge damages to the direct purchaser class, and (iii) rebutted arguments made by the defense expert relating to class certification. The court granted class certification, and the Relafen direct purchaser class ultimately settled their claims for $175 million. For purposes of

---

[1] "AB-rated" is a term the United States Food and Drug Administration ("FDA") uses to classify generic drug products that have been found to be therapeutically equivalent to the branded counterpart. An AB-rated generic may be freely substituted for its branded counterpart at the pharmacy level without the prescribing physician's permission in most states. The FDA lists such substitutable drugs in its "Orange Book," the formal title of which is *Approved Drug Products With Therapeutic Equivalence Indications*. "Therapeutically equivalent" is a technical term for products that meet certain criteria including safety and efficacy, "pharmaceutical equivalence," "bioequivalence," labeling and manufacturing standards. The definitions of therapeutic equivalence, pharmaceutical equivalence, and bioequivalence are listed in Sections 1.2 and 1.7 of the FDA's "Orange Book". The "Orange Book" can be found at http://www.fda.gov/cder/orange/default.htm.

this settlement, I submitted a report setting forth the damages methodology I employed, an allocation methodology and the results based upon application of my proposed methodologies to the claimant data. The damages and allocation methodologies and results were approved by the court.

In the *Cardizem* case (*In re: Cardizem CD Antitrust Litigation*, MDL No. 1278 (E.D. Mich.)), I prepared an analysis of aggregate, class-wide damages incurred by a class of direct purchasers for purposes of mediation and settlement. The direct purchaser class (which was certified by the court) settled their claims for $110 million. I also prepared an analysis regarding the allocation of settlement proceeds among class members. The court approved this analysis.

I performed a similar role in the *Buspirone* case (*In re: Buspirone Patent & Antitrust Litigation*, MDL No. 1413 (S.D.N.Y.)). In connection with the $220 million settlement of the direct purchaser class claims in this case, I prepared a report analyzing aggregate damages to the direct purchaser class and proposed a damages allocation method. This report was submitted to the court in support of the motion to approve the class settlement and proposed allocation plan and was approved as fair and reasonable.

In *In re: Remeron Direct Purchaser Antitrust Litigation*, No. 03-CV-0085 (D.N.J.), I submitted a report in support of class certification. The class certification issues I addressed included (i) the likely impact of a delay in generic competition on a class of direct purchasers of the branded antidepressant

- 3 -

Remeron, (ii) the availability of economic methodologies and evidence common to all class members that would demonstrate impact in the form of overcharges, and (iii) whether overcharge damages could be calculated on a class-wide, aggregate basis using reliable methodologies. I also submitted an expert report addressing the issues of monopoly power, market definition, and aggregate overcharge damages, and a rebuttal report on those subjects. Finally, I submitted a proposed allocation plan to the court in support of settlement. In Remeron, the direct purchaser class claims were settled for $75 million and the court approved my damages and allocation methodologies as fair and reasonable. See Exhibit 1 for a more detailed list of my work in the pharmaceutical industry.

Econ One is being compensated for the time I spend on this matter at my normal and customary rate of $525 per hour. Econ One also is being compensated for time spent by my research staff on this project at their normal and customary hourly rates.

## II.     Factual Overview

I understand that the Complaint[2] in this matter was filed by Meijer, Inc. and Meijer Distribution, Inc., Louisiana Wholesale Drug Company, Inc.,

---

[2] The Complaint to which I refer is dated April 14, 2006, and is entitled "Amended Class Action Complaint." I shall refer to it hereinafter as the "Complaint."

Rochester Drug Co-Operative, Inc., Valley Wholesale Drug Company, Inc., American Sales Company, Inc., SAJ Distributors, Inc. and Stephen L. LaFrance Holdings, Inc. ("Plaintiffs"), on behalf of themselves and a class of direct purchasers of the drug Ovcon 35 (the "Class")[3], a prescription oral contraceptive, against Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (US) Inc., Warner Chilcott Company, Inc., Galen (Chemicals), Ltd. (collectively "Warner Chilcott") and Barr Pharmaceuticals, Inc. ("Barr") (collectively "Defendants").

Warner Chilcott is the only manufacturer selling Ovcon 35 products[4] in the United States despite the fact that Ovcon 35 is not subject to patent protection.[5] Warner Chilcott has sold Ovcon 35 in the United States since it purchased the rights from Bristol-Meyer Squibb Company ("BMS") in early 2000.[6] In 2005, Warner Chilcott's Ovcon 35 sales were approximately $93.5 million.[7]

---

[3] The "Class" is defined in the Complaint as: "All persons or entities in the United States who purchased Ovcon [35] directly from Warner Chilcott at any time from April 22, 2004, through the present and continuing until the effects of Defendants' anticompetitive conduct have ceased." The Class excludes "Defendants, and their officers, directors, employees, subsidiaries, or affiliates, and all governmental entities." Complaint ¶ 61.

[4] "Ovcon 35 products" are oral contraceptives that contain a specific formulation of 0.035 mg of ethinyl estradiol and 0.4 mg of norethindrone. These products consist of Warner Chilcott's non-chewable brand-name drug Ovcon 35 and any AB-rated generic equivalents, including Barr's generic version, Balziva.

[5] Complaint ¶¶ 32, 35; Warner Chilcott Corporation Form S-4, p. 88, July 15, 2005.

[6] Under this agreement, BMS supplies Warner Chilcott with Ovcon 35. Complaint ¶ 34.

[7] IMS Health ("IMS"). IMS provides market data that tracks sales of prescription drugs measured in dollars and units.

Barr is a generic drug manufacturer that developed a bioequivalent generic version of Ovcon 35. Barr's Abbreviated New Drug Application ("ANDA") for generic Ovcon 35 was approved by the FDA on or about April 22, 2004.[8] Prior to the conduct at issue in this case, internal Barr documents reflect

REDACTED

Plaintiffs allege, however, that in exchange for approximately $20 million, Barr entered into an anticompetitive agreement with Warner Chilcott not to enter the United States market with its generic Ovcon 35 product for a period of five years (the "Agreement").[11] This Agreement, Plaintiffs allege, was an illegal restraint of trade that has deprived Class members of the "benefits of free and open competition" in their purchases of Ovcon 35 products.[12]

---

[8] Orange Book.

[9] The generic penetration rate is the portion of total sales that the generic captures from the brand.

[10] BARR-000-0555-0556; BARR-00-00631-650; BARR-00-00609-612.

[11] Complaint ¶¶ 49-56.

[12] Complaint ¶ 60.

III.    **Assignment**

I have been asked to form an opinion about the likely impact of Defendants' conduct on prices Class members paid for Ovcon 35 products. I also have been asked to determine whether the existence of that impact as to all (or nearly all) Class members will be demonstrable without need for individualized inquiry as to the circumstances of individual Class members. Finally, I have been asked to determine whether overcharge damages can be calculated for the Class as a whole on an aggregate basis using a reliable methodology.

I have reviewed the Complaint, documents produced in discovery by Warner Chilcott and Barr, publicly available data and sales data provided by Warner Chilcott and IMS. A list of the materials I and/or my staff have reviewed is attached as Exhibit 2. As discovery is ongoing, I intend to continue to review documents and data as they are made available.

IV.    **Summary of Conclusions**

I have concluded:

1.    The benefits (*i.e.*, lower prices and/or higher discounts) associated with generic competition are predictable, substantial and market-wide. As a result, the antitrust impact associated with anticompetitive behavior directed at

delaying or preventing generic competition lends itself naturally to class-wide analysis.

2.      There is a well-documented history surrounding the competitive effects of unimpeded generic competition in pharmaceutical markets generally. This history is reflected in: 1) extensive scientific literature regarding the pricing effects of generic competition; 2) Defendants' internal analyses concerning [ REDACTED ] and 3) pricing data showing the experience in dozens of other pharmaceutical markets following generic entry. All of this evidence is common to members of the proposed Class.

3.      Generic competition causes price reductions. As a result, substantial numbers of customers/patients switch their purchases from the brand-name drug to the AB-rated generic equivalent. Direct purchasers, in turn, must buy the generic equivalent (at lower prices) to meet this demand, and be able to supply the customers/patients with the generic equivalent. Accordingly, generic competition (or impaired generic competition) will necessarily impact all or almost all direct purchasers.

4.    Proof of impact from the Defendants' conduct at issue in this action would consist of the above-mentioned evidence about the substantial size and market-wide scope of generic price impact, as well as evidence about the direct purchaser's role in the pharmaceutical distribution system and the relationship between market-wide changes in prices and purchase patterns.    This proof does not require individualized Class member inquiries.

5.    Having now performed similar analyses in more than half a dozen other matters involving impeded or delayed generic competition, I am confident that the calculation of aggregate overcharges for the Class in this case will be readily susceptible to formulaic analysis that does not require individualized inquiry as to each Class member.    In the course of my past work, I have had first-hand experience with economic models and methodologies that can reliably measure the aggregate overcharge to the Class -- methodologies that have been accepted by courts presiding over similar pharmaceutical class action cases.[13]

---

[13] See, e.g., In re: Cardizem CD Antitrust Litigation, MDL No. 1278 (E.D. Mich.); In re: Buspirone Patent & Antitrust Litigation, MDL No. 1413 (S.D.N.Y.); In re: Relafen Antitrust Litigation, Master File No. 01-12239-WGY (D. Mass.); In re: Remeron Direct Purchaser Antitrust Litigation, No. 03-CV-0085 (D.N.J.).

V.    **Ovcon 35 Products**

A.    **Warner Chilcott**

Ovcon 35, an oral contraceptive, has a combination of synthetic estrogen (ethinyl estradiol) and progesterone (norethindrone) in a particular ratio -- 0.035 mg of ethinyl estradiol and 0.4 mg of norethindrone. Ovcon 35 has been sold in the United States since the mid-1970s and is not subject to any patent protection.[14] Warner Chilcott began selling Ovcon 35 in the United States in early 2000 after purchasing the rights to Ovcon 35 and entering into a supply agreement with BMS.[15]

Internal documents show

REDACTED

Sales of Ovcon 35 in the United States grew from $28.5 million in 2000 to $93.5 million in 2005.[17]

Other internal Warner Chilcott

REDACTED

---

[14] Complaint ¶¶ 32.

[15] Complaint ¶ 34.

[16] WC00113396-428; WC00104901-908.

[17] IMS.

[18] WC00102212-235.

REDACTED

Warner Chilcott also developed a chewable form of Ovcon 35 ("Ovcon 35 Chewable") (which is discussed further in Section V.D. below). Ovcon 35 Chewable received FDA approval in November 2003,[20] but has yet to be sold by Warner Chilcott.

**B.    Barr**

Barr received FDA approval for its 0.4 mg norethindrone/.035mg ethinyl estradiol product ("generic Ovcon 35") in April 2004.[21]  Barr's product, called Balziva, is an AB-rated (defined above) generic version of Warner Chilcott's Ovcon 35.[22]  A press release by Barr indicates that it intended to market its generic Ovcon 35 product upon FDA approval if Warner Chilcott did not exercise its option under their Agreement.[23]

Internal documents indicate that

REDACTED

---

[19] I explain the reasons for this in Section VI. below.

[20] Orange Book.

[21] Orange Book.

[22] Orange Book.

[23] "Barr's Generic Ovcon-35 Tablets Approved," Barr Press Release, April, 23, 2004 (www.barrlabs.com).



These same internal documents show REDACTED However, Barr

has not brought its cheaper, generic product to market.

### C.    Generic Competition

In order to obtain an AB-rating from the FDA, a generic drug must be therapeutically equivalent to an existing FDA-approved branded product for that branded product's FDA-approved uses.  AB-rated generics provide the same efficacy and safety as their corresponding branded drugs, but at a lower price.  AB-rated generics play a critical (and unique) role in U.S. pharmaceutical markets, providing direct, price-related competition to branded drugs.

For AB-rated generics, most of the brand's market is susceptible to competitive (and often automatic) substitution.  State laws allow (and in some cases, require) pharmacists to switch patients who have a prescription for the brand product to AB-rated generics.[26]  Absent an AB-rating, the pharmacist must first ask and receive permission from a physician to make any contemplated switch to another drug.  Moreover, when a generic is AB-rated, managed care

---

[24] *See*, for example, BARR-000-0557-0561; BARR-000-0549-0553; BARR-00-00681-00704; BARR-00-00662-00674.

[25] *See*, for example, BARR-000-0555-0556; BARR-00-00631-650; BARR-00-00609-612.

[26] It is my understanding that in all 50 states, the pharmacist need not obtain the prescribing physician's permission to substitute an AB-rated generic even where the prescription is for the branded version of the drug (unless prescription is specifically written for "brand only").

entities routinely employ mechanisms that result in rapid and widespread substitution of the AB-rated generic for the brand.

Under the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Act"), generic drug manufacturers are allowed to file an ANDA, which permits these manufacturers to rely on basic research supporting the safety and efficacy of the original or "pioneer" version of the drug. This streamlined application process is designed to permit generic drugs to come to market in an expedited fashion. A separate ANDA is required for each dosage form of a drug entity.

**D.    Defendants' Agreement**

Barr filed an ANDA for its generic Ovcon 35 product in September 2001.[27] Plaintiffs allege that in order to forestall the competitive threat of Barr's generic product, Warner Chilcott devised a strategy to switch current users of Ovcon 35 to a new branded version of Ovcon 35, Ovcon 35 Chewable, before generic entry by Barr.[28] Prescriptions written for Ovcon 35 Chewable would not be able to be filled at pharmacies with Barr's generic Ovcon 35 product because Barr's generic version of the non-chewable Ovcon 35 product would not be AB-rated to Ovcon 35 Chewable.

---

[27] Complaint ¶ 37.

[28] Complaint ¶ 43.

By mid-2003, Warner Chilcott's strategy of switching users from Ovcon 35 to Ovcon 35 Chewable was in jeopardy because Barr's generic entry appeared imminent and Warner Chilcott's new drug, Ovcon 35 Chewable, had not yet been approved by the FDA.[29]

In August 2003, Barr and Warner Chilcott discussed potential terms under which Barr would not bring its generic product to market in competition with Ovcon 35.[30]  A Letter of Intent to enter into an agreement was signed by Warner Chilcott and Barr in September 2003.[31]   Under the terms of the agreement outlined in the Letter of Intent, Warner Chilcott would pay Barr $20 million if Barr did not market its generic Ovcon 35 in the United States for five years after it received FDA approval.[32]  Barr also agreed to be available to supply Warner Chilcott with Ovcon 35 if Warner Chilcott required a second supplier.[33]

On March 24, 2004, Defendants signed the Agreement outlined in the Letter of Intent and Warner Chilcott paid Barr $1 million.[34]  Barr received FDA approval for its generic Ovcon 35 product in April 2004, and Warner Chilcott paid

---

[29] Complaint ¶ 45.

[30] Complaint ¶ 48.

[31] Complaint ¶ 49.

[32] Complaint ¶ 49.

[33] Complaint ¶ 49.

[34] Complaint ¶ 50.

Barr $19 million in May 2004.[35]  According to Plaintiffs, this money was paid to Barr in exchange for Barr's agreement to keep its generic Ovcon 35 product off the market.[36]

Plaintiffs claim that Defendants' Agreement succeeded in impairing generic competition to branded Ovcon 35 by delaying the market entry of a competing generic Ovcon 35 product, and thereby depriving the Class of the "benefits of free and open competition."[37]

## VI.    Antitrust Impact

One key economic impact of conduct that blocks or delays generic competition is that prices paid for the branded product remain at artificially high levels sustainable by an absence of AB-rated generic competition.  By blocking AB-rated generic alternatives, the branded product prevents substitution to a lower-priced generic.  This also eliminates any need for competitive price reactions by the brand.  As a result, direct purchasers incur overcharges.

I expect that all (or nearly all) of the proposed Class members here experienced some amount of overcharge due to the delay in generic competition to Ovcon 35.  My conclusion in this regard is grounded in two observations

---

[35] Orange Book; Complaint ¶ 54.

[36] Complaint ¶ 54.

[37] Complaint ¶ 60.

- 15 -

recognized by the empirical evidence and economic literature cited herein about generic competition and the pharmaceutical industry. First, generic competition is a broad and powerful instrument in lowering prices. Typically, within a relatively short time period, unfettered generic competition converts the vast majority of the market to generic products priced at less than a third of what the brand used to command. The remaining few buyers that continue to buy the brand often do so because they are offered substantial discounts.

Second, the Class members in this case are, for the most part, middlemen and/or resellers in the drug distribution system supplying broad cross-sections of the patient community. The substitution and price reductions that generic competition triggers throughout the market invariably affect the purchases of the customers/patients the direct purchasers supply (with substantial numbers of patients/customers substituting the generic for the brand). In order to meet the demand of the customers/patients, direct purchasers must buy generic product. They also purchase highly discounted brand volumes for the limited numbers of their customers that continue to buy the brand.

Having now been involved in a number of pharmaceutical cases involving delayed generic competition, I have yet to see an instance in which there was a material number of direct purchasers that were not generic customers, or would not have been generic customers had that competition been

unimpeded, or that did not receive substantial price discounts from the brand in exchange for remaining loyal brand customers.

Class-wide proof of this impact would include the following types of evidence.

### A.    Economic Literature and Empirical Evidence Regarding the Effects of Generic Competition

There is an extensive body of published research concerning the effects of generic competition in pharmaceutical markets. The principal conclusions of this research are that AB-rated generic products: (1) enter the market at substantially lower prices than their branded counterparts; and (2) capture a significant share of the combined product (brand and AB-rated generic) unit sales. Several studies also have found that the price differential between the generic and the corresponding brand, as well as the generic's share of sales, increase over time. Recent work further demonstrates that generic competition produces lower net prices for the brand as well.

Some of the studies that comprise this research include:

1.    U.S. Food and Drug Administration, *The Pediatric Exclusivity Provision: January 2001 Status Report to Congress*, January 2001.

2.    Kirking, D.M., F.J. Ascione, C.A. Gaither, and L.S. Welage, *Economics and Structure of the Generic Pharmaceutical Industry*, Journal of the American Medical Association, 41, 578-584, 2001 ("Kirking, *et al.* (2001)").

3.    Congressional Budget Office, *How Increased Competition from Generic Drugs has Affected Prices and Returns in the Pharmaceutical Industry*, July 1998 ("CBO Study").

- 17 -

4.  Bae, J. B., *Drug Patent Expirations and the Speed of Generic Entry*, Health Services Research, Vol. 32, No. 1, pp. 87-101, April 1997.

5.  Frank, R. and D. Salkever, *Generic Entry and the Pricing of Pharmaceuticals,* Journal of Economics and Management Strategy, v. 6, no. 1, Spring 1997, pp. 75-90 ("Frank and Salkever (1997)").

6.  Grabowski, H. and J. M. Vernon, *Longer Patents for Increased Generic Competition in the US*, PharmacoEconomics, v. 10, suppl. 2, 1996, pp. 110-123 ("Grabowski and Vernon (1996)").

7.  Suh, Dong Churl, *Effect of Multiple Source Entry on Price Competition After Patent Expiration in the Pharmaceutical Industry,* Health Services Research, 35:2, June 2000.

8.  Office of Technology Assessment, *Pharmaceutical R&D: Costs, Risks and Rewards,* OTA-H-522, February 1993.

9.  Grabowski, H. and J. M. Vernon, *Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act,* Journal of Law and Economics, v. XXXV, October 1992, pp. 331-350 ("Grabowski and Vernon (1992)").

10. Caves, Richard E., Michael D. Whinston, and Mark A. Hurwitz, *Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry*, Brookings Papers on Economic Activity: Microeconomics, 1991, pp. 1-66.

11. Wiggins, Steven N. and Robert Maness, *Price Competition in Pharmaceuticals: The Case of Anti-Infectives*, Economic Inquiry, 2004 ("Wiggins and Maness (2004)").

12. Reiffen, David and Michael Ward, *Generic Drug Industry Dynamics*, The Review of Economics and Statistics, February 2005, 87(1): 37-49.

The 1998 CBO Study offers a comprehensive look at the economic effects of generic competition. This study used a large data set, representing about 70 percent of all prescription drugs sold through United States retail pharmacies in 1994. The data set included 21 drugs that faced generic

- 18 -

competition between 1991 and 1993. The study found that, "[d]uring the first full calendar year in which those 21 drugs faced generic competition. . . [g]enerics . . . cost one-fourth less than the brand-name drugs, on average, at retail prices."[38]

The CBO Study also calculated average retail prices for generic and brand pharmaceuticals in 1994. The study reported that the average retail price for a single source drug (*i.e.*, a branded drug with no generic equivalent) was $53.80 versus $17.40 for a generic drug, a difference of over 65 percent.[39]

A study by Grabowski and Vernon (1996) compared prices of brand drugs whose patents expired between 1984 and 1991 (the data continued through 1993). The authors found that within one year following generic entry, the generic price fell to less than 50 percent of the brand price. After two years of generic competition, the generic price in each case was less than 40 percent of the brand.

A more recent study by Kirking, *et al.* (2001), reported that the differential between average generic and average brand prescriptions had increased:

> In 1993 the average cost for a brandname prescription was about 275% higher than the average generic ($35.28 versus $12.82). (cite omitted) By 2000 this difference had grown to nearly 340% ($65.29 versus $19.33) (p. 579).

---

[38] CBO Study, p. 28.

[39] CBO Study, p. 15.

These studies also show that once generic competition begins, a large portion of the market quickly switches over to the generic product. Within its data set of 21 drugs that faced generic competition between 1991 and 1993, the CBO found that within the first year, generics captured on average 44 percent of the prescriptions.[40]

Moreover, the rate of generic penetration has increased over time. Grabowski and Vernon (1996), using the same three time periods discussed above, found that after 1 year of entry the generic share of unit sales was:

| 1984-1985 | 32 percent |
| 1986-1987 | 38 percent |
| 1989-1991 | 41 percent |
| 1991-1992 | 61 percent |

The 1991-1992 data also showed that within 18 months following entry, the generic share reached 72 percent of the unit sales of the brand and its generic equivalents. The authors concluded that:

---

[40] CBO Study, p. 28.

> Our analysis of major new drugs coming off patent
> indicates that the extent of generic competition has
> continued to accelerate in recent years. In particular,
> drugs that have come off patent since 1991
> experienced unit sales losses to generics of over 50%
> during the first several months of generic competition.
> This is a much more rapid rate of loss to generics
> than was observed for similar drugs coming off patent
> between 1984 and 1989. [cite omitted][41]

One additional subject that has frequently been addressed in these studies is the effect of generic entry on prices for the brand. Some early work (Grabowski and Vernon (1992), Frank and Salkever (1997)) observed that even in the face of generic entry, average brand prices continued to increase. However, Grabowski and Vernon (1992) found evidence that for some drugs the rate of brand price growth slowed with generic entry. A more recent study by Wiggins and Maness (2004) found that brand prices decrease upon generic entry.

One difficulty with the early work is that it centered on prices drawn from commercially-available data that did not capture all discounts (when compared to the confidential manufacturer transactional data to which I have been given access in numerous cases). The net price paid by direct purchasers for the brand depends both on the starting list price and the discounts they receive. Working with data including discount levels, the CBO Study found that, "[a] statistical analysis of pharmaceutical prices shows that purchasers tend to

---

[41] Grabowski and Vernon (1996), p. 121.

obtain higher discounts from manufacturers on brand-name drugs when generic substitutes are available[.]"[42] The CBO Study concluded that when two or more generic manufacturers were competing with a brand, discounts off the brand price were 10 to 17 percent greater.[43] The CBO Study concluded that "[o]n a selective basis . . . manufacturers of brand name drugs do offer discounts and rebates to some purchasers, and those discounts tend to be larger when generic versions of the drug are available."[44]

Overall, this literature clearly establishes that, upon their entry into the market, AB-rated generic drugs sell at a substantial discount to brand drugs and that the generic price advantage generally continues to grow over time until an equilibrium point is reached. This literature also demonstrates that AB-rated generic products, when not competitively impaired, capture significant unit sales, and hence market share, from their equivalent brand-name products following the inception of generic competition -- exactly the sort of powerful substitution effect between AB-rated generics and their corresponding brand-name drugs that Plaintiffs allege has been blocked.[45] Recent literature notes that purchasers are often able to obtain substantially larger discounts and rebates on brand-name drugs following generic entry.

---

[42] CBO Study, p. 24.

[43] CBO Study, p. 29.

[44] CBO Study, p. 35.

[45] Complaint ¶¶ 79 -80.

This literature is evidence that is common to all members of the Class.

**B.    The Defendants' Internal** 

As reflected in their internal documents, REDACTED By contrast to what has actually happened in this market, these ⬚ offer another common source of evidence that can be used to prove the class-wide impact of Defendants' actions.

**1.    Warner Chilcott**

For instance, REDACTED

---

[45] WC00127992-030.

[47] WC00118596-599.

REDACTED

---

[48] WC00138855-889.

REDACTED

2.     Barr

Barr also

---

[49] WC00127992-030.

[50] WC00109161; WC00126884-885.



Thus, to
the extent Defendants were able to exclude generic Ovcon 35 from the market,

they were able to forestall these competitive effects. That is to say, through the

Agreement, Defendants were able to force Class members to pay substantial

overcharges. This evidence is common to members of the Class.

---

[51] BARR-000-0557-BARR-000-0561.

[52] BARR-00-00609-BARR-00-00612.

[53] BARR-000-0554.

C.    **Data Reflecting The Effects of Generic Competition on Other Branded Drugs**

Another way to show the market effects of generic competition is through pricing data (published by IMS) for a variety of brand products that have experienced generic competition.[54]  Those data provide a rich laboratory in which the effects of generic entry can be tracked first-hand.

REDACTED

[55]    One can use IMS data to compare and contrast the experience of other drugs facing unimpeded generic competition with the Ovcon 35 experience reflected in Defendants' transactional data (produced in this case) for the allegedly affected period.  Indeed, one could look to

REDACTED

D.    **The Economic Role of Direct Purchasers**

REDACTED

These entities all supply broad cross-sections of the patient community.

---

[54] Indeed, IMS data has been frequently relied upon in the economic literature cited above.

[55]

REDACTED

As explained above, the impact of the conduct at issue in this case would have been to forestall what would otherwise have been a broad market-wide shift from branded Ovcon 35 to lower-priced AB-rated generic Ovcon 35 (through substitution of the generic for the brand), as well as to forestall the availability of increased discounts on those portions of Class members' Ovcon 35 product purchases that would have remained with the brand. In the (likely) event that the shift to AB-rated generics would have replaced 70%-80% of Warner Chilcott's Ovcon 35 prescriptions[56] then, purely as a matter of statistical probabilities, there is a very high likelihood that proposed Class members buying product directly for resale to various cross-sections of customers would have had at least some need (and likely a significant need) to purchase the AB-rated generics.[57]

Moreover, given the likelihood (based upon the past history of brand pricing responses to generic competition) that at least some of the branded Ovcon 35 that would have continued to be sold would have carried higher

---

[56] In my experience, these percentages are broadly consistent with actual experience when generic competition operates freely. REDACTED

[57] To illustrate, if every prescription has an independent 70% probability of becoming generic, the likelihood that a direct purchaser/reseller handling 1000 prescriptions would require no generic is $(.3)^{1000}$, which is well below one in a trillion. Even with 50 prescriptions, the probability is still less than one in a million. While the underlying independence assumption may not hold strictly, there is no reason to believe here that direct purchasers are segmented with respect to their customers in a way that would somehow align the direct purchasers with only non-generic customers (customers that would have only purchased the brand). In other words, it is extremely likely that all (or almost all) direct purchasers would have needed to supply some number of generic customers if generic Ovcon 35 had been available.

discounts, there remains a likelihood of antitrust impact even as to the unlikely direct purchaser that would not have purchased any generic in a fully competitive world.

Accordingly, this evidence about the economic role of class members, combined with the other evidence described above regarding the broad and deep market impact of unimpeded generic entry, would demonstrate that, with a high degree of likelihood, all or almost all Class members suffered antitrust impact. This evidence is common to the Class as a whole.

## VII.    Class-Wide Analysis of Damages

Plaintiffs claim that they and members of the Class were harmed by Defendants' allegedly unlawful conduct by paying more for Ovcon 35 products during the period in which generic competition was allegedly delayed by Defendants' Agreement not to compete, and for some period thereafter until the competitive process reaches the equilibrium it would have achieved had generic competition not been delayed.

The class-wide aggregate "overcharge" here stems from the following two sources. First, because of the delay in generic competition caused by Defendants' Agreement, Class members purchased higher-priced branded Ovcon 35 instead of the less-expensive AB-rated generic version of Ovcon 35. This elimination (or at least substantial suppression) of substitution of AB-rated

generics for brand is what I refer to as "Brand-Generic" or "BG" overcharges. The second source of overcharge is the failure of Class members to realize the effects of unimpeded generic competition on branded Ovcon 35 pricing. This reflects the difference between lower discounted branded Ovcon 35 prices that certain purchasers would have received given unimpaired generic competition versus actual prices paid for Ovcon 35 ("Brand-Brand" or "BB" overcharges).

These overcharges can be assessed readily through class-wide, aggregate damage models utilizing formulas and methodologies that do not require individualized analysis. Indeed, much of the same common evidence that I would rely upon to establish class-wide impact -- *i.e.*, the published literature, Defendants' REDACTED can be used to develop benchmarks for Ovcon 35 pricing and generic penetration had AB-rated generic competition not been delayed by the Defendants' Agreement.

I take further confidence in the ability to measure aggregate overcharges suffered by the Class members in this action given my experience in similar cases. Among others, I have analyzed overcharges for direct purchaser classes of the branded products Cardizem, Buspar, Relafen, and Remeron. In each of these cases, the aggregate damage analysis I performed served as the basis for the court's review and approval of class-wide settlements. My review of

- 30 -

the facts in this case reveals nothing to indicate that overcharges will not be similarly susceptible to class-wide measurement.

The method I have employed frequently in past cases (and the method I would apply here) to measure aggregate overcharges involves, first, the development of a benchmark for market performance -- the "but-for world" -- reflecting the world as it would have existed had generic competition not been restrained by Defendants' Agreement.  The next step is a comparison of the Class members' aggregate actual expenditures for the drug (including both branded and generic equivalent forms) and the expenditures they would have incurred in the but-for world.

One may develop the but-for world based upon empirical data from a comparable generic product, or a sampling of other branded drugs that have faced generic competition in the market.  One can also model the but-for world using an analysis keyed to one or more of Defendants' REDACTED  Either (or both) of these approaches is economically reasonable, reliable and feasible under the facts of this case.

After determining the benchmark, the next step involves ascertaining the sum of:  (1) the difference between the generic Ovcon 35 price Class members would have paid in the but-for world and the Ovcon 35 brand price actually paid by Class members, multiplied by the volume of generic substitution by the Class that was forestalled by the impairment of generic

competition; and (2) the difference between the discounted brand prices Class members would have paid in the but-for world had generic competition not been restrained and the actual Ovcon 35 brand price actually paid by Class members, multiplied by the branded volumes the Class would have continued to purchase after generic entry into the market.[58]

I am signing this Declaration under penalty of perjury.

7/14/06
Date

Jeffrey J. Leitzinger, Ph.D.

---

[58] Note that if generic Ovcon 35 comes to market during the pendency of this suit, damages for the inflated amounts paid by the Class for generic volumes attributable to unrealized generic price competition could be included. This is measured by the difference between the but-for and actual generic Ovcon 35 prices, multiplied by generic volume purchased.

**Exhibit 1**
**Page 1 of 13**



## Dr. JEFFREY J. LEITZINGER
*President*
Los Angeles, California
Tel: 213 624 9600

### EDUCATION

Ph.D., Economics, University of California, Los Angeles
M.A., Economics, University of California, Los Angeles
B.S., Economics, Santa Clara University

### WORK EXPERIENCE

*Econ One Research, Inc.*, President, July 1997 to date
Founded *Econ One Research, Inc.*, 1997

*Micronomics, Inc.*, President and CEO, 1994–1997
*Micronomics, Inc.*, Executive Vice President, 1988-1994
Cofounded *Micronomics, Inc.*, 1988

*National Economic Research Associates, Inc. 1980-1988*
(Last position was Senior Vice President and member of the Board of
Directors)

### ADMITTED AS AN EXPERT ECONOMIST TO TESTIFY ABOUT:

<u>*Relevant Markets and Competition*</u>

Before:     Federal Energy Regulatory Commission
                Superior Court, State of Alaska
                Superior Court, State of California
                Superior Court, State of Washington
                U.S. District Court, Central District of California
                U.S. District Court, Northern District of California
                U.S. District Court, District of Colorado
                U.S. District Court, Eastern District of Missouri
                U.S. District Court, Eastern District of Texas
                U.S. District Court, Western District of Texas
                U.S. District Court, District of Wyoming

<u>*Valuation, Economic Loss and Damages*</u>

Before:     Circuit Court, Mobile County, Alabama
                Civil Court, Harris County, Texas
                Civil Court, Midland County, Texas
                State of Alaska Department of Revenue
                Superior Court, State of California

**Dr. Jeffrey J. Leitzinger**                                      **Exhibit 1**
*President*                                                        **Page 2 of 13**

        U.S. Bankruptcy Court, District of Alaska
        U.S. Bankruptcy Court, Northern District of Texas
        U.S. District Court, State of Alabama
        U.S. District Court, Central District of California
        U.S. District Court, District of Colorado
        U.S. District Court, State of Louisiana
        U.S. District Court, Southern District of Mississippi
        U.S. District Court, District of North Dakota
        U.S. District Court, Eastern District of Texas
        U.S. District Court, Southern District of Texas
        U.S. District Court, Western District of Texas

*Patent and Intellectual Property Issues*

    *Before:*    Superior Court, State of Washington
                U.S. District Court, Northern District of California
                U.S. District Court, District of Colorado
                U.S. District Court, District of Connecticut
                U.S. District Court, Southern District of Texas

*The Economics of Regulated Industries*

    *Before:*    Alaska Public Utilities Commission
                California Energy Commission
                California Public Utilities Commission
                Federal Energy Regulatory Commission
                Nevada Public Service Commission
                Wisconsin Public Service Commission
                U.S. District Court, Northern District of Oklahoma
                U.S. District Court, Northern District of Texas

## INVITED PRESENTATIONS REGARDING:

What Can an Economist Say About The Presence of Conspiracy? *American Bar Association,* Section of Antitrust Law, The Antitrust Litigation Course, October 2003.

Lessons From Gas Deregulation, *International Association for Energy Economics,* Houston Chapter, December 2002.

A Retrospective Look at Wholesale Gas Industry Restructuring, *Center for Research in Regulated Industries,* 20th Annual Conference of the Advanced Workshop in Regulation and Competition, May 2001.

The Economic Analysis of Intellectual Property Damages, *American Conference Institute,* Sixth National Advanced Forum, January 2001.

Law and Economics of Predatory Pricing Under Federal and State Law, *Golden State Antitrust and Unfair Competition Law Institute,* 8th Annual Meeting, October 2000.

**Dr. Jeffrey J. Leitzinger**
*President*

**Exhibit 1**
**Page 3 of 13**

Non-Price Predation--Some New Thinking About Exclusionary Behavior, *Houston Bar Association*, Antitrust and Trade Regulation Section, October 2000.

After the Guilty Plea:  Does the Defendant Pay the Price in the Civil Damage Action (expert witness in mock trial presentation), *American Bar Association*, Section of Antitrust Law, 48th Annual Spring Meeting, April 2000.

Economics of Restructuring in Gas Distribution, *Center for Research in Regulated Industries*, 12th Annual Western Conference, July 1999.

A Basic Speed Law for the Information Superhighway, *California State Bar Association*, December 1998.

Innovation in Regulation: Section Discussant, *Center for Research in Regulated Industries*, 11th Annual Western Conference, July/September 1998.

Electric Industry Deregulation: What Does The Future Hold? *Los Angeles Headquarters Association*, November 1996.

Why Deregulate Electric Utilities?, *National Association of Regulatory Utility Commissioners*, November 1995.

Restructuring U.S. Power Markets: What Can the Gas Industry's Experience Tell Us?, *National Association of Regulatory Utility Commissioners*, July 1995.

Natural Gas Restructuring: Lessons for Electric Utilities and Regulators, *International Association for Energy Economics*, Los Angeles, California, May 1995.

Techniques in the Direct and Cross-Examination of Economic, Financial and Damage Experts, *The Antitrust and Trade Regulation Law Section of the State Bar of California and The Los Angeles County Bar Association*, 2ND Annual Golden State Antitrust and Trade Regulation Institute, Los Angeles, California October 1994.

Demonstration: Deposition of Expert Witnesses and Using Legal Technology, *National Association of Attorneys General*, 1994 Antitrust Training Seminar, Santa Fe, New Mexico, September 1994.

Direct and Cross Examination of Financial, Economic, and Damage Experts, *The State Bar of California, Antitrust and Trade Regulation Law Section*, San Francisco, California, May 1994.

Price Premiums in Gas Purchase Contracts, *International Association for Energy Economics*, Seattle, Washington, October 1992.

**Dr. Jeffrey J. Leitzinger**
*President*

**Exhibit 1**
**Page 4 of 13**

Valuing Water Supply Reliability, *Western Economic Association,* Natural Resources Section, San Francisco, California, July 1992.

Transportation Services After Order 636: "Back to the Future" for Natural Gas, Seminar sponsored by Jones, Day, Reavis & Pogue; Dallas, Texas, May 1992.

The Cost of An Unreliable Water Supply for Southern California, Forum presented by Micronomics, Inc., Los Angeles, California, May 1991.

Market Definition: It's Time for Some "New Learning," *Los Angeles County Bar Association,* Antitrust and Corporate, Law Section, Los Angeles, California, December 1989.

Market Definition in Antitrust Cases: Some New Thinking, *Oregon State Bar,* Antitrust Law Section, Portland, Oregon, March 1987.

Future Directions for Antitrust Activity in the Natural Gas Industry, *International Association of Energy Economists*; Houston, Texas, February 1987.

Information Externalities in Oil and Gas Leasing, Western Economic Association Meetings, Natural Resources Section, Seattle, Washington, July 1983.

Economic Analysis of Offshore Oil and Gas Leasing, *Western States Land Commissioners Association*; South Padre Island, Texas, December 1982.

## PUBLISHED ARTICLES

"A Retrospective Look at Wholesale Gas: Industry Restructuring," *Journal of Regulatory Economics,* January 2002.

"Balance Needed in Operating Agreements as Industry's Center of Gravity Shifts to State Oil Firms," *Oil & Gas Journal,* October 2000.

"What Can We Expect From Restructuring In Natural Gas Distribution?" *Energy Law Journal,* January 2000.

"Gas Experience Can Steer Power Away from Deregulation Snags," *Oil & Gas Journal,* August 1996.

"Anatomy of FERC Order 636: What's out, What's in," *Oil & Gas Journal,* June 1992.

"Antitrust II – Future Direction for Antitrust in the Natural Gas Industry," *Natural Gas,* November 1987.

"Information Externalities in Oil and Gas Leasing," *Contemporary Policy Issues,* March 1984.

"Regression Analysis in Antitrust Cases: Opening the Black Box," *Philadelphia Lawyer*, July 1983.

"Foreign Competition in Antitrust Law," *The Journal of Law & Economics*, April 1983.

## REGULATORY SUBMISSIONS

In the Matter of the Application of Southern California Gas Company Regarding Year Six (1999-2000) Under its Experimental Gas Cost Incentive Mechanism and Related Gas Supply Matters; A.00-06-023, Public Utilities Commission of the State of California, November 2001.

Sempra Energy and KN Energy, Incorporation; Docket No. EC99-48-000 (Affidavit and Verified Statement), Federal Energy Regulatory Commission, March/May 1999.

Rulemaking on the Commission's Own Motion to Assess and Revise the Regulatory Structure Governing California's Natural Gas Industry (Market Conditions Report), Public Utilities Commission of the State of California, July 1998.

In the Matter of the Application of Pacific Enterprises, Enova Corporation, et al. for Approval of a Plan of Merger Application No. A. 96-10-038, Public Utilities Commission of the State of California, August/October 1997.

In re: Koch Gateway Pipeline Company; Docket No. RP 97-373-000, Federal Energy Regulatory Commission, May/October 1997 and February 1998.

In the Matter of the Application of Sadlerochit Pipeline Company for a Certificate of Public Convenience and Necessity; Docket No. P-96-4, Alaska Public Utilities Commission, May 1996.

Public Funding of Electric Industry Research, Development and Demonstration (RD&D) Under Partial Deregulation, California Energy Commission, January 1995.

NorAm Gas Transmission Company; Docket No. RP94-343-000, Federal Energy Regulatory Commission, August 1994/June 1995.

Natural Gas Vehicle Program; Investigation No. 919-10-029, California Public Utilities Commission, July 1994.

Transcontinental Gas Pipe Line Corporation; Docket No. RP93-136-000 (Proposed Firm-to-the-Wellhead Rate Design), Federal Energy Regulatory Commission, January 1994.

**Dr. Jeffrey J. Leitzinger**
*President*

**Exhibit 1**
Page 6 of 13

In re: Sierra Pacific's Proposed Nomination for Service on Tuscarora Gas Pipeline; Docket No. 93-2035, The Public Service Commission of Nevada, July 1993.

Employment Gains in Louisiana from Entergy-Gulf States Utilities Merger, Louisiana Public Utilities Commission, December 1992.

Employment Gains to the Beaumont Area from Entergy-Gulf States Utilities Merger, Texas Public Utilities Commission, August 1992.

Transcontinental Gas Pipe Line Corporation; Docket No. RS 92-86-000 (Affidavit regarding Transco's Proposed IPS Service), Federal Energy Regulatory Commission, June 1992.

In Re: Pipeline Service Obligations; Docket No. RM91-11-000; Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations; Docket No. RM91-3-000; Revisions to the Purchased Gas Adjustment Regulations; Docket No. RM90-15-000, Federal Energy Regulatory Commission, May 1991.

In the Matter of Natural Gas Pipeline Company of America; Docket No. CP89-1281 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, January 1990.

In the Matter of United Gas Pipeline Company, UniSouth, Cypress Pipeline Company; Docket No. CP89-2114-000 (Proposed Certificate of Storage Abandonment by United Gas Pipeline Company), Federal Energy Regulatory Commission, December 1989.

In the Matter of Tennessee Gas Pipeline Company; Docket No. CP89-470 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, July 1989.

In the Matter of Take-Or-Pay Allocation Proposed by Mississippi River Transmission Corporation, Federal Energy Regulatory Commission, March 1988.

In the Matter of Natural Gas Pipeline Company of America; Docket No.RP87-141-000 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, December 1987.

In the Matter of Application of Wisconsin Gas Company for Authority to Construct New Pipeline Facilities; 6650-CG-104, Public Service Commission, State of Wisconsin, August 1987.

Trans-Alaska Pipeline System; Docket Nos. OR 78-1-014 and OR 78-1-016 (Phase 1 Remand), Federal Energy Regulatory Commission, October 1983.

Exhibit 1
7 of 13
Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
*Prior Testimony*
June 2002 – May 2006

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 1. | Louie Alakayak, et al., v. All Alaskan Seafoods, Inc., et al. | Superior Court for the State of Alaska, Third Judicial District | 3AN-9S-4676 Civil | Deposition Trial | November 1998 March 2003 May 2003 |
| 2. | Ronald Cleveland d/b/a Lone Star Videotronics, Ruben Loredo d/b/a Five Palms Video, et al. vs. Viacom, Inc., Blockbuster, Inc., Paramount Home Video, Inc., Buena Vista Home Entertainment, Inc., et al. | U.S. District Court for the Western District of Texas, San Antonio Division | Civil Action SA-99-CA-783-EP | Deposition Trial | October 2001 May 2002 June 2002 |
| 3. | In Re: Terazosin Hydrochloride Antitrust Litigation | U.S. District Court, Southern District of Florida | Case Nos. 98-3125 and 99-7134 | Deposition | January 2002 July 2002 February 2004 |
| 4. | Frederick L. Sample, et al., v. Monsanto Company, et al. | U.S. District Court, Eastern District of Missouri | Case No. 4:01cv65RWS | Deposition Hearing | July 2002 January 2003 April 2003 |
| 5. | Toronto Dominion (Texas), Inc., et al., v. PricewaterhouseCoopers LLP | State Court of Fulton County, State of Georgia | No. 00VS012679-F | Deposition | July 2002 |

Exhibit 1
8 of 13
Econ One Research, Inc.
Los Angeles, California

DR. JEFFREY J. LEITZINGER
*Prior Testimony*
June 2002 – May 2006

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 6. | Elliott Industries Limited Partnership, v. Conoco Inc., Amoco Production Company and Amoco Energy Trading Corporation | U.S. District Court, District of New Mexico | Cause No. CIV-00-655-JC-WWD-ACE | Deposition | July 2002 |
| 7. | Duramed Pharmaceuticals, Inc. v. Wyeth-Averst Laboratories, Inc. | U.S. District Court, Southern District of Ohio | No. C-1-00-735 | Deposition | August 2002 |
| 9. | Computer Access Technology Corporation, v. Catalyst Enterprises, Inc. | U.S. District Court, Northern District of California, Oakland Division | No. C 00-4852 DLJ | Deposition Trial | September 2002 November 2002 |
| 10. | ISP Tel, Inc. v. Lucent Technologies, Inc. | U.S. District Court, Northern District of California, Oakland Division | No. C 01-1390 CW (ARB) | Deposition | November 2002 |
| 11. | Synopsys, Inc. v. Nassda Corporation | U.S. District Court, Northern District of California, San Francisco Division | No. C-01-2519-SI | Deposition | November 2002 |

Exhibit 1
9 of 13
Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
*Prior Testimony*
June 2002 – May 2006

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 12. | The Goeken Group Corporation and In-Flight Phone Corporation v. McCaw Cellular Communications, Inc., Claircom Communications, L.P., and Hughes Network Systems, Inc. | The Circuit Court of DuPage County, Illinois, Eighteenth Judicial District | No. 93 CH 1065 | Deposition | June 2003 |
| 13. | In Re: Ciprofloxacin Hydrochloride Antitrust Litigation | U.S. District Court, Eastern District of New York | No. 1:00-MD-1383 | Deposition | July 2003 May 2004 |
| 14. | In Re: Scrap Metal Antitrust Litigation | U.S. District Court, Northern District of Ohio, Eastern Division | No. 1:02 CV 0844 | Deposition  Trial | August 2003 September 2004 January 2006 |
| 15. | KLA-Tencor Corporation v. Tokyo Seimitsu Co., Ltd., and TSK America, Inc. | U.S. District Court, Northern District of California, Oakland Division | No. CV01-2489 SBA | Deposition | August 2003 |
| 16. | In Re: Relafen Antitrust Litigation | U.S. District Court, District of Massachusetts | No. 01-CV-12239 (WGY) | Deposition | September 2003 December 2003 |

Exhibit 1
10 of 13
Econ One Research, Inc.
Los Angeles, California

DR. JEFFREY J. LEITZINGER
*Prior Testimony*
June 2002 – May 2006

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 17. | Francis Ferko, and Russell Vaughn, as Shareholders of Speedway Motorsports, Inc. v. National Association of Stock Car Auto Racing, Inc.; International Speedway Corporation; and Speedway Motorsports Inc. | U.S. District Court, Eastern District of Texas, Sherman Division | No. 4:02-CV-50 | Deposition | November 2003 |
| 18. | Chevron U.S.A., Inc. v. State of Louisiana, Louisiana State Mineral Board and Louisiana Department of Natural Resources | U.S. District Court, 17th Judicial District, Parish of Lafourche, Louisiana | Number 93,658 Division C | Deposition Trial | January 2004 March 2004 |
| 19. | Houston McLane Company, Inc. and Houston Regional Sports Network, L.P. v. Affiliated Regional Communications, Ltd. d/b/a/ Fox Sports Southwest | U.S. District Court, 333rd Judicial District, Harris County, Texas | Cause No. 2003-10943 | Deposition | March 2004 |
| 20. | Harry E. Stetser, Dale E. Nelson and Michael deMontbrun v. TAP Pharmaceutical Products, Inc., et al | State of North Carolina, New Hanover County, In The General Court of Justice, Superior Court Division | File No. 01CVS 5288 | Deposition | April 2004 |
| 21. | Masimo Corporation vs. Tyco Health Care Group L.P. and Mallinckrodt Incorporated | U.S. District Court, Central District of California, Western Division | Case No. CV-02-4770 | Deposition Trial | April 2004 March 2005 |

DR. JEFFREY J. LEITZINGER
*Prior Testimony*
June 2002 – May 2006

Exhibit 1
11 of 13
Econ One Research, Inc.
Los Angeles, California

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 22. | J.B.D.L. Corp. d/b/a Beckett Apothecary, et al v. Wyeth-Averst Laboratories, Inc., et al. | United States District Court, Southern District of Ohio, Western Division | Civil Action No. C-1-01-704 | Deposition | May 2004 November 2004 |
| 23. | Dewana G. Turner, Bonita H. Hixson, and Yolanda P. Monroe, on behalf of themselves and all others similarly situated v. Alaska Communications Systems Long Distance, Inc., and Alaska Communications Systems Group, Inc. | Superior Court for the State of Alaska, Third Judicial District at Anchorage | Case No. 3AN-01-7208 CI | Deposition | July 2004 |
| 24. | In Re: Remeron Direct Purchaser Antitrust Litigation | U.S. District Court, District of New Jersey | Master Docket No. 03-CV-0085 | Deposition | July 2004 |
| 25. | Louisiana Wholesale Drug Co., Inc. on behalf of itself and all others similarly situated, v. Schering-Plough Corporation, Upsher-Smith Laboratories, and American Home Products Corporation | U.S. District Court, District of New Jersey | MDL No. 1419 | Deposition | December 2004 |

Exhibit 1
12 of 13
Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
*Prior Testimony*
*June 2002 – May 2006*

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 26. | Pixton, Inc. v. Placeware, Inc. | U.S. District Court, Northern District of California | Case No. C 03 2909 SI | Deposition Trial | December 2004 February 2005 |
| 27. | Fran-Am Partnership, L.L.C. vs. Sports Car Club of America, Inc. and S.C.C.A. Enterprises Inc. | U.S. District Court, District of Colorado | Civil Action No. 02-Z-2060 (OES) | Deposition | January 2005 |
| 28. | In Re: Medical Waste Services Antitrust Litigation | U.S. District Court, District of Utah, Central Division | MDL No. 1546 | Deposition | April 2005 |
| 29. | Applied Medical Resources Corp. v. Ethicon, Inc., Ethicon Endo-Surgery, Inc., Johnson & Johnson Health Care Systems, Inc. and Novation, L.L.C. | U.S. District Court, Central District of California, Southern Division | Case NO. SACV 03-1329 JVS | Deposition | June 2005 |
| 30. | Brady Enterprises, Inc.; Charlotte J.Lopacki, d/b/a Budget Drug and Heritage Pharmacy, Inc.; On behalf of themselves and all others similarly situated and the Pharmacy Freedom Fund and the National Community Pharmacists Association v. Medco Health Solutions, Inc., and Merck & Co., Inc. | U.S. District Court, Eastern District of Pennsylvania | Civil Action No. 03-4730 | Deposition | July 2005 |

Exhibit 1
13 of 13
Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
*Prior Testimony*
June 2002 – May 2006

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 31. | The Regents of the University of California, a California public corporation, vs. Monsanto Company, a Delaware corporation | U.S. District Court, Northern District of California, San Francisco Division | Case No. C04-00634 PJH | Deposition | August 2005 |
| 32. | Dennis M. Devetter, ET AL., vs. Alex Brown Management Services, Inc., ET AL | In the Circuit Court for Baltimore City | Case No. 24-C-037514 | Deposition | January 2006 |
| 33. | Sky Technologies, LLC, vs. IBM Corporation and i2 Technologies, Inc. | U.S. District Court, Eastern District of Texas, Marshall Division | Case No. 2:03 CV 54-DF | Deposition | January 2006 |
| 34. | In Re: Nifedipine Antitrust Litigation | U.S. District Court, District of Columbia | MDL No. 151 | Deposition | May 2006 |

Exhibit 2

*Meijer, Inc., et al. v. Warner Chilcott Holdings Company III, LTD., et al.*
**List of Materials Reviewed**

*Includes all documents, studies and articles cited in the Declaration.*

<u>Pleadings, Orders</u>

    Consolidated Amended Class Action Complaint, January 27, 2006
    Amended Class Action Complaint, April 14, 2006

<u>Data - Electronic Files/CDs</u>

    **Warner Chilcott**
    WC Data 001

    **IMS Health**
    November 1999 - April 2006

<u>Documents (WC prefix)</u>

| | | |
|---|---|---|
| 00000001 | - | 00000010 |
| 00100000 | - | 00100001 |
| 00100009 | - | 00100059 |
| 00100091 | - | 00100348 |
| 00100368 | - | 00100389 |
| 00100410 | - | 00100495 |
| 00100528 | - | 00100535 |
| 00100539 | - | 00100544 |
| 00100558 | - | 00100570 |
| 00100576 | - | 00100587 |
| 00100596 | - | 00100619 |
| 00100666 | - | 00100671 |
| 00100673 | - | 00100678 |
| 00100727 | - | 00100741 |
| 00100795 | - | 00100826 |
| 00100828 | - | 00100837 |
| 00101141 | - | 00101156 |
| 00101247 | - | 00101248 |
| 00101275 | - | 00101306 |
| 00101328 | - | 00101843 |
| 00101850 | - | 00102018 |
| 00102073 | - | 00102076 |
| 00102096 | - | 00102105 |
| 00102140 | - | 00102153 |
| 00102176 | - | 00102198 |
| 00102199 | - | 00102235 |
| 00102256 | - | 00102257 |
| 00102314 | - | 00102316 |
| 00102318 | | |
| 00102320 | - | 00102327 |
| 00102344 | - | 00102353 |
| 00102389 | - | 00102414 |
| 00102484 | - | 00102527 |
| 00102603 | - | 00102604 |
| 00102818 | - | 00102851 |
| 00102866 | - | 00102891 |
| 00103113 | - | 00103139 |
| 00103189 | - | 00103284 |
| 00103325 | - | 00103333 |
| 00103336 | - | 00103341 |

**Exhibit 2**

*Meijer, Inc., et al. v. Warner Chilcott Holdings Company III, LTD., et al.*
**List of Materials Reviewed**

| | | |
|---|---|---|
| 00104254 | - | 00104255 |
| 00104460 | | |
| 00104627 | - | 00104655 |
| 00104681 | - | 00104720 |
| 00104901 | - | 00104951 |
| 00105209 | - | 00105221 |
| 00105768 | - | 00106044 |
| 00106052 | - | 00106082 |
| 00106228 | - | 00106246 |
| 00106263 | - | 00106310 |
| 00106855 | - | 00106991 |
| 00107107 | - | 00107119 |
| 00108665 | - | 00108720 |
| 00108850 | - | 00108851 |
| 00109055 | - | 00109436 |
| 00110625 | | |
| 00111305 | - | 00111329 |
| 00111338 | - | 00111341 |
| 00111344 | - | 00111581 |
| 00111623 | - | 00112440 |
| 00112460 | - | 00113266 |
| 00113396 | - | 00113428 |
| 00113489 | - | 00113490 |
| 00113551 | - | 00113564 |
| 00113578 | - | 00113582 |
| 00114178 | - | 00114180 |
| 00117245 | - | 00117248 |
| 00118482 | - | 00118483 |
| 00118592 | - | 00118599 |
| 00118741 | - | 00118742 |
| 00118748 | - | 00118751 |
| 00119149 | - | 00119151 |
| 00119189 | - | 00119206 |
| 00119233 | - | 00119257 |
| 00119575 | - | 00119609 |
| 00119894 | | |
| 00119899 | - | 00119923 |
| 00119943 | - | 00120028 |
| 00120091 | | |
| 00121374 | - | 00121381 |
| 00121632 | - | 00121636 |
| 00121641 | - | 00121907 |
| 00123927 | - | 00123995 |
| 00124538 | - | 00124551 |
| 00124557 | - | 00125089 |
| 00125097 | - | 00125127 |
| 00125168 | - | 00125171 |
| 00125203 | - | 00125206 |
| 00125223 | - | 00125241 |
| 00125255 | - | 00125257 |
| 00125272 | | |
| 00125287 | - | 00125310 |
| 00125322 | - | 00125344 |
| 00125365 | - | 00125372 |
| 00125394 | - | 00125402 |
| 00125406 | - | 00125431 |
| 00125441 | - | 00125457 |
| 00125794 | - | 00125811 |

Exhibit 2

*Meijer, Inc., et al. v. Warner Chilcott Holdings Company III, LTD., et al.*
List of Materials Reviewed

| | | |
|---|---|---|
| 00125851 | - | 00125860 |
| 00125916 | - | 00125935 |
| 00125949 | - | 00125954 |
| 00125961 | - | 00126002 |
| 00126004 | - | 00126045 |
| 00126051 | - | 00126060 |
| 00126064 | - | 00126077 |
| 00126107 | | |
| 00126158 | - | 00126176 |
| 00126180 | - | 00126183 |
| 00126233 | - | 00126242 |
| 00126251 | - | 00126260 |
| 00126268 | - | 00126277 |
| 00126451 | - | 00126469 |
| 00126470 | - | 00126507 |
| 00126529 | - | 00126558 |
| 00126559 | - | 00126622 |
| 00126626 | - | 00126628 |
| 00126645 | - | 00126707 |
| 00126871 | - | 00126895 |
| 00126987 | - | 00118589 |
| 00127264 | - | 00127271 |
| 00127274 | - | 00127403 |
| 00127425 | - | 00127452 |
| 00127527 | - | 00127536 |
| 00127626 | - | 00127659 |
| 00127681 | - | 00127696 |
| 00127701 | | |
| 00127747 | - | 00127770 |
| 00127992 | - | 00128085 |
| 00128112 | - | 00128164 |
| 00128189 | - | 00128302 |
| 00128357 | - | 00128474 |
| 00128486 | - | 00128650 |
| 00128897 | - | 00129459 |
| 00129499 | - | 00129501 |
| 00129595 | - | 00129631 |
| 00131296 | - | 00131476 |
| 00131587 | - | 00131597 |
| 00131602 | - | 00131691 |
| 00131708 | - | 00131720 |
| 00131774 | - | 00131778 |
| 00131799 | - | 00131836 |
| 00132051 | - | 00132096 |
| 00132218 | - | 00132242 |
| 00134193 | - | 00134245 |
| 00134418 | - | 00134482 |
| 00134541 | - | 00134598 |
| 00134678 | - | 00134698 |
| 00135486 | - | 00135499 |
| 00135529 | - | 00135540 |
| 00135862 | - | 00135891 |
| 00135893 | - | 00135896 |
| 00135947 | - | 00135954 |
| 00136269 | - | 00136309 |
| 00136319 | | |
| 00136325 | - | 00136326 |
| 00136331 | - | 00136332 |

Exhibit 2

*Meijer, Inc., et al. v. Warner Chilcott Holdings Company III, LTD., et al.*
List of Materials Reviewed

```
        00136355
        00136358   -   00136361
        00136368
        00136377   -   00136395
        00136447   -   00136459
        00136477   -   00136489
        00136492   -   00136495
        00136498   -   00136501
        00136505   -   00136527
        00136685   -   00136700
        00136817   -   00136828
        00136836
        00137741   -   00137743
        00137745   -   00137750
        00138352   -   00138383
        00138386   -   00138392
        00138527   -   00138567
        00138687   -   00138704
        00138706   -   00138715
        00138740   -   00138749
        00138785   -   00138827
        00138855   -   00138889
        00138895   -   00138896
        00138918   -   00138924
        00142405
        00142420   -   00142431
        00142437   -   00142438
        00142462   -   00142489
        00142550   -   00142624
        00143139   -   00143143
        00143145   -   00143150
        00212886   -   00212894
        00213006   -   00213076
     00138827.79   -   00138827.84
```

Documents (FTC-BMS- prefix)

```
        000001   -   000060
```

Documents (FTC-S&P- prefix)

```
        000001   -   000014
```

Documents (BARR -000- prefix)

```
        0543   -   0562
```

Documents (BARR -00- prefix)

```
        0225   -   0245
        00603  -   00708
```

Exhibit 2

*Meijer, Inc., et al. v. Warner Chilcott Holdings Company III, LTD., et al.*
List of Materials Reviewed

Documents (BARR-12 prefix)

        0284  -  0299

Documents (BARR-15 prefix)

        02412  -  02448
        03620  -  03622

Documents (BARR-45 prefix)

        00001  -  00002

Publicly Available Materials

U.S. FDA Orange Book, 24th Edition, www.fda.gov
Warner Chilcott Corporation, Form S-4, July 15, 2005
"FDA Approves Ovcon 35 as the First Chewable Oral Contraceptive Tablet for Women," FDA, 11/23/03
"Barr's Generic Ovcon-35 Tablets Approved," Barr Press Release, www.Barrlabs.com 4/23/2004
"Barr Confirms FTC Lawsuit Related to Generic Ovcon-35 License," Barr Press Release, www.Barrlabs.com, 11/7/05
"FTC Sues to Stop Anticompetitive Agreement in U.S. Drug Industry," FTC, 11/7/05
"Which Oral Contraceptive Pill is Best for Me?" Woman's Diagnostic Cyber, http://www.wdxcyber.com/ncontr13.htm
U.S. Food and Drug Administration, *The Pediatric Exclusivity Provision: January 2001 Status Report to Congress*
    January 2001
Kirking, D.M., F.J. Ascione, C.A. Gaither, and L.S. Welage, *Economics and Structure of the Generic Pharmaceutical
    Industry*, Journal of the American Pharmaceutical Association 41, 578-584, 2001
Congressional Budget Office, *How Increased Competition from Generic Drugs has Affected Prices and Returns
    in the Pharmaceutical Industry*, July 1998
Bae, J.B., *Drug Patent Expirations and the Speed of Generic Entry*, Health Services Research Vol. 32, No. 1,
    pp. 87-101, April 1997
Frank, R. and D. Salkever, *Generic Entry and the Pricing of Pharmaceuticals*,Journal of Economics and
    Management Strategy, v. 6, no. 1, Spring 1997, pp. 75-90
Grabowski, H. and J. M. Vernon, *Longer Patents for Increased Generic Competition in the US*,
    PharmacoEconomics, v. 10, suppl. 2, 1996, pp. 110-123
Suh, Dong Churl, *Effect of Multiple Source Entry on Price Competition After Patent Expiration in the
    Pharmaceutical Industry*, Health Services Research, 35:2, June 2000
Office of Technology Assessment, *Pharmaceutical R&D: Costs, Risks and Rewards*,OTA-H-522, February 1993.
Grabowski, H. and J. M. Vernon, *Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the
    1984 Drug Act*, Journal of Law and Economics v. XXXV, October 1992, pp. 331-350
Caves, Richard E, Michael D. Whinston, and Mark A. Hurwitz, *Patent Expiration, Entry, and Competition in the
    U.S. Pharmaceutical Industry*, Brookings Papers on Economic Activity: Microeconomics, 1991, pp. 1-66
Wiggins, Steven N. and Robert Maness, *Price Competition in Pharmaceuticals: The Case of Anti-Infectives*,
    Economic Inquiry, 2004
Reiffen, David and Michael Ward, *Generic Drug Industry Dynamics*, The Review of Economics and Statistics
    February 2005, 87(1): 37-49