## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MEIJER, INC., MEIJER DISTRIBUTION, INC.,
LOUISIANA WHOLESALE DRUG CO., INC.,
ROCHESTER DRUG CO-OPERATIVE, INC.,
VALLEY WHOLESALE DRUG COMPANY, INC.,
AMERICAN SALES COMPANY, INC., SAJ
DISTRIBUTORS, INC., and STEPHEN L. LaFRANCE
HOLDINGS, INC., on behalf of themselves and all
others similarly situated,

                    Plaintiffs,

    v.

WARNER CHILCOTT HOLDINGS COMPANY III,
LTD., WARNER CHILCOTT CORPORATION,
WARNER CHILCOTT (US) INC., WARNER
CHILCOTT COMPANY, INC., GALEN
(CHEMICALS), LTD., and BARR
PHARMACEUTICALS, INC.,

                  Defendants.

No. 05 Civ. 2195 (CKK)

ORAL ARGUMENT REQUESTED

## DIRECT PURCHASER CLASS PLAINTIFFS' RESPONSE TO BARR
## PHARMACEUTICAL'S MOTION TO COMPEL DISCOVERY

TABLE OF CONTENTS

Page

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.    DISCOVERY MUST BE RELEVANT AND NOT
      BURDENSOME OR OPPRESSIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   FEDERAL COURTS HAVE BARRED DISCOVERY OF
      "DOWNSTREAM" PURCHASER DATA AS LEGALLY
      IRRELEVANT AND OPPRESSIVE IN ANTITRUST
      ACTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.    Barr Seeks Wide-Ranging, Extremely Burdensome
            Data Irrelevant To Antitrust Actions By Direct
            Purchasers Seeking Overcharge Damages . . . . . . . . . . . . . . . . . . . . . 10

      B.    Federal Courts Routinely Deny Defendants' Attempts to take
            Downstream Discovery in Antitrust Cases Just Like This One . . . . . . . . 13

      C.    Barr's Justifications For Its Burdensome Discovery Lack Merit . . . . . . 15

            1.    The Requested Data is Irrelevant to Overcharge
                  Damage Calculations Given that Mitigation of
                  Damages with Downstream Effects is Expressly
                  Barred Under *Hanover Shoe/IllinoisBrick* and
                  Their Progeny . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            2.    Downstream Discovery is Not Needed to Allow
                  Defendants to Predict Demand in a "But-For" World . . . . . . . . . 17

      D.    Defendants' "Cost-Plus"/Fixed Quantity Argument Is Meritless . . . . . . 19

      E.    Whatever Relevance Downstream Sales Data Has to the Indirect
            Purchaser Case Is Far Outweighed by the Burden of Production . . . . . . 22

      F.    Valley Drug is Inapplicable, Wrongly Decided, and Does
            Not Support "Downstream Discovery" In This Case . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Terasozin Antitrust Litigation*,
　223 F.R.D. 666  (S.D. Fla. 2004) ..........................................................................................24

*In re Buspirone Patent & Antitrust Litigation*,
　210 F.R.D. 43 (S.D.N.Y. 2002) ....................................................................................4, 14, 21

*In re Cardizem CD Antitrust Litigation*,
　200 F.R.D. 297 (E.D. Mich. 2001) ....................................................................................4, 16

*Eastern Air Lines, Inc. v. Atlantic Richfield Co.*,
　609 F.2d at 497, 499 (Em. App. 1977) ..................................................................................20

*Food Lion, Inc. v. United Food & Commercial Workers International Union*,
　103 F.3d 1007 (D.C. Cir. 1997) ................................................................................................7

*\*Hanover Shoe v. United Shoe*,
　392 U.S. 481 (1968) ...............................................................................................7, 8, 21

*Illinois Brick Co. v. Illinois*,
　431 U.S. 720 (1977) .......................................................................................................... 9, 20

*Kansas v. Utilicorp United*,
　497 U.S. 199 (1990) ...............................................................................................................20

*Lee-Moore Oil v. Union Oil*,
　599 F.2d 1299  (4th Cir. 1979) ..............................................................................................16

*In re Lower Lake Erie Iron Ore Antitrust Litigation*,
　998 F.2d 1144 (3rd Cir. 1993) ................................................................................................16

*McCarthy v. Recordex Serv. Inc.*,
　80 F.3d 842 (3rd Cir. 1996) ...................................................................................................20

*In re Pressure Sensitive Labelstock*,
　226 F.R.D. 492 (M.D. Pa. 2005) ...........................................................................................14

*In re Relafen Antitrust Litigation*,
　218 F.R.D. 337 (D. Mass. 2003) ...................................................................................4, 14, 16

*Valley Drug v. Geneva Pharm*,
　350 F.3d 1181 (11th Cir. 2003) .............................................................................................23

*In re Vitamins Antitrust Litigation,
  198 F.R.D. 296 (D.D.C. 2000)............................................................3, 13, 17, 22, 23

In re Wirebound Boxes Litigation,
  131 F.R.D. 578 (D. Minn. 1990).................................................................................14

## UNPUBLISHED CASES

In re Hypodermic Product Direct Purchaser Litigation,
  MDL No. 1730 (JLL/RJH) (D.N.J. Sept. 7, 2006) ....................................................13

In re K-Dur,
  No. 01-cv-1652 (D.N.J. Mar. 24, 2005)......................................................................14

Louisiana Wholesale Drug v. Becton Dickinson,
  C.A. No. 05-cv-1602 (D.N.J. Oct. 17, 2005)........................................................13, 14

Lumco Ind. v. Jeld-Wen,
  No. 96-cv-2125 (E.D. Pa. May 16, 1997)...................................................................14

In re Polyester Stapled Antitrust Litigation,
  2005 WL 3766934 No. 3:03cv1516, (W.D. N.C. Feb. 5, 2004)................................14

In re Tricor Direct Purchaser Antitrust Litig.
  C.A. No. 05-340 (D. Del. Mar. 3, 2006) ......................................................12, 14, 23

## FEDERAL STATUTES

Fed. R. Civ. P. 26(b) ...........................................................................................................6

## MISCELLANEOUS

ABA Section of Antitrust Law, Proving Antitrust Damages:
  Legal and Economic Issues 193-94 .............................................................................16

Joshua P. Davis, David F. Sorensen, "Chimerical Class Conflicts in Federal
Antitrust Litigation: The Fox Guarding the Chicken House in Valley Drug,"
  39 U.S.F.L.R. 141 ......................................................................................................23

## INTRODUCTION

Plaintiffs are wholesalers and retailers of pharmaceutical products who filed this antitrust action on behalf of themselves and a proposed class of similarly situated entities that purchase the oral contraceptive Ovcon-35 directly from defendant Warner Chilcott Corp. ("Warner Chilcott").    Plaintiffs allege that, in violation of federal antitrust laws, Warner Chilcott paid defendant Barr Pharmaceuticals, Inc. ("Barr") not to sell a competing, generic version of Ovcon-35 ("Ovcon").[1]   Plaintiffs allege that defendants' conspiracy artificially inflated the price of the drug compound, forcing direct purchasers to pay higher prices for Ovcon products than they would have, had generic versions been sold.   As in several prior direct purchaser actions challenging efforts to impede generic competition, the direct purchaser plaintiffs here seek damages in the form of the overcharges (trebled) they paid, and continue to pay for, Ovcon products due to the challenged conduct in restraint of trade.

In an effort to shift attention away from its illicit agreement to exclude competition, defendant Barr seeks the production of extremely voluminous − yet utterly irrelevant − "downstream" sales and profitability data from the representative direct purchaser plaintiffs in this action.   Conceding that the requested discovery has no relevance to defendants' underlying liability in this case, Barr claims to need this information in order to perform some inexplicable, piecemeal damages calculation that Barr asserts − without any evidentiary support or elaboration − may somehow be relevant to the computation of damages in this case.   As shown below, for important public policy reasons, it is black-

---

[1] The term "Ovcon products" refers to oral contraceptives that contain a specific formulation of 0.035 mg of ethinyl estradiol and 0.4 mg. of norethindrone.   These products consist of Warner Chilcott's non-chewable brand-name drug Ovcon-35 and any actual or potential AB-rated generic equivalents, including Barr's generic version, Balziva.

letter law that a direct purchaser's overcharge damages are unaffected by what it does with the product **after** the initial purchase, and thus, the requested "downstream" data is irrelevant, protected from disclosure, and is certainly outweighed by the unnecessary burden such discovery would impose.

Barr's stated justification for requesting this irrelevant information is flawed in numerous respects. _First_, although downstream _resale_ data might be relevant in many other types of civil actions, under established antitrust case law, such "mitigation of damages" discovery is absolutely irrelevant in an action brought by a direct purchaser plaintiff pursuing a federal antitrust cause of action. In fact, as discussed below, it has long been held in cases like this one that such downstream discovery is not simply irrelevant, but its mere production and use is antithetical to the very purposes of federal antitrust laws.

For this reason, the United States Supreme Court and numerous other federal courts (including this one) have, for years, prohibited antitrust defendants from extracting exactly the type of voluminous and burdensome downstream discovery from injured direct purchasers that Barr now seeks to compel. _E.g., In re Vitamins Antitrust Litig._, 198 F.R.D. 296, 301 (D.D.C. 2000) (Hogan, J.) (_"Vitamins"_) ("no court has ever allowed production of individualized downstream data"). Barr simply chooses to overlook the overwhelming weight of authority denying antitrust defendants access to downstream purchaser discovery in its motion to compel responses to its downstream discovery requests that are particularly broad, exceptionally wide-ranging and highly burdensome.

_Second_, there is no reason to believe, beyond Barr's bald assertions, that information about downstream sales collected from a handful of direct purchasers would possibly produce _any_ usable information about the relevant market or class-wide damages.

Barr has not explained how the requested individual data would be used in such a damage analysis, nor has Barr submitted an expert declaration or any other support demonstrating any need for the requested information.  Instead, Barr simply asserts that the information is needed to perform unexplained damage calculations.

By contrast, the Declaration of economist Dr. Leitzinger (submitted with Plaintiffs' class certification briefing) described the process for calculating damages that has been used, time and again, by economists to calculate damages in antitrust cases involving impeded generic competition very similar to this one. *See, generally, Declaration of Jeffrey J. Leitzinger, Ph.D., dated July 14, 2006 ("Leitzinger Decl.")* at 29-32.[2]  The method, which has been repeatedly approved by federal courts,[3] utilizes upstream purchase data, *i.e.*, defendants' own sales data, which reflects the prices direct purchasers ***pay*** (and permits estimates of what they would have paid absent the challenged conduct).  In accord with binding Supreme Court precedent, the individualized downstream sales data Barr seeks has no place in such an analysis − or to challenge such analysis.  It is legally irrelevant.

*Third*, Barr's argument that the downstream sales data of a handful of representative direct purchasers would demonstrate "demand shifts" in the market that are somehow relevant to a damages determination is entirely disingenuous.  Market-wide data concerning "demand" is readily available through commercial subscription services, like IMS, that monitor trends in pharmaceutical sales and consumption on a nationwide basis.

---

[2] Given that the Leitzinger Declaration contains references to information that the Protective Order in this case seemingly requires to be submitted under seal, Plaintiffs have not resubmitted this document, which was submitted to the Court previously, as an exhibit to this Memorandum of Law.

[3] *See In re Relafen Antitrust Litig.*, 218 F.R.D. 337 (D. Mass. 2003); *In re Buspirone Patent & Antitrust Litig.*, 210 F.R.D. 43 (S.D.N.Y. 2002); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297 (E.D. Mich. 2001).

*See Leitzinger Decl.* at 27. Barr's suggestion that market-wide trends can be derived simply by examining the individual sales records, correspondence, and receipts of the few, named plaintiffs in this action is not credible or reasonable.

Moreover, Barr's supposed underlying hypothesis - that demand for a generic decreases following a generic's launch - is plainly contradicted by numerous governmental and academic studies that show that Barr's justification for the discovery, contradicts the well-known and accepted patterns of consumer behavior concerning the introduction of generic products on the market. *See, generally, Leitzinger Decl.* at 17-22 (citing the extensive body of governmental and academic research demonstrating that AB-rated generic products enter the market at substantially lower prices than their branded counterparts and capture a significant share of the combined product, thus reducing net prices).

Finally, Barr's arguments that the requested data is (i) discoverable under *Hanover Shoe's* extremely limited exception for "cost-plus/fixed quantity requirements contracts," or (ii) needed to defend against indirect purchaser suits are also easily dispatched. No court has ever found the "cost-plus/fixed quantity" exception to apply in a pharmaceutical antitrust case, or in ***any*** case of which we are aware. The extremely limited and largely theoretical exception requires a showing of a fixed price, fixed quantity contract, and there is absolutely no reason to believe that any direct purchaser of pharmaceuticals employs such contracts, and Barr has cited none. Courts have rejected both arguments when defendants in similar pharmaceutical antitrust actions have raised them in similar efforts to justify requests for relief from the downstream discovery prohibition.

In sum, and as described further below, defendant Barr's request for discovery: (a) has no basis in applicable law; (b) is unsupported by any evidentiary justification; and (c) is unduly harassing and burdensome.  Barr has proffered no legitimate reason for creating an exception to the prohibition on downstream discovery.  By contrast, as shown below, providing the requested information, which arguably implicates millions of pages of documentation and data from the direct purchasers' offices, would impose an extreme burden and cost upon the representative plaintiffs for no possible return.  *See Declaration of Laurence Doud* dated September 25, 2006 ("*Doud Decl.*") (attached as Ex. A). It is the epitome of discovery designed to harass and not inform.  Accordingly, Barr's Motion to Compel must be denied.

## ARGUMENT

### I.    DISCOVERY MUST BE RELEVANT AND NOT BURDENSOME OR OPPRESSIVE

For information to be discoverable under Rule 26 of the Federal Rules of Civil Procedure, requested discovery must be "relevant" to a claim or defense of a party and it must not be "unreasonably cumulative or duplicative" or "obtainable from some other source that is more convenient, less burdensome, or less expensive" and the "burden or expense of the proposed discovery [cannot] outweigh[] its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2).   The downstream discovery Barr seeks to compel does not satisfy any of these requirements.

The cases cited by Barr for the proposition that information is discoverable if there is "any possibility" that the information requested is relevant to some facet of the litigation,

do not support the defense's contention that the requested materials are discoverable. *See Barr Br.* at 7. Both cited cases, *Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*, 103 F.3d 1007, 1013 (D.C. Cir. 1997) ("[d]ocuments sought are not relevant to the subject matter of the underlying litigation and thus may not be discovered) and *Burlington Ins. Co. v. Okie Dokie, Inc.*, 368 F. Supp. 2d 85, 87 (D.D.C. 2005) (denying motion to compel discovery "irrelevant to the pending action"), support Plaintiffs' point that the massive amounts of irrelevant materials Barr seeks to compel should be barred from production. In both cases, this Court ***denied*** motions to compel information in response to discovery requests seeking information that was found to be marginally relevant to the underlying action. This Court recognizes the limits of discovery especially where a party seeks to go on a harassing fishing expedition for documents that are completely irrelevant to any claim or defense.

## II.    FEDERAL COURTS HAVE BARRED DISCOVERY OF "DOWNSTREAM" PURCHASER DATA AS LEGALLY IRRELEVANT AND OPPRESSIVE IN ANTITRUST ACTIONS

In order to encourage plaintiffs to prosecute antitrust violations, the Supreme Court has held that a direct purchaser is entitled to recover the "full amount" of any overcharges incurred by that purchaser, regardless of whether the purchaser gained or lost money reselling the product or service "downstream" to another buyer. *See Hanover Shoe v. United Shoe*, 392 U.S. 481, 494 (1968). Accordingly, inquiry into the direct purchaser's sales and profits is irrelevant to an antitrust action as a matter of law. What matters in an overcharge case is the sale by defendants to the direct purchaser — not what occurs further "downstream" in the chain of distribution.

In *Hanover* Shoe, the Supreme Court rejected the idea that a direct purchaser seeking overcharge damages must show that it suffered "lost profits":

> Our conclusion is that Hanover proved injury and the amount of its damages for purposes of its treble-damages suit when it provide that United had overcharged it during the damage period and showed the amount of the overcharge; United was not entitled to assert a passing-on defense.

392 U.S. at 494. The Court reasoned that if defendants were permitted to defend an overcharge claim by arguing that direct purchasers had "passed on" the overcharge to its own customers and, that therefore a direct purchaser's profits were unaffected, defendants would inevitably pursue complicated and expensive discovery concerning "pass on" or "downstream" issues – as Barr is attempting here. This would, in turn, vastly complicate private antitrust litigation, burdening the parties and courts with "massive evidence and complicated theories," and thereby diminishing the effectiveness of private antitrust suits as an important weapon in enforcing the nation's antitrust laws. *Id.* at 493-94.

Due to the burden and complexities inherent in tracing "downstream" effects, the Supreme Court stated that merely wading into these issues and computations would weaken enforcement, undermining the very purposes of the antitrust laws: "In consequence, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them. Treble-damage actions, the importance of which the Court has many time emphasized, would be substantially reduced in effectiveness." *Id.* Accordingly, the Supreme Court rejected the defense in *Hanover Shoe*, holding that only in extremely rare circumstances, a direct purchaser is injured by the full amount of the overcharge paid by it and an antitrust defendant is not allowed to introduce pass-on evidence that indirect

8

purchasers were in fact injured by the overcharge. The Supreme Court reaffirmed and clarified this holding in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977):

> a direct purchaser suing for treble damages under § 4 of the Clayton Act is injured within the meaning of § 4 by the full amount of the overcharge paid by it and [] **the antitrust defendant is not permitted to introduce evidence and indirect purchasers were in fact injured by the illegal overcharge.**

431 U.S. at 724-25 (emphasis added).

The established prohibition on downstream discovery makes perfect sense: Discovery concerning an overcharged direct purchaser plaintiff's downstream ***sales*** of a particular product to a third party or the ***profits earned*** by such a plaintiff from those sales are completely irrelevant to that plaintiff's claim that their supplier overcharged them for the product by violating antitrust laws. Allowing an antitrust defendant to require a direct purchaser plaintiff to produce voluminous data concerning its sales to third parties is nothing more than a pure harassment technique that serves no arguable purpose other than punishing a direct purchaser plaintiff for having the temerity to file suit. As such, downstream discovery is not sanctioned by the Federal Rules of Civil Procedure. The direct purchaser plaintiff's ***purchases*** of the products and the price ***paid*** by those plaintiffs to the defendant seller constitute the discoverable data in a direct purchaser's possession relevant to an antitrust analysis.

**A.** **Barr Seeks Wide-Ranging, Extremely Burdensome Data Irrelevant To Antitrust Actions By Direct Purchasers Seeking Overcharge Damages**

Despite controlling precedent expressly barring downstream discovery in precisely this type of case, defendant Barr seeks to compel the named direct purchaser Plaintiffs to produce massive amounts of irrelevant documentation and data relating to Plaintiffs' re-sales of oral contraceptives to their downstream customers. *See generally, Barr Pharmaceuticals, Inc.'s First Request for Production of Documents to Direct Purchaser Plaintiffs* (Ex. B) and *Barr Pharmaceuticals, Inc.'s First Set of Interrogatories to Direct Purchaser Plaintiffs* (Ex. C). Barr also seeks documentation concerning the relative profitability of Plaintiffs' downstream sales of these products and implicitly concedes that none of this information has any relevance whatsoever to the underlying merits of the lawsuit. Instead, Barr claims that this downstream discovery is needed to perform some unexplained mathematical computations that, it asserts, is somehow relevant to an assessment of damages in this case.

The data sought by Barr is exceptionally broad, wide-ranging and would be extremely burdensome to gather. For example, in Document Request No. 2, Barr seeks:

> All documents relating to your sales of Ovcon 35, including but not limited to pharmacy logs, customer lists, price lists, contracts, purchase orders, bills of lading, invoices, bills, checks received, receipts, and all other documents or data reflecting the amounts of Ovcon 35 you sold, the prices charged for Ovcon 35 you sold including all applicable rebates, discounts, chargebacks, offsets, and allowances, the amount of any insurance or other health benefit provider that covered any portion of the purchase price, the name of the insurance or other health benefit plan(s) that provided coverage, and the total amount the customer paid.

Interrogatory No. 4 seeks largely identical information in the form of an interrogatory.

Document Request 3 seeks greater detail about these irrelevant transactions; it seeks:

> All documents relating to the resale of Ovcon 35 by your direct or
> indirect customers, including all available information for each sale,
> such as the date and location of the transaction, the name of the
> customer, the quantity of Ovcon 35 sold and the price charged per
> unit, and the amount of any discounts, coupons, or rebates that the
> customer received.

Request No. 6 is even more intrusive, seeking what would amount to every scrap of

paper and all electronic data related to all of Plaintiffs' sales of all contraceptive

products to all of its downstream customers:

> All documents relating to how you decide which Combined
> Hormonal Contraceptives to sell and how to price Combined
> Hormonal Contraceptives, including (i) whether or not to stock
> both brand-name and generic versions of a given Combined
> Hormonal Contraceptive; (ii) whether or not to stock more than
> one generic version or label of a given brand-name product; (iii)
> whether or not to stock a generic Combined Hormonal
> Contraceptive but not its brand-name counterpart; (v) how much
> to charge for generic and brand-name oral contraceptives; and (vi)
> how much to differentiate between the prices charged for generic
> and brand-name versions of a given Combined Hormonal
> Contraceptive product.

These Requests, as well as the other discovery sought by Barr, are designed to

probe the direct purchasers' profitability and, as such, are absolutely irrelevant as a

matter of law under *Hanover Shoe,* since Plaintiffs are only seeking overcharge damages

and not lost profits, as Barr implies contrary to the Complaint in this matter. *See Barr Br.*

at 7 n. 2.

Aside from the irrelevance of this information to this antitrust case, producing the

requested data would require injured plaintiffs to expend a great deal of time, expense

and energy in gathering the requested data, which would arguably entail millions of pages

of documents and massive amounts of electronic data, for little if any benefit. *See Doud*

*Decl.* ¶ 5. Responding to Request Numbers 2, 3 & 6 or Interrogatory No. 4 – to say

11

nothing of Barr's other Requests and Interrogatories seeking additional forms of the downstream sales information at issue – would involve the expenditure of literally hundreds of hours of Plaintiffs' personnel's time. *Id.* Sorting through the mountain of data and documentation sought by Barr would disrupt Plaintiffs' day-to-day business operations for weeks. *See id.*; *see also Correspondence from Messrs Long (Cardinal Health), Huston (McKesson) and Bizar (AmerisourceBergen)* (discussing the overwhelming burden similar downstream discovery requests directed at direct purchaser plaintiffs in antitrust action involving delayed generic entry would impose).[4]

Not only do defendants maintain detailed transactional sales data of all Ovcon sales, but extensive information concerning national, market-wide sales of Ovcon (and other oral contraceptives) is available to defendants from subscription services such as IMS, to which defendants, like all major pharmaceutical companies, already subscribe. *See Leitzinger Decl. at 27.* Given the legal irrelevance of the requested discovery to this case, and the availability of alternate sources of data, the burden of gathering the requested downstream data clearly outweighs any marginal benefit to ordering its production.

---

[4] These letters were submitted to the district court *In re Tricor Direct Purchaser Antitrust Litig.* (C.A. No. 05-340 (KAJ) D. Del. March 3, 2006) (*"Tricor"*) and are attached as Exhibit D to this action. The letters were written by national pharmaceutical wholesalers who were class members, but not named Plaintiffs in the *Tricor* action. The *Tricor* defendants argued that these direct purchasers had a potential conflict of interest with other direct purchasers and that the requested downstream discovery was relevant to an indirect purchaser case. The *Tricor* court saw no possible conflict and had denied defendants' request for downstream discovery. *See Tricor* Hearing Transcript dated March 3, 2006 at 34 (attached as Ex. E).

**B.    Federal Courts Routinely Deny Defendants' Attempts to take
Downstream Discovery in Antitrust Cases Just Like this One**

Though defendants, like Barr, continue to ignore this black letter law, following
*Hanover Shoe* and *Illinois Brick*, courts in overcharge cases have repeatedly denied
antitrust defendants' attempts to take "downstream" discovery – including discovery into
the effect, if any, of defendants' overcharge on direct purchasers' sales, prices and
profits, and whether direct purchasers "passed on" the overcharge – because such
discovery has absolutely no bearing on an antitrust overcharge claim, or on any legally
cognizable defense.

In *Vitamins*, Chief Judge Hogan considered and rejected defendants' request for
downstream discovery that had been based on almost the same justifications raised by Barr
here.  198 F.R.D. at 301.  Affirming the Magistrate Judge's ruling denying a motion to
compel the downstream discovery, Judge Hogan explained that the requested data was of
"questionable" value and could not justify compelling the production of individualized
downstream data given that the requested discovery would have posed undue burden upon
the plaintiffs that far outweighed any potential benefit.  *Id.*

Chief Judge Hogan's determination that the great burden imposed on direct
purchaser plaintiffs does not justify marginally relevant downstream discovery has been
widely followed.  Most recently, earlier this month, in *In re Hypodermic Product Direct
Purchaser Litig.,* MDL No. 1730, No. 05-cv-1602(JLL/RJH) (D.N.J. Sept. 7, 2006)
(*"Hypodermic Products"*) (Ex. F), Judge Linares affirmed Magistrate Judge Hedges's
earlier ruling[5] that a direct purchaser's sales data and communications with customers

---

[5] *See Louisiana Wholesale Drug v. Becton Dickinson*, C.A. No. 05-cv-1602 (D.N.J. Oct. 17, 2005 (denying
downstream discovery from named plaintiffs and national wholesalers) (Ex. G).

"would be overly burdensome on the Plaintiff class." *Id.* at 23; *see also Tricor* at 34-35 (denying downstream discovery as irrelevant in direct purchaser actions involving allegations of delayed generic entry).[6]   Numerous federal courts, before and since the *Vitamins* ruling, have rejected defendants' requests for downstream data:

- *In re Automotive Refinishing Paint Antitrust Litig.*, MDL 1426, 2006 WL 1479819 (E.D. Pa. May 26, 2006) ("we will deny defendants' request that we depart from the long-held practice of proscribing discovery of downstream data");

- *In re Carbon Dioxide Antitrust Litig.*, MDL 940 *slip op.* at 4 (M.D. Fla. Nov. 19, 1993) ("The Court finds that Defendants are not entitled to information about Plaintiffs' costs and profits") (Ex. H);

- *In re Monosodium Glutamate*, MDL 00-1328 (D. Minn. Sept. 14, 2000) (denying downstream discovery due to "lack of relevance") (Ex. I);

- *In re K-Dur*, No. 01-cv-1652, Order at ¶2 (D.N.J. Mar. 24, 2005) (rejecting argument that downstream discovery from the named plaintiff and national wholesalers was relevant to class certification in a case, like this one, alleging improperly delayed generic entry) (Ex. J);

- *In re Pressure Sensitive Labelstock*, 226 F.R.D. 492, 498 (M.D. Pa. 2005) (denying discovery of "downstream data regarding Plaintiffs' sales to their customers" as more burdensome than beneficial; marginal relevance outweighed by burden); [7]

---

[6] *See also Buspirone*, 210 F.R.D. 43, 60 (rejecting arguments against class certification based on "net" economic effects and explaining that to permit the argument would introduce "just the kind of complicated proceedings that the Supreme Court held to be generally inappropriate in this antitrust context"); *Relafen*, 218 F.R.D. 337 (defendant's arguments "regarding actual economic harm" are "irrelevant" where class seeks overcharge damages).

[7] *In re Wirebound Boxes Litig.*, 131 F.R.D. 578 (D. Minn. 1990); *In re Polyester Stapled Antitrust Litig.*, 2005 WL 3766934No. 3:03cv1516  (W.D.N.C. Feb. 5, 2004) (Ex. J); *Lumco Ind. v. Jeld-Wen*, No. 96-cv-2125 (E.D. Pa. May 16, 1997) (plaintiff's downstream sales to its customers "irrelevant and inadmissible as a matter of law in accordance with *Hanover Shoe*") (Ex. K).

C.    **Barr's Justifications for its Burdensome Discovery Lack Merit**

In the face of this overwhelming controlling authority, Barr offers several justifications in an effort to circumvent established precedent barring the production of downstream data, none of which has any merit: (1) discovery is needed to calculate damages, including mitigation of damages; (2) discovery is needed to allow defendants to predict "demand" in a but-for world; (3) the discovery "may" fall into the exceeding narrow "cost-plus/fixed quantity" exception to the downstream discovery ban; and (4) the requested information is needed to defend against indirect purchaser actions. These same justifications have, time and again, been rejected by courts considering these issues.

1.    **The Requested Data is Irrelevant to Overcharge Damage Calculations Given that Mitigation of Damages with Downstream Effects is Expressly Barred Under *Hanover Shoe/IllinoisBrick* and their Progeny**

Barr first argues that, despite *Hanover Shoe*, it supposedly needs the direct purchasers' own sales and profit data in order "to determine the amount of any alleged overcharge or profit level that may be argued as a measure of damages" and "to evaluate the applicability of any number of defenses, including mitigation and existence of an alternative cause." *Barr Br. at 7.* Barr's initial justification for the requested discovery flatly contradicts and ignores the established case law concerning antitrust damages. There is no discernible difference between Barr's rationale and a standard "pass-on" defense. Barr's proffered rationale for its excessive discovery, is precisely the argument that the Supreme Court considered and rejected decades ago. Essentially, Barr argues that damages in the case should be computed in a way that is time and again rejected.

Here, the direct purchaser Plaintiffs seek only overcharge damages. *See generally Consolidated Amended Complaint ("CAC").* Overcharges are calculated by computing the

15

difference in price between the expensive brand-name Ovcon-35 that Plaintiffs purchased from Warner-Chilcott and (a) the cheaper generic that defendants blocked from the market, which Defendants' own internal documents show would have been substituted for the brand; and (b) the lower branded price for those units that would have continued to be purchased in branded form. *Id.; see also Leitzinger Decl.* at 17-32 (describing damages analyses and common evidence supporting the overcharge theory). Courts in analogous cases have routinely allowed recovery of overcharges calculated in precisely this manner. *See, e.g., Cardizen*, 200 F.R.D. at 309-14; *Relafen*, 218 F.R.D. at 344.[8]

The amount the direct purchasers charged their downstream customers has absolutely no place in the overcharge damage calculation. As in all direct purchasers actions seeking overcharges, the data needed to perform the comparison between the price the direct purchasers were charged and the price they would have been charged had a generic been available includes ***defendants***' own sales data – which would show precisely how much it charged the direct purchasers. *See Leitzinger Decl. at* 27. Moreover, market-wide data available from vendors, such as IMS, that show the absolute number of market-wide prescription sales, would also be relevant to this analysis. *Id.*

But-for prices and volumes will be computed based on a variety of common evidence demonstrating the dramatic marketwide effects of blocking generic entry, including defendants' own contemporaneous internal projections of the economic effects of their scheme. *Id. at 30.* The amount that the direct purchasers charged their downstream

---

[8] *See also In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. 1993) (recognizing that a direct purchaser prevented from purchasing a different, but cheaper substitute as a result of an antitrust violation may seek to recover the difference in price as an overcharge); *Lee-Moore Oil v. Union Oil*, 599 F.2d 1299, 1306 (4th Cir. 1979) (same). *See generally ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues* 193-94 (1996) (discussing same issue).

customers, however, has absolutely no place in the overcharge damage calculation. Barr has not explained how the requested information would fit into the damage calculation or any legally recognized critique thereof.[9]

In its brief, Barr mentions that it would use the requested information to determine whether Plaintiffs mitigated their damages, in some way. The "mitigation" analysis is simply a different term for the "pass-on" defense that the Supreme Court rejected in *Hanover Shoe/Illinois Brick*. Barr apparently proposes to assess "mitigation" of damages by looking at Plaintiffs' re-sales of Ovcon-35 and subtracting some portion of the downstream profits from the overcharge. This is plainly improper since the Supreme Court ruled that direct purchaser plaintiffs are entitled to the ***entire overcharge with no mitigation permitted***. It is also unclear how evidence of actual ***sales*** by the Plaintiffs could tell Barr anything about the ability to "mitigate" damages.

Chief Judge Hogan rejected a similar defense justification in *Vitamins*: "As long as class members are entitled to recover overcharges, whether certain class members made a profit on the overcharges in comparison to other class members is generally irrelevant." 198 F.R.D. at 300-01.

### 2. Downstream Discovery is Not Needed to Allow Defendants to Predict Demand in a "But-For" World

Barr next contends that it needs downstream discovery in order to predict "demand" in the "but-for world" relevant to damage calculations. *Barr Br. at 8.* Although Barr does not elaborate on the rationale for using or, in way explain or support, the relevance of "demand" information in their "but-for" damages calculation, Barr may be arguing that it

---

[9] If Barr were to submit a rationale it would necessarily be the type of enormously complicated calculation that the Supreme Court sought to avoid.

needs to collect massive amounts of downstream discovery in order to determine whether demand for Ovcon would have increased rather than declined following the introduction of a generic version of the compound. Again, this justification lacks any factual or legal merit.

The individual downstream re-sale records of six named Plaintiffs are simply irrelevant to Barr's supposed demand calculation. The relevant information needed to determine trends in demand following the entry of a generic pharmaceutical is the market-wide sales data gathered by commercial vendors, such as IMS, which are routinely used by the defendant pharmaceutical companies themselves to market their products. *Leitzinger Decl.* at 27. Additionally, as noted in Dr. Leitzinger's Declaration, a wealth of governmental and academic literature, studies and analyses exists which demonstrate the precise effects of the entry of a generic version of a product on market demand. *Id.* at 18-22.

As a matter of common sense, the piecemeal data Barr wants from each of the named plaintiffs has no relevance to Barr's supposed demand analysis. Indeed, as Dr. Leitzinger stated, Defendants themselves frequently projected the substitution and demand effects of generic competition, and relied on those projections in the regular course of business. *Leitzinger Decl.* at 23-26. Not once did defendants seek piecemeal downstream data from their direct purchaser customers in conducting those analyses. *Id.*

In *Vitamins,* Chief Judge Hogan considered and rejected an argument similar to the one Barr posits here: that downstream discovery was needed to calculate demand in the "but-for" world. 198 F.R.D. at 199. Unlike here, in *Vitamins,* the defendants seeking downstream purchaser discovery cited declarations from their proposed experts, asserting

that individualized plaintiff-by-plaintiff downstream data were relevant to show the demand for defendants' vitamin products because demand is a factor in determining the prices plaintiffs would have been charged "but-for" the conspiracy. *Id.* They argued that damages recoverable by the direct purchasers will be determined by the difference between the "but for" prices and the prices actually charged to the conspiracy. *Id.* Chief Judge Hogan ruled that the requested downstream data was irrelevant for this purpose, as the defense expert did not assert that the requested downstream data was needed for this purpose. *Id.* ("[defendant] does not state that individualized plaintiff-by-plaintiff downstream discovery data is necessary for this determination, rather he relies on public information to assess the impact of demand on damages.").

### D.    Defendants' "Cost-Plus/Fixed Quantity" Argument Is Meritless

Defendants next improperly argue that they require extremely burdensome downstream discovery in order to determine whether the theoretical "cost-plus/fixed quantity" exception to *Hanover Shoe* might apply. *Barr Br.* at 7.  This argument is also without merit.

Although the Supreme Court in *Hanover Shoe* suggested that there "might" be an exception to the ban on downstream direct purchaser discovery when a "pre-existing 'cost-plus/[fixed quantity]' contract" was at issue, that exception was only available in situations where it was "easy to prove" that a direct purchaser resells under a "pre-existing cost-plus contract" obligating its own customers to purchase a "fixed quantity regardless of price." For the narrow exception to apply, it must also be obvious, merely by reading the contract, that the direct purchaser "will bear no portion of the overcharge and otherwise suffer no injury." *Hanover Shoe*, 392 U.S. at 494 (internal citation omitted).  In *Illinois Brick*, the

Court later explained the rationale for the narrow exception: "In such a situation, the purchaser is insulated from any decrease in its sales...because its customer is committed to buying a fixed quantity regardless of price." *Id.* at 736.

The cost-plus/fixed quantity exception, to the extent it ever existed as a practical (and not merely theoretical) matter, is vanishing and exceedingly narrow. By definition, the exception only applies to pre-existing contracts that fix, well in advance, the amount to be purchased and the price. *See Hanover Shoe*, 392 U.S. at 494; *Eastern Air Lines, Inc. v. Atlantic Richfield Co.*, 609 F.2d at 497, 499 (Em. App. 1979) (cost-plus/fixed quantity contract is one "that is already in existence, in that its impact on pricing decisions must be known in advance"). A mere percentage mark-up contract is ***not*** sufficient. *See Kansas v. Utilicorp United*, 497 U.S. 199, 217-18 (1990); *Illinois Brick*, 431 U.S. at 735-36.

The Supreme Court has clarified that the "cost-plus/fixed-quantity" exception, if it exists at all, is only available in an extremely small number of cases. In 1990, the Court refused to recognize the cost-plus/fixed quantity exception even where applicable regulations required that 100% of the plaintiff utility company's overcharge was passed on to indirect purchasers. *Utilicorp*, 497 U.S. at 217-18 ("The [utility] did not sell the gas to its customers under a pre-existing cost-plus contract."). The Court reasoned that "the utility itself had no guarantee of any particular profit" since the utility's customers had not committed to purchase a particular quantity of gas. *Id.* at 218. Since *Utilicorp*, the existence of the "cost-plus" exception has been called into question. *McCarthy v. Recordex Serv. Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) ("The vitality of the pre-existing cost-plus contract' exception is doubtful, however, in light of *Utilicorp*.").

20

The contracts the direct purchasers use to resell pharmaceuticals do not qualify as "cost-plus/fixed quantity" contracts under *Hanover Shoe*. Barr cites no support for its argument the "cost-plus/fixed quantity" exception to the downstream discovery ban applies here – and, as the party seeking to compel discovery under this narrow exception, it is their burden to do so. Barr also cites no legal opinion finding that a direct purchaser of pharmaceuticals utilized a "cost-plus/fixed quantity" contract.

Precedent contradicts Barr's position. The same issue was litigated and decided – against defendants – in *Buspirone*, 210 F.R.D. at 60-61 (rejecting argument that wholesalers' contracts for the resale of pharmaceuticals qualified for the exception); and *Hypodermic Products* at 23 (refusing to allow downstream discovery under the supposed cost-plus/fixed quantity exception based on "single piece of evidence that purport[ed] to show" existence of such a contract). The essential elements of the exception – fixed quantity, a fixed price and a pre-existing contract – are simply absent in the pharmaceutical context, and Defendants do not assert have no reasonable basis to believe the facts could possibly be otherwise.

### E. Whatever Relevance Downstream Sales Data Has to the Indirect Purchaser Case Is Far Outweighed by the Burden of Production

Finally, Barr argues that the direct purchasers should spend significant time and expense producing reams of data concerning their downstream sales because the data is purportedly relevant to the suit filed by a purported class of indirect purchasers. It is again unclear what, if any, relevance the individual sales records of a handful of direct purchasers would have to any analysis of the merits of the indirect purchaser case. The production of this irrelevant material would be extremely expensive and disruptive to Plaintiffs' businesses. *See Doud* Decl. at 3. Additionally, defendants are free to obtain discovery concerning indirect purchaser plaintiffs' relevant transactions from these plaintiffs themselves.

As previously described, and as Barr well knows, there exist in this industry vastly superior and more comprehensive sources of data reflecting prices paid at the retail indirect purchaser level, namely data vendors such as IMS which compile such information on a nationwide scale – data which Defendants already have or could easily obtain. *See Leitzinger Decl. at 27.* Thus, any limited relevance of their sales data is greatly outweighed by the burden of producing it. Compare *id.* to *Doud Decl.* at 2-3.,

Again, in *Vitamins*, Chief Judge Hogan considered and rejected the defense's "indirect purchaser" argument holding: "the proposition that there are indirect purchasers in this case who may assert claims for damages other than direct overcharges is not sufficient to carry defendants' burden of showing this information ought to be produced by the direct purchasers." 198 F.R.D. at 301.

Allowing an exception to the ban against harassing direct purchaser plaintiffs with burdensome downstream discovery in those situations where indirect purchasers also filed

suit against defendants who have conspired to violate antitrust laws, would create an exception large enough to swallow the rule. As Chief Judge Hogan recognized "certainly there are other antitrust cases in which direct and indirect purchasers were together as parties to the litigation." *Vitamins*, 198 F.R.D. at 301. Allowing such a massive loophole would undermine important antitrust public policies the Supreme Court sought to foster, namely, encouraging direct purchasers to challenge antitrust violations. Production of this data will require enormous effort from archived systems and will be of virtually no use. For this and all of the foregoing reasons, Defendants' Motion to Compel should be denied.

### F. *Valley Drug* is Inapplicable, Wrongly Decided, and Does Not Support Downstream Discovery In This Case

Barr cites without elaboration *Valley Drug v. Geneva Pharm*, 350 F.3d 1181 (11th Cir. 2003) (*remand*, 223 F.R.D. 666 (S.D. Fla. 2004) – the ***first case ever to sanction*** downstream discovery – apparently in support of their argument that downstream discovery is appropriate in this case. *Valley Drug* is distinguishable from the present case in that the defendants justified their need for the requested discovery by arguing it was needed to determine whether there were any intra-class conflicts of interest between named and absent class members, an argument ***not*** presented by Barr in support of its motion.[10]

The specific experience of *Valley Drug* on remand demonstrates the perils inherent in allowing burdensome downstream discovery in a case such as this one. On remand, the *Valley Drug* court permitted months of irrelevant downstream discovery, purportedly to try

---

[10] *Valley Drug* does not represent the law of this Circuit; it is non-binding authority. *See generally Vitamins*. The decision has been widely criticized. Numerous courts that have considered *Valley Drug's* conclusions, overwhelmingly prohibit the "novel" downstream discovery *Valley Drug* appeared to sanction. *See Tricor* (rejecting *Valley Drug*'s conclusions); *Hypodermic Products* at 11 citing *Joshua P. Davis, David F. Sorensen, "Chimerical Class Conflicts in Federal Antitrust Litigation: The Fox Guarding the Chicken House in Valley Drug,"* 39 U.S.F.L.R. 141 (2004).

and determine whether pursuing that case was in the "interests" of the absent class members. Data, which various experts scrutinized, was produced at great expense. A full hearing was held. And despite all this expense and effort, in the end, neither the defendants, nor the district court, could even articulate any foreseeable conflict. *See In re Terasozin Antitrust Litig.*, 223 F.R.D. 666, 678 (S.D. Fla. 2004) ("no evidence of "an actual disagreement or realistic possibility of fundamental antagonism").

## CONCLUSION

In conclusion, for the reasons stated, Plaintiffs respectfully request that defendant Barr's request for an Order compelling discovery should be denied.

Dated: September 27, 2006                          Respectfully submitted,


_____/s/_____
Linda P. Nussbaum (D.C. Bar No. 483254)
Kanchana Wangkeo
COHEN, MILSTEIN, HAUSFELD
  & TOLL, P.L.L.C.
150 East 52nd Street, 30th Floor
New York, NY 10022
(212) 838-7797
(212) 838-7745 (Fax)

Michael D. Hausfeld (D.C. Bar No. 153742)
COHEN, MILSTEIN, HAUSFELD
  & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
(202) 408-4600
(202) 408-4699 (Fax)
***Counsel for Plaintiffs Meijer, Inc.
and Meijer Distribution, Inc.***

Daniel Berger
Eric L. Cramer

Ellen T. Noteware
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4604 (Fax)

David U. Fierst (D.C. Bar. No. 912899)
STEIN, MITCHELL
   & MEZINES, LLP
1100 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036
(202) 737-7777
(202) 296-8312 (Fax)
***Counsel for Plaintiff Rochester Drug
Co-operative, Inc.***


William Isaacson (D.C. Bar No. 414788)
Tanya Chutkan (D.C. Bar No. 420478)
BOIES, SCHILLER
   & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Suite 800
Washington, D.C. 20015
(202) 237-2727
(202) 237-6131 (Fax)

Richard B. Drubel (D.C. Bar No. 334359)
Kimberly H. Schultz
BOIES, SCHILLER
   & FLEXNER LLP
26 S. Main Street
Hanover, NH 03755
(609) 643-9090
(609) 643-9010 (Fax)
***Counsel for Plaintiff Valley
Wholesale Drug Co., Inc.***

Bruce E. Gerstein
Barry S. Taus
Kevin S. Landau
GARWIN GERSTEIN
 & FISHER, L.L.P.
1501 Broadway, Suite 1416
New York, NY 10011
(212) 398-0055
(212) 764-6620 (Fax)

David U. Fierst (D.C. Bar No. 912899)
STEIN, MITCHELL
 & MEZINES LLP
1100 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036
(202) 737-7777
(202) 296-8312 (Fax)
***Counsel for Plaintiff Louisiana
Wholesale Drug Co., Inc.***

Dianne M. Nast
RODA NAST, P.C.
801 Estelle Drive
Lancaster, PA 17601
(717) 892-3000
(717) 892-1200

Linda P. Nussbaum (D.C. Bar No. 483254)
COHEN, MILSTEIN, HAUSFELD
 & TOLL, P.L.L.C.
150 East 52nd Street, 30th Floor
New York, NY 10022
(212) 838-7797
(212) 838-7745 (Fax)
***Counsel for SAJ Distributors, Inc.
and Stephen L. LaFrance Holdings,
Inc.***

Thomas M. Sobol
HAGENS BERMAN SOBOL
  & SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, MA 02142
(617) 482-3700

Linda P. Nussbaum (D.C. Bar No. 483254)
COHEN, MILSTEIN, HAUSFELD
  & TOLL, P.L.L.C.
150 East 52nd Street, 30th Floor
New York, NY 10022
(212) 838-7797
(212) 838-7745 (Fax)
***Counsel for American Sales Co., Inc.***