# EXHIBIT E

1

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -

 4    -----------------------------------
                                         :
 5    IN RE: TRICOR DIRECT PURCHASER     :   CIVIL ACTION
      ANTITRUST LITIGATION               :
 6                                       :   NO. 05-340 (KAJ)
      -----------------------------------
 7                                       :
      THIS DOCUMENT RELATES TO:          :   (Consolidated)
 8                                       :
      ALL ACTIONS                        :
 9                                       :
      -----------------------------------
10    -----------------------------------        -and-
                                         :
11    IN RE: TRICOR INDIRECT PURCHASER   :
      ANTITRUST LITIGATION               :
12                                       :   NO. 05-360 (KAJ)
      -----------------------------------
13                                       :
      THIS DOCUMENT RELATES TO:          :   (Consolidated)
14                                       :
      ALL ACTIONS                        :
15                                       :
      -----------------------------------
16
                                - - -
17
                          Wilmington, Delaware
18              Friday, March 3, 2006 at 11:32 o'clock, a.m.
                         TELEPHONE CONFERENCE
19
                                - - -
20
      BEFORE:       HONORABLE KENT A. JORDAN, U.S.D.C.J.
21
                                - - -
22
      APPEARANCES:  (Listed on page two)
23

24
                                           Brian P. Gaffigan
25                                         Registered Merit Reporter
```

1    MR. DES ROCHES: Your Honor, this is Stuart Des
2    Roches. We can talk with counsel for Abbott about this, but
3    I think we have some ideas in mind, specific ideas in mind
4    as to how to very specifically tailor and narrow those
5    requests to the items that go to the heart of what I spoke
6    about.
7    THE COURT: Well, that is what did you need to
8    do because I'm giving you the discovery about Hytrin as to
9    this specific, the two specific points that we've just
10   discussed. And those points are: What did they have in
11   their minds as they were making this switch? And what is
12   the evidence that this was motivated by something perhaps
13   beyond improvement or wholly other than improvement of the
14   product itself?
15   And you folks I hope can work with the guidance
16   I have given you to come up with something that is mutually
17   agreeable as a way to move forward.
18   All right. Mr. Cavanaugh, are you also taking
19   the helm with respect to the downstream discovery request?
20   MR. CAVANAUGH: No, Your Honor. Mr. Peterman
21   from my office will.
22   THE COURT: All right. Mr. Peterman, why don't
23   you go ahead and launch on that, please.
24   MR. PETERMAN: Thank you, Your Honor. As you
25   know from the letters, we are seeking the downstream

1   discovery relevant to sales of TriCor and other fenofibrate
2   products from the direct purchaser plaintiffs.  We believe
3   this is relevant to two points.  The main point is class
4   certification.
5           There is no preordained right under Rule 23 for
6   the direct purchasers to be certified as a class.  In order
7   for them to be certified as a class, there must not be any
8   intraclass conflicts.  The Hytrin court in the Eleventh
9   Circuit expressly realized the possibility of these
10  intraclass conflicts between the regional wholesalers for
11  these named plaintiffs and the Big Three wholesalers who we
12  have identified in our letter.
13          THE COURT:  Yes.  Can I ask you a question about
14  that?
15          MR. PETERMAN:  Yes, Your Honor.
16          THE COURT:  What, if any, weight should I give
17  to the letters that these these Big Three, as you have --
18  somebody called them the Big Three.  I don't know whether
19  that is an industry standard way of referring to them or
20  not, but the letters they've sent me through counsel saying,
21  hey, we don't see any conflict here and we don't want Abbott
22  and Fournier purporting to speak for our interest.  They
23  don't have in business doing that.  What should I make of
24  those letters?
25          MR. PETERMAN:  Your Honor, those letters, just

1  because those parties say that there is no conflict is not
2  dispositive of the issue.  The Court, through Rule 23, needs
3  to decide, based on a full factual record, whether there
4  are indeed intraclass conflicts, because it protects the
5  interest of the defendants, it protects the interest of the
6  alleged class and it goes to the integrity of the federal
7  class action mechanism.
8  　　　　　　Those three very similar letters are striking in
9  part based on what is absent from those letters.  In our
10 letters, we alleged that the Big Three operated on a cost
11 plus basis.  Those letters did not address that.  They do
12 not refute that.  The letters from the regional wholesalers
13 did not address that or refute that as well.  So before the
14 Court now, we've got a situation where Abbott and Fournier
15 alleged the possibility that there are different mechanisms
16 by which the regional wholesalers set their prices and the
17 Big Three and other unnamed wholesalers set their prices.
18 So the possibility of intraclass conflict still exists.
19 　　　　　　THE COURT:  Well, help me out.  Let's assume for
20 the sake of discussion that you were right, that they did
21 this on a markup basis.  Does that change the legal right of
22 anybody to recover if they were to prove that in fact -- and
23 I'm not saying you did, obviously, but if they were to make
24 out their antitrust case, does that bar somebody from
25 recovering?

1    MR. PETERMAN: Your Honor, through this motion,
2 we're not alleging that the direct purchaser plaintiffs
3 would be entitled to argue for an overcharge theory. We're
4 not alleging that. We're alleging that we do need
5 information in our opposition, class certification to make
6 sure that the putative class is free from intraclass
7 conflicts.
8    THE COURT: And I'm trying to press you on that.
9 You say there is an intraclass conflict. I'm trying to find
10 out what is the nature of the conflict, what is the legal
11 conflict that would exist even if you got everything you
12 wanted and you got the "aha" documents and were able to say,
13 look, they did this on a cost plus basis. Point me to the
14 legal conflict that would then exist between the Big Three
15 and the rest of the direct purchasers so that I understand
16 how that would constitute a basis for denying class
17 certification. That is what I need you to do for me.
18    MR. PETERMAN: The legal conflict is some
19 members of the class would have obtained a net benefit
20 from the alleged anticompetitive activities by Abbott and
21 Fournier.
22    With the absence of generic products on the
23 market, you know, it is possible that the Big Three and
24 other wholesalers that operate on a specific type of cost
25 plus basis, you know, are better served without generic

1    products on the market.
2         Now, what we're asking for is discovery so we
3    can look into and see if in fact these types of intraclass
4    conflicts exist. The Becton case which was cited in the
5    plaintiffs' letter for the proposition that downstream
6    discovery was not proper, in that case there was actually --
7    prior to that decision, the magistrate judge in that case
8    ordered the production of the customer contracts that the
9    direct purchaser plaintiffs had with their customers. So I
10   think at a minimum, we would be entitled to that in order
11   to ascertain whether there is the potential of conflict.
12         We would also request a 30(b)(6) deposition that
13   we can take on direct purchaser plaintiffs to understand
14   the basis for their setting their prices and we do intend
15   to seek third-party discovery on the Big Three and other
16   wholesalers.
17         THE COURT: And the relevance of the discovery
18   would be to this same point that you got a net benefit and
19   your theory is, because you had a net benefit, you have a
20   different interest than the people who didn't get a net
21   benefit. Have I got you right?
22         MR. PETERMAN: Yes, that is our theory. Of
23   course, with discovery, we might be able to uncover
24   other possible intraclass conflicts between the regional
25   wholesalers and the national wholesalers.

1   THE COURT: Okay. Talk to me for a minute
2   about the assertions that are in that letter that you just
3   referred to again. That's the March 2nd letter that came
4   to me over Ms. Zeldin's signature and it cites a series of
5   cases, In Re: Vitamins, which they quote as saying no
6   courts ever allowed production of individualized downstream
7   data; the In Re: Carbon Dioxide case, that it's not
8   relevant to class certification; the two District of New
9   Jersey cases; the Becton case you noted, In Re: K-Dur;
10  these cases where they say, hey, courts are rejecting this
11  theory. What is your response to that?
12      MR. PETERMAN: A number of the cases that
13  plaintiffs have cited are not in the pharmaceutical context.
14  The Becton case as just discussed did include some discovery
15  on the downstream sales based on the customer contracts.
16      THE COURT: Well, back up just a minute. Why
17  would it make any difference whether this was in the
18  pharmaceutical or the fast food or the high school vending
19  machine? I don't know what you would -- name an industry.
20  Why does the character of the industry make a difference on
21  the legal point of whether downstream sales information
22  should be relevant to class certification?
23      MR. PETERMAN: Well, in the pharmaceutical
24  industry, you do have three national wholesalers who control
25  the bulk of the distribution of drugs. We believe that they

1  operate on a different basis in terms of setting their
2  prices than the regional wholesalers do.  So I would submit
3  the pharmaceutical industry is different from these other
4  types of industries where there are not, you know, three or
5  just a small group, small group of companies that control
6  the majority of the distribution channels there.
7           THE COURT:  And is the question whether a
8  class should be certified at all or whether a class could
9  be certified that included these Big Three?
10          MR. PETERMAN:  I think the question is both, you
11 know, whether it's proper to certify a class, including the
12 Big Three, or whether there is any subset of classes of
13 direct purchaser plaintiffs that can be certified.
14          THE COURT:  Well, help me out with the issue
15 of whether you get discovery or not as related to this
16 question.  Assume, Mr. Peterman, that there was the problem
17 you have identified and that it was, as a legal matter, a
18 conflict.  Would that mean that there couldn't be a direct
19 purchaser class if these three weren't in it?  I'm just
20 trying to --
21          MR. CAVANAUGH:  Your Honor, this is
22 Mr. Cavanaugh.  If you took out the Big Three, you are
23 probably taking out in excess of 90 percent of the market,
24 if not higher; 95 percent of the market.  We have to see
25 what was left of the directs to see if they had enough to

1   have a class. And it would certainly, that would have a
2   profound impact on the size of the class.
3       THE COURT: All right. Now, Mr. Peterman, let
4   me ask you a question, another question with regard to the
5   burden or the associated cost of the discovery you are
6   seeking. The assertion is that you're looking to impose an
7   enormous burden on these folks, the Big Three as well as I
8   guess the others that you say you are just the 10 percent of
9   the market, and the purpose for which you are seeking it is
10  sufficiently tenuous that even if it were somehow relevant,
11  is just not worth the candle. It's so expensive, it doesn't
12  make sense. What is your response to that specific
13  argument?
14      MR. PETERMAN: Our response is that the
15  mechanism for Rule 23 requires this detailed analysis on
16  whether a class is properly certified. The plaintiffs are
17  the ones that have the burden to prove that the class is
18  proper and in our work to oppose the class, we are entitled
19  to serve them discovery with respect to the conflicts.
20      THE COURT: And you are not really answering my
21  direct question, which is, is cost a factor that the Court
22  ought to have in mind? Unless the position you are taking;
23  and it's fine if you are, I just need you to take it; that
24  I shouldn't be worried about what the cost is, when I'm
25  looking at the requested discovery, I don't need to weigh

1   the potential relevance against the potential cost?

2              MR. PETERMAN: No, Your Honor, I'm not arguing

3   that the cost of the discovery is relevant. And it's

4   possible we can craft a certain subset of documents that

5   would be sufficient to obtain the basis upon which the

6   regional wholesalers set their places and the basis upon

7   the unnamed plaintiffs, including the Big Three, set their

8   prices.

9              THE COURT: And what is your basis for believing

10  it's cost plus markup? What do you have for asserting that,

11  that is, your good faith basis for believing this is

12  something that requires further inquiry?

13             MR. PETERMAN: Your Honor, it's our general

14  knowledge of the industry and also the fact that's none of

15  the plaintiffs or the letters from the Big Three, that

16  basis.

17             THE COURT: It's a "they didn't say no"

18  argument; right?

19             MR. CAVANAUGH: Your Honor, I think it's a

20  little more.

21             THE COURT: Well that's what I'm looking for. I

22  need something specific. What have you got?

23             MR. CAVANAUGH: Your Honor, our client tells us

24  that that is how the Big Three function, that they function

25  on a cost plus basis. And that is our understanding. And I

1  believe in the Eleventh Circuit decision, in Hytrin, it was
2  pointed out that the Big Three functioned on a cost plus
3  basis. I'm not certain of that, Your Honor, but I believe
4  that is true.
5           THE COURT: All right. Okay. Who is speaking
6  to this from the plaintiff's side?
7           MR. CRAMER: Your Honor, this is Eric Cramer
8  from Berger & Montague. I'll be speaking for the
9  plaintiffs.
10          THE COURT: All right.
11          MR. CRAMER: Let me point out upfront a point
12 that was just made in the question Your Honor made, and I
13 think that is an issue with defendants entire motion here.
14 They have no evidence of anything. All we have are
15 assertions. That to the extent they come from anywhere,
16 they come from the Eleventh Circuit decision in Valley Drug,
17 which itself said that all of these things might be true but
18 since there was no record before them about these issues in
19 Valley Drug, they don't know if it's true. So right up
20 front, we have defendants making a motion that has no
21 backup, no support.
22          Second, let me hit a discussion that was had a
23 moment ago about whether it is appropriate or proper to
24 certify a class in this context in the delayed generic entry
25 drug cases direct purchaser class, including the Big Three.

29

```
 1  That question has been answered and answered repeatedly in
 2  the affirmative.  We have cited to Your Honor in footnote
 3  two and throughout this brief, and we'll cite to Your Honor
 4  in the class motion, the class decisions in In Re: Relafen,
 5  in the District of Massachusetts; In Re: Buspirone in the
 6  Southern District of New York; In Re: Cardizem in the
 7  Southern District of Michigan; the JBDL case and various
 8  others, including Valley Drug itself which was ultimately
 9  certified in light of settlement in which classes were
10  certified nearly identical to the class plaintiffs seek to
11  have certified here, including the Big Three, and
12  specifically addressing the issue that Your Honor was
13  probing the defendants about as to the difference between
14  the legal injury and legal claim and the net benefit/net
15  cost analysis the defendants want to do.
16          The Court in the JBDL case which we cited to
17  Your Honor in our footnote two at 225 FRD 216 says as
18  follows:  "Wyeth next argues there is a conflict between the
19  class representatives and some class members because some
20  class members purchased large quantities of premarin and
21  were able to resell it at a greater profit after price
22  increases.  This argument is also without merit.  Antitrust
23  injury is considered complete when the direct purchaser pays
24  an illegal overcharge and whether he was able to pass
25  through the overcharge to indirect purchaser is irrelevant
```

1   to the inquiry", citing <u>Hanover Shoe</u>, <u>Illinois Brick</u> and
2   other cases.
3           It goes on to state, "thus, as long as the price
4   paid by the class members for premarin was higher than it
5   would have been absent the alleged anticompetitive conduct.
6   There is no conflict created if indeed some of the direct
7   purchasers were able to recoup the overcharge through price
8   increases passed on to other purchasers."
9           In other words, the key question here is whether
10  or not there is legal injury.  And as Your Honor correctly
11  probed, the legal injury is complete at the moment the
12  direct purchaser pays the overcharge.  And defendants here
13  are not challenging whether plaintiffs have the right to
14  recover overcharges and don't claim that any of this
15  discovery is relevant at all to the question of legal
16  injury.
17          And the reasoning behind that comes from the
18  Supreme Court in <u>Hanover Shoe</u> which said that this
19  downstream information and the net benefits/net costs
20  analysis that defendants are seeking to do here is not only
21  irrelevant but it is harmful to deterrence and to the
22  enforcement of the antitrust laws because of the highly
23  burdensome nature and the endlessly complicated nature of
24  the endeavor and that is endlessly complicated, are the
25  words from the Third Circuit decision in <u>Bogosian</u> which

1  certified a class dismissing a lot of the arguments that
2  defendants are making here.
3       Second, and this, that is the reason, that is
4  the reason why you have a near universal bar and ban on
5  downstream discovery, from Vitamins to the Schering case to
6  the Becton case and on and on. Those cases say that the
7  end runaround Hanover Shoe that the defendants seek to
8  have, seek to employ here is improper and would harm the
9  enforcement of the antitrust laws and has no bearing on
10 class certification or the adequacy issues.
11      We agree with the defendants. And this is a
12 key point. In their letter, citing Labelstock at page
13 two, note six, they say the question here is whether the
14 defendants have made an initial showing of conditions
15 making it probable that some large subset of the class had
16 interests antagonistic to other class members. That's the
17 defendants' statement of their burden here.
18      The issue here is then would plaintiffs pursuit
19 of overcharges in this case be contrary to the interest of
20 significant subset of class? Plaintiffs have made a
21 definitive showing with definitive evidence that there is
22 no likelihood or possibility of any conflict. The national
23 wholesalers have each written to this court and said there
24 is no conflict, their interests are aligned. And as Tom
25 Long, counsel for Cardinal Health, wrote to this court and

1  Your Honor, he said, on page two of his letter which is
2  attached as Exhibit A to our papers: "First, if the point
3  of the discovery request is for defendants to determine
4  indirectly whether it is in Cardinal Health's best interest
5  to become an absent member of any certified class in this
6  case, it is not for defendants to make any such decision.
7  Defendant does not operate Cardinal Health."
8        THE COURT: Okay. Mr. Cramer, I read the letter
9  so I got that firmly in mind.
10       MR. CRAMER: Okay. And it's not only these
11 letters, it's also the fact that these national wholesalers,
12 the three of them plus every other direct purchaser has
13 participated in, by not opting out and not objecting to at
14 least six and actually several other settlements of directly
15 analogous cases in which these direct purchasers, including
16 the national wholesalers, have recovered over $700 million
17 in overcharges.
18       Now, what could the downstream discovery and the
19 net effects analysis the defendants seek to do here possibly
20 tell us about whether it is in the national wholesalers
21 interest to be in this suit? Are defendants saying that
22 if they do some kind of mathematical computation that
23 ultimately determines that there is some benefit to the
24 defendants from delaying generic entry, are they saying
25 that that is going to trump the national wholesalers own

1  opinion as to what is in their own best interest?

2  THE COURT: Okay. Well, we'll go ahead and ask
3  them.

4  Mr. Peterman, I believe I have the plaintiffs'
5  position here. It's your motion so I'm giving you the last
6  word. What is your take on that last question and anything
7  else you want to respond to in Mr. Cramer's remarks?

8  MR. PETERMAN: Thank you, Your Honor. Our
9  basic position is this. Rule 23 requires a mechanism for
10 determining whether class certification is proper. It not
11 only protects the interest of the putative class, it
12 protects the interest of the defendants.

13 Plaintiffs are in possession of information
14 whether or not intraclass conflicts exist. We have made an
15 assertion, based on our understanding of the pharmaceutical
16 industry, of a possible conflict. And they have refused to
17 give us any discovery whatsoever where we can make a more
18 informed decision on whether there is a possible conflict
19 and bring it to the Court's attention in opposition to their
20 class certification motion.

21 MR. CRAMER: Your Honor, could I just answer
22 that last point for two seconds?

23 THE COURT: No. I think I've got everybody's
24 positions very clearly in mind. All right. And besides,
25 Mr. Cramer, you're about to win so you can relax.

1          MR. CRAMER:  Thank you.

2          THE COURT:  I'm not giving this discovery.  I
3   appreciate the argument that has been made.  I think I
4   understand the arguments that have been made by the
5   defendants here but I don't think Rule 23 requires or
6   encourages in any fashion that I permit discovery that I
7   can't figure out legal relevance for.  And I don't see it.
8   If you overcharge these -- I guess the bottom line is I'm
9   accepting the primary argument the plaintiffs are making
10  here, and that is the antitrust injury occurs when you
11  overcharge, if you did.  And it doesn't make a whit of
12  difference what they do with that product they get from
13  you afterwards.

14          If they can find people that they can sell it to
15  for 10 times the amount that folks ought to pay, well, then
16  maybe there is some cause of action against them by some
17  other people, but that doesn't excuse the antitrust injury
18  that is being alleged here.  So the legal relevance is
19  beyond me, even as to class certification.  I don't see how
20  that creates a conflict.  And so I'm not going to kick the
21  door open to this kind of discovery, particularly when all
22  three of the folks who would be subject to a good deal of
23  this, and I'm talking about Big Three although I know you
24  were seeking this from all the direct purchaser plaintiffs,
25  have indicated in a way that I think is persuasive that this

1   is a fishing expedition that would be enormously expensive
2   and I believe the federal rules do require me to look at
3   what the cost of a demand is associated with its potential
4   relevance.
5           I see no relevance.  If I was able to discern
6   some, I'd have to say it would be pretty small and certainly
7   not worth the candle that is being presented to me here.  So
8   I'm denying the effort to get at this downstream data
9   discovery.  It's not happening.
10          All right.  That handles the issues that we had
11  on the table today.  And I'm reluctant to do it since we
12  got so many people on the call but before I let you off,
13  traditionally, as long as we spent the money and time and
14  effort to get here, is there anything else that ought to be
15  addressed while we are all on the phone together?  Is there
16  anything from the direct purchasers?
17          MR. TAUS:  Your Honor, this is Barry Taus for
18  the direct purchaser class plaintiffs.  We just wondering
19  with the upcoming motion to dismiss argument coming up on
20  March 15th, we were wondering whether the Court wanted to
21  direct us to any particular issues that the Court may have
22  in mind that you want us to focus on or if there is any
23  particular agenda the Court has in mind for that particular
24  argument.
25          THE COURT:  No, I'll just see you in court on

1  that day.

2  MR. CRAMER: Okay. Thank you.

3  THE COURT: All right. Is there anything from
4  your clients, Ms. McGeever? Or co-counsel?

5  MR. CRAMER: No, Your Honor. Thank you.

6  THE COURT: All right. For Teva?

7  MR. GAGALA: No, Your Honor.

8  THE COURT: Impax?

9  (MS. BLIZZARD: No, Your Honor.

10  THE COURT: All right. How about from Abbott or
11  Fournier?

12  MR. CAVANAUGH: No, judge.

13  THE COURT: Okay. I think I had Pacificare on
14  here as well. Is there anything from you folks?

15  MR. TURNER: Nothing from us, Your Honor.

16  THE COURT: I probably left somebody off. If I
17  have, I'm sorry.

18  MR. NALVEN: Your Honor, David Nalven for the
19  indirect class. We also have nothing at this time.

20  THE COURT: All right. Well, thanks for your
21  time today. I'll get a short order out that just references
22  this call as the basis for my rulings, and you folks go
23  ahead and move forward, if you would, on the guidance given
24  here. We'll talk to you all later. Good-bye.

25  (Telephone conference ends at 12:20 p.m.)