# EXHIBIT
# F

<u>**NOT FOR PUBLICATION**</u>

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE HYPODERMIC PRODUCT DIRECT PURCHASER ANTITRUST LITIGATION | MDL No.: 1730<br>Master Docket No.: 05-CV-1602 (JLL/RJH) |
| This Document Relates To:<br>*Louisiana Wholesale Drug Co., Inc. v. Becton Dickinson & Co.*, Civil Action No.: 05-CV-1602; *Dik Drug Co. v. Becton Dickinson & Co.*, Civil Action No.: 05-CV-4465 | <u>**OPINION AND ORDER**</u> |

This matter comes before the Court on Defendant Becton Dickinson & Company's

(hereinafter "Defendant") appeal of the October 17, 2005 Letter Opinion and Order of the

Honorable Magistrate Judge Ronald J. Hedges, U.S.M.J., denying Defendant's request for

"downstream discovery," namely certain sales data and customer communications, from

Plaintiffs Louisiana Wholesale Drug Company, Inc., Smith Drug Company, Rochester Drug Co-

Operative, Inc., and Dik Drug Company (hereinafter "Plaintiffs"). Defendant asserts that the

Order should be reversed because the court misinterpreted and misapplied the law, and failed to

address their additional arguments. The Court has considered the papers submitted by the

parties, including the supplemental briefing regarding the recent decision by a court in the

District of Delaware in <u>In re Tricor Direct Purchaser Antitrust Litigation</u> (C.A. No. 05-340 (KAJ)

(D. Del. March 3, 2006)) and the supplemental briefing regarding the purportedly new issues

raised on August 5, 2006.[1]  The appeal is resolved without oral argument.  Fed. R. Civ. P. 78.

For the reasons stated herein, Magistrate Judge Hedges' October 17 Letter Opinion and Order is

affirmed.

## BACKGROUND FACTS

Defendant, a medical device manufacturer, allegedly controls a dominant share of the

relevant market for the hypodermic products at issue in this case.  Plaintiffs, medical supply

distributors and alleged purchasers of Defendant's products, allege that Defendant violated

Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 - 2, "by leveraging its monopoly power

through the use of a variety of exclusionary tactics to frustrate and impair competition, acquire

and enhance monopoly power, and artificially inflate the prices of its hypodermic products."  (Pl.

Br. in Opp. to Appeal at 1).  Plaintiffs' Second Consolidated Amended Class Action Complaint

("Complaint") purports to bring the action pursuant to Federal Rules of Civil Procedure 23(a),

(b)(2) and (b)(3).  Plaintiffs propose to bring this action on their own and as representatives of

the following class of persons and entities ("the Class"):

---

[1]Defendant filed a supplemental memorandum on August 5, 2006, which purportedly raises new issues regarding standing and injunctive relief in light of the newly filed Consolidated Amended Class Action Complaints.  On August 11, 2006, Plaintiffs filed a responsive brief that responds to Defendant's arguments and objects to the Court considering the untimely filing.  Plaintiffs further argue that Defendant's arguments are not new and have already been raised.  But to the extent they contain new arguments, Plaintiffs argue that they must first be raised before the magistrate judge.  The Court has reviewed the papers, including Defendant's reply filed August 29th, and finds the issues to be similar to those already raised in the direct purchaser action.  The Court will not consider any new issues raised by this supplemental memorandum, and directs Defendant to first raise these issues before the magistrate judge by way of motion.  This Court's present Opinion is without prejudice, and is based generally on the arguments and facts presented at the time of the original briefing of the appeal.  The parties are not precluded from raising future discovery requests before the magistrate judge, including downstream discovery, as they become relevant and necessary.  Accordingly, Plaintiffs' recent motion to strike this supplemental briefing is denied.

> All persons and entities who purchased Relevant Hypodermic Products in the United States directly from Becton at any time during the period March 23, 2001 through the present (the "Class Period"). The Class excludes Becton, Becton's parents, subsidiaries and affiliates.

(Compl. ¶ 25). In the alternative, Plaintiffs propose the following class:

> All persons and entities who purchased disposable syringes and associated needles, of the safety and/or non-safety varieties, in the United States directly from Becton at any time during the period March 23, 2001 through the present ("the Class Period"). The Class excludes Becton, Becton's parents, subsidiaries and affiliates.

(Compl. ¶ 26).

The Complaint seeks relief for the legal claims under Rule 23(b)(3) and for the equitable claims under Rule 23(b)(2). However, in their opposition brief to this appeal and in their opposition to the supplemental briefing filed this month, Plaintiffs indicate that they "have decided not to pursue a class under 23(b)(2)." (Pl.'s Opp. Br. at 20).

At present, the parties are engaged in discovery limited solely to class certification issues. Beginning on August 24, 2005, a series of Discovery Letters were submitted to Magistrate Judge Hedges discussing Defendant's requests for "downstream discovery" from "plaintiffs and other distributors." (Def. Letter dated Aug. 24, 2005, Rubin Ex. E, at 1). On September 27, 2005, Magistrate Judge Hedges heard oral argument. Following oral argument, on October 11, 2005, Magistrate Judge Hedges entered Case Management Order #4, which ordered Plaintiffs to produce all documents they agreed to produce along with copies of all written contracts between any of them and any group purchasing organization relating to the claims at issue in this case and copies of each of their Articles of Incorporation and By-laws. The court reserved on the remaining discovery requests which were the subject of the Discovery Letters. By Letter Opinion

and Order dated October 17, 2005, Magistrate Judge Hedges denied Defendant's request for

Plaintiffs' "downstream" sales data and communications, and held that "Pursuant to Rule

26(b)(2)(iii), discovery shall be limited to contracts between plaintiffs and its customers and shall

not include downstream sales data or written communications." (Op. at 5).

    The remaining discovery that Defendant requests Plaintiffs produce is (1) their sales data

pertaining to the products at issue, and (2) their written communications with customers about

supply bids, contracts and sales calls. (Def. App. Br. at 1). Defendant seeks this information for

four reasons: (1) to demonstrate a potential economic conflict between Plaintiffs and certain

absent class members; (2) to demonstrate that Plaintiffs cannot meet the typicality or adequacy

requirements of Rule 23(a) because they have chosen not to pursue a lost profits claim, which

absent class members might want to assert; (3) to show that Plaintiffs cannot establish that the

economic impact of the alleged antitrust violation can be proven on a class-wide basis using

generalized, common proof; and (4) to establish that some or all of the Plaintiffs are not adequate

or typical class representatives because they do not have standing to assert antitrust claims on

behalf of themselves.

### LEGAL STANDARD

    A United States Magistrate Judge may hear and determine any [non-dispositive] pretrial

matter pending before the court pursuant to 28 U.S.C. § 636(b)(1)(A). The district court will

only reverse a magistrate judge's decision on these matters if it is "clearly erroneous or contrary

to law." 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); L. Civ. R. 72.1(c)(1)(A). Therefore,

"this Court will review a magistrate judge's findings of fact for clear error." Lithuanian

Commerce Corp., Ltd. v. Sara Lee Hosiery, 177 F.R.D. 205, 213 (D.N.J. 1997) (citing Lo Bosco

v. Kure Eng'g Ltd., 891 F. Supp. 1035, 1037 (D.N.J. 1995)). Under this standard, a finding is

clearly erroneous when "although there is evidence to support it, the reviewing court on the entire

evidence is left with the definite and firm conviction that a mistake has been committed."

Anderson v. Bessemer City, 470 U.S. 564, 573 (1985) (citing United States v. U.S. Gypsum Co.,

333 U.S. 364, 395 (1948)). The district court will not reverse the magistrate judge's

determination, even in circumstances where the court might have decided the matter differently.

Bowen v. Parking Auth. of City of Camden, 2002 WL 1754493, at *3 (D.N.J. July 30, 2002). "A

district judge's simple disagreement with the magistrate judge's findings is insufficient to meet

the clearly erroneous standard of review." Andrews v. Goodyear Tire & Rubber Co., Inc., 191

F.R.D. 59, 68 (D.N.J. 2000).

In matters where the magistrate judge is authorized to exercise his or her discretion, the

decision will be reversed only for an abuse of discretion. Kresefky v. Panasonic

Communications & Sys. Co., 169 F.R.D. 54, 64 (D.N.J. 1996) ("Where, as here, the magistrate

has ruled on a non-dispositive matter such as a discovery motion, his or her ruling is entitled to

great deference and is reversible only for abuse of discretion"). "This deferential standard is

'especially appropriate where the Magistrate Judge has managed this case from the outset and

developed a thorough knowledge of the proceedings.'" Lithuanian Commerce Corp., 177 F.R.D.

at 214 (quoting Pub. Interest Research Group v. Hercules, Inc., 830 F. Supp. 1525, 1547 (D.N.J.

1993), aff'd on other grounds and rev'd on other grounds, 50 F.3d 1239 (3d Cir. 1995)).

However, a magistrate judge's legal conclusions on a non-dispositive motion will be

reviewed de novo. See Haines v. Liggett Group, Inc., 975 F.2d 81, 91 (3d Cir. 1992); Lo Bosco,

891 F. Supp. at 1037. A ruling is "contrary to law" when the magistrate judge has misinterpreted

or misapplied the applicable law. Pharmaceutical Sales & Consulting Corp. v. J.W.S. Delavau

Co., Inc., 106 F. Supp. 2d 761, 764 (D.N.J. 2000).

    In light of this framework, the Court turns to Defendant's appeal of Magistrate Judge

Hedges' October 17 Letter Opinion and Order. As this appeal arises out of a discovery dispute

over whether Plaintiffs must turn over to Defendant certain "downstream discovery," Magistrate

Judge Hedges' decision denying Defendant's request hinges on the application of matters within

his discretion and some matters of law. Therefore, this Court will apply the clearly erroneous

and de novo standards of review where appropriate.

### DISCUSSION

    The issue before the Court is whether Magistrate Judge Hedges abused his discretion or

misapplied the applicable law in denying Defendant's request for "downstream discovery" of

Plaintiffs' sales data and communications. Defendant sets forth three separate arguments in

support of its appeal of the October 17 Letter Opinion and Order: (1) the discovery requested is

relevant, is reasonably calculated to lead to the discovery of admissible evidence, and is not

unduly burdensome; (2) the denial of "Downstream Discovery" should be reversed because the

discovery order misinterprets the relevant law; and (3) Becton is entitled to discovery of

Plaintiffs' sales data and communications for several other reasons that Magistrate Judge Hedges

failed to seriously consider. The Court will address each of these arguments in turn.

#### *(1) Class Certification Discovery*

    Federal Rule of Civil Procedure 26(b)(1) provides that for good cause "the court may

order discovery of any matter relevant to the subject matter involved in the action. Relevant

information need not be admissible at the trial if the discovery appears reasonably calculated to

lead to the discovery of admissible evidence." Relevancy is construed liberally under Rule 26,

Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978), but it may be determined and

limited by the circumstances of each case. Continental Access Control Sys., Inc. v. Recal-

Vikonics, 101 F.R.D. 418, 419-20 (E.D. Pa. 1983). While the scope of relevance in the context

of discovery is far broader than that allowed for evidentiary purposes, see Centurion Indus., Inc.

v. Warren Steurer and Assocs., 665 F.2d 323, 326 (10th Cir. 1981); Bailey v. Meister Brau, Inc.,

55 F.R.D. 211 (N.D. Ill. 1972), it is not without limits, see Broadway & Ninety-Sixth St. Realty

Co. v. Loew's, Inc., 21 F.R.D. 347 (S.D.N.Y. 1958). The determination of relevance is within

the discretion of the district court. O'Neal v. Riceland Foods, 684 F.2d 577 (8th Cir. 1982);

Stewart v. Winter, 669 F.2d 328 (5th Cir. 1982); Stabilus, A Div. of Fichtel & Sachs Indus., Inc.

v. Haynsworth, Baldwin, Johnson and Greaves, P.A., 144 F.R.D. 258, 265 (E.D. Pa. 1992);

Bowman v. Gen. Motors Corp., 64 F.R.D. 62 (E.D. Pa. 1974).

Under the Federal Rules, in addition to satisfying the four prerequisites outlined in Rule

23(a), under Rule 23(b)(3), relevant to the present case, a court may certify a class if it "finds that

the questions of law or fact common to the members of the class predominate over any questions

affecting only individual members, and that a class action is superior to other available methods

for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). It is

important to note that Rule 23(b)(3) class actions are "opt out" class actions, and members are

free to exclude themselves from the case by affirmatively opting out.

As will be discussed in this Opinion, the issue before this Court is not whether Hanover

Shoe bars downstream discovery, but whether the Defendant's purpose for obtaining downstream

discovery is relevant to the class certification issue. First, the Court must determine from which

Plaintiffs the Defendant seeks to obtain this downstream discovery. A review of Defendant's

letters to Magistrate Judge Hedges and briefs on appeal demonstrate that exactly which Plaintiffs

the Defendant seeks downstream discovery from is far from clear. In briefing this issue before

Magistrate Judge Hedges they clearly sought to obtain information from "plaintiffs and other

distributors." However, in Defendant's brief in support of its appeal, Defendant says it has not

"inquire[d] into the downstream sales activities of every member of the plaintiff class." (Def.'s

Br. on Appeal at 9). But then later in that same brief, Defendant states it is seeking "sales data

and written communications from Plaintiffs and a selection of other distributors." (Id. at 22; see

also Def.'s Reply Br. on Appeal at 8 n.5). On yet another page in that same brief, Defendant's

statement "that the sales data it requested from Plaintiffs (and will seek from other select

distributors. . .)," (Def.'s Br. on Appeal at 25), leads this Court to believe that maybe they have

not yet sought this data. Since Defendant fails to explain to this Court how it would benefit from

the use of data obtained only from the named Plaintiffs, in its efforts to oppose a class

certification motion, the Court can only surmise that Defendant must also be seeking it from

other class members. While Defendant agrees that seeking such discovery from *every* member of

the Plaintiff class would impose an undue burden on Plaintiffs, this Court cannot reconcile this

incongruity. Based on the competing statements by Defendant, the Court will assume for

purposes of this motion that Defendant is seeking downstream discovery from the named

Plaintiffs and at least some, though not all, of the class members.

        The Court now turns to the parties' specific arguments.

        ### (2) *Valley Drug* **and the Applicable Law Addressing Adequacy**

        Next, the Court must consider whether Magistrate Judge Hedges misapplied the law set

forth by the Eleventh Circuit in the Valley Drug decision. Defendant argues that the decision by

Magistrate Judge Hedges, in analyzing whether Plaintiffs are adequate class representatives

under Rule 23(a)(4) where their economic interests arguably conflict with those of absent class

members, misapplied the law and that he should have followed the reasoning of the Eleventh

Circuit's decision in Valley Drug Co. v. Geneva Pharm., Inc., 350 F.3d 1181 (11th Cir. 2003).

Plaintiffs argue that Magistrate Judge Hedges correctly applied the law and appropriately

disregarded the Valley Drug decision as non-binding authority and inapplicable in this circuit. In

supplemental briefing, Plaintiffs provided another case for the proposition that courts in this

circuit do not follow Valley Drug. In re Tricor Direct Purchaser Antitrust Litigation (C.A. No.

05-340 (KAJ) (D. Del. March 3, 2006)).[2]

    After reviewing the parties submissions and hearing oral argument, Magistrate Judge

Hedges held that the Third Circuit did not follow the narrow reading of Hanover Shoe v. United

Shoe Mach. Corp., 392 U.S. 481 (1968), set forth in the Eleventh Circuit's decision in Valley

Drug. In Valley Drug, the Eleventh Circuit noted that while the class members may have

suffered an antitrust injury, "neither Hanover Shoe nor its progeny imbue the named

representatives in this case with the automatic right to certify a class where the economic reality

of the situation reveals that a fundamental conflict may exist among the class members because

of their different economic circumstances and different economic interests." Valley Drug, 350

F.3d at 1193. Magistrate Judge Hedges explained that:

---

[2]The Court has considered the parties arguments regarding In re Tricor Direct Purchaser Antitrust
Litigation (C.A. No. 05-340 (KAJ) (D. Del. March 3, 2006) and concludes that in light of the
factual dissimilarity, and the fact that the district judge did not explicitly address Valley Drug in
his decision on the record in a telephone conference, it is not persuasive and not necessary in
light of this Court's decision.

> *Valley Drug* read *Hanover Shoe* as "directing a court to overlook the potential net
> gain, or conversely the potential absence of net loss, that a direct purchaser may in
> fact have experienced for the purposes of providing the direct purchaser with
> standing to sue and a means for calculating damages in antitrust violation
> litigation." 350 F.3d at 1193. The [*Valley Drug*] court noted that it "will not
> interpret the 'fundamental conflict/antagonistic interests' prong of" Rule 23(a)(4)
> any differently in antitrust suits. 350 F.3d at 1193 (noting that net economic gain
> of some class members must not be overlooked when determining whether Rule
> 23 is satisfied). This narrow reading of *Hanover Shoe* is neither shared by this
> Court nor this circuit.

(Op. at 3).

The rationale that "Hanover Shoe does not hold that this net economic gain must be

ignored or overlooked by a court when determining whether Rule 23 has been satisfied," Valley

Drug, 350 F.3d at 1193, is inconsistent with the Third Circuit decision in In re Warfarin Sodium

Antitrust Litigation, 391 F.3d 516, 532 (3d Cir. 2004). Magistrate Judge Hedges articulated that

in considering class certification the Third Circuit held in In re Warfarin that despite the

argument that members of the plaintiff class suffered different types of economic damages as a

result of defendant's alleged anticompetitive behavior, the plaintiff class "suffered the same

injury resulting from the overpayment for [the product]" and therefore satisfied the requirements

of Rule 23(a)(4). (Op. at 4). Though In re Warfarin does not address downstream discovery, it is

relevant for purposes of analyzing Defendant's rationale for obtaining the requested discovery.

In his Opinion the magistrate judge also cited In re Pressure Sensitive Labelstock

Antitrust Litig., 226 F.R.D. 492, 498 (M.D. Pa. 2005), a relevant decision from the Middle

District of Pennsylvania involving an antitrust suit in which the court denied the defendants'

request for downstream discovery where they had asserted the need to determine whether any of

the class had "cost plus" contracts or whether they were controlled by a customer.[3]  The court

held that "[i]n the absence of some showing of conditions making it probable that some large

subset of the class benefitted from the [monopoly], making their interests antagonistic to other

class members, downstream discovery should be disallowed."  Id.  Magistrate Judge Hedges also

commented that the Labelstock court indicated that in Hanover Shoe the Supreme Court warned

against permitting defendants to perform massive downstream discovery activities where it might

reduce the effectiveness of antitrust actions.  The Labelstock court further concluded that the

"relevance of the information sought" was "clearly outweighed by the burden and expense that

the proposed discovery would impose."  Id.

Having reviewed this argument de novo, the Court comes to the same conclusion as

Magistrate Judge Hedges.  For purposes of class certification, direct purchasers that have

suffered overcharges have an antitrust injury and would be entitled to recover the full amount of

the overcharge they paid; it is irrelevant if they may have also benefitted from the higher prices

because their profits were a percentage of their acquisition costs.  See, e.g., Hanover Shoe, 392

U.S. at 489; Illinois Brick Co. v. Illinois, 431 U.S. 720, 724-25 (1977).  The Eleventh Circuit, in

Valley Drug, did not address this issue.  See Joshua P. Davis and David F. Sorensen, Chimerical

Class Conflicts in Federal Antitrust Litigation: The Fox Guarding the Chicken House in Valley

Drug, 39 U.S.F. L. Rev. 141, 159-63 (discussing how the Eleventh Circuit incorrectly applied the

general principle, inapplicable in antitrust cases under the direct purchaser rule, that "a class

cannot be certified when its members have opposing interests or when it consists of members

who benefit from the same acts alleged to be harmful to other members of the class.").

---

[3]These two exceptions to the direct purchaser rule are discussed at more length infra.

Even assuming Valley Drug is authoritative, it did not suggest that downstream discovery was appropriate in every antitrust case. Here, the Court finds that unlike the defendants in Valley Drug, Defendant has failed to initially produce any evidence to support its claim that it is entitled to downstream sales data and written communications to show that Plaintiffs are not adequate class representatives because they have economic interests in conflict with absent class members. For example, in Valley Drug the defendants did produce evidence showing the manner in which the plaintiffs may have benefitted from their alleged conduct. Id. at 1190-91. By contrast, only in support of its appeal has Defendant come forward with any such evidence -- namely a single Securities and Exchange Commission filing by a sole putative class member stating that the majority of its distribution arrangements compensate the company on a cost-plus percentage basis. (Def. Br. in Support of its Appeal at 13).

The SEC filing states: "In many cases, distribution contracts in the medical/surgical supply industry specify a minimum volume of product to be purchased and are terminable by the customer upon short notice." Assuming that this putative class member does enter into such minimum volume contracts, taken as a whole, this document does not support Defendant's arguments because it does not involve a fixed quantity and it involves only one putative class member. Since it does not state that this putative class member contracts with indirect purchasers under this "cost-plus" method for a fixed quantity, it is arguable that without the alleged overcharges by Defendant that an indirect purchaser may have purchased in excess of its contractual minimum volume. Further, since these contracts allow for termination by the indirect purchaser on short notice it is possible that if prices increase the indirect purchaser would go elsewhere for its medical supplies. Nevertheless, the cost-plus exception is only applicable

where there is a contract requiring the indirect purchaser to buy a fixed quantity of products. That does not appear to be the case with this putative class member. Moreover, while this single piece of evidence may show conduct by one putative class member, there is no evidence to show how seeking "downstream discovery" from the named Plaintiffs will establish the existence of an intra-class conflict. Thus, <u>Valley Drug</u>, even if followed in this jurisdiction, does not assist Defendant. Accordingly, Magistrate Judge Hedges decision on this matter is neither clearly erroneous nor contrary to law and is hereby affirmed.

### (3) Defendant's Three Other Grounds That Were Allegedly Overlooked

The Court now turns to Defendant's arguments on appeal that Magistrate Judge Hedges overlooked their three other arguments supporting downstream discovery. Those three arguments are: (1) Plaintiffs are not typical or adequate class representatives because their overcharge theory of damages potentially conflicts with the interests of certain absent class members; (2) common questions do not predominate because there is no common proof of economic impact; and (3) certain named Plaintiffs and class members may lack injury and standing. Although Defendant contends that Magistrate Judge Hedges did not consider these arguments, his October 17 Letter-Opinion and Order demonstrates that he did not overlook Defendant's remaining arguments. Magistrate Judge Hedges specifically stated:

> The defendant here contends that absent class members may include "giant distributors" who may sell defendant's products "pursuant to 'cost plus' contracts." Becton Letter at 2. It also contends that it requires "downstream discovery to demonstrate that plaintiffs' 'overcharge' theory of damages puts them at odds with others in the class who might pursue recovery of lost profits." Becton Letter at 4. I am not persuaded.

(Op. at 4). His Honor also stated: "As long as class members are entitled to recover overcharges,

whether certain class members 'made a profit on the overcharges in comparison' to other class members is generally irrelevant." (Op. at 5, citing In re Vitamins Antitrust Litig., 198 F.R.D. 296, 300-01 (D.D.C. 2000)). Nevertheless, because Magistrate Judge Heges did not set forth his reasoning for these conclusions, and this Court is left with nothing to review, the Court will consider defendant's arguments de novo.

### (a) Overcharge Theory of Damages

First, Defendant contends that downstream discovery is necessary for it to establish that Plaintiffs are not typical or adequate class representatives under Rule 23(a) because their overcharge theory of damages potentially conflicts with the interests of certain absent class members that might want to pursue a lost profits claim. The downstream discovery will allegedly show that Plaintiffs' pricing and mix of products do not give Plaintiffs an incentive to claim other damages. In addition, it will help Defendant support its theory that some of the Plaintiffs do not even supply safety syringes – the product made by rivals that Defendant allegedly foreclosed its rivals from selling. This will supposedly demonstrate a conflict with other Plaintiffs that do and have a more varied product mix. These latter Plaintiffs would argue that absent Defendant's anti-competitive behavior, they would have profited from a shift in market share from Defendant's standard syringes to the more profitable safety syringes. Under these circumstances, the Plaintiffs would not be typical or adequate class representatives because their "theory of damages is antagonistic to an alternative theory that many class members will likely wish to pursue." Bradburn Parent/Teacher Store, Inc. v. 3M, 2004 U.S. Dist. LEXIS 3347, at *32 (E.D. Pa. March 1, 2004).

Plaintiffs set forth several arguments in opposition to Defendant's challenge of their

overcharge theory of damages. First, they point out that <u>Bradburn</u> is irrelevant because it did not

involve downstream discovery. Second, the Third Circuit has held that "the standard method of

measuring damages in price enhancement cases is overcharge, not lost profits." <u>Howard Hess</u>

<u>Dental Labs. Inc. v. Dentsply Int'l, Inc.</u>, 424 F.3d 363, 375 (3d Cir. 2005). The circuit further

stated that "'Lost' profits damages are disfavored, at least in part because they are more difficult

to prove than overcharge damages." <u>Id.</u> at 374-75. Thus, Plaintiffs reason that Defendant fails to

articulate why an absent class member would want to assert a theory of damages that might

"practically deny recovery." <u>Id.</u> at 374. In addition, the discovery sought by Defendant would

not assist Defendant in determining whether a <u>Bradburn</u> type conflict exists in the present case

because Defendant's exclusionary conduct has not ceased. Since a comparison of purchases

made by Plaintiffs before and after the exclusionary conduct has ceased is not possible,

Defendant cannot determine what Plaintiffs would or would not purchase. Further, if it is the

current product mix that Defendant seeks to discover, they have this information because it is

upstream purchase data between class members and Defendant. In the present case, unlike the

plaintiff in <u>Bradburn</u> that admitted it would not have purchased the excluded rival's private label

tape, the Plaintiffs have alleged that absent Defendant's challenged conduct the class members

would have substituted their purchase of Defendant's relevant hypodermic products with those of

a less expensive rival. (Compl. ¶ 50).

　　"Typicality lies where there is a strong similarity of legal theories or where the claims of

the class representatives and the class members arise from the same alleged course of conduct by

the defendant." <u>In re Prudential Ins. Co. of Am. Sales Practices Litig ("Prudential I")</u>, 962 F.

Supp. 450, 518 (D.N.J. 1997) (citations omitted). Hence, even where there may be factual

differences between the claims of the class representatives and other class members, it does not

rule out a finding of typicality.  In re Lucent Techs., Inc. Sec. Litig. ("Lucent I "), 307 F. Supp. 2d

633, 640 (D.N.J. 2004) (citing In re Prudential Ins. Co. of Am. Sales Practices Litig ("Prudential

II"), 148 F.3d 283, 310 (3d Cir. 1998)).  In endorsing class certification in Prudential II, the Third

Circuit stated that, while the Class suffered various forms of injuries, they all were derived from

some alleged common wrong that provided a sufficient basis for a finding of typicality.  148 F.3d

at 312; see also In re Warfarin Sodium Antitrust Litig., 391 F.3d at 531-32 ("typicality, as with

commonality, does not require 'that all putative class members share identical claims.'" (citation

omitted)).  Likewise, "factual differences among the claims of the putative class members do not

defeat certification."  Baby Neal for & by Kanter v. Casey, 43 F.3d 48, 56 (3d Cir. 1994).

Similar to adequacy of representation, the typicality requirement also looks "to the potential for

conflicts in the class."  Georgine v. Amchem Prods., 83 F.3d 610, 632 (3d Cir. 1996).

     Turning first to Bradburn Parent/Teacher Store v. 3M, 2004 U.S. Dist. LEXIS 3347 (E.D.

Pa. March 1, 2004), a decision heavily relied on by Defendant, the Court concludes that it is not

relevant to the matter at hand.  In a subsequent opinion in the Bradburn case, in which class

certification of a modified class was granted, the district court set forth the following explanation

of its earlier decision that is the subject of discussion by the present parties:

> The Court specifically found that Plaintiff failed to satisfy the requirements of
> Federal Rule of Civil Procedure 23(a)(4), in that Plaintiff failed to show that it
> could adequately protect the interests of all of the proposed class members.
> Specifically, the Court found that Plaintiff's position as a sole purchaser of 3M
> branded transparent tape resulted in a conflict of interest between Plaintiff and
> those class members who purchased "private label" tape.  Those members of the
> proposed class who purchased significant quantifies of private label tape, the
> Court found, would likely be interested in pursuing a "lost profits" theory of
> damages, and would accordingly seek to present evidence that maximized a shift

in market share from 3M branded to private label tape in the absence of 3M's
anti-competitive conduct. Plaintiff, by contrast, was solely pursuing an
overcharge theory of damages, and therefore would attempt to demonstrate that
the price of 3M branded tape would have fallen in the absence of 3M's anti-
competitive conduct. The court found that these two competing positions resulted
in an apparent and imminent conflict among members of the proposed class.

Bradburn Parent/Teacher Store v. 3M, 2004 U.S. Dist. LEXIS 16193, at *7-8 (E.D. Pa. Aug. 17,

2004) (footnote omitted).

Bradburn is not relevant to the matter at hand for two reasons. First, Bradburn does not

involve any discussion of downstream discovery, which is at issue here. Second, the facts do not

coincide with those of this case. As is demonstrated by the subsequent opinion granting class

certification, once the class was narrowed to exclude parties that purchased private label tape the

class was certified. Here, as opposed to the plaintiff that would not purchase private label tape,

Plaintiffs have asserted in their Complaint that they would have purchased the relevant

hypodermic products from Defendant's rivals. Thus, Bradburn does not assist Defendant in

demonstrating any antagonism between the Plaintiffs and the proposed class members that would

justify this Court permitting the requested downstream discovery at this time.

Without getting into the merits of the class certification issue, given that Magistrate Judge

Hedges has already ordered Plaintiffs to supply Defendant with their customer contracts, this

Court is of the opinion that those contracts will likely provide Defendant with sufficient

information to make this same argument in opposition to class certification. While sales data

may prove helpful in establishing damages, here it is unnecessary given the other discovery

available to Defendant. Also, the relevance of written communications is doubtful, particularly

in light of other available discovery.

Page 17 of 24

### (b) Commonality and Predominance

Next, Defendant contends that it needs this discovery to establish that common questions do not predominate because there is no generalized common proof of the economic impact of the alleged antitrust violation. Defendant asserts that in antitrust cases, Plaintiffs must show "common impact." It asserts that in this instance there is no common conduct or common economic impact to all the class members. Specifically, Defendant states that the prices Plaintiffs as direct purchasers pay for Defendant's products "result from a multitude of different and individually negotiated contracts, arising from their own unique bidding procedures and negotiating histories, and a multitude of different off-contract pricing practices that can vary widely from purchaser to purchaser." (Def. Br. at 23-24). The prices that Plaintiffs would pay in a more competitive "but-for" world can only be determined through individualized inquiries due to the many different factors that would impact the pricing. In their brief, Defendant explains that they need the downstream discovery because the prices paid by many of the direct purchasers for Defendant's products is governed by arrangements between the direct purchasers/distributors and the "downstream" customers.

Plaintiffs take the position that Defendant is really seeking upstream information, as opposed to downstream information, because it is data establishing the prices paid by Plaintiffs to Defendant. Magistrate Judge Hedges also noted that Defendant knows who it sells to and what prices it charges its distributors. Since Defendant already possesses documents that establish this data, the request for supplemental discovery, Plaintiffs argue, cannot outweigh the enormous burdens inherent in its production. Further, to the extent that Defendant is arguing that Plaintiffs' downstream purchasers influence the prices paid by Plaintiffs, Plaintiffs contend that

those downstream purchasers negotiated their contracts through agents and Defendant. Thus,

Defendant would also have this information.

For a class that is certified under Rule 23(b)(3), which the Plaintiffs are here seeking, the

Court must find that common questions predominate over individual issues. Prudential I, 962 F.

Supp. at 510-11. "To evaluate predominance, the Court must determine whether the efficiencies

gained by class resolution of the common issues are outweighed by individual issues presented

for adjudication." Id. at 511 (citing 1 Newberg § 4.25, at 4-81 to 4-86). Courts have readily held

that even a few common issues can satisfy this requirement where their resolution will

significantly advance the litigation. Id. (gathering authority). Predominance has been found not

to be met in cases that "required individualized proof of 'highly case-specific factual issues.'"

Elkins v. Equitable Life Ins. Co., 1998 U.S. Dist. LEXIS 1557, at *49 (M.D. Fla. Jan. 27, 1998)

(quoting Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1004-05 (11th Cir. 1997)

(involving whether Motel 6 had a practice or policy of racial discrimination)); see also Amchem

Prods. v. Windsor, 521 U.S. 591, 622 (1997) (involving widely varying personal injuries as a

result of different sorts of exposure to different types of asbestos products with current and future

asbestos-related claims). In fact, the need to calculate "damages on an individual basis should not

preclude class determination when the common issues which determine liability predominate."

Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124, 137 (3d Cir. 2000); see also

Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir. 1977).

> [T]he proof plaintiffs must adduce to establish a conspiracy to fix prices, and that
> defendants base price was higher than it would have been absent the conspiracy,
> would be common to all class members. Therefore, even though some plaintiffs
> negotiated prices, if plaintiffs can establish that the base price from which these
> negotiations occurred was inflated, this would establish at least the fact of

damage, even if the extent of the damage by each plaintiff varied.

In re Flat Glass Antitrust Litig., 191 F.R.D. 472, 486 (W.D. Pa. 1999). Nevertheless, Plaintiffs

will have to demonstrate that the base price and the but for price (the price absent any anti-

competitive behavior) can be determined without individualized inquiries into each potential

class member. See, e.g., Blades v. Monsanto Co., 400 F.3d 562, 569-71 (8th Cir. 2005) .

Again, without reaching the merits of the class certification issues, Magistrate Judge

Hedges already ordered Plaintiffs to turn over their contracts with their customers. Those

contracts should provide relevant information for Defendant to ascertain differences between

Plaintiffs. Since, as Defendant contends, the pricing is governed by arrangements between the

distributors and their customers, Defendant fails to say why the contracts themselves, which have

been ordered to be produced, would be insufficient for this purpose. Moreover, much of the

information that Defendant seeks is "upstream" information that is already in Defendant's

possession. Hence, the Court agrees with Magistrate Judge Hedges that providing the sales data

and communications, in addition to data that Defendant already possesses, would be overly

burdensome on Plaintiffs and that burden would outweigh the benefit to Defendant at this stage

of discovery.

### (c) Injury and Standing

Lastly, Defendant contends the downstream discovery will assist it in demonstrating that

certain named Plaintiffs and class members may lack injury and standing to assert antitrust

claims. Defendant argues that where a named plaintiff is subject to defenses such as lack of

standing or injury, they are not adequate or typical representatives under Rule 23. In addition,

commonality would be defeated if there were absent class members who lacked standing or

injury because there would be no class-wide proof of economic impact. Here, Defendant contends that the named Plaintiffs may lack injury or standing under the "pre-existing cost-plus contract" exception and/or the "owned or controlled" exception, and the discovery it seeks is directly relevant to establishing these exceptions.

Plaintiff first argues that these are new issues that were not presented to Magistrate Judge Hedges and that the objections should have been lodged against Case Management Order #4, in which discovery was limited to Plaintiffs' articles of incorporation and bylaws. They also point out that Magistrate Judge Hedges did not entirely foreclose this discovery, he told Defendant to return to the Court if it found more detailed shareholder information was necessary. (Tr. at 43). Lastly, Plaintiffs argue that Defendant does not even meet the standards of showing that the "cost-plus"/fixed quantity and "owned or controlled" issues are relevant to justify such far-reaching discovery

There are two potential exceptions to the direct purchaser rule: (1) where the direct purchaser and indirect purchaser are bound by a pre-existing cost-plus contract with a fixed quantity of goods, and (2) "where the direct purchaser is owned or controlled by its customer." Illinois Brick, 431 U.S. at 735-36. "Since the policies underlying Illinois Brick and Hanover Shoe principally the difficulty of proving that an overcharge has been passed on . . . would not be as seriously implicated in the cost-plus and control situations, the court carved out narrow exceptions for them." Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 494 F. Supp. 1246, 1250 (M.D. Pa. 1980) (internal citation omitted).

In Hanover Shoe and Illinois Brick, the Supreme Court recognized that there might be an exception to the direct purchaser rule when a direct purchaser sold to its customers under a "pre-

existing cost-plus contract."

> In [a pre-existing cost-plus contract] situation, the [direct] purchaser is insulated
> from any decrease in its sales as a result of attempting to pass on the overcharge,
> because its customer is committed to buying a fixed quantity regardless of price.
> The effect of the overcharge is essentially determined in advance, without
> reference to the interaction of supply and demand that complicates the
> determination in the general case.

Illinois Brick, 431 U.S. at 736.

The Third Circuit has stated that "[t]he vitality of the 'pre-existing cost-plus contract'

exception is doubtful, however, in light of Utilicorp." McCarthy v. Recordex Serv., 80 F.3d 842,

855 (3d Cir. 1996). In Kansas v. Utilicorp United, Inc., 497 U.S. 199, 217-18 (1990), even

though one hundred percent of the cost increases was passed on to the indirect purchasers, the

Supreme Court declined to apply the cost-plus contract exception in a situation where

regulations and tariffs required the direct purchaser, a utility company, to pass on its costs to the

consumers because "[t]he [utility] did not sell the gas to its customers under a pre-existing cost-

plus contract." The Court reasoned that "the utility itself had no guarantee of any particular

profit" since the utility's customers had not committed to purchase a particular quantity of gas.

Id. at 218. Therefore,

> [e]ven though the [utility] raised its prices to cover its costs, we cannot ascertain
> its precise injury because . . . we do not know what might have happened in the
> absence of an overcharge. In addition, even if the utility customers had a highly
> inelastic demand for natural gas, the need to inquire into the precise operation of
> market forces would negate the simplicity and certainty that could justify a cost-
> plus contract exception.

Id. (internal citation omitted). However, the Court did note that it "might allow indirect

purchasers to sue only when, by hypothesis, the direct purchaser will bear no portion of the

overcharge and otherwise suffer no injury." Id.

Without deciding at this juncture whether or not the "pre-existing cost-plus contract" exception is still binding, for the reasons set forth above in Section 2, this Court is not persuaded by Defendant's single piece of evidence that purports to demonstrate that a putative class member contracts with indirect purchasers under a "cost-plus" method. While this piece of evidence may arguably show conduct by one putative class member, there is no evidence to show how seeking "downstream discovery" from the named Plaintiffs will establish that Plaintiffs lack injury or standing. Given that Magistrate Judge Hedges did permit discovery on contracts between Plaintiffs and their customers, (Op. at 5), the downstream discovery Defendant seeks, that is Plaintiffs' (1) sales data pertaining to the products at issue, and (2) their written communications with customers about supply bids, contracts and sales calls, would be overly burdensome on the Plaintiff class without a greater showing.

In so far as Defendant continues to seek discovery on the "own or control" issues, Magistrate Judge Hedges clearly ruled that Plaintiffs were to turn over the articles of incorporation and bylaws, and that Defendant "can come back to me again if you want shareholder lists." (Tr. at 43). While Plaintiffs are correct that if Defendant wished to appeal this issue, they should have appealed CMO #4. However, Magistrate Judge Hedges left the door open for Defendant to return to him should they continue to need that information. In any event, the matter is not properly before this Court on appeal and will not be addressed any further.

Lastly, to the extent that Defendant is seeking communications with GPOs, that was also decided during oral argument. Defendant's request was for GPO contracts and communications. Magistrate Judge Hedges granted their request for the GPO contracts but would go no further. (Tr. at 37). Again, this issue could have been appealed at that time, but Defendant is not

Page 23 of  24

precluded from going back to Magistrate Judge Hedges to again seek this information.

## CONCLUSION

For the reasons set forth above, it is on this 7th day of September, 2006,

ORDERED that Defendant's appeal [Docket Entry # 44] of Magistrate Judge Hedges'

October 17, 2005 Letter Opinion and Order is DENIED, and the decision is hereby AFFIRMED;

and it is further

ORDERED that Plaintiffs' motion to strike Defendant's supplemental briefing [Docket

Entry #97] is DENIED.

It is so ordered.

DATED: September 7, 2006                          /s/ Jose L. Linares
                                                 JOSE L. LINARES,
                                                 UNITED STATES DISTRICT JUDGE