IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEIJER, INC., MEIJER DISTRIBUTION, INC., LOUISIANA WHOLESALE DRUG CO., INC., ROCHESTER DRUG CO-OPERATIVE, INC., AMERICAN SALES COMPANY, INC., SAJ DISTRIBUTORS, INC., and STEPHEN L. LaFRANCE HOLDINGS, INC., on behalf of themselves and all others similarly situated, | No. 05 Civ. 2195 (CKK) |
| | ORAL ARGUMENT REQUESTED |
| **Plaintiffs,** | |
| v. | |
| WARNER CHILCOTT HOLDINGS COMPANY III, LTD., WARNER CHILCOTT CORPORATION, WARNER CHILCOTT (US) INC., WARNER CHILCOTT COMPANY, INC., GALEN (CHEMICALS), LTD., and BARR PHARMACEUTICALS, INC., | |
| **Defendants.** | |

# REDACTED
# PURSUANT TO PROTECTIVE ORDER

### DIRECT PURCHASER CLASS PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

### COUNSEL LISTED ON SIGNATURE PAGE

**Dated: March 12, 2007.**

# TABLE OF CONTENTS

**Page**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.    FACTUAL & PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . .  5

III.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

     A.     Class Certification is Particularly
           Appropriate in Antitrust Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

     B.     The Standards for Class Certification Under Rule 23 . . . . . . . . . . . . . . .  11

     C.     The Requirements for Rule 23(a) are Satisfied . . . . . . . . . . . . . . . . . . . . .  12

           1.     Numerosity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

           2.     Commonality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

           3.     Typicality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

           4.     Adequacy of Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

                 a.     Absence of Conflict . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

                 b.     Qualifications of Counsel . . . . . . . . . . . . . . . . . . . . . . . . .  16

     D.     The Requirements of Rule 23(b)(3) Are Satisfied . . . . . . . . . . . . . . . . . . .  18

           1.     Predominance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

                 a.     Section 1 Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

                 b.     Common Antitrust Injury or Impact . . . . . . . . . . . . . . . . .  21

                      (1)     Academic/Governmental Studies . . . . . . . . . . . . . .  24

                      (2)     Defendants' Own Contemporaneous
                           Internal Projections . . . . . . . . . . . . . . . . . . . . . . . .  25

(3)     Data Reflecting Actual Generic Competition .....  26

(a)     Class-Wide Methodologies Are Available
For Estimating the Amount of Damages ...  27

2.     Superiority ..........................................  29

IV.     CONCLUSION ....................................................  30

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 18

*In re Ampicillin Antitrust Litigation,*
    55 F.R.D. 269 (D.D.C. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 20, 29

*In re Auction Houses Antitrust Litigation,*
    193 F.R.D. 162 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 23

*Bigelow v. Radio Pictures,*
    327 U.S. 251 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Bogosian v. Gulf Oil Corp.,*
    561 F.2d 434 (3d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 28

*In re Brand Name Prescription Drugs Antitrust Litigation,*
    Nos. 94 C 897, MDL 997, 1994 WL 663590 (N.D. Ill. 1994) . . . . . . . . . . . . . . . . . . 11

*Brown v. Pro Football,*
    146 F.R.D. 1 (D.D.C. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 18

*In re Buspirone Patent & Antitrust Litigation,*
    210 F.R.D. 43 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Cardizem CD Antitrust Litigation,*
    200 F.R.D. 297 (E.D. Mich. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Chattanooga Foundry & Pipe Works v. City of Atlanta,*
    203 U.S. 390 (1906) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Committee of Blind Vendors v. District of Columbia,*
    695 F. Supp. 1234 (D.D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Currency Conversion Fee Antitrust Litigation,*
    224 F.R.D. 555 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Disposable Contact Lens Antitrust Litigation,*
    170 F.R.D. 524 (M.D. Fla. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

iii

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation,*
No. M02-1486 (PJH), 2006 WL. 1530166 (N.D. Cal. June 5, 2006) . . . . . . . . . 18, 20

*Eisen v. Carlisle & Jacquelin,*
417 U.S. 156 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Jack Faucett Associate v. American Telegraph & Telegraph Co.,*
No. 81-1804, 1983 WL 4601 (D.D.C. Mar. 18, 1983) . . . . . . . . . . . . . . . . . . . . 28

*In re Flat Glass Antitrust Litigation,*
191 F.R.D. 472 (W.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 18, 19

*Hawaii v. Standard Oil Co. of Cal.,*
405 U.S. 251 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Industrial Diamonds Antitrust Litigation,*
167 F.R.D. 374 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 20, 27

*J.B.D.L. Corp. v. Wyeth-Ayerst Laboratories,*
225 F.R.D. 208 (S.D. Ohio 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 30

*Lee-Moore Oil v. Union Oil,*
599 F.2d 1299 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*In re Linerboard Antitrust Litigation,*
305 F.3d 145 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Linerboard Antitrust Litig.,*
203 F.R.D. 197 (E.D. Pa. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 18, 19, 22, 23, 27

*In re Lorazepam & Clorazepate Antitrust Litigation,*
202 F.R.D. 12 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Lower Lake Erie Ore Antitrust Litigation,*
998 F.2d 1144 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Lumco Indust. Inc. v. Jeld-Wen,*
171 F.R.D. 168 (E.D. Pa. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Magnetic Audiotape Antitrust Litig.,*
No. 99 CIV. 1580 (LMM), 2001 WL. 619305 (S.D.N.Y. Jun. 6, 2001) . . . . . . . . . . 11

*In re Master Key Antitrust Litigation,*
528 F.2d 5 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

iv

*In re Mercedes-Benz Antitrust Litigation,*
    213 F.R.D. 180 (D.N.J. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re NASDAQ Market-Makers Antitrust Litigation,*
    169 F.R.D. 493 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 18, 22, 23, 27, 28

*North Shore Hematology and Oncology Associates, P.C. v. Bristol-Myers Squibb Co.,*
    No. 1:04-CV-248 (D.D.C.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Northwest Airlines,*
    208 F.R.D. 174 (E.D. Mich. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Oncology & Radiation Associates, P.A. v. Bristol-Myers Squibb Company and ABI,*
    No. 1:01-CV-02313 (D.D.C.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Perma Life Mufflers v. International Parts Corp.,*
    392 U.S. 134 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Philadelphia Electric Co. v. Anaconda America Brass Co.,*
    43 F.R.D. 452 (E.D. Pa. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Pillsbury Co. v. Conboy,*
    459 U.S. 248 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Polypropylene Carpet Antitrust Litigation,*
    93 F. Supp. 2d 1348 (N.D. Ga. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Potash Antitrust Litigation,*
    159 F.R.D. 682 (D. Minn. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Relafen Antitrust Litigation,*
    218 F.R.D. 337 (D. Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Remeron Antitrust Litigation,*
    No. 03-CV-0085 (D.N.J.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Rossi v. Standard Roofing, Inc.,*
    156 F.3d 452 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re School Asbestos Litigation,*
    789 F.2d 996 (3d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Sugar Industrial Antitrust Litigation,*
    73 F.R.D. 322 (E.D. Pa. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Sumitomo Copper Litigation,*
    182 F.R.D. 85 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Terazosin Hydrochloride Antitrust Litigation,*
    No. 99-MDL-1317 (S.D. Fla.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Thomas v. Christopher,*
    169 F.R.D. 224 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Twelve John Does v. District of Columbia,*
    117 F.3d 571 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Veneman,*
    309 F.3d 789 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Visa Check/MasterMoney Antitrust Litigation,*
    280 F.3d 124 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19

*In re Vitamins Antitrust Litigation,* No. 99-197 (TFH ),
    MDL 1285, 2001 WL 856292 (D.D.C. July 25, 2001) . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Vitamins Antitrust Litigation,*
    209 F.R.D. 251 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
    395 U.S. 114 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## FEDERAL STATUTES

38 U.S.C. § 1407 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Civ. P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 12, 17, 20

## MISCELLANEOUS SOURCES

Congressional Budget Office, *How Increased Competition from Generic*
    *Drugs Has Affected Prices and Returns in the Pharmaceutical Industry,*
    (July 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues,
"Antitrust Digest" Ch. 6, "Overcharges" (1996) ("Antitrust Damages") . . . . . . . . . . . . . . . 21

I.    **INTRODUCTION**

Plaintiffs in this antitrust class action case are direct purchasers of Ovcon 35, a brand-name prescription oral contraceptive that contains a particular combination of the active ingredients estrogen and progesterone – 0.035 mg ethinyl estradiol (synthetic estrogen) and 0.4 mg norethindrone (synthetic progestin).[1]  Plaintiffs allege that defendants Warner Chilcott[2] and Barr Pharmaceuticals, Inc. ("Barr") (collectively, "Defendants") entered into an illegal agreement to delay the market entry of a less expensive, generic version of Ovcon 35 that would have entered the market but for the Defendants' agreement.  By delaying generic competition through this agreement, Defendants forced direct purchasers to overpay for Ovcon 35 Products.  Plaintiffs seek to recover trebled overcharge damages  –  the amount of extra money they had to pay for Ovcon 35 Products resulting from the Defendants' illegal agreement to suppress competition, trebled.

Generic drugs typically enter the market at prices substantially below their brand-name counterparts, and as a result, rapidly replace sales of the brand.  This predictable and inevitable pattern is what has driven so many brand-name drug makers to devise ways to block or delay the entry of generic rivals.  When, as here, generic competition is delayed or prevented, direct purchasers pay substantially more for the drug at issue (here, Ovcon 35 Products).  If a generic version of Ovcon 35 had been available, direct purchasers would have purchased some amount

---

[1] In this memorandum, the term "Ovcon 35 Products" refers to Warner Chilcott's non-chewable, brand-name drug, Ovcon 35, and any AB-rated generic equivalents, including Barr's generic version named Balziva and the generic version sold by Watson Pharmaceuticals, Inc. ("Watson") pursuant to an agreement with Warner Chilcott, Zenchent (the "authorized generic").  These are oral contraceptives that contain the formulation 0.035 mg of ethinyl estradiol and 0.4 mg norethindrone.

[2] As defined in the Amended Class Action Complaint ("AC") filed April 14, 2006, "Warner Chilcott" collectively refers to named defendants Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (US) Inc., Warner Chilcott Company, Inc., and Galen (Chemicals), Ltd. and their predecessors, successors, parents and/or subsidiary corporations.

of a less expensive generic version of Ovcon 35 and/or would have paid less for brand-name Ovcon 35 as a result of generic competition.

Plaintiffs respectfully request that the Court certify a class of direct purchasers of Ovcon 35 and appoint Class counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure. The proposed "Class" is defined as follows: "All persons and entities in the United States who purchased Ovcon [35] directly from Warner Chilcott at any time from April 22, 2004, through the present and continuing until the effects of Defendants' anti-competitive conduct have ceased." (AC ¶ 61).[3]

Proof that Defendants' anticompetitive agreement similarly injured every direct purchaser of Ovcon 35 is common and, like numerous analogous antitrust cases in the pharmaceutical area, the requirements of Rule 23 are easily satisfied here. For example, several federal courts have recently certified similar classes of direct purchasers of brand-name drugs in antitrust cases directly analogous to this one – cases where direct purchasers alleged that drug manufacturers illegally blocked or delayed the entry of less expensive generic competitors, and sought to recover resulting overcharge damages:

- *In re Relafen Antitrust Litig.*, 218 F.R.D. 337 (D. Mass. 2003) (certifying class of direct purchasers of a brand-name prescription drug alleging overcharges as a result of illegally delayed generic competition) ("*Relafen*");

- *In re Buspirone Patent & Antitrust Litig.*, 210 F.R.D. 43 (S.D.N.Y. 2002) (same) ("*Buspirone*"); and

---

[3] Excluded from the proposed Class are Defendants and their officers, directors, employees, subsidiaries, or affiliates, and all government entities. (AC ¶ 61).

- *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297 (E.D. Mich. 2001), *leave to appeal under Fed. R. Civ. P. 23(f) denied* (6th Cir. Jun. 18, 2001) (same) ("*Cardizem*").

In each of these cases, the district courts held that all the requirements of Rule 23 had been satisfied and that class certification was appropriate.[4] The dominant judicial view clearly favors certifying antitrust cases that, like the case at hand and those mentioned above, seek to recover overcharge damages as a result of an alleged violation of the Sherman Act. As Chief Judge Hogan has written in another directly analogous case: "[L]ong ago the Supreme Court recognized the importance that class actions play in the private enforcement of antitrust actions . . . . Accordingly, courts have repeatedly found antitrust claims to be particularly well suited for class actions." *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 21 (D.D.C. 2001) (certifying class of direct purchasers of prescription drug seeking overcharge damages resulting from monopolization of underlying drug ingredients), *review denied*, 289 F.3d 98 (D.C. Cir. 2002) ("*Lorazepam*").

The present antitrust case is particularly well-suited to proceed as a class action. The core issues here – Warner Chilcott's $20 million payment to Barr to prevent the imminent market entry of a less expensive generic version of Ovcon 35 and the impact of this violation on Plaintiffs and the Class – are overwhelmingly common and predominate over any conceivable individual issues. These common issues will be proven at trial using evidence and methodologies applicable on a class-wide basis. Accordingly, as in *Relafen*, *Buspirone*, *Cardizem* and *Lorazepam*, and as

---

[4] *See also J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 225 F.R.D. 208 (S.D. Ohio 2003) (certifying class of direct purchasers of a prescription drug alleging that entry of less expensive competitor was impeded) ("*J.B.D.L.*").

detailed below, this action is ideal for class treatment and satisfies all requirements of Rule 23(a), and at least one prong of Rule 23(b).

Specifically, as with *Cardizem* and *Buspirone*, both cases involving Section 1 conspiracies (at least in part), core liability issues in this case will be proven through common evidence that would not change whether this action were brought by one plaintiff or one hundred: Defendants' agreement cannot be illegal as to some direct purchasers but not others.

Similarly, just as in *Relafen*, *Cardizem*, *Buspirone* and *Lorazepam*, Plaintiffs have met their burden on class certification as to injury or fact of impact: proof of antitrust injury, or fact of impact, will be demonstrated here by common, class-wide evidence. Among other things, Plaintiffs have submitted an expert declaration by a noted economist, Jeffrey J. Leitzinger, Ph.D., who has extensive experience analyzing economic impact and damages in antitrust drug cases generally, and *specifically* in the delayed generic entry antitrust cases discussed above (among other similar pending actions), in which district courts have certified classes of direct purchasers of brand-name prescription drugs. *See Declaration of Jeffrey J. Leitzinger, Ph.D. ("Leitzinger Decl.")* (Exh. A in accompanying volume of exhibits) at 2-4 and Exh. 1. Dr. Leitzinger concludes, among other things, that the same type of common evidence that other courts deemed suitable and sufficient for class certification purposes in directly analogous cases is available here. *Leitzinger Decl.* at 9, 16-30. *See, e.g., Cardizem*, 200 F.R.D. at 308; *Buspirone*, 210 F.R.D. at 58; *Relafen*, 218 F.R.D. at 344.

As detailed below, in antitrust cases alleging injury in the form of overcharges, the core issues can be proven through evidence that is common and class-wide. As the Supreme Court has

stated, "Predominance [of common issues] is a test readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997).

## II.    FACTUAL & PROCEDURAL BACKGROUND

This case involves Warner Chilcott's agreement to pay a total of $20 million to generic pharmaceutical manufacturer Barr in exchange for Barr's agreement to refrain for a period of time from selling a generic version of Ovcon 35. This allowed Warner Chilcott to maintain its status as the exclusive marketer of Ovcon 35 Products, *i.e.*, the oral contraceptive containing the 0.035 mg ethinyl estradiol/0.4 mg norethindrone formulation, despite an absence of intellectual property protection. Defendants did not enter this agreement for any legitimate business purpose. Rather, as its own internal documents show, Warner Chilcott paid Barr not to enter the market, and not to compete, in order to sustain Warner Chilcott's inflated profits on its brand-name Ovcon 35, in violation of Section 1 of the Sherman Act.

Ovcon 35 has been one of Warner Chilcott's highest revenue-producing products. (AC ¶ 36). Net dollar sales of Ovcon 35 have more than doubled since Warner Chilcott began marketing the drug in 2000,[5] even as Warner Chilcott has raised Ovcon 35's price. *Id.; Leitzinger Decl.* at 10.

In September 2001, Barr filed an Abbreviated New Drug Application ("ANDA") with the U.S. Food and Drug Administration ("FDA") for approval to market a generic version of Ovcon 35. (AC ¶ 37). Barr's product, called "Balziva," is AB-rated[6] as a generic equivalent to Ovcon

---

[5] Prior to January 26, 2000, Bristol-Myers Squibb Company ("BMS") manufactured, distributed and marketed Ovcon 35 in the United States. (AC ¶ 33). Warner Chilcott purchased from BMS certain rights, title, and interests in Ovcon 35 and began marketing Ovcon 35 in the United States thereafter. (AC ¶ 34).

[6] An "AB-rated" generic drug is one the FDA has determined to be bioequivalent to a brand-name drug. (AC ¶ 28).

(continued...)

5

35. *Id.; Leitzinger Decl.* at 11-12. In January 2003, Barr publicly announced its intention to launch its generic version of Ovcon 35 by the end of that year. (AC ¶ 38).

**REDACTED**

Barr projected that it would capture at least 50% of new prescriptions for Ovcon 35 Products. (AC ¶ 41). Warner Chilcott calculated that if Barr's generic Ovcon 35 Product had launched, Warner Chilcott would have lost nearly the entire Ovcon 35 Products market to less expensive generic competitors in a short period of time. (AC ¶ 42).

As part of its attempts to combat this competitive threat and protect its revenues and profits despite the absence of patent protection, Warner Chilcott embarked on a "line extension" strategy. (AC ¶ 43). Warner Chilcott had initially planned to convert existing Ovcon 35 customers to a chewable version of Ovcon 35 ("Ovcon 35 Chewable") and to stop selling brand-name Ovcon 35 before entry of Barr's generic equivalent. *Id.* Although an AB-rated generic drug can be substituted for a brand-name drug, prescriptions for Ovcon 35 Chewable could not be filled with Barr's generic Ovcon 35 because Barr's generic was not a "chewable" formulation and would not have been bioequivalent to branded Ovcon 35 Chewable. (AC ¶ 44).

By mid-2003, however, Warner Chilcott's line extension strategy was in jeopardy. (AC ¶ 45). The entry of Barr's generic version of Ovcon 35 appeared imminent and the FDA had not yet approved Ovcon 35 Chewable. *Id.* In May 2003, Warner Chilcott's chief financial officer warned

---

[6](...continued)
Bioequivalent means that the drugs contain the same active ingredients and there is no material difference in the formulation, quality, safety, and effectiveness of the two drugs. A generic drug that is "AB-rated" to a brand-name drug may be listed in a publication titled "Approved Drug Products with Therapeutic Equivalence Evaluations" (commonly known as the "Orange Book") and dispensed by a pharmacist in lieu of its brand-name counterpart. (AC ¶ 25).

the company's Board of Directors that generic Ovcon 35 was the "biggest risk to the Company."
(AC ¶ 46).

By the summer of 2003, Warner Chilcott believed that the entry of Barr's generic Ovcon

35 could occur as early as September of that year. (AC ¶ 47). In August 2003, Warner Chilcott

and Barr discussed potential business arrangements under which Barr would refrain from

competing with Warner Chilcott's brand-name Ovcon 35 in exchange for cash payment. (AC ¶

48). On September 10, 2003, Warner Chilcott and Barr signed a Letter of Intent to enter into an

agreement in which Warner Chilcott would, *inter alia*, pay Barr $20 million not to compete in the

United States for five years following Barr's final FDA approval for its generic version of Ovcon

35. (AC ¶ 49).

On April 22, 2004, the FDA granted final approval of Barr's ANDA for generic Ovcon 35.

(AC ¶ 52). The next day, Barr announced its intention to begin selling generic Ovcon 35 under

the name "Balziva" unless Warner Chilcott exercised its option under the terms of their agreement

to pay Barr an additional $19 million to refrain from selling generic Ovcon 35 in the United States

for five years. (AC ¶ 53). On May 6, 2004, Warner Chilcott exercised its option and paid Barr

the remainder of the promised $20 million payment in exchange for Barr's agreement not to

compete with Warner Chilcott until May 2009. (AC ¶ 54).

Absent this agreement, Barr would have begun marketing generic Ovcon 35 soon after it

received FDA approval of its ANDA on April 22, 2004. (AC ¶ 57). Instead, Warner Chilcott

allocated a portion of its profits from brand-name Ovcon 35 to Barr to prevent competition. (AC

¶ 58). Plaintiffs allege that this is a classic horizontal anticompetitive restraint on trade that is

illegal on its face.

As a result of pressure from pending actions against it relating to the Agreement, including a suit and preliminary injunction motion by the Federal Trade Commission, Warner Chilcott waived the exclusivity provision of the Agreement on or about September 25, 2006, allowing Barr to finally launch its generic version of Ovcon 35. *See* www.prnewswire.com, "Barr Announces Warner Chilcott Waives Exclusive License for Ovcon 35," Barr Pharmaceuticals, Inc. News Release (Sept. 26, 2006). In October 2006, within a matter of weeks of Warner Chilcott's waiver of the exclusivity provision, Barr belatedly launched Balziva, its generic version of Ovcon 35. *Id.* In January 2007, Warner Chilcott entered into an agreement with Watson to launch a generic version of Ovcon 35 named Zenchent. *See* www.prnewswire.com, "Warner Chilcott and Watson Pharmaceuticals Announce Launch of Zenchent," PRNewswire (Jan. 29, 2007). Watson and Warner Chilcott share the profits on this "authorized" generic version of Ovcon 35 which was launched that same month. *Id.*

Common evidence is available to show, as Plaintiffs allege, that the delay in generic competition to brand-name Ovcon 35 resulted in overcharges to the members of the proposed Class. Had Barr entered the market and competed with Warner Chilcott when the FDA approved Barr's generic Ovcon 35 ANDA, Plaintiffs and direct purchasers of brand-name Ovcon 35 would have substituted lower-priced generic Ovcon 35 for higher-priced branded Ovcon 35 and/or they would have paid less for brand-name Ovcon 35. Due to Defendants' anticompetitive conduct, Plaintiffs and members of the Class overpaid for Ovcon 35 Products. (AC ¶ ¶ 59-60).

As discussed in more detail below, and in Dr. Leitzinger's Declaration, evidence demonstrating the antitrust impact of this conduct is the type of common proof used in previous antitrust class action cases involving delayed generic entry. There are several sources of common

proof of impact available to Plaintiffs here -- each of which would be sufficient standing alone, but together they form a formidable cache of class-wide evidence available to show that Defendants' scheme caused the members of the Class to overpay for Ovcon 35 Products. These include, for example: (a) the economic literature and empirical evidence regarding the marketwide economic effects of unimpeded generic competition; (b) Defendants' own contemporaneous internal documents **REDACTED** **REDACTED** (c) data reflecting and modeling the economic impact of AB-rated generic competition in pharmaceutical drug markets; and (d) data reflecting the economic impact of the actual entry of AB-rated generic Ovcon 35 Products in October 2006. *See Leitzinger Decl.* at 8, 16-30.

## III.    ARGUMENT

### A.    Class Certification is Particularly Appropriate in Antitrust Cases

As the courts in *Buspirone*, *Cardizem*, *Relafen* and *Lorazepam* found, class certification is particularly appropriate where, as here, direct purchasers alleged they suffered overcharges resulting from antitrust violations, and specifically from conduct alleged to impede competition in a pharmaceutical market. The Supreme Court has long recognized that private antitrust actions are "a bulwark of anti-trust enforcement." *Perma Life Mufflers v. International Parts Corp.*, 392 U.S. 134, 139 (1968).[7] The Court has also recognized that class actions are a very important tool in enforcing the antitrust laws. "Rule 23 of the Federal Rules of Civil Procedure provides for class actions that may enhance the efficacy of private [antitrust] actions by permitting citizens to

---

[7] *See also Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983) ("This Court has emphasized the importance of the private action as a means of furthering the policy goals of certain federal regulatory statutes, including the federal antitrust laws.") (citations omitted).

combine their limited resources to achieve a more powerful litigation posture." *Hawaii v.*

*Standard Oil Co.*, 405 U.S. 251, 266 (1972).

> This Court has explained:

> The treble damages provision . . . was designed to encourage private enforcement
> of the antitrust laws by offering generous recompense to those harmed by the
> proscribed conduct and simultaneously to erect a deterrent to those contemplating
> similar conduct in the future. . . . Moreover, it has long been recognized that class
> actions play an important role in the private enforcement of antitrust action.
> Further, courts tend to favor class certification when in doubt.

*In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 258 (D.D.C. 2002) (citations omitted)

("*Vitamins*").

> Likewise, Chief Judge Hogan noted in certifying the class of direct purchasers in

*Lorazepam*:

> Long ago the Supreme Court recognized the importance that class actions play in
> the private enforcement of antitrust class actions. . . . Accordingly, courts have
> repeatedly found antitrust claims to be particularly well suited for class actions:
> The treble-damages provision . . . was designed to encourage private enforcement
> of the antitrust laws and simultaneously to erect a deterrent to those contemplating
> similar conduct in the future. These linked objections could not be fully realized if
> large numbers of potential claimants are not afforded an efficient and cost-effective
> method of vindicating their claims. The class action device is well-suited to afford
> the desired access.

*Lorazepam*, 202 F.R.D. at 21 (citation omitted).

> In light of the critical role that private class actions play in enforcing antitrust laws, courts

in this district and elsewhere have repeatedly and consistently certified classes in analogous cases

involving horizontal agreements between and among competitors that were alleged to have

artificially inflated prices. *See, e.g., Vitamins*; *Lorazepam*; *Brown v. Pro Football, Inc.*, 146

F.R.D. 1 (D.D.C. 1992); *In re Ampicillin Antitrust Litig.*, 55 F.R.D. 269, 273 (D.D.C. 1972)

("*Ampicillin I*"); *see also Buspirone; Relafen; Cardizem.*[8]

## B.    The Standards for Class Certification Under Rule 23

The district court's role at the class certification stage is not to decide the merits, but rather

to determine whether the requirements of Rule 23 have been met. *In re Veneman*, 309 F.3d 789,

795 (D.C. Cir. 2002) (court should not "inappropriately mix the issue of class certification with

the merits"); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974); *Vitamins*, 209

F.R.D. at 257 n.9 ("an investigation into the merits of the case at this time would run afoul of

*Eisen*"). For purposes of this motion, the Court must accept as true the factual allegations stated

in the Amended Complaint. *See, e.g., Lorazepam*, 202 F.R.D. at 21.

To prevail on a motion for class certification, the plaintiff must satisfy each requirement of

Rule 23(a) (numerosity, commonality, typicality, and adequacy) and at least one subsection of

Rule 23(b). *Veneman*, 309 F.3d at 792; *Lorazepam*, 202 F.R.D. at 22. As demonstrated below,

this action easily meets each of the requirements.

---

[8] *See also In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002), *aff'g In re Linerboard Antitrust Litig.*, 203 F.R.D. 197 (E.D. Pa. 2001) ("*Linerboard*"); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) ("*Visa Check*"); *In re Magnetic Audiotape Antitrust Litig.*, No. 99 CIV. 1580 (LMM), 2001 WL 619305 (S.D.N.Y. Jun. 6, 2001); *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162 (S.D.N.Y. 2000) ("*Auction Houses*"); *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348 (N.D. Ga. 2000); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472 (W.D. Pa. 1999) ("*Flat Glass*"); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996) ("*NASDAQ*"); *In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374 (S.D.N.Y. 1996) ("*Diamonds*"); *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524 (M.D. Fla. 1996); *In re Potash Antitrust Litig.*, 159 F.R.D. 682 (D. Minn. 1995); *In re Brand Name Prescription Drugs Antitrust Litig.*, Nos. 94 C 897, MDL 997, 1994 WL 663590 (N.D. Ill. Nov. 18, 1994).

### C.   The Requirements for Rule 23(a) are Satisfied

#### 1.   Numerosity

Numerosity need not detain the Court.  To satisfy the numerosity requirement, the class

need only be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P.

23(a)(1).  There is no minimum "magic number" that a plaintiff must surpass.  *See Thomas v.*

*Christopher*, 169 F.R.D. 224, 237 (D.D.C. 1996); *see also Committee of Blind Vendors v. District*

*of Columbia*, 695 F. Supp. 1234, 1242 (D.D.C. 1988).  "So long as a reasonable basis for the

estimate is given," the numerosity requirement is satisfied.  *See Vitamins*, 209 F.R.D. at 258.

Joinder has been found to be an impractical solution, when, as here, class members are dispersed

geographically across the country.  *See id.*

Based on a preliminary review of

**REDACTED**

That is more

than sufficient to satisfy the numerosity requirement.  As one court stated when certifying a

smaller class:  "I see no necessity for encumbering the judicial process with 25 lawsuits, if one

will do."  *Philadelphia Elec. Co. v. Anaconda Am. Brass Co.*, 43 F.R.D. 452, 463 (E.D. Pa. 1968).

Warner Chilcott's transactional records, which will be produced during the course of discovery,

will identify the precise number of Class members.

#### 2.   Commonality

The second requirement – that "there are questions of law *or* fact common to the class" –

is also satisfied here.  *See* Fed. R. Civ. P. 23(a)(2).  In an antitrust case such as this, "numerous

courts have held that allegations concerning the existence, scope, and efficacy of an alleged

antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)." *Lorazepam*, 202 F.R.D. at 27 (quoting *NASDAQ*, 169 F.R.D. at 510); *see also Ampicillin I*, 55 F.R.D. at 273 (finding commonality).

Here, Plaintiffs' claims raise numerous common issues of fact *and* law, including, for example:

- whether Defendants entered into an agreement not to compete in the sale of Ovcon 35 Products;

- whether Defendants' agreement not to compete is lawful;

- whether the activities of Defendants have substantially affected interstate commerce;

- whether, and to what extent, Defendants' unlawful conduct caused Plaintiffs and the other members of the Class to pay more for Ovcon 35 Products than they would have paid absent Defendants' conduct; and

- the appropriate measure of damages.

(AC ¶ 22(a)-(f)).

Defendants themselves have acknowledged in their pleadings before the Judicial Panel on Multidistrict Litigation related to this case that core issues are common to all potential Class members. Referring to the multitude of then-pending actions brought by various parties, including direct purchasers, Defendants argued that the common questions of law or fact asserted were "[t]he existence of an agreement between Defendants," "[w]hether Defendants' agreement was lawful," "[w]hether Defendants' alleged conduct caused Plaintiffs and the other members of the classes to pay more for Ovcon 35 than they would have paid absent Defendants' alleged conduct," and "[w]hether Defendants' conduct caused injury to class members and, if so, the appropriate measure of damages." Brief in Support of Defendants' Joint Motion to Consolidate

13

and Transfer for Pretrial Proceedings Pursuant to 38 U.S.C. § 1407 (Dec. 9, 2005) at 8 (attached

as Exh. "B").

That Defendants have acknowledged commonality here is hardly surprising:  the very

nature of antitrust cases brought under Section 1 of the Sherman Act has led courts almost

uniformly to find that commonality exists.  This requirement is clearly satisfied here.

### 3.     Typicality

Plaintiffs also satisfy the requirement of Rule 23(a)(3) that a class representative's claims

be typical of the claims of the other class members.  Typicality will be found where, as here, "each

class member's claim arises from the same course of events that led to the claims of the

representatives." *See Vitamins*, 209 F.R.D. at 260; *Lorazepam*, 202 F.R.D. at 27.

Typicality is readily established in antitrust cases. *See Vitamins*, 209 F.R.D. at 209;

*Relafen*, 218 F.R.D. at 343 (finding that the overcharge claims of drug wholesaler were typical of

class of direct purchasers of brand-name prescription drug because representative plaintiff

"base[d] its claims on the same core pattern of alleged anticompetitive conduct that gives rise to

all class members' claims") (citations omitted); *Buspirone*, 210 F.R.D. at 57 (same); *Cardizem*,

200 F.R.D. at 304 (same).

Here, Plaintiffs' claims rely on facts and legal theories identical to those of the Class.  All

Class members' claims arise out of the same "core pattern" of alleged anticompetitive conduct:

Defendants' agreement delayed generic competition and kept prices for Ovcon 35 Products higher

than they otherwise would have been.  As the common evidence will show, delaying generic

competition resulted in antitrust injury to all Class members, *i.e.*, class members paid more for

14

Ovcon 35 Products than they would have paid *but for* Defendants' allegedly anticompetitive conduct. The typicality requirement is, therefore, easily satisfied here.

### 4.    Adequacy of Representation

Just as in *Cardizem, Buspirone, Relafen* and *Lorazepam*, cases with many of the same class representatives and class counsel as this one, the requirement of Rule 23(a)(4) – that the proposed class representatives "fairly and adequately protect the interests of the class" – is also established here. These requirements generally examine whether: (a) the named representatives have antagonistic or conflicting interests with the unnamed members of the class; and (b) the representatives are able to vigorously prosecute the interests of the class through qualified counsel. *See Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997).[9]

The representative Plaintiffs in this action are direct purchasers of Ovcon 35 or their assignees. There can be no credible argument that the representative Plaintiffs' interests in pursuing and receiving the maximum legally cognizable overcharges from Defendants conflict in any way with the interests of absent Class members or with each other's interests.

### a.    Absence of Conflict

In this case, each Class member has precisely the same interest in establishing Defendants' liability and in recovering the maximum amount of overcharges. There are no foreseeable intra-

---

[9] The Court of Appeals has also suggested consideration of other factors, including the communication between the named plaintiffs and their counsel and the rest of the class, as well as the overall context of the litigation. *See Twelve John Does*, 117 F.3d at 575; *Vitamins*, 209 F.R.D. at 261. These factors need not detain the Court. The named Plaintiffs and their counsel have now represented classes composed of a similar set of drug wholesalers and resellers in several prior pharmaceutical antitrust cases, and in such contexts, have regularly communicated with counsel for many members of the Class proposed here. Moreover, many of the most significant absent members of these classes have communicated their support for the class actions.

15

class conflicts and certainly no fundamental ones. *Cf. Relafen*, 218 F.R.D. at 343; *Buspirone*,

210 F.R.D. at 58; *Cardizem*, 200 F.R.D. at 306.

      **b.**    **Qualifications of Counsel**

On April 4, 2006, the Court granted Plaintiffs' Joint Motion for the Establishment of a

Plaintiffs' Executive Committee consisting of the six law firms that had been retained by the

representative Plaintiffs: Berger & Montague, P.C.; Boies, Schiller & Flexner LLP; Cohen,

Milstein, Hausfeld & Toll, P.L.L.C.;[10] Garwin, Gerstein & Fisher, L.L.P.; Hagens Berman Sobol

& Shapiro LLP and Roda Nast, P.C. Rule 23(g) of the Federal Rules of Civil Procedure provides

that a Court certifying a class must appoint class counsel who will fairly and adequately represent

the interests of the class.

The law firms that have been serving as the Executive Committee in this case are

eminently qualified to represent the Class.[11] Counsel here have extensive experience and

expertise in antitrust, class action, and complex civil litigation and have successfully prosecuted

class actions and similar antitrust cases in courts in this judicial district as well as throughout the

United States. Moreover, these firms have successfully litigated several class actions alleging

similar anticompetitive conspiracies (and claims of monopolization) involving delayed generic

---

[10] Linda Nussbaum, counsel for named Class representatives Meijer, Inc. and Meijer Distribution, Inc., has recently changed firms from Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("CMHT") to Kaplan Fox & Kilsheimer LLP ("Kaplan Fox"). Ms. Nussbaum continues to act as counsel for these named Class representatives at her new firm. The Executive Committee will inform the parties and the Court shortly concerning any proposed amendments to the Executive Committee.

[11] The firms' websites, which contain descriptive information about each of their respective practices, are as follows: Berger & Montague, P.C., www.bergermontague.com; Boies, Schiller & Flexner LLP, www.bsfllp.com; Cohen, Milstein, Hausfeld & Toll, P.L.L.C., www.cmht.com; Kaplan Fox & Kilsheimer LLP, www.kaplanfox.com; Garwin Gerstein & Fisher, L.L.P., www.garwingerstein.com; Hagens Berman Sobol & Shapiro, LLP, www.hagens-berman.com; and Roda Nast, www.rodanast.com. Copies of each firm's resume can be provided upon request.

drug entry in the prescription drug industry.[12]  In such circumstances, as here, there is "no reason

to suspect that the named plaintiffs will not adequately represent" the Class.  *In re Vitamins*

*Antitrust Litig.*, No. 99-197 (TFH ), MDL 1285, 2001 WL 856292, at *3 (D.D.C. July 25, 2001).

Moreover, proposed Class counsel have vigorously and efficiently pursued the litigation

on behalf of Plaintiffs and the proposed Class since it was first filed.  Counsel have engaged in

extensive investigations prior to filing this lawsuit and devoted significant resources developing

this case.  After the lawsuit was filed, counsel have efficiently and effectively divided work

amongst themselves in a sensible manner, litigated all motions, conducted and are conducting

discovery, including working with experts, and have managed all other aspects of the litigation.

Counsel have devoted, and continue to devote, the resources needed to prosecute this action on

behalf of the Class.

Plaintiffs respectfully request that the Court appoint the six firms now serving on the

Executive Committee as Class counsel in this matter pursuant to Fed. R. Civ. P. 23(g).

---

[12] Counsel serving on the Executive Committee for the Direct Purchaser Class have also been involved in prosecuting similar antitrust class actions on behalf of direct purchaser classes involving anticompetitive conduct in the pharmaceutical industry allegedly resulting in delayed entry of generic drugs. *See, e.g., In re Remeron Antitrust Litig.*, No. 03-CV-0085 (D.N.J.) (settled for $75 million in 2005); *Relafen*, No. 01-12239-WGY (D. Mass.) (Young, C.J.) (settled for $175 million in 2003); *Buspirone*, No. 01-MDL-1413 (S.D.N.Y.) (settled for $220 million in 2003); *Cardizem*, No. 99-MDL-1278 (E.D. Mich.) (settled for $110 million in 2002); *In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-MDL-1317 (S.D. Fla.) (settled for $74.5 million in 2005); *Lorazepam*, MDL 1290 (D.D.C.) (Hogan, C.J.) (settled for $35 million in 2003); *North Shore Hematology and Oncology Associates, P.C. v. Bristol-Myers Squibb Co.*, No. 1:04-CV-248 (D.D.C.) (Sullivan, J.) ("Taxol") (settled for approx. $65 million); *Oncology & Radiation Associates, P.A. v. Bristol-Myers Squibb Co.*, No. 1:01-CV-02313 (D.D.C.) (Sullivan, J.) ("Platinol") (settled for $50 million).

17

**D.    The Requirements of Rule 23(b)(3) Are Satisfied**

Rule 23(b)(3) requires: (1) that the Court find that common questions of law *or* fact

predominate over individual questions; and (2) that a class action is superior to other available

methods of adjudication.  These requirements are satisfied here.

**1.    Predominance**

The predominance requirement is readily met where, as here, a common nucleus of

anti-competitive conduct is at the core of all Class members' claims.  *See, e.g., Amchem*, 521 U.S.

at 625 ("Predominance is a test readily met in certain cases alleging. . . violations of the antitrust

laws.").[13]  These common legal and factual questions – which Defendants previously

acknowledged in their MDL briefing – clearly predominate.  As Chief Judge Hogan has observed,

"[a]ntitrust actions involving common question[s] of liability for monopolization and price-fixing

have frequently been held to predominate for the preliminary stage of class certification."

*Lorazepam*, 202 F.R.D. at 29.

Plaintiffs need only make a threshold showing that common or "generalized proof" will

predominate at trial with respect to the essential elements of their antitrust claims.  *See*

*Linerboard*, 203 F.R.D. at 214; *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 190 (D.N.J.

2003); *Relafen*, 218 F.R.D. at 344; *In re Dynamic Random Access Memory (DRAM) Antitrust*

*Litig.*, No. M02-1486 (PJH), 2006 WL 1530166, at *9 (N.D. Cal. June 5, 2006) ("DRAM").  The

mere existence of individual issues will not defeat class certification.  The "common issues need

not be exclusive, but must only predominate over individual concerns." *Brown*, 146 F.R.D. at 4;

---

[13] *See also Flat Glass*, 191 F.R.D. at 484  (evidence about conspiracy is "common to all members of the class"); *NASDAQ*, 169 F.R.D. at 518 ("Since a single conspiracy is alleged, the relevant proof of this will not vary among class members and clearly presents a common question fundamental to all class members.").

*Lorazepam*, 202 F.R.D. at 29 ("common issues must only predominate; they do not have to be dispositive of the litigation").[14]

In evaluating predominance, a court should review: (1) the substantive elements of the claims of class members; and (2) the type of proof the plaintiff intends to proffer to establish those claims. *Vitamins*, 209 F.R.D. at 256. Where, as here, Plaintiffs' proof is predominantly common (*i.e.*, the same basic evidence will establish the claims of both Plaintiffs and absent Class members), the predominance requirement is met. Here, the elements of the antitrust claims asserted by the named Plaintiffs and absent Class members are identical: (1) a violation of Section 1 of the Sherman Act; and (2) an antitrust injury (or fact of damage) caused by such violation. *See Linerboard*, 203 F.R.D at 214. Defendants' antitrust violation and the resulting antitrust impact will be proved through evidence and expert analysis that are entirely common. Moreover, damages can and will be proved in the aggregate, again relying on common evidence. The presence of any possible individual questions that pertain only to quantification of *damages* does not prevent certification. *See, e.g, Vitamins*, 209 F.R.D. at 268 ("Many courts have held that individual issues with respect to the amount of damages incurred by class members will not defeat certification where common issues predominate with respect to the alleged antitrust conspiracy and impact.").[15]

---

[14] *See also In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986) (even a few common issues may satisfy predominance requirement if resolution of such issues "will so advance the litigation that they may fairly be said to predominate"); *Flat Glass*, 191 F.R.D. at 484 ("[w]here many significant questions are common to the class, predominance is satisfied").

[15] *See also Cardizem*, 200 F.R.D. at 307 ("If generalized evidence exists which will prove or disprove this injury element on a simultaneous class-wide basis, then there is no need to examine each class members' [sic] individual circumstance[.] . . . Such an examination will relate to the quantum of damages; not the fact of injury."); *Visa Check.*, 280 F.3d at 139-40 ("[C]ourts have correctly recognized that any other rule would eliminate antitrust class actions."); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 92 (S.D.N.Y. 1998) ("[F]actual differences in the amount of damages, date, size or manner (continued...)

a.    **Section 1 Violation**

Plaintiffs allege that Defendants' anticompetitive agreement constituted an unreasonable restraint of trade under Section 1 of the Sherman Act. (AC ¶¶ 74-75). Whether analyzed under a *Per Se,* "Quick Look," or Rule of Reason standard, the analysis and proof concerning these issues will be entirely common to the Class as a whole. Likewise, the outcome of this analysis will be common – if Defendants violated Section 1 as to any Plaintiff, they violated Section 1 as to all Class members. Indeed, in price-fixing conspiracy cases like this one, courts have often *presumed* that common questions predominate. *See, e.g., Lumco Indust. Inc. v. Jeld-Wen, Inc.,* 171 F.R.D. 168, 172 (E.D. Pa. 1997) ("Several courts have held that when a defendant is alleged to have participated in a nationwide price-fixing conspiracy, impact will presume as a matter of law, and the predominance requirement of Fed. R. Civ. P. 23(b)(3) will be satisfied"); *see also Ampicillin I,* 55 F.R.D. at 278 (conspiratorial agreement among defendants to lessen competition along with defendants' other anticompetitive activities were "common items of proof which predominate"); *Vitamins,* 209 F.R.D. at 262-63 ("antitrust actions involving allegations of price fixing have frequently been held to predominate in the class certification analysis"). Given the abundant and irrefutable evidence of common proof of impact here, however, no such presumption is necessary.

---

[15](...continued)
of purchase . . . will not defeat class action certification"); *DRAM,* 2006 WL 1530166, at *9; *Diamonds,* 167 F.R.D. at 383; *Lorazepam,* 202 F.R.D. at 30 ("fact that there may be individual differences in prices paid by Class members" not relevant to class certification determination); *In re Currency Conversion Fee Antitrust Litig.,* 224 F.R.D. 555, 556 (S.D.N.Y. 2004) ("individual damage issues cannot defeat certification").

## b.    Common Antitrust Injury or Impact

As in the analogous delayed generic entry cases that have come before this one, fact of damage, or antitrust "impact," will be demonstrated here using evidence and methods that are entirely common to the Class. Here, Plaintiffs intend to prove class-wide impact in the form of "overcharges" – the difference between the price that was actually paid and the price that would have been paid had the anticompetitive conduct not occurred. *See, e.g., Cardizem*, 200 F.R.D. at 309-14; *Relafen*, 218 F.R.D. at 344.[16] The *amount* of the total overcharge, *i.e.*, damages, is irrelevant to proving the *fact* of antitrust impact, as long as the common evidence shows that there is *some* overcharge. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969).

To demonstrate antitrust impact at trial, Plaintiffs need prove only that Class members would have paid more for Ovcon 35 Products than they would have if the generic had been available: either because Class members would have purchased *some amount* of a less expensive generic version of Ovcon 35 had it been available during the proposed Class Period or would have paid less for brand-name Ovcon 35 as a result of generic competition, or both. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 455 (3d Cir. 1977) (antitrust plaintiff "could prove fact of damage [impact] simply by proving that the free market prices would be lower than the prices paid and that he made *some purchases* at the higher price") (emphasis added); *see also Linerboard*, 305 F.3d at 151.

---

[16] *See also In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144 (3d Cir. 1993) (direct purchaser prevented from purchasing a different but cheaper substitute product due to an antitrust violation may seek to recover the difference in price as an overcharge); *Lee-Moore Oil Co. v. Union Oil Co.*, 599 F.2d 1299, 1306 (4th Cir. 1999) (same); *Chattanooga Foundry & Pipe Works v. Atlanta*, 203 U.S. 390, 396 (1906); *In re* ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues, "Antitrust Digest" Ch. 6, "Overcharges" at 172 (1996) ("Antitrust Damages").

Plaintiffs are not required, in the context of a motion for class certification, to prove that Class members actually suffered antitrust impact. For purposes of class certification, "the court need only find that plaintiffs have identified a valid method for determining impact" on a class-wide basis. *Linerboard*, 203 F.R.D. at 220; *Cardizem*, 200 F.R.D. at 307. In other words, Plaintiffs need not make a threshold showing that prices were actually higher than they would have been but for Defendants' conduct or that the entry of generic Ovcon 35 would, in fact, have resulted in lower prices (though Plaintiffs' evidence, and Dr. Leitzinger's analysis, support both of these points with largely irrefutable common evidence). Those are merits issues. Instead, Plaintiffs need only present a *method of proof* that is predominantly common.

In overcharge cases such as this one, impact may be proven on a class-wide basis if common evidence or methodologies exist for demonstrating widespread impact to the class.[17] In cases alleging a nationwide conspiracy to fix prices or allocate markets, common impact is generally established – or may even be presumed – because such an overarching conspiracy will invariably inflate the prices paid by all direct purchasers. *See, e.g., In re Master Key Antitrust Litig.*, 528 F.2d 5, 12 n.11 (2d Cir. 1975) ("If the appellees establish . . . that the defendants engaged in an unlawful national conspiracy which had the effect of stabilizing prices above competitive levels, and further establish that the appellees were consumers of that product, we would think that the jury could reasonably conclude that appellants' conduct caused injury to each

---

[17] "Even if it could be shown that some individual class members were not injured, class certification, nevertheless, is appropriate where the antitrust violation has caused widespread injury to the class." *NASDAQ*, 169 F.R.D. at 523. *See also Cardizem*, 200 F.R.D. at 320-21 ("Even if Plaintiff could not show injury-in-fact as to a few class members, this would not be fatal."); *In re Northwest Airlines Corp. Antitrust Litig.*, 208 F.R.D. 174, 174-75 (E.D. Mich. 2002) ("[i]t is not necessary, at the class certification state, for Plaintiffs to show that each and every class member could satisfy an individualized standing inquiry").

appellee.").[18]  Given the abundant common evidence available here, no common impact presumption is necessary.

Overcharges are recoverable where, as here, Defendants conspire to exclude a cheaper competing product for a period of time.  Evidence that Class members would have purchased some amount of the lower-priced generic Ovcon 35 and/or discounted brand-name Ovcon 35 had generic Ovcon 35 been available is proof that the direct purchasers paid overcharges, and thus incurred antitrust injury.  *Relafen*, 218 F.R.D. at 344; *Cardizem*, 200 F.R.D. at 309-14.  *See also Lee-More Oil Co. v. Union Oil Co.*, 599 F.2d 1299, 1306 (4th Cir. 1979); *Antitrust Damages* at 193-94.  Here, as in prior cases involving the delayed market entry of cheaper generic pharmaceuticals, evidence of the impact of Defendants' anticompetitive acts on the Class will be decidedly common.

In his supporting Declaration, Dr. Leitzinger has identified three main types and methods of proof, each involving entirely class-wide evidence:

- governmental and academic studies relating to the marketwide economic effects of generic competition, which universally conclude that purchasers derive substantial savings when generic companies are allowed to compete;


- and

- pricing data from (i) several drug markets showing the predictable pattern of significant price erosion following generic entry; and (ii) generic Ovcon 35 Products since generic Ovcon 35 entry in October 2006.

*Leitzinger Decl.* at 17-27.

---

[18] *Auction Houses*, 193 F.R.D. at 166 ("Price fixing conspiracies, at least to the extent they succeed in fixing prices, almost invariably injure everyone who purchases the relevant goods or services."); *NASDAQ*, 169 F.R.D. at 523 (facts of price fixing or market allocation will tend to show each member of class was injured). *See also Linerboard*, 203 F.R.D. at 217 (collecting cases).

### (1)    Academic/Governmental Studies

As discussed in more detail in Dr. Leitzinger's Declaration, numerous independent studies have concluded that AB-rated generic drugs rapidly displace their brand-name counterparts, and do so at a substantial price discount compared to the brand. *Leitzinger Decl.* at 17-23 (citing studies). A 1998 study by the Congressional Budget Office ("CBO"), for example, compared the prices for branded drugs versus generics for 21 brand-name drugs that faced generic competition between 1991 and 1993.[19] *Id.* at 19-20. The CBO Study found that the average AB-rated generic prescription price was *less than half* the brand price. *Id.* at 20.

A more recent study found that the average price difference had increased:

In 1993 the average cost for a brand-name prescription drug was 275% higher than the average generic ($35.28 versus $12.82). By 2000 this difference had grown to nearly 340% ($65.29 versus $19.33).

*See* Kirking, et al., *Economics and Structure of the Generic Pharmaceutical Industry*, 41 J. Amer. Pharm. Assoc. 578, 579 (2001); *see also Leitzinger Decl.* at 20.

As a result of these dramatic price differences, the cost-containment policies of managed care organizations, and generic substitution laws (providing that pharmacists may, or must, substitute an FDA-approved generic for a brand), purchasers quickly switch from the brand to the generic. *Leitzinger Decl.* at 13, 16-17. The CBO and other studies found that once generic competition begins, the generic product is rapidly substituted for the brand. *Id.* at 17-23.

---

[19] Congressional Budget Office, *How Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry*, at 32 (July 1998), *available at* http://www.cbo.gov/ftpdocs/6xx/doc655/pharm.pdf.

24

(2)     **Defendants' Own Contemporaneous** | REDACTED |

# REDACTED

# REDACTED

### (3)    Data Reflecting Actual Effects of Generic Competition

Dr. Leitzinger has concluded that analyzing the price and sales data from actual market transactions is another class-wide means of showing the market effects of generic competition. Such data includes: (i) actual Ovcon 35 Product pricing and sales data since the first generic Ovcon 35 Product was launched in October 2006; and/or (ii) actual pricing data (published by a commercial data collection service known as IMS Health) for a variety of brand-name products that have experienced generic competition. *Leitzinger Decl.* at 27-28. The published IMS Health pricing data, in essence, is what the generic competition literature previously cited relied upon. *Id.*

The type of evidence discussed above is precisely the kind of common evidence that other courts in nearly identical cases have found sufficient to satisfy the plaintiffs' burden at the class certification stage. *See, e.g., Cardizem*, 200 F.R.D. at 308; *Relafen*, 218 F.R.D. at 345-46 ("The direct purchaser plaintiffs have met that burden, establishing that general market effects would be

26

proven through common evidence including governmental and academic studies, internal manufacturers' analyses, and actual market data.").

Defendants may attempt to dispute some of Plaintiffs' allegations and evidence (though much of the evidence of impact is commonly accepted in the industry and | **REDACTED** |

| **REDACTED** | ) and the findings and conclusions of Plaintiffs' expert economist. These disputes, however, need not, indeed should not, be adjudicated in the context of class certification.[20] The main issue here is whether Plaintiffs have demonstrated that there is a *method* of proving their claim through predominantly class-wide proof. Plaintiffs have clearly made such a showing.

In short, proof of antitrust impact here will be accomplished through evidence and expert analysis that is predominantly, if not entirely, common and of class-wide application.

> **(a)     Class-Wide Methodologies Are Available
> For Estimating the Amount of Damages**

Plaintiffs' burden with respect to damages at the class certification stage is a "limited" one. *Cardizem*, 200 F.R.D. at 321.[21] No precise damage formula must be shown; indeed, Plaintiffs need not choose any one methodology now, as long as a generally accepted method is offered. *See Linerboard*, 203 F.R.D. at 217-19; *NASDAQ*, 169 F.R.D. at 522 ("The Court need

---

[20] *See, e.g., Buspirone*, 210 F.R.D. at 56 (it would be "unwise and unfair" for the court to consider factual disputes between experts at class certification stage); *Vitamins*, 209 F.R.D. at 267 (disputes between parties' respective experts "are not appropriately settled at the class certification stage"); *Cardizem*, 200 F.R.D. at 311 (class certification "is not . . . the proper forum" to adjudicate a "'battle of the experts'"); *see also Relafen*, 218 F.R.D. at 344; *Diamonds*, 167 F.R.D. at 384.

[21] Even at the merits stage of the case, Plaintiffs need not provide an exact or precise calculation of their antitrust damages. *See Rossi v. Standard Roofing*, 156 F.3d 452, 484 (3d Cir. 1998); *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 352 (E.D. Pa. 1976). A jury can determine damages as long as it can "make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly." *Bigelow v. RKO Radio Pictures, Inc.* 327 U.S. 251, 264 (1946).

not decide at this juncture what approach is best suited to the particularities of this case. It is sufficient to note at this stage that there are methodologies available."). Even if some individual questions exist pertaining to damages, that will not affect class certification. *See, e.g., Bogosian*, 561 F.2d at 456; *NASDAQ*, 169 F.R.D. at 524; *Jack Faucett Assoc. v. American Tel. & Tel.* Co., No. 81-1804, 1983 WL 4601, at *3 (D.D.C. Mar. 18, 1983).

Here, just as Dr. Leitzinger has done in several similar class actions involving delayed generic entry, Plaintiffs' expert can reliably estimate damages in the aggregate for the Class as a whole, using the same types of common evidence that can be employed to demonstrate the fact of antitrust injury. *Leitzinger Decl.* at 30-33.

Given the well-understood, marketwide nature of the effects of generic competition and the availability of data regarding the histories of other brand-name drugs that have undergone generic competition, it is feasible to estimate damages on an aggregate, class-wide basis. *Leitzinger Decl.* at 8-9; 30-33. In general, damages may be estimated by modeling the extent of generic substitution that would have occurred "but for" the illegal conduct, along with expected pricing of the discounted brand-name and generic Ovcon 35. These estimates are then applied against the actual quantities of Ovcon 35 Products purchased by the Class and the prices Class members actually paid for Ovcon 35 Products. *Id.* at 32-33. [22]

---

[22] The propriety of using aggregate damage methodologies is well-established. In the *NASDAQ* case, for example, the court upheld the use of an aggregate damages calculation in a complex horizontal price-fixing conspiracy involving a class of more than one million members, stating that such damages analyses "have been widely used in antitrust, securities and other class actions." 169 F.R.D. at 525 (citing cases). In its extended discussion of aggregate damages, the *NASDAQ* court explained that such an approach is not only permissible, but has "obvious case management advantages," including eliminating the need for individual damage proofs at trial. *Id.* at 524-26.

Courts have approved the use of an aggregate damages model in cases exactly like this one
- *i.e.*, where a plaintiff alleges overcharges caused by defendants' illegal delay of competition
from generic versions of prescription drugs. *See, e.g., Cardizem*, 200 F.R.D. at 324 (concluding
that "the use of an aggregate approach to measure class-wide damages is appropriate"); *see also
Buspirone*, 210 F.R.D. at 57. Moreover, for purposes of class certification, "it is not necessary to
identify specific benchmarks or methodology to ascertain the amount of damages," but rather, it
"is sufficient to note at this stage that there are methodologies available." *Cardizem*, 200 F.R.D.
at 321-22.

In sum, Dr. Leitzinger's Declaration and the evidence cited therein establish that, at the
appropriate stage of this litigation, the amount of damages can be reliably estimated using
predominantly common methodologies, formulae and evidence.

### 2.    Superiority

The class action device is far superior to, and more manageable than, any other procedure
available for the treatment of the factual and legal issues raised by Plaintiffs' claims. Each Class
member is alleged to have incurred overcharge damages as a result of Defendants' anticompetitive
conduct, and it would waste judicial and litigant resources to force each Class member to prove
the nucleus of the alleged misconduct again and again in dozens of separate trials. If the class
action mechanism were not available, some Class members may have claims that are too small to
justify the high costs of complex litigation. *See Ampicillin I*, 55 F.R.D. at 276 ("unless the claims
of the members of these classes can be litigated on a class basis, they cannot be feasibly litigated
at all"). The prosecution of this action as a class action will achieve substantial economies of

29

time, effort, and expense, both for the judicial system and the litigants, and promote uniformity of

decision as to persons similarly situated.

The experience thus far in this case demonstrates that there are no significant management

difficulties that will be encountered in the litigation on behalf of the Class, and courts have been

unwilling to deny class certification based on vague speculation about manageability. Instead,

they have been willing to adapt to management problems as they arise. *See Cardizem,* 200 F.R.D.

at 326 ("court is confident that whatever problems may arise . . . can be satisfactorily resolved");

*Relafen,* 231 F.R.D. at 71 ("class action has to be unwieldy indeed before it can be pronounced an

inferior alternative"); *J.B.D.L.,* 225 F.R.D. at 220 (superiority established where no similar cases

were pending against defendants in other fora, class action would save class members costs of

pursuing individual actions, and there were no particular case management difficulties identified).

Accordingly, the class procedure is the superior method for handling this action.

## IV.    CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Direct Purchaser

Class Plaintiffs' Motion for Class Certification be granted, that the named Plaintiffs be approved

as Class Representatives, and that their counsel be approved as Class Counsel pursuant to Rule

23(g).

Dated: March 12, 2007.                       Respectfully submitted,

William Isaacson (D.C. Bar No. 414788)
Tanya Chutkan (D.C. Bar No. 420478)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W., Suite 800
Washington, D.C. 20015
(202) 237-2727
(202) 237-6131 (Fax)

Richard B. Drubel (D.C. Bar No. 334359)
Kimberly H. Schultz
BOIES, SCHILLER & FLEXNER LLP
26 S. Main Street
Hanover, NH 03755
(609) 643-9090
(609) 643-9010 (Fax)

Daniel Berger
Eric L. Cramer
Ellen T. Noteware
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4604 (Fax)

Linda P. Nussbaum (D.C. Bar No. 483254)
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, NY 10022
(212) 687-1980
(212) 687-7714 (Fax)

Michael D. Hausfeld, D.C. Bar No. 153742
Brian A. Ratner, D.C. Bar No. 473284
COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.
1100 New York Avenue, NW
Suite 500 West
Washington, DC 20005
(202) 408-4600
(202) 408-4699 (Fax)

Steig D. Olson
COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.
150 East 52nd Street, 30th Floor
New York, NY 10022
(212) 838-7797
(212) 838-7745 (Fax)

31

David U. Fierst (D.C. Bar. No. 912899)
STEIN, MITCHELL & MEZINES, LLP
1100 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036
(202) 737-7777
(202) 296-8312 (Fax)

Bruce E. Gerstein
Barry S. Taus
Kevin S. Landau
GARWIN GERSTEIN & FISHER, L.L.P.
1501 Broadway, Suite 1416
New York, NY 10011
(212) 398-0055
(212) 764-6620 (Fax)

David U. Fierst (D.C. Bar No. 912899)
STEIN, MITCHELL & MEZINES LLP
1100 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036
(202) 737-7777
(202) 296-8312 (Fax)

Dianne M. Nast
RODA NAST, P.C.
801 Estelle Drive
Lancaster, PA 17601
(717) 892-3000
(717) 892-1200 (Fax)

Thomas M. Sobol
HAGENS BERMAN SOBOL
& SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, MA 02142
(617) 482-3700
(617) 482-3003 (Fax)

***Counsel for Direct Purchaser Class***

32