# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MEIJER, INC., MEIJER DISTRIBUTION, INC., LOUISIANA WHOLESALE DRUG CO., INC., ROCHESTER DRUG CO-OPERATIVE, INC., AMERICAN SALES COMPANY, INC., SAJ DISTRIBUTORS, INC., and STEPHEN L. LaFRANCE HOLDINGS, INC.,**

**On behalf of themselves and all others similarly situated,**

          **Plaintiffs,**

    **v.**

**WARNER CHILCOTT HOLDINGS COMPANY III, LTD., WARNER CHILCOTT CORPORATION, WARNER CHILCOTT (US) INC., WARNER CHILCOTT COMPANY, INC., GALEN (CHEMICALS), LTD., and BARR PHARMACEUTICALS, INC.,**

        **Defendants.**

**No. 05 Civ. 2195 (CKK)**

## CLASS CERTIFICATION REBUTTAL DECLARATION
## OF JEFFREY J. LEITZINGER, PH.D.

**Econ One Research, Inc.**

**May 21, 2007**

5th Floor
1101 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 756-4582
fax (202) 835-2226

Suite 100
555 University Avenue
Sacramento, California 95825
(916) 576-0366
fax (916) 576-0365

5th Floor
601 West 5th Street
Los Angeles, California 90071
(213) 624-9600
fax (213) 624-6994

Suite 2825
Three Allen Center
333 Clay Street
Houston, Texas 77002
(713) 228-2700
fax (713) 228-3296

Suite 230
106 E. 6th Street
Austin, Texas 78701
(512) 476-3711
(512) 476-9712

## I.    Introduction and Qualifications

I am the same Jeffrey J. Leitzinger that previously filed a declaration in support of class certification in this matter.[1]  I also have submitted an expert report[2] containing economic evidence regarding the antitrust injury alleged to have been incurred by members of the proposed Class, and quantifying the aggregate overcharge damages resulting from the challenged conduct.  A summary of my experience and qualifications was contained in both my Declaration and my Expert Report.  An updated summary of my training, past experience, and prior testimony is shown in **Exhibit 1**.

Econ One is being compensated for the time I spend on this matter at my normal and customary rate of $525 per hour.  Econ One also is being compensated for time spent by my research staff on this project at their normal and customary hourly rates.

## II.    Overview

I have been asked by counsel for the Direct Purchaser Class Plaintiffs ("Plaintiffs") to comment on the opinions presented in the Declaration of

---

[1] *See* Declaration of Jeffrey J. Leitzinger, Ph.D., dated March 12, 2007 ("Declaration" or "Leitzinger Declaration").

[2] *See* Expert Report of Jeffrey J. Leitzinger, Ph.D., dated May 18, 2007 ("Expert Report" or "Leitzinger Report").

Brian L. Palmer, Ph.D., dated April 12, 2007 ("Palmer Declaration"),[3] as they pertain to the opinions I expressed in my earlier Declaration in support of class certification in this matter.   Since my earlier Declaration, I have reviewed additional materials, including the Palmer Declaration, the transcript of Dr. Palmer's May 3, 2007 deposition, and Dr. Palmer's work papers.  A list of these additional materials is attached as **Exhibit 2**.

As an overarching matter, Dr. Palmer appears to disagree with my conclusion that class-wide antitrust injury can be proven with evidence that is common to members of the proposed Class, and that damages can be measured without the need for individualized analysis as to each Class member.[4]  Having now submitted an Expert Report containing both class-wide proof of antitrust injury and a class-wide calculation of aggregate overcharge damages, Dr. Palmer's claims about whether these analyses can be done on a class-wide basis have necessarily been superseded by the actual analyses and calculations in my Expert Report, which I incorporate herein and attach as **Exhibit 3**.  I find that none of the issues Dr. Palmer raises in his declaration undermines or in any way undercuts the conclusions I have now offered in my Expert Report or, for that matter, in my earlier Declaration regarding class issues.

---

[3] Dr. Palmer is the expert for Defendant Barr Pharmaceuticals, Inc. ("Barr").

[4] Palmer Declaration, ¶¶ 5-6.

### III.    Summary of My Conclusions

A full statement of my conclusions and the supporting bases for these conclusions is contained in my Expert Report.  By way of overview, it is my opinion that, assuming the validity of Plaintiffs' allegations as to liability, all (or nearly all) members of the proposed Class have suffered antitrust injury in the form of overcharges.  This conclusion is based on the following evidence (which is common to all Class members):

- The basic economics surrounding branded drug development and the legal and regulatory framework associated with generic pharmaceutical products.

- The large and growing literature analyzing the consumer benefits of generic competition (and consistently noting the market-wide nature of those benefits).

> **REDACTED**

> **REDACTED**

- The fact that the proposed Class members are almost exclusively wholesalers and resellers of pharmaceutical products serving broad customer bases that can reasonably be expected to purchase generics and thereby participate in the competitive pricing that generics create.

---

[5] For purposes of this declaration, "Ovcon 35 Products" shall mean oral contraceptives that contain a specific formulation of 0.035 mg of ethinyl estradiol and 0.4 mg of norethindrone. These products consist of Warner Chilcott's non-chewable brand-name drug Ovcon 35 and any AB-rated generic equivalents, including Barr's generic version, Balziva, and the generic version Warner Chilcott authorized Watson Pharmaceuticals, Inc. ("Watson") to sell, Zenchent.

With respect to damages, I start with the understanding that the correct measure of damages is the amount of overcharge (*i.e.*, the amount Class members overpaid for Ovcon 35 Products as a result of the challenged conduct). While I recognize that the amount or quantum of overcharge (both in total and perhaps even per prescription) will differ across members of the proposed Class, I further understand that for purposes of the trial in this case Plaintiffs need only develop a reasonable estimate of the aggregate overcharge incurred by the Class as a whole.  Hence, differences across Class members with respect to the amount of overcharge are, for present purposes, irrelevant.

My Expert Report sets forth a reasonable estimate of the aggregate overcharge in this case.[6]  In terms of general method and sources of data, this analysis is consistent with (and in some cases an improvement over):

- The literature which consistently tabulates the competitive benefits of generic entry (*i.e.*, the price benefits which are the counterpart of the overcharge here) on a market-wide basis.

- My previous experience in measuring aggregate overcharges in nearly a dozen pharmaceutical class cases involving delay or blockage of generic entry.

---

[6] *See* Leitzinger Report, pp. 6, 43-44; Exhibits 4A-4C.

## IV.   Dr. Palmer's Claims

Dr. Palmer claims that I (and the Plaintiffs more generally) have "not demonstrated that there are compelling economic reasons to certify the proposed class."[7] He bases this conclusion on the following claims:[8]

1) There are conflicts between the economic interests of Class members that could prevent the named Plaintiffs from pursuing the best interests of the other members of the proposed Class;[9]

2) The named Plaintiffs are supposedly not typical of the members of the proposed Class due to asserted differences in pricing structures, business models, and resale arrangements;[10]

3) There may be fewer than 30 members of the proposed Class;[11]

4) Plaintiffs have not identified an end date to the Class period;[12]

5) Individualized inquiries will be necessary to establish the fact of antitrust injury because of differences among Class members in pricing structures, business models, and resale arrangements; and

6) Damages cannot be calculated on a class-wide basis without engaging in individualized inquires into purchasing patterns and contract terms (including rebates) for each Class member.[13]

---

[7] Palmer Declaration, ¶ 5. I note here that it has not been my role in this case to offer "compelling reasons" to certify the Class. The propriety of class certification, as I understand it, is a legal matter involving questions of due process and judicial efficiency. My role here is simply to offer economic insight regarding the predominance of common issues with respect to two elements of the Plaintiffs' economic proof: antitrust injury/impact and damages.

[8] Palmer Declaration, ¶¶ 5-6.

[9] Palmer Declaration, ¶¶ 59-62.

[10] Palmer Declaration, ¶¶ 52-56.

[11] Palmer Declaration, ¶ 5.1.

[12] Palmer Declaration, ¶¶ 47-49.

[13] Palmer Declaration, ¶¶ 63-75.

The first two issues listed above are largely legal questions. While some of the conclusions and analysis I describe below may have relevance to those issues, I focus this rebuttal on the last four claims by Dr. Palmer.

## V.    Description of the Class

Dr. Palmer claims that "there is a maximum of 30, and likely to be less than 25 members in the proposed class."[14]  The "Class" is defined in the Complaint[15] as:

> All persons or entities in the United States who purchased Ovcon [35] directly from Warner Chilcott at any time from April 22, 2004, through the present and continuing until the effects of Defendants' anticompetitive conduct have ceased.[16]

The Class excludes Defendants and their officers, directors, employees, subsidiaries, or affiliates, and all governmental entities.[17]  In addition, I have been directed to exclude hospitals, universities, and clinics from the Class.[18]  I also exclude those entities that have opted out of the Class and

---

[14] Palmer Declaration, ¶¶ 5.1, 41, 57.

[15] The complaint to which I refer is dated April 14, 2006, and is entitled "Amended Class Action Complaint."  I shall refer to it herein as the "Complaint."

[16] Complaint ¶ 61.

[17] Complaint ¶ 61.

[18] Dr. Palmer agrees that hospitals, clinics, universities, and college facilities should be excluded from the Class.  Palmer Declaration, ¶¶ 39, 57.

brought their own suits,[19] as well as the one named Plaintiff that withdrew from this action.[20]   Furthermore, I have been advised by counsel that the Class period ends on December 31, 2006.[21]   Based on this Class definition, as clarified through counsel's instruction, I have identified 30 Class members based upon

| REDACTED | [22] |
|---|---|

## VI.   Class-Wide Antitrust Injury

### A.   Focusing On The Right Question

After a lengthy discussion of the marketplace, the chain of distribution, and the role played by direct purchasers of Ovcon 35 (*i.e.*, Class members) within that distribution chain, Dr. Palmer concludes that "common injury cannot be established through common, class-wide evidence but would

---

[19] The entities that have opted out of this litigation are Albertson's Inc., CVS Pharmacy, Inc., Maxi Drug, Inc. d/b/a Brooks Pharmacy, Eckerd Corporation, Hy-Vee Inc., The Kroger Co., Rite Aid Corporation and Rite Aid Headquarters Corp., Safeway, Inc., and Walgreen Co. (collectively, the "opt-outs").

[20] It is my understanding that Valley Wholesale Drug Co. has withdrawn from this action.

[21] This is the ending date for the period defining the membership of the Class.  I have found that damages for members of the Class continue to accrue beyond that date.  See Leitzinger Report, pp. 41-43.

[22] For a more detailed discussion regarding how I identified Class members, *see* Leitzinger Report, pp. 30-32.

instead require primarily individualized fact finding."[23]  In this regard, he points to: (i) Class members at multiple levels of the distribution chain; (ii) Class members with supposedly complex, individualized pricing; (iii) certain Class members who were supposedly "bypassed" in their purchase of generic Ovcon 35 Products; (iv) Class members with differing business models; and (v) Class members who supposedly would be affected differently by supply disruptions.[24]  On the basis of these observations, Dr. Palmer asserts that "[w]hether, and to what extent, any particular customer was <u>affected</u> by the challenged activities depends on multiple factors specific to each customer and each claim, including the customer's class of trade, volume of purchases, pricing arrangements, and other customer-specific factors" (emphasis added).[25]

But, putting his conclusory assertions to one side, a close reading of his declaration clearly reveals that his conclusions about "effects" are not about antitrust injury (as that concept relates to this case).  Rather, his discussion

---

[23] Palmer Declaration, ¶ 64.  Despite his claim that these factors affect the fact of impact (*i.e.*, whether Class members suffered some amount of overcharge), the discussion in his declaration regarding the economic significance of these issues focuses largely on potential differences among Class members as to the <u>amount</u> of antitrust injury (*i.e.*, the quantum of harm).  The amount of antitrust injury, however, is irrelevant to showing <u>fact</u> of impact.  As I understand it, Plaintiffs do not need to show that all Class members were injured in the same amount.  They need only show the existence of some antitrust injury on the part of the proposed Class as a result of the challenged conduct.

[24] Palmer Declaration, ¶ 63.

[25] Palmer Declaration, ¶ 66 (emphasis added).

about effects involves the net economic consequences of delayed Ovcon 35 generic entry on Class members.[26]

For these direct purchaser Class members, however, net economic effect and antitrust injury are two distinct concepts.  As I understand it, antitrust injury for these direct purchasers flows simply from the fact of an overcharge. Broader questions associated with the net economic effect of that overcharge on the business of the direct purchaser are irrelevant to the fact of antitrust injury. The injury question here, as I understand it, is simply whether all or nearly all Class members suffered some overcharge in connection with some volume of their Ovcon 35 Product purchases as a result of the challenged conduct.  As to *that* question, most of what Dr. Palmer raises as individualized issues is irrelevant.

**B.   Dr. Palmer's Claims About Lack Of Injury On The Part Of Large National Wholesalers**

Dr. Palmer simply asserts in his Declaration, without any support, that the presence in the Class of national wholesalers (*i.e.*, the largest purchasers within the proposed Class) with their supposedly unique business models "render[s] any proper analysis of impact or damages among national wholesalers highly individualized."[27]   It is difficult, of course, to counter

---

[26] In this regard, he states that some Class members "could be better off when no generic product is available."  Palmer Declaration, ¶ 60.

[27] Palmer Declaration, ¶ 54.

unsupported conclusory assertions.  However, having worked in almost a dozen different class cases now involving these same large national wholesalers, there is nothing I am aware of that is unique about their business models which would cause them not to suffer some antitrust injury as a result of the challenged conduct.  Based upon all of my work here and in a dozen or so prior cases, national wholesalers -- like all Class members -- pay more for at least some of their product purchases when generic entry for the brand in question is blocked or delayed.

In fact,  I have calculated average prices for Class members by class of trade.[28]  This analysis (attached as **Exhibit 4**) shows

**REDACTED**

## C.   Dr. Palmer's Claims About Bypass

Dr. Palmer raises generic bypass as a complicating factor in establishing the fact of antitrust injury.[29]  The possibility that Class members were bypassed as to some of their generic purchases has no bearing, however, on the fact of antitrust injury.  The issue is whether, irrespective of the presence

---

[28] I have used the class of trade classifications that Dr. Palmer used.  He categorized Class members as "retail chain," "national wholesaler," "regional wholesaler," and "mail order pharmacy."

[29] "Generic bypass" occurs when, as a result of generic entry, former customers of Class members choose to buy the generic from a different (non-Class member) wholesaler or simply buy directly from the generic manufacturer.

- 10 -

of bypass, a Class member would have purchased at least some generic units in the but-for world in place of the higher-priced brand. If so, that Class member was overcharged by virtue of any delay in generic entry and, at least to that extent, suffered antitrust injury. For all of the reasons discussed in my original class Declaration and in my Expert Report, I conclude that this is indeed the case as to all (or nearly all) Class members.

To the extent it has any bearing for this case, bypass could in theory (and depending upon certain legal issues involving the manner in which it should be treated) reduce the amount of overcharge. But that relates to the quantification of damages, not the fact of impact.[30]

Dr. Palmer claims that five specific Class members did not buy generic Ovcon 35 from Barr (since it became available in October 2006).[31] He

**REDACTED**

He says that these entities were thus "entirely bypassed" as a result of generic entry (and would therefore not have incurred any overcharge based upon the delay in that entry).[32]

---

[30] Dr. Palmer appears to agree. Palmer Deposition, pp. 241-244.

[31] Palmer Declaration, ¶¶ 53, 58.

[32] Palmer Declaration, ¶¶ 53, 58, 67.

First, and significantly, Dr. Palmer confirms that



**REDACTED**

[33]

Thus, Dr. Palmer must agree with me that, at the very least, the vast majority of

Class members bought generic Ovcon 35 in substitution for the more expensive

brand almost immediately after it became available.

Second, Dr. Palmer bases his claim with respect to the five

supposedly "completely bypassed" entities on

**REDACTED** Plaintiffs, on the

other hand, claim that generic entry in this case was delayed for approximately

two-and-a-half years. **REDACTED** to

gauge the full competitive effects lost to the market as a result of a two-and-a-

half-year generic entry delay.  The logical fallacy in Dr. Palmer's approach to this

question can be readily seen by asking what one would conclude about common

antitrust injury in a case with only one month's worth of data following generic

entry.  In all likelihood, many direct purchasers would not yet have availed

themselves of the lower prices spawned by generic competition.  Clearly, though,

one would make an obvious error in then concluding that generic competition

would not benefit those purchasers.

---

[33] Palmer Deposition, pp. 112, 182.

Even accepting Dr. Palmer's highly attenuated time window (and

> **REDACTED**

for assessing the

existence of injury, he is factually incorrect even with regard to the five entities he

singles out.   Two of the five firms identified by Dr. Palmer (Drogueria and

Wholesalers Group) are based in Puerto Rico and are therefore *not* members of

the proposed Class.  A third entity, Anoka, is owned by Cardinal, another Class

member that has purchased Balziva, and therefore does not belong on the list.

Another of the five entities identified by Dr. Palmer, Rochester Drug Co-

operative,

> **REDACTED**

Thus, Dr. Palmer was wrong as to at least four of the five Class members that he

claims to have been completely bypassed.

It should also be noted here that the delay of generic Ovcon 35

enabled Warner Chilcott to release its chewable branded Ovcon 35 product

("Ovcon 35 Chewable") at approximately the same time as generic entry.[35]  This

has slowed the growth in generic sales in the actual world.  In the but-for world,

generic Ovcon 35 would have come out approximately two and a half years prior

to Ovcon 35 Chewable.  Generic Ovcon 35 substitution for branded Ovcon 35 in

the but-for world would have thus occurred more rapidly (and, one would expect,

more broadly) than it has so far.  Accordingly, even if Dr. Palmer had been able

---

[34]

> **REDACTED**

[35] Ovcon 35 Chewable came to market in September 2006 and Barr's generic Ovcon 35 Product
(Balziva) came to market in October 2006.

to find some Class members that did not purchase generic Ovcon 35 in the early part of the damages period here, that does not mean that these entities would not have purchased generic Ovcon 35 in the but-for world.

### D.    The Relevance of Potential Supply Disruptions

Similarly, Dr. Palmer's claim that different Class members would be affected differently by supply disruptions due to regional differences in generic substitution rates is without merit.[36]   First, I have seen no evidence, and Dr. Palmer offers none, that there are regional differences in generic substitution patterns.  Second, even if there were such differences, as discussed above, due to the Class members' role as middlemen/resellers, they do not segregate into brand-only or generic-only suppliers.  As such, all Class members would buy at least some generic in place of the more expensive brand.  To the extent that the conduct at issue precluded them from doing so, they suffered antitrust injury.

### E.    The Role Of Branded Ovcon 35 Price Effects

Dr. Palmer is also wrong to claim that in proving antitrust injury, I assume that Warner Chilcott would reduce its prices for branded Ovcon 35 in response to generic competition.  The economic evidence regarding antitrust injury presented in my Expert Report involves no direct reference or implicit reliance upon the possibility that generic competition will affect prices for branded Ovcon 35.  I gather that in attributing this assumption to me, he simply guesses

---

[36] Palmer Declaration, ¶¶ 73-74.

as much based upon his (incorrect) observation that a number of proposed Class members have not yet purchased generics and a (misguided) belief that I must then depend upon lower branded Ovcon 35 prices in the but-for world as the source of antitrust injury for those customers.[37]

The problem with his reasoning (putting aside his factual errors) is that, as described above, one cannot leap from the observation that a given Class member has not yet purchased generic Ovcon 35 in the actual world to a conclusion that the Class member would not have done so in the but-for world. As noted above, (1) there has simply not been enough time since actual generic entry to reliably assess the full extent of generic substitution that will occur, and (2) giving consideration to the effects of the recent introduction of Ovcon 35 Chewable, generic substitution likely would have been more extensive in the but-for world than it has been to date.

For my common impact analysis, given the well understood effects of lower- priced generic entry in pharmaceutical markets, I place importance both on the broad scope of generic substitution predicted by the parties in this case and generally reflected in the experience of the pharmaceutical industry, as well as the limited (four months or so) actual generic experience we have in this case. The Congressional Budget Office, the Federal Trade Commission, and the Food

---

[37] Dr. Palmer offers no citation to my earlier Declaration or deposition testimony to support his claim that my conclusions depend upon a branded Ovcon 35 price effect.

and Drug Administration have all found that generic competition benefits consumers through lower prices. Both my earlier Declaration and Expert Report cite this economic literature at length.[38] The existence of these benefits is not open to serious debate.

Dr. Palmer does not disagree with my claim that the existing economic literature demonstrates that broad market-wide competitive benefits result from generic competition.[39] Dr. Palmer also does not (a) disagree with my characterization of Defendants' internal analyses as projecting market-wide effects on prices and purchases of Ovcon 35 Products as a result of generic Ovcon 35 entry, or (b) dispute the fact that in the few months since generic Ovcon 35 entry has actually occurred, it brought lower prices to a substantial portion of the Ovcon 35 Products market, including all or nearly all Class members.[40]

The role played by potential but-for branded Ovcon 35 price reductions in my conclusions is simply to recognize as a possibility that one mechanism through which AB-rated generic entry can create (and, in fact, has

---

[38] Leitzinger Declaration, pp. 17-23; Leitzinger Report, pp. 18-23.

[39] In fact, Dr. Palmer states in his deposition that generics generally enter at lower prices than the brand and take share away from the brand. Palmer Deposition, pp. 131-132.

[40] Dr. Palmer admits that he did not even compare Ovcon 35 brand and generic prices and that he does not know whether or not Class members were paying less for Ovcon 35 Products after generic entry. Palmer Deposition, pp. 176-178. He did, however, note that generics generally come in at lower prices than the brand and take share from the brand. Palmer Deposition, pp. 131-132.

created) competitive benefits is through increased discounts offered by the brand to selected customers in order to retain their business in the face of a generic option.[41]

## VII.   Damages

Dr. Palmer had little to say on the subject of damages that was independent of his antitrust injury discussion.  In discussing each of the issues described above, Dr. Palmer for the most part related them both to class-wide proof of injury and calculation of damages.  Thus, for all of the reasons described above, the issues he raises are no more problematic for class-wide calculation of damages than they are for class-wide proof of impact.  And, to the extent that his conclusion is that overcharge damages cannot be reasonably calculated, I would simply refer him to my Expert Report[42] where that very calculation is described and applied.

Beyond that, however, the manner in which he perfunctorily sweeps the two issues together overlooks a fundamental point:  damages need only be measured on a class-wide aggregate basis.  Accordingly, in considering class-wide measurement of damages, the question is simply whether or not there are

---

[41] There is some documentary support for that outcome here.  As I noted in my deposition,

**REDACTED**

For his part, Dr. Palmer simply asserts without any evidentiary basis that generic entry in the but-for world would have had no impact on branded Ovcon 35 prices.  Palmer Declaration, ¶ 5.4.

[42] Leitzinger Report, pp. 28-44.

methods that can be used to reasonably measure the aggregate overcharge incurred by Class members. Even in the face of individual circumstances that might cause the quantum of overcharge as to each Class member to be different, the actual damage calculation need not incorporate any of those individualized differences. Class-wide averages of prices and generic substitution rates are all that is needed as long as the resulting total overcharge is reasonable. Moreover, to the extent individual data for Class members' purchase volumes and prices reside in electronic data, aggregate damage calculations incorporating that electronic data is straightforward.

Dr. Palmer offers no opinions or analysis in his declaration that this kind of aggregate calculation cannot produce a reasonable result. He does, however, assert at one point in his declaration that customer-specific pricing, including rebates, would preclude use of a single, class-wide formula. I fail to see how. As is described in my Expert Report,[43] I simply use the total revenue paid by Class members (net of rebates, chargebacks, and other discounts), in combination with their aggregate purchase volumes to calculate average prices, both for the brand and for the generics that have been sold since their recent date of market entry. By then reconstructing those same averages to reflect the earlier time at which generics would have been available, I have reliably estimated total costs for Ovcon 35 Products in the but-for world. By comparing

---

[43] Leitzinger Report, p. 33.

these estimates with the actual costs incurred by the Class, I was then readily able to calculate the amount of overcharge.

In regards to damages, generic bypass is a phenomenon that I have previously accounted for within the aggregate damages analyses that I performed in prior pharmaceutical class cases involving these same issues.[44] It did not preclude the class-wide calculation of overcharges in any of these cases and it has not here.

As discussed in my Expert Report,[45]

**REDACTED**

Since these volumes are not part of the Class, there is no class-wide bypass.[46] Dr. Palmer claims that different levels of bypass can give rise to differences in the amount of damages incurred by each Class member. As noted above, that fact -- even if true -- is of no significance here. The only relevant question is the aggregate amount of damages suffered by the Class. Issues relating to differences in the amount of overcharge across Class members are reserved for the process of Class member allocation that would follow any recovery by the Class.

---

[44] Bypass can be incorporated into the overcharge calculation by reducing the Class's share of the but-for market volumes by the amount of the bypass that occurs after generic entry in the actual world. I have incorporated such a calculation in some of the past work I have done calculating damages in class pharmaceutical cases with claims similar to the claims in this case.

[45] Leitzinger Report, p. 44 n. 105.

[46] Leitzinger Report, p. 44 n. 105.

I am signing this Declaration under penalty of perjury.


Date:  May 21, 2007                                Jeffrey J. Leitzinger, Ph.D.

# EXHIBIT 1

**Exhibit 1**
**Page 1 of 14**



**Dr. JEFFREY J. LEITZINGER**
*President*
**Los Angeles, California**
**Tel: 213 624 9600**

**EDUCATION**

Ph.D., Economics, University of California, Los Angeles
M.A., Economics, University of California, Los Angeles
B.S., Economics, Santa Clara University

**WORK EXPERIENCE**

*Econ One Research, Inc.*, President, July 1997 to date
Founded *Econ One Research, Inc.*, 1997

*Micronomics, Inc.,* President and CEO, 1994-1997
*Micronomics, Inc.*, Executive Vice President, 1988-1994
Cofounded *Micronomics, Inc.*, 1988

*National Economic Research Associates, Inc. 1980-1988*
(Last position was Senior Vice President and member of the Board
of Directors)

**ADMITTED AS AN EXPERT ECONOMIST TO TESTIFY ABOUT:**

<u>*Relevant Markets and Competition*</u>

Before:    Federal Energy Regulatory Commission
Superior Court, State of Alaska
Superior Court, State of California
Superior Court, State of Washington
U.S. District Court, Central District of California
U.S. District Court, Northern District of California
U.S. District Court, District of Colorado
U.S. District Court, Eastern District of Missouri
U.S. District Court, Eastern District of Texas
U.S. District Court, Western District of Texas
U.S. District Court, District of Wyoming

<u>*Valuation, Economic Loss and Damages*</u>

Before:    Circuit Court, Mobile County, Alabama
Civil Court, Harris County, Texas

**Dr. Jeffrey J. Leitzinger**
*President*

**Exhibit 1**
**Page 2 of 14**

Civil Court, Midland County, Texas
State of Alaska Department of Revenue
Superior Court, State of California
U.S. Bankruptcy Court, District of Alaska
U.S. Bankruptcy Court, Northern District of Texas
U.S. District Court, State of Alabama
U.S. District Court, Central District of California
U.S. District Court, District of Colorado
U.S. District Court, State of Louisiana
U.S. District Court, Southern District of Mississippi
U.S. District Court, District of North Dakota
U.S. District Court, Eastern District of Texas
U.S. District Court, Southern District of Texas
U.S. District Court, Western District of Texas

### Patent and Intellectual Property Issues

Before:     Superior Court, State of Washington
U.S. District Court, Northern District of California
U.S. District Court, District of Colorado
U.S. District Court, District of Connecticut
U.S. District Court, Southern District of Texas

### The Economics of Regulated Industries

Before:     Alaska Public Utilities Commission
California Energy Commission
California Public Utilities Commission
Federal Energy Regulatory Commission
Nevada Public Service Commission
Wisconsin Public Service Commission
U.S. District Court, Northern District of Oklahoma
U.S. District Court, Northern District of Texas

## INVITED PRESENTATIONS REGARDING:

Antitrust Injury and the Predominance Requirement in Antitrust Class Actions
*American Bar Association*, Houston Chapter, April 2007.

What Can an Economist Say About The Presence of Conspiracy? *American Bar Association,* Section of Antitrust Law, The Antitrust Litigation Course, October 2003.

Lessons From Gas Deregulation, *International Association for Energy Economics, Houston Chapter,* December 2002.

A Retrospective Look at Wholesale Gas Industry Restructuring, *Center for Research in Regulated Industries*, 20th Annual Conference of the Advanced Workshop in Regulation and Competition, May 2001.

**Dr. Jeffrey J. Leitzinger**
*President*

**Exhibit 1**
**Page 3 of 14**

The Economic Analysis of Intellectual Property Damages, *American Conference Institute,* Sixth National Advanced Forum, January 2001.

Law and Economics of Predatory Pricing Under Federal and State Law, *Golden State Antitrust and Unfair Competition Law Institute,* 8th Annual Meeting, October 2000.

Non-Price Predation--Some New Thinking About Exclusionary Behavior, *Houston Bar Association,* Antitrust and Trade Regulation Section, October 2000.

After the Guilty Plea:  Does the Defendant Pay the Price in the Civil Damage Action (expert witness in mock trial presentation), *American Bar Association,* Section of Antitrust Law, 48th Annual Spring Meeting, April 2000.

Economics of Restructuring in Gas Distribution, *Center for Research in Regulated Industries,* 12th Annual Western Conference, July 1999.

A Basic Speed Law for the Information Superhighway, *California State Bar Association,* December 1998.

Innovation in Regulation: Section Discussant, *Center for Research in Regulated Industries,* 11th Annual Western Conference, July/September 1998.

Electric Industry Deregulation: What Does The Future Hold? *Los Angeles Headquarters Association,* November 1996.

Why Deregulate Electric Utilities?, *National Association of Regulatory Utility Commissioners,* November 1995.

Restructuring U.S. Power Markets: What Can the Gas Industry's Experience Tell Us?, *National Association of Regulatory Utility Commissioners,* July 1995.

Natural Gas Restructuring: Lessons for  Electric Utilities and Regulators, *International Association for Energy Economics,* Los Angeles, California, May 1995.

Techniques in the Direct and Cross-Examination of Economic, Financial and Damage Experts, *The Antitrust and Trade Regulation Law Section of the State Bar of California and The Los Angeles County Bar Association,* 2ND Annual Golden State Antitrust and Trade Regulation Institute, Los Angeles, California October 1994.

Demonstration: Deposition of Expert Witnesses and Using Legal Technology, *National Association of Attorneys General,* 1994 Antitrust Training Seminar, Santa Fe, New Mexico, September 1994.

**Dr. Jeffrey J. Leitzinger**                                    **Exhibit 1**
*President*                                                      **Page 4 of 14**

Direct and Cross Examination of Financial, Economic, and Damage Experts, *The State Bar of California, Antitrust and Trade Regulation Law Section,* San Francisco, California, May 1994.

Price Premiums in Gas Purchase Contracts, *International Association for Energy Economics,* Seattle, Washington, October 1992.

Valuing Water Supply Reliability, *Western Economic Association,* Natural Resources Section, San Francisco, California, July 1992.

Transportation Services After Order 636: "Back to the Future" for Natural Gas, Seminar sponsored by Jones, Day, Reavis & Pogue; Dallas, Texas, May 1992.

The Cost of An Unreliable Water Supply for Southern California, Forum presented by Micronomics, Inc., Los Angeles, California, May 1991.

Market Definition: It's Time for Some "New Learning," *Los Angeles County Bar Association,* Antitrust and Corporate, Law Section, Los Angeles, California, December 1989.

Market Definition in Antitrust Cases: Some New Thinking, *Oregon State Bar,* Antitrust Law Section, Portland, Oregon, March 1987.

Future Directions for Antitrust Activity in the Natural Gas Industry, *International Association of Energy Economists*; Houston, Texas, February 1987.

Information Externalities in Oil and Gas Leasing, Western Economic Association Meetings, Natural Resources Section, Seattle, Washington, July 1983.

Economic Analysis of Offshore Oil and Gas Leasing, *Western States Land Commissioners Association*; South Padre Island, Texas, December 1982.

**PUBLISHED ARTICLES**

"The Predominance Requirement for Antitrust Class Actions--Can Relevant Market Analysis Help?," American Bar Association, Section of Antitrust Law, *Economics Committee Newsletter*, Volume 7, No. 1, Spring 2007.

"A Retrospective Look at Wholesale Gas: Industry Restructuring," *Journal of Regulatory Economics,* January 2002.

"Balance Needed in Operating Agreements as Industry's Center of Gravity Shifts to State Oil Firms," *Oil & Gas Journal*, October 2000.

"What Can We Expect From Restructuring In Natural Gas Distribution?" *Energy Law Journal*, January 2000.

**Dr. Jeffrey J. Leitzinger**
*President*

**Exhibit 1**
**Page 5 of 14**

"Gas Experience Can Steer Power Away from Deregulation Snags," *Oil & Gas Journal,* August 1996.

"Anatomy of FERC Order 636: What's out, What's in," *Oil & Gas Journal*, June 1992.

"Antitrust II – Future Direction for Antitrust in the Natural Gas Industry," *Natural Gas*, November 1987.

"Information Externalities in Oil and Gas Leasing," *Contemporary Policy Issues*, March 1984.

"Regression Analysis in Antitrust Cases: Opening the Black Box," *Philadelphia Lawyer*, July 1983.

"Foreign Competition in Antitrust Law," *The Journal of Law & Economics*, April 1983.

## REGULATORY SUBMISSIONS

In the Matter of the Application of Southern California Gas Company Regarding Year Six (1999-2000) Under its Experimental Gas Cost Incentive Mechanism and Related Gas Supply Matters; A.00-06-023, Public Utilities Commission of the State of California, November 2001.

Sempra Energy and KN Energy, Incorporation; Docket No. EC99-48-000 (Affidavit and Verified Statement), Federal Energy Regulatory Commission, March/May 1999.

Rulemaking on the Commission's Own Motion to Assess and Revise the Regulatory Structure Governing California's Natural Gas Industry (Market Conditions Report), Public Utilities Commission of the State of California, July 1998.

In the Matter of the Application of Pacific Enterprises, Enova Corporation, et al. for Approval of a Plan of Merger Application No. A. 96-10-038, Public Utilities Commission of the State of California, August/October 1997.

In re: Koch Gateway Pipeline Company; Docket No. RP 97-373-000, Federal Energy Regulatory Commission, May/October 1997 and February 1998.

In the Matter of the Application of Sadlerochit Pipeline Company for a Certificate of Public Convenience and Necessity; Docket No. P-96-4, Alaska Public Utilities Commission, May 1996.

Public Funding of Electric Industry Research, Development and Demonstration (RD&D) Under Partial Deregulation, California Energy Commission, January 1995.

NorAm Gas Transmission Company; Docket No. RP94-343-000, Federal Energy Regulatory Commission, August 1994/June 1995.

Natural Gas Vehicle Program; Investigation No. 919-10-029, California Public Utilities Commission, July 1994.

Transcontinental Gas Pipe Line Corporation; Docket No. RP93-136-000 (Proposed Firm-to-the-Wellhead Rate Design), Federal Energy Regulatory Commission, January 1994.

In re: Sierra Pacific's Proposed Nomination for Service on Tuscarora Gas Pipeline; Docket No. 93-2035, The Public Service Commission of Nevada, July 1993.

Employment Gains in Louisiana from Entergy-Gulf States Utilities Merger, Louisiana Public Utilities Commission, December 1992.

Employment Gains to the Beaumont Area from Entergy-Gulf States Utilities Merger, Texas Public Utilities Commission, August 1992.

Transcontinental Gas Pipe Line Corporation; Docket No. RS 92-86-000 (Affidavit regarding Transco's Proposed IPS Service), Federal Energy Regulatory Commission, June 1992.

In Re: Pipeline Service Obligations; Docket No. RM91-11-000; Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations; Docket No. RM91-3-000; Revisions to the Purchased Gas Adjustment Regulations; Docket No. RM90-15-000, Federal Energy Regulatory Commission, May 1991.

In the Matter of Natural Gas Pipeline Company of America; Docket No. CP89-1281 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, January 1990.
In the Matter of United Gas Pipeline Company, UniSouth, Cypress Pipeline Company; Docket No. CP89-2114-000 (Proposed Certificate of Storage Abandonment by United Gas Pipeline Company), Federal Energy Regulatory Commission, December 1989.

In the Matter of Tennessee Gas Pipeline Company; Docket No. CP89-470 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, July 1989.

In the Matter of Take-Or-Pay Allocation Proposed by Mississippi River Transmission Corporation, Federal Energy Regulatory Commission, March 1988.

In the Matter of Natural Gas Pipeline Company of America; Docket No.RP87-141-000 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, December 1987.

**Dr. Jeffrey J. Leitzinger**
*President*

<div align="right">

**Exhibit 1**
**Page 7 of 14**

</div>

<u>In the Matter of Application of Wisconsin Gas Company for Authority to Construct New Pipeline Facilities; 6650-CG-104,</u> Public Service Commission, State of Wisconsin, August 1987.

<u>Trans-Alaska Pipeline System: Docket Nos. OR 78-1-014 and OR 78-1-016</u> (Phase 1 Remand), Federal Energy Regulatory Commission, October 1983.

Exhibit 1
8 of 14
Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
*Prior Testimony*
June 2003 – May 2007

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/Trial/Hearing | Date |
|---|---|---|---|---|---|
| 1. | In Re: Terazosin Hydrochloride Antitrust Litigation | U.S. District Court, Southern District of Florida | Cass Nos. 98-3125 and 99-7134 | Deposition | January 2002 July 2002 February 2004 |
| 2. | The Goeken Group Corporation and In-Flight Phone Corporation v. McCaw Cellular Communications, Inc., Claircom Communications, L.P., and Hughes Network Systems, Inc. | The Circuit Court of DuPage County, Illinois, Eighteenth Judicial District | No. 93 CH 1065 | Deposition | June 2003 |
| 3. | In Re: Ciprofloxacin Hydrochloride Antitrust Litigation | U.S. District Court, Eastern District of New York | No. 1:00-MD-1383 | Deposition | July 2003 May 2004 |
| 4. | In Re: Scrap Metal Antitrust Litigation | U.S. District Court, Northern District of Ohio, Eastern Division | No. 1:02 CV 0844 | Deposition<br>Trial | August 2003 September 2004 January 2006 |
| 5. | KLA-Tencor Corporation v. Tokyo Seimitsu Co. Ltd., and TSK America, Inc. | U.S. District Court, Northern District of California, Oakland Division | No. CV01-2489 SBA | Deposition | August 2003 |

Exhibit 1
9 of 14
Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
*Prior Testimony*
June 2003 – May 2007

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/Trial/Hearing | Date |
|---|---|---|---|---|---|
| 6. | In Re: Relafen Antitrust Litigation | U.S. District Court, District of Massachusetts | No. 01-CV-12239 (WGY) | Deposition | September 2003 December 2003 |
| 7. | Francis Ferko, and Russell Vaughn, as Shareholders of Speedway Motorsports, Inc. v. National Association of Stock Car Auto Racing, Inc.; International Speedway Corp.; and Speedway Motorsports, Inc. | U.S. District Court, Eastern District of Texas, Sherman Division | No. 4:02-CV-50 | Deposition | November 2003 |
| 8. | Chevron U.S.A., Inc. v. State of Louisiana, Louisiana State Mineral Board, and Louisiana Department of Natural Resources | U.S. District Court, 17th Judicial District, Parish of Lafourche, Louisiana | Number 93,658 Division C | Deposition Trial | January 2004 March 2004 |
| 9. | Houston McLane Co. Inc. and Houston Regional Sports Network, L.P. v. Affiliated Regional Communications, Ltd. | U.S. District Court, 333rd Judicial District, Harris County, Texas | Cause No. 2003-10943 | Deposition | March 2004 |

Exhibit 1
10 of 14
Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
*Prior Testimony*
June 2003 – May 2007

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/Trial/Hearing | Date |
|---|---|---|---|---|---|
| 10. | Harry E. Stetser, Dale E. Nelson & Michael deMontbrun v. TAP Pharmaceutical Products, Inc., et al | State of North Carolina, New Hanover County, In The General Court of Justice, Superior Court Division | File No. 01CVS 5268 | Deposition | April 2004 |
| 11. | Masimo Corporation, vs. Tyco Health Care Group L.P., and Mallinckrodt, Incorporated | U.S. District Court, Central District of California, Western Division | Case No. CV-02-4770 | Deposition Trial | April 2004 March 2005 |
| 12. | J.B.D.L. Corp. d/b/a Beckett Apothecary, et al v. Wyeth-Ayerst Laboratories, Inc., et al. | United States District Court, Southern District of Ohio, Western Division | Civil Action No. C-1-01-704 | Deposition | May 2004 November 2004 |
| 13. | Dewana G. Turner, Bonita H. Hixson, and Yolanda P. Monroe, on behalf of themselves and all others similarly situated v. Alaska Communications Systems Long Distance, Inc. and Alaska Communications Systems Group, Inc. | Superior Court for the State of Alaska, Third Judicial District at Anchorage | Case No. 3AN-01-7208 CI | Deposition | July 2004 |
| 14. | In Re: Remeron Direct Purchaser Antitrust Litigation | U.S. District Court, District of New Jersey | Master Docket No. 03-CV-0085 | Deposition | July 2004 |

Exhibit 1
11 of 14
Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
*Prior Testimony*
June 2003 – May 2007

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 15. | Louisiana Wholesale Drug Co., Inc., on behalf of itself and all others similarly situated, v. Schering-Plough Corporation; Upsher-Smith Laboratories; and American Home Products Corporation | U.S. District Court, District of New Jersey | MDL No. 1419 | Deposition | December 2004 |
| 16. | Pixion, Inc. v. Placeware, Inc. | U.S. District Court, Northern District of California | Case No. C 03 2909 SI | Deposition Trial | December 2004 February 2005 |
| 17. | Fran-Am Partnership, L.L.C. vs. Sports Car Club of America, Inc. and S.C.C.A. Enterprises, Inc. | U.S. District Court, District of Colorado | Civil Action No. 02-Z-2060 (OES) | Deposition | January 2005 |
| 18. | In Re: Medical Waste Services Antitrust Litigation | U.S. District Court, District of Utah, Central Division | MDL No. 1546 | Deposition | April 2005 |
| 19. | Applied Medical Resources Corp. v. Ethicon, Inc., Ethicon Endo-Surgery, Inc., et al. | U.S. District Court, Central District of California, Southern Division | Case NO. SACV 03-1329 JVS | Deposition Trial | June 2005 August 2006 |

Exhibit 1
12 of 14
Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
*Prior Testimony*
June 2003 – May 2007

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 20. | Brady Enterprises, Inc.; Charlotte J. Lopacki, d/b/a Budget Drug and Heritage Pharmacy, Inc.; On behalf of themselves and all others similarly situated; and the Pharmacy Freedom Fund and the National Community Pharmacists Association v. Medco Health Solutions, Inc., et al. | U.S. District Court, Eastern District of Pennsylvania | Civil Action No. 03-4730 | Deposition | July 2005 |
| 21. | The Regents of the University of California, a CA Public corporation vs. Monsanto Company, a Delaware Corp. | U.S. District Court, Northern District of California, San Francisco Division | Case No. C04-00634 PJH | Deposition | August 2005 |
| 22. | Dennis M. Devetter, vs. Alex Brown Management Services, Inc.; et al. | In the Circuit Court for Baltimore City | Case No. 24-C-037514 | Deposition | January 2006 |
| 23. | Sky Technologies, LLC, vs. IBM Corporation and i2 Technologies, Inc. | U.S. District Court, Eastern District of Texas, Marshall Division | Case No. 2:03 CV 54-DF | Deposition | January 2006 |

Exhibit 1
13 of 14
Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
*Prior Testimony*
June 2003 – May 2007

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 24. | In Re: Nifedipine Antitrust Litigation | U.S. District Court, District of Columbia | MDL No. 151 | Deposition | May 2006 |
| 25. | In Re: Tricor Direct Purchaser Antitrust Litigation | U.S. District Court, District of Delaware | Civil Action No. 05-340 KAJ | Deposition | July 2006 |
| 26. | Tessera, Inc. v. Micron Technology, Inc. Micron Semiconductor Products, Inc. Infineon Technologies AG, Infineon Technologies Richmond, LP, Infineon Technologies North America Corp., and Qimonda AG | U.S. District Court, Eastern District of Texas | Case No. 2:05-CV-94 | Deposition | July 2006 |
| 27. | The SCO Group v. International Business Machines Corporation | U.S. District Court, District of Utah | Civil No. 2:03CV-0294 | Deposition | September 2006 |
| 28. | USI of Southern California, et al. v. Christopher Rodenfels | Superior Court of the State of California, for the County of Los Angeles, Central District | Case No. BC335639 | Deposition | November 2006 |

Exhibit 1
14 of 14
Econ One Research, Inc.
Los Angeles, California

DR. JEFFREY J. LEITZINGER
*Prior Testimony*
June 2003 – May 2007

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/Trial/Hearing | Date |
|---|---|---|---|---|---|
| 29. | Columbus Drywall & Insulation, Inc., et al. on behalf of a class of similarly situated persons v. Masco Corporation, et al. | U.S. District Court, Northern District of Georgia, Atlanta Division | Civil Action No. 1:04-cv-3066 | Deposition Deposition | November 2006 February 2007 |
| 30. | John G. Miles, et al. v. Merrill Lynch & Co., et al. | United States Court of Appeals for the Second Circuit | Docket No. 05-3349-cv | Trial | December 2006 |
| 31. | City of San Antonio, Texas, et al. v. Hotels.com, LP, et al. | U.S. District Court, Western District of Texas, San Antonio Division | Case No. SA06CA0381 OG | Deposition | March 2007 |
| 32. | Meijer, Inc. and Meijer Distribution, Inc., on behalf of themselves and all others similarly situated v. Warner Chilcott Holdings Company III, Ltd., et al. | U.S. District Court, District of Columbia | Civil Action No. 1:05-CV-02195-CKK | Deposition | April 2007 |

# EXHIBIT 2

EXHIBIT 2

**Meijer, Inc., et al. v. Warner Chilcott Holdings Company III, LTD., et al.**
**List of Materials Reviewed Since the March 12, 2007 Class Certification Declaration**

*Includes all documents, studies, and articles cited in the Declaration.*

Pleadings/Orders

    Defendants' Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification (4-12-2007)

Correspondence

    Letter from A. Rizzi to N. Clark re: Warner Chilcott data production (10-20-2006)
    Letter from E. Eun to N. Clark re: Barr data production (4-10-2007)
    Letter from D. Nalven to M. Raptis re: Watson data questions (4-11-2007)
    Letter from E. Eun to N. Clark re: Barr data production (4-18-2007)
    Letter from A. Rizzi to E. Noteware re: Warner Chilcott data questions (4-20-2007)
    Letter from A. Rizzi to N. Clark re: Warner Chilcott data questions (5-10-2007)

Data - Electronic Files/CDs

    **Barr**
        BARR-OVCON-0841476.xls
        BARR-OVCON-0841477.xls
        BARR-OVCON-0841478.xls
        BARR-OVCON-0841479.xls
        BARR-OVCON-0841480.xls
        BARR-OVCON-0841481.xls
        BARR-OVCON-0841482.xls
        BARR-OVCON-0841483.xls
        BARR-OVCON-0841484.xls
        BARR-OVCON-0841485.xls
        BARR-OVCON-NF-019126.xls

    **Warner Chilcott**
        WC Data 004
        WC Data 005

    **Watson**
        nyc3-585042-1.xls
        nyc3-585036-1.xls
        nyc3-591131-1.xls
        nyc3-591132-1.xls
        nyc3-588406-2.xls

    **IMS Health**
        Through March 2007

    **Wolters Kluwer Health**
        Ovcon_etc_WACs_ex_PC2.txt

    **Opt-out Entities**
        econ_alb.sas7bdat
        econ_cvs.sas7bdat
        econ_eck.sas7bdat
        econ_hyv.sas7bdat
        econ_kros.sas7bdat
        econ_rit.sas7bdat
        econ_saf.sas7bdat
        econ_wal.sas7bdat

EXHIBIT 2

**Meijer, Inc., et al. v. Warner Chilcott Holdings Company III, LTD., et al.**
**List of Materials Reviewed Since the March 12, 2007 Class Certification Declaration**

**RDC**
OVCON Update~May 8 2007.xls

**Defendant Expert Work Papers**
Balziva Market Direct Sales.xls

<u>Declarations</u>

Declaration of Brian L. Palmer, Ph.D. (4/12/2007) and work papers

<u>Expert Reports (**FTC v. Barr** litigation)</u>

Ecock, Frank (12/7/2006,1/5/2007)
Hauser, John (12/9/2006)
Addanki, Sumanth (12/11/2006,1/8/2007)
Bell, Gregory (12/11/2006, 1/8/2007)
Grabowski, Henry (12/11/2006, 1/8/2007)
Hausman, Jerry (12/11/2006, 1/8/2007)
Lewis, Tracy (12/11/2006, 1/8/2007)
Rubinfeld, Daniel (12/11/2006, 1/8/2007)
Dickey, Richard (1/5/2007)

<u>Depositions</u>

MacFarlane, Katie, Vol. 1 & 2 (10/10/2006-10/11/2006)
Palmer, Brian (5/3/2007)

<u>Documents (BARR-OVCON prefix)</u>

310253 - 310283
318958 - 318988
0837706 - 0837710
841250 - 841254
841277 - 841306
841315 - 841317
841319
841332 - 841336
841338
841343 - 841345
841348 - 841349
841350 - 841359
841360 - 841475

<u>Documents (OVCON_MEIJER)</u>

0054 - 0058
0062 - 0063

<u>Documents (OVCON_SAJ)</u>

0001 - 0002
000094 - 000117

<u>Documents (BARR-08 prefix)</u>

0008 - 0011

EXHIBIT 2

**Meijer, Inc., et al. v. Warner Chilcott Holdings Company III, LTD., et al.**
**List of Materials Reviewed Since the March 12, 2007 Class Certification Declaration**

<u>Documents (BARR-13 prefix)</u>

00042 - 00043

<u>Documents (BARR-29 prefix)</u>

00002 - 00006
00003 - 00007
00011 - 00039

<u>Documents (WC prefix)</u>

00141390 - 00141442
00364675
00463928 - 00464164
00463928 - 00463934
00464045 - 00464052

<u>Publicly Available Materials</u>

Atanu Saha, Henry Grabowski, Howard Birnbaum, Paul Greenberg and Oded Bizan, *Generic Competition in the US Pharmaceutical Industry*, <u>International Journal of the Economics of Business</u>, Vol. 13, No. 1, February 2006, pp. 15-38
United States Healthcare Distribution, Information Technology & PBMs, 2003 Distribution Outlook, JPMorgan, April 21, 2003

# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MEIJER, INC., MEIJER DISTRIBUTION, INC., LOUISIANA WHOLESALE DRUG CO., INC., ROCHESTER DRUG CO-OPERATIVE, INC., AMERICAN SALES COMPANY, INC., SAJ DISTRIBUTORS, INC., and STEPHEN L. LaFRANCE HOLDINGS, INC.,

On behalf of themselves and all others similarly situated,

        **Plaintiffs,**

   **v.**

WARNER CHILCOTT HOLDINGS COMPANY III, LTD., WARNER CHILCOTT CORPORATION, WARNER CHILCOTT (US) INC., WARNER CHILCOTT COMPANY, INC., GALEN (CHEMICALS), LTD., and BARR PHARMACEUTICALS, INC.,

        **Defendants.**

No. 05 Civ. 2195 (CKK)

## EXPERT REPORT OF JEFFREY J. LEITZINGER, PH.D.

### Econ One Research, Inc.
### May 18, 2007

5th Floor
1101 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 756-4582
fax (202) 835-2226

Suite 100
555 University Avenue
Sacramento, California 95825
(916) 576-0366
fax (916) 576-0365

5th Floor
601 West 5th Street
Los Angeles, California 90071
(213) 624-9600
fax (213) 624-6994

Suite 2825
Three Allen Center
333 Clay Street
Houston, Texas 77002
(713) 228-2700
fax (713) 228-3296

Suite 230
106 E. 6th Street
Austin, Texas 78701
(512) 476-3711
(512) 476-9712

## I.    Introduction and Qualifications

I am an economist and President of Econ One Research, Inc., an economic research and consulting firm with offices in Los Angeles, Sacramento, Austin, Houston, and Washington D.C. I have masters and doctoral degrees in economics from UCLA and a bachelor's degree in economics from Santa Clara University. While at UCLA, one of my areas of concentration was industrial organization, which involves the study of markets, competition, antitrust, and other forms of regulation.

During the past 27 years of my professional career, industrial organization has remained the principal focus of much of my work. I have worked on numerous projects relating to antitrust economics, including analyzing issues involving market power, market definition, and the competitive effects of firm behavior. I also have frequently assessed damages resulting from anticompetitive conduct and have substantial experience in the calculation of damages in class action litigation. Additionally, I have significant experience with economic issues related to class certification in antitrust contexts.

I have testified as an expert economist in state and federal courts and before a number of regulatory commissions. A more detailed summary of my training, past experience, and prior testimony is shown in Exhibit 1.

I have submitted a declaration, dated March 12, 2007, in support of class certification in this case (the "Class Declaration"), and expect to submit a second declaration in support of class certification that addresses certain issues raised by Defendants and their expert, Dr. Brian L. Palmer, relating to class certification. I incorporate my Class Declarations by reference here.

As discussed at some length in the Class Declaration, I am familiar with the economic and academic literature on the subject of generic competition and impaired generic competition. I also have extensive experience analyzing impact and damages issues in class action antitrust cases involving direct purchasers of brand-name drugs who were overcharged as a result of impaired generic competition.

Econ One is being compensated for the time I spend on this matter at my normal and customary rate of $525 per hour. Econ One also is being compensated for time spent by my research staff on this project at their normal and customary hourly rates.

## II.    Assignment

I understand that the Complaint[1] in this matter was filed by Meijer, Inc. and Meijer Distribution, Inc., Louisiana Wholesale Drug Company, Inc.,

---

[1] The Complaint to which I refer is dated April 14, 2006, and is entitled "Amended Class Action Complaint." I shall refer to it hereinafter as the "Complaint."

Rochester Drug Co-Operative, Inc., American Sales Company, Inc., SAJ Distributors, Inc., and Stephen L. LaFrance Holdings, Inc. ("Plaintiffs"),[2] on behalf of themselves and a class of direct purchasers of the drug Ovcon 35 (the "Class"),[3] a prescription oral contraceptive, against Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (US) Inc., Warner Chilcott Company, Inc., Galen (Chemicals), Ltd. (collectively, "Warner Chilcott") and Barr Pharmaceuticals, Inc. ("Barr") (collectively, "Defendants"). Plaintiffs allege that Defendants entered into an agreement that unlawfully delayed the date upon which less expensive, generic versions of Ovcon 35 entered the market and became available to Class members.  Plaintiffs allege that as a result of Defendants' conduct, Class members were overcharged on their purchases of Ovcon 35 Products.[4]

---

[2] I understand that although Valley Wholesale Drug Company, Inc. was initially a named Plaintiff in the Complaint, it has since withdrawn from this action.

[3] The "Class" is defined in the Complaint as: "All persons or entities in the United States who purchased Ovcon [35] directly from Warner Chilcott at any time from April 22, 2004, through the present and continuing until the effects of Defendants' anticompetitive conduct have ceased."    The Class excludes "Defendants, and their officers, directors, employees, subsidiaries, or affiliates, and all governmental entities."  Complaint ¶ 61.  I understand from counsel for the Class that the definition of the Class has been further refined to exclude hospitals, universities and clinics.  In addition, I understand the Class period ends December 31, 2006.

[4] For purposes of this report, "Ovcon 35 Products" shall mean oral contraceptives that contain a specific formulation of 0.035 mg of ethinyl estradiol and 0.4 mg of norethindrone.  These products consist of Warner Chilcott's non-chewable brand-name drug Ovcon 35 and any AB-rated generic equivalents, including Barr's generic version, Balziva, and the generic version Warner Chilcott authorized Watson Pharmaceuticals, Inc. ("Watson") to sell, Zenchent.

- 3 -

I have been asked to form an opinion as to whether, assuming Plaintiffs' allegations regarding Defendants' illegal behavior are true, the members of the Class proposed in this case have suffered antitrust injury. I also have been asked, based upon that same assumption regarding liability in this case, to compute aggregate overcharge damages incurred by the Class as a result of the unlawful conduct. In this regard, I have been asked to compute overcharge damages assuming two different but-for (*i.e.*, in a world absent the challenged conduct) generic entry scenarios. Scenario 1 assumes that a generic version of Ovcon 35 would have entered the market in May 2004.[5] Scenario 2 assumes that a generic version of Ovcon 35 would have entered the market in August 2004.[6]

## III.    Materials Reviewed

For purposes of this report, my staff and I have reviewed, among other things, deposition testimony, pleadings, studies of the pharmaceutical industry, and the declaration of Defendants' expert, Dr. Brian L. Palmer, which

---

[5] I understand from Class counsel that they will be supporting this assumption (which assumes generic entry very close to the time of FDA approval of Barr's generic Ovcon 35 Product) through

**REDACTED**

[6] I understand from Class counsel that they will be supporting this assumption (which assumes generic entry approximately three months after FDA approval of Barr's generic Ovcon 35 Product) through

**REDACTED**

- 4 -

was filed with regard to class certification proceedings.   In addition, we have

reviewed documents and data produced by Defendants and other parties,

including

**REDACTED**

We

also have reviewed sales data obtained from IMS Health, Inc. ("IMS"),[7] a

company that compiles data relating to the pharmaceutical industry, and

**REDACTED**

[8] A list of materials my staff

and I have reviewed is set forth in Exhibit 2.


## IV.    Summary of Conclusions

I have concluded that:

1.    All (or nearly all) Class members have been injured by

overcharges on Ovcon 35 Products as a result of the alleged

delay in generic entry caused by Defendants' conduct.

2.    The alleged delay in the availability of generic Ovcon 35

Products resulted in Class members paying more for Ovcon

35 Products than they otherwise would have.  Specifically,

---

[7] IMS provides market research on the pharmaceutical industry, including estimated sales of prescription drugs.

[8] The entities that have opted out of this litigation are Albertson's Inc. ("Albertson's), CVS Pharmacy, Inc. ("CVS"), Maxi Drug, Inc. d/b/a Brooks Pharmacy, Eckerd Corporation ("Eckerd"), Hy-Vee Inc., The Kroger Co., Rite Aid Corporation and Rite Aid Headquarters Corp. (collectively, "Rite Aid"), Safeway, Inc. ("Safeway"), and Walgreen Co. ("Walgreen") (collectively, the "opt-outs").

the conduct at issue increased the aggregate amount Class

members paid for Ovcon 35 Products during the damages

period by **REDACTED**

In describing the grounds for these conclusions, I begin below by

describing some of the pertinent background, including regarding the applicable

regulatory and patent framework and Ovcon 35 and its therapeutic role and

generic equivalents.  I then turn individually to each of the conclusions set forth

above, describing the nature of my analysis and the factual evidence upon which

it is based.

## V.   Background

### A.   Regulatory Protection in the Pharmaceutical Industry

Manufacturers of branded pharmaceuticals devote considerable

resources to developing, patenting, testing, gaining regulatory approval for, and

then ultimately bringing to market new products.  The incentive for this effort is

the substantial profits that await commercially successful pharmaceutical

products.[10]

---

[9] Please note that these estimates are conservative for the reasons set forth in Section VII. below.

[10] Congressional Budget Office, *How Increased Competition From Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry*, July 1988 ("CBO Study"), p. 3.

One of the main reasons behind that substantial profit is the legal protection from competition granted to new products.   This protection takes several forms.  Often, the developers of new products are able to acquire patents covering the compound itself, the manufacturing process, or the compound's application.[11]  Moreover, the Food and Drug Administration (the "FDA") has the ability to grant patent extensions (beyond the life of the applicable patents) in recognition of the fact that a substantial amount of patent life may be expended in obtaining the necessary approvals to bring the product to market.[12]

In addition to patent protection, the FDA is not permitted to accept an application for a generic version of a drug containing a "'new chemical entity' (*i.e.*, an active ingredient for which the FDA has never before granted marketing approval)"[13] until at least five years after its approval.[14]  Moreover, the technical risks of research and development, as well as the time and resource-intensive

---

[11] Federal Trade Commission, *Generic Drug Entry Prior to Patent Expiration*, July 2002 ("FTC Study"), p. 41.

[12] FTC Study, p. 4; CBO Study, pp. 3-4.

[13] 21 U.S.C. § 355(j)(5)(D)(ii); FTC Study, p. A-35, n. 33.

[14] Since a company seeking to market a generic product cannot file its Abbreviated New Drug Application ("ANDA") until 5 years after FDA approval of the originator drug, the *de facto* period of exclusivity for the branded product is even longer than this five-year minimum period (*i.e.*, the additional time it takes a generic applicant to obtain final FDA approval and come to market after filing its ANDA).

process of bringing new products to market, are themselves barriers to entry that afford competitive protection to those who succeed.[15]

The monopoly power that this system creates for branded pharmaceutical products is extensive.  The revenues, margins, and profits of branded monopolies are such that a few flagship products -- so called "blockbuster drugs" -- create billions in revenue for their manufacturers.

The same regulatory system that creates these branded drug monopolies, however, also imposes finite time limits on their existence.  Patents, of course, expire within 20 years of filing.[16]  On top of that, Congress passed the Drug Price Competition and Patent Term Restoration Act (also known as the "Hatch-Waxman Act") to "make available more low-cost generic drugs by establishing a generic drug approval procedure for pioneer drugs first approved after 1962" and "to create a new incentive for increased expenditures for research and development of certain products which are subject to pre-market government approval."[17]

In essence, Congress created a new set of regulatory approval rules, strengthening the protection enjoyed by brands on the front end, but at the

---

[15] U.S. Congress, Office of Technology Assessment, *Pharmaceutical R&D: Costs, Risks and Rewards* (1993), OTA-H-522, Washington, D.C.: U.S. Government Printing Office (available at http://govinfo.library.unt.edu/ota/Ota_1/DATA?1993/9336.PDF) ("OTA Study").

[16] http://www.uspto.gov/web/offices/pac/doc/general/index.html.

[17] H.R. Rep. 98-857 (I), 1984 U.S.C.C.A.N. 2647.

same time expediting the ability of generics to enter the market on the back end. As an economic matter, I would understand the Hatch-Waxman Act to be Congress's effort to balance brand companies' incentives for new product development (which incentives derive, in part, from their expectations of a protected monopoly) with consumers' interests in the much lower prices that competition, together with the low marginal production costs of most drugs, can generate.

Under the Hatch-Waxman Act, would-be generic competitors are allowed to bring AB-rated products to market under an abbreviated application process (by filing an ANDA). The "AB" (bioequivalence) rating is the FDA's assurance to physicians, pharmacists, and patients that the product will have the same therapeutic effects, safety, and efficacy as the brand.[18] Upon entry of an AB-rated generic into the market, a combination of favorable generic economics, state laws and regulations, managed care policies, and pharmacy incentives induce rapid and substantial substitution of the much cheaper AB-rated generic in place of prescriptions written for the corresponding brand. Additional AB-rated

---

[18] "AB rated" is a term the FDA uses to classify drug products (e.g., a generic version of a branded drug) that have been found to be therapeutically equivalent (to the branded counterpart). An AB-rated generic may be freely substituted for its branded counterpart at the pharmacy level without the prescribing physician's permission in most states. "Therapeutically equivalent" is a technical term for products that meet certain criteria including safety and efficacy, "pharmaceutical equivalence," "bioequivalence," labeling, and manufacturing standards. The FDA lists such substitutable drugs in its "Orange Book," the formal title of which is *Approved Drug Products With Therapeutic Equivalence Evaluations*. The definitions of therapeutic equivalence, pharmaceutical equivalence, and bioequivalence are set out in Sections 1.2 and 1.7 of the Orange Book.

- 9 -

generic products typically come into the market, creating further competition that rapidly drives prices toward marginal costs, eradicating the brand's monopoly and the overall high prices for the drug product at issue.

In analyzing the allegations in this case, it is important to understand how and why this AB-rated generic substitution process operates as it does. It is not, for the most part, a function of direct consumer choice driven by lower prices. Rather, physicians write prescriptions for particular drugs based on perceptions of therapeutic efficacy and safety, informed (however that judgment might be) by information provided by the drug companies' detailing[19] efforts. Where AB-rated generics are available, laws in every state allow (and in a number of cases require) pharmacies, hospitals, or managed care organizations to fill the brand prescription with AB-rated generics.[20]   The key here is the AB-rating.   Without that FDA stamp of approval with respect to safety, efficacy, bioequivalence, and pharmaceutical equivalence, these intermediaries cannot substitute the less expensive generic product for the prescribed brand without explicit physician acquiescence.

Under the Hatch-Waxman Act, generics have been a powerful engine for consumer benefits.[21]   By offering the same compound as a previously

---

[19] "Detailing" is advertising/promotion aimed at physicians.

[20] Such practice may not be allowed if a physician specifies that the prescription be filled only with the branded product.

[21] The powerful effects of generic competition are described in the following sources, among others:  OTA Study, pp. 83, 87, 89 n.17, 243; CBO Study, pp. ix, xii-xiii, 8-9, 13, 27-35.

approved brand, a generic seller avoids most of the costs associated with development, testing, and FDA approval for a new drug. Coupled with the ready substitutability associated with an AB rating, competition from these lower cost products provides the means by which consumers (who have been paying back the high cost of development through years of monopoly prices) see greatly reduced drug costs.[22] Thus, conduct that interferes with generic competition (as alleged in this case) extends the period over which consumers must continue rewarding the brand for its product development (or acquisition).

### B.   Ovcon 35 and its AB-Rated Generic Equivalents

#### 1.   Warner Chilcott

Ovcon 35, an oral contraceptive, has a combination of synthetic estrogen (ethinyl estradiol) and progesterone (norethindrone) in a particular ratio -- 0.035 mg of ethinyl estradiol and 0.4 mg of norethindrone. Ovcon 35 has been sold in the United States since the mid-1970s and is not subject to any patent protection.[23]   Warner Chilcott began selling Ovcon 35 in the United States in

---

[22] The CBO Study estimates that generics saved drug consumers between $8 and $10 billion in 1994 alone. Another study by the FDA found that drug costs per day could fall by 14 to 16 percent if patients use generics instead of branded drugs. "Savings from Generic Drugs Purchased at Retail Pharmacies,"
www.fda.gov/cder/consumerinfo/savingsfromgenericdrugs.htm. Additionally, patients who could fully meet their medical needs with generics could reduce their daily drug costs by 52 percent. *Id.*

[23] **REDACTED**

- 11 -

early 2000 after purchasing the rights to Ovcon 35 and entering into a supply

agreement with BMS.[24]



Sales of Ovcon 35 in the United

States grew from $28.5 million in 2000 to $93.5 million in 2005.[26]

Warner Chilcott also developed a chewable form of Ovcon 35

("Ovcon 35 Chewable" or "Ovcon 35 FE" or "Femcon FE").[29]   Warner Chilcott

---

[24] Warner Chilcott Form S-4, p. 88 (July, 15, 2005).

[25] REDACTED

[26] IMS Health.

[27] REDACTED

[28] REDACTED

[29] Ovcon 35 Chewable is not AB-rated to non-chewable Ovcon 35.  Thus, pharmacists cannot substitute Ovcon 35 Chewable with non-chewable generic versions of Ovcon 35.

received FDA approval for its Ovcon 35 Chewable in November 2003,[30] and began selling its Ovcon 35 Chewable in September 2006.[31]

In September 2006, Warner Chilcott waived the exclusivity provision of the alleged unlawful agreement (described more fully below), allowing Barr to finally launch its generic Ovcon 35 Product,[32] and allowing Watson to come to market with an authorized generic.[33]

### 2.    Barr

Barr received final FDA approval for its generic Ovcon 35 Product in April 2004.[34]   Barr's product, called Balziva, is an AB-rated (defined above) generic version of Warner Chilcott's Ovcon 35.[35]   A press release by Barr indicates that it had intended to market its generic Ovcon 35 Product upon FDA approval if Warner Chilcott did not exercise its option under its alleged unlawful agreement (described more fully below) with Barr.[36]

---

[30] Orange Book.

[31] "Warner Chilcott Release:  The FTC Files a New Motion in Connection with Ongoing Ovcon Litigation," September 26, 2006, available at www.Biospace.com.

[32]  "Barr Announces Warner Chilcott Waives Exclusive License for Ovcon 35," Barr Pharmaceuticals, Inc. News Release, September 26, 2006 (www.barrlabs.com).

[33]  "Warner Chilcott and Watson Pharmaceuticals Announce Launch of Zenchent," PRNewswire, January 29, 2007 (www.prnewswire.com).

[34] Orange Book and "Barr's Generic Ovcon-35 Tablets Approved," Barr Press Release, April, 23, 2004 (www.barrlabs.com).

[35] Orange Book and "Barr's Generic Ovcon-35 Tablets Approved," Barr Press Release, April, 23, 2004 (www.barrlabs.com).

[36]  "Barr's Generic Ovcon-35 Tablets Approved," Barr Press Release, April, 23, 2004 (www.barrlabs.com).



**REDACTED**

In September 2006, Warner Chilcott waived the exclusivity provision of its alleged unlawful agreement with Barr, and Barr finally brought its generic version of Ovcon 35 to market in October 2006 under the name Balziva-- over 2.5 years after Barr had received final FDA approval to market Balziva.[39]

### 3.     Watson

In January 2007, Warner Chilcott authorized Watson to launch a generic version of Ovcon 35 in return for a share of the profits from Watson's sales.  Watson's generic Ovcon 35 Product, Zenchent, was launched that same month.[40]



---

[37]     **REDACTED**

[38]     **REDACTED**

[39]  "Barr Announces Warner Chilcott Waives Exclusive License for Ovcon 35," Barr Pharmaceuticals, Inc. News Release, September 26, 2006 (www.barrlabs.com).

[40]  "Warner Chilcott and Watson Pharmaceuticals Announce Launch of Zenchent," PRNewswire, January 29, 2007 (www.pmewswire.com).

####    4.    Defendants' Agreement

# REDACTED

Barr received final FDA approval for its generic Ovcon 35 Product in April 2004.[45]

### REDACTED

Warner Chilcott paid Barr $19 million in May 2004.[47]  For purposes of this damage analysis, I have been asked to



41
42  **REDACTED**
43
44

[45] Orange Book.

46  **REDACTED**

[47] Complaint ¶ 54.

- 15 -

assume that this agreement delayed generic entry and will be found illegal under the Sherman Act.

## VI.    Antitrust Injury

A key observation about pharmaceutical markets for the purpose at hand is that competition allows purchasers to switch from high-priced brand products to lower-priced (generic) alternatives.  By implication, then, conduct that blocks or delays generic entry necessarily maintains high-priced brand purchases at artificially high levels.  As a result, direct purchasers who would otherwise purchase at least some lower-priced generics incur overcharges as a result of such conduct.[48]

Indeed, I conclude that all (or nearly all) of the proposed Class members experienced some amount of overcharge assuming the illegal delay in generic competition to branded Ovcon 35.  This conclusion is grounded in two observations about generic competition and the pharmaceutical industry.

First, generic competition is a broad and powerful instrument for lowering pharmaceutical costs.  There is a variety of evidence, discussed at some length below, which supports this conclusion.

**REDACTED**

---

[48] The absence of generic substitution also eliminates the potential incentive for competitive price reactions by the brand.  This can be an additional source of overcharges.

**REDACTED**

Moreover, this is the kind of competitive benefit that the literature consistently ascribes to generic competition in pharmaceutical markets. (*See* Section VI.A. below.)

Second, the proposed Class members in this case (*i.e.*, direct purchasers of Ovcon 35) are, for the most part, middlemen and/or resellers in the drug distribution system, supplying broad cross-sections of the patient community. The substitution and price reductions that generic competition triggers throughout the market invariably affect the purchases of the customers/patients that the direct purchaser Class members supply with product. Therefore, in order to meet the demand of their customers/patients, the Class members proposed in this case must buy generic product.[49]

These results comport with my own direct experience analyzing pharmaceutical markets over the last six years. Having now been involved in a number of pharmaceutical cases involving delayed generic competition, I have

---

[49] To the extent that Warner Chilcott resorts to higher discounts for its branded Ovcon 35 as a means for retaining some of its sales volume, Class members would also be expected to experience those effective price reductions.

yet to see an instance in which there was a material number of direct purchasers that did not experience lower prices as a result of generic competition.[50]

### A. Economic Literature and Empirical Evidence Regarding the Effects of Generic Competition

There is an extensive body of published research concerning the effects of generic competition in pharmaceutical markets. The principal conclusions of this research are that AB-rated generic products: (i) enter the market at substantially lower prices than their branded counterparts; and (ii) capture a significant share of the combined product (brand and AB-rated generic) unit sales – exactly the sort of powerful substitution effect between AB-rated generics and their corresponding brand-name drugs that Plaintiffs allege has been delayed here.[51]

Examples of this research include:

1. U.S. Food and Drug Administration, *The Pediatric Exclusivity Provision: January 2001 Status Report to Congress*, January 2001.

2. Kirking, D.M., F.J. Ascione, C.A. Gaither, and L.S. Welage, *Economics and Structure of the Generic Pharmaceutical Industry*, <u>Journal of the American Pharmaceutical Association</u>, 41, pp. 578-584, 2001 ("Kirking, *et al.* (2001)").

3. Congressional Budget Office, *How Increased Competition from Generic Drugs has Affected Prices and Returns in the Pharmaceutical Industry,* July 1998 ("CBO Study").

---

[50] Direct purchasers experience these lower prices either through the purchase of lower-priced generics or direct price reductions on the brand.

[51] Complaint ¶¶ 79 -80.

- 18 -

4.    Bae, J. B., *Drug Patent Expirations and the Speed of Generic Entry,* Health Services Research, Vol. 32, No. 1, pp. 87-101, April 1997.

5.    Frank, R. and D. Salkever, *Generic Entry and the Pricing of Pharmaceuticals,* Journal of Economics and Management Strategy, v. 6, no. 1, Spring 1997, pp. 75-90 ("Frank and Salkever (1997)").

6.    Grabowski, H. and J. M. Vernon, *Longer Patents for Increased Generic Competition in the US,* PharmacoEconomics, v. 10, suppl. 2, 1996, pp. 110-123 ("Grabowski and Vernon (1996)").

7.    Suh, Dong Churl, *Effect of Multiple Source Entry on Price Competition After Patent Expiration in the Pharmaceutical Industry,* Health Services Research, 35:2, June 2000.

8.    Office of Technology Assessment, *Pharmaceutical R&D: Costs, Risks and Rewards,* OTA-H-522, February 1993.

9.    Grabowski, H. and J. M. Vernon, *Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act,* Journal of Law and Economics, v. XXXV, October 1992, pp. 331-350 ("Grabowski and Vernon (1992)").

10.   Caves, Richard E., Michael D. Whinston, and Mark A. Hurwitz, *Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry,* Brookings Papers on Economic Activity: Microeconomics, 1991, pp. 1-66.

11.   Wiggins, Steven N. and Robert Maness, *Price Competition in Pharmaceuticals: The Case of Anti-Infectives,* Economic Inquiry, 2004 ("Wiggins and Maness (2004)").

12.   Reiffen, David and Michael Ward, *Generic Drug Industry Dynamics,* The Review of Economics and Statistics, February 2005, 87(1): 37-49.

13.   Saha, Atanu, *et al.*, *Generic Competition in the U.S. Pharmaceutical Industry,* International Journal of the Economics of Business, Vol. 13, No. 1, February 2006, pp. 15-38.

The 1998 CBO Study offers a comprehensive look at the economic

effects of generic competition.   This study used a large data set, representing

- 19 -

about 70 percent of all prescription drugs sold through United States retail pharmacies in 1994. The data set included 21 drugs that faced generic competition between 1991 and 1993. The study found that, "[d]uring the first full calendar year in which those 21 drugs faced generic competition. . . [g]enerics . . . cost one-fourth less than the brand-name drugs, on average, at retail prices."[52]

The CBO Study also calculated average retail prices for generic and brand pharmaceuticals in 1994. The study reported that the average retail price for a single source drug (*i.e.*, a branded drug with no generic equivalent) was $53.80 versus $17.40 for a generic drug, a difference of over 65 percent.[53]

A study by Grabowski and Vernon (1996) compared prices of brand drugs whose patents expired between 1984 and 1991 (the data continued through 1993). The authors found that within one year following generic entry, the generic price fell to less than 50 percent of the brand price. After two years of generic competition, the generic price in each case was less than 40 percent of the brand.

A more recent study by Kirking, *et al.* (2001), reported that the differential between average generic and average brand prescriptions had increased:

---

[52] CBO Study, p. 28.

[53] CBO Study, p. 15.

> In 1993 the average cost for a brandname prescription was about 275% higher than the average generic ($35.28 versus $12.82). (cite omitted) By 2000 this difference had grown to nearly 340% ($65.29 versus $19.33) (p. 579).

These studies also show that once generic competition begins, a large portion of the market quickly switches over to the generic product. Within its data set of 21 drugs that faced generic competition between 1991 and 1993, the CBO found that within the first year, generics captured on average 44 percent of the prescriptions.[54]

Moreover, the rate of generic penetration has increased over time. Grabowski and Vernon (1996), using the same three time periods discussed above, found that after 1 year of entry the generic share of unit sales was:

| 1984-1985 | 32 percent |
|-----------|------------|
| 1986-1987 | 38 percent |
| 1989-1991 | 41 percent |
| 1991-1992 | 61 percent |

The 1991-1992 data also showed that within 18 months following entry, the generic share reached 72 percent of the unit sales of the brand and its generic equivalents. The authors concluded that:

---

[54] CBO Study, p. 28.

> Our analysis of major new drugs coming off patent
> indicates that the extent of generic competition has
> continued to accelerate in recent years. In particular,
> drugs that have come off patent since 1991
> experienced unit sales losses to generics of over 50%
> during the first several months of generic competition.
> This is a much more rapid rate of loss to generics
> than was observed for similar drugs coming off patent
> between 1984 and 1989. [cite omitted][55]

One additional subject that has frequently been addressed in these studies is the effect of generic entry on prices for the brand. Some early work (Grabowski and Vernon (1992); Frank and Salkever (1997)) observed that even in the face of generic entry, average brand prices continued to increase. However, Grabowski and Vernon (1992) found evidence that for some drugs the rate of brand price growth slowed with generic entry. A more recent study by Wiggins and Maness (2004) found that brand prices decrease upon generic entry.

One difficulty with some of this early work is that it centered on prices drawn from commercially-available data that did not capture all discounts (when compared to the confidential manufacturer transactional data to which I have been given access in numerous cases). The net price paid by direct purchasers for the brand depends both on the starting list price and the discounts they may receive. Working with data including discount levels, the CBO Study observed that "[o]n a selective basis . . . manufacturers of brand name drugs do

---

[55] Grabowski and Vernon (1996), p. 121.

offer discounts and rebates to some purchasers"[56] and found that, "[a] statistical analysis of pharmaceutical prices shows that purchasers tend to obtain higher discounts from manufacturers on brand-name drugs when generic substitutes are available[.]"[57]   The CBO Study concluded that when two or more generic manufacturers were competing with a brand, discounts off the brand price were 10 to 17 percent greater.[58]

**B.**      **The Defendants'**



These REDACTED offer another common source of evidence that also supports my finding of class-wide impact of Defendants' actions.

**1.**      **Warner Chilcott**



---

[56] CBO Study, p. 35.

[57] CBO Study, p. 24.

[58] CBO Study, p. 29.

[59] REDACTED

**REDACTED**

**REDACTED**

REDACTED

2.   Barr

REDACTED

REDACTED

**REDACTED**

Thus, to the extent Defendants were able to exclude generic Ovcon 35 from the market, they were able to forestall these competitive effects.  That is to say, through the Agreement, Defendants were able to force Class members to pay substantial overcharges.

### C.   Data Reflecting The Actual Effects of Generic Competition

In addition to the results highlighted in the academic literature and

**REDACTED**

---

[66] These ⟦REDACTED⟧ are described in Section VII.A.2. below.

For example, prior to the entry of Barr's generic Ovcon 35 Product, Warner Chilcott's average net price of its branded Ovcon 35 Product sold to Class members was approximately | **REDACTED** | Upon the entry of Barr's Ovcon 35 Product, Barr's average net price to Class members was approximately | **REDACTED** |[69] Once Watson entered with the second generic Ovcon 35 Product, the average net price of its generic Ovcon 35 Product was approximately | **REDACTED** | In combination, the Ovcon 35 generics offered by Barr and Watson have captured approximately

**REDACTED**

D.    **The Economic Role of Direct Purchasers**

The broad shifts in market purchasing patterns described above are particularly significant for the question of antitrust injury in light of the economic role that direct purchasers play in the distribution system.   From my review of

**REDACTED**

These entities all serve as middlemen and/or resellers supplying broad cross-sections of the patient community.   With substantial numbers of patients/customers substituting the

---

[69] This price does not include adjustments (such as rebates and chargebacks) to price.   Barr has indicated that it will provide these data.   I expect that such adjustments will cause this price to decrease.

- 27 -

generic for the brand when it became available, the purchases of the Class member intermediaries that supply those patients/customers clearly would have included more generics in the but-for world.[70]  For these reasons, it is my opinion that all (or nearly all) of the proposed Class members experienced some antitrust injury in the form of an overcharge due to the delay in generic competition.[71]

## VII.    Calculation of Aggregate Damages to the Class

I have been asked to calculate the aggregate amount of the overcharges incurred by members of the Class.  I previously have computed aggregate class-wide damages in several other class actions in which the issue at hand was the aggregate amount of overcharges associated with a delay in AB-rated generic entry.[72]  In this case, I have employed the same basic methodology used in those prior cases, albeit modified in some respects to account for the facts and available data in this case.



[70] **REDACTED**

[71] Given the likelihood (based upon the past history of brand pricing responses to generic competition) that at least some of the continuing branded Ovcon 35 sales following generic entry would have carried higher discounts, even the unlikely direct purchaser that would not have purchased any generic in a fully competitive world may have been deprived of lower brand prices by the conduct in question.  This would be another form of antitrust injury.  Indeed, as I noted in my deposition, **REDACTED**

[72] *See* Class Declaration, pp. 2-4.

Overcharge damages arise from the difference between the actual prices that Class members paid for Ovcon 35 Products and the prices they would have paid had generic Ovcon 35 entered the market earlier. While data reflecting actual prices, market shares, and purchase volumes are available, these same quantities have to be estimated in the but-for world involving earlier generic entry dates. To measure the aggregate damages to Class members as a whole, I calculate the difference over the damages period between the average price the Class actually paid for Ovcon 35 Products (brand plus generics) and the average price that the Class would have paid for those products in the but-for world. I then multiply that difference by the volume of Ovcon 35 Products in the but-for world.

The "damages period" extends from the point at which a generic manufacturer could have first come to market with a competing generic product, (May 2004 or August 2004 according to Plaintiffs' counsel), until the effects of delayed generic entry have ended and equilibrium has been reached (*i.e.*, the point at which prices and penetration rates stabilize).

## A.    The Actual World

I calculated actual world prices and volumes for the Class defined by counsel by analyzing the transaction data provided by Warner Chilcott, Barr, and Watson.

### 1.    Direct Purchaser Class Identification

The process for identifying actual total Ovcon 35, Balziva, and Zenchant purchases by Class members proceeded as follows.  The first step was to identify Class members.  The Class is defined in the Complaint as:

> All persons or entities in the United States who purchased Ovcon [35] directly from Warner Chilcott at any time from April 22, 2004, through the present and continuing until the effects of Defendants' anticompetitive conduct have ceased.[73]

The Class excludes "Defendants, and their officers, directors, employees, subsidiaries, or affiliates, and all governmental entities."[74]  I also have been advised by counsel to exclude hospitals, universities, and clinics.[75]  Additionally, I understand that Plaintiffs have modified the Class definition to include an end date for the Class period of December 31, 2006.

Thus, in order to be a Class member, the customer had to make a direct purchase of branded Ovcon 35 during the "Class period" (April 22, 2004 (inclusive) through December 31, 2006 (inclusive)) and not be an excluded entity as described above.  I identified purchasers fitting these criteria using REDACTED

| REDACTED |  produced in this case.[76]

---

[73] Complaint ¶ 61.

[74] Complaint ¶ 61.

[75]  REDACTED

[76]  REDACTED

Specifically, I used a combination of the following variables in

**REDACTED**

Using

public information (company websites and 10-Ks), I identified parent companies

and their subsidiaries.[77]   This information was used to assign a single parent

company name to the

**REDACTED**

Each parent company

with positive purchases from Warner Chilcott during the Class period was flagged

as a Class member.  Those excluded were government entities, universities, and

clinics that I identified using

**REDACTED**

I next identified Class member purchases of Barr's generic Ovcon

35 Product, Balziva, by cross-checking Class members' parent (and subsidiary)

names against

**REDACTED**

Balziva volumes and

dollar purchases corresponding to Class member name matches were flagged as

---

[77]

**REDACTED**

[78]

**REDACTED**

- 31 -

Class member purchases.  Class member purchases of Zenchant were provided to me by Watson (as discussed in Section VII.A.2.c. below).

Transactions by the eight entities that chose to proceed separately from the Class action (collectively, the "opt-outs")[79] are not included in defining Class unit volumes or dollar purchases of Ovcon 35, Balziva, or Zenchant.

Additionally, Class members AmerisourceBergen, Cardinal Health, and McKesson have assigned to certain of the opt-out entities (opt-out assignees) damages corresponding to the volumes of Ovcon 35 they resold to the opt-out assignees.[80]  We obtained data from

**REDACTED**

I removed these amounts from the monthly Class purchase volumes for the overcharge calculation.  I conclude that there are REDACTED members of the Direct Purchaser Class.

---

[79] *See* footnote 8.

[80] **REDACTED** As of the time of this report, it is possible that I have not received 100% of the information relating to assignments to opt-outs.  I may update my calculations should this data become available to me.

[81] **REDACTED**

## 2.    Transaction Data

I determined Class members' actual payments and purchase quantities for Ovcon 35 and its AB-rated generics based on transactional databases provided by Warner Chilcott, Barr, and Watson. For purposes of this analysis, a unit is a one-month's supply of an Ovcon 35 Product either packaged with 21 or 28 tablets.    Payments reflect a combination of gross sales, chargebacks,[82] and rebates. I calculated weighted-average per-unit net prices for the various time periods in my overcharge analysis (as discussed in Section VII.C. below) by dividing the sum of all payments reflected in the transaction data during the period in question by the total units from that same data.

### a.    Warner Chilcott data

Warner Chilcott produced

REDACTED

---

[82] A chargeback is a payment made by the manufacturer to the wholesaler, reducing its net per-unit price. A wholesaler purchases product initially at list price and then sells that product to a customer that has an agreement with the manufacturer for a discounted price. For example, a wholesaler purchases the product for $1.00 and resells the product to a customer who pays the wholesaler $0.35, the price the customer and the manufacturer contracted for. The manufacturer then issues a "chargeback" to the wholesaler in the amount of $0.65, the difference between what the wholesaler initially paid and received.

[83]    REDACTED

[84]  REDACTED

**REDACTED**

Each customer was classified as a Class member or a non-Class member, according to the Class definition in the Complaint (and later modifications of counsel described in Section VII.A.1. above).   The Class excludes internal sales, government entities, non-US entities, and customers with no direct purchases of branded Ovcon 35 since April 22, 2004.  Also excluded are customers classified as **REDACTED** as well as customers that opted out of this litigation.

> b.    *Barr data*

Barr provided



**REDACTED**

Among Dr. Palmer's work product files that were produced along with his class certification declaration,

85 **REDACTED**

86 **REDACTED**

**REDACTED**

Class members were
identified as any entity affiliated with customers with direct purchases from
Warner Chilcott during the Class period and not excluded from the Class.

### c. Watson data

Watson provided

**REDACTED**

---

[87] **REDACTED**

[88] I received Barr data on May 17, 2007. **REDACTED**
When usable data become available, I may revise my damage
calculation.

[89] **REDACTED**

**REDACTED**

90 | REDACTED

91 | REDACTED

I calculated the total market and Class member purchase volumes

by multiplying

**REDACTED**

### B.    The But-For World

As noted above, I have been instructed by Plaintiffs' counsel to calculate damages assuming two different but-for generic entry scenarios. In Scenario 1, I assume that in the but-for world Barr would have introduced its generic Ovcon 35 Product in May 2004 (soon after Barr received final FDA approval for its generic product). In Scenario 2, I assume that Barr would have entered with its generic Ovcon 35 Product in August 2004 (several months after Barr received final FDA approval to launch its generic product). I have further been instructed to assume that in the but-for world an authorized generic Ovcon 35 Product would have entered the market four months after the entry of Barr's generic Ovcon 35 (as Watson did with its authorized generic Ovcon 35 Product in the actual world per an agreement with Warner Chilcott). Finally, I have been asked to calculate overcharges assuming Ovcon 35 Chewable came out in September 2006 (as it did in the actual world).

---

[92] One package of Zenchent contains 5X28 tablets.   *See* Watson company website: http://www.watsonpharm.com/products/search_results_products.asp?group=alpha&c=Z.

### 1.    Total Ovcon 35 Products Volume in the But-For World

In considering the but-for world, it is necessary to consider what the size of the Ovcon 35 Products prescription base or sales volume would have been.   Brand sellers typically engage in marketing efforts to promote their products and expand their prescription base.

**REDACTED**

Exhibit 3 shows

**REDACTED**

Historically, brand sellers have often withdrawn (or at least curtailed) their marketing efforts for the product facing AB-rated generic competition once that competition emerges.   Typically, the brand company shifts



93 **REDACTED**

94 **REDACTED**

95 **REDACTED**

its promotional efforts to other products, often "line extensions" of the existing product.[96]

<div style="border:1px solid">

**REDACTED**

</div>

With these considerations in mind, I have employed two possible scenarios for the size of the Ovcon 35 Products market in the but-for world.

   a.  *The but-for market equals the actual market*

   I have been asked by counsel to calculate damages assuming a world in which sales volumes in the Ovcon 35 Products market were the same in the but-for world as they have been and will be in the world as it stands today.[98]

    b.  *Sales of Ovcon 35 Products decline following generic entry*

   I assume for purposes of this second market size scenario that

<div style="border:1px solid">

**REDACTED**

</div>

In modeling damages under this scenario, I give effect to the potential impact of such

<div style="border:1px solid">

**REDACTED**

</div>

---

[96] United States Healthcare Distribution, Information Technology & PBMs, 2003 Distribution Outlook, JPMorgan, April 21, 2003, p. 16.

[97] **REDACTED**

[98] I understand that Plaintiffs base this scenario on a legal argument that their overcharges may be based on the volumes of Ovcon 35 Products that Class members actually bought (and from which Defendants, as sellers, benefited).

> **REDACTED**

A chewable version of Ovcon 35 was introduced by Warner Chilcott in September 2006. For the purposes of the calculations in the two above scenarios, I regard prescriptions written to the Ovcon 35 Chewable product as diversions from what would otherwise have been part of the Ovcon 35 brand sales volume. Under the declining total volume scenario described above, the

> **REDACTED**

I thus reduce the but-for brand volume in the same proportion as the chewable actually diverted volume in the actual world.

### 2.    But-For Prices

I estimate but-for prices using a "before/after" method.[99]   The before/after method uses the market experience before and/or after the alleged misconduct period to provide the basis for estimating prices that would have existed during the period but for the conduct in question.

In my opinion, the before/after method is particularly well suited to analyzing overcharge damages in this case. Barr's introduction of generic Ovcon 35 to the market in October 2006 marks the start of an "after" period with market results that reasonably portray what would have happened to prices beginning in

---

[99] See Hovenkamp, Herbert, Federal Antitrust Policy:  The Law of Competition and Its Practice, 2nd ed., St. Paul, MN: West Group, 1999, pp. 660-6.

May 1, 2004 or August 1, 2004 but for the delay in generic entry.   Moreover, discovery in this case has yielded some class-wide transactional data from this "after" period.

To use the post-generic entry experience as the benchmark for calculating overcharges, I take that pricing experience as it actually occurred and, as a general matter, simply shift it back to the point in time at which it would have occurred but for the alleged anticompetitive conduct.   In that way, my analysis of the but-for world directly reflects real world pricing data and experience.   I utilize pricing data from the same manufacturers, the same product, and essentially the same customers that would have made up the Ovcon 35 Products market but for the alleged delay in generic entry.   It provides a reliable basis for reconstructing Ovcon 35 Products prices in the but-for world.

### 3.    Generic Equilibrium

Equilibrium is reached once prices and penetration rates stabilize. Once the actual world and the but-for world reach equilibrium, damages no longer accrue.   Thus, it is important to determine when equilibrium has been reached in order to determine the ending date for calculating accrual of damages.

Generic entry occurred in this market in October 2006 when Barr launched its generic version of Ovcon 35.   Watson then entered with an authorized generic (*i.e.*, a generic version licensed by the brand owner) at the

- 41 -

end of January 2007.  The latest and best information I have regarding



**REDACTED**

**REDACTED**

---

[100] WAC is the wholesale acquisition cost or, effectively, the list price.

[101] **REDACTED**

[102] March 2007 volumes are estimated for Warner Chilcott and Barr using IMS data.

[103] This is conservative because it makes no allowance for reductions in the brand price (either the WAC itself or through increased discounts) and it will miss the extent to which additional time produces further increases in the amount of generic discount or penetration.  Additionally, in my experience, two months is most likely not enough time for the full competitive effect of Watson's entry to have manifested itself in the marketplace.  The use of a post-generic equilibrium that involves (i) a longer period to reach that equilibrium, (ii) declines in the effective brand price, or (iii) further generic price reductions, would in each case lead to higher aggregate overcharges.

[104] **REDACTED**

Given the manner in which but-for pricing in this damage model is created by simply moving the actual pricing experience following generic entry back in time to the but-for entry dates, my assumptions about the timing of competitive equilibrium in the actual world mean that the same competitive equilibrium would have been achieved in the but-for world within REDACTED of the but-for generic entry dates. Hence, the competitive effects of actual generic entry will finally "catch up" with the but-for competitive equilibrium as of

**REDACTED**

Accordingly, my calculation of aggregate overcharge damages extends through REDACTED

## C.   The Calculation of Aggregate Overcharges

I break the damage period into three separate periods:  (1) May or August 2004 through October 15, 2006 (the "no-generics" period); (2) October 16, 2006 through January 2007 (the "single generic" period); and (3) February through March 2007 (the "multiple generic" pre-equilibrium period).  Actual total volumes and average prices for each of these three periods are shown in **Exhibit 4A**.

**Exhibit 4B** shows total volumes and average prices for each of the periods contained in **Exhibit 4A** under the two alternative scenarios regarding the treatment of total but-for volumes of Ovcon 35 Products.  **Exhibit 4C** shows

- 43 -

the overcharge result I obtained for each of the periods listed in **Exhibit 4A** based upon the price differences between the actual world average prices shown in **Exhibit 4A** and the but-for average prices in **Exhibit 4B** applied to the but-for volumes shown in **Exhibit 4B**.[105]

Based on the methodology described above, I have calculated the total aggregate overcharge damages to the Class (before trebling) to be as follows:[106]

### Aggregate Class Overcharges

| But-For Entry Date | But-For Volume Scenarios | |
|---|---|---|
| | Actual | Declining |
| | (Dollars in Millions) | |
| May 2004 August 2004 | REDACTED | |

Dated:  May 18, 2007

*[signature]*

Jeffrey J. Leitzinger, Ph.D.

---

[105] Whether or not my damages calculation needs to account for bypass is a legal issue.  I have been asked to investigate how accounting for bypass would change the overcharge numbers.

REDACTED

[106] If any of the assumptions regarding the but-for world change, my model can be easily modified to accommodate these new assumptions.  Moreover, if new data become available, I may update my calculations.

**Exhibit 1**
**Page 1 of 14**



**Dr. JEFFREY J. LEITZINGER**
*President*
**Los Angeles, California**
**Tel: 213 624 9600**


**EDUCATION**

Ph.D., Economics, University of California, Los Angeles
M.A., Economics, University of California, Los Angeles
B.S., Economics, Santa Clara University

**WORK EXPERIENCE**

*Econ One Research, Inc.*, President, July 1997 to date
Founded *Econ One Research, Inc.*, 1997

*Micronomics, Inc.*, President and CEO, 1994-1997
*Micronomics, Inc.*, Executive Vice President, 1988-1994
Cofounded *Micronomics, Inc.*, 1988

*National Economic Research Associates, Inc. 1980-1988*
(Last position was Senior Vice President and member of the Board
of Directors)

**ADMITTED AS AN EXPERT ECONOMIST TO TESTIFY ABOUT:**

<u>*Relevant Markets and Competition*</u>

*Before:*    Federal Energy Regulatory Commission
Superior Court, State of Alaska
Superior Court, State of California
Superior Court, State of Washington
U.S. District Court, Central District of California
U.S. District Court, Northern District of California
U.S. District Court, District of Colorado
U.S. District Court, Eastern District of Missouri
U.S. District Court, Eastern District of Texas
U.S. District Court, Western District of Texas
U.S. District Court, District of Wyoming

<u>*Valuation, Economic Loss and Damages*</u>

*Before:*    Circuit Court, Mobile County, Alabama
Civil Court, Harris County, Texas

**Dr. Jeffrey J. Leitzinger**
*President*

**Exhibit 1**
**Page 2 of 14**

Civil Court, Midland County, Texas
State of Alaska Department of Revenue
Superior Court, State of California
U.S. Bankruptcy Court, District of Alaska
U.S. Bankruptcy Court, Northern District of Texas
U.S. District Court, State of Alabama
U.S. District Court, Central District of California
U.S. District Court, District of Colorado
U.S. District Court, State of Louisiana
U.S. District Court, Southern District of Mississippi
U.S. District Court, District of North Dakota
U.S. District Court, Eastern District of Texas
U.S. District Court, Southern District of Texas
U.S. District Court, Western District of Texas

### Patent and Intellectual Property Issues

Before:   Superior Court, State of Washington
U.S. District Court, Northern District of California
U.S. District Court, District of Colorado
U.S. District Court, District of Connecticut
U.S. District Court, Southern District of Texas

### The Economics of Regulated Industries

Before:   Alaska Public Utilities Commission
California Energy Commission
California Public Utilities Commission
Federal Energy Regulatory Commission
Nevada Public Service Commission
Wisconsin Public Service Commission
U.S. District Court, Northern District of Oklahoma
U.S. District Court, Northern District of Texas

## INVITED PRESENTATIONS REGARDING:

Antitrust Injury and the Predominance Requirement in Antitrust Class Actions
*American Bar Association*, Houston Chapter, April 2007.

What Can an Economist Say About The Presence of Conspiracy? *American Bar Association,* Section of Antitrust Law, The Antitrust Litigation Course, October 2003.

Lessons From Gas Deregulation, *International Association for Energy Economics, Houston Chapter,* December 2002.

A Retrospective Look at Wholesale Gas Industry Restructuring, *Center for Research in Regulated Industries*, 20th Annual Conference of the Advanced Workshop in Regulation and Competition, May 2001.

The Economic Analysis of Intellectual Property Damages, *American Conference Institute,* Sixth National Advanced Forum, January 2001.

Law and Economics of Predatory Pricing Under Federal and State Law, *Golden State Antitrust and Unfair Competition Law Institute*, 8th Annual Meeting, October 2000.

Non-Price Predation--Some New Thinking About Exclusionary Behavior, *Houston Bar Association*, Antitrust and Trade Regulation Section, October 2000.

After the Guilty Plea:  Does the Defendant Pay the Price in the Civil Damage Action (expert witness in mock trial presentation), *American Bar Association*, Section of Antitrust Law, 48th Annual Spring Meeting, April 2000.

Economics of Restructuring in Gas Distribution, *Center for Research in Regulated Industries*, 12th Annual Western Conference, July 1999.

A Basic Speed Law for the Information Superhighway, *California State Bar Association*, December 1998.

Innovation in Regulation: Section Discussant, *Center for Research in Regulated Industries*, 11th Annual Western Conference, July/September 1998.

Electric Industry Deregulation: What Does The Future Hold? *Los Angeles Headquarters Association,* November 1996.

Why Deregulate Electric Utilities?, *National Association of Regulatory Utility Commissioners*, November 1995.

Restructuring U.S. Power Markets: What Can the Gas Industry's Experience Tell Us?, *National Association of Regulatory Utility Commissioners*, July 1995.

Natural Gas Restructuring: Lessons for Electric Utilities and Regulators, *International Association for Energy Economics,* Los Angeles, California, May 1995.

Techniques in the Direct and Cross-Examination of Economic, Financial and Damage Experts, *The Antitrust and Trade Regulation Law Section of the State Bar of California and The Los Angeles County Bar Association*, 2ND Annual Golden State Antitrust and Trade Regulation Institute, Los Angeles, California October 1994.

Demonstration: Deposition of Expert Witnesses and Using Legal Technology, *National Association of Attorneys General*, 1994 Antitrust Training Seminar, Santa Fe, New Mexico, September 1994.

Direct and Cross Examination of Financial, Economic, and Damage Experts, *The State Bar of California, Antitrust and Trade Regulation Law Section,* San Francisco, California, May 1994.

Price Premiums in Gas Purchase Contracts, *International Association for Energy Economics,* Seattle, Washington, October 1992.

Valuing Water Supply Reliability, *Western Economic Association,* Natural Resources Section, San Francisco, California, July 1992.

Transportation Services After Order 636: "Back to the Future" for Natural Gas, Seminar sponsored by Jones, Day, Reavis & Pogue; Dallas, Texas, May 1992.

The Cost of An Unreliable Water Supply for Southern California, Forum presented by Micronomics, Inc., Los Angeles, California, May 1991.

Market Definition: It's Time for Some "New Learning," *Los Angeles County Bar Association,* Antitrust and Corporate, Law Section, Los Angeles, California, December 1989.

Market Definition in Antitrust Cases: Some New Thinking, *Oregon State Bar,* Antitrust Law Section, Portland, Oregon, March 1987.

Future Directions for Antitrust Activity in the Natural Gas Industry, *International Association of Energy Economists*; Houston, Texas, February 1987.

Information Externalities in Oil and Gas Leasing, Western Economic Association Meetings, Natural Resources Section, Seattle, Washington, July 1983.

Economic Analysis of Offshore Oil and Gas Leasing, *Western States Land Commissioners Association*; South Padre Island, Texas, December 1982.

## PUBLISHED ARTICLES

"The Predominance Requirement for Antitrust Class Actions--Can Relevant Market Analysis Help?," American Bar Association, Section of Antitrust Law, *Economics Committee Newsletter*, Volume 7, No. 1, Spring 2007.

"A Retrospective Look at Wholesale Gas: Industry Restructuring," *Journal of Regulatory Economics,* January 2002.

"Balance Needed in Operating Agreements as Industry's Center of Gravity Shifts to State Oil Firms," *Oil & Gas Journal*, October 2000.

"What Can We Expect From Restructuring In Natural Gas Distribution?" *Energy Law Journal*, January 2000.

**Dr. Jeffrey J. Leitzinger**                                    **Exhibit 1**
*President*                                                      **Page 5 of 14**

"Gas Experience Can Steer Power Away from Deregulation Snags," *Oil & Gas Journal,* August 1996.

"Anatomy of FERC Order 636: What's out, What's in," *Oil & Gas Journal*, June 1992.

"Antitrust II – Future Direction for Antitrust in the Natural Gas Industry," *Natural Gas*, November 1987.

"Information Externalities in Oil and Gas Leasing," *Contemporary Policy Issues,* March 1984.

"Regression Analysis in Antitrust Cases: Opening the Black Box," *Philadelphia Lawyer*, July 1983.

"Foreign Competition in Antitrust Law," *The Journal of Law & Economics*, April 1983.

## REGULATORY SUBMISSIONS

In the Matter of the Application of Southern California Gas Company Regarding Year Six (1999-2000) Under its Experimental Gas Cost Incentive Mechanism and Related Gas Supply Matters; A.00-06-023, Public Utilities Commission of the State of California, November 2001.

Sempra Energy and KN Energy, Incorporation; Docket No. EC99-48-000 (Affidavit and Verified Statement), Federal Energy Regulatory Commission, March/May 1999.

Rulemaking on the Commission's Own Motion to Assess and Revise the Regulatory Structure Governing California's Natural Gas Industry (Market Conditions Report), Public Utilities Commission of the State of California, July 1998.

In the Matter of the Application of Pacific Enterprises, Enova Corporation, et al. for Approval of a Plan of Merger Application No. A. 96-10-038, Public Utilities Commission of the State of California, August/October 1997.

In re: Koch Gateway Pipeline Company; Docket No. RP 97-373-000, Federal Energy Regulatory Commission, May/October 1997 and February 1998.

In the Matter of the Application of Sadlerochit Pipeline Company for a Certificate of Public Convenience and Necessity; Docket No. P-96-4, Alaska Public Utilities Commission, May 1996.

Public Funding of Electric Industry Research, Development and Demonstration (RD&D) Under Partial Deregulation, California Energy Commission, January 1995.

**Dr. Jeffrey J. Leitzinger**
*President*

**Exhibit 1**
**Page 6 of 14**

NorAm Gas Transmission Company; Docket No. RP94-343-000, Federal Energy Regulatory Commission, August 1994/June 1995.

Natural Gas Vehicle Program; Investigation No. 919-10-029, California Public Utilities Commission, July 1994.

Transcontinental Gas Pipe Line Corporation; Docket No. RP93-136-000 (Proposed Firm-to-the-Wellhead Rate Design), Federal Energy Regulatory Commission, January 1994.

In re: Sierra Pacific's Proposed Nomination for Service on Tuscarora Gas Pipeline; Docket No. 93-2035, The Public Service Commission of Nevada, July 1993.

Employment Gains in Louisiana from Entergy-Gulf States Utilities Merger, Louisiana Public Utilities Commission, December 1992.

Employment Gains to the Beaumont Area from Entergy-Gulf States Utilities Merger, Texas Public Utilities Commission, August 1992.

Transcontinental Gas Pipe Line Corporation; Docket No. RS 92-86-000 (Affidavit regarding Transco's Proposed IPS Service), Federal Energy Regulatory Commission, June 1992.

In Re: Pipeline Service Obligations; Docket No. RM91-11-000; Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations; Docket No. RM91-3-000; Revisions to the Purchased Gas Adjustment Regulations; Docket No. RM90-15-000, Federal Energy Regulatory Commission, May 1991.

In the Matter of Natural Gas Pipeline Company of America; Docket No. CP89-1281 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, January 1990.
In the Matter of United Gas Pipeline Company, UniSouth, Cypress Pipeline Company; Docket No. CP89-2114-000 (Proposed Certificate of Storage Abandonment by United Gas Pipeline Company), Federal Energy Regulatory Commission, December 1989.

In the Matter of Tennessee Gas Pipeline Company; Docket No. CP89-470 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, July 1989.

In the Matter of Take-Or-Pay Allocation Proposed by Mississippi River Transmission Corporation, Federal Energy Regulatory Commission, March 1988.

In the Matter of Natural Gas Pipeline Company of America: Docket No.RP87-141-000 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, December 1987.

**Dr. Jeffrey J. Leitzinger**
*President*

**Exhibit 1**
**Page 7 of 14**

<u>In the Matter of Application of Wisconsin Gas Company for Authority to Construct New Pipeline Facilities; 6650-CG-104.</u> Public Service Commission, State of Wisconsin, August 1987.

<u>Trans-Alaska Pipeline System: Docket Nos. OR 78-1-014 and OR 78-1-016</u> (Phase 1 Remand), Federal Energy Regulatory Commission, October 1983.

Exhibit 1
8 of 14
Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
*Prior Testimony*
June 2003 – May 2007

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 1. | In Re: Terazosin Hydrochloride Antitrust Litigation | U.S. District Court, Southern District of Florida | Case Nos. 98-3125 and 99-7134 | Deposition | January 2002 July 2002 February 2004 |
| 2. | The Goeken Group Corporation and In-Flight Phone Corporation v. McCaw Cellular Communications, Inc., Claircom Communications, L.P. and Hughes Network Systems, Inc. | The Circuit Court of DuPage County, Illinois, Eighteenth Judicial District | No. 93 CH 1065 | Deposition | June 2003 |
| 3. | In Re: Ciprofloxacin Hydrochloride Antitrust Litigation | U.S. District Court, Eastern District of New York | No. 1:00-MD-1383 | Deposition | July 2003 May 2004 |
| 4. | In Re: Scrap Metal Antitrust Litigation | U.S. District Court, Northern District of Ohio, Eastern Division | No. 1:02 CV 0844 | Deposition<br>Trial | August 2003 September 2004 January 2006 |
| 5. | KLA-Tencor Corporation v. Tokyo Seimitsu Co., Ltd., and TSK America, Inc. | U.S. District Court, Northern District of California, Oakland Division | No. CV01-2489 SBA | Deposition | August 2003 |

Exhibit 1
9 of 14
Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
*Prior Testimony*
June 2003 – May 2007

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 6. | In Re: Relafen Antitrust Litigation | U.S. District Court, District of Massachusetts | No. 01-CV-12239 (WGY) | Deposition | September 2003 December 2003 |
| 7. | Francis Ferko and Russell Vaughn as Shareholders of Speedway Motorsports, Inc. v. National Association of Stock Car Auto Racing, Inc.; International Speedway Corp.; and Speedway Motorsports, Inc. | U.S. District Court, Eastern District of Texas, Sherman Division | No. 4:02-CV-50 | Deposition | November 2003 |
| 8. | Chevron U.S.A., Inc. v. State of Louisiana, Louisiana State Mineral Board, and Louisiana Department of Natural Resources | U.S. District Court, 17th Judicial District, Parish of Lafourche, Louisiana | Number 93,658 Division C | Deposition Trial | January 2004 March 2004 |
| 9. | Houston McLane Co. Inc. and Houston Regional Sports Network, L.P. v. Affiliated Regional Communications, Ltd. | U.S. District Court, 333rd Judicial District, Harris County, Texas | Cause No. 2003-10943 | Deposition | March 2004 |

Exhibit 1
10 of 14
Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
*Prior Testimony*
June 2003 – May 2007

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 10. | Harry E. Stetser, Dale E. Nelson & Michael deMontbrun v. TAP Pharmaceutical Products, Inc., et al | State of North Carolina, New Hanover County, In The General Court of Justice, Superior Court Division | File No. 01CVS 5268 | Deposition | April 2004 |
| 11. | Masimo Corporation vs. Tyco Health Care Group L.P. and Mallinckrodt Incorporated | U.S. District Court, Central District of California, Western Division | Case No. CV-02-4770 | Deposition Trial | April 2004 March 2005 |
| 12. | J.B.D.L. Corp. d/b/a Beckett Apothecary, et al. v. Wyeth-Ayerst Laboratories, Inc., et al. | United States District Court, Southern District of Ohio, Western Division | Civil Action No. C-1-01-704 | Deposition | May 2004 November 2004 |
| 13. | Dewana G. Turner, Bonita H. Hixson and Yolanda P. Monroe, on behalf of themselves and all others similarly situated v. Alaska Communications Systems Long Distance, Inc. and Alaska Communications Systems Group, Inc. | Superior Court for the State of Alaska, Third Judicial District at Anchorage | Case No. 3AN-01-7208 CI | Deposition | July 2004 |
| 14. | In Re: Remeron Direct Purchaser Antitrust Litigation | U.S. District Court, District of New Jersey | Master Docket No. 03-CV-0085 | Deposition | July 2004 |

Exhibit 1
11 of 14
Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
*Prior Testimony*
June 2003 – May 2007

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 15. | Louisiana Wholesale Drug Co., Inc. on behalf of itself and all others similarly situated, v. Schering-Plough Corporation; Upsher-Smith Laboratories; and American Home Products Corporation | U.S. District Court, District of New Jersey | MDL No. 1419 | Deposition | December 2004 |
| 16. | Pixion, Inc. v. Placeware, Inc. | U.S. District Court, Northern District of California | Case No. C 03 2909 SI | Deposition Trial | December 2004 February 2005 |
| 17. | Fran-Am Partnership, L.L.C. vs. Sports Car Club of America, Inc. and S.C.C.A. Enterprises, Inc. | U.S. District Court, District of Colorado | Civil Action No. 02-Z-2060 (OES) | Deposition | January 2005 |
| 18. | In Re: Medical Waste Services Antitrust Litigation | U.S. District Court, District of Utah, Central Division | MDL No. 1546 | Deposition | April 2005 |
| 19. | Applied Medical Resources Corp. v. Ethicon, Inc., Ethicon Endo-Surgery, Inc., et al | U.S. District Court, Central District of California, Southern Division | Case NO. SACV 03-1329 JVS | Deposition Trial | June 2005 August 2006 |

Exhibit 1
12 of 14
Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
*Prior Testimony*
June 2003 – May 2007

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 20. | Brady Enterprises, Inc.; Charlotte J. Lopacki, d/b/a Budget Drug and Heritage Pharmacy, Inc.; On behalf of themselves and all others similarly situated and the Pharmacy Freedom Fund and the National Community Pharmacists Association v. Medco Health Solutions, Inc., et al. | U.S. District Court, Eastern District of Pennsylvania | Civil Action No. 03-4730 | Deposition | July 2005 |
| 21. | The Regents of the University of California, a CA Public corporation, vs. Monsanto Company, a Delaware Corp. | U.S. District Court, Northern District of California, San Francisco Division | Case No. C04-00634 PJH | Deposition | August 2005 |
| 22. | Dennis M. Devetter vs. Alex Brown Management Services, Inc.; et al. | In the Circuit Court for Baltimore City | Case No. 24-C-037514 | Deposition | January 2006 |
| 23. | Sky Technologies, LLC. vs. IBM Corporation and i2 Technologies, Inc. | U.S. District Court, Eastern District of Texas, Marshall Division | Case No. 2:03 CV 54-DF | Deposition | January 2006 |

Exhibit 1
13 of 14
Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
*Prior Testimony*
June 2003 – May 2007

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 24. | In Re: Nifedipine Antitrust Litigation | U.S. District Court, District of Columbia | MDL No. 151 | Deposition | May 2006 |
| 25. | In Re: Tricor Direct Purchaser Antitrust Litigation | U.S. District Court, District of Delaware | Civil Action No. 05-340 KAJ | Deposition | July 2006 |
| 26. | Tessera, Inc. v. Micron Technology, Inc., Micron Semiconductor Products, Inc. Infineon Technologies AG, Infineon Technologies Richmond LP, Infineon Technologies North America Corp., and Qimonda AG | U.S. District Court, Eastern District of Texas | Case No. 2:05-CV-94 | Deposition | July 2006 |
| 27. | The SCO Group v. International Business Machines Corporation | U.S. District Court, District of Utah | Civil No. 2:03CV-0294 | Deposition | September 2006 |
| 28. | USI of Southern California, et al. v. Christopher Rodenfels | Superior Court of the State of California, for the County of Los Angeles, Central District | Case No. BC335639 | Deposition | November 2006 |

Exhibit 1
14 of 14
Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
*Prior Testimony*
June 2003 – May 2007

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 29. | Columbus Drywall & Insulation, Inc., et al., on behalf of a class of similarly situated persons v. Masco Corporation, et al. | U.S. District Court, Northern District of Georgia, Atlanta Division | Civil Action No. 1:04-cv-3066 | Deposition Deposition | November 2006 February 2007 |
| 30. | John G. Miles, et al. v. Merrill Lynch & Co., et al. | United States Court of Appeals for the Second Circuit | Docket No. 05-3349-cv | Trial | December 2006 |
| 31. | City of San Antonio, Texas, et al. v. Hotels.com, L.P., et al. | U.S. District Court, Western District of Texas, San Antonio Division | Case No. SA06CA0381 OG | Deposition | March 2007 |
| 32. | Meijer, Inc., and Meijer Distribution, Inc., on behalf of themselves and all others similarly situated v. Warner Chilcott Holdings Company III, Ltd., et al. | U.S. District Court, District of Columbia | Civil Action No. 1:05-CV-02195-CKK | Deposition | April 2007 |

EXHIBIT 2

*Meijer, Inc., et al. v. Warner Chilcott Holdings Company III, LTD., et al.*
**List of Materials Reviewed**

*Includes all documents, studies, and articles cited in the Report.*

**Pleadings/Orders**

Consolidated Amended Class Action Complaint, January 27, 2006
Amended Class Action Complaint, April 14, 2006
Defendants' Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification, April 12, 2007

**Correspondence**

Letter from A. Rizzi to N. Clark re: Warner Chilcott data production (10-20-2006)
Letter from E. Eun to N. Clark re: Barr data production (4-10-2007)
Letter from D. Nalven to M. Raptis re: Watson data questions (4-11-2007)
Letter from E. Eun to N. Clark re: Barr data production (4-18-2007)
Letter from A. Rizzi to E. Noteware re: Warner Chilcott data questions (4-20-2007)
Letter from A. Rizzi to N. Clark re: Warner Chilcott data questions (5-10-2007)

**Data - Electronic Files/CDs**

**Warner Chilcott**
WC Data 001
WC Data 004
WC Data 005
WC Data 03
WC 00102077

**IMS Health**
November 1999 - March 2007

**Barr**
BARR-OVCON-0841476.xls
BARR-OVCON-0841477.xls
BARR-OVCON-0841478.xls
BARR-OVCON-0841479.xls
BARR-OVCON-0841480.xls
BARR-OVCON-0841481.xls
BARR-OVCON-0841482.xls
BARR-OVCON-0841483.xls
BARR-OVCON-0841484.xls
BARR-OVCON-0841485.xls
BARR-OVCON-NF-019126.xls

**Watson**
nyc3-585042-1.xls
nyc3-585036-1.xls
nyc3-591131-1.xls
nyc3-591132-1.xls
nyc3-588406-2.xls

**Wolters Kluwer Health**
Ovcon_etc_WACs_ex_PC2.txt

**Opt-out Entities**
econ_alb.sas7bdat
econ_cvs.sas7bdat
econ_eck.sas7bdat
econ_hyv.sas7bdat
econ_krosas7bdat
econ_rit.sas7bdat
econ_saf.sas7bdat
econ_wal.sas7bdat

EXHIBIT 2

***Meijer, Inc., et al. v. Warner Chilcott Holdings Company III, LTD., et al.***
**List of Materials Reviewed**

**RDC**
   OVCON Update~May 8 2007.xls

**Defendant Expert Work Papers**
   Balziva Market Direct Sales.xls

<u>Declarations</u>

   Declaration of Brian L. Palmer, Ph.D. (4/12/2007) and work papers

<u>Expert Reports (*FTC v. Barr* litigation)</u>

   Ecock, Frank (12/7/2006,1/5/2007)
   Hauser, John (12/9/2006)
   Addanki, Sumanth (12/11/2006,1/8/2007)
   Bell, Gregory (12/11/2006, 1/8/2007)
   Grabowski, Henry (12/11/2006, 1/8/2007)
   Hausman, Jerry (12/11/2006, 1/8/2007)
   Lewis, Tracy (12/11/2006, 1/8/2007)
   Rubinfeld, Daniel (12/11/2006, 1/8/2007)
   Dickey, Richard (1/5/2007)

<u>Depositions</u>

   MacFarlane, Katie, Vol. 1 & 2 (10/10/2006-10/11/2006)
   Palmer, Brian (5/3/2007)

<u>Documents (WC prefix)</u>

   00000001  -  00000010
   00100000  -  00100001
   00100009  -  00100059
   00100091  -  00100348
   00100368  -  00100389
   00100410  -  00100495
   00100528  -  00100535
   00100539  -  00100544
   00100558  -  00100570
   00100576  -  00100587
   00100596  -  00100619
   00100666  -  00100671
   00100673  -  00100678
   00100727  -  00100741
   00100795  -  00100826
   00100828  -  00100837
   00101141  -  00101156
   00101247  -  00101248
   00101275  -  00101306
   00101328  -  00101843
   00101850  -  00102018
   00102073  -  00102076
   00102096  -  00102105
   00102140  -  00102153
   00102176  -  00102196
   00102199  -  00102235
   00102256  -  00102257
   00102314  -  00102316
   00102318
   00102320  -  00102327
   00102344  -  00102353
   00102389  -  00102414

EXHIBIT 2

**Meijer, Inc., et al. v. Warner Chilcott Holdings Company III, LTD., et al.**
**List of Materials Reviewed**

| | | |
|---|---|---|
| 00102484 | - | 00102527 |
| 00102603 | - | 00102604 |
| 00102818 | - | 00102851 |
| 00102866 | - | 00102891 |
| 00103113 | - | 00103139 |
| 00103189 | - | 00103284 |
| 00103325 | - | 00103333 |
| 00103336 | - | 00103341 |
| 00104254 | - | 00104255 |
| 00104460 | | |
| 00104627 | - | 00104655 |
| 00104681 | - | 00104720 |
| 00104901 | - | 00104951 |
| 00105209 | - | 00105221 |
| 00105768 | - | 00106044 |
| 00106052 | - | 00106082 |
| 00106228 | - | 00106246 |
| 00106263 | - | 00106310 |
| 00106855 | - | 00106991 |
| 00107107 | - | 00107119 |
| 00108665 | - | 00108720 |
| 00108850 | - | 00108851 |
| 00109055 | - | 00109436 |
| 00110625 | | |
| 00111305 | - | 00111329 |
| 00111338 | - | 00111341 |
| 00111344 | - | 00111581 |
| 00111623 | - | 00112440 |
| 00112460 | - | 00113266 |
| 00113396 | - | 00113428 |
| 00113489 | - | 00113490 |
| 00113551 | - | 00113564 |
| 00113578 | - | 00113582 |
| 00114178 | - | 00114180 |
| 00117245 | - | 00117248 |
| 00118482 | - | 00118483 |
| 00118592 | - | 00118599 |
| 00118741 | - | 00118742 |
| 00118748 | - | 00118751 |
| 00119149 | - | 00119151 |
| 00119189 | - | 00119206 |
| 00119233 | - | 00119257 |
| 00119575 | - | 00119609 |
| 00119894 | | |
| 00119899 | - | 00119923 |
| 00119943 | - | 00120028 |
| 00120091 | | |
| 00121374 | - | 00121381 |
| 00121632 | - | 00121636 |
| 00121641 | - | 00121907 |
| 00123927 | - | 00123995 |
| 00124538 | - | 00124551 |
| 00124557 | - | 00125089 |
| 00125097 | - | 00125127 |
| 00125168 | - | 00125171 |
| 00125203 | - | 00125206 |
| 00125223 | - | 00125241 |
| 00125255 | - | 00125257 |
| 00125272 | | |
| 00125287 | - | 00125310 |
| 00125322 | - | 00125344 |

EXHIBIT 2

*Meijer, Inc., et al. v. Warner Chilcott Holdings Company III, LTD., et al.*
**List of Materials Reviewed**

| | | |
|---|---|---|
| 00125365 | - | 00125372 |
| 00125394 | - | 00125402 |
| 00125406 | - | 00125431 |
| 00125441 | - | 00125457 |
| 00125794 | - | 00125811 |
| 00125851 | - | 00125860 |
| 00125916 | - | 00125935 |
| 00125949 | - | 00125954 |
| 00125961 | - | 00126002 |
| 00126004 | - | 00126045 |
| 00126051 | - | 00126060 |
| 00126064 | - | 00126077 |
| 00126107 | | |
| 00126158 | - | 00126176 |
| 00126180 | - | 00126183 |
| 00126233 | - | 00126242 |
| 00126251 | - | 00126260 |
| 00126268 | - | 00126277 |
| 00126451 | - | 00126469 |
| 00126470 | - | 00126507 |
| 00126529 | - | 00126558 |
| 00126559 | - | 00126622 |
| 00126626 | - | 00126628 |
| 00126645 | - | 00126707 |
| 00126871 | - | 00126895 |
| 00126987 | - | 00118589 |
| 00127264 | - | 00127271 |
| 00127274 | - | 00127403 |
| 00127425 | - | 00127452 |
| 00127527 | - | 00127536 |
| 00127626 | - | 00127659 |
| 00127681 | - | 00127696 |
| 00127701 | | |
| 00127747 | - | 00127770 |
| 00127992 | - | 00128085 |
| 00128112 | - | 00128164 |
| 00128189 | - | 00128302 |
| 00128357 | - | 00128474 |
| 00128486 | - | 00128650 |
| 00128897 | - | 00129459 |
| 00129499 | - | 00129501 |
| 00129595 | - | 00129631 |
| 00131296 | - | 00131476 |
| 00131587 | - | 00131597 |
| 00131602 | - | 00131691 |
| 00131708 | - | 00131720 |
| 00131774 | - | 00131778 |
| 00131799 | - | 00131836 |
| 00132051 | - | 00132096 |
| 00132218 | - | 00132242 |
| 00134193 | - | 00134245 |
| 00134418 | - | 00134482 |
| 00134541 | - | 00134598 |
| 00134678 | - | 00134698 |
| 00135486 | - | 00135499 |
| 00135529 | - | 00135540 |
| 00135862 | - | 00135891 |
| 00135893 | - | 00135896 |

EXHIBIT 2

*Meijer, Inc., et al. v. Warner Chilcott Holdings Company III, LTD., et al.*
**List of Materials Reviewed**

| | | |
|---|---|---|
| 00135947 | - | 00135954 |
| 00136269 | - | 00136309 |
| 00136319 | | |
| 00136325 | - | 00136326 |
| 00136331 | - | 00136332 |
| 00136355 | | |
| 00136358 | - | 00136361 |
| 00136368 | | |
| 00136377 | - | 00136395 |
| 00136447 | - | 00136459 |
| 00136477 | - | 00136489 |
| 00136492 | - | 00136495 |
| 00136498 | - | 00136501 |
| 00136505 | - | 00136527 |
| 00136685 | - | 00136700 |
| 00136817 | - | 00136828 |
| 00136836 | | |
| 00137741 | - | 00137743 |
| 00137745 | - | 00137750 |
| 00138352 | - | 00138383 |
| 00138386 | - | 00138392 |
| 00138527 | - | 00138567 |
| 00138687 | - | 00138704 |
| 00138706 | - | 00138715 |
| 00138740 | - | 00138749 |
| 00138785 | - | 00138827 |
| 00138827.79 | - | 00138827.84 |
| 00138855 | - | 00138889 |
| 00138895 | - | 00138896 |
| 00138918 | - | 00138924 |
| 00141390 | - | 00141442 |
| 00142405 | | |
| 00142420 | - | 00142431 |
| 00142437 | - | 00142438 |
| 00142482 | - | 00142489 |
| 00142550 | - | 00142624 |
| 00143139 | - | 00143143 |
| 00143145 | - | 00143150 |
| 00212886 | - | 00212894 |
| 00213006 | - | 00213076 |
| 00364675 | | |
| 00463928 | - | 00463934 |
| 00463928 | - | 00464164 |
| 00463928 | - | 00463934 |
| 00463935 | - | 00464044 |
| 00464045 | - | 00464052 |
| 00464045 | - | 00464052 |
| 00464053 | - | 00464163 |
| 00464164 | | |

**Documents (FTC-BMS- prefix)**

000001  -  000060

**Documents (FTC-S&P- prefix)**

000001  -  000014

**Documents (BARR -000- prefix)**

0543  -  0562

EXHIBIT 2

*Meijer, Inc., et al. v. Warner Chilcott Holdings Company III, LTD., et al.*
**List of Materials Reviewed**

<u>Documents (BARR -00- prefix)</u>

| | | |
|---|---|---|
| 0225 | - | 0245 |
| 00603 | - | 00708 |

<u>Documents (BARR-08 prefix)</u>

| | | |
|---|---|---|
| 0008 | - | 0011 |

<u>Documents (BARR-12 prefix)</u>

| | | |
|---|---|---|
| 0284 | - | 0299 |

<u>Documents (BARR-13 prefix)</u>

| | | |
|---|---|---|
| 00042 | - | 00043 |

<u>Documents (BARR-15 prefix)</u>

| | | |
|---|---|---|
| 02412 | - | 02448 |
| 03620 | - | 03622 |

<u>Documents (BARR- 29 prefix)</u>

| | | |
|---|---|---|
| 00002 | - | 00006 |
| 00003 | - | 00007 |
| 00011 | - | 00039 |

<u>Documents (BARR-45 prefix)</u>

| | | |
|---|---|---|
| 00001 | - | 00002 |

<u>Documents (BARR-OVCON prefix)</u>

| | | |
|---|---|---|
| 310253 | - | 310283 |
| 318958 | - | 318988 |
| 0837706 | - | 0837710 |
| 841250 | - | 841254 |
| 841277 | - | 841306 |
| 841315 | - | 841317 |
| 841319 | | |
| 841332 | - | 841336 |
| 841338 | | |
| 841343 | - | 841345 |
| 841348 | - | 841349 |
| 841350 | - | 841359 |
| 841360 | - | 841475 |

<u>Documents (OVCON MEIJER)</u>

| | | |
|---|---|---|
| 0054 | - | 0058 |
| 0062 | - | 0063 |

<u>Documents (OVCON SAJ)</u>

| | | |
|---|---|---|
| 0001 | - | 0002 |
| 000094 | - | 000117 |

<u>Watson Pharma Documents (no bates number)</u>

Watson Pharma Zenchent Offer Letter to Kroger Company, January 31, 2007

**EXHIBIT 2**

*Meijer, Inc., et al. v. Warner Chilcott Holdings Company III, LTD., et al.*
**List of Materials Reviewed**

<u>Publicly Available Materials</u>

U.S. FDA Orange Book, 24th Edition, www.fda.gov

Warner Chilcott Corporation, Form S-4, July 15, 2005

"FDA Approves Ovcon 35 as the First Chewable Oral Contraceptive Tablet for Women," www.fda.gov, 11/23/03

"Barr's Generic Ovcon-35 Tablets Approved," Barr Press Release, www.Barrlabs.com 4/23/2004

"Barr Confirms FTC Lawsuit Related to Generic Ovcon-35 License," Barr Press Release, www.Barrlabs.com, 11/7/05

"FTC Sues to Stop Anticompetitive Agreement in U.S. Drug Industry," www.ftc.gov, 11/7/05

"Which Oral Contraceptive Pill is Best for Me?" Woman's Diagnostic Cyber, http://www.wdxcyber.com/ncontr13.htm

"Warner Chilcott Release:  The FTC Files A New Motion In Connection With Ongoing Ovcon Litigation,"
     www.biospace.com, 9/26/06

"Barr Announces Warner Chilcott Waives Exclusive License for OVCON(R) 35," Barr Press Release,
     phx.corporate-ir.net, 9/26/06

"Warner Chilcott and Watson Pharmaceuticals Announce Launch of Zenchent(TM)," Warner Chilcott Release,
     www.warnerchilcott.com, 1/29/07

U.S. Food and Drug Administration, *The Pediatric Exclusivity Provision: January 2001 Status Report to Congress*,
     January 2001

Kirking, D.M., F.J. Ascione, C.A. Gaither, and L.S. Welage, *Economics and Structure of the Generic Pharmaceutical*
     *Industry*, Journal of the American Pharmaceutical Association, 41, 578-584, 2001

Congressional Budget Office, *How Increased Competition from Generic Drugs has Affected Prices and Returns*
     *in the Pharmaceutical Industry*, July 1998

Bae, J.B., *Drug Patent Expirations and the Speed of Generic Entry*, Health Services Research, Vol. 32, No. 1,
     pp. 87-101, April 1997

Frank, R. and D. Salkever, *Generic Entry and the Pricing of Pharmaceuticals*, Journal of Economics and
     Management Strategy, v. 6, no. 1, Spring 1997, pp. 75-90

Grabowski, H. and J. M. Vernon, *Longer Patents for Increased Generic Competition in the U.S.*,
     PharmacoEconomics, v. 10, suppl. 2, 1996, pp. 110-123

Suh, Dong Churl, *Effect of Multiple Source Entry on Price Competition After Patent Expiration in the*
     *Pharmaceutical Industry*, Health Services Research, 35:2, June 2000

Office of Technology Assessment, *Pharmaceutical R&D: Costs, Risks and Rewards*, OTA-H-522, February 1993

Grabowski, H. and J. M. Vernon, *Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the*
     *1984 Drug Act*, Journal of Law and Economics, v. XXXV, October 1992, pp. 331-350

Caves, Richard E., Michael D. Whinston, Mark A. Hurwitz, Ariel Pakes and Peter Temin, *Patent Expiration,*
     *Entry, and Competition in the U.S. Pharmaceutical Industry*, Brookings Papers on Economic Activity:
     Microeconomics, 1991, pp. 1-66

Wiggins, Steven N. and Robert Maness, *Price Competition in Pharmaceuticals:  The Case of Anti-Infectives*,
     Economic Inquiry, 2004

Reiffen, David and Michael Ward, *Generic Drug Industry Dynamics*, The Review of Economics and Statistics,
     February 2005, 87(1):  37-49

Atanu Saha, Henry Grabowski, Howard Birnbaum, Paul Greenberg and Oded Bizan, *Generic Competition*
     *in the US Pharmaceutical Industry*, International Journal of the Economics of Business, Vol. 13,  No. 1,
     February 2006, pp. 15-38

United States Healthcare Distribution, Information Technology & PBMs, 2003 Distribution Outlook,
     JPMorgan, April 21, 2003

EXHIBIT 3



Ovcon 35 Total Prescriptions
April 1997 - December 2005

REDACTED

Source: WC 001 (New and Total Prescriptions 1-00 - 12-05.xls); WC00112615-WC00112630; WC00102346.

EXHIBIT 4A

## Actual Class Volume and Prices



|  | Actual Volume (Brand & Generic) (Units) (1) | Average Price (Brand & Generic) (Dollar/Unit) (2) |
|---|---|---|
| **May 2004 But-for Entry** | | |
| Period 1 | REDACTED | |
| Period 2 | | |
| Period 3 | | |
| **August 2004 But-for Entry** | | |
| Period 1 | REDACTED | |
| Period 2 | | |
| Period 3 | | |

Note:   A unit is a one-month's supply of an Ovcon 35 Product.

Source:   REDACTED

EXHIBIT 4B

## But-For Class Volume and Prices



|  | Actual Volume (Brand & Generic) | | Declining Total Market (Brand & Generic) | |
|---|---|---|---|---|
|  | But-For Volume | But-For Price | But-For Volume | But-For Price |
|  | (Units) | (Dollar/Unit) | (Units) | (Dollar/Unit) |
|  | (1) | (2) | (3) | (4) |
| **May 2004 But-for Entry** | | | | |
| Period 1 | | | | |
| Period 2 | | REDACTED | | |
| Period 3 | | | | |
| **August 2004 But-for Entry** | | | | |
| Period 1 | | | | |
| Period 2 | | | | |
| Period 3 | | | | |

Note:   A unit is a one-month's supply of an Ovcon 35 Product.

Source:   REDACTED

EXHIBIT 4C

## Aggregate Class Overcharges



Actual Volume
(Brand & Generic)

(1)

Declining Total Market
(Brand & Generic)

(Dollars In Million)

(2)

**May 2004 But-for Entry**

Period 1

Period 2

Period 3

**Total Overcharges:**

REDACTED

**August 2004 But-for Entry**

Period 1

Period 2

Period 3

**Total Overcharges:**

REDACTED

Source:

# EXHIBIT 4

EXHIBIT 4

Pre- and Post-Generic Entry Price Comparison
by Class of Trade for Ovcon 35 Products

**REDACTED**