# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE TRICOR DIRECT PURCHASER ANTITRUST LITIGATION
)
)
)

Civil Action No. 05-340-KAJ
(Consolidated)

THIS DOCUMENT RELATES TO:
)
)

ALL ACTIONS
)

## ORDER

At Wilmington this **6th** day of **March, 2006,**

For the reasons set forth by the Court during the teleconference on March

3, 2006,

IT IS ORDERED that:

1. Discovery by plaintiffs regarding Hytrin will be permitted to the extent

described during the teleconference.

2. Discovery by defendants into "downstream" sales data will not be

permitted.

UNITED STATES DISTRICT JUDGE

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4    ------------------------------------
                                        :
5    IN RE: TRICOR DIRECT PURCHASER      :    CIVIL ACTION
     ANTITRUST LITIGATION                :
6    ------------------------------------ :    NO. 05-340 (KAJ)

7                                        :
     THIS DOCUMENT RELATES TO:           :    (Consolidated)
8                                        :
     ALL ACTIONS                         :
9                                        :
     ------------------------------------
10   ------------------------------------         -and-
                                        :
11   IN RE: TRICOR INDIRECT PURCHASER    :
     ANTITRUST LITIGATION                :
12   ------------------------------------ :    NO. 05-360 (KAJ)

13                                       :
     THIS DOCUMENT RELATES TO:           :    (Consolidated)
14                                       :
     ALL ACTIONS                         :
15                                       :
     ------------------------------------
16
                           - - -
17
                  Wilmington, Delaware
18        Friday, March 3, 2006 at 11:32 o'clock, a.m.
                  TELEPHONE CONFERENCE
19
                           - - -
20
     BEFORE:        HONORABLE **KENT A. JORDAN**, U.S.D.C.J.
21
                           - - -
22
     APPEARANCES: (Listed on page two)
23

24
                              Brian P. Gaffigan
25                            Registered Merit Reporter

2

```
 1    APPEARANCES:

 2

 3              ROSENTHAL MONHAIT GROSS & GODDESS, P.A.
              BY:   JEFFREY S. GODDESS, ESQ., and
 4                  JESSICA ZELDIN, ESQ.

 5                  -and-

 6              ODOM & DES ROCHES, LLP
              BY:   STUART DES ROCHES, ESQ.
 7                  (New Orleans, Louisiana)

 8                  -and-

 9              GARWIN GERSTEIN & FISHER, LLP
              BY:   BARRY S. TAUS, ESQ.
10                  (New York, New York)

11                  -and-

12              BERGER & MONTAGUE, P.C.
              BY:   ERIC L. CRAMER, ESQ.
13                  (Philadelphia, Pennsylvania))

14                  -and-

15              COHEN MILSTEIN HAUSFELD & TOLL, P.L.L.C.,
              BY:   LINDA P. NUSSBAUM, ESQ.
16                  (New York, New York)

17                       Counsel for direct purchaser class

18

19              MORRIS, NICHOLS, ARSHT & TUNNELL
              BY:   MARY B. GRAHAM, ESQ.

20                  -and-

21              PATTERSON, BELKNAP, WEBB & TYLER, LLP
              BY:   WILLIAM F. CAVANAUGH, JR., ESQ., and
22                  CHAD PETERMAN, ESQ.
                  (New York, New York)
23
                       Counsel for Abbott Laboratories
24

25
```

1    APPEARANCES:   (Continued)

2

3                    RICHARDS LAYTON & FINGER
                     BY:   FREDERICK L. COTTRELL, III, ESQ.
4
                            -and-
5
                     CADWALADER, WICKERSHAM & TAFT, LLP
6                    BY:   STEVEN C. SUNSHINE, ESQ.
                            (Washington, District of Columbia)
7
                            -and-
8
                     STEPTOE & JOHNSON
9                    BY:   TIMOTHY C. BICKHAM, ESQ.
                            (Washington, District of Columbia)
10
                                 Counsel for Fournier Industrie et
11                               Sante, and Laboratories Fournier S.A.

12
                     YOUNG CONAWAY STARGATT & TAYLOR
13                   BY:   JOSY W. INGERSOLL, ESQ.

14                          -and-

15                   GOODWIN PROCTOR LLP
                     BY:   CHRISTOPHER T. HOLDING, ESQ.
16                          (Boston, Massachusetts)

17                          -and-

18
                     LEYDIG VOIT & MAYER, LTD. LLP
19                   BY:   BRUCE M. GAGALA, ESQ.
                            (Chicago, Illinois)
20
                                 Counsel for Teva Pharmaceuticals
21                               USA, Inc.

22

23

24

25

4

1    APPEARANCES: (Continued)

2

3            MORRIS JAMES HITCHENS & WILLIAMS, LLP
             BY:  MARY MATTERER, ESQ.
4
                    -and-
5
             KEKER & VAN NEST, LLP
6            BY:  PAULA L. BLIZZARD, ESQ.
                    (San Francisco, California)
7
                        Counsel for Impax Laboratories
8

9            CHIMICLES & TIKELLIS
             BY:  A. ZACHARY NAYLOR, ESQ.
10
                    -and-
11
             HAGENS BERMAN SOBOL SHAPIRO, LLP
12           BY:  DAVID S. NALVEN, ESQ.
                    (Cambridge, Massachusetts)
13
                        Counsel for indirect purchaser
14                      plaintiffs, Local 28 Sheet Metal
                        workers, individuals in indirect
15                      purchaser class actions

16
             PRICKETT JONES & ELLIOTT
17           BY:  ELIZABETH M. McGEEVER, ESQ.

18                  -and-

19           HANGLEY ARONCHICK SEGAL & PUDLIN
             BY:  STEVE D. SHADOWEN, ESQ.
20                  (Harrisburg, Pennsylvania)

21                  -and-

22           HANGLEY ARONCHICK SEGAL & PUDLIN
             BY:  SCOTT E. PERWIN, ESQ.
23                  (Miami, Florida)

24                      Counsel on behalf of CVS - Rite Aid

25

5

1    APPEARANCES:   (Continued)

2

3               MURPHY SPADARO & LANDON
               BY:   JONATHAN PARSHALL, ESQ.
4
                    -and-
5
               SUSSMAN GODFREY
6               BY:   JOHN W. TURNER, ESQ.
                    (Dallas, Texas)
7
                         Counsel on behalf of Pacificare Health
8                        Systems

9

10

11                         - oOo -

12                    P R O C E E D I N G S

13          (REPORTER'S NOTE:  The following telephone

14   conference was held in chambers, beginning at 11:32 a.m.)

15          THE COURT:  Hi, this is Judge Jordan.  Who do I

16   have on the line?

17          MS. ZELDIN:  Good morning.  This is Jessica

18   Zeldin from Rosenthal Monhait Rosen & Goddess on behalf of

19   certain plaintiffs.  If it pleases the Court, I'll let my

20   co-counsel introduce themselves.

21          THE COURT:  That's fine.

22          MR. CRAMER:  Good morning, Your Honor.  This is

23   Eric Cramer from Berger & Montague on behalf of the direct

24   purchaser class plaintiffs.

25          MR. DES ROCHES:  Your Honor, this is Stuart

1   Des Roches also on behalf of the direct purchaser class

2   plaintiffs.

3           MS. McGEEVER:  Good morning.  Excuse me.  Go

4   ahead.

5           MS. NUSSBAUM:  It's Linda Nussbaum also on

6   behalf of the direct purchaser plaintiffs.

7           MS. McGEEVER:  Your Honor, this is Elizabeth

8   McGeever, and I am here for certain individual direct

9   purchasers.  And if it is permissible to the Court, my

10  co-counsel will introduce themselves.

11          THE COURT:  Okay.

12          MR. SHADOWEN:  Good morning, Your Honor.  Steve

13  Shadowen on behalf of CVS and Rite Aid.

14          MR. PERWIN:   Good morning.  Scott Perwin on

15  behalf of the Walgren plaintiffs.

16          THE COURT:  All right.

17          MS. INGERSOLL:  Josy Ingersoll, Your Honor, on

18  behalf of Teva.  And with me on the line is Chris Holding at

19  Goodwin Procter.

20          MS. MATTERER:  This is Mary Matterer for Impax;

21  and on the line with me is Paula Blizzard from Keker Van

22  Nest for Impax.

23          THE COURT:  All right.

24          MR. COTTRELL:  Your Honor, Fred Cottrell for

25  Fournier; and on the phone with me is Steve Sunshine at

7

1    Cadwalader and Tim Bickham at Steptoe.

2            THE COURT:  All right.

3            MS. GRAHAM:  This is Mary Graham for Abbott; and

4    with me are Bill Cavanaugh and Chad Peterman from Patterson

5    Belknap.

6            MR. PARSHALL:  Good morning, Your Honor.

7    Jonathan Parshall for Pacificare Health Systems.  Also on

8    the line for Pacificare is John Turner.

9            MR. PARSHALL:  Good morning, Your Honor.  Zach

10   Naylor for indirect purchaser plaintiffs.  I'm joined by

11   David Nalven of Hagens Berman.

12           THE COURT:  All right.

13           MR. NALVEN:  Good morning, Your Honor.

14           THE COURT:  Good morning.

15           MR. GAGALA:  Good morning, Your Honor.  It's

16   Bruce Gagala.  I don't think Josy knew I was on the phone.

17           MS. INGERSOLL:  I didn't.  Sorry

18           MR. GAGALA: :  No problem.

19           THE COURT:  All right.  Thank you.

20           MR. TAUS:  Also Barry Taus for the direct

21   purchaser class.

22           THE COURT:  Okay.

23           MR. GODDESS:  Also Jeff Goddess.  I wasn't able

24   to get through on my own call a few seconds ago.  Thank you,

25   Your Honor.

1          THE COURT:  Is there anybody else?  Okay.  A

2    cast of housands.

3          I·appreciate everybody being on the call; and

4    when I look at the letters,  it indicates to me be have two

5    discovery issues teed up for today.  One is if I've got it

6    right, the plaintiffs' request for discovery into Hytrin

7    and Tranxene, if I'm saying those drug names correctly.

8    Specifically, switching from tablet form to capsule form as

9    evidence I take it from the submissions that the defendants

10   here really were making the switch in this case from TriCor

11   capsule to tablet for a nefarious purpose, an antitrust

12   purpose.  And the second issue being tied up is the defend-

13   ants' request for downstream discovery, that is, sales

14   of the direct purchasers on down to other folks who were

15   interested in buying TriCor.

16          So am I right that that is the agenda we've got

17   today?  There is no other thing out there, is there?

18          (Unidentified female voice):  That's correct.

19          THE COURT:  Okay.  Well, why don't we start

20   with the plaintiff's request on this.  And who is speaking

21   on behalf of the plaintiffs?  I've got letters from a

22   couple different folks, but it appears that the arguments

23   are basically the same.  Is there somebody that the

24   plaintiffs have selected to take the point?

25          MR. DES ROCHES:  Good morning, Your Honor.  This

1    is Stuart Des Roches of Odom & Des Roches in New Orleans,

2    and I believe I'm going to make the initial arguments on

3    behalf of the plaintiffs in that regard.

4        THE COURT:  All right.  Mr. Des Roches, please

5    go ahead.

6        MR. DES ROCHES:  Yes.

7        THE COURT:  And be assured I've read your

8    papers.

9        MR. DES ROCHES:  Okay.  As Your Honor has

10    pointed out, we do seek documents regarding Abbott's

11    conversion from formulations in Hytrin and Tranxene.  And

12    as Your Honor has noted, one of the reasons we would like to

13    have those documents is to show Abbott's intent as well as

14    their purpose and effect in executing the TriCor conversion

15    from capsules to tablets.

16        As we pointed out to Your Honor in the letter,

17    there are documents which indicate those two conversions,

18    the Hytrin conversion and the TriCor conversion perhaps

19    being modeled off of one another or at least a recognition

20    they were very similar.

21        Now, we believe, Your Honor, that certainly a

22    conversion that is linked in the defendants' own documents

23    to at least some degree and a conversion in the instance

24    of Hytrin at least that went in the other direction from a

25    tablet to a capsule is certainly relevant to the intent

1   purpose and effect of the TriCor conversion.

2            As I understand the defendants' position, it is

3   that they argued that intent, for instance, or knowledge is

4   not an element of our monopolization case.  Your Honor, I

5   would certainly agree with the defendants that intent or

6   knowledge is not is a formal element of our Section 2

7   monopolization case.  However, I would disagree with them

8   that knowledge, purpose and effect and intent is not

9   relevant to our case.

10           Your Honor, since the defendants quoted and

11  cited Your Honor to the Grinnell Corporation case, which is

12  a 1966 United States Supreme Court case, however, there are

13  a couple of cases I'd like to point out to Your Honor that

14  have specifically dealt with this issue.

15           Some time after the issuance of the Grinnell

16  case, the United States Supreme Court issued the Aspen

17  Skiing Company case.  The formal cite is Aspen Skiing

18  Company vs. Aspen Highlands, 472 U.S. 585.  In that case,

19  the United States Supreme Court specifically held that while

20  intent is not a formal element to be shown in the Section 2

21  monopolization case, it did specifically state, and I quote

22  "that intent is relevant to the question whether the

23  challenged conduct is fairly characterized as exclusionary

24  or anticompetitive, to use the words in the trial court's

25  instruction, or predatory, to use a word that scholars seem

1    to favor."

2         More recently, Your Honor, the Third Circuit

3    itself has acknowledged that what would call relevance

4    reality.  Although intent is not a formal element, it is

5    something that is certainly relevant to the inquiry as to

6    whether something is anticompetitive or not.

7         And I would cite Your Honor to the LePage's

8    case, which is a Third Circuit case, (2003), 324 F.3d 141,

9    which held the same thing as Aspen Ski and actually quoted

10   it.  And there is even a more recent case from the Third

11   Circuit called Gordon vs. Lewiston Hospital, which is 423

12   F.3d 184, in which it said the exact same thing.

13        Professionors Arita and Hovenkamp have said the

14   same thing.  And a quick quote from Arita and Hovenkamp is

15   in cases of ambiguity, knowledge of intent may help the

16   Court to interpret facts and to prevent consequences.

17        Your Honor, so I think from the intent or

18   knowledge point of view, it certainly seems to have been

19   recognized by many prominent cases, prominent scholars that

20   although it's not a formal element, it is most certainly

21   something that is relevant to the inquiry.

22        We have also sought these documents, Your

23   Honor -- aside from the knowledge and purpose and effect,

24   we've also sought these documents in regards to one of the

25   defenses that Abbott and Fournier appear to be putting forth

1    in this case.  And that is that in this instance, the

2    TriCor conversion from a capsule to a tablet constituted an

3    innovation and they stand very prominently on that point in

4    their motions to dismiss.

5         As I understand the defendants' position, they

6    allege three types of innovation.  One is in the conversion

7    from the capsule to the tablet and one is that the tablet

8    had a new indication.  The new indication was for raising

9    good cholesterol.  The other indication was for improved

10   bioavailability.  And the third innovation was the fact that

11   the product moved from a capsule to a tablet.

12        And what we would like to show Your Honor and

13   what we would like to discover is whether, in other

14   instances, Hytrin and Tranxene, specifically Abbott took

15   the position that capsules were preferable to tablets as

16   opposed to the other way around, which is the position they

17   have taken in this case.  For that reason, Your Honor, for

18   those general reasons, we believe that this discovery is

19   quite relevant to this case to the intent aspect of the case

20   as well as to the actual innovation arguments that the

21   defendants are putting forth.

22        THE COURT:  Okay.  I think I have your argument,

23   Mr. Des Roches.  Thank you very much.

24        Who is speaking on this from the defendants'

25   perspective?

1          MR. CAVANAUGH:  Your Honor, this is

2    Mr. Cavanaugh on behalf of Abbott.

3          THE COURT:  Okay.

4          MR. CAVANAUGH:  Your Honor, this is even more

5    remote than the discovery that they were seeking with

6    respect to TriCor future products which Your Honor rejected

7    finding that if there was a violation here, that would be

8    determined and discovered by looking at what was done with

9    respect to TriCor.

10          THE COURT:  Well, let me press you on that a

11    little bit.

12          MR. CAVANAUGH:  Go ahead.

13          THE COURT:  When you say this is even more

14    remote, I want you to respond to the specific, two specific

15    points that have been made.  And when you do, keep in mind

16    these quotes that they have put in front of me.  A document

17    from Fournier that says "TriCor fit the Hytrin story:

18    Launch, expand, innovate with new dosage forms, managed

19    generics."  That is quoted to me in the February 28th letter

20    from Mr. Shaw on behalf of Teva.

21          Later in that same letter, there is another

22    quote, minutes of a Fournier meeting apparently "to switch

23    capsule to tablets, NDA.  Because it's a tablet, the dosage

24    form gets exclusivity."

25          You know, those are the kinds of things that I

1   believe Mr. Des Roches was referring to when he said they're

2   not making this stuff up, there is some evidence in what you

3   have already given them that you folks, Abbott and Fournier

4   had this in mind as a way to manage the generics entry into

5   the market.

6              Now you tell me how that would be remote.  If I

7   accept that premise, is your argument still this is too

8   remote?

9              MR. CAVANAUGH:  Well, it is, Your Honor.

10  Because only point those documents make is that Hytrin was

11  introduced at a lower dose and it was introduced as a

12  capsule.  The real distinction here with respect to a

13  generic is TriCor came out with a lower dose and so did

14  Hytrin but that doesn't make Hytrin relevant here.  Hytrin,

15  the decision was made to go from a tablet to a capsule

16  because of whatever the specifics were of that market.

17             The critical point is you are able to come out

18  with an improvement, a lower dose, which in the case of

19  TriCor, we did.  When counsel for plaintiff was listing the

20  improvements, he neglected to note the most significant

21  improvement which is that it was a lower dose of

22  fenofibrate.  And when you look at at the drugs against

23  which TriCor was competing, they were all tablets so it

24  made sense.

25             And what they will discover when they do

1    discovery of TriCor, which should be focus of this case,

2    is that the new formation, you could make it in a tablet.

3    Previously, under the older TriCor formulations and

4    manufacturing processes, they couldn't make it with a

5    capsule.

6         So my point, Your Honor, is that the focus we

7    believe should be on TriCor.  If they want to make arguments

8    about intent, that can best be discerned by looking at

9    TriCor.

10         The Hytrin example they point to, that was 1995.

11   Tranxene is 1980.  And, in fact, we learned last night they

12   got the facts wrong.  That was I believe a move from a

13   capsule to a tablet, consistent with what was done with

14   TriCor.  And I'm sure you can look through the history of

15   pharmaceutical companies and find lots of things that are

16   "consistent:" going from tablet to a capsule, lowering a

17   dose, getting additional improvements and indications, but

18   the fact that you are able to get a lower dose on one drug

19   and you got a lower dose on another drug doesn't inform you

20   as to whether there was some violation of the antitrust

21   laws with respect to the particular drug that is at issue

22   in this case.

23         The plaintiffs are saying essentially let's

24   try and compare improvements across different products,

25   products that compete in completely different therapeutic

16

1    categories that have nothing to do with one another.  The

2    fact there is a document that says, you know, with TriCor

3    we're having, we're having a lower dose and there is a

4    movement from a capsule to a tablet like Hytrin, okay, I

5    don't see how that informs anyone as to intent or anything

6    that is relevant with respect to TriCor.

7              THE COURT:  Okay.

8              MR. DES ROCHES:  Your Honor, may I address those

9    two points real quick?

10             THE COURT:  Yes, real quick.

11             MR. DES ROCHES:  Your Honor, Mr. Cavanaugh

12   said that Hytrin went to a capsule due to the specifics of

13   that market.  That is exactly what we want to know:  the

14   specifics of that market that caused Hytrin to go from a

15   tablet to a capsule.  Was it scientific matters or was it a

16   pure managed generic issue?

17             As to his point that Abbott takes the position

18   that it couldn't make the new version with a capsule, it's

19   something certainly subject to discovery in this case and

20   that is not a proposition we're necessarily willing to agree

21   to, with the documents we've seen so far on those point as

22   to why they did what they did with TriCor.

23             THE COURT:  All right.

24             MR. CAVANAUGH:  Your Honor, counsel

25   misunderstood me.  I said under the old formulation of

1    fenofibrate, you could not make it as a tablet.

2         THE COURT:  Okay.  Well, here is the bottom line

3    on this one.  I've got a ruling for you, and it's a partial

4    win for the plaintiffs.

5         I'm not prepared to say -- and I have to say

6    that the direct purchaser plaintiffs were kind enough to

7    give me the actual request they propound in this regard

8    which includes Request No. 78 and it's Exhibit A to the

9    February 27th letter from Mr. Goddess to me.  And it's just

10   too broadly framed.  They said they want the documents

11   relating to any decision with regard to FDA approval for

12   scale up, manufacture, market and/or promote a new dosage

13   form and/or formulation of a pharmaceutical product already

14   sold by you, including, but not limited to, Hytrin and

15   Tranxene, et cetera.

16        I understand that lawyers like to cast a net

17   broadly but I'm not getting into this "including, but not

18   limited to" kind of discovery.  Nor am I prepared to throw

19   the net as broadly even as the Tranxene product because at

20   this point, all I have got is the assertion of counsel they

21   think there is something relevant going on there.  In this

22   case, however, the information they've given me about Hytrin

23   is enough to indicate that it is relevant for the purposes

24   that the plaintiffs have outlined.  That there was a switch

25   in product form, that part of the switch may have been to

1    "manage generics," and partly to get "exclusivity."  And it

2    sheds light on, important light perhaps, I don't know, I

3    guess we'll wait and see what they come up with, but there

4    is enough of a basis in the record that they've developed

5    to persuade me that this isn't wholly irrelevant.  On the

6    contrary, it's relevant to the two things that Mr. Des

7    Roches has outlined here and which were outlined in the

8    letters.

9            I'm going to allow that discovery.  So you can

10   consider that done and we'll have a short order on that.

11   Now, how you explain that --

12           MR. CAVANAUGH:  Your Honor?

13           THE COURT:  Yes, Mr. Cavanaugh.

14           MR. CAVANAUGH:  This is Mr. Cavanaugh.  Is it

15   limited to that?  They asked for all documents relating

16   essentially to Hytrin.

17           THE COURT:  No, it's not all documents.  I'm

18   just emphasizing this; all right?

19           MR. CAVANAUGH:  Okay.

20           THE COURT:  It goes to the two points that were

21   raised here, and you guys ought to be talking.  I'm not

22   going to craft the discovery responses back and forth here.

23           MR. CAVANAUGH:  I understand, Your Honor.

24           THE COURT:  I'm telling you right now what they

25   do have is too broad.

1         MR. DES ROCHES:  Your Honor, this is Stuart Des

2  Roches.  We can talk with counsel for Abbott about this, but

3  I think we have some ideas in mind, specific ideas in mind

4  as to how to very specifically tailor and narrow those

5  requests to the items that go to the heart of what I spoke

6  about.

7         THE COURT:  Well, that is what did you need to

8  do because I'm giving you the discovery about Hytrin as to

9  this specific, the two specific points that we've just

10  discussed.  And those points are:  What did they have in

11  their minds as they were making this switch?  And what is

12  the evidence that this was motivated by something perhaps

13  beyond improvement or wholly other than improvement of the

14  product itself?

15         And you folks I hope can work with the guidance

16  I have given you to come up with something that is mutually

17  agreeable as a way to move forward.

18         All right.  Mr. Cavanaugh, are you also taking

19  the helm with respect to the downstream discovery request?

20         MR. CAVANAUGH:  No, Your Honor.  Mr. Peterman

21  from my office will.

22         THE COURT:  All right.  Mr. Peterman, why don't

23  you go ahead and launch on that, please.

24         MR. PETERMAN:  Thank you, Your Honor.  As you

25  know from the letters, we are seeking the downstream

1    discovery relevant to sales of TriCor and other fenofibrate

2    products from the direct purchaser plaintiffs.  We believe

3    this is relevant to two points.  The main point is class

4    certification.

5            There is no preordained right under Rule 23 for

6    the direct purchasers to be certified as a class.  In order

7    for them to be certified as a class, there must not be any

8    intraclass conflicts.  The Hytrin court in the Eleventh

9    Circuit expressly realized the possibility of these

10   intraclass conflicts between the regional wholesalers for

11   these named plaintiffs and the Big Three wholesalers who we

12   have identified in our letter.

13           THE COURT:  Yes.  Can I ask you a question about

14   that?

15           MR. PETERMAN:  Yes, Your Honor.

16           THE COURT:  What, if any, weight should I give

17   to the letters that these these Big Three, as you have --

18   somebody called them the Big Three.  I don't know whether

19   that is an industry standard way of referring to them or

20   not, but the letters they've sent me through counsel saying,

21   hey, we don't see any conflict here and we don't want Abbott

22   and Fournier purporting to speak for our interest.  They

23   don't have in business doing that.  What should I make of

24   those letters?

25           MR. PETERMAN:  Your Honor, those letters, just

1   because those parties say that there is no conflict is not

2   dispositive of the issue.  The Court, through Rule 23, needs

3   to decide, based on a full factual record, whether there

4   are indeed intraclass conflicts, because it protects the

5   interest of the defendants, it protects the interest of the

6   alleged class and it goes to the integrity of the federal

7   class action mechanism.

8           Those three very similar letters are striking in

9   part based on what is absent from those letters.  In our

10  letters, we alleged that the Big Three operated on a cost

11  plus basis.  Those letters did not address that.  They do

12  not refute that.  The letters from the regional wholesalers

13  did not address that or refute that as well.  So before the

14  Court now, we've got a situation where Abbott and Fournier

15  alleged the possibility that there are different mechanisms

16  by which the regional wholesalers set their prices and the

17  Big Three and other unnamed wholesalers set their prices.

18  So the possibility of intraclass conflict still exists.

19          THE COURT:  Well, help me out.  Let's assume for

20  the sake of discussion that you were right, that they did

21  this on a markup basis.  Does that change the legal right of

22  anybody to recover if they were to prove that in fact -- and

23  I'm not saying you did, obviously, but if they were to make

24  out their antitrust case, does that bar somebody from

25  recovering?

1      MR. PETERMAN:  Your Honor, through this motion,

2   we're not alleging that the direct purchaser plaintiffs

3   would be entitled to argue for an overcharge theory.  We're

4   not alleging that.  We're alleging that we do need

5   information in our opposition, class certification to make

6   sure that the putative class is free from intraclass

7   conflicts.

8      THE COURT:  And I'm trying to press you on that.

9   You say there is an intraclass conflict.  I'm trying to find

10   out what is the nature of the conflict, what is the legal

11   conflict that would exist even if you got everything you

12   wanted and you got the "aha" documents and were able to say,

13   look, they did this on a cost plus basis.  Point me to the

14   legal conflict that would then exist between the Big Three

15   and the rest of the direct purchasers so that I understand

16   how that would constitute a basis for denying class

17   certification.  That is what I need you to do for me.

18      MR. PETERMAN:  The legal conflict is some

19   members of the class would have obtained a net benefit

20   from the alleged anticompetitive activities by Abbott and

21   Fournier.

22      With the absence of generic products on the

23   market, you know, it is possible that the Big Three and

24   other wholesalers that operate on a specific type of cost

25   plus basis, you know, are better served without generic

1     products on the market.

2         Now, what we're asking for is discovery so we

3     can look into and see if in fact these types of intraclass

4     conflicts exist. The Becton case which was cited in the

5     plaintiffs' letter for the proposition that downstream

6     discovery was not proper, in that case there was actually --

7     prior to that decision, the magistrate judge in that case

8     ordered the production of the customer contracts that the

9     direct purchaser plaintiffs had with their customers. So I

10    think at a minimum, we would be entitled to that in order

11    to ascertain whether there is the potential of conflict.

12        We would also request a 30(b)(6) deposition that

13    we can take on direct purchaser plaintiffs to understand

14    the basis for their setting their prices and we do intend

15    to seek third-party discovery on the Big Three and other

16    wholesalers.

17         THE COURT: And the relevance of the discovery

18    would be to this same point that you got a net benefit and

19    your theory is, because you had a net benefit, you have a

20    different interest than the people who didn't get a net

21    benefit. Have I got you right?

22         MR. PETERMAN: Yes, that is our theory. Of

23    course, with discovery, we might be able to uncover

24    other possible intraclass conflicts between the regional

25    wholesalers and the national wholesalers.

1          THE COURT:  Okay.  Talk to me for a minute

2    about the assertions that are in that letter that you just

3    referred to again.  That's the March 2nd letter that came

4    to me over Ms. Zeldin's signature and it cites a series of

5    cases, In Re:  Vitamins, which they quote as saying no

6    courts ever allowed production of individualized downstream

7    data; the In Re:  Carbon Dioxide case, that it's not

8    relevant to class certification; the two District of New

9    Jersey cases; the Becton case you noted, In Re:  K-Dur;

10   these cases where they say, hey, courts are rejecting this

11   theory.  What is your response to that?

12         MR. PETERMAN:  A number of the cases that

13   plaintiffs have cited are not in the pharmaceutical context.

14   The Becton case as just discussed did include some discovery

15   on the downstream sales based on the customer contracts.

16         THE COURT:  Well, back up just a minute.  Why

17   would it make any difference whether this was in the

18   pharmaceutical or the fast food or the high school vending

19   machine?  I don't know what you would -- name an industry.

20   Why does the character of the industry make a difference on

21   the legal point of whether downstream sales information

22   should be relevant to class certification?

23         MR. PETERMAN:  Well, in the pharmaceutical

24   industry, you do have three national wholesalers who control

25   the bulk of the distribution of drugs.  We believe that they

1    operate on a different basis in terms of setting their

2    prices than the regional wholesalers do.  So I would submit

3    the pharmaceutical industry is different from these other

4    types of industries where there are not, you know, three or

5    just a small group, small group of companies that control

6    the majority of the distribution channels there.

7            THE COURT:  And is the question whether a

8    class should be certified at all or whether a class could

9    be certified that included these Big Three?

10           MR. PETERMAN:  I think the question is both, you

11   know, whether it's proper to certify a class, including the

12   Big Three, or whether there is any subset of classes of

13   direct purchaser plaintiffs that can be certified.

14           THE COURT:  Well, help me out with the issue

15   of whether you get discovery or not as related to this

16   question.  Assume, Mr. Peterman, that there was the problem

17   you have identified and that it was, as a legal matter, a

18   conflict.  Would that mean that there couldn't be a direct

19   purchaser class if these three weren't in it?  I'm just

20   trying to --

21           MR. CAVANAUGH:  Your Honor, this is

22   Mr. Cavanaugh.  If you took out the Big Three, you are

23   probably taking out in excess of 90 percent of the market,

24   if not higher; 95 percent of the market.  We have to see

25   what was left of the directs to see if they had enough to

1   have a class.  And it would certainly, that would have a

2   profound impact on the size of the class.

3           THE COURT:  All right.  Now, Mr. Peterman, let

4   me ask you a question, another question with regard to the

5   burden or the associated cost of the discovery you are

6   seeking.  The assertion is that you're looking to impose an

7   enormous burden on these folks, the Big Three as well as I

8   guess the others that you say you are just the 10 percent of

9   the market, and the purpose for which you are seeking it is

10  sufficiently tenuous that even if it were somehow relevant,

11  is just not worth the candle.  It's so expensive, it doesn't

12  make sense.  What is your response to that specific

13  argument?

14          MR. PETERMAN:  Our response is that the

15  mechanism for Rule 23 requires this detailed analysis on

16  whether a class is properly certified.  The plaintiffs are

17  the ones that have the burden to prove that the class is

18  proper and in our work to oppose the class, we are entitled

19  to serve them discovery with respect to the conflicts.

20          THE COURT:  And you are not really answering my

21  direct question, which is, is cost a factor that the Court

22  ought to have in mind?  Unless the position you are taking;

23  and it's fine if you are, I just need you to take it; that

24  I shouldn't be worried about what the cost is, when I'm

25  looking at the requested discovery, I don't need to weigh

1    the potential relevance against the potential cost?

2            MR. PETERMAN:  No, Your Honor, I'm not arguing

3    that the cost of the discovery is relevant.  And it's

4    possible we can craft a certain subset of documents that

5    would be sufficient to obtain the basis upon which the

6    regional wholesalers set their places and the basis upon

7    the unnamed plaintiffs, including the Big Three, set their

8    prices.

9            THE COURT:  And what is your basis for believing

10   it's cost plus markup?  What do you have for asserting that,

11   that is, your good faith basis for believing this is

12   something that requires further inquiry?

13           MR. PETERMAN:  Your Honor, it's our general

14   knowledge of the industry and also the fact that's none of

15   the plaintiffs or the letters from the Big Three, that

16   basis.

17           THE COURT:  It's a "they didn't say no"

18   argument; right?

19           MR. CAVANAUGH:  Your Honor, I think it's a

20   little more.

21           THE COURT:  Well that's what I'm looking for.  I

22   need something specific.  What have you got?

23           MR. CAVANAUGH:  Your Honor, our client tells us

24   that that is how the Big Three function, that they function

25   on a cost plus basis.  And that is our understanding.  And I

1    believe in the Eleventh Circuit decision, in Hytrin, it was

2    pointed out that the Big Three functioned on a cost plus

3    basis.  I'm not certain of that, Your Honor, but I believe

4    that is true.

5              THE COURT:  All right.  Okay.  Who is speaking

6    to this from the plaintiff's side?

7              MR. CRAMER:  Your Honor, this is Eric Cramer

8    from Berger & Montague.  I'll be speaking for the

9    plaintiffs.

10             THE COURT:  All right.

11             MR. CRAMER:  Let me point out upfront a point

12   that was just made in the question Your Honor made, and I

13   think that is an issue with defendants entire motion here.

14   They have no evidence of anything.  All we have are

15   assertions.  That to the extent they come from anywhere,

16   they come from the Eleventh Circuit decision in Valley Drug,

17   which itself said that all of these things might be true but

18   since there was no record before them about these issues in

19   Valley Drug, they don't know if it's true.  So right up

20   front, we have defendants making a motion that has no

21   backup, no support.

22             Second, let me hit a discussion that was had a

23   moment ago about whether it is appropriate or proper to

24   certify a class in this context in the delayed generic entry

25   drug cases direct purchaser class, including the Big Three.

1    That question has been answered and answered repeatedly in

2    the affirmative.  We have cited to Your Honor in footnote

3    two and throughout this brief, and we'll cite to Your Honor

4    in the class motion, the class decisions in In Re:  Relafen,

5    in the District of Massachusetts; In Re:  Buspirone in the

6    Southern District of New York; In Re:  Cardizem in the

7    Southern District of Michigan; the JBDL case and various

8    others, including Valley Drug itself which was ultimately

9    certified in light of settlement in which classes were

10   certified nearly identical to the class plaintiffs seek to

11   have certified here, including the Big Three, and

12   specifically addressing the issue that Your Honor was

13   probing the defendants about as to the difference between

14   the legal injury and legal claim and the net benefit/net

15   cost analysis the defendants want to do.

16        The Court in the JBDL case which we cited to

17   Your Honor in our footnote two at 225 FRD 216 says as

18   follows:  "Wyeth next argues there is a conflict between the

19   class representatives and some class members because some

20   class members purchased large quantities of premarin and

21   were able to resell it at a greater profit after price

22   increases.  This argument is also without merit.  Antitrust

23   injury is considered complete when the direct purchaser pays

24   an illegal overcharge and whether he was able to pass

25   through the overcharge to indirect purchaser is irrelevant

1    to the inquiry", citing Hanover Shoe, Illinois Brick and

2    other cases.

3    　　　　It goes on to state, "thus, as long as the price

4    paid by the class members for premarin was higher than it

5    would have been absent the alleged anticompetitive conduct.

6    There is no conflict created if indeed some of the direct

7    purchasers were able to recoup the overcharge through price

8    increases passed on to other purchasers."

9    　　　　In other words, the key question here is whether

10   or not there is legal injury.  And as Your Honor correctly

11   probed, the legal injury is complete at the moment the

12   direct purchaser pays the overcharge.  And defendants here

13   are not challenging whether plaintiffs have the right to

14   recover overcharges and don't claim that any of this

15   discovery is relevant at all to the question of legal

16   injury.

17   　　　　And the reasoning behind that comes from the

18   Supreme Court in Hanover Shoe which said that this

19   downstream information and the net benefits/net costs

20   analysis that defendants are seeking to do here is not only

21   irrelevant but it is harmful to deterrence and to the

22   enforcement of the antitrust laws because of the highly

23   burdensome nature and the endlessly complicated nature of

24   the endeavor and that is endlessly complicated, are the

25   words from the Third Circuit decision in Bogosian which

1    certified a class dismissing a lot of the arguments that

2    defendants are making here.

3            Second, and this, that is the reason, that is

4    the reason why you have a near universal bar and ban on

5    downstream discovery, from Vitamins to the Schering case to

6    the Becton case and on and on.  Those cases say that the

7    end runaround Hanover Shoe that the defendants seek to

8    have, seek to employ here is improper and would harm the

9    enforcement of the antitrust laws and has no bearing on

10   class certification or the adequacy issues.

11           We agree with the defendants.  And this is a

12   key point.  In their letter, citing Labelstock at page

13   two, note six, they say the question here is whether the

14   defendants have made an initial showing of conditions

15   making it probable that some large subset of the class had

16   interests antagonistic to other class members.  That's the

17   defendants' statement of their burden here.

18           The issue here is then would plaintiffs pursuit

19   of overcharges in this case be contrary to the interest of

20   significant subset of class?  Plaintiffs have made a

21   definitive showing with definitive evidence that there is

22   no likelihood or possibility of any conflict.  The national

23   wholesalers have each written to this court and said there

24   is no conflict, their interests are aligned.  And as Tom

25   Long, counsel for Cardinal Health, wrote to this court and

1    Your Honor, he said, on page two of his letter which is

2    attached as Exhibit A to our papers:  "First, if the point

3    of the discovery request is for defendants to determine

4    indirectly whether it is in Cardinal Health's best interest

5    to become an absent member of any certified class in this

6    case, it is not for defendants to make any such decision.

7    Defendant does not operate Cardinal Health."

8              THE COURT:  Okay.  Mr. Cramer, I read the letter

9    so I got that firmly in mind.

10             MR. CRAMER:  Okay.  And it's not only these

11   letters, it's also the fact that these national wholesalers,

12   the three of them plus every other direct purchaser has

13   participated in, by not opting out and not objecting to at

14   least six and actually several other settlements of directly

15   analogous cases in which these direct purchasers, including

16   the national wholesalers, have recovered over $700 million

17   in overcharges.

18             Now, what could the downstream discovery and the

19   net effects analysis the defendants seek to do here possibly

20   tell us about whether it is in the national wholesalers

21   interest to be in this suit?  Are defendants saying that

22   if they do some kind of mathematical computation that

23   ultimately determines that there is some benefit to the

24   defendants from delaying generic entry, are they saying

25   that that is going to trump the national wholesalers own

1   opinion as to what is in their own best interest?

2           THE COURT:  Okay.  Well, we'll go ahead and ask

3   them.

4           Mr. Peterman, I believe I have the plaintiffs'

5   position here.  It's your motion so I'm giving you the last

6   word.  What is your take on that last question and anything

7   else you want to respond to in Mr. Cramer's remarks?

8           MR. PETERMAN:  Thank you, Your Honor.  Our

9   basic position is this.  Rule 23 requires a mechanism for

10  determining whether class certification is proper.  It not

11  only protects the interest of the putative class, it

12  protects the interest of the defendants.

13          Plaintiffs are in possession of information

14  whether or not intraclass conflicts exist.  We have made an

15  assertion, based on our understanding of the pharmaceutical

16  industry, of a possible conflict.  And they have refused to

17  give us any discovery whatsoever where we can make a more

18  informed decision on whether there is a possible conflict

19  and bring it to the Court's attention in opposition to their

20  class certification motion.

21          MR. CRAMER:  Your Honor, could I just answer

22  that last point for two seconds?

23          THE COURT:  No.  I think I've got everybody's

24  positions very clearly in mind.  All right.  And besides,

25  Mr. Cramer, you're about to win so you can relax.

1      MR. CRAMER:  Thank you.

2      THE COURT:  I'm not giving this discovery.  I

3  appreciate the argument that has been made.  I think I

4  understand the arguments that have been made by the

5  defendants here but I don't think Rule 23 requires or

6  encourages in any fashion that I permit discovery that I

7  can't figure out legal relevance for.  And I don't see it.

8  If you overcharge these -- I guess the bottom line is I'm

9  accepting the primary argument the plaintiffs are making

10  here, and that is the antitrust injury occurs when you

11  overcharge, if you did.  And it doesn't make a whit of

12  difference what they do with that product they get from

13  you afterwards.

14      If they can find people that they can sell it to

15  for 10 times the amount that folks ought to pay, well, then

16  maybe there is some cause of action against them by some

17  other people, but that doesn't excuse the antitrust injury

18  that is being alleged here.  So the legal relevance is

19  beyond me, even as to class certification.  I don't see how

20  that creates a conflict.  And so I'm not going to kick the

21  door open to this kind of discovery, particularly when all

22  three of the folks who would be subject to a good deal of

23  this, and I'm talking about Big Three although I know you

24  were seeking this from all the direct purchaser plaintiffs,

25  have indicated in a way that I think is persuasive that this

1  is a fishing expedition that would be enormously expensive

2  and I believe the federal rules do require me to look at

3  what the cost of a demand is associated with its potential

4  relevance.

5         I see no relevance.  If I was able to discern

6  some, I'd have to say it would be pretty small and certainly

7  not worth the candle that is being presented to me here.  So

8  I'm denying the effort to get at this downstream data

9  discovery.  It's not happening.

10        All right.  That handles the issues that we had

11  on the table today.  And I'm reluctant to do it since we

12  got so many people on the call but before I let you off,

13  traditionally, as long as we spent the money and time and

14  effort to get here, is there anything else that ought to be

15  addressed while we are all on the phone together?  Is there

16  anything from the direct purchasers?

17        MR. TAUS:  Your Honor, this is Barry Taus for

18  the direct purchaser class plaintiffs.  We just wondering

19  with the upcoming motion to dismiss argument coming up on

20  March 15th, we were wondering whether the Court wanted to

21  direct us to any particular issues that the Court may have

22  in mind that you want us to focus on or if there is any

23  particular agenda the Court has in mind for that particular

24  argument.

25        THE COURT:  No, I'll just see you in court on

1    that day.

2              MR. CRAMER:  Okay.  Thank you.

3              THE COURT:  All right.  Is there anything from

4    your clients, Ms. McGeever?  Or co-counsel?

5              MR. CRAMER:  No, Your Honor.  Thank you.

6              THE COURT:  All right.  For Teva?

7              MR. GAGALA:  No, Your Honor.

8              THE COURT:  Impax?

9              (MS. BLIZZARD:  No, Your Honor.

10             THE COURT:  All right.  How about from Abbott or

11   Fournier?

12             MR. CAVANAUGH:  No, judge.

13             THE COURT:  Okay.  I think I had Pacificare on

14   here as well.  Is there anything from you folks?

15             MR. TURNER:  Nothing from us, Your Honor.

16             THE COURT:  I probably left somebody off.  If I

17   have, I'm sorry.

18             MR. NALVEN:  Your Honor, David Nalven for the

19   indirect class.  We also have nothing at this time.

20             THE COURT:  All right.  Well, thanks for your

21   time today.  I'll get a short order out that just references

22   this call as the basis for my rulings, and you folks go

23   ahead and move forward, if you would, on the guidance given

24   here.  We'll talk to you all later.  Good-bye.

25             (Telephone conference ends at 12:20 p.m.)