IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEIJER, INC., *et al.*,<br><br>    Plaintiffs,<br><br> v.<br><br>WARNER CHILCOTT HOLDINGS CO.<br>III, LTD., *et al.*,<br><br>    Defendants. | Civil Action No.: 1:05-CV-02195-CKK |
| WALGREEN CO., *et al.*,<br><br>    Plaintiffs,<br><br> v.<br><br>WARNER CHILCOTT HOLDINGS CO.<br>III, LTD., *et al.*,<br><br>    Defendants. | Civil Action No.: 1:06-CV-00494-CKK |

**BARR PHARMACEUTICALS, INC.'S MOTION TO COMPEL ANSWERS
TO INTERROGATORIES AND THE PRODUCTION OF DOCUMENTS
FROM DIRECT PURCHASER PLAINTIFFS**

Defendant Barr Pharmaceuticals, Inc. ("Barr") brings this motion to compel Plaintiffs in *Meijer, Inc., et al., v. Warner Chilcott Holdings Co. III, Ltd., et al.* ("*Meijer*") and *Walgreen Co., et al., v. Warner Chilcott Holdings Co. III, Ltd., et al.* ("*Walgreen*") to produce documents and information responsive to its discovery requests, including: (1) documents and information regarding Combined Hormonal Contraceptives (CHCs) other than Ovcon 35 and its generic equivalents, and (2) documents and data regarding Ovcon 35 and its generic equivalents.

## INTRODUCTION

Plaintiffs refuse to produce documents that are directly relevant to the claims and defenses in this litigation. During the course of discovery and at Plaintiffs' request, Barr has produced to Plaintiffs *more than 895,000 pages* of material including information regarding Defendants' manufacture and sale of Ovcon 35 and *dozens of other CHCs*. By comparison, the twelve Plaintiffs against whom Barr now moves have collectively produced to Barr a paltry 1,052 pages. They now refuse to produce documents—admittedly in their possession—that are directly relevant to the claims and defenses asserted in this case.

*First*, Plaintiffs refuse to produce any documents regarding CHCs other than Ovcon 35 and its generic equivalents. But data regarding CHCs other than Ovcon 35 are directly relevant to this case. Plaintiffs claim that Defendants' License and Supply Agreements ("Agreements") unreasonably restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Accordingly, Barr is entitled to present evidence that Defendants had no market power within a properly defined product market (here, the market for CHCs) and thus could have not have "unreasonably restrained trade" as Plaintiffs allege. In other words, information regarding CHCs other than Ovcon 35 is directly relevant to Barr's affirmative defenses. (*See, e.g.*, Barr's Answer to *Meijer* Complaint, Affirmative Defense No. 19.) Additionally, Plaintiffs' claims are founded on a "but-for" world in which a generic version of Ovcon 35 would have been available for purchase in 2004. Information about other CHCs from this period is relevant to Plaintiffs' damages claims, insofar as it will permit Barr to assess the impact of Plaintiffs' hypothetical generic version of Ovcon 35.

*Second*, several individual Plaintiffs (including American Sales Company, Albertson's, Inc., Eckerd Corporation, Hy-vee, Inc., The Kroger Company, Maxi Drug, Inc., d/b/a/ Brooks

Pharmacy, Safeway, Inc., and Walgreen Company) refuse to produce documents and data regarding Ovcon 35 and its generic equivalents, including: (1) data regarding Plaintiffs' purchases of Ovcon 35 and its generic equivalents, (2) contracts and agreements under which Plaintiffs purchased Ovcon 35 and its generic equivalents, and (3) forecasts and analyses regarding Ovcon 35 and its generic equivalents. These documents and data are clearly relevant to the subject-matter of this litigation and Plaintiffs cannot plausibly argue otherwise.

In short, Plaintiffs have refused discovery into matters directly relevant to the claims and defenses asserted in these coordinated cases. Accordingly, Barr respectfully moves the Court to compel production of documents responsive to Barr's First Request for Production of Documents Numbers 1, 5, 6, 7, 8, 9, 16, and 22, and Barr's First Set of Interrogatories Numbers 3, 5, and 7.

## BACKGROUND

*Meijer, Inc., et al., v. Warner Chilcott Holdings Co. III, Ltd., et al.*

On May 23, 2006, Barr served Meijer, Inc., Meijer Distribution, Inc., American Sales Company, Inc., Rochester Drug Co-operative, Inc., Louisiana Wholesale Drug Company, Inc., SAJ Distributors, Inc., and Steven L. LaFrance Holdings, Inc. (collectively, the "*Meijer* Plaintiffs") with its First Request for Production of Documents and First Set of Interrogatories. Barr's discovery requests seek documents and information relating to:

- the prices Plaintiffs pay for the CHCs they sell (Request No. 5);

- how Plaintiffs decide which CHCs to sell and how to price those CHCs (Request No. 6 and Interrogatory No. 5);

- competition among CHCs (Request No. 7);

- the impact of CHC detailing and sampling on Plaintiffs' businesses (Request No. 9); and

- contracts between Plaintiffs and third parties for the purchase, sale, manufacture, supply, or distribution of any pharmaceutical product on an exclusive basis (Request No. 16 and Interrogatory No. 7).

3

The *Meijer* Plaintiffs served their responses on June 26, 2006. In their responses, Plaintiffs asserted blanket objections to the above requests on grounds of relevance and burden, and refused to produce documents and information regarding CHCs other than Ovcon 35 and its generic equivalents. (*See, e.g.*, American Sales Company's Responses to Barr's First Request for Production of Documents, attached as Exhibit A; American Sales Company's Answers and Objections to Barr's First Set of Interrogatories, attached as Exhibit B.)

Following the depositions of several of the *Meijer* Plaintiffs' employees, Barr contacted counsel for individual Plaintiffs to request production of additional documents—identified during those depositions—that, although within the scope of Barr's original discovery requests, had not been produced. These documents include contracts and agreements under which American Sales Company purchased Ovcon 35 and its generic equivalents. These documents are responsive to Barr's Request for Production Numbers 1, 5, 8, and 16, and Interrogatory Number 7.

Barr met and conferred with counsel for each individual Plaintiff regarding Plaintiffs' discovery responses and objections. However, each Plaintiff has refused to produce the requested information.

**Walgreen Co., et al., v. Warner Chilcott Holdings Co. III, Ltd., et al.**

On May 23, 2006, Barr served Walgreen Company, Eckerd Corporation, Maxi Drug, Inc., d/b/a Brooks Pharmacy, The Kroger Company, Albertson's, Inc., Safeway, Inc., and Hy-vee, Inc. (collectively, the "*Walgreen* Plaintiffs") with its First Request for Production of Documents and First Set of Interrogatories. Barr's discovery requests seek documents and information relating to:

- the prices Plaintiffs pay for the CHCs they sell (Request No. 5);

- how Plaintiffs decide which CHCs to sell and how to price those CHCs (Request No. 6 and Interrogatory No. 5);

- competition among CHCs (Request No. 7);

- the impact of CHC detailing and sampling on Plaintiffs' businesses (Request No. 9); and

- contracts between Plaintiffs and third parties for the purchase, sale, manufacture, supply, or distribution of any pharmaceutical product on an exclusive basis (Request No. 16 and Interrogatory No. 7).

The *Walgreen* Plaintiffs served their responses on June 23, 2006. In their responses, Plaintiffs asserted blanket objections to the above requests on grounds of relevance and burden, and refused to produce documents and information regarding CHCs other than Ovcon 35 and its generic equivalents. (*See, e.g.*, Plaintiffs' Response to Barr's First Request for Production of Documents, attached as Exhibit C; Walgreen's Response to Barr's First Set of Interrogatories, attached as Exhibit D.)

Following the depositions of several of the *Walgreen* Plaintiffs' employees, Barr contacted counsel for individual Plaintiffs to request production of additional documents—identified during those depositions—that, although within the scope of Barr's original discovery requests, had not been produced. These documents include: (1) data regarding Plaintiffs' purchases of Ovcon 35 and its generic equivalents, (2) contracts and agreements under which Plaintiffs purchased Ovcon 35 and its generic equivalents; and (3) forecasts and analyses regarding Ovcon 35 and its generic equivalents. These documents are responsive to Barr's Request for Production Numbers 1, 5, 6, 7, 8, 16, and 22 and Interrogatory Numbers 3, 5, and 7.

Barr met and conferred with Plaintiffs' counsel regarding Plaintiffs' discovery responses and objections. However, Plaintiffs have not produced the requested information.

## ARGUMENT

Under the Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. . . ." Fed. R. Civ. P. 26(b)(1). The definition of relevant information in Rule 26(b)(1) is extremely broad. "Relevant information need not be admissible at the trial if the discovery appears *reasonably calculated* to lead to the discovery of admissible evidence." *Id.* (emphasis added). It is well-established that information is discoverable if there is *any possibility* that it is relevant to some claim or defense present in the litigation. *See, e.g., Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (relevance under Rule 26(b)(1) is broadly construed "to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."); *Avianca, Inc. v. Corriea*, 705 F. Supp. 666, 676 (D.D.C. 1989) ("Relevancy under [ ] Rule 26 . . . is very broadly defined, including both directly relevant material and material likely to lead to the discovery of admissible evidence."); *United States v. Am. Telephone & Telegraph*, 461 F. Supp. 1314, 1341 n.81 (D.D.C. 1978) ("The clear policy of the rules is toward full disclosure. . . . [I]t is rare that a showing can be made that a particular item of requested information is not 'relevant' under the broad definition given that word in Rule 26."). Here, each Plaintiff has—without basis—refused to produce documents that are directly relevant to the claims and defenses at issue in this litigation and, indeed, have refused production of certain documents regarding Ovcon 35.

I. **DOCUMENTS AND INFORMATION REGARDING OTHER COMBINED HORMONAL CONTRACEPTIVES ARE DIRECTLY RELEVANT TO MATTERS AT ISSUE IN THIS CASE AND SHOULD BE PRODUCED.**

At its core, this is a case about competition in the market for CHCs. The applicable "rule of reason" analysis focuses on the impact of a challenged practice on competition within a particular product market. *GTE New Media Servs., Inc v. Ameritech Corp.*, 21 F. Supp. 2d 27,

43 (D.D.C. 1998) (*citing Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977)) ("courts focus on the challenged restraint[']s (1) market power and (2) the effect it will have on the competition in that market."). Plaintiffs contend that the relevant market here consisted of only Ovcon 35 and its generic equivalents. Information regarding other CHCs is therefore directly relevant to Barr's affirmative defenses, insofar as it will permit Barr to rebut this erroneous assertion. Additionally, this information is relevant to Plaintiffs' damages claims.

  A.  **Documents And Information Regarding CHCs Other Than Ovcon 35 And Its Generic Equivalents Are Relevant to Market Definition.**

Plaintiffs erroneously claim that the market for Ovcon 35 consists only of Ovcon 35 and its generic equivalents. *Meijer* Compl. at ¶ 78 ("the relevant product market is Ovcon and its AB-rated generic equivalents"); *Walgreen* Compl. at ¶¶ 50, 52 (defining the relevant market as "Ovcon and its generic equivalents"); *see also* Expert Report of Richard J. Derman, M.D., M.P.H., at ¶ 8.A. (concluding that oral contraceptives had "significant clinical and pharmacological differences" and that as a result of these differences "oral contraceptives are not reasonably interchangeable with one another"). It is well-settled that the scope of a product market is defined by "the reasonable interchangeability of use [by consumers] [or] the cross-elasticity of demand between the product itself and substitutes for it." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 119 (D.D.C. 2004) (*quoting Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). The key question in this regard is "whether and to what extent purchasers are willing to substitute one [product] for the other." *Id.*; *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1074 (D.D.C. 1997).

Information regarding CHCs other than Ovcon 35 and its generic equivalents—including information on how Plaintiffs select which CHCs to stock and which CHCs Plaintiffs have purchased—will show whether and to what extent Plaintiffs, as purchasers, regard CHCs as

substitutable for one another. Plaintiffs have defined an exceptionally narrow product market. They should not be permitted to refuse discovery of information relevant to Barr's effort to rebut these claims.[1]

### B. Documents And Information Regarding Other CHCs Are Relevant to Plaintiffs' Damages Claims.

Plaintiffs' entire case is founded on a "but-for" world in which a generic version of Ovcon 35 would have been available for their purchase and resale beginning in 2004. Plaintiffs' damages will therefore depend on three facts: (1) the price of a hypothetical generic version of Ovcon 35, (2) the percentage of Ovcon 35 purchases that would have been replaced with generic Ovcon 35 purchases, and (3) the percentage of Ovcon 35 purchases that would have been replaced with purchases of other branded and generic CHCs.[2] Other courts have concluded that is appropriate to look to data for other CHCs to fill-in these blanks. *See, e.g., In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 323 (E.D. Mich. 2001) (noting that one method of evaluating the impact of generic entry is to "select an appropriate set of drug products that have gone off patent

---

[1]  Plaintiffs have themselves requested from Barr production of documents and information regarding CHCs other than Ovcon 35 and its generic equivalents. *See, e.g.*, Government Plaintiffs' Joint First Request for the Production of Documents from Defendant Barr Pharmaceuticals, Inc., attached as Exhibit E (incorporated in *Meijer* Plaintiffs' First Set of Requests for Production of Documents from Barr and seeking production of documents and information regarding other CHCs, including IMS and ImpactRX data, and Barr's sales and pricing data); *see also* Plaintiffs' First Set of Requests for Admissions to Defendant Barr Pharmaceuticals, Inc., attached as Exhibit F (including 73 requests for admissions regarding CHCs other that Ovcon 35 and its generic equivalents).

[2]  Plaintiffs will almost certainly argue that to evaluate their damages, we need look no further than the real-world impact of Balziva, introduced by Barr in October 2006. But given the volatile and ever-changing nature of the CHC market, this would sacrifice accuracy for convenience. *See* Expert Report of Richard P. Dickey, M.D., Ph.D. at ¶ 14 (stating that as of September 2006, "there were 83 oral contraceptive products available for physicians to prescribe"); Dickey Dep. at 58 (stating that, seven months later, "the count is 87"). Plaintiffs' own expert witness appears to agree, stating that we should consider CHC data from 2004, when Plaintiffs allege that their hypothetical generic version of Ovcon 35 would have entered the market. *See* May 18, 2007 Expert Report of Jeffrey J. Leitzinger, Ph.D. at 29 (noting that "[w]hile data reflecting actual prices, market shares, and purchase volumes [following Balziva's October 2006 entry] are available, *these same quantities have to be estimated in the but-for world involving earlier generic entry dates.*" (emphasis added)).

and enter the price and generic penetration data into a regression equation. The use of statistical regression would allow one to learn from the experience of a number of other drugs and to model the empirical findings from those drugs in a manner that matches the characteristics of the drug being evaluated. . . ."). Thus, information regarding other CHCs—including information on the prices Plaintiffs have paid for other generic CHCs and information about Plaintiffs' purchasing patterns for other CHCs—is relevant to Plaintiffs' "but-for" world, including the impact of Plaintiffs' hypothetical generic version of Ovcon 35.[3]

## II. DOCUMENTS AND DATA REGARDING OVCON 35 AND ITS GENERIC EQUIVALENTS ARE DIRECTLY RELEVANT TO MATTERS AT ISSUE IN THIS CASE AND SHOULD BE PRODUCED.

Several individual Plaintiffs additionally refuse to produce documents and data regarding Ovcon 35 and its generic equivalents, including (1) data regarding Plaintiffs' purchases of Ovcon 35 and its generic equivalents, (2) contracts and agreements under which Plaintiffs purchased Ovcon 35 and its generic equivalents, and (3) forecasts and analyses regarding Ovcon 35 and its generic equivalents.[4] All of these documents and data were specifically requested by Barr. (*See* Exs. A and C, at Req. Nos. 1, 5, 8, 16, and 22; Exs. B and D, at Interrogatory Nos. 3 and 7.) Yet, Plaintiffs have—without any reasonable basis—simply refused to produce them. These documents and data are clearly relevant to the subject-matter of this litigation and Plaintiffs

---

[3] Plaintiffs' expert witness cited three sources for data regarding this hypothetical "but-for" world: (1) economic literature and empirical data regarding the effect of generic entry on *other brand name drugs*, (2) Defendants' generic penetration models and forecasts (which are based on data regarding *other CHCs*), and (3) data for *other branded products* that have experienced generic competition. March 12, 2007 Expert Report of Jeffrey J. Leitzinger, Ph.D. at 17-28. According to Leitzinger, the third category of data in particular "provide a rich laboratory in which the effects of generic entry can be tracked first-hand. . . . Indeed, one could look to the very same brands that Warner Chilcott used in its own effort to project the likely consequences of unimpeded generic competition on Ovcon 35." *Id.* at 27-28.

[4] A list of the documents and data regarding Ovcon 35 and its generic equivalents that Plaintiffs have not produced is included at Appendix A.

cannot plausibly argue otherwise. The requested documents and data will show, among other things, the amount of Ovcon 35 purchased by Plaintiffs, the terms on which these purchases occurred (including the net price paid by Plaintiffs), and how the October 2006 entry of Balziva impacted these purchases. All of this is relevant to Plaintiffs' damages claims.

## CONCLUSION

For all of the foregoing reasons, Barr respectfully requests that the Court order Plaintiffs to produce documents and information responsive to its discovery requests, including: (1) documents and information regarding CHCs other than Ovcon 35 and its generic equivalents, and (2) documents and data, identified in Appendix A, regarding Ovcon 35 and its generic equivalents.

Date:  June 28, 2007

Respectfully submitted,

/s/ Karen N. Walker
Karen N. Walker (D.C. Bar # 412137)
Mark L. Kovner (D.C. Bar # 430431)
Chong S. Park (D.C. Bar # 463050)
Patrick M. Bryan (D.C. Bar # 490177)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, District of Columbia  20005
Telephone: (202) 879-5000
Facsimile: (202) 979-5200

# APPENDIX A

**PLAINTIFFS HAVE REFUSED TO PRODUCE THE FOLLOWING DOCUMENTS AND DATA REGARDING OVCON 35 AND ITS GENERIC EQUIVALENTS:**

*Meijer, Inc., et al., v. Warner Chilcott Holdings Co. III, Ltd., et al.*

American Sales Company, Inc.

- American Sales Company's contract with Cardinal Health (under which it purchased Ovcon 35) (*See* Barr's First Request for Production of Documents to Direct Purchaser Plaintiffs, attached as Ex. G, at Req. Nos. 1, 5, and 16; Barr's First Set of Interrogatories to Direct Purchaser Plaintiffs, attached as Ex. H, at Interrogatory No. 7); and

- American Sales Company's market share agreement with Watson Pharmaceuticals (under which it purchased Zenchent) (*See* Ex. G, at Req. Nos. 1, 5, 8, and 16; Ex. H, at Interrogatory No. 7).

*Walgreen Co., et al., v. Warner Chilcott Holdings Co. III, Ltd., et al.*

Albertson's, Inc.

- Contracts and agreements under which Albertson's purchased Ovcon 35 from McKesson Corporation ("McKesson") (*See* Ex. G, at Req. Nos. 1, 5, and 16; Ex. H, at Interrogatory No. 7);

- Contracts and agreements under which McKesson purchased Ovcon 35 from Warner Chilcott for resale to Albertson's (*See* Ex. G, at Req. Nos. 1, 5, and 16; Ex. H, at Interrogatory No. 7);[5]

- Contracts and agreements under which Albertson's purchased Balziva and Zenchent (*See* Ex. G, at Req. Nos. 1, 5, 8, and 16; Ex. H, at Interrogatory No. 7);

- Records of Albertson's purchases of Ovcon 35 for the period from April 2006 to the present (*See* Ex. G, at Req. Nos. 1 and 5; Ex. H, at Interrogatory No. 3);

- Records of McKesson's purchases of Ovcon 35 for resale to Albertson's for the period from January 1, 2000 to the present (*See* Ex. G, at Req. Nos. 1 and 5; Ex. H, at Interrogatory No. 3);

---

[5]   McKesson has assigned antitrust claims arising from these purchases to Albertson's. *Walgreen* Compl. at ¶ 6.

- Records of Albertson's purchases of Balziva, Zenchent, Ovcon Chewable, and Femcon for the period from January 1, 2000 to the present (*See* Ex. G, at Req. Nos. 1, 5, and 8; Ex. H, at Interrogatory No. 3);

- Supply forecasts for Ovcon 35, Balziva, and Zenchent (*See* Ex. G, at Req. Nos. 1, 6, 8, and 22; and Ex. H, at Interrogatory No. 5); and

- Analyses and other documents regarding the following subjects: (1) the increase in generic prescriptions over the 2002-2006 period; (2) the impact of Balziva on the total combined purchases of branded and generic Ovcon 35; (3) generic substitution rates; and (4) rebates received by Albertson's on its purchases of Ovcon 35 (*See* Ex. G, at Req. Nos. 1, 5, 6, 7, 8, and 22; Ex. H, at Interrogatory No. 5).

Hy-vee, Inc.

- Contracts and agreements under which McKesson purchased Ovcon 35 from Warner Chilcott for resale to Hy-vee (*See* Ex. G, at Req. Nos. 1, 5, and 16; Ex. H, at Interrogatory No. 7);[6]

- Contracts and agreements under which Hy-vee purchased Balziva and Zenchent (*See* Ex. G, at Req. Nos. 1, 5, 8, and 16; Ex. H, at Interrogatory No. 7);

- Records of Hy-vee's purchases of Ovcon 35 for the period from January 1, 2000 to the present (*See* Ex. G, at Req. Nos. 1 and 5; Ex. H, at Interrogatory No. 3);

- Records of McKesson's purchases of Ovcon 35 for resale to Hy-vee for the period from January 1, 2000 to the present (*See* Ex. G, at Req. Nos. 1 and 5; Ex. H, at Interrogatory No. 3);

- Records of Hy-vee's purchases of Balziva, Zenchent, Ovcon Chewable, and Femcon for the period from January 1, 2000 to the present (*See* Ex. G, at Req. Nos. 1, 5, and 8; Ex. H, at Interrogatory No. 3); and

- Supply forecasts for Ovcon 35, Balziva, or Zenchent (*See* Ex. G, at Req. Nos. 1, 6, 8, and 22; Ex. H, at Interrogatory No. 5).

The Kroger Company

- Contracts and agreements under which Kroger purchased Ovcon 35 from Warner Chilcott (*See* Ex. G, at Req. Nos. 1, 5, and 16; Ex. H, at Interrogatory No. 7);

- Contracts and agreements under which Kroger purchased Balziva (*See* Ex. G, at Req. Nos. 1, 5, 8, and 16; Ex. H, at Interrogatory No. 7);

---

[6] McKesson has assigned antitrust claims arising from these purchases to Hy-vee. *Walgreen* Compl. at ¶ 8.

- Records of Kroger's purchases of Ovcon 35 for the period from April 2006 to the present (*See* Ex. G, at Req. Nos. 1 and 5; Ex. H, at Interrogatory No. 3); and

- Records of Kroger's purchases of Balziva, Zenchent, Ovcon Chewable, and Femcon for the period from January 1, 2000 to the present (*See* Ex. G, at Req. Nos. 1, 5, and 8; Ex. H, at Interrogatory No. 3).

Maxi Drug, Inc., d/b/a/ Brooks Pharmacy and Eckerd Corporation ("Brooks/Eckerd")

- Contracts and agreements under which Brooks/Eckerd purchased Ovcon 35 from McKesson (*See* Ex. G, at Req. Nos. 1, 5, and 16; Ex. H, at Interrogatory No. 7);

- Contracts and agreements under which McKesson purchased Ovcon 35 from Warner Chilcott for resale to Brooks/Eckerd (*See* Ex. G, at Req. Nos. 1, 5, and 16; Ex. H, at Interrogatory No. 7);[7]

- Contracts and agreements under which Brooks/Eckerd purchased Zenchent (*See* Ex. G, at Req. Nos. 1, 5, 8, and 16; Ex. H, at Interrogatory No. 7);

- Records of Brooks/Eckerd's purchases of Ovcon 35 for the period from August 2006 to the present (*See* Ex. G, at Req. Nos. 1 and 5; Ex. H, at Interrogatory No. 3);

- Records of McKesson's purchases of Ovcon 35 for resale to Brooks/Eckerd for the period from January 1, 2000 to the present (*See* Ex. G, at Req. Nos. 1 and 5; Ex. H, at Interrogatory No. 3); and

- Records of Brooks/Eckerd's purchases of Balziva, Zenchent, Ovcon Chewable, and Femcon for the period from January 1, 2000 to the present (*See* Ex. G, at Req. Nos. 1, 5, and 8; Ex. H, at Interrogatory No. 3).

Safeway, Inc.

- Contracts and agreements under which Safeway purchased Ovcon 35 from McKesson (*See* Ex. G, at Req. Nos. 1, 5, and 16; Ex. H, at Interrogatory No. 7);

- Contracts and agreements under which McKesson purchased Ovcon 35 from Warner Chilcott for resale to Safeway (*See* Ex. G, at Req. Nos. 1, 5, and 16; Ex. H, at Interrogatory No. 7);[8]

---

[7] McKesson has assigned antitrust claims arising from these purchases to Brooks/Eckerd. *Walgreen* Compl. at ¶¶ 3-4.

[8] McKesson has assigned antitrust claims arising from these purchases to Safeway. *Walgreen* Compl. at ¶ 7.

- Contracts and agreements under which Safeway purchased Zenchent, including Safeway's market share agreement with Watson Pharmaceuticals (*See* Ex. G, at Req. Nos. 1, 5, 8, and 16; Ex. H, at Interrogatory No. 7);

- Records of Safeway's purchases of Ovcon 35 for the period from January 1, 2000 to the present (*See* Ex. G, at Req. Nos. 1 and 5; Ex. H, at Interrogatory No. 3);

- Records of McKesson's purchases of Ovcon 35 for resale to Safeway for the period from January 1, 2000 to the present (*See* Ex. G, at Req. Nos. 1 and 5; Ex. H, at Interrogatory No. 3); and

- Records of Safeway's purchases of Balziva, Zenchent, Ovcon Chewable, and Femcon for the period from January 1, 2000 to the present (*See* Ex. G, at Req. Nos. 1, 5, and 8; Ex. H, at Interrogatory No. 3).

Walgreen Company

- Contracts and agreements under which Walgreen has purchased Ovcon 35 from Amerisource Bergen (*See* Ex. G, at Req. Nos. 1, 5, and 16; Ex. H, at Interrogatory No. 7);

- Contracts and agreements under which Amerisource Bergen has purchased Ovcon 35 from Warner Chilcott for resale to Walgreen (*See* Ex. G, at Req. Nos. 1, 5, and 16; Ex. H, at Interrogatory No. 7);[9]

- Contracts and agreements under which Walgreen purchased Balziva and Zenchent, including Walgreen's market share agreement with Watson Pharmaceuticals (*See* Ex. G, at Req. Nos. 1, 5, 8, and 16; Ex. H, at Interrogatory No. 7);

- Records of Walgreen's purchases of Ovcon 35 for the period from April 2006 to the present (*See* Ex. G, at Req. Nos. 1 and 5; Ex. H, at Interrogatory No. 3);

- Records of Amerisource Bergen's purchases of Ovcon 35 for resale to Walgreen for the period from January 1, 2000 to the present (*See* Ex. G, at Req. Nos. 1 and 5; Ex. H, at Interrogatory No. 3);

- Records of Walgreen's purchases of Balziva, Zenchent, Ovcon Chewable, and Femcon for the period from January 1, 2000 to the present (*See* Ex. G, at Req. Nos. 1, 5, and 8; Ex. H, at Interrogatory No. 3);

---

[9] Amerisource Bergen has assigned antitrust claims arising from these purchases to Walgreen. *Walgreen* Compl. at ¶ 2.

- Documents prepared in anticipation of a generic version of Ovcon 35, including product analysis forms and pricing models (*See* Ex. G, at Req. Nos. 1, 5, 6, 7, 8, and 22; Ex. H, at Interrogatory No. 5); and

- A legible copy of the document Bates stamped WAL_000022 and marked as Walgreen Exhibit 4 (*See* Ex. G, at Req. Nos. 1, 5, and 22).