# EXHIBIT D

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
 2
                      - - -
 3
   Meijer, Inc., and Meijer  :
 4 Distribution, Inc., on     :
   behalf of themselves and   :
 5 all others similarly       :
   situated,                  :
 6                            :
        Plaintiffs,           :
 7                            :
        vs.                   :  Case No.
 8                            :  1:05-CV-02195-CKK
   Warner Chilcott Holdings   :
 9 Company, III, Ltd.;        :
   Warner Chilcott            :
10 Corporation; Warner        :
   Chilcott (US) Inc.;        :
11 Galen (Chemicals), Ltd.;   :
   and Barr Pharmaceuticals,  :
12 Inc.,                      :
                              :
13      Defendants.           :
14                    - - -
15      DEPOSITION OF JOHN JAY FLINN
16                    - - -
17          Friday, June 8, 2007
            12:45 o'clock p.m.
18          Baker Hostetler
            Capitol Square, Suite 2100
19          65 East State Street
            Columbus, Ohio  43215
20
21                    - - -
22      ERIN D. GILKISON, RPR, CRR,
        REGISTERED PROFESSIONAL REPORTER
23
24                    - - -
25
```

**Page 2**

```
 1 APPEARANCES:
 2      ERIC L. CRAMER, Attorney at Law
        Berger & Montague, P.C.
 3      1622 Locust Street
        Philadelphia, Pennsylvania  19103
 4
            On behalf of the Direct Purchaser Class
 5      of Plaintiffs.
 6      SCOTT E. PERWIN, Attorney at Law
        Kenny Nachwalter
 7      1100 Miami Center
        201 South Biscayne Boulevard
 8      Miami, Florida  33131
 9          On behalf of the Plaintiff, Walgreen.
10      THOMAS L. LONG, Attorney at Law
        Baker Hostetler
11      Capitol Square, Suite 2100
        65 East State Street
12      Columbus, Ohio  43215
13          On behalf of the Witness.
14
        PATRICK M. BRYAN, Attorney at Law
15      EUNNICE H. EUN, Attorney at Law
        Kirkland & Ellis, LLP
16      655 Fifteenth Street, N.W.
        Washington, D.C.  20005
17
            On behalf of the Defendant, Barr
18      Pharmaceuticals, Inc.
19
        FRANCISCO J. NAVARRO
20      Simpson, Thacher & Bartlett, LLP
        425 Lexington Avenue
21      New York, New York  10017
22          On behalf of the Defendant, Warner
        Chilcott
23
                      - - -
24
25
```

**Page 3**

```
 1                  I N D E X
 2                    - - -
   WITNESS                        PAGE
 3
   JOHN JAY FLINN
 4
        Cross-Examination          04
 5      (By Mr. Bryan)
 6      Direct Examination         84
        (By Mr. Long)
 7
        Recross Examination        85
 8      (By Mr. Bryan)
 9                    - - -
10 EXHIBITS                      MARKED
11 Exhibit No. 1                   04
   (Amended Class Action Complaint)
12
   Exhibit No. 2                   04
13 (Declaration of John Jay Flinn)
14                    - - -
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1            P R O C E E D I N G S
 2                   - - -
 3        And, thereupon, Exhibit Nos. 1 and 2 were
 4 marked for purposes of identification.
 5                   - - -
 6            JOHN JAY FLINN,
 7 being by me first duly sworn, as hereinafter
 8 certified, deposes and says as follows:
 9            CROSS-EXAMINATION
10 BY MR. BRYAN:
11 Q.       Good afternoon, sir.  Could you introduce
12 yourself for the record?
13 A.       For the record, my name is John Jay Flinn.
14 I work with Cardinal Health.
15 Q.       And what's your position at Cardinal?
16 A.       Senior vice president of finance for the
17 healthcare supply chain, pharmaceutical segment.
18 Q.       And what are your responsibilities as
19 senior vice president?
20 A.       That's basically the CFO for the segment.
21 That's the position that, off the top of my head,
22 takes responsibility for the accounting, books and
23 records, the internal controls, and so forth.
24 Q.       And you said for "the segment."  What
25 segment are you referring to?
```

5

1  A.      The healthcare supply chain,
2  pharmaceuticals segment.
3  Q.      **What does that entail?**
4  A.      That includes the distribution business,
5  the nuclear pharmacy business, the specialty
6  pharmaceutical business, and the medicine shop
7  franchising business.
8  Q.      **What is the nuclear pharmacy, just**
9  **generally?**
10 A.      Generally it's a business that provides
11 diagnostic nuclear pharmaceutical services for
12 hospitals, clinics, and so forth; heart scans mostly.
13 Q.      **Do you have any responsibility for**
14 **negotiating contracts with Cardinal customers?**
15 A.      Very little.
16 Q.      **What do you mean by "very little"?**
17 A.      More behind-the-scenes analysis of the
18 deals, pricing, and so forth.
19 Q.      **So you wouldn't be responsible for signing**
20 **an agreement with a Cardinal customer; is that fair?**
21 A.      That's fair.
22 Q.      **Do you have any authority for setting**
23 **pricing by Cardinal?**
24         MR. LONG:  Well, just stop.  I'm willing
25 to tolerate a general question of his duties and

6

1  responsibilities; but in this deposition -- and I
2  made it very clear in our objections and responses to
3  the subpoena -- we are not going to get into
4  downstream discovery here.  So, Patrick, I -- again,
5  I'm going to note on a general basis you can talk
6  about what he does, but I'm going to instruct him not
7  to answer any questions along the terms of downstream
8  discovery.
9          MR. BRYAN:  On what basis?
10         MR. LONG:  It's very clear in the
11 objections that they're not proper discovery in a
12 case of this nature, and it was on the record
13 beforehand.
14         MR. BRYAN:  Well, your objection is to
15 form, but I will expect answers to each question
16 related to --
17         MR. LONG:  You're not going to get an
18 answer.  I'll instruct him not to answer.
19         MR. BRYAN:  I understand your objection,
20 but there is no basis to deny discovery pursuant to a
21 subpoena.
22         MR. LONG:  Patrick, I tell you what, you
23 want to end the deposition now?  We'll end it now.
24 This deposition was set up because this man put in a
25 declaration.  That's what we are here for.  We're not

7

1  getting into downstream discovery.  That's it.
2          MR. BRYAN:  There is no agreement about
3  the scope of the -- of this deposition.  It's a
4  discovery deposition pursuant to a subpoena which you
5  requested.  So if you want to instruct the witness
6  not to answer questions which you find objectionable,
7  we will address them one by one.  I have no intention
8  of foreclosing this deposition or adjourning this
9  deposition based on your objection to downstream
10 discovery.
11         MR. LONG:  I just told you, I'm going to
12 object to the downstream.  I'm just going to let you
13 know ahead of time.
14 BY MR. BRYAN:
15 Q.      **Sir, I'll repeat my question.  Do you have**
16 **any authority over pricing?**
17 A.      What do you mean by "authority"?
18 Q.      **Do you set pricing for products that**
19 **Cardinal resells to its customers?**
20 A.      We set -- we set pricing on a
21 customer-by-customer basis, not on a
22 product-by-product basis.
23 Q.      **But that, sir, didn't answer my question.**
24 **My question was:  Do you set pricing on a**
25 **customer-by-customer basis or have any responsibility**

8

1  **relating to setting pricing?**
2  A.      I have the responsibility of working with
3  the team to set the pricing for the customers.
4  Q.      **And what team would be responsible?**
5  A.      The Cardinal Health sales team, and the
6  other members of the customer service team.
7  Q.      **Do you have any responsibility to**
8  **negotiate or approve contracts for the purchase of**
9  **pharmaceuticals with manufacturers?**
10 A.      Other than review responsibility, no.
11 Q.      **And when you say "review responsibility,"**
12 **what is your responsibility when you review a**
13 **contract?**
14 A.      This would be more of an analytical review
15 of what does this -- the -- what's the financial
16 implications of the contract that they're
17 negotiating.
18 Q.      **Do you have any other responsibilities in**
19 **your role as senior vice president?**
20 A.      I have a lot of different responsibilities
21 depending on what happens during the day, and...
22 Q.      **Any responsibilities with respect to**
23 **contracts that we haven't discussed?**
24 A.      No.
25 Q.      **Now, I introduced myself before the**

9

1 deposition, but you understand that I represent Barr?
2 A.    Yes.
3 Q.    And let me ask you, are you represented
4 today by counsel?
5 A.    Yes.
6 Q.    And can you identify who that is?
7 A.    Mr. Long.
8 Q.    Anyone else?
9 A.    No.
10 Q.    Are you represented by Mr. Cramer?
11 A.    I don't --
12        MR. LONG:  Well, I'm going to object.
13 That really calls for a legal conclusion.  As you
14 know, this is a punitive class action, and Cardinal
15 would be a member.  They represent one of the class
16 counsel.  Having said that, if you understand the
17 question, you can go ahead and answer.
18        MR. BRYAN:  A proper objection, Mr. Long,
19 is to form.  If you want to --
20        MR. LONG:  Patrick, we're going to stop
21 real quick here.  I'm not going to get a lecture from
22 you.  If you want to take the deposition, fine.
23        MR. BRYAN:  I'm not going to argue with
24 you, sir.  I am asking you to keep your objections
25 within the scope of the rules, which is to form.

10

1 BY MR. BRYAN:
2 Q.    Now, sir, I'm only asking you for your
3 general understanding.  Are you represented by
4 Mr. Cramer based on your personal knowledge?
5 A.    Based on my personal knowledge, the way I
6 understand it, Mr. Cramer is a representative of the
7 plaintiffs.  I'm not well-versed in legal -- how all
8 these things work; so to that extent, that's the
9 answer that I would have.
10 Q.    And, sir, just to be clear on the record,
11 I'm only asking for your personal knowledge today.
12 And if you don't know or can't understand one of my
13 questions, just tell me --
14 A.    Yep.
15 Q.    -- and we'll proceed; is that fair?
16 A.    Yep.
17 Q.    And you understand that Barr and Warner
18 Chilcott have been named in a lawsuit filed by
19 certain direct purchasers of Ovcon 35; is that
20 correct?
21 A.    That's my understanding.
22 Q.    And there are several products that we may
23 talk about today.  I just want to make sure that
24 we're clear when I say Ovcon 35, I'm referring to the
25 branded product sold by Warner Chilcott; is that

11

1 fair?
2 A.    Yes.
3 Q.    And when I refer to a generic version of
4 Ovcon 35, I'll try to use the trade name, for
5 example, Balziva; do you understand?
6 A.    Yes.
7 Q.    And when I want to refer to Ovcon 35, the
8 brand, and Balziva, and any other generic versions of
9 Ovcon 35, I will use the term "Ovcon products"; is
10 that fair?
11 A.    Yes.
12 Q.    And you'll understand that I mean both the
13 brand and the generic when I use the term "Ovcon
14 products"?
15 A.    Yes.
16 Q.    And if you are not sure by my question,
17 just let me know, and I'll specify.
18 A.    Yes.
19 Q.    Sir, I'm handing you what's been
20 pre-marked as Deposition Exhibit 1.  Can you take a
21 look at that, please?
22        And Deposition Exhibit 1, sir, is a copy
23 of the complaint filed by Meijer and several other
24 direct purchasers of Ovcon; is that right?
25        MR. LONG:  Well, it's the amended

12

1 complaint, is it not?
2        MR. BRYAN:  Thank you.
3 BY MR. BRYAN:
4 Q.    That is a correct copy of the amended
5 complaint filed by certain direct purchasers against
6 Barr and Warner Chilcott; is that right?
7 A.    Yes, that's what it says here.
8 Q.    Have you seen Deposition Exhibit 1 before
9 today?
10 A.    I've seen the complaint; whether it was
11 the amended one or not, I am not sure.
12 Q.    When did you first see a complaint
13 involving the parties in Deposition Exhibit 1?
14 A.    This week.
15 Q.    When?
16 A.    Either late Wednesday or Thursday.  I
17 received it when we started to get ready for this
18 deposition.  When I actually looked at it, it was
19 either Wednesday or Thursday.  I don't remember when
20 I actually read it.
21 Q.    And what did you do to prepare for today's
22 deposition?
23 A.    I met with Mr. Long and Cardinal's
24 counsel.
25 Q.    Anyone else present?

13

1  A.    To prepare for this, no.
2  Q.    Okay.  And you said that was when?
3  A.    That was Wednesday.  It was two days ago.
4  Q.    And it was at that time you were given a
5  copy of Deposition Exhibit 1 or another complaint
6  involving the parties named in Deposition Exhibit 1?
7  A.    Yes.
8  Q.    Any other documents that you reviewed?
9  A.    That I reviewed?  Is that --
10 Q.    Yes.
11 A.    I've reviewed a few other affidavits in
12 similar cases.
13 Q.    What affidavits specifically?
14 A.    The one that I recall is a case related to
15 K-Dur.  I don't remember the other names of the
16 cases.
17 Q.    Did you review any other affidavits
18 relating to this case?
19 A.    No.
20 Q.    And you understand, sir, that the Meijer
21 plaintiffs are proceeding as a class action?
22 A.    I'm sorry?
23 Q.    You understand that the Meijer case -- Let
24 me rephrase.
25        You understand that Barr and Warner

14

1  Chilcott have been named in a case that is involving
2  a class action; is that correct?
3  A.    Yes.
4  Q.    And is it your understanding that Cardinal
5  would be a member of any class, if a class is
6  certified by the Court in this case?
7  A.    Yes.
8  Q.    Were you aware that other declarations
9  were submitted in connection with this case?
10 A.    Declarations?  What -- You mean
11 affidavits?
12 Q.    Sir, you submitted a -- Let me hand you
13 what's been pre-marked as Deposition Exhibit 2.
14 A.    Okay.  Okay.  Yes.
15        No, I am not aware of any others that have
16 been submitted.
17 Q.    And just to be clear, Deposition Exhibit 2
18 is a copy of the declaration that you submitted in
19 this case?
20 A.    Yes.
21 Q.    And you're referring to that as an
22 affidavit; is that correct?
23 A.    I'm sorry.  I got the words interchanged.
24 Q.    I understand.  But that is what you were
25 referring to when you said "affidavit" --

15

1  A.    Yes.
2  Q.    -- Deposition Exhibit 2?
3        Did you have any discussions with -- Let
4  me strike that.
5        Looking at Deposition Exhibit 2, is that a
6  true and correct copy of the declaration that you
7  filed in this case?
8  A.    It appears to be, yes.
9  Q.    And that's your signature on the final
10 page?
11 A.    Yes.
12 Q.    When were you asked to prepare a
13 declaration in this case?
14 A.    I believe it would have been the date that
15 it was signed.
16 Q.    Did you draft the declaration, Deposition
17 Exhibit 2?
18 A.    I did not write the declaration.  I
19 reviewed this with Mr. Long and Cardinal's counsel,
20 went through the words and got comfortable with the
21 wording, and made some spelling changes and so forth,
22 so that was my participation in the drafting.
23 Q.    So is it fair then that the declaration
24 was drafted by someone else?
25 A.    The words were typed by someone else, yes.

16

1  Q.    Who?
2  A.    I do not know that.  Somebody in the legal
3  department.
4  Q.    Okay.  And you said you were asked on or
5  about May 18th to submit a declaration in the case?
6  A.    Yes.
7  Q.    The same date that you signed the
8  declaration?
9  A.    Yes.
10 Q.    And can you tell me the circumstances in
11 which you were asked to prepare a declaration in this
12 case?
13 A.    There was a discussion between Mr. Long
14 and Cardinal's attorney regarding the case, and I
15 guess that would be the circumstances.
16 Q.    And they contacted you?
17 A.    Yes.
18 Q.    And who contacted you specifically?
19 A.    Cardinal's attorney, Corey Goldsane.
20 Q.    Did you make any other changes, other than
21 spelling changes that you mentioned, to Deposition
22 Exhibit 2?
23 A.    No.  The spelling changes and I believe
24 the title change are the two changes that I had.
25 Q.    Before signing the declaration, did you

17

1 **discuss it with anyone outside of Cardinal other than**
2 **Mr. Long?**
3 A.      Outside of Cardinal?
4 **Q.      Yes.**
5 A.      No.
6 **Q.      What about inside of Cardinal?  Did you**
7 **discuss it with anyone other than the --**
8 **Mr. Goldstein that you mentioned or --**
9        MR. LONG:  It's Goldsane.  It's
10 G-O-L-D-S-A-N-E.
11        MR. BRYAN:  Thank you.
12 A.      There was -- My accounting controller was
13 in the room when we were going over the document.
14 She has familiarity with these cases in the past, so
15 I asked her a few questions about it as we were going
16 through it.
17 **Q.      Asked her about some assertions in the**
18 **declaration?**
19 A.      Asked her about --
20        MR. LONG:  Well, I'm going to caution the
21 witness that meeting was in the presence of counsel
22 and would be a privileged session.  You can inquire
23 obviously, Patrick, about who was there, but the
24 communication, no.
25 BY MR. BRYAN:

18

1 **Q.      And you mentioned, sir, the time where you**
2 **spoke to the accounting controller.  Was that in the**
3 **presence of Cardinal's counsel?**
4 A.      Yes.
5 **Q.      Okay.  And as a result of your**
6 **communications with your -- the accounting**
7 **controller, did you change any assertions in your**
8 **declaration?**
9 A.      No.
10 **Q.      Let's look at Deposition Exhibit 2 if we**
11 **could, sir.  Paragraph 1 in the second sentence, you**
12 **see where you state, "I have authority to execute**
13 **this declaration on behalf of Cardinal"?**
14 A.      Yes.
15 **Q.      Do you see that?**
16       **On what basis do you have authority to**
17 **execute the declaration, sir?**
18 A.      As I said, the -- I'm basically the CFO
19 for this segment.  This is -- this falls within the
20 distribution segment.
21 **Q.      Is there any documents empowering you with**
22 **the authority to execute the declaration on behalf of**
23 **Cardinal?**
24 A.      There are -- For this specific document, I
25 don't know if there are.  There's other declarations

19

1 of authority within Cardinal that spell out certain
2 things, but not to this document, I don't believe.
3 **Q.      Did you ask your boss to see if you could**
4 **execute the declaration?**
5 A.      The person that previously executed these
6 documents was my boss, and he had moved on; and so
7 that was part of the -- part of how I got comfortable
8 that I had the authority to do this.
9 **Q.      So is it correct, sir, that you did not**
10 **seek out permission from your boss before executing**
11 **the declaration?**
12 A.      That's correct.
13 **Q.      And who is your boss, sir?**
14 A.      Right now my boss is Linda Hardy.  She's
15 the executive vice president for the healthcare
16 supply chain sector.
17 **Q.      Does Mr. Mike Kaufman have any authority**
18 **over your segment?**
19 A.      Not at this time.
20 **Q.      And are the facts asserted in**
21 **declaration -- in your declaration, Deposition**
22 **Exhibit 2, are they based on your personal knowledge?**
23 A.      Yes.
24 **Q.      Did you conduct any investigation or**
25 **review of documents before signing Deposition**

20

1 **Exhibit 2?**
2 A.      No.
3 **Q.      Did you inquire with other employees,**
4 **other than the accounting controller that you**
5 **mentioned, other employees at Cardinal about any of**
6 **the assertions in the declaration before signing it?**
7 A.      None other than the mention -- the
8 discussion that I mentioned earlier with Mr. Long and
9 Mr. Goldsane.
10 **Q.      So before signing Deposition Exhibit 2,**
11 **you didn't have to conduct any research?**
12 A.      No more than what I did.
13 **Q.      In paragraph 3, you describe -- is it**
14 **fair, sir, you describe the fact that Cardinal has**
15 **purchased both brand name Ovcon 35 and generic; is**
16 **that right?**
17 A.      Yes.
18 **Q.      And that's based on your personal**
19 **knowledge?**
20 A.      Yes.
21 **Q.      On what basis?**
22 A.      It's a distribution company, and I've seen
23 the products.  I mean, I know what -- I know that
24 product is purchased, and I know the generic product
25 is purchased.

21

1  Q.      And how much of Ovcon 35 does Cardinal
2  purchase?
3  A.      That I don't know.
4  Q.      Do you know how much in relation to its
5  purchases of Balziva?
6  A.      No.
7  Q.      Twice as much brand versus --
8  A.      I don't know.
9  Q.      Who would you ask if you wanted to find
10  that out?
11  A.      If I wanted to find that out, I would
12  asking somebody in the purchasing department.
13  Q.      Do you see reports or documents that
14  indicate that Cardinal has purchased both Ovcon 35
15  and Balziva?
16  A.      Do I see them in the regular course of
17  business?  Is that your question?
18  Q.      That wasn't my question.  But just
19  generally speaking, sir --
20  A.      Oh.
21  Q.      -- do you see in the course of --
22  A.      I could if I requested it.
23  Q.      But you didn't ask for any such documents
24  before signing the declaration?
25  A.      No, I didn't.

22

1  Q.      You just knew that Cardinal continues to
2  purchase Balziva today?
3  A.      Yes.
4  Q.      On what basis?
5  A.      If there is a product in the market, I
6  know that we purchase it.
7  Q.      Why is that?
8  A.      Because 33 percent of all pharmaceuticals
9  go through our distribution center.  So if you're
10  asking me did I know specifically did we -- did we
11  buy this, I guess I would have to say that it was an
12  assumption on my behalf that we do.
13  Q.      Okay.  Now, in paragraph 4 of Deposition
14  Exhibit 2, you talk about Cardinal's contracts.  Do
15  you see that?
16  A.      Yes.
17  Q.      Did you have to conduct any review of
18  Cardinal's contracts before signing this declaration?
19  A.      No.
20  Q.      And you assert that, "There are no
21  contracts under which customers are obligated to
22  purchase fixed quantities"; do you see that?
23  A.      Yes.
24  Q.      It goes on to say, "and at pre-determined
25  prices"?

23

1  A.      Yes.
2  Q.      Are there any contracts in which
3  Cardinal's customers purchase a fixed quantity,
4  irrespective of the pre-determined prices?
5  A.      No.
6  Q.      But you don't negotiate contracts with
7  Cardinal's customers; is that right?
8  A.      I do not negotiate the contracts.
9  Q.      Do you see all the contracts that Cardinal
10  has with its customers?
11  A.      I do not see all of them.  Right now I see
12  all the new ones.
13  Q.      Starting when?
14  A.      Probably about six months ago.
15  Q.      How long have you been in your current
16  position, sir?
17  A.      About seven months.  Since September, so
18  however many months that is.
19  Q.      So with respect to -- Well, what was your
20  prior position at Cardinal?
21  A.      I was the vice president of finance in the
22  nuclear pharmacy business.
23  Q.      So that's -- that's a different type of
24  business than just buying and selling branded and
25  generic pharmaceuticals; is that fair?

24

1  A.      Yes.
2  Q.      And how long were you vice president of
3  the nuclear pharmacy finances?
4  A.      From January of 2003 until September, so
5  three and a half years.
6  Q.      So about September of last year is when
7  you became a senior vice president?
8  A.      Yes.
9  Q.      And before signing the declaration that
10  Warner Chilcott has purchased Ovcon 35 since
11  April 22nd, 2004, did you investigate Cardinal's
12  purchases between the time that -- September of last
13  year and April 22nd, 2004?
14  A.      No.
15  Q.      Did you review any contracts that existed
16  at Cardinal with its customers before September of
17  last year?
18  A.      No.
19      (Mr. Navarro entered the room.)
20  BY MR. BRYAN:
21  Q.      Did you review any records other than
22  contracts that would indicate that Cardinal does not
23  have contracts of fixed quantities or pre-determined
24  prices?
25  A.      I'm sorry.  I don't understand that

25

1 question.

2 Q.    Well, I assume there are other business

3 records other than contracts that indicate the terms

4 of sale between Cardinal and those customers.  Am I

5 right?

6 A.    Yes, yes.

7 Q.    Did you review any business records that

8 may not be contracts, but that would indicate the

9 terms of sale between Cardinal and its customers?

10 A.    Related to this?

11 Q.    Yes, sir.

12 A.    No.

13 Q.    Is it fair, sir, that before September of

14 2006, you wouldn't have reviewed contracts relating

15 to the purchase or sale of generic or branded

16 pharmaceuticals?

17 A.    Within what time period?

18 Q.    Between 2003 and September of last year.

19 A.    That's fair.  That's correct.

20 Q.    So any contracts that may have existed

21 between 2003 and, let's say, September of last year

22 between Cardinal and its customers, you wouldn't be

23 familiar with those?

24 A.    I would not have reviewed them.

25 Q.    Does Cardinal have any contracts in which

26

1 it assigns or conveys any interest that it may have

2 in a cause of action against Barr or Warner Chilcott?

3 A.    I don't know.  That's -- I don't know.

4 Q.    Okay.  Are you familiar with the term

5 "assignment"?

6 A.    Yes.

7 Q.    And do you understand that's someone

8 giving a right to another?

9 A.    Yes.

10 Q.    And are you -- You are not aware that

11 Cardinal has issued an assignment with respect to

12 this case?

13 A.    I -- No, I am not.  I don't know whether

14 we have or whether we have not.

15 Q.    If you wanted to find out, who would you

16 ask?

17 A.    I would probably ask one of the attorneys.

18 Q.    Anyone else?

19 A.    No.

20 Q.    But to your knowledge, there could be

21 assignments out there relating to this case?

22 A.    Based on what I understand of this case,

23 there could be, yes.

24 Q.    Were you asked to collect documents

25 relating to assignments and claims?

27

1 A.    No.

2 Q.    Were you asked to collect any documents in

3 preparation for today's deposition?

4 A.    No.

5 Q.    Were you shown a copy of the subpoena for

6 your appearance here today?

7 A.    Yes.

8 Q.    When were you shown that?

9 A.    Just before we came down here.

10 Q.    And that was a meeting with counsel?

11 A.    Yes.

12 Q.    And who?

13 A.    Mr. Long.

14 Q.    Anyone else?

15 A.    No.

16 Q.    Does Cardinal have any contracts in which

17 its customers purchase fixed quantities of

18 pharmaceuticals?

19 A.    No.

20 Q.    Does Cardinal have any contracts in which

21 its customers purchase at a benchmark, plus or minus

22 a percentage; for example, are you familiar -- for

23 example, WAC, plus or minus a certain percentage?

24 A.    Yes.

25 Q.    And you understand WAC to be a benchmark

28

1 price set by a manufacturer?

2 A.    Yes.

3 Q.    Is that inclusive or exclusive of any

4 discounts or rebates that Cardinal may get from the

5 manufacturer?

6 A.    To my knowledge, it is exclusive.

7 Q.    So just so I'm clear, Cardinal purchases a

8 pharmaceutical and resells that pharmaceutical at

9 WAC, plus or minus a certain percentage?

10 A.    Yes.

11 Q.    Does that percentage vary by whether it's

12 a branded pharmaceutical or a generic?

13 A.    Not to my knowledge.

14 Q.    There could be contracts that it does

15 or --

16 A.    There could be variations in the pricing

17 on a branded versus generic, but I -- not that I've

18 seen.

19 Q.    Now, going to the last page -- I'm

20 sorry -- the last sentence of paragraph 4 of

21 Deposition Exhibit 2, you state that, "Prevailing

22 market conditions also influence prices that Cardinal

23 charges for prescription pharmaceutical products"; do

24 you see that?

25 A.    Yes.

29

1 Q.      What prevailing market conditions are you
2 referring to?
3 A.      Competition between the three wholesalers
4 or four wholesalers, the other competitors, things
5 like that.
6 Q.      What about the price at which Cardinal
7 purchases pharmaceuticals?
8 A.      That could come into play in a -- in a
9 generic introduction, generic versus brand situation.
10 Q.      How is that?
11 A.      Typically when a generic product is
12 introduced into the market, it's introduced at a
13 price below the brand product, anywhere from 30
14 percent to 50 percent.
15 Q.      And if Cardinal is selling both the brand
16 and the generic at WAC, plus or minus a certain
17 percentage, is it fair to assume that Cardinal makes
18 more on a branded sale than a generic?
19      MR. LONG: I'm going to object. This is
20 downstream discovery. I'll instruct the witness not
21 to answer.
22      MR. CRAMER: I'll join the objection.
23      MR. BRYAN: Well, there is no basis for
24 the objection, as your witness has made a statement
25 with respect to influences of prices that Cardinal

30

1 charges for prescription pharmaceutical products. It
2 is front and center in his declaration.
3      MR. LONG: I said he's not going to answer
4 the question. Move on.
5 BY MR. BRYAN:
6 Q.      Sir, are you going to follow Mr. Long's
7 instructions?
8      MR. LONG: He's going to follow the
9 instructions of his counsel. Move on.
10 A.      Yes.
11      MR. BRYAN: He can answer for himself.
12      MR. LONG: I tell you what, Mr. Bryan, I
13 represent this witness. You don't. I told you --
14      MR. BRYAN: I'm entitled to an answer to
15 my question. You know that.
16      MR. LONG: Please do not interrupt me when
17 I'm speaking, or this is going to end. He's not
18 going to answer those questions. Move on. Don't
19 waste the witness's time.
20      MR. BRYAN: It is my time and my
21 deposition, Mr. Long. I will ask the questions.
22 BY MR. BRYAN:
23 Q.      So just to be clear, you are refusing to
24 answer based on your counsel's instruction?
25 A.      Yes.

31

1 Q.      Let me ask you this: If a widget seller
2 was selling a widget at X number of dollars plus 10
3 percent -- You understand where I am so far? He
4 would be selling the widget at X plus 10 percent,
5 okay?
6 A.      (Indicating.)
7 Q.      Is that yes?
8 A.      Yes.
9 Q.      If X was reduced to X minus Y plus 10
10 percent, would the widget maker make more if he sold
11 it at X plus 10 percent or X minus Y plus 10 percent?
12      MR. LONG: Objection. It suggests trying
13 to lead into downstream discovery regarding profit
14 margin. Instruct the witness not to answer.
15      MR. CRAMER: Also incomplete hypothetical.
16      MR. BRYAN: Well, I'm entitled to an
17 answer on my hypothetical. It's not downstream
18 discovery. It's with respect to widget makers.
19 BY MR. BRYAN:
20 Q.      Now, sir, can you answer my question based
21 on the hypothetical that I've presented?
22      MR. LONG: Instruct the witness not to
23 answer.
24      MR. CRAMER: Same instruction.
25      MR. BRYAN: Are you instructing a witness

32

1 not to answer with respect to a question about
2 widgets?
3      MR. LONG: I just said I instructed him
4 not to answer. You don't have to sit there and give
5 me a smirky look. I said --
6      MR. BRYAN: I just wanted to be clear,
7 sir.
8      MR. LONG: Would you stop interrupting?
9 That's the second time in three minutes. I'm going
10 to finish my statement. Now conduct the deposition
11 in a professional way. I have told you he's not
12 going to answer the question. He's instructed not
13 to.
14      MR. BRYAN: There's been nothing that I
15 have done that is unprofessional, sir, and I resent
16 that. I have asked -- If I want to ask a particular
17 question, I'm entitled for him to answer and you to
18 instruct. That's the way it works. So please don't
19 lecture me about how to conduct my deposition. And,
20 also, if I have three and a half hours, if I want to
21 spend them asking questions with respect to issues
22 that I feel are relevant, that is my prerogative. If
23 you want to instruct him not to answer, we will go
24 question by question, but don't interrupt me when I'm
25 talking about simply a widget, okay? Is that --

33

1  You're instructing the witness not to answer?
2       MR. LONG: I have instructed the witness
3  not to answer.
4  BY MR. BRYAN:
5  Q.      Now, sir, in paragraph 5 you state that
6  "Cardinal is aware," and then you have a series of
7  paragraphs after that; do you see that?
8  A.      Yes.
9  Q.      Okay. On what basis is Cardinal aware
10 that Stephen L. LaFrance and other plaintiffs have
11 brought a class action?
12 A.      When you say "Cardinal," are you asking me
13 as Cardinal or Cardinal -- I'm not sure who you mean
14 by "Cardinal."
15 Q.      That's the issue I'm getting at, sir.
16 When you say "Cardinal is aware that," is that you
17 speaking based on your personal knowledge?
18 A.      Based on the knowledge that I have, given
19 the discussions I had with the counsels.
20 Q.      And prior to that date on May 18th before
21 you signed Deposition Exhibit 2, you weren't aware of
22 that; is that fair?
23 A.      That's correct.
24      MR. LONG: Can I take a very quick break
25 here for a minute?

34

1       MR. BRYAN: Go off the record.
2           (Recess taken.)
3  BY MR. BRYAN:
4  Q.      Sir, you mentioned that Cardinal had
5  certain contracts that are WAC, plus or minus a
6  certain percentage, with its customers?
7  A.      Yes.
8  Q.      What percentage of its contracts relating
9  to the sale of pharmaceuticals are based on WAC, plus
10 or minus?
11      MR. LONG: Objection. Instruct the
12 witness not to answer. It's downstream discovery.
13      MR. BRYAN: He's already testified about
14 these contracts. I don't see any basis to cordon him
15 off.
16      MR. LONG: I'm not going to change the
17 instruction.
18 BY MR. BRYAN:
19 Q.      And, sir, you're following your counsel's
20 instruction?
21 A.      Yes.
22 Q.      Going back to Deposition Exhibit 2, you
23 make a representation about contracts that Cardinal
24 has with its customers. Is that a fair
25 characterization?

35

1  A.      Which paragraph?
2  Q.      Paragraph 4.
3  A.      Yes.
4  Q.      And I asked you a question with respect to
5  contracts that Cardinal has with its customers; is
6  that fair?
7  A.      You -- I'm sorry?
8  Q.      I asked you a question relating to what
9  other kinds of contracts Cardinal may have with its
10 customers; correct?
11 A.      I'm not sure what you're asking me.
12 Q.      Okay. I asked you whether or not -- or
13 how many contracts Cardinal has that are based on
14 WAC, plus or minus a percentage; correct?
15 A.      Yes.
16 Q.      Do you remember that question?
17      And in paragraph 4, you'll agree with me
18 that you are making an assertion about Cardinal's
19 contracts with its customers; correct?
20 A.      Yes.
21 Q.      Were there any other benchmarks other than
22 WAC that Cardinal uses to price its products?
23      MR. LONG: Objection. Instruct the
24 witness not to answer.
25 BY MR. BRYAN:

36

1  Q.      Are there any contracts in which Cardinal
2  uses the term "cost plus"?
3       MR. LONG: Objection. Instruct the
4  witness not to answer.
5  BY MR. BRYAN:
6  Q.      Sir, are you following counsel's
7  instruction?
8  A.      Yes.
9  Q.      Are there any contracts that are based on
10 AWP minus a certain percentage?
11      MR. LONG: Objection. Instruct the
12 witness not to answer.
13 BY MR. BRYAN:
14 Q.      Are there any other benchmarks that
15 Cardinal uses to set prices?
16      MR. LONG: To its customers?
17      MR. BRYAN: To its customers.
18      MR. LONG: Objection. Instruct the
19 witness not to answer.
20 BY MR. BRYAN:
21 Q.      For contracts in which Cardinal prices
22 pharmaceutical products to its customers at WAC plus
23 a certain percentage, does it vary by brand or
24 generic?
25      MR. LONG: Objection. Instruct the

37

1  witness not to answer.
2  BY MR. BRYAN:
3  Q.      Sir, are you following counsel's
4  instruction?
5  A.      Yes.
6  Q.      Do the prices at which Cardinal resells
7  Ovcon 35 vary by customer?
8          MR. LONG:  Objection.  Instruct the
9  witness not to answer.
10  BY MR. BRYAN:
11  Q.      Are you following your counsel's
12  instruction?
13  A.      Yes.
14  Q.      Are the prices at which Cardinal sells
15  Ovcon 35 to American Sales different to Rochester
16  Drug -- different from the prices that Cardinal sells
17  to Rochester Drug?
18          MR. LONG:  Well, I'm going to object and
19  instruct him not to answer.  Further, the question
20  assumes that Cardinal sells to those particular
21  customers.  But, again, instruct the witness not to
22  answer.
23  BY MR. BRYAN:
24  Q.      Let me fix the foundation question.  Does
25  Cardinal sell Ovcon 35 to American Sales?

38

1  A.      I don't know.
2  Q.      Does Cardinal sell Ovcon 35 to Rochester
3  Drug?
4  A.      I don't know.
5  Q.      Who would know the answer to that
6  question?
7  A.      That I don't know either.
8  Q.      So sitting here today, you don't know
9  whether the prices that Cardinal charges American
10  Sales or Rochester Drug, assuming that they do sell
11  to those two entities, would vary?
12  A.      As I --
13          MR. LONG:  I'm going to object and
14  instruct him not to answer.
15  BY MR. BRYAN:
16  Q.      Are you following counsel's instruction?
17  A.      Yes.
18  Q.      Does Cardinal sell Zenchent?
19  A.      Is that a product?
20  Q.      You're not familiar with the
21  pharmaceutical by the trade name Zenchent?
22  A.      No, I'm not.
23  Q.      So you don't know that it is a generic
24  version of Ovcon 35?
25  A.      No, I don't.

39

1  Q.      Before today, have you heard the term
2  "Balziva"?
3  A.      Yes.
4  Q.      When was the first time you heard Balziva?
5  A.      When I read the complaint.
6  Q.      And that was at a meeting with counsel on
7  May 18th?
8  A.      Yes.
9  Q.      Does Cardinal have any contracts with its
10  customers in which its customers receive tiered
11  pricing depending on the quantity that they purchase?
12          MR. LONG:  Objection.  I'll instruct the
13  witness not to answer.
14  BY MR. BRYAN:
15  Q.      Following counsel's instruction?
16  A.      Yes.
17  Q.      Does Cardinal have any contracts with
18  suppliers at which it purchases pursuant to a tiered
19  contract, receives rebates based on the quantity of
20  purchases?
21  A.      Yes.
22  Q.      Does it have any contracts with Warner
23  Chilcott in that regard?
24  A.      I don't know.
25  Q.      Who would know the answer to that?

40

1  A.      Somebody in the purchasing department.
2  Q.      And the contracts in which Cardinal -- Let
3  me strike that and start over.
4          So you wouldn't know whether that the
5  tiered pricing for Cardinal's purchases of
6  pharmaceutical products are based on volumes of both
7  branded and generic purchases?
8  A.      For a specific supplier?
9  Q.      For any supplier.
10  A.      Not without looking at the contract, no.
11  Q.      But sitting here today, you don't --
12  you're not familiar with any tiered purchasing
13  contracts?
14  A.      No, I am familiar with some tiered
15  purchasing contracts.  Not the one you asked me
16  about.
17  Q.      Fair point.  Narrowing it down to
18  manufacturers of oral contraceptives, are you
19  familiar with any tiered purchasing contracts that
20  relate to oral contraceptives?
21  A.      No.
22  Q.      Does Cardinal have any market share rebate
23  contracts with its customers?
24          MR. LONG:  Objection.  Instruct the
25  witness not to answer.

41

1  BY MR. BRYAN:
2  Q.      Are you following your counsel's
3  instruction?
4  A.      Yes.
5  Q.      Does Cardinal have any market share rebate
6  contracts with suppliers?
7        MR. LONG:  For its purchases?
8        MR. BRYAN:  I think that's self-evident,
9  for its purchases.
10 A.      I don't know.
11 Q.      Who would know that?
12 A.      I don't know who would know that.
13 Q.      Does Cardinal have any inventory
14 management agreements with suppliers?
15 A.      What do you mean by "inventory management
16 agreements"?
17 Q.      Well, let me take a step back, sir.  Are
18 you familiar with the term "inventory management
19 agreement"?
20 A.      I'm familiar with the term "inventory
21 management."
22 Q.      Okay.  Is -- Are you familiar with a term
23 that's often used in pharmaceutical distribution,
24 "inventory management agreement"?
25 A.      I have not -- I guess I have not seen that

42

1  term used widely in the industry, so I would have to
2  say no.
3  Q.      And when you refer to inventory
4  management, what are you referring to?  And let me
5  specify, from the perspective of Cardinal dealing
6  with a supplier.
7  A.      What I've referred to is the management of
8  the quantities of inventory in the supply chain in a
9  day's perspective.
10 Q.      And have you seen agreements in which a
11 supplier pays Cardinal a fee for managing certain
12 inventory levels?
13 A.      It depends on your definition of
14 "managing."
15 Q.      Well, can you give me an example?
16 A.      We have agreements with suppliers to
17 maintain a certain level of inventory.  It's not
18 managing the supplier's.  It's managing our own.
19 Q.      I see.  And do suppliers pay Cardinal a
20 certain fee for managing your own inventory of their
21 products?
22 A.      Some do, yes.
23 Q.      Does Warner Chilcott?
24 A.      I don't know.
25 Q.      Any rebates that Cardinal receives from

43

1  its suppliers for its purchases, that would affect
2  net cost of your purchases; is that fair?
3        MR. PERWIN:  Can I hear that question
4  again?  Sorry.
5        (Record read back as requested.)
6        MR. PERWIN:  I don't understand the
7  question.  It didn't sound good.
8        MR. LONG:  Objection; form.
9        MR. BRYAN:  That is a little obtuse.  Let
10 me rephrase.
11 BY MR. BRYAN:
12 Q.      If you get a rebate, it is a discount; is
13 that fair?
14 A.      You could say it's a discount, yes.
15 Q.      So in Cardinal's purchases of Ovcon 35, if
16 it receives a service fee or other rebate from Warner
17 Chilcott, it would be a discount on the net price of
18 its purchases; is that fair?
19       MR. CRAMER:  Objection to form.
20       MR. LONG:  Objection.
21       MR. CRAMER:  Calls for a legal conclusion.
22 BY MR. BRYAN:
23 Q.      Is that fair, sir?
24       MR. LONG:  Well, I'm going to object to
25 form also.  It's compound.  Go ahead.  You can answer

44

1  that.
2  A.      Could you repeat the question?
3        MR. BRYAN:  Could you repeat the question
4  for me?
5        (Record read back as requested.)
6        MR. CRAMER:  Same objection.
7        MR. LONG:  Same objection.  Go ahead.  You
8  can answer it.
9  A.      If you are -- if your definition of price
10 is cost, the answer is yes.
11 Q.      And are there circumstances, sir, where
12 you use price to purchase a good and cost in a
13 different sense?
14 A.      When we -- When we buy product, we refer
15 to that as the cost of the product.  That's the
16 language.  That's why I wanted to clarify that.
17 Q.      Okay.  Did the cost of Ovcon 35 increase
18 after Balziva became available?
19 A.      I don't know.
20 Q.      Did any discounts received from Warner
21 Chilcott increase after Balziva became available?
22 A.      I don't know.
23 Q.      Who would know the answer to that, sir?
24 A.      Somebody in the purchasing department.
25 Q.      Who's responsible to purchase Ovcon 35

45

1  and/or Balziva?
2  A.        Somebody in the purchasing department.  I
3  don't know how.
4  Q.        Who's the head of purchasing at Cardinal?
5        MR. PERWIN:  For pharmaceuticals, is that
6  your question, or in general?
7        MR. BRYAN:  Yes.
8  BY MR. BRYAN:
9  Q.        Who is the head of purchasing at Cardinal
10  for branded and generic pharmaceuticals?
11  A.        The head would be Steve Inacker.
12  Q.        Is there a separate manager of purchasing
13  for brands versus generics?
14  A.        Yes.
15  Q.        And Mr. Inacker is the head of which,
16  brand or generic or both?
17  A.        He is brand.
18  Q.        And who is his counterpart in generic?
19  A.        Frank Seagraves -- Seagrave, I'm sorry.
20  Q.        Now, going back to Deposition Exhibit 2,
21  paragraph 4, when you say, "Prevailing market
22  conditions also influence the prices that Cardinal
23  charges," would one of those prevailing market
24  conditions be the cost at which Cardinal purchased
25  the product for resale?

46

1  A.        You're referring to the price that we
2  charge our customers?
3  Q.        Well, I think, sir, you're referring to
4  the price that Cardinal charges for your customers.
5  Now I'm looking for is one of the prevailing market
6  factors that influences that price that Cardinal
7  charges its customer the cost at which Cardinal
8  purchases Ovcon 35?
9  A.        I guess the way I would answer that is we
10  do not price our services on a product-by-product
11  basis.  So one product changing -- The cost of one
12  product going up or down does not -- is not a
13  prevailing influence on the service fee, if you will,
14  that we would charge.
15  Q.        Does Cardinal try to pass on any cost
16  increases to its customers?
17        MR. LONG:  Objection.  Instruct the
18  witness not to answer.
19        MR. CRAMER:  Join.
20  BY MR. BRYAN:
21  Q.        Sir, are you following your counsel's --
22  A.        Yes.
23  Q.        Does Cardinal have any contracts in
24  which -- for the sale of contraceptive products that
25  automatically allow Cardinal to increase the price at

47

1  which it resold contraceptives in response to a price
2  increase by a manufacturer?
3        MR. LONG:  Objection; instruct the witness
4  not to answer.
5        MR. CRAMER:  Join.
6  BY MR. BRYAN:
7  Q.        Are you following counsel's advice?
8  A.        Yes.
9  Q.        Now, in paragraph -- Let's look at
10  paragraph 5C of Deposition Exhibit 2.  And you refer
11  to, "The Named Plaintiffs seek to recover damages in
12  the form of overcharges on behalf of the class"; do
13  you see that?
14  A.        Yes.
15  Q.        What does that -- what do you mean by
16  "overcharges"?
17  A.        We -- Prices that we paid that were higher
18  than we would have paid.
19  Q.        On what products?
20  A.        Ovcon 35.
21  Q.        So do you contend that Cardinal overpaid
22  for the price of Ovcon 35?
23  A.        Yes.
24  Q.        Do you contend that Cardinal overpaid for
25  the -- for any other oral contraceptive?

48

1  A.        In this document, no.
2  Q.        Now, you also go on to say that, "The
3  class seeks to recover as a whole in the aggregate,
4  such aggregate damages (if recovered) to be allocated
5  proportionally"; do you see that?
6  A.        Yes.
7  Q.        What do you mean by that?
8  A.        Basically that the damages would be split
9  amongst the class.
10  Q.        How?
11  A.        Proportionate to the purchases.
12  Q.        Based on volume or dollars?
13  A.        I think that would be up to how the legal
14  people determined it.
15  Q.        And the basis for your statement in
16  paragraph 5C is what?
17  A.        What do you mean by "basis"?
18  Q.        Well, sir, before May 18th, you weren't
19  familiar with this lawsuit; is that correct?
20  A.        That's correct.
21  Q.        Okay.  So I'm asking how did you learn
22  that the Named Plaintiffs are seeking to recover
23  damages in the aggregate and they plan to allocate
24  them proportionally?
25        MR. LONG:  Now, you can go ahead and

49

1 answer as long as you don't, as we've mentioned
2 earlier, add a discussion with your counsel.
3        THE WITNESS:  But that's how I learned.
4        MR. LONG:  That's fine.
5 BY MR. BRYAN:
6 Q.        So before your meeting with counsel, you
7 weren't aware of -- that the Named Plaintiffs seek to
8 recover damages in the form of overcharges; is that
9 correct?
10 A.        That's correct.
11        MR. CRAMER:  Objection.  Which meetings
12 with counsel are you referring to?  There's been
13 several that he's testified to.
14 BY MR. BRYAN:
15 Q.        Sir, in response to my question, which
16 meeting of counsel were you referring to?
17 A.        The initial meeting where we reviewed
18 the -- this document.
19 Q.        And that was May 18th of 2007?
20 A.        Yes.
21 Q.        And turning to paragraph 5F, which is
22 page 3 of Deposition Exhibit 2, you say, "Some of the
23 Named Plaintiffs are proceeding as assignees or
24 partial assignees of direct purchasers of Ovcon 35";
25 do you see that?

50

1 A.        Yes.
2 Q.        And you also learned of that on
3 May 18th --
4 A.        Yes.
5 Q.        -- 2007?
6 A.        Yes.
7 Q.        And I apologize, sir, if I interrupt you
8 in your answer.  I try not to.  And I also ask that
9 you wait until my question is finished.
10 A.        Yes.
11 Q.        Thank you.
12        And are you aware of any other -- Are you
13 aware of any assignees that purchase from Cardinal
14 Ovcon 35?
15 A.        No.
16 Q.        Let's look at paragraph 6.  You say that,
17 "Cardinal has determined, in its considered business
18 judgment, that its interests would best be served by
19 the Court certifying the proposed class of direct
20 purchasers"; do you see that?
21 A.        Yes.
22 Q.        What interests are you referring to?
23 A.        The overcharging damages.
24 Q.        Okay.  Can you be more specific?
25 A.        The damages that we're seeking in the

51

1 claim.
2 Q.        So is it fair that Cardinal's interests
3 are served the more damages it would recover?
4 A.        I'm not sure what you mean by that.
5 Q.        Well, if Cardinal is seeking overcharge
6 damages, I would assume Cardinal would want to
7 receive the maximum amount of overcharge damages; is
8 that fair?
9 A.        Yes.
10 Q.        And when you say that, "Its interests
11 would best be served by the Court certifying the
12 proposed class," do you contend that by participating
13 in this lawsuit, Cardinal would achieve a maximum
14 recovery of overcharge damages?
15 A.        I would contend that this is the most
16 economical way for the class -- for all damages to be
17 handled; whether it would be the maximum, I wouldn't
18 know that.
19 Q.        What do you mean by "considered business
20 judgment"?
21 A.        We've done this in the past.  I've seen
22 these -- these affidavits; so in our judgment, this
23 is the way we would handle this.
24 Q.        Now, sir, you said you've seen these
25 affidavits.  Were you referring to the K-Dur

52

1 affidavit you mentioned earlier?
2 A.        Yes, yes.
3 Q.        And you saw that on May 18th; is that
4 right?
5 A.        Yes.
6 Q.        Had you seen any other affidavits or any
7 other indication that Cardinal has participated in
8 class action lawsuits related to pharmaceuticals
9 before seeing the K-Dur affidavit?
10 A.        Not anything specifically, no.
11        MR. CRAMER:  Objection to form.
12 BY MR. BRYAN:
13 Q.        Did you participate in Cardinal's
14 considered business judgment --
15        MR. CRAMER:  Objection to form.
16 BY MR. BRYAN:
17 Q.        -- in coming to this conclusion?
18        MR. CRAMER:  Same.
19 A.        If -- I guess I don't fully understand
20 what you mean by "participate."
21 Q.        Well, let me rephrase.  First, when did
22 Cardinal reach this considered business judgment?
23 A.        It -- Are you asking when we entered the
24 claim?
25 Q.        No, sir.  I'm referring to your

53

1  declaration, paragraph 6, in which you say that,
2  "Cardinal has determined, in its considered business
3  judgment..."  My question is:  Well, when did it
4  reach that considered business judgment?
5  A.      I can only answer when I reached that
6  judgment, and that was in the meeting on May 18th.
7  Q.      So is it your considered business judgment
8  that participating in this class serves the interests
9  of Cardinal?
10 A.      In this document, yes.
11 Q.      What do you mean by "in this document"?
12 A.      This is the document that I signed.
13 Q.      I understand, but did you reach an
14 independent conclusion on your own that this was --
15 A.      Yes.  I'm sorry.
16 Q.      And when did that happen?
17 A.      On May 18th.
18 Q.      Did you -- Let me ask you this:  What did
19 you do to reach this considered business judgment?
20 A.      That was the discussion that I had with
21 the counsels on May 18th.
22 Q.      And I may have asked you this before.  Was
23 anyone else present other than Mr. Long and
24 Mr. Goldsane?
25 A.      Yes, my controller.

54

1  Q.      For the entire meeting?
2  A.      Yes.
3  Q.      How long was the meeting?
4  A.      I don't recall how long the meeting was.
5  Q.      Was it more than an hour?
6  A.      I really don't recall.
7  Q.      Was it an all-day meeting?
8  A.      No, it was not an all-day meeting.
9  Q.      So was it -- Well, would you characterize
10 it as a long or short meeting?
11 A.      I would characterize it as a relatively --
12 I mean, depends on your definition of short.  My
13 definition of short is between one and two hours.
14 Q.      And is it fair -- Would you say that the
15 meeting you had in which you discussed Cardinal's
16 considered business judgment was within that range?
17 A.      Yes.
18 Q.      Anyone else enter during that time frame?
19 A.      No.
20 Q.      Did you ever have any discussions with
21 counsel for the Named Plaintiffs?
22 A.      No.
23 Q.      Anyone participate by phone in the meeting
24 that you had on May 18th with counsel?
25 A.      No.

55

1  Q.      During that meeting with counsel, did
2  you -- did anyone from the outside participate by
3  phone other than counsel for the Named Plaintiffs?  I
4  think that was unclear.  I didn't mean to imply that
5  counsel participated.  So let me rephrase.
6          Did anyone else participate in the meeting
7  by telephone?
8  A.      No.  Nobody participated by telephone.
9          MR. BRYAN:  Thank you.  I wanted to be
10 clear.  I saw -- saw you getting a little --
11         MR. LONG:  No, I understood what you were
12 asking --
13         MR. BRYAN:  -- bothered over there.
14         MR. LONG:  -- and I was going to say why
15 don't you ask whether anybody was by telephone, but
16 we've got it on the record.
17         MR. BRYAN:  Right.
18 BY MR. BRYAN:
19 Q.      Now, in paragraph 8, you refer to
20 Cardinal's economic and other interests.  Do you see
21 that?  Second to the last sentence?
22         MR. LONG:  Read the whole paragraph.
23 A.      Yes.
24 Q.      Okay.  What are the economic and other
25 interests that you're referring to in paragraph 8 of

56

1  Deposition Exhibit 2?
2  A.      The economic interests, I think we've
3  already talked about, the overcharging.  The other
4  interests would simply be the -- the introduction of
5  pharmaceuticals into the marketplace and the trade
6  relations.
7  Q.      What do you mean by "trade relations"?
8  A.      The ability to purchase the products
9  generic or brand, whatever they may be.
10 Q.      And why does Cardinal want to see the
11 introduction of a generic?
12 A.      It's not really -- I guess I would answer
13 that we provide services to our customers.  The
14 customers want to see the introduction of generics,
15 therefore, it's good -- if the customer wants it,
16 Cardinal wants it.
17 Q.      What happened to the sales of Ovcon 35
18 after the introduction of Balziva?
19 A.      I don't --
20         MR. LONG:  Sales by Cardinal, is that what
21 you're --
22         MR. BRYAN:  (Nods head.)
23         MR. LONG:  Instruct the witness not to
24 answer.
25 BY MR. BRYAN:

57

1 Q.        And you're following counsel's
2 instruction?
3 A.        Yes.
4 Q.        What happened to Cardinal's purchases of
5 Ovcon 35 after the introduction of Balziva?
6 A.        I don't know.
7 Q.        Do you have any sense whatsoever whether
8 they increased or decreased?
9 A.        No, I don't.
10 Q.        And the same question with respect to
11 Balziva. After it became available, do you have any
12 idea of the volume of Cardinal's purchases?
13 A.        No, I don't.
14 Q.        And you have no idea of the volume in
15 relation -- of Balziva purchases in relation to Ovcon
16 35 purchases; is that right?
17 A.        That's right.
18 Q.        Now in paragraph 8, you also refer to,
19 "Cardinal's economic and other interests are best
20 served by participating as a class member"; do you
21 see that?
22 A.        Yes.
23 Q.        Do you contend that Cardinal would not opt
24 out of any class if it was certified?
25 A.        Yes.

58

1 Q.        On what basis?
2 A.        On the basis of this statement, we believe
3 we're best served by the class.
4 Q.        Did you independently make that judgment?
5 A.        With the -- In the discussion with
6 counsel.
7 Q.        So did you conduct any analysis of your
8 own of Cardinal's economic or other interests with
9 respect to participating in this class action?
10 A.        No, I didn't.
11         MR. CRAMER: Objection to form.
12 BY MR. BRYAN:
13 Q.        To your knowledge, did anyone analyze
14 Cardinal's economic interests or other interests with
15 respect to participating in this class action?
16 A.        Not to my knowledge.
17         MR. CRAMER: Asked and answered.
18 BY MR. BRYAN:
19 Q.        Now, let's go back to paragraph 7.
20 Paragraph 7 you state, "Based on past experience,
21 Cardinal is confident that the Named Plaintiffs and
22 their counsel are fully capable of representing
23 Cardinal's interests"; do you see that?
24 A.        Yes, I do.
25 Q.        And what past experience are you referring

59

1 to?
2 A.        The -- My understanding, based on
3 discussions of past cases, these counsels have been
4 involved and have performed up to expectations.
5 Q.        Do you, yourself, have any experience with
6 Named Plaintiffs and their counsel in this case?
7 A.        No.
8 Q.        So is it fair that before May 18th, the
9 date that you signed Deposition Exhibit 2, you were
10 not familiar with the Named Plaintiffs or their
11 counsel?
12 A.        Yes.
13 Q.        And what past experience -- Is there
14 specific past experience at Cardinal that you are
15 referring to in Deposition Exhibit 2?
16 A.        The past experience would be related to
17 these cases that have -- that have been litigated,
18 you know, previously based on -- as discussed with
19 me.
20 Q.        Do you mention some of those past cases in
21 your declaration?
22 A.        I believe in paragraph 9.
23 Q.        Other than the cases in paragraph 9, are
24 there any other cases that you're familiar with?
25 A.        No.

60

1 Q.        Do you have any personal knowledge or did
2 you participate in those other cases in any way?
3 A.        No.
4 Q.        So in paragraph 9 of Deposition Exhibit 2
5 when you're referring to wholesalers Louisiana
6 Wholesaler and Rochester Drug, you don't have any
7 other experience with them in litigation?
8 A.        No.
9 Q.        Are you familiar with Louisiana Drug and
10 Rochester Drug in any way?
11 A.        No other way other than these. No other
12 way than what's -- what we talked about here.
13 Q.        Before signing this declaration, were you
14 familiar with Louisiana Drug or Rochester Drug?
15 A.        No.
16         MR. BRYAN: We can take a five-minute
17 break.
18         MR. LONG: That's fine.
19         (Recess taken.)
20 BY MR. BRYAN:
21 Q.        Sir, going back to paragraph 6 of
22 Deposition Exhibit 2, were there any documents
23 generated relating to Cardinal's considered business
24 judgment that its interests would be served in
25 participating in this class action?

61

1    MR. PERWIN:  Other than this one you mean?
2 A.    No.
3 Q.    Now, am I correct that on May 18th, you
4 were handed a copy of your declaration, of Deposition
5 Exhibit 2?
6 A.    I was handed a draft.
7 Q.    And did that draft contain 11 numbered
8 paragraphs as Deposition Exhibit 2?
9 A.    I mean, I don't recall if the draft did.
10 I mean, this is the final document that we ended up
11 with.
12 Q.    Are there any paragraphs that you added to
13 Deposition Exhibit 2 that were not in the draft that
14 you were shown on -- initially on May 18th?
15 A.    No.
16 Q.    What revisions did -- if at all, did you
17 make to Deposition Exhibit 2?
18 A.    The revisions that I recall were obviously
19 my name spelling and title.  I don't recall if there
20 were other wording changes.  I know I asked for
21 clarification on things, you know, to --
22    MR. LONG:  Watch.  You can say you asked
23 for clarification, but you can't get into substance
24 because of the privilege.
25 A.    Yeah.

62

1 Q.    Did you, yourself, have any communications
2 with counsel for the Named Plaintiffs outside of the
3 meeting on 5-18?
4 A.    No.
5 Q.    Did you have any meetings with counsel for
6 the named plaintiff after submitting this
7 declaration?
8 A.    No.
9    MR. LONG:  Well, just to be fair, when
10 Mr. Cramer came in about the same time, they
11 introduced themselves and that was it.
12 BY MR. BRYAN:
13 Q.    Other than today, you haven't seen Named
14 Plaintiffs' counsel; is that correct?
15 A.    That's correct.
16 Q.    Did you have any personal knowledge of any
17 other, what you refer to as overcharge claims in
18 paragraph 9, before May 18th?
19 A.    No.
20    MR. CRAMER:  Objection to form.
21 BY MR. BRYAN:
22 Q.    Do you have any personal knowledge at all
23 with respect to Cardinal's overcharge claims in other
24 cases?
25    MR. LONG:  Excuse me.

63

1    MR. BRYAN:  Would you like to take a break
2 to confer with your client?
3    MR. LONG:  He's fine.
4    MR. BRYAN:  Mr. Long, would you like to --
5    MR. LONG:  No, he's fine.
6 BY MR. BRYAN:
7 Q.    Sir, could you answer my question?
8 A.    Could you repeat the question?
9    MR. BRYAN:  Could you read my question
10 back, please?
11    (Record read back as requested.)
12 A.    This was when we talked to my controller,
13 she had explained some things to me.
14 Q.    Now, when I use the term "personal
15 knowledge," sir, I'm referring to what you actually
16 participated in.  So is it correct that other than
17 that conversation with your controller on May 18th,
18 you had no personal knowledge of Cardinal's
19 overcharge claims in any other case?
20    MR. CRAMER:  Objection to form.
21    MR. LONG:  Go ahead and answer.
22 A.    In the -- Yes, I did, in the -- Yes.
23 Q.    And what are you -- What other personal
24 knowledge did you have with respect to Cardinal's
25 overcharge claims in other cases?

64

1 A.    In a very old case related to vitamins.
2 Q.    Did you participate in that case?
3 A.    I participated in the analysis of the
4 various pieces of it, but not actually in the case.
5 Q.    How long ago was that?
6 A.    The settlement was several years ago.  I
7 don't remember the exact years.
8 Q.    Now, in paragraph 9 of Deposition Exhibit
9 2, when you state that, "Cardinal also affirmatively
10 expressed its support of other similar pending class
11 actions"; do you see that?
12 A.    Yes.
13    MR. LONG:  Here (indicating).
14 BY MR. BRYAN:
15 Q.    It's the very last line of paragraph 9.
16 A.    Yes.
17    MR. LONG:  Take your time and read it.
18 BY MR. BRYAN:
19 Q.    Do you have any personal knowledge of
20 Cardinal expressing affirmative support for other
21 similar pending class actions?
22 A.    No.
23 Q.    In paragraph 10, you state that, "There's
24 no antagonism or conflict between the interests of
25 the Named Plaintiffs in this case"; do you see that?

16 (Pages 61 to 64)

65

1  A.      Yes.
2  Q.      What are you referring to by "antagonism"
3  or "conflict"?
4  A.      I'm referring to we believe that we did
5  not have a conflict of interest with any of the other
6  Named Plaintiffs.
7  Q.      And what is it you mean by "conflict of
8  interest"?
9  A.      We were all subject to the same situation.
10 We were all subject to the claim -- the items stated
11 in the claim.
12 Q.      And when you say "claim," are you
13 referring to the claim by the Meijer plaintiffs?
14 A.      This document (indicating).
15 Q.      You're referring to Deposition Exhibit 1?
16 A.      Yes.
17 Q.      Did you conduct any analysis of the
18 interests of other class members?
19 A.      No.
20 Q.      So is it fair that Cardinal's interests
21 may conflict with other class members?
22         MR. CRAMER:  Objection to form.  Asked and
23 answered.
24         MR. LONG:  Go ahead and answer if you can.
25 A.      We do not believe we have a conflict.

66

1  Q.      Did you analyze whether there was such a
2  conflict?
3          MR. CRAMER:  Objection; form, asked and
4  answered.
5          MR. LONG:  Go ahead and answer it.
6  A.      It depends on your definition of
7  "analyze."
8  Q.      All right.  What did you do to determine
9  that Cardinal does not have any conflict of interest
10 with other class members?
11 A.      What I did was looked at the other Named
12 Plaintiffs, some of which I knew.  We're all in a
13 similar business.  We all would have been buying the
14 products similarly.  That's -- that's what I did.
15 Q.      And on that basis, you concluded that
16 there was no conflict between the interests of
17 Cardinal and other class members?
18 A.      I concluded I believed there was none.
19 Q.      Did you do anything else to come to that
20 conclusion?
21 A.      No.
22 Q.      Is Cardinal's business like that of
23 American Sales?
24         MR. CRAMER:  Objection to form.
25 A.      I don't know.

67

1  Q.      Is Cardinal bigger in terms of sales
2  volume or smaller than American Sales?
3  A.      My assumption is it's bigger.
4  Q.      Does, to your knowledge, American Sales
5  have any contracts with suppliers by which it
6  receives a service fee?
7  A.      I don't know.
8  Q.      Are there differences in the business
9  model between Cardinal and Rochester Drug?
10 A.      I don't know.
11 Q.      Have you ever looked at Rochester Drug to
12 determine whether it's in the same type of business
13 as Cardinal?
14 A.      No.
15 Q.      How about any other Named Plaintiffs in
16 this case?
17 A.      What's --
18 Q.      Did you look at any of the Named
19 Plaintiffs to determine whether their business model
20 was similar to Cardinal's?
21 A.      No.
22 Q.      Did you determine whether their purchasing
23 practices were at all similar to Cardinal's?
24 A.      No.
25 Q.      Did you determine whether their prices for

68

1  the purchases of Ovcon 35 were similar to that of
2  Cardinal's?
3  A.      I wouldn't have availability to that.
4  Q.      So it's correct that you did not look or
5  try to determine whether the prices at which Cardinal
6  purchased Ovcon 35 were similar at all to the prices
7  of any named plaintiff in this case?
8  A.      That's correct.
9  Q.      Does Cardinal sell Balziva to CVS?
10 A.      I don't know.
11 Q.      Does Cardinal sell Balziva to Walgreen?
12 A.      I don't know.
13 Q.      Do you know if either of those entities
14 purchased Ovcon 35 from Cardinal?
15 A.      I don't know.
16 Q.      What about American Sales?  Do you know
17 whether they purchase Ovcon 35 or Balziva from
18 Cardinal?
19 A.      I don't know.
20 Q.      Who would you ask to determine the answer
21 to that question?
22 A.      Somebody in the sales data organization.
23 Q.      Can you name a retailer that Cardinal
24 sells Ovcon 35 to currently?
25 A.      Not specifically.

69

1      MR. LONG:  I'm sorry.  I didn't hear the
2  question.  It's my fault.  Could you read it back,
3  please?
4      (Record read back as requested.)
5      MR. LONG:  Go ahead and answer.
6  A.      Not specifically.
7  Q.      **What do you mean "not specifically"?**
8  A.      Not without looking at reports.
9  Q.      **So you wouldn't know whether a retailer**
10  **purchased both Ovcon 35 and Balziva from Cardinal?**
11  A.      Not without looking at the reports.
12  Q.      **What reports are you referring to?**
13  A.      Any sales report.
14  Q.      **Is there a particular name other than**
15  **"sales report"?**
16  A.      No, I would have to go ask.
17  Q.      **Who would you ask?**
18  A.      Somebody in the sales data organization.
19  Q.      **Who would you call?**
20  A.      I would have to go see who's in the sales
21  data organization.  I don't have a name.
22  Q.      **To your knowledge, do customers -- retail**
23  **customers buy generics generally directly from the**
24  **manufacturer?**
25  A.      They can.

70

1  Q.      **Do some Cardinal customers buy generic**
2  **pharmaceutical products directly from the**
3  **manufacturer rather than Cardinal?**
4  A.      Yes.
5  Q.      **Can you give me an example?**
6  A.      No.
7  Q.      **So is it the case that customers that may**
8  **have purchased Ovcon 35 from Cardinal may purchase**
9  **Balziva directly from a buyer?**
10      MR. CRAMER:  Objection.
11      MR. LONG:  Go ahead and answer if you can.
12  A.      Again, I wouldn't know without running the
13  reports.
14  Q.      **But given that you said that on occasion**
15  **customers do purchase generics directly from the**
16  **generic manufacturer --**
17  A.      Yes.
18  Q.      **-- would you expect that some purchasers**
19  **of Ovcon 35 from Cardinal purchase Balziva directly**
20  **from Barr?**
21      MR. CRAMER:  Foundation, asked and
22  answered.
23      MR. BRYAN:  Don't interrupt, Mr. Cramer.
24  I'm still in my question.
25      MR. CRAMER:  I'm sorry.  I thought you

71

1  were done.
2      MR. LONG:  Are you finished with your
3  question?
4      MR. BRYAN:  I'm finished now.
5      MR. LONG:  I'm going to object.  It's been
6  asked and answered.  If you can answer it, go ahead.
7      MR. CRAMER:  Calls for speculation.
8      MR. BRYAN:  Please read it back.
9      (Record read back as requested.)
10      MR. CRAMER:  Same objection.
11      MR. LONG:  Same objection.  Asked and
12  answered.  Answer if you can.
13  A.      I guess is the question -- Is the question
14  could somebody purchase Ovcon 35 from Cardinal and
15  Balziva from Barr?  Is that the question?
16  Q.      **Well, the question is actually would you**
17  **expect to see that?**
18      MR. CRAMER:  Same objections.
19  A.      I would expect that that could happen,
20  yes.
21  Q.      **After Balziva became available, what**
22  **percentage of -- what happened to Cardinal's volume**
23  **of sales of Ovcon products?**
24      MR. LONG:  Objection.  It goes to
25  downstream.  Instruct the witness not to answer.

72

1      MR. CRAMER:  It's also asked and answered.
2      MR. LONG:  Yes, twice.
3  BY MR. BRYAN:
4  Q.      **You following counsel's instruction?**
5  A.      Yes.
6  Q.      **Did Cardinal lose sales volume as a result**
7  **of the entry of Balziva to the market?**
8      MR. LONG:  Objection; calls for
9  downstream --
10      MR. CRAMER:  Asked and answered.
11      MR. LONG:  -- and asked and answered.
12  Instruct the witness not to answer.
13  BY MR. BRYAN:
14  Q.      **Are you following counsel's instruction?**
15  A.      Yes.
16  Q.      **Is Cardinal better off with more sales or**
17  **fewer sales of Ovcon 35 and its generics?**
18      MR. LONG:  Objection.
19      MR. CRAMER:  Objection.
20      MR. LONG:  Goes to downstream.
21      MR. CRAMER:  Incomplete hypothetical.
22      MR. LONG:  It's incomplete, and instruct
23  the witness not to answer.
24      MR. BRYAN:  I just want to clarify, you're
25  instructing the witness not to answer whether

18 (Pages 69 to 72)

73

1 Cardinal is better off with more sales or fewer sales
2 on the basis of downstream discovery?
3         MR. LONG:  Yes.
4 BY MR. BRYAN:
5 Q.        And are you following your counsel's
6 instruction in that regard?
7 A.        Yes.
8         MR. LONG:  Absolutely he's going to follow
9 his counsel's instruction.
10         MR. BRYAN:  Mr. Long, please don't
11 interrupt me.
12         MR. LONG:  I didn't interrupt you,
13 Mr. Bryan.
14         MR. BRYAN:  I was in the middle of asking
15 a question.  Please don't interrupt my questions.
16 BY MR. BRYAN:
17 Q.        Now, sir, before counsel interrupted me, I
18 asked if you were going to follow counsel's
19 instruction?
20 A.        Yes.
21 Q.        Thank you.  Would Cardinal like to make
22 more money or less money, generally speaking?
23         MR. LONG:  Objection.  It's just a silly
24 attempt to try to get into downstream discovery.
25 Instruct the witness not to answer.

74

1         MR. CRAMER:  It's argumentative also.
2 BY MR. BRYAN:
3 Q.        Are you following counsel's instructions,
4 sir?
5 A.        Yes.
6 Q.        Did anyone at Cardinal analyze what
7 happened to the sales volume of Ovcon 35 and Balziva
8 once generic products became available?
9         MR. LONG:  Objection.  Instruct the
10 witness not the answer.  It's downstream discovery.
11         MR. BRYAN:  On the question of whether
12 anyone analyzed?
13         MR. LONG:  Yes.
14 BY MR. BRYAN:
15 Q.        And you are following counsel's
16 instruction?
17 A.        Yes.
18 Q.        If you wanted to answer that question, who
19 would you ask?
20         MR. LONG:  Objection.  Instruct him not to
21 answer.
22 BY MR. BRYAN:
23 Q.        And you're following counsel's
24 instruction?
25 A.        Yes.

75

1 Q.        Now, going back to paragraph 10 of
2 Deposition Exhibit 2, before you were given a copy of
3 your declaration and draft, did you have an opinion
4 one way or the other whether there was any antagonism
5 or conflict between the interests of Cardinal and the
6 Named Plaintiffs in this case?
7 A.        No.
8 Q.        So is it correct that in the two-hour
9 meeting before you signed Deposition Exhibit 2 on
10 May 18th, that's when you reached your belief?
11 A.        Yes.
12 Q.        Cardinal could pursue its claims outside
13 the class; isn't that right?
14 A.        I believe so, yes.
15 Q.        And would you characterize its purchases
16 of Ovcon 35 as significant?
17 A.        I don't know.
18 Q.        Cardinal is one of the largest
19 wholesalers, is it not?
20 A.        Yes.
21 Q.        And I assume that it has the wherewithal
22 to sue independently of the class; is that right?
23 A.        Yes.
24 Q.        And sophisticated counsel to sue
25 independently?

76

1 A.        I'm sorry?
2 Q.        Do you believe that it has sophisticated
3 counsel to represent it if it wanted to sue
4 independently?
5 A.        I believe if they did, yes.
6 Q.        In paragraph 11, you state that, "Cardinal
7 waives any alleged conflict of interest."  Do you see
8 that?
9 A.        Yes.
10 Q.        I'm referring to Deposition Exhibit 2; is
11 that right?
12 A.        Yes.
13 Q.        Is it -- Do you have authority to waive
14 any conflict of interest on behalf of Cardinal?
15 A.        Yes.
16         MR. CRAMER:  Objection to form --
17         MR. CRAMER:  On what basis?
18         MR. CRAMER:  Can I just finish my
19 objection?
20         -- to the extent you're misstating what it
21 says.  It says if there is a conflict.
22 BY MR. BRYAN:
23 Q.        On what basis do you have the authority to
24 waive a conflict of interest on behalf of Cardinal?
25 A.        Based on the basis that we discussed

19 (Pages 73 to 76)

77

1 earlier.
2 **Q.        Which is what?**
3 A.        My position in the company.
4 **Q.        And as senior vice president of finance,**
5 **have you ever waived a conflict of interest on behalf**
6 **of Cardinal in the past?**
7 A.        No.
8 **Q.        What about when you were vice president?**
9 A.        Never had an opportunity.
10 **Q.        Before May 18th, were you ever called on**
11 **to submit a declaration in any litigation?**
12 A.        No.
13 **Q.        Have you analyzed whether Cardinal's**
14 **economic interests would be better served suing**
15 **independently outside of the class?**
16 A.        No.
17 **Q.        Did you discuss with anyone whether**
18 **Cardinal's interests would be better served by suing**
19 **them separately?**
20 A.        No.
21        MR. LONG:  Well, I'm going to object,
22 Patrick.  I understand where you're going, but my
23 concern on that is that may well go into
24 attorney-client protected discussions.
25        MR. BRYAN:  The question was yes or no,

78

1 and I think he answered, so I think we're safe.
2 BY MR. BRYAN:
3 **Q.        Was it your decision to waive any conflict**
4 **of interest?**
5 A.        On this document, yes.
6 **Q.        Before walking into that meeting on**
7 **May 18th, did you think that you had authority on**
8 **behalf of Cardinal to waive a conflict of interest?**
9 A.        I guess I had not thought about it before
10 that, that meeting.
11 **Q.        And in referring to paragraph 11, you**
12 **state that, "Named Plaintiffs can adequately**
13 **represent the interests of Cardinal in prosecuting**
14 **this case"; do you see that?**
15 A.        Yes.
16 **Q.        And what's that statement based on?**
17 A.        Again, it was based on the discussion of
18 the fact that these attorneys had handled these cases
19 in the past.
20 **Q.        That the -- that you learned of on**
21 **May 18th; is that right?**
22 A.        Yes.
23 **Q.        Do, to your knowledge, Rochester or**
24 **American Sales receive service fees from Warner**
25 **Chilcott?**

79

1 A.        I don't know.
2 **Q.        Is it fair to say that the three national**
3 **wholesalers, Cardinal, McKesson, and Amerisource**
4 **obtain different pricing because of their volume and**
5 **scale?**
6 A.        I can only speak related to Cardinal.  I
7 don't know what the others do.
8 **Q.        With respect to Cardinal, do you believe**
9 **that Cardinal receives preferential pricing because**
10 **of its scale compared to, for example, Rochester?**
11 A.        I don't know.
12 **Q.        Are you familiar with the term "generic**
13 **substitution"?**
14 A.        Yes.
15 **Q.        And do you monitor generic substitution in**
16 **your role as senior vice president?**
17 A.        No, I don't.
18 **Q.        Who does?**
19 A.        It's somebody in the purchasing
20 organization.
21 **Q.        So you haven't analyzed generic**
22 **substitution with respect to Ovcon 35; is that fair?**
23 A.        That's correct.
24 **Q.        Are you familiar with the term**
25 **"chargeback"?**

80

1 A.        Yes.
2 **Q.        What does that mean to you?**
3 A.        What that means to me is, in layman's
4 terms, a supplier will contract with a customer, a
5 Cardinal customer, for a price of the product that is
6 lower than our WAC; and so when we sell the product,
7 we charge back the manufacturer for the difference.
8 **Q.        Does Cardinal charge back the difference**
9 **with respect to purchases of Ovcon 35?**
10 A.        I don't know.
11 **Q.        What about with respect to Balziva; do you**
12 **know?**
13 A.        I don't know.
14 **Q.        Are you familiar at all with oral**
15 **contraceptives?**
16 A.        What do you mean by "familiar"?
17 **Q.        I mean, let me be more specific.  Are you**
18 **familiar with Cardinal's sales of oral**
19 **contraceptives, generally?**
20 A.        No, other than the fact that I know we
21 sell them.
22 **Q.        In your role as senior vice president, do**
23 **you have any responsibility with respect to the**
24 **distribution of oral contraceptives?**
25 A.        No.

81

1  **Q.    Do you have any responsibility**
2  **specifically to Ovcon 35?**
3  A.    No.
4  **Q.    Now, sir, you understand that deposition**
5  **Exhibit 2 is a sworn statement; is that right?**
6  A.    Yes.
7  **Q.    And am I correct that prior to signing**
8  **this sworn statement, you did not conduct any**
9  **research into the assertions that you made in**
10 **Deposition Exhibit 2?**
11        MR. PERWIN:  Objection to the form of the
12 question.
13        MR. CRAMER:  Objection.
14        MR. LONG:  Objection to the form of the
15 question.  I think he testified that -- What do you
16 mean by -- Patrick, I'd like to -- my question is
17 what do you mean by "investigation"?
18 BY MR. BRYAN:
19 **Q.    In common layman's terms, sir, did you**
20 **conduct any investigation or research whatsoever with**
21 **respect to the claims that you assert in Deposition**
22 **Exhibit 2 prior to signing the sworn statement?**
23        MR. CRAMER:  Asked and answered.
24        MR. LONG:  Yeah.
25 BY MR. BRYAN:

82

1  **Q.    Sir?**
2         MR. LONG:  Same objection.
3  A.    Again, it depends on what you mean by
4  "research."  I mean, I had appropriate -- in my
5  opinion, I had appropriate discussions with the
6  appropriate people to allow me to sign this document.
7  **Q.    And you -- when you refer to "appropriate**
8  **people," you're referring to counsel, and is there**
9  **anyone else?**
10 A.    The controller, as I mentioned, was in the
11 meeting as well.
12 **Q.    Did you review any documents in that**
13 **meeting other than Deposition Exhibit 2?**
14 A.    And the -- the claim.
15 **Q.    And you're referring to Deposition Exhibit**
16 **1, the complaint?**
17 A.    Yeah.  Again, whether it was the amended
18 one or whether it was not, I don't recall, but it was
19 the claim.
20        MR. BRYAN:  I'm going to take a
21 five-minute break.
22        MR. LONG:  Hold on just so -- I'd like
23 to --
24        MR. BRYAN:  Do you want to go off the
25 record to confer with your witness?

83

1         MR. LONG:  Give us just a moment.
2         Okay.  Good enough.  That's fine.
3         MR. BRYAN:  Why don't we take a
4  five-minute break, and we'll wrap up.
5         MR. LONG:  That's good.  Okay.
6         (Recess taken.)
7  BY MR. BRYAN:
8  **Q.    Now, sir, before we took a break, I asked**
9  **you if you conducted any research, and you responded**
10 **depends on what you mean by research; do you recall**
11 **that?**
12 A.    Yes.
13 **Q.    What do you mean by research, generally**
14 **speaking?**
15 A.    In the frame of your question, what I
16 indicated I did was I talked to the people that I
17 thought I needed to talk to to get the answers to
18 sign this document.
19 **Q.    And the people that you spoke to included**
20 **Cardinal's counsel; correct?**
21 A.    Yes.
22 **Q.    Including Mr. Long?**
23 A.    Yes.
24 **Q.    And that was conducted solely at a meeting**
25 **on May 18th, the same date that you signed your**

84

1  declaration?
2  A.    Yes.
3         MR. BRYAN:  I have no further questions.
4         MR. NAVARRO:  I have no questions.
5         MR. PERWIN:  No questions.
6         MR. CRAMER:  No questions.
7         MR. LONG:  I have two just clarifying
8  questions.
9              - - -
10        DIRECT EXAMINATION
11 BY MR. LONG:
12 **Q.    Mr. Flinn, you were asked about contracts**
13 **where a customer had an agreement to purchase a fixed**
14 **quantity of product from Cardinal.  How long have you**
15 **been with Cardinal Health?**
16 A.    Just over 16 years.
17 **Q.    During your 16 years with Cardinal Health,**
18 **are you aware of any arrangement between a customer**
19 **and Cardinal to purchase a fixed quantity of a**
20 **product?**
21 A.    No.
22 **Q.    Second, there was a question by Mr. Bryan**
23 **regarding service fees Cardinal would receive from**
24 **certain manufacturers; do you recall that?**
25 A.    Yes.

85

1  Q.       Are service fees product specific, or do
2  they relate to the overall management of a
3  manufacturer's product lines?
4          MR. BRYAN: Object to form.
5          MR. NAVARRO: Objection to form.
6  BY MR. LONG:
7  Q.       Go ahead and answer.
8  A.       They relate to the overall basket of
9  products.
10         MR. LONG: I have nothing further.
11         MR. BRYAN: I have a follow-up.
12                     - - -
13              RECROSS-EXAMINATION
14  BY MR. BRYAN:
15  Q.       Now, sir you've testified you've been at
16  Cardinal for 16 years?
17  A.       Yes.
18  Q.       And in that 16 years, have you had any
19  responsibility to review contracts with respect to
20  sales of branded and generic pharmaceuticals?
21  A.       Yes.
22  Q.       And did you have any such responsibility
23  since April 22nd, 2004?
24  A.       Since April, 22nd?
25  Q.       Since April --

86

1  A.       In my current capacity, yes.
2  Q.       And your current capacity started in
3  September of 2006?
4  A.       Yes.
5  Q.       Now, is it correct that between
6  April 22nd, 2004, and September of 2006, you had no
7  responsibility to review contracts relating to the
8  sale of branded and generic pharmaceutical products?
9  A.       That would not be correct.
10  Q.       Okay. What contracts specifically did you
11  review?
12  A.       It would have been in the nuclear pharmacy
13  organization, which also uses branded and generic
14  pharmaceutical products.
15  Q.       In the nuclear pharmacy division, are
16  there any sales of branded or generic
17  pharmaceuticals, specifically oral contraceptive
18  pharmaceuticals?
19  A.       No.
20  Q.       So is it correct that in your role as vice
21  president of the nuclear pharmacy, you would not
22  review contracts that relate specifically or
23  generally to the sale of branded or generic oral
24  contraceptives?
25  A.       That's correct.

87

1          MR. BRYAN: Now, Mr. Long, you have asked
2  this witness about Cardinal's contracts with its
3  customers and any arrangements that it had with its
4  customers. This witness has specified in his
5  declaration and made assertions about Cardinal's
6  contracts with its customers, and you have
7  insisted -- or refused to allow this witness to
8  answer my questions with respect to Cardinal's
9  contracts with its customers. I want to state for
10  the record that I believe your objections were
11  improper, but we will revisit that at another time.
12         MR. LONG: Fine. That's fine. The other
13  thing, while we're here, we did serve yesterday our
14  responses and objections to the document request; and
15  I just wanted to make clear one part I tried to put
16  in the transmittal letter. It's just to make things
17  easier from your perspective.
18         MR. BRYAN: Is this something we need to
19  discuss on the record?
20         MR. LONG: I'd like it on the record if we
21  can. It will be very brief. We will furnish --
22  Cardinal will furnish purchase data that you
23  requested. The one thing I really want to explain is
24  we have found, in past cases, if you will furnish the
25  NDC codes for the products that you think should be

88

1  covered, because we don't want to have the purchasing
2  data people trying to figure out what products have
3  to be covered. Second, if you could also furnish it
4  to us, just list it in an Excel spreadsheet, because
5  the way they do a data inquiry, he can paste them in
6  and do the data inquiry, because we literally -- in
7  one of the early cases, there was a transposing of
8  one of the numbers that made a mistake in the thing.
9  It took us all a while to get it covered; and I don't
10  know all the time deadlines, but I know you're under
11  some. Cardinal is a June 30 fiscal year, so if you
12  could get that to us. My concern is come July 1, the
13  data people and literally the equipment really gets
14  tied up doing year-end reports for a while. And I
15  know you had some deadline this summer, so I'd gladly
16  work with you on that.
17         MR. BRYAN: Well, I appreciate it. And I
18  can't -- I'm not prepared to say whether or not we
19  can produce -- or ask for a specific indices, but I'm
20  happy to meet -- we'll do whatever we can to make the
21  burden on Cardinal minimal.
22         MR. LONG: I appreciate it.
23         MR. BRYAN: Thank you.
24         MR. LONG: John, you have a right to
25  review this; and generally in these cases we ask you

22 (Pages 85 to 88)

89

```
 1   to review the transcript.  We'll work with the court
 2   reporter to make that arrangement.
 3              MR. BRYAN:  I just assumed you're
 4   reserving signature, so...
 5              MR. LONG:  Yeah.  Exactly.
 6              (Signature not waived.)
 7                    - - -
 8              And, thereupon, the deposition was
 9   concluded at approximately 2:34 p.m.
10                    - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

90

```
 1   State of Ohio    :
                      SS:
 2   County of Franklin:
 3         I, JOHN JAY FLINN, do hereby certify that
 4   I have read the foregoing transcript of my deposition
 5   given on June 8, 2007; that together with the
 6   correction page attached hereto noting changes in
 7   form or substance, if any, it is true and correct.
 8
 9        _____
               JOHN JAY FLINN
10
11        I do hereby certify that the foregoing
12   transcript of the deposition of JOHN JAY FLINN was
13   submitted to the witness for reading and signing;
14   that after he had stated to the undersigned Notary
15   Public that he had read and examined the deposition,
16   he signed the same in my presence on the _____ day of
17   _____, 2007.
18
          _____
19            Notary Public
20   My commission expires _____
21                    - - -
22
23
24
25
```

91

```
 1
 2                    Pg.  of  Pgs.
 3
 4
 5        I wish to make the following changes, for
 6   the following reasons:
 7   PAGE LINE
 8   ____ ____     CHANGE: _____
 9             REASON: _____
10   ____ ____     CHANGE: _____
11             REASON: _____
12   ____ ____     CHANGE: _____
13             REASON: _____
14   ____ ____     CHANGE: _____
15             REASON: _____
16   ____ ____     CHANGE: _____
17             REASON: _____
18   ____ ____     CHANGE: _____
19             REASON: _____
20   ____ ____     CHANGE: _____
21             REASON: _____
22   ____ ____     CHANGE: _____
23             REASON: _____
24   ____ ____     CHANGE: _____
25             REASON: _____
```

92

```
 1
 2   PAGE LINE
 3   ____ ____     CHANGE: _____
 4             REASON: _____
 5   ____ ____     CHANGE: _____
 6             REASON: _____
 7   ____ ____     CHANGE: _____
 8             REASON: _____
 9   ____ ____     CHANGE: _____
10             REASON: _____
11   ____ ____     CHANGE: _____
12             REASON: _____
13   ____ ____     CHANGE: _____
14             REASON: _____
15   ____ ____     CHANGE: _____
16             REASON: _____
17   ____ ____     CHANGE: _____
18             REASON: _____
19   ____ ____     CHANGE: _____
20             REASON: _____
21
22
23
24
25
```

23 (Pages 89 to 92)

93

```
 1                   CERTIFICATE
    State of Ohio    :
 2                   SS:
    County of Franklin:
 3          I, Erin D. Gilkison, Notary Public in and
 4   for the State of Ohio, duly commissioned and
 5   qualified, certify that the within named JOHN JAY
 6   FLINN was by me duly sworn to testify to the whole
 7   truth in the cause aforesaid; that the testimony was
 8   taken down by me in stenotypy in the presence of said
 9   witness, afterwards transcribed upon a computer; that
10   the foregoing is a true and correct transcript of the
11   testimony given by said witness taken at the time and
12   place in the foregoing caption specified.
13          I certify that I am not a relative,
14   employee, or attorney of any of the parties hereto,
15   or of any attorney or counsel employed by the
16   parties, or financially interested in the action.
17          IN WITNESS WHEREOF, I have set my hand and
18   affixed my seal of office at Columbus, Ohio, on this
19   13th day of June, 2007.
20          _____
            ERIN D. GILKISON, Notary Public
21          in and for the State of Ohio
            and Registered Professional
22          Reporter.
23   My Commission expires October 31, 2007.
24
25
```

**A**

**ability** 56:8
**Absolutely** 73:8
**accounting** 4:22
  17:12 18:2,6 20:4
**achieve** 51:13
**action** 3:11 9:14
  13:21 14:2 26:2
  33:11 52:8 58:9,15
  60:25 93:16
**actions** 64:11,21
**add** 49:2
**added** 61:12
**address** 7:7
**adequately** 78:12
**adjourning** 7:8
**advice** 47:7
**affect** 43:1
**affidavit** 14:22,25
  52:1,9
**affidavits** 13:11,13
  13:17 14:11 51:22
  51:25 52:6
**affirmative** 64:20
**affirmatively** 64:9
**affixed** 93:18
**aforesaid** 93:7
**afternoon** 4:11
**aggregate** 48:3,4,23
**ago** 13:3 23:14 64:5
  64:6
**agree** 35:17
**agreement** 5:20 7:2
  41:19,24 84:13
**agreements** 41:14
  41:16 42:10,16
**ahead** 7:13 9:17
  43:25 44:7 48:25
  63:21 65:24 66:5
  69:5 70:11 71:6
  85:7
**alleged** 76:7
**allocate** 48:23
**allocated** 48:4
**allow** 46:25 82:6
  87:7
**all-day** 54:7,8
**amended** 3:11 11:25
  12:4,11 82:17
**American** 37:15,25

38:9 66:23 67:2,4
  68:16 78:24
**Amerisource** 79:3
**amount** 51:7
**analysis** 5:17 58:7
  64:3 65:17
**analytical** 8:14
**analyze** 58:13 66:1,7
  74:6
**analyzed** 74:12
  77:13 79:21
**and/or** 45:1
**answer** 6:7,18,18
  7:6,23 9:17 10:9
  29:21 30:3,11,14
  30:18,24 31:14,17
  31:20,23 32:1,4,12
  32:17,23 33:1,3
  34:12 35:24 36:4
  36:12,19 37:1,9,19
  37:22 38:5,14
  39:13,25 40:25
  43:25 44:8,10,23
  46:9,18 47:4 49:1
  50:8 53:5 56:12,24
  63:7,21 65:24 66:5
  68:20 69:5 70:11
  71:6,12,25 72:12
  72:23,25 73:25
  74:10,18,21 85:7
  87:8
**answered** 58:17
  65:23 66:4 70:22
  71:6,12 72:1,10,11
  78:1 81:23
**answers** 6:15 83:17
**antagonism** 64:24
  65:2 75:4
**anybody** 55:15
**apologize** 50:7
**appearance** 27:6
**APPEARANCES**
  2:1
**appears** 15:8
**appreciate** 88:17,22
**appropriate** 82:4,5
  82:6,7
**approve** 8:8
**approximately** 89:9
**April** 24:11,13

85:23,24,25 86:6
**argue** 9:23
**argumentative** 74:1
**arrangement** 84:18
  89:2
**arrangements** 87:3
**asked** 15:12 16:4,11
  17:15,17,19 26:24
  27:2 32:16 35:4,8
  35:12 40:15 53:22
  58:17 61:20,22
  65:22 66:3 70:21
  71:6,11 72:1,10,11
  73:18 81:23 83:8
  84:12 87:1
**asking** 9:24 10:2,11
  21:12 22:10 32:21
  33:12 35:11 48:21
  52:23 55:12 73:14
**assert** 22:20 81:21
**asserted** 19:20
**assertion** 35:18
**assertions** 17:17
  18:7 20:6 81:9
  87:5
**assignees** 49:23,24
  50:13
**assignment** 26:5,11
**assignments** 26:21
  26:25
**assigns** 26:1
**assume** 25:2 29:17
  51:6 75:21
**assumed** 89:3
**assumes** 37:20
**assuming** 38:10
**assumption** 22:12
  67:3
**attached** 90:6
**attempt** 73:24
**attorney** 2:2,6,10,14
  2:15 16:14,19
  93:14,15
**attorneys** 26:17
  78:18
**attorney-client**
  77:24
**authority** 5:22 7:16
  7:17 18:12,16,22
  19:1,8,17 76:13,23

78:7
**automatically** 46:25
**availability** 68:3
**available** 44:18,21
  57:11 71:21 74:8
**Avenue** 2:20
**aware** 14:8,15 26:10
  33:6,9,16,21 49:7
  50:12,13 84:18
**AWP** 36:10

**B**

**back** 34:22 41:17
  43:5 44:5 45:20
  58:19 60:21 63:10
  63:11 69:2,4 71:8
  71:9 75:1 80:7,8
**Baker** 1:18 2:10
**Balziva** 11:5,8 21:5
  21:15 22:2 39:2,4
  44:18,21 45:1
  56:18 57:5,11,15
  68:9,11,17 69:10
  70:9,19 71:15,21
  72:7 74:7 80:11
**Barr** 1:11 2:17 9:1
  10:17 12:6 13:25
  26:2 70:20 71:15
**Bartlett** 2:20
**based** 7:9 10:4,5
  19:22 20:18 26:22
  30:24 31:20 33:17
  33:18 34:9 35:13
  36:9 39:19 40:6
  48:12 58:20 59:2
  59:18 76:25 78:16
  78:17
**basically** 4:20 18:18
  48:8
**basis** 6:5,9,20 7:21
  7:22,25 18:16
  20:21 22:4 29:23
  33:9 34:14 46:11
  48:15,17 58:1,2
  66:15 73:2 76:17
  76:23,25
**basket** 85:8
**behalf** 1:4 2:4,9,13
  2:17,22 18:13,22
  22:12 47:12 76:14

76:24 77:5 77:8 78:8
**behind-the-scenes**
  5:17
**belief** 75:10
**believe** 15:14 16:23
  19:2 58:2 59:22
  65:4,25 75:14 76:2
  76:5 79:8 87:10
**believed** 66:18
**benchmark** 27:21
  27:25
**benchmarks** 35:21
  36:14
**Berger** 2:2
**best** 50:18 51:11
  57:19 58:3
**better** 72:16 73:1
  77:14,18
**bigger** 67:1,3
**Biscayne** 2:7
**books** 4:22
**boss** 19:3,6,10,13,14
**bothered** 55:13
**Boulevard** 2:7
**brand** 11:8,13 20:15
  21:7 29:9,13,15
  36:23 45:16,17
  56:9
**branded** 10:25
  23:24 25:15 28:12
  28:17 29:18 40:7
  45:10 85:20 86:8
  86:13,16,23
**brands** 45:13
**break** 33:24 60:17
  63:1 82:21 83:4,8
**brief** 87:21
**brought** 33:11
**Bryan** 2:14 3:5,8
  4:10 6:9,14,19 7:2
  7:14 9:18,23 10:1
  12:2,3 17:11,25
  24:20 29:23 30:5
  30:11,12,14,20,22
  31:16,19,25 32:6
  32:14 33:4 34:1,3
  34:13,18 35:25
  36:5,13,17,20 37:2
  37:10,23 38:15
  39:14 41:1,8 43:9

43:11,22 44:3 45:7
45:8 46:20 47:6
49:5,14 52:12,16
55:9,13,17,18
56:22,25 58:12,18
60:16,20 62:12,21
63:1,4,6,9 64:14
64:18 70:23 71:4,8
72:3,13,24 73:4,10
73:13,14,16 74:2
74:11,14,22 76:17
76:22 77:25 78:2
81:18,25 82:20,24
83:3,7 84:3,22
85:4,11,14 87:1,18
88:17,23 89:3
**burden** 88:21
**business** 5:4,5,6,7
5:10 21:17 23:22
23:24 25:2,7 50:17
51:19 52:14,22
53:2,4,7,19 54:16
60:23 66:13,22
67:8,12,19
**buy** 22:11 44:14
69:23 70:1
**buyer** 70:9
**buying** 23:24 66:13

**C**

**C** 4:1
**call** 69:19
**called** 77:10
**calls** 9:13 43:21 71:7
72:8
**capable** 58:22
**capacity** 86:1,2
**Capitol** 1:18 2:11
**caption** 93:12
**Cardinal** 4:14,15
5:14,20,23 7:19
8:5 9:14 14:4 17:1
17:3,6 18:13,23
19:1 20:5,14 21:1
21:14 22:1 23:9,20
24:16,22 25:4,9,22
25:25 26:11 27:16
27:20 28:4,7,22
29:6,15,17,25 33:6
33:9,12,13,13,14

33:16 34:4,23 35:5
35:9,13,22 36:1,15
36:21 37:6,14,16
37:20,25 38:2,9,18
39:9,17 40:2,22
41:5,13 42:5,11,19
42:25 45:4,9,22,24
46:4,6,7,15,23,25
47:21,24 50:13,17
51:5,6,13 52:7,22
53:2,9 56:10,16,20
57:23 58:21 59:14
64:9,20 66:9,17
67:1,9,13 68:5,9
68:11,14,18,23
69:10 70:1,3,8,19
71:14 72:6,16 73:1
73:21 74:6 75:5,12
75:18 76:6,14,24
77:6 78:8,13 79:3
79:6,8,9 80:5,8
84:14,15,17,19,23
85:16 87:22 88:11
88:21
**Cardinal's** 12:23
15:19 16:14,19
18:3 22:14,18 23:3
23:7 24:11 35:18
40:5 43:15 51:2
52:13 54:15 55:20
57:4,12,19 58:8,14
58:23 60:23 62:23
63:18,24 65:20
66:22 67:20,23
68:2 71:22 77:13
77:18 80:18 83:20
87:2,5,8
**case** 1:7 6:12 13:14
13:18,23 14:1,6,9
14:19 15:7,13 16:5
16:12,14 26:12,21
26:22 59:6 63:19
64:1,2,4,25 67:16
68:7 70:7 75:6
78:14
**cases** 13:12,16 17:14
59:3,17,20,23,24
60:2 62:24 63:25
78:18 87:24 88:7
88:25

**cause** 26:2 93:7
**caution** 17:20
**center** 2:7 22:9 30:2
**certain** 10:19 12:5
19:1 27:23 28:9
29:16 34:5,6 36:10
36:23 42:11,17,20
84:24
**CERTIFICATE**
93:1
**certified** 4:8 14:6
57:24
**certify** 90:3,11 93:5
93:13
**certifying** 50:19
51:11
**CFO** 4:20 18:18
**chain** 4:17 5:1 19:16
42:8
**change** 16:24 18:7
34:16 91:8,10,12
91:14,16,18,20,22
91:24 92:3,5,7,9
92:11,13,15,17,19
**changes** 15:21 16:20
16:21,23,24 61:20
90:6 91:5
**changing** 46:11
**characterization**
34:25
**characterize** 54:9
54:11 75:15
**charge** 46:2,14 80:7
80:8
**chargeback** 79:25
**charges** 28:23 30:1
38:9 45:23 46:4,7
**Chemicals** 1:11
**Chilcott** 1:8,9,10
2:22 10:18,25 12:6
14:1 24:10 26:2
39:23 42:23 43:17
44:21 78:25
**circumstances**
16:10,15 44:11
**claim** 51:1 52:24
65:10,11,12,13
82:14,19
**claims** 26:25 62:17
62:23 63:19,25

75:12 81:21
**clarification** 61:21
61:23
**clarify** 44:16 72:24
**clarifying** 84:7
**class** 2:4 3:11 9:14
9:15 13:21 14:2,5
14:5 33:11 47:12
48:3,9 50:19 51:12
51:16 52:8 53:8
57:20,24 58:3,9,15
60:25 64:10,21
65:18,21 66:10,17
75:13,22 77:15
**clear** 6:2,10 10:10
10:24 14:17 28:7
30:23 32:6 55:10
87:15
**client** 63:2
**clinics** 5:12
**codes** 87:25
**collect** 26:24 27:2
**COLUMBIA** 1:1
**Columbus** 1:19 2:12
93:18
**come** 29:8 66:19
88:12
**comfortable** 15:20
19:7
**coming** 52:17
**commission** 90:20
93:23
**commissioned** 93:4
**common** 81:19
**communication**
17:24
**communications**
18:6 62:1
**company** 1:9 20:22
77:3
**compared** 79:10
**Competition** 29:3
**competitors** 29:4
**complaint** 3:11
11:23 12:1,5,10,12
13:5 39:5 82:16
**compound** 43:25
**computer** 93:9
**concern** 77:23 88:12
**concluded** 66:15,18

89:9
**conclusion** 9:13
43:21 52:17 53:14
66:20
**conditions** 28:22
29:1 45:22,24
**conduct** 19:24 20:11
22:17 32:10,19
58:7 65:17 81:8,20
**conducted** 83:9,24
**confer** 63:2 82:25
**confident** 58:21
**conflict** 64:24 65:3,5
65:7,21,25 66:2,9
66:16 75:5 76:7,14
76:21,24 77:5 78:3
78:8
**connection** 14:9
**considered** 50:17
51:19 52:14,22
53:2,4,7,19 54:16
60:23
**contacted** 16:16,18
**contain** 61:7
**contend** 47:21,24
51:12,15 57:23
**continues** 22:1
**contraceptive** 46:24
47:25 86:17
**contraceptives**
40:18,20 47:1
80:15,19,24 86:24
**contract** 8:13,16
39:19 40:10 80:4
**contracts** 5:14 8:8
8:23 22:14,18,21
23:2,6,8,9 24:15
24:22,23 25:3,8,14
25:20,25 27:16,20
28:14 34:5,8,14,23
35:5,9,13,19 36:1
36:9,21 39:9,17,22
40:2,13,15,19,23
41:6 46:23 67:5
84:12 85:19 86:7
86:10,22 87:2,6,9
**controller** 17:12
18:2,7 20:4 53:25
63:12,17 82:10
**controls** 4:23

**conversation** 63:17
**conveys** 26:1
**copy** 11:22 12:4
  13:5 14:18 15:6
  27:5 61:4 75:2
**cordon** 34:14
**Corey** 16:19
**Corporation** 1:10
**correct** 10:20 12:4
  14:2,22 15:6 19:9
  19:12 25:19 33:23
  35:10,14,19 48:19
  48:20 49:9,10 61:3
  62:14,15 63:16
  68:4,8 75:8 79:23
  81:7 83:20 86:5,9
  86:20,25 90:7
  93:10
**correction** 90:6
**cost** 36:2 43:2 44:10
  44:12,15,17 45:24
  46:7,11,15
**counsel** 9:4,16 12:24
  15:19 17:21 18:3
  27:10 30:9 39:6
  49:2,6,12,16 54:21
  54:24 55:1,3,5
  58:6,22 59:6,11
  62:2,5,14 73:17
  75:24 76:3 82:8
  83:20 93:15
**counsels** 33:19
  53:21 59:3
**counsel's** 30:24
  34:19 36:6 37:3,11
  38:16 39:15 41:2
  46:21 47:7 57:1
  72:4,14 73:5,9,18
  74:3,15,23
**counterpart** 45:18
**County** 90:2 93:2
**course** 21:16,21
**court** 1:1 14:6 50:19
  51:11 89:11
**covered** 88:1,3,9
**Cramer** 2:2 9:10
  10:4,6 29:22 31:15
  31:24 43:19,21
  44:6 46:19 47:5
  49:11 52:11,15,18

58:11,17 62:10,20
  63:20 65:22 66:3
  66:24 70:10,21,23
  70:25 71:7,10,18
  72:1,10,19,21 74:1
  76:16,18 81:13,23
  84:6
**Cross-Examination**
  3:4 4:9
**CRR** 1:22
**current** 23:15 86:1,2
**currently** 68:24
**customer** 5:20 8:6
  37:7 46:7 56:15
  80:4,5 84:13,18
**customers** 5:14 7:19
  8:3 22:21 23:3,7
  23:10 24:16 25:4,9
  25:22 27:17,21
  34:6,24 35:5,10,19
  36:16,17,22 37:21
  39:10,10 40:23
  46:2,4,16 56:13,14
  69:22,23 70:1,7,15
  87:3,4,6,9
**customer-by-cust...**
  7:21,25
**CVS** 68:9

D

**D** 1:22 3:1 4:1 93:3
  93:20
**damages** 47:11 48:4
  48:8,23 49:8 50:23
  50:25 51:3,6,7,14
  51:16
**data** 68:22 69:18,21
  87:22 88:2,5,6,13
**date** 15:14 16:7
  33:20 59:9 83:25
**day** 8:21 90:16
  93:19
**days** 13:3
**day's** 42:9
**deadline** 88:15
**deadlines** 88:10
**dealing** 42:5
**deals** 5:18
**decision** 78:3
**declaration** 3:13

6:25 14:18 15:6,13
  15:16,18,23 16:5,8
  16:11,25 17:18
  18:8,13,17,22 19:4
  19:11,21,21 20:6
  21:24 22:18 24:9
  30:2 53:1 59:21
  60:13 61:4 62:7
  75:3 77:11 84:1
  87:5
**declarations** 14:8,10
  18:25
**decreased** 57:8
**Defendant** 2:17,22
**Defendants** 1:13
**definition** 42:13
  44:9 54:12,13 66:6
**deny** 6:20
**department** 16:3
  21:12 40:1 44:24
  45:2
**depending** 8:21
  39:11
**depends** 42:13
  54:12 66:6 82:3
  83:10
**deposes** 4:8
**deposition** 1:15 6:1
  6:23,24 7:3,4,8,9
  9:1,22 11:20,22
  12:8,13,18,22 13:5
  13:6 14:13,17 15:2
  15:5,16 16:21
  18:10 19:21,25
  20:10 22:13 27:3
  28:21 30:21 32:10
  32:19 33:21 34:22
  45:20 47:10 49:22
  56:1 59:9,15 60:4
  60:22 61:4,8,13,17
  64:8 65:15 75:2,9
  76:10 81:4,10,21
  82:13,15 89:8 90:4
  90:12,15
**describe** 20:13,14
**determine** 66:8
  67:12,19,22,25
  68:5,20
**determined** 48:14
  50:17 53:2

**diagnostic** 5:11
**difference** 80:7,8
**differences** 67:8
**different** 8:20 23:23
  37:15,16 44:13
  79:4
**direct** 2:4 3:6 10:19
  11:24 12:5 49:24
  50:19 84:10
**directly** 69:23 70:2
  70:9,15,19
**discount** 43:12,14
  43:17
**discounts** 28:4
  44:20
**discovery** 6:4,8,11
  6:20 7:1,4,10
  29:20 31:13,18
  34:12 73:2,24
  74:10
**discuss** 17:1,7 77:17
  87:19
**discussed** 8:23
  54:15 59:18 76:25
**discussion** 16:13
  20:8 49:2 53:20
  58:5 78:17
**discussions** 15:3
  33:19 54:20 59:3
  77:24 82:5
**distribution** 1:4 5:4
  18:20 20:22 22:9
  41:23 80:24
**DISTRICT** 1:1,1
**division** 86:15
**document** 17:13
  18:24 19:2 48:1
  49:18 53:10,11,12
  61:10 65:14 78:5
  82:6 83:18 87:14
**documents** 13:8
  18:21 19:6,25
  21:13,23 26:24
  27:2 60:22 82:12
**doing** 88:14
**dollars** 31:2 48:12
**downstream** 6:4,7
  7:1,9,12 29:20
  31:13,17 34:12
  71:25 72:9,20 73:2

73:24 74:10
**draft** 15:16 61:6,7,9
  61:13 75:3
**drafted** 15:24
**drafting** 15:22
**Drug** 37:16,17 38:3
  38:10 60:6,9,10,14
  60:14 67:9,11
**duly** 4:7 93:4,6
**duties** 5:25
**D.C** 2:16

E

**E** 2:6 3:1 4:1,1
**earlier** 20:8 49:2
  52:1 77:1
**early** 88:7
**easier** 87:17
**East** 1:19 2:11
**economic** 55:20,24
  56:2 57:19 58:8,14
  77:14
**economical** 51:16
**either** 12:16,19 38:7
  68:13
**Ellis** 2:15
**employed** 93:15
**employee** 93:14
**employees** 20:3,5
**empowering** 18:21
**ended** 61:10
**entail** 5:3
**enter** 54:18
**entered** 24:19 52:23
**entire** 54:1
**entities** 38:11 68:13
**entitled** 30:14 31:16
  32:17
**entry** 72:7
**equipment** 88:13
**ERIC** 2:2
**Erin** 1:22 93:3,20
**EUN** 2:15
**EUNNICE** 2:15
**exact** 64:7
**Exactly** 89:5
**Examination** 3:6,7
  84:10
**examined** 90:15
**example** 11:5 27:22

27:23 42:15 70:5
79:10
**Excel** 88:4
**exclusive** 28:3,6
**Excuse** 62:25
**execute** 18:12,17,22
19:4
**executed** 19:5
**executing** 19:10
**executive** 19:15
**Exhibit** 3:11,12 4:3
11:20,22 12:8,13
13:5,6 14:13,17
15:2,5,17 16:22
18:10 19:22 20:1
20:10 22:14 28:21
33:21 34:22 45:20
47:10 49:22 56:1
59:9,15 60:4,22
61:5,8,13,17 64:8
65:15 75:2,9 76:10
81:5,10,22 82:13
82:15
**EXHIBITS** 3:10
**existed** 24:15 25:20
**expect** 6:15 70:18
71:17,19
**expectations** 59:4
**experience** 58:20,25
59:5,13,14,16 60:7
**expires** 90:20 93:23
**explain** 87:23
**explained** 63:13
**expressed** 64:10
**expressing** 64:20
**extent** 10:8 76:20

---
**F**

**fact** 20:14 78:18
80:20
**factors** 46:6
**facts** 19:20
**fair** 5:20,21 10:15
11:1,10 15:23
20:14 23:25 25:13
25:19 29:17 33:22
34:24 35:6 40:17
43:2,13,18,23 51:2
51:8 54:14 59:8
62:9 65:20 79:2,22

**falls** 18:19
**familiar** 25:23 26:4
27:22 38:20 40:12
40:14,19 41:18,20
41:22 48:19 59:10
59:24 60:9,14
79:12,24 80:14,16
80:18
**familiarity** 17:14
**far** 31:3
**fault** 69:2
**fee** 42:11,20 43:16
46:13 67:6
**feel** 32:22
**fees** 78:24 84:23
85:1
**fewer** 72:17 73:1
**Fifteenth** 2:16
**figure** 88:2
**filed** 10:18 11:23
12:5 15:7
**final** 15:9 61:10
**finance** 4:16 23:21
77:4
**finances** 24:3
**financial** 8:15
**financially** 93:16
**find** 7:6 21:9,11
26:15
**fine** 9:22 49:4 60:18
63:3,5 83:2 87:12
87:12
**finish** 32:10 76:18
**finished** 50:9 71:2,4
**first** 4:7 12:12 39:4
52:21
**fiscal** 88:11
**five-minute** 60:16
82:21 83:4
**fix** 37:24
**fixed** 22:22 23:3
24:23 27:17 84:13
84:19
**Flinn** 1:15 3:3,13
4:6,13 84:12 90:3
90:9,12 93:6
**Florida** 2:8
**follow** 30:6,8 73:8
73:18
**following** 34:19 36:6

37:3,11 38:16
39:15 41:2 46:21
47:7 57:1 72:4,14
73:5 74:3,15,23
91:5,6
**follows** 4:8
**follow-up** 85:11
**foreclosing** 7:8
**foregoing** 90:4,11
93:10,12
**form** 6:15 9:19,25
43:8,19,25 47:12
49:8 52:11,15
58:11 62:20 63:20
65:22 66:3,24
76:16 81:11,14
85:4,5 90:7
**forth** 4:23 5:12,18
15:21
**found** 87:24
**foundation** 37:24
70:21
**four** 29:4
**frame** 54:18 83:15
**franchising** 5:7
**FRANCISCO** 2:19
**Frank** 45:19
**Franklin** 90:2 93:2
**Friday** 1:17
**front** 30:2
**fully** 52:19 58:22
**furnish** 87:21,22,24
88:3
**further** 37:19 84:3
85:10

---
**G**

**G** 4:1
**Galen** 1:11
**general** 5:25 6:5
10:3 45:6
**generally** 5:9,10
21:19 69:23 73:22
80:19 83:13 86:23
88:25
**generated** 60:23
**generic** 11:3,8,13
20:15,24 23:25
25:15 28:12,17
29:9,9,11,16,18

36:24 38:23 40:7
45:10,16,18 56:9
56:11 70:1,16 74:8
79:12,15,21 85:20
86:8,13,16,23
**generics** 45:13
56:14 69:23 70:15
72:17
**getting** 7:1 33:15
55:10
**Gilkison** 1:22 93:3
93:20
**give** 32:4 42:15 70:5
83:1
**given** 13:4 33:18
70:14 75:2 90:5
93:11
**giving** 26:8
**gladly** 88:5
**go** 9:17 22:9 32:23
34:1 43:25 44:7
48:2,25 58:19
63:21 65:24 66:5
69:5,16,20 70:11
71:6 77:23 82:24
85:7
**goes** 22:24 71:24
72:20
**going** 6:3,5,6,17
7:11,12 9:12,20,21
9:23 17:13,15,20
28:19 29:19 30:3,6
30:8,17,18 32:9,12
34:16,22 37:18
38:13 43:24 45:20
46:12 55:14 60:21
71:5 73:8,18 75:1
77:21,22 82:20
**Goldsane** 16:19
17:9 20:9 53:24
**Goldstein** 17:8
**good** 4:11 43:7
44:12 56:15 83:2,5
**guess** 16:15 22:11
41:25 46:9 52:19
56:12 71:13 78:9
**G-O-L-D-S-A-N-E**
17:10

---
**H**

**H** 2:15
**half** 24:5 32:20
**hand** 14:12 93:17
**handed** 61:4,6
**handing** 11:19
**handle** 51:23
**handled** 51:17 78:18
**happen** 53:16 71:19
**happened** 56:17
57:4 71:22 74:7
**happens** 8:21
**happy** 88:20
**Hardy** 19:14
**head** 4:21 45:4,9,11
45:15 56:22
**Health** 4:14 8:5
84:15,17
**healthcare** 4:17 5:1
19:15
**hear** 43:3 69:1
**heard** 39:1,4
**heart** 5:12
**hereinafter** 4:7
**hereto** 90:6 93:14
**higher** 47:17
**Hold** 82:22
**Holdings** 1:8
**hospitals** 5:12
**Hostetler** 1:18 2:10
**hour** 54:5
**hours** 32:20 54:13
**hypothetical** 31:15
31:17,21 72:21

---
**I**

**idea** 57:12,14
**identification** 4:4
**identify** 9:6
**III** 1:9
**implications** 8:16
**imply** 55:4
**improper** 87:11
**Inacker** 45:11,15
**included** 83:19
**includes** 5:4
**Including** 83:22
**inclusive** 28:3
**incomplete** 31:15
72:21,22
**increase** 44:17,21

46:25 47:2
**increased** 57:8
**increases** 46:16
**independent** 53:14
**independently** 58:4
75:22,25 76:4
77:15
**indicate** 21:14 24:22
25:3,8
**indicated** 83:16
**indicating** 31:6
64:13 65:14
**indication** 52:7
**indices** 88:19
**industry** 42:1
**influence** 28:22
45:22 46:13
**influences** 29:25
46:6
**initial** 49:17
**initially** 61:14
**inquire** 17:22 20:3
**inquiry** 88:5,6
**inside** 17:6
**insisted** 87:7
**instruct** 6:6,18 7:5
29:20 31:14,22
32:18,23 34:11
35:23 36:3,11,18
36:25 37:8,19,21
38:14 39:12 40:24
46:17 47:3 56:23
71:25 72:12,22
73:25 74:9,20
**instructed** 32:3,12
33:2
**instructing** 31:25
33:1 72:25
**instruction** 30:24
31:24 34:17,20
36:7 37:4,12 38:16
39:15 41:3 57:2
72:4,14 73:6,9,19
74:16,24
**instructions** 30:7,9
74:3
**intention** 7:7
**interchanged** 14:23
**interest** 26:1 65:5,8
66:9 76:7,14,24

77:5 78:4,8
**interested** 93:16
**interests** 50:18,22
51:2,10 53:8 55:20
55:25 56:2,4 57:19
58:8,14,14,23
60:24 64:24 65:18
65:20 66:16 75:5
77:14,18 78:13
**internal** 4:23
**interrupt** 30:16
32:24 50:7 70:23
73:11,12,15
**interrupted** 73:17
**interrupting** 32:8
**introduce** 4:11
**introduced** 8:25
29:12,12 62:11
**introduction** 29:9
56:4,11,14,18 57:5
**inventory** 41:13,15
41:18,20,24 42:3,8
42:12,17,20
**investigate** 24:11
**investigation** 19:24
81:17,20
**involved** 59:4
**involving** 12:13 13:6
14:1
**irrespective** 23:4
**issue** 33:15
**issued** 26:11
**issues** 32:21
**items** 65:10

____

### J

**J** 2:19
**January** 24:4
**Jay** 1:15 3:3,13 4:6
4:13 90:3,9,12
93:5
**John** 1:15 3:3,13 4:6
4:13 88:24 90:3,9
90:12 93:5
**join** 29:22 46:19
47:5
**judgment** 50:18
51:20,22 52:14,22
53:3,4,6,7,19
54:16 58:4 60:24

**July** 88:12
**June** 1:17 88:11
90:5 93:19

____

### K

**Kaufman** 19:17
**keep** 9:24
**Kenny** 2:6
**kinds** 35:9
**Kirkland** 2:15
**knew** 22:1 66:12
**know** 7:13 9:14
10:12 11:17 16:2
18:25 20:23,23,24
21:3,4,8 22:6,10
26:3,3,13 30:15
38:1,4,5,7,8,23
39:24,25 40:4
41:10,11,12,12
42:24 44:19,22,23
45:3 51:18 57:6
59:18 61:20,21
66:25 67:7,10
68:10,12,13,15,16
68:19 69:9 70:12
75:17 79:1,7,11
80:10,12,13,20
88:10,10,15
**knowledge** 10:4,5
10:11 19:22 20:19
26:20 28:6,13
33:17,18 58:13,16
60:1 62:16,22
63:15,18,24 64:19
67:4 69:22 78:23
**K-Dur** 13:15 51:25
52:9

____

### L

**L** 2:2,10 33:10
**LaFrance** 33:10
**language** 44:16
**largest** 75:18
**late** 12:16
**Law** 2:2,6,10,14,15
**lawsuit** 10:18 48:19
51:13
**lawsuits** 52:8
**layman's** 80:3 81:19
**lead** 31:13

**learn** 48:21
**learned** 49:3 50:2
78:20
**lecture** 9:21 32:19
**legal** 9:13 10:7 16:2
43:21 48:13
**letter** 87:16
**let's** 18:10 25:21
47:9 50:16 58:19
**level** 42:17
**levels** 42:12
**Lexington** 2:20
**Linda** 19:14
**line** 64:15 91:7 92:2
**lines** 85:3
**list** 88:4
**literally** 88:6,13
**litigated** 59:17
**litigation** 60:7 77:11
**little** 5:15,16 43:9
55:10
**LLP** 2:15,20
**Locust** 2:3
**long** 2:10 3:6 5:24
6:10,17,22 7:11
9:7,12,18,20 11:25
12:23 15:19 16:13
17:2,9,20 20:8
23:15 24:2 27:13
29:19 30:3,8,12,16
30:21 31:12,22
32:3,8 33:2,24
34:11,16 35:23
36:3,11,16,18,25
37:8,18 38:13
39:12 40:24 41:7
43:8,20,24 44:7
46:17 47:3 48:25
49:1,4 53:23 54:3
54:4,10 55:11,14
55:22 56:20,23
60:18 61:22 62:9
62:25 63:3,4,5,21
64:5,13,17 65:24
66:5 69:1,5 70:11
71:2,5,11,24 72:2
72:8,11,18,20,22
73:3,8,10,12,23
74:9,13,20 77:21
81:14,24 82:2,22

83:1,5,22 84:7,11
84:14 85:6,10 87:1
87:12,20 88:22,24
89:5
**Long's** 30:6
**look** 11:21 18:10
32:5 47:9 50:16
67:18 68:4
**looked** 12:18 66:11
67:11
**looking** 15:5 40:10
46:5 69:8,11
**lose** 72:6
**lot** 8:20
**Louisiana** 60:5,9,14
**lower** 80:6

____

### M

**M** 2:14
**maintain** 42:17
**maker** 31:10
**makers** 31:18
**making** 35:18
**man** 6:24
**management** 41:14
41:15,18,21,24
42:4,7 85:2
**manager** 45:12
**managing** 42:11,14
42:18,18,20
**manufacturer** 28:1
28:5 47:2 69:24
70:3,16 80:7
**manufacturers** 8:9
40:18 84:24
**manufacturer's**
85:3
**margin** 31:14
**marked** 3:10 4:4
**market** 22:5 28:22
29:1,12 40:22 41:5
45:21,23 46:5 72:7
**marketplace** 56:5
**maximum** 51:7,13
51:17
**McKesson** 79:3
**mean** 5:16 7:17
11:12 14:10 20:23
33:13 41:15 47:15
48:7,17 51:4,19

52:20 53:11 54:12
55:4 56:7 61:1,9
61:10 65:7 69:7
80:2,16,17 81:16
81:17 82:3,4 83:10
83:13
**means** 80:3
**medicine** 5:6
**meet** 88:20
**meeting** 17:21 27:10
39:6 49:6,16,17
53:6 54:1,3,4,7,8
54:10,15,23 55:1,6
62:3 75:9 78:6,10
82:11,13 83:24
**meetings** 49:11 62:5
**Meijer** 1:3,3 11:23
13:20,23 65:13
**member** 9:15 14:5
57:20
**members** 8:6 65:18
65:21 66:10,17
**mention** 20:7 59:20
**mentioned** 16:21
17:8 18:1 20:5,8
34:4 49:1 52:1
82:10
**met** 12:23
**Miami** 2:7,8
**middle** 73:14
**Mike** 19:17
**minimal** 88:21
**minus** 27:21,23 28:9
29:16 31:9,11 34:5
34:10 35:14 36:10
**minute** 33:25
**minutes** 32:9
**misstating** 76:20
**mistake** 88:8
**model** 67:9,19
**moment** 83:1
**money** 73:22,22
**monitor** 79:15
**Montague** 2:2
**months** 23:14,17,18
**Move** 30:4,9,18
**moved** 19:6

**N**

**N** 3:1 4:1

**Nachwalter** 2:6
**name** 4:13 11:4
20:15 38:21 61:19
68:23 69:14,21
**named** 10:18 13:6
14:1 47:11 48:22
49:7,23 54:21 55:3
58:21 59:6,10 62:2
62:6,13 64:25 65:6
66:11 67:15,18
68:7 75:6 78:12
93:5
**names** 13:15
**Narrowing** 40:17
**national** 79:2
**nature** 6:12
**Navarro** 2:19 24:19
84:4 85:5
**NDC** 87:25
**need** 87:18
**needed** 83:17
**negotiate** 8:8 23:6,8
**negotiating** 5:14
8:17
**net** 43:2,17
**Never** 77:9
**new** 2:21,21 23:12
**Nods** 56:22
**Nos** 4:3
**Notary** 90:14,19
93:3,20
**note** 6:5
**noting** 90:6
**nuclear** 5:5,8,11
23:22 24:3 86:12
86:15,21
**number** 31:2
**numbered** 61:7
**numbers** 88:8
**N.W** 2:16

**O**

**O** 4:1
**object** 7:12 9:12
29:19 37:18 38:13
43:24 71:5 77:21
85:4
**objection** 6:14,19
7:9 9:18 29:22,24
31:12 34:11 35:23

36:3,11,18,25 37:8
39:12 40:24 43:8
43:19,20 44:6,7
46:17 47:3 49:11
52:11,15 58:11
62:20 63:20 65:22
66:3,24 70:10
71:10,11,24 72:8
72:18,19 73:23
74:9,20 76:16,19
81:11,13,14 82:2
85:5
**objectionable** 7:6
**objections** 6:2,11
9:24 71:18 87:10
87:14
**obligated** 22:21
**obtain** 79:4
**obtuse** 43:9
**obviously** 17:23
61:18
**occasion** 70:14
**October** 93:23
**office** 93:18
**Oh** 21:20
**Ohio** 1:19 2:12 90:1
93:1,4,18,21
**okay** 13:2 14:14,14
16:4 18:5 22:13
26:4 31:5 32:25
33:9 35:12 41:22
44:17 48:21 50:24
55:24 83:2,5 86:10
**old** 64:1
**once** 74:8
**ones** 23:12
**opinion** 75:3 82:5
**opportunity** 77:9
**opt** 57:23
**oral** 40:18,20 47:25
80:14,18,24 86:17
86:23
**organization** 68:22
69:18,21 79:20
86:13
**outside** 17:1,3 55:2
62:2 75:12 77:15
**Ovcon** 10:19,24
11:4,7,9,9,13,24
20:15 21:1,14

24:10 37:7,15,25
38:2,24 43:15
44:17,25 46:8
47:20,22 49:24
50:14 56:17 57:5
57:15 68:1,6,14,17
68:24 69:10 70:8
70:19 71:14,23
72:17 74:7 75:16
79:22 80:9 81:2
**overall** 85:2,8
**overcharge** 51:5,7
51:14 62:17,23
63:19,25
**overcharges** 47:12
47:16 49:8
**overcharging** 50:23
56:3
**overpaid** 47:21,24
**o'clock** 1:17

**P**

**P** 4:1
**page** 3:2 15:10
28:19 49:22 90:6
91:7 92:2
**paid** 47:17,18
**paragraph** 18:11
20:13 22:13 28:20
33:5 35:1,2,17
45:21 47:9,10
48:16 49:21 50:16
53:1 55:19,22,25
57:18 58:19,20
59:22,23 60:4,21
62:18 64:8,15,23
75:1 76:6 78:11
**paragraphs** 33:7
61:8,12
**part** 19:7,7 87:15
**partial** 49:24
**participate** 52:13,20
54:23 55:2,6 60:2
64:2
**participated** 52:7
55:5,8 63:16 64:3
**participating** 51:12
53:8 57:20 58:9,15
60:25
**participation** 15:22

**particular** 32:16
37:20 69:14
**parties** 12:13 13:6
93:14,16
**pass** 46:15
**paste** 88:5
**Patrick** 2:14 6:4,22
9:20 17:23 77:22
81:16
**pay** 42:19
**pays** 42:11
**pending** 64:10,21
**Pennsylvania** 2:3
**people** 48:14 82:6,8
83:16,19 88:2,13
**percent** 22:8 29:14
29:14 31:3,4,10,11
31:11
**percentage** 27:22,23
28:9,11 29:17 34:6
34:8 35:14 36:10
36:23 71:22
**performed** 59:4
**period** 25:17
**permission** 19:10
**person** 19:5
**personal** 10:4,5,11
19:22 20:18 33:17
60:1 62:16,22
63:14,18,23 64:19
**perspective** 42:5,9
87:17
**PERWIN** 2:6 43:3,6
45:5 61:1 81:11
84:5
**Pg** 91:2
**Pgs** 91:2
**pharmaceutical**
4:17 5:6,11 28:8,8
28:12,23 30:1
36:22 38:21 40:6
41:23 70:2 86:8,14
**pharmaceuticals**
1:11 2:18 5:2 8:9
22:8 23:25 25:16
27:18 29:7 34:9
45:5,10 52:8 56:5
85:20 86:17,18
**pharmacy** 5:5,8
23:22 24:3 86:12

86:15,21
**Philadelphia** 2:3
**phone** 54:23 55:3
**pieces** 64:4
**place** 93:12
**plaintiff** 2:9 62:6
68:7
**plaintiffs** 1:6 2:5
10:7 13:21 33:10
47:11 48:22 49:7
49:23 54:21 55:3
58:21 59:6,10 62:2
62:14 64:25 65:6
65:13 66:12 67:15
67:19 75:6 78:12
**plan** 48:23
**play** 29:8
**please** 11:21 30:16
32:18 63:10 69:3
71:8 73:10,15
**plus** 27:21,23 28:9
29:16 31:2,4,9,11
31:11 34:5,9 35:14
36:2,22
**point** 40:17
**position** 4:15,21
23:16,20 77:3
**practices** 67:23
**preferential** 79:9
**preparation** 27:3
**prepare** 12:21 13:1
15:12 16:11
**prepared** 88:18
**prerogative** 32:22
**prescription** 28:23
30:1
**presence** 17:21 18:3
90:16 93:8
**present** 12:25 53:23
**presented** 31:21
**president** 4:16,19
8:19 19:15 23:21
24:2,7 77:4,8
79:16 80:22 86:21
**prevailing** 28:21
29:1 45:21,23 46:5
46:13
**previously** 19:5
59:18
**pre-determined**

22:24 23:4 24:23
**pre-marked** 11:20
14:13
**price** 28:1 29:6,13
35:22 43:17 44:9
44:12 46:1,4,6,10
46:25 47:11,22 80:5
**prices** 22:25 23:4
24:24 28:22 29:25
36:15,21 37:6,14
37:16 38:9 45:22
47:17 67:25 68:5,6
**pricing** 5:18,23 7:16
7:18,20,24 8:1,3
28:16 39:11 40:5
79:4,9
**prior** 23:20 33:20
81:7,22
**privilege** 61:24
**privileged** 17:22
**probably** 23:14
26:17
**proceed** 10:15
**proceeding** 13:21
49:23
**produce** 88:19
**product** 10:25 20:24
20:24 22:5 29:11
29:13 38:19 44:14
44:15 45:25 46:11
46:12 80:5,6 84:14
84:20 85:1,3
**products** 7:18 10:22
11:9,14 20:23
28:23 30:1 35:22
36:22 40:6 42:21
46:24 47:19 56:8
66:14 70:2 71:23
74:8 85:9 86:8,14
87:25 88:2
**product-by-produ...**
7:22 46:10
**professional** 1:22
32:11 93:21
**profit** 31:13
**proper** 6:11 9:18
**proportionally** 48:5
48:24
**Proportionate** 48:11
**proposed** 50:19

51:12
**prosecuting** 78:13
**protected** 77:24
**provide** 56:13
**provides** 5:10
**Public** 90:15,19 93:3
93:20
**punitive** 9:14
**purchase** 8:8 21:2
22:2,6,22 23:3
25:15 27:17,21
39:11 44:12,25
50:13 56:8 68:17
70:8,15,19 71:14
84:13,19 87:22
**purchased** 20:15,24
20:25 21:14 24:10
45:24 68:6,14
69:10 70:8
**Purchaser** 2:4
**purchasers** 10:19
11:24 12:5 49:24
50:20 70:18
**purchases** 21:5
24:12 28:7 29:7
39:18,20 40:5,7
41:7,9 43:1,2,15
43:18 46:8 48:11
57:4,12,15,16 68:1
75:15 80:9
**purchasing** 21:12
40:1,12,15,19
44:24 45:2,4,9,12
67:22 79:19 88:1
**purposes** 4:4
**pursuant** 6:20 7:4
39:18
**pursue** 75:12
**put** 6:24 87:15
**P.C** 2:2
**P.m** 1:17 89:9

**Q**

**qualified** 93:5
**quantities** 22:22
24:23 27:17 42:8
**quantity** 23:3 39:11
39:19 84:14,19
**question** 5:25 6:15
7:15,23,24 9:17

11:16 21:17,18
25:1 30:4,15 31:20
32:1,12,17,24,24
35:4,8,16 37:19,24
38:6 43:3,7 44:2,3
45:6 49:15 50:9
53:3 57:10 63:7,8
63:9 68:21 69:2
70:24 71:3,13,13
71:15,16 73:15
74:11,18 77:25
81:12,15,16 83:15
84:22
**questions** 6:7 7:6
10:13 17:15 30:18
30:21 32:21 73:15
84:3,4,5,6,8 87:8
**quick** 9:21 33:24

**R**

**R** 4:1
**range** 54:16
**reach** 52:22 53:4,13
53:19
**reached** 53:5 75:10
**read** 12:20 39:5 43:5
44:5 55:22 63:9,11
64:17 69:2,4 71:8
71:9 90:4,15
**reading** 90:13
**ready** 12:17
**real** 9:21
**really** 9:13 54:6
56:12 87:23 88:13
**REASON** 91:9,11
91:13,15,17,19,21
91:23,25 92:4,6,8
92:10,12,14,16,18
92:20
**reasons** 91:6
**rebate** 40:22 41:5
43:12,16
**rebates** 28:4 39:19
42:25
**recall** 13:14 54:4,6
61:9,18,19 82:18
83:10 84:24
**receive** 39:10 51:7
78:24 84:23
**received** 12:17

44:20
**receives** 39:19 42:25
43:16 67:6 79:9
**Recess** 34:2 60:19
83:6
**record** 4:12,13 6:12
10:10 34:1 43:5
44:5 55:16 63:11
69:4 71:9 82:25
87:10,19,20
**records** 4:23 24:21
25:3,7
**recover** 47:11 48:3
48:22 49:8 51:3
**recovered** 48:4
**recovery** 51:14
**Recross** 3:7
**RECROSS-EXA...**
85:13
**reduced** 31:9
**refer** 11:3,7 42:3
44:14 47:10 55:19
57:18 62:17 82:7
**referred** 42:7
**referring** 4:25 10:24
14:21,25 29:2 42:4
46:1,3 49:12,16
50:22 51:25 52:25
55:25 58:25 59:15
60:5 63:15 65:2,4
65:13,15 69:12
76:10 78:11 82:8
82:15
**refused** 87:7
**refusing** 10:23
**regard** 39:23 73:6
**regarding** 16:14
31:13 84:23
**Registered** 1:22
93:21
**regular** 21:16
**relate** 40:20 85:2,8
86:22
**related** 6:16 13:14
25:10 52:8 59:16
64:1 79:6
**relating** 8:1 13:18
25:14 26:21,25
34:8 35:8 60:23
86:7

**relation** 21:4 57:15
57:15
**relations** 56:6,7
**relative** 93:13
**relatively** 54:11
**relevant** 32:22
**remember** 12:19
13:15 35:16 64:7
**repeat** 7:15 44:2,3
63:8
**rephrase** 13:24
43:10 52:21 55:5
**report** 69:13,15
**reporter** 1:22 89:2
93:22
**reports** 21:13 69:8
69:11,12 70:13
88:14
**represent** 9:1,15
30:13 76:3 78:13
**representation**
34:23
**representative** 10:6
**represented** 9:3,10
10:3
**representing** 58:22
**request** 87:14
**requested** 7:5 21:22
43:5 44:5 63:11
69:4 71:9 87:23
**resale** 45:25
**research** 20:11 81:9
81:20 82:4 83:9,10
83:13
**resells** 7:19 28:8
37:6
**resent** 32:15
**reserving** 89:4
**resold** 47:1
**respect** 8:22 23:19
26:11 29:25 31:18
32:1,21 35:4 57:10
58:9,15 62:23
63:24 79:8,22 80:9
80:11,23 81:21
85:19 87:8
**responded** 83:9
**response** 47:1 49:15
**responses** 6:2 87:14
**responsibilities** 4:18

6:1 8:18,20,22
**responsibility** 4:22
5:13 7:25 8:2,7,10
8:11,12 80:23 81:1
85:19,22 86:7
**responsible** 5:19 8:4
44:25
**result** 18:5 72:6
**retail** 69:22
**retailer** 68:23 69:9
**review** 8:10,11,12
8:14 13:17 19:25
22:17 24:15,21
25:7 82:12 85:19
86:7,11,22 88:25
89:1
**reviewed** 13:8,9,11
15:19 25:14,24
49:17
**revisions** 61:16,18
**revisit** 87:11
**right** 11:24 12:6
19:14 20:16 23:7
23:11 25:5 26:8
52:4 55:17 57:16
57:17 66:8 75:13
75:22 76:11 78:21
81:5 88:24
**Rochester** 37:15,17
38:2,10 60:6,10,14
67:9,11 78:23
79:10
**role** 8:19 79:16
80:22 86:20
**room** 17:13 24:19
**RPR** 1:22
**rules** 9:25
**running** 70:12

──────── **S** ────────

**S** 4:1
**safe** 78:1
**sale** 25:4,9,15 29:18
34:9 46:24 86:8,23
**sales** 8:5 37:15,25
38:10 56:17,20
66:23 67:1,2,4
68:16,22 69:13,15
69:18,20 71:23
72:6,16,17 73:1,1

74:7 78:24 80:18
85:20 86:16
**saw** 52:3 55:10,10
**says** 4:8 12:7 76:21
76:21
**scale** 79:5,10
**scans** 5:12
**scope** 7:3 9:25
**SCOTT** 2:6
**Seagrave** 45:19
**Seagraves** 45:19
**seal** 93:18
**second** 18:11 32:9
55:21 84:22 88:3
**sector** 19:16
**see** 12:12 18:12,15
19:3 21:13,16,21
22:15,22 23:9,11
23:11 28:24 33:7
34:14 42:19 47:13
48:5 49:25 50:20
55:20 56:10,14
57:21 58:23 64:11
64:25 69:20 71:17
76:7 78:14
**seeing** 52:9
**seek** 19:10 47:11
49:7
**seeking** 48:22 50:25
51:5
**seeks** 48:3
**seen** 12:8,10 20:22
28:18 41:25 42:10
51:21,24 52:6
62:13
**segment** 4:17,20,24
4:25 5:2 18:19,20
19:18
**self-evident** 41:8
**sell** 37:25 38:2,10,18
68:9,11 80:6,21
**seller** 31:1
**selling** 23:24 29:15
31:2,4
**sells** 37:14,16,20
68:24
**senior** 4:16,19 8:19
24:7 77:4 79:16
80:22
**sense** 44:13 57:7

**sentence** 18:11
28:20 55:21
**separate** 45:12
**separately** 77:19
**September** 23:17
24:4,6,12,16 25:13
25:18,21 86:3,6
**series** 33:6
**serve** 87:13
**served** 50:18 51:3
51:11 57:20 58:3
60:24 77:14,18
**serves** 53:8
**service** 8:6 43:16
46:13 67:6 78:24
84:23 85:1
**services** 5:11 46:10
56:13
**session** 17:22
**set** 6:24 7:18,20,20
7:24 8:3 28:1
36:15 93:17
**setting** 5:22 8:1
**settlement** 64:6
**seven** 23:17
**share** 40:22 41:5
**shop** 5:6
**short** 54:10,12,13
**shown** 27:5,8 61:14
**sign** 82:6 83:18
**signature** 15:9 89:4
89:6
**signed** 15:15 16:7
33:21 53:12 59:9
75:9 83:25 90:16
**significant** 75:16
**signing** 5:19 16:25
19:25 20:6,10
21:24 22:18 24:9
60:13 81:7,22
90:13
**silly** 73:23
**similar** 13:12 64:10
64:21 66:13 67:20
67:23 68:1,6
**similarly** 1:5 66:14
**simply** 32:25 56:4
**Simpson** 2:20
**sir** 4:11 7:15,23 9:24
10:2,10 11:19,22

13:20 14:12 18:1
18:11,17 19:9,13
20:14 21:19 23:16
25:11,13 30:6
31:20 32:7,15 33:5
33:15 34:4,19 36:6
37:3 41:17 43:23
44:11,23 46:3,21
48:18 49:15 50:7
51:24 52:25 60:21
63:7,15 73:17 74:4
81:4,19 82:1 83:8
85:15
**sit** 32:4
**sitting** 38:8 40:11
**situated** 1:5
**situation** 29:9 65:9
**six** 23:14
**smaller** 67:2
**smirky** 32:5
**sold** 10:25 31:10
**solely** 83:24
**somebody** 16:2
21:12 40:1 44:24
45:2 68:22 69:18
71:14 79:19
**sophisticated** 75:24
76:2
**sorry** 13:22 14:23
24:25 28:20 35:7
43:4 45:19 53:15
69:1 70:25 76:1
**sound** 43:7
**South** 2:7
**speak** 79:6
**speaking** 21:19
30:17 33:17 73:22
83:14
**specialty** 5:5
**specific** 18:24 40:8
50:24 59:14 80:17
85:1 88:19
**specifically** 13:13
16:18 22:10 52:10
68:25 69:6,7 81:2
86:10,17,22
**specified** 87:4 93:12
**specify** 11:17 42:5
**speculation** 71:7
**spell** 19:1

**spelling** 15:21 16:21
  16:23 61:19
**spend** 32:21
**split** 48:8
**spoke** 18:2 83:19
**spreadsheet** 88:4
**Square** 1:18 2:11
**SS** 90:1 93:2
**start** 40:3
**started** 12:17 86:2
**Starting** 23:13
**state** 1:19 2:11
  18:12 28:21 33:5
  58:20 64:9,23 76:6
  78:12 87:9 90:1
  93:1,4,21
**stated** 65:10 90:14
**statement** 29:24
  32:10 48:15 58:2
  78:16 81:5,8,22
**STATES** 1:1
**stenotypy** 93:8
**step** 41:17
**Stephen** 33:10
**Steve** 45:11
**stop** 5:24 9:20 32:8
**Street** 1:19 2:3,11
  2:16
**strike** 15:4 40:3
**subject** 65:9,10
**submit** 16:5 77:11
**submitted** 14:9,12
  14:16,18 90:13
**submitting** 62:6
**subpoena** 6:3,21 7:4
  27:5
**substance** 61:23
  90:7
**substitution** 79:13
  79:15,22
**sue** 75:22,24 76:3
**suggests** 31:12
**suing** 77:14,18
**Suite** 1:18 2:11
**summer** 88:15
**supplier** 40:8,9 42:6
  42:11 80:4
**suppliers** 39:18 41:6
  41:14 42:16,19
  43:1 67:5

**supplier's** 42:18
**supply** 4:17 5:1
  19:16 42:8
**support** 64:10,20
**sure** 10:23 11:16
  12:11 33:13 35:11
  51:4
**sworn** 4:7 81:5,8,22
  93:6

**T**

**take** 9:22 11:20
  33:24 41:17 60:16
  63:1 64:17 82:20
  83:3
**taken** 34:2 60:19
  83:6 93:8,11
**takes** 4:22
**talk** 6:5 10:23 22:14
  83:17
**talked** 56:3 60:12
  63:12 83:16
**talking** 32:25
**team** 8:3,4,5,6
**telephone** 55:7,8,15
**tell** 6:22 10:13 16:10
  30:12
**term** 11:9,13 26:4
  36:2 39:1 41:18,20
  41:22 42:1 63:14
  79:12,24
**terms** 6:7 25:3,9
  67:1 80:4 81:19
**testified** 34:13 49:13
  81:15 85:15
**testify** 93:6
**testimony** 93:7,11
**Thacher** 2:20
**Thank** 12:2 17:11
  50:11 55:9 73:21
  88:23
**thing** 87:13,23 88:8
**things** 10:8 19:2
  29:4 61:21 63:13
  87:16
**think** 41:8 46:3
  48:13 55:4 56:2
  78:1,1,7 81:15
  87:25
**THOMAS** 2:10

**thought** 70:25 78:9
  83:17
**three** 24:5 29:3 32:9
  32:20 79:2
**Thursday** 12:16,19
**tied** 88:14
**tiered** 39:10,18 40:5
  40:12,14,19
**time** 7:13 13:4 18:1
  19:19 24:12 25:17
  30:19,20 32:9 39:4
  54:18 62:10 64:17
  87:11 88:10 93:11
**title** 16:24 61:19
**today** 9:4 10:11,23
  12:9 22:2 27:6
  38:8 39:1 40:11
  62:13
**today's** 12:21 27:3
**told** 7:11 30:13
  32:11
**tolerate** 5:25
**top** 4:21
**trade** 11:4 38:21
  56:5,7
**transcribed** 93:9
**transcript** 89:1 90:4
  90:12 93:10
**transmittal** 87:16
**transposing** 88:7
**tried** 87:15
**true** 15:6 90:7 93:10
**truth** 93:7
**try** 11:4 46:15 50:8
  68:5 73:24
**trying** 31:12 88:2
**turning** 49:21
**twice** 21:7 72:2
**two** 13:3 16:24
  38:11 54:13 84:7
**two-hour** 75:8
**type** 23:23 67:12
**typed** 15:25
**Typically** 29:11

**U**

**unclear** 55:4
**undersigned** 90:14
**understand** 6:19 9:1
  9:16 10:6,12,17

  11:5,12 13:20,23
  13:25 14:24 24:25
  26:7,22 27:25 31:3
  43:6 52:19 53:13
  77:22 81:4
**understanding** 10:3
  10:21 14:4 59:2
**understood** 55:11
**UNITED** 1:1
**unprofessional**
  32:15
**use** 11:4,9,13 44:12
  63:14
**uses** 35:22 36:2,15
  86:13

**V**

**variations** 28:16
**various** 64:4
**vary** 28:11 36:23
  37:7 38:11
**version** 11:3 38:24
**versions** 11:8
**versus** 21:7 28:17
  29:9 45:13
**vice** 4:16,19 8:19
  19:15 23:21 24:2,7
  77:4,8 79:16 80:22
  86:20
**vitamins** 64:1
**volume** 48:12 57:12
  57:14 67:2 71:22
  72:6 74:7 79:4
**volumes** 40:6
**vs** 1:7

**W**

**WAC** 27:23,25 28:9
  29:16 34:5,9 35:14
  35:22 36:22 80:6
**wait** 50:9
**waive** 76:13,24 78:3
  78:8
**waived** 77:5 89:6
**waives** 76:7
**Walgreen** 2:9 68:11
**walking** 78:6
**want** 6:23 7:5 9:19
  9:22 10:23 11:7
  32:16,20,23 51:6

  56:10,14 72:24
  82:24 87:9,23 88:1
**wanted** 21:9,11
  26:15 32:6 44:16
  55:9 74:18 76:3
  87:15
**wants** 56:15,16
**Warner** 1:8,9,10
  2:22 10:17,25 12:6
  13:25 24:10 26:2
  39:22 42:23 43:16
  44:20 78:24
**Washington** 2:16
**wasn't** 21:18
**waste** 30:19
**Watch** 61:22
**way** 10:5 32:11,18
  46:9 51:16,23 60:2
  60:10,11,12 75:4
  88:5
**Wednesday** 12:16
  12:19 13:3
**week** 12:14
**well-versed** 10:7
**went** 15:20
**weren't** 33:21 48:18
  49:7
**we'll** 6:23 10:15
  83:4 88:20 89:1
**we're** 6:25 9:20
  10:24 50:25 58:3
  66:12 78:1 87:13
**we've** 49:1 51:21
  55:16 56:2
**whatsoever** 57:7
  81:20
**WHEREOF** 93:17
**wherewithal** 75:21
**Wholesaler** 60:6
**wholesalers** 29:3,4
  60:5 75:19 79:3
**widely** 42:1
**widget** 31:1,2,4,10
  31:18 32:25
**widgets** 32:2
**willing** 5:24
**wish** 91:5
**witness** 2:13 3:2 7:5
  17:21 29:20,24
  30:13 31:14,22,25

33:1,2 34:12 35:24
36:4,12,19 37:1,9
37:21 39:13 40:25
46:18 47:3 49:3
56:23 71:25 72:12
72:23,25 73:25
74:10 82:25 87:2,4
87:7 90:13 93:9,11
93:17
**witness's** 30:19
**wording** 15:21
61:20
**words** 14:23 15:20
15:25
**work** 4:14 10:8
88:16 89:1
**working** 8:2
**works** 32:18
**wouldn't** 5:19 25:14
25:22 40:4 51:17
68:3 69:9 70:12
**wrap** 83:4
**write** 15:18

#### X

**X** 3:1 31:2,4,9,9,11
31:11

#### Y

**Y** 31:9,11
**Yeah** 61:25 81:24
82:17 89:5
**year** 24:6,13,17
25:18,21 88:11
**years** 24:5 64:6,7
84:16,17 85:16,18
**year-end** 88:14
**Yep** 10:14,16
**yesterday** 87:13
**York** 2:21,21

#### Z

**Zenchent** 38:18,21

#### 0

**04** 3:4,11,12

#### 1

**1** 3:11 4:3 11:20,22
12:8,13 13:5,6
18:11 65:15 82:16

88:12
**1:05-CV-02195-C...**
1:8
**10** 31:2,4,9,11,11
64:23 75:1
**10017** 2:21
**11** 61:7 76:6 78:11
**1100** 2:7
**12:45** 1:17
**13th** 93:19
**16** 84:16,17 85:16
85:18
**1622** 2:3
**18th** 16:5 33:20 39:7
48:18 49:19 50:3
52:3 53:6,17,21
54:24 59:8 61:3,14
62:18 63:17 75:10
77:10 78:7,21
83:25
**19103** 2:3

#### 2

**2** 3:12 4:3 14:13,17
15:2,5,17 16:22
18:10 19:22 20:1
20:10 22:14 28:21
33:21 34:22 45:20
47:10 49:22 56:1
59:9,15 60:4,22
61:5,8,13,17 64:9
75:2,9 76:10 81:5
81:10,22 82:13
**2:34** 89:9
**20005** 2:16
**2003** 24:4 25:18,21
**2004** 24:11,13 85:23
86:6
**2006** 25:14 86:3,6
**2007** 1:17 49:19
50:5 90:5,17 93:19
93:23
**201** 2:7
**2100** 1:18 2:11
**22nd** 24:11,13 85:23
85:24 86:6

#### 3

**3** 20:13 49:22
**30** 29:13 88:11

**31** 93:23
**33** 22:8
**33131** 2:8
**35** 10:19,24 11:4,7,9
20:15 21:1,14
24:10 37:7,15,25
38:2,24 43:15
44:17,25 46:8
47:20,22 49:24
50:14 56:17 57:5
57:16 68:1,6,14,17
68:24 69:10 70:8
70:19 71:14 72:17
74:7 75:16 79:22
80:9 81:2

#### 4

**4** 22:13 28:20 35:2
35:17 45:21
**425** 2:20
**43215** 1:19 2:12

#### 5

**5** 33:5
**5C** 47:10 48:16
**5F** 49:21
**5-18** 62:3
**50** 29:14

#### 6

**6** 50:16 53:1 60:21
**65** 1:19 2:11
**655** 2:16

#### 7

**7** 58:19,20

#### 8

**8** 1:17 55:19,25
57:18 90:5
**84** 3:6
**85** 3:7

#### 9

**9** 59:22,23 60:4
62:18 64:8,15