# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

NO. 05-2195 (CKK)

---------------------------------

MEIJER, INC., MEIJER DISTRIBUTION,     DEPOSITION OF:
INC., LOUISIANA WHOLESALE DRUG         JEFFREY J. LEITZINGER,
CO., INC., ROCHESTER DRUG              Ph.D.
CO-OPERATIVE, INC., VALLEY
WHOLESALE DRUG COMPANY,
AMERICAN SALES COMPANY, INC.,
SAJ DISTRIBUTORS, INC. and
STEPHEN L. LaFRANCE HOLDINGS, INC.,

          Plaintiff,

     vs.

WARNER CHILCOTT HOLDINGS
COMPANY III, LTD., et al.,

          Defendant.
---------------------------------


          TRANSCRIPT of the stenographic notes of the

proceedings in the above-entitled matter, as taken by and

before MARGARET M. REIHL, RPR, CRR, CCR, CLR, Notary Public,

held at the offices of BOIES, SCHILLER & FLEXNER LLP, 5301

Wisconsin Avenue, N.W., Washington, D.C., on Wednesday, April

4, 2007, commencing at 9:45 a.m.

1 reviewed in connection with forming your opinions in

2 Deposition Exhibit 4 that are not listed on Deposition

3 Exhibit 5?

4 A.      No, not to the -- certainly not as of the time

5 that Exhibit 4 was -- I'm sorry -- Exhibit 5 was

6 prepared.

7 Q.      So with respect to the deposition testimony

8 excerpts that you testified previously, those

9 deposition excerpts were not reviewed in connection

10 with preparation of Deposition Exhibit 4?

11 A.      Based on -- based on Exhibit 5, I -- I

12 would -- I would conclude that my recollection

13 potentially about looking at some Warner Chilcott

14 deposition excerpts was incorrect.

15 Q.      So just to clarify, in connection with forming

16 your opinions with respect -- that are contained in

17 Deposition Exhibit 4, you did not review any

18 deposition testimony?

19 A.      That's correct.

20 Q.      Did you perform any statistical analyses in

21 connection with forming your opinions in Deposition

22 Exhibit 4?

23 A.      Well, there is a -- one of the footnotes in

24 the exhibit actually involves a -- a statistical

25 calculation of a sort.

1 Q.      Referring to -- I'm sorry, I interrupted.  Go

2 ahead.

3        You are referring to footnote 63 on Page 29 of

4 your Deposition Exhibit 4?

5 A.      Yes.  Beyond that, however, no, I don't think

6 there's anything that would fairly be characterized as

7 statistical analysis that I did in connection with

8 arriving at the conclusions described in Exhibit 4.

9 Q.      What about econometrics or regressions?

10 A.      No.

11 Q.      Now, going back to Deposition Exhibit 5, there

12 is an entry for "Data - Electronic Files/CDs"; do you

13 see that on the first page?

14 A.      Yes.

15 Q.      And there is some entries "WC Data"; do you

16 see that?

17 A.      Yes.

18 Q.      Does that refer -- or is it your understanding

19 that that refers to transaction and sales data

20 produced by Warner Chilcott in this case?

21 A.      At -- at least a summary of that kind of data

22 that was produced by Warner Chilcott, that's the way

23 I -- I have understood it.

24 Q.      And there's an also an entry for "IMS Health";

25 do you see that?

1 A.      Yes.

2 Q.      And "IMS Health," can you describe for me what

3 that data is?

4 A.      The "IMS Health" data involves -- relates to

5 volumes and pricing associated with Ovcon and balziva.

6 Q.      Is that wholesale or retail pricing?

7 A.      That -- that is wholesale pricing.

8 Q.      And did the IMS data -- well, let me ask you

9 this:  Did you review the IMS data in connection with

10 forming your opinions in Deposition Exhibit 4?

11 A.      Yes.

12 Q.      And what did you use the IMS data for in

13 forming your opinions?

14 A.      Well, one of the -- one of the possible

15 approaches to arriving at a benchmark for purposes of

16 damages that's described in Exhibit 4 is to use the

17 experience in the market starting from the time in

18 late 2006 that a generic version of Ovcon first came

19 into the market.  The -- it is -- it is for purposes

20 of that potential benchmark analysis that the IMS data

21 may be useful.

22 Q.      Did you determine what benchmark should be

23 used to calculate damages in this case?

24 A.      As -- as of the time of the declaration,

25 Exhibit 4, no, I haven't reached any -- certainly any

1 that you worked on the Cardizem case; is that right?

2 A.    Yes.

3 Q.    And the Buspirone case, did I pronounce that

4 correctly?

5 A.    Yes.

6 Q.    But they are not listed in Deposition Exhibit

7 6; is that right?

8 A.    Yes.

9 Q.    Can you tell me why; was it just that they

10 were outside the date that is on Exhibit 6?

11 A.    In the Buspirone case, while I think it may

12 well have been outside the date, I did not -- I was

13 not deposed or -- or did not give any trial testimony.

14    I think the same -- the same is true of the

15 Cardizem case, I don't recall being deposed in that

16 case.

17 Q.    What was the nature of your opinion in the

18 Buspirone case?

19 A.    My work in the Buspirone case involved a -- an

20 analysis of damages on the part of the proposed class

21 and development of methods for the allocation of

22 settlement monies to the class members, some of the

23 class members.

24 Q.    So a class was already certified in that case

25 before you rendered your opinion?

1 A.      I -- I don't recall.  There may have been, but

2 it may well have been that the -- that there was a

3 settlement that occurred and, hence, a settlement

4 class, but that all happened before there was a

5 decision overall as to class certification in the

6 case.

7 Q.      What about the Cardizem case, was that class

8 already certified before you offered an opinion in

9 that case?

10 A.     I -- I think that's -- I think that's right, I

11 think there had been, yes.

12 Q.     Did you also calculate damages in Cardizem?

13 A.     Yes.

14 Q.     Now, if we turn to Item Number 20 on

15 Deposition Exhibit 6, it's Page 10.

16 A.     Yes.

17 Q.     "In Re:  Medical Waste Services Antitrust

18 Litigation."

19        Can you describe the nature of that case for

20 me?

21 A.     Yes.  The case arose out of the -- a -- a --

22 first a series of initial agreements and then,

23 ultimately, the merger of two companies that were

24 involved in the handling and disposal of medical waste

25 in the Western United States.

1           The no part of it is I don't -- I am not

2 looking to any particular episode in terms of the past

3 experience with another drug and as -- at at this

4 point in my mind as somehow being a benchmark for

5 exactly what would have happened here.

6 Q.      So you haven't chosen a benchmark at this

7 point; is that right?  Or you haven't determined what

8 would be an appropriate benchmark for purposes of this

9 case?

10 A.     I am -- I am in the process of working on that

11 question now.  I have not reached a -- a final

12 determination as to the damage benchmark, I think that

13 is correct.

14 Q.     So just to clarify for purposes of your

15 opinions that are expressed in Deposition Exhibit 4,

16 you have not decided what the appropriate benchmark

17 would be for your analysis of damages?

18 A.     I -- I think as is clear in the declaration, I

19 did not hold out a -- a specific benchmark as

20 appropriate for damages.  I identified several places

21 one could look for a benchmark that either -- that I

22 have used or the companies themselves have used in

23 analyzing the problem, but that's as far as things --

24 that's as far as I went in terms of the declaration.

25 Q.     Now, do you have an understanding how