IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


MEIJER, INC. et al.,                                    Civil Action No. 05-2195 (CKK)

       Plaintiffs,

  v.

WARNER CHILCOTT HOLDINGS COMPANY
III, LTD. et al.,

       Defendants.

_____/

WALGREEN CO. et al.,                                   Civil Action No. 06-494 (CKK)

       Plaintiffs,

  v.

WARNER CHILCOTT HOLDINGS COMPANY
III, LTD., et al.,

       Defendants.

_____/


**PLAINTIFFS' STATEMENT OF POINTS AND
AUTHORITIES IN OPPOSITION TO
BARR'S JUNE 28, 2007 MOTION TO COMPEL DISCOVERY**


Defendant Barr Pharmaceuticals, Inc. ("Barr") has moved to compel discovery of documents and data relating to a host of oral contraceptives that are ***not*** involved in this case, along with certain (mostly nonexistent) documents and data relating to the single oral contraceptive that ***is*** involved in this case, a few days before the close of fact discovery. Plaintiffs in the *Meijer* and *Walgreen* actions respectfully submit this statement of points and authorities and request that Barr's motion be denied.

I

Preliminary Statement

Plaintiffs allege in these actions that Defendants Warner Chilcott and Barr entered into an illegal written Agreement[1] whereby Warner Chilcott agreed to pay Barr $20 million and Barr agreed, among other things, not to launch its FDA-approved generic version of Ovcon 35 for five years.  In September 2006, approximately halfway through the five-year term, Warner Chilcott waived the illegal exclusivity provision in the Agreement and allowed Barr to launch its generic version of Ovcon 35, which it markets under the trade name Balziva.  As expected, Barr priced Balziva at substantially less than Ovcon 35 and, as a result, almost immediately took more than 80% of Warner Chilcott's pre-generic unit sales.[2]  Plaintiffs allege (and Defendants do not seriously dispute) that, but for the Agreement, Balziva would have been launched at least two years earlier and Plaintiffs would have obtained the benefits of generic competition at that time.  Plaintiffs assert that Defendants' antitrust violation caused them to pay higher prices for the drug beginning on the date on which generic Ovcon 35 would otherwise have been available and are seeking damages in the form overcharges they paid on the drug during the relevant period of time.

While the allegations in this case relate exclusively to Ovcon 35 and its generic equivalents, Barr has nevertheless demanded production of documents and purchase data relating

_____

[1]     There were actually two separate written agreements—an Option and License Agreement, and a Finished Product Supply Agreement.  The two agreements were executed simultaneously, and each refers to the other.  For convenience, we will refer to them as a single agreement (the "Agreement").

[2]     *See* News Release, *Warner Chilcott Reports Operating Results for the Quarter Ended March 31, 2007 and Raises 2007 Full Year Guidance*, p.1 (May 11, 2007) ("The decline in Ovcon revenue was due to introduction of a generic version of Ovcon 35 in late October 2006, which led to an 80.4% decline in filled prescriptions for Ovcon 35 compared to the same quarter last year").

to Plaintiffs' purchases of all other combined hormonal contraceptives (the most common form of oral contraceptive). Barr argues that information relating to these other products is relevant and discoverable because they are allegedly therapeutic alternatives to Ovcon 35 and therefore, according to Barr, part of the relevant antitrust product market. Barr also argues that discovery regarding Plaintiffs' purchases of other oral contraceptives is potentially relevant to Plaintiffs' damages. Barr has moved to compel discovery of this (and certain other) information at the close of discovery. The motion should be denied.

First, Barr's motion is untimely. Barr has known *for over a year* that Plaintiffs objected to production of documents and purchase data relating to oral contraceptives other than Ovcon 35 and its AB-rated generic equivalents—the only oral contraceptive involved in this case. The responses to Barr's discovery requests on which its motion is based were served in *June of 2006*. *See, e.g.,* Mot. Ex. A (served June 26, 2006). The federal courts have not hesitated to deny motions to compel discovery that are served long after the moving party is on notice of a discovery dispute, particularly where that party can offer no justification for its delay. *See, e.g., Ridge Chrysler Jeep L.L.C. v. Daimler Chrysler Services North America L.L.C.*, 2004 WL 3021842, *4 - *6 (N.D. Ill. Dec. 30, 2004) (denying motion to compel where moving party waited a year to file motion and motion was filed four days before the close of discovery). Granting Barr's motion would effectively extend the discovery deadline and would result in a completely unwarranted and unnecessary delay in the Court's existing pretrial schedule.

Second, documents and purchase data concerning oral contraceptives other than Ovcon 35 and its AB-rated generic equivalents are irrelevant to this case. As explained below and

3

in Plaintiffs' soon-to-be-refiled motion for partial summary judgment,[3] the undisputed agreement between Barr and Warner Chilcott being challenged in this case is a *per se* violation of section 1 of the Sherman Act. The non-Ovcon discovery sought by Barr is irrelevant to that determination (which is made by the Court as a matter of law) and, if Plaintiffs are right, is irrelevant, period. Market power and market definition are not issues in a *per se* case.

Third, even if market power were an issue in this case, evidence regarding Plaintiffs' purchases of non-Ovcon oral contraceptives is irrelevant to proving market power or defining a relevant product market. It is undisputed that Ovcon 35 is priced at many multiples of its marginal cost. That fact, standing alone, makes any further effort a market definition unnecessary, because it demonstrates conclusively that the existence of other oral contraceptives does not prevent Warner Chilcott from raising the price of Ovcon 35 substantially above marginal cost. It follows that other oral contraceptives, while they may be (for some patients) *therapeutic* alternatives to Ovcon 35, are not *economic* substitutes for Ovcon 35 and thus not in the same relevant product market. *See Federal Trade Comm'n v. H. J. Heinz Co.*, 246 F.3d 708, 718 (D.C. Cir. 2001) (two products are in the same product market if buyers will switch from one to the other "in response to a small but significant and nontransitory increase in price").

Fourth, Plaintiffs' purchase data would not be useful in defining a relevant market because the data are incomplete. Plaintiffs are only a handful of wholesale and retail purchasers. In order to be informative, the kind of econometric study Barr has in mind must be performed using total sales volumes across the relevant geographic market—in this case, the entire United States.

---

[3]     Plaintiffs' motion for partial summary judgment was filed in June and denied without prejudice based on the Court's view that summary judgment motions should not be filed until discovery is over. Plaintiffs intend to refile the motion as soon as the Court sets a briefing schedule.

Without complete data, any hypothetical increase in purchases of Ovcon 35 by a particular retailer following a price increase on some other oral contraceptive would not prove that patients who formerly took the other contraceptive are now taking Ovcon 35—it is just as likely that patients who formerly bought Ovcon 35 at one pharmacy are now buying the same drug at a different pharmacy. Barr likely already has highly detailed, nationwide price and volume data sold by third-party vendors that is perfectly suitable for estimating cross-elasticities if it chooses to do so. Thus, the data Barr is seeking would not be useful for the purpose for which Barr proposes to use it, and Barr already undoubtedly has comprehensive data that could be used for that purpose.

Fifth, Plaintiffs' purchases of non-Ovcon oral contraceptives are irrelevant to their overcharge claim. Plaintiffs' expert reports have already been served (and responded to). They estimate Plaintiffs' overcharges by "backcasting" *the actual savings they began to achieve when generic Ovcon 35 was finally released in October 2006* to the beginning of the damage period (mid-2004). To the extent that other data is used by Plaintiffs' experts in performing the damage calculations, that data has already been produced. Stated differently, Plaintiffs' damage analyses are based on *actual data* reflecting what actually happened when generic Ovcon 35 entered the market. Whatever effect non-Ovcon contraceptives may have had on the process of generic entry wold necessarily be incorporated into the data.

Finally, Barr has not established that most of the Ovcon-related documents Plaintiffs are supposedly withholding exist. With a few exceptions,[4] Plaintiffs have made a diligent search and believe they have produced all relevant and responsive documents and data in their possession,

---

[4]    Several of the drugs for which Plaintiffs have agreed to produce purchase data (Balziva, Zenchent and Ovcon chewable, later renamed Femcon FE) have been on the market for only a few months. Some Plaintiffs have produced updated purchase data and the others are in the process of updating.

custody or control that relate to their purchases of Ovcon and its generic equivalents. They are not, however, required to produce documents or data that do not exist. For example, Barr has moved to compel production of supply contracts under which McKesson Corporation (an absent class member) purchases Ovcon 35 from Warner Chilcott. There is no evidence in the record that McKesson *has* a contract with Warner Chilcott for the purchase of Ovcon 35,[5] nor is there any evidence that such a contract, if it exists, is in any Plaintiff's possession, custody or control. Similarly, Barr has moved to compel production of purchase data for Balziva for the period from January 1, 2000 to the present, despite the fact that (as Barr is well aware) Balziva was not launched until October 2006. Accordingly, this portion of Barr's motion should also be denied.[6]

## II

## Barr' Motion is Untimely

Barr's motion, which is dated June 28, ***2007***, is based on discovery responses that were served in June ***2006***. Fact discovery in these cases closed on July 6, 2007. *See* Order dated February 15, 2007 (D.E. 55 in Case No. 06-cv-494). Thus, Barr's motion was filed approximately ***one year*** after it became aware of the discovery dispute between the parties and roughly a week before the close of fact discovery. There is no justification for this delay, and Barr's motion should be denied on that ground alone.

Even in the absence of a specific Court- (or local rule-) ordered deadline for filing motions to compel, the federal courts have recognized that litigants cannot wait indefinitely to bring discovery disputes before the court. The courts have looked primarily at three factors in evaluating

---

[5]     If such a contract exists, Barr's co-Defendant Warner Chilcott obviously has a copy of it.

[6]     Plaintiffs have attached as Appendix A specific responses to Barr's Appendix A.

the timeliness of a motion to compel discovery: (1) the length of the movant's delay; (2) whether the delay is justified; and (3) whether granting the motion would extend the pretrial schedule. *See Fast Food Gourmet, Inc. v. Little Lady Foods, Inc.*, 2007 WL 1673563 (N.D. Ill. June 8, 2007); *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 331 (N.D. Ill. 2005); *Ridge Chrysler Jeep L.L.C. v. Daimler Chrysler Services North America L.L.C.*, 2004 WL 3021842, *4 - *6 (N.D. Ill. Dec. 30, 2004). In this case, all three factors militate against Barr's motion.

First, the length of the delay is substantial. These cases are approximately two years old, which means that Barr has been sitting on its motion to compel for approximately half the time the cases have been pending. Delays of considerably shorter duration have led to the denial of a motion to compel. *See Fast Food Gourmet*, 2007 WL 1673563, *3 (three-month delay); *In re Sulfuric Acid*, 231 F.R.D. at 341 (eight-month delay).

Second, Barr has offered no justification for waiting a year to file its motion, and Plaintiffs are not aware of any justification. While discovery was stayed for several months in late 2006 and early 2007, that stay expired many months ago. Since then, the parties have been completing fact depositions and serving expert reports. Barr's dilatoriness is unexplained and inexplicable.

Third, granting Barr's motion would result in substantial additional discovery that could not be completed within the Court's current pretrial schedule. As noted above, fact discovery in these cases closed on July 6, 2007. All discovery is required to be completed by August 22, 2007, and the Court has scheduled a status conference to establish a briefing schedule for dispositive motions on September 7, 2007. The discovery Barr is seeking is extensive and could not possibly be completed before August 22nd. Moreover, much of the data Barr is seeking relate to various areas of expert testimony and may result in supplemental expert reports and additional expert depositions.

7

Where the inevitable result of granting a late-filed motion to compel would be a substantial delay in the pretrial schedule, the motion should be denied. *See Fast Food Gourmet*, 2007 WL 1673563, *4 (denying motion to compel because, "if the motion were granted, potentially extensive, additional discovery would be required"); *Ridge Chrysler Jeep*, 2004 WL 3021842, *6 (denying motion to compel that, while filed before the discovery cutoff, was filed "so late as to make it impossible to conduct the requested discovery within the discovery period"); *United States v. Philip Morris USA, Inc.*, 219 F.R.D. 203, 205-06 (D.D.C. 2004) (denying late-filed motion to compel where the practical effect of granting the motion would be to delay the trial schedule).

III

<u>Market Power and Market Definition Are Irrelevant in a *Per Se* Case</u>

The Agreement is in writing and undisputed. Accordingly, if the Court agrees with Plaintiffs that the agreement is subject to the *per se* rule, it necessarily follows that Barr and Warner Chilcott violated section 1 of the Sherman Act by entering into a prohibited "contract, combination . . . or conspiracy in restraint of trade." Market power and market definition are not relevant to that determination. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 650 (1980) (restraints that are subject to the *per se* rule are "conclusively presumed illegal without further examination under the rule of reason"). Moreover, *whether* the Agreement is subject to the *per se* rule is an issue of law decided by the Court, and thus an issue to which discovery is irrelevant. *See In re Cardizem CD Antitrust Litigation*, 105 F. Supp. 2d 682, 694 (E.D. Mich. 2000), *aff'd*, 332 F.3d 896 (6th Cir. 2003).

As we show below, the agreement between Warner Chilcott and Barr is a horizontal market-allocation agreement and therefore a *per se* violation of the Sherman Act.

A.    Horizontal Market Allocation Agreements are *Per Se* Illegal

Most restraints on competition are evaluated using a "rule of reason." *State Oil v.*

8

*Khan*, 522 U.S. 3, 10 (1997). Some restraints, however, "are deemed unlawful *per se* because they "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit." *Id.* (citing *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)). "*Per se* treatment is appropriate 'once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.'" *State Oil*, 522 U.S. at 10 (quoting *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 344 (1982)). Whether the courts have long experience with a particular industry or fact pattern is irrelevant to the inquiry; what matters is whether the *type of restraint* is one that the Supreme Court has condemned as unlawful *per se*. *Maricopa County*, 457 U.S. at 350-51 & n.19.

One type of restraint that falls squarely under the *per se* rule is a horizontal[7] agreement allocating markets or territories. *See*, *e.g*., *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) (holding that agreements between actual or potential competitors eliminating competition within certain territorial limits are illegal *per se*); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) ("Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal *per se* without inquiry into the harm it has actually caused").

Indeed, the Supreme Court has called horizontal market allocation agreements between competitors "[o]ne of the classic examples of a *per se* violation of §1." *United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972). *See also In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d at 1313 ("horizontal agreements between competitors are antitrust's most 'suspect' classification, which as a group provoke closer scrutiny than any other arrangement."); *United States*

---

[7]     Horizontal restraints are those resulting from agreements between actual or potential competitors. *See, e.g., NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998).

*v. Cooperative Theatres of Ohio Inc.*, 845 F.2d 1367 (6th Cir. 1988) (horizontal agreements to allocate markets are *per se* violations); *Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995) (same). Thus, proof that a horizontal agreement allocates markets or customers to one or both of the conspirators also establishes that the agreement is illegal *per se*. *See Palmer, supra.*

          B.      On its Face, the Agreement between Warner Chilcott and Barr Eliminated Competition for Sales of Ovcon 35 and is a *Per Se* Illegal Restraint of Trade.

      The Agreement between Warner Chilcott and Barr is a straightforward horizontal market allocation agreement. Under the Agreement, Warner Chilcott paid Barr $20 million and Barr agreed, among other things, not to market generic Ovcon in competition with Warner Chilcott for five years after receiving final FDA approval of its ANDA. At the time, Warner Chilcott marketed Ovcon and Barr was its only potential competitor for sales of that drug. Thus, the Agreement allocated all sales of Ovcon and its generic equivalents to Warner Chilcott and eliminated competition from Barr's generic Ovcon for five years.

      Since the Agreement was, at its core, a horizontal agreement which allocated to Warner Chilcott the market for Ovcon throughout the United States, it constitutes a classic example of a *per se* illegal restraint of trade. *See Palmer v. BRG of Georgia, Inc.*, 498 U.S. at 49-50; *Valley Drug*, 344 F.3d at 1304; *Cardizem CD*, 332 F.3d at 908-09.[8]

      While Defendants euphemistically characterize the Agreement as an "exclusive" supply and license agreement, that label does not alter the fact that it is a horizontal market

---

[8]     *See also* I ABA Antitrust Section, ANTITRUST LAW DEVELOPMENTS 58 (5th ed. 2002) ("Certain agreements are treated as illegal *per se* with virtually no factual inquiry. For example…market allocation agreements among competitors rarely have plausible procompetitive justifications, and all a plaintiff usually needs to prove to establish illegality is that such an agreement exists.").

allocation agreement.  Antitrust law looks to the substance of the agreement, rather than the label attached to it.  *See Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451, 466-67 (1992) (legal analysis based on "formalistic distinctions rather than actual market realities [is] generally disfavored in antitrust law"); *Palmer*, 498 U.S. at 47 (finding that "exclusive license" between competing bar-review firms was illegal *per se*).  These types of agreements have long been held illegal *per se*:

> An agreement between competitors to allocate markets is, as the district court noted, clearly anticompetitive.  Such an agreement has the obvious tendency to diminish output and raise prices.  *When a firm pays its only potential competitor not to compete in return for a share of the profits that firm can obtain by being a monopolist, competition is reduced.  See, e.g., Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49-50 (1990) (per curiam) (agreements not to compete within certain territorial limits are obviously anticompetitive); *United States v. Topco Assoc.*, 450 U.S. 596, 608 (1972) (observing that an agreement between competitors to allocate territories is a "classic example" of a per se violation of the Sherman Act, with no purpose other than reducing competition).

*Valley Drug v. Geneva Pharmaceuticals, Inc.*, 344 F.3d 1294, 1304 (11th Cir. 2003) (emphasis supplied).

This Agreement lacks even the fig leaf of justification relied on (but ultimately rejected) in *Valley Drug*.  In the Eleventh Circuit's opinion in that case, the court noted that it would "readily affirm" the district court's order condemning the agreement at issue as a *per se* violation if not for the complicating factor that, at the time the agreement was signed, Abbott owned a presumptively valid patent that Geneva's proposed generic drug unquestionably infringed.  *Valley Drug*, 344 F.3d at 1304.  On remand, once the district court concluded that the agreement went beyond the scope of Abbott's patent, it had no difficulty finding the agreement illegal *per se* under settled antitrust law.  *See In re Terazosin Hydrochloride Antitrust Litigation*, 352 F. Supp. 2d 1279

11

(S.D. Fla. 2005). In this case, of course, Warner Chilcott has no patent rights that could be used to justify an agreement delaying generic competition.

*Palmer v. BRG of Georgia, Inc.* is also directly analogous. In *Palmer*, two companies that had competed in providing bar review courses in Georgia stopped competing pursuant to an agreement whereby one company (BRG) became the exclusive licensee of the other (HBJ) in Georgia and BRG agreed not to compete with HBJ outside Georgia. 498 U.S. at 47. The Supreme Court condemned the agreement as "unlawful on its face." *Id.* at 50. "Such agreements are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other." *Id.* at 49-50.

The Sixth Circuit in *Cardizem CD* likewise held that a similar agreement between branded and generic drug manufacturers involving the drug Cardizem constituted a *per se* violation of Section 1 of the Sherman Act. *See Cardizem*, 332 F.3d at 900. Like Defendants here, the defendants in *Cardizem* entered into an agreement whereby the branded manufacturer paid the generic manufacturers millions of dollars not to enter the United States market for the branded product and its generic equivalents. The Sixth Circuit held that the agreement at issue was properly characterized as a horizontal market allocation agreement and that such agreements have long been held *per se* illegal under the antitrust laws. *Id.* at 908 (there was "simply no escaping the conclusion, that the Agreement . . . was, at its core, a horizontal agreement to eliminate competition in the market for Cardizem CD throughout the United States, a classic example of a *per se* illegal restraint of trade.").[9]

---

[9]     As in *Valley Drug*, the agreement not to compete in *Cardizem* arose in the context of a settlement of patent claims. *See Cardizem*, 332 F.3d 896. The case here is simpler as there are no patent issues of any kind.

12

Defendants may argue that, before applying the *per se* rule, the Court must determine whether this particular Agreement is one that would "always or almost always tend to restrict competition" and whether it has any countervailing procompetitive virtues. Such an argument would "indicate[] a misunderstanding of the *per se* concept." *Maricopa County*, 457 U.S. at 351. As the Sixth Circuit explained in *Cardizem CD*, the whole point of *per se* analysis "is that it allows courts to presume that certain behaviors *as a class* are anticompetitive without expending judicial resources to evaluate the actual anticompetitive effects or procompetitive justifications in a particular case." 332 F.3d at 909 (emphasis added). If a court were required to determine the anticompetitive effects and procompetitive justifications for a *particular* restraint before applying the *per se* rule, the whole point of *per se* analysis would be defeated. That inquiry is done with respect to the *class* of restraints at issue (i.e., horizontal market-allocation agreements), and it has already been done.

The only question the Court must answer before applying the *per se* rule is whether the Agreement is in fact a horizontal market-allocation agreement. It plainly is. The Agreement is an agreement between potential competitors in which one party (Barr) agrees not to compete with the other (Warner Chilcott) in a particular territory (the United States) for a particular period of time (five years). Such agreements are unlawful *per se*. *See Palmer*; *Cardizem CD*. Accordingly, the non-Ovcon discovery Barr is seeking is legally irrelevant to this case.

IV

Other Oral Contraceptives Are Not Economic Substitutes for Ovcon 35

Even if the Court were to reject Plaintiffs' contention and apply the rule of reason, documents and purchase data regarding the many non-Ovcon oral contraceptives would remain irrelevant to this case. In addition to applying the wrong substantive legal standard to Plaintiffs'

13

claims, Barr's motion confuses the concept of functional or therapeutic alternatives with the concept of economic substitutes.[10]

The issue of whether two products are economic substitutes comes into play in resolving issues of market power. In some antitrust cases,[11] an important issue is whether the defendant has market (or monopoly) power—the ability to profitably raise prices substantially above the competitive level. *See United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) ("a firm is a monopolist if it can profitably raise prices substantially above the competitive level"); *In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 603 (7th Cir. 1997) (market power is "the power to raise price above cost without losing so many sales as to the make the price rise unsustainable").

There are two alternative ways to prove market (or monopoly) power. First, the antitrust plaintiff can show directly that the defendant has in fact profitably raised prices substantially above the competitive level, which is defined as the level at which price equals marginal cost. *See Microsoft*, 253 F.2d at 51; *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). Second, the antitrust plaintiff can define a relevant market and show that the

---

[10]      *See Geneva Pharmaceuticals, Inc. v. Barr Laboratories, Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (branded Coumadin and its AB-rated generic equivalent were therapeutically equivalent but "nevertheless in separate markets for antitrust analysis"); James A. Keyte, *Market Definition and Differentiated Products: The Need for a Workable Standard*, 63 ANTITRUST L. J. 697, 709 (1995) ("functional interchangeability is irrelevant unless coupled with a proven, significant degree of cross-elasticity of demand").

[11]      Even in cases not governed by the *per se* rule, proof of actual adverse effects on competition obviates the need to prove *either* the defendant's market power *or* the market in which it competes. *See Federal Trade Comm'n v. Indiana Federation of Dentists*, 476 U.S. 447, 461 (1986) ("the finding of actual, sustained adverse effects on competition . . . is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis").

defendant has a dominant share of that market.  *See Microsoft*, 253 F.3d at 51.  Under this second approach, two products are in the same relevant market if an attempt to raise prices above marginal cost on one of them would cause so many buyers to switch to the other that such a price increase would not be profitable.  *See Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 469 & n.15 (1992) (market definition is based on "cross-elasticity of demand"); 1992 FTC/DOJ MERGER GUIDELINES § 1.1.  Whether the plaintiff uses the "direct" or the "circumstantial" method of proving market power, *see Microsoft*, 253 F.3d at 51, the analytical focus is the same—the defendant's ability (or inability) to raise price above cost without causing buyers to shift their purchases to other products.  *See Kodak*, 504 U.S. at 469 n.15.

    In this case, it is plain that other oral contraceptives are not economic substitutes for Ovcon 35.  Ovcon 35, like virtually every brand-name drug, is priced at many times its marginal cost.[12]  Once it is determined that a product is priced substantially above its marginal cost, it follows that the seller has market power and any further efforts at market definition are unnecessary.  *See Microsoft*, 253 F.3d at 51 ("Where evidence indicates that a firm has in fact profitably [raised prices above marginal cost], the existence of monopoly power is clear"); IIA P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 531a at 187 ("Finding the relevant market and its structure is not a goal in itself but a surrogate for market power"); *In the Matter of Schering-Plough Corp.*, 2003 WL 22989651 at 11 (F.T.C. Dec. 8, 2003) ("it is not necessary to rely on indirect proof that Schering has a monopoly share in a relevant market when the competitive effects of the restraint can be shown directly"), *rev'd on other grounds*, 402 F.3d 1056 (11th Cir. 2005).

---

    [12]    As Judge Posner pointed out in the *Brand Name* case, "[e]veryone knows" that manufacturers of branded prescription drugs "have market power."  *In re Brand Name Prescription Drugs Antitrust Litigation*, 186 F.3d 781, 786 (7th Cir. 1999).

As Professors Areeda and Hovenkamp explain in their treatise:

> A first approximation "provisional market" is in fact a relevant antitrust market if its prices are already significantly supracompetitive. Such a market definition would be incorrectly broadened by adding a second product . . . that would make a *further* price increase unprofitable to the first firm or set of firms.

*Id.* ¶ 539 at 241.[13]

In fact, Barr's principal economic expert has already endorsed the propositions that (I) market power is the ability to raise price above marginal cost, and (ii) Warner Chilcott has market power in connection with the sale of Ovcon 35. At his deposition in the parallel government cases, Professor Gregory Bell testified that, "from an economist's perspective," market power exists in situations "where an individual producer or manufacturer is facing a downward-sloping demand curve for the product that that individual producer or manufacturer creates,"[14] and that this implies that the manufacturer is able "to price the product at a price that exceeds the marginal cost of production." Bell dep. at 149. Professor Bell went on to acknowledge that, "by virtue of the fact

---

[13]     This analysis has been applied in several cases to find that a single drug and its AB-rated generic equivalents constitute a relevant antitrust product market. *See In re Ciprofloxacin Hydrochloride Antitrust Litigation*, 363 F. Supp. 2d 514, 523 (E.D.N.Y. 2005) (rejecting Barr's argument that the relevant market "must include all quinolone antibiotics" and holding instead that "the relevant market is for [brand and generic] ciprofloxacin and Bayer [the branded manufacturer] had market power in that market"); *In re Terazosin Hydrochloride Antitrust Litigation*, 352 F. Supp. 2d 1279, 1319 n.40 (S.D. Fla. 2005) ("the Court is persuaded that Abbott has power in the relevant market, which is the market for Hytrin and its generic bioequivalent forms of terazosin hydrochloride"); *see also Geneva Pharmaceuticals, Inc. v. Barr Laboratories, Inc.*, 386 F.3d 485, 495-500 (2d Cir. 2004) (in case alleging restraint that prevented entry of a second generic, the relevant product market was limited to generic warfarin sodium and did not include the therapeutically equivalent branded drug); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir. 1978) ("We therefore conclude that the relevant product market . . . is that composed of cephalosporin antibiotics; there is neither appropriate interchangeability, price sensitivity, nor cross-elasticity of demand in the broader market of antibiotics").

[14]     Sellers without market power face a flat (horizontal) demand curve rather than a downward-sloping one. *See* P. Areeda & L. Kaplow, ANTITRUST ANALYSIS 15 n.29 (1997).

that [Ovcon's] price is not equal to its marginal cost, . . . that would satisfy an economist's sort of classical definition in some sense of the existence of market power." *Id.* at 150-51.

In light of Warner Chilcott's undisputed ability to sell Ovcon 35 profitably at a price substantially above marginal cost, it logically follows that the existence of other oral contraceptives has not constrained Warner Chilcott from raising the price of Ovcon 35 substantially above marginal cost and, therefore, that other oral contraceptives are not economic substitutes for Ovcon 35.[15] Discovery regarding Plaintiffs' purchases of those other oral contraceptives will shed no light on whether Warner Chilcott has market power or on whether it illegally maintained that market power by delaying generic competition. Instead, Warner Chilcott's market power is evidenced by its actual pricing of Ovcon 35.

V

Plaintiffs' Purchase Data Will Not Assist Barr in Market Definition

Barr contends that Plaintiffs' purchases of oral contraceptives other than Ovcon will assist it in investigating market definition issues (issues that at this point have already been the subject of expert reports). As noted above, market definition (the "circumstantial" method of proving market power) analyzes "the extent to which consumers will change their consumption of one product in response to a price change in another, i.e., the 'cross-elasticity of demand.'" *Kodak*, 504 U.S. at 469. One way of determining whether two products have a positive cross-elasticity of

_____

[15] In performing a cross-elasticity analysis, cross-elasticity must be measured at the level of marginal cost. Otherwise, the analysis will be subject to what is known in antitrust parlance as the "Cellophane fallacy." *See* Areeda & Hovenkamp, ANTITRUST LAW ¶ 539. The Cellophane fallacy recognizes that a monopolist will always raise price to the elastic part of the demand curve—the level where further price increases by the monopolist will be unprofitable. If prices are already at that level, any further price increases will, by definition, cause as shift in demand. This shift, however, does not mean that the monopolist lacks monopoly power. It merely means that the monopolist has already exercised it.

demand is to look at data showing the prices and sales volumes of one product and see whether a price increase on one product relative to the other appears to result in higher total sales of the other product. If such a pattern is found, one explanation is that consumers have shifted their purchases between the two products. Plaintiffs' purchase data is not appropriate for such a study, for two reasons.

First, in order to be informative, a study of cross-elasticity must be performed using total sales volumes across the relevant geographic market (in this case, the United States). Otherwise, there is no way to determine whether an increase in sales volume represents a shift in demand from one product to the other, or simply a shift from one retail outlet to another. For example, suppose that one Plaintiff's purchase data shows an increase in purchases of other oral contraceptives some time after a price increase on Ovcon 35 (with no corresponding price increase on the other drugs). Without nationwide data, there is no way to know whether this increase in purchases reflects the fact that former Ovcon 35 patients are now taking other drugs instead or simply the fact that existing users of other contraceptives are now getting their prescriptions filled at that Plaintiff's stores rather than somewhere else. The only way to avoid this problem is to obtain data showing total sales of all oral contraceptives throughout the United States, either from the manufacturers themselves or (more commonly) from third-party vendors like IMS Health. It is virtually certain that Barr already obtains this data in the normal course of business.

Second, cross-elasticity studies using current prices are irrelevant if there is reason to believe that current prices are supracompetitive. Basic economic theory dictates that a firm with market power will raise prices to the profit-maximizing level. Under these circumstances, by definition, any *further* price increase will cause buyers to shift their purchases to other products and render the price increase unprofitable, indicating that there is a positive cross-elasticity of demand

18

between the monopolist's product and other products.  Inferring a lack of market power in these circumstances is known as the Cellophane fallacy, and it has been recognized as a fallacy by the Supreme Court and by lower courts.  *See Kodak*, 504 U.S. at 471 ("The existence of significant substitution in the event of *further* price increases . . . does not tell us whether the defendant *already* exercises significant market power") (quoting P. Areeda & L. Kaplow, ANTITRUST ANALYSIS ¶ 340(b) (1988)); *United States v. Aluminum Co. of America*, 148 F.2d 416, 426 (2d Cir. 1945) ("substitutes are available for almost all commodities, and to raise the price enough is to invoke them").

When weighed against this drastically limited relevance, the burden of producing this data becomes the critical consideration.  Tracking down and producing data showing every purchase of every oral contraceptive stocked by Plaintiffs is an extraordinary burden.  Plaintiffs' purchase data is not organized by drug.  In order to obtain such reports, a program needs to be written to search the relevant files and extract information on purchases of the relevant drugs.  In some cases, the relevant data files have been archived and would have to be retrieved from storage.  This is particularly likely given that Barr has waited until June 2007 to bring this motion.  The burdens plainly outweigh the benefits, and Defendants' motion should therefore be denied.  *See In re Vitamins Antitrust Litigation*, 198 F.R.D.  296, 301-02 (D.D.C. 2000) (plaintiffs' transaction data, while marginally relevant, need not be produced because the benefit to defendants of having the data was outweighed by the burden to plaintiffs of producing it).

VI

Plaintiffs' Non-Ovcon Purchases Are Irrelevant to Assessing Damages

Plaintiffs' documents and purchase data relating to non-Ovcon oral contraceptives are also irrelevant to their damage claims.  Plaintiffs' expert reports on damages, and the responses

of Defendants' experts to those reports, have already been served. As Barr recognizes in footnote 2 of its statement of points and authorities, Plaintiffs' expert reports use the *actual* pricing and substitution rates experienced by Balziva when it entered the market in October 2006 to estimate the prices and substitution rates that would have been experienced in 2004.

All of the available evidence indicates that actual data regarding Balziva's entry in 2006 is the best means of estimating the competitive benefits that generic entry would have brought in 2004 (and none of Defendants' experts argues otherwise). While no one denies that it is possible to model generic discounts and substitution rates using other drugs which have faced generic competition in the past, Plaintiffs have already produced whatever documents they have showing generic substitution rates in general, or for particular classes of drugs. What Barr is asking for is transaction data from which generic discounts and substitution rates for other drugs could be derived. In light of the fact that we now have generic discounts and substitution rates for *this* drug, Barr has failed to show that the minuscule relevance of this data outweighs the enormous burden of producing it. Accordingly, Barr's motion to compel production of this data should be denied.

VII

<u>Most of the Ovcon Documents Sought by Barr Do Not Exist</u>

Finally, Barr asks the Court to order Plaintiffs to produce certain documents (identified on Appendix A) that purportedly relate directly to Ovcon rather than to other oral contraceptives. As noted above, Barr has failed to come forward with any evidence that the majority of these documents exist or are in any Plaintiff's possession, custody or control. Plaintiffs are in the process of locating and producing the remainder. We have attached as Appendix A specific responses to Barr's Appendix A.

VIII

<u>Conclusion</u>

For the reasons stated above, Barr's motion to compel should be denied.


Respectfully submitted,

/s/ Scott E. Perwin
Scott E. Perwin
Lauren C. Ravkind
Robert D.W. Landon III (D.C.  Bar No. 441571)
KENNY NACHWALTER P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
(305) 373-1000
(305) 372-1861 (fax)
*Counsel for Plaintiffs Walgreen Co. et al.*

Linda P. Nussbaum (D.C. Bar No. 483254)
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, New York 10022
(212) 687-1980
(212) 687-7714 (fax)

Eric L. Cramer
BERGER & MONTAGUE
1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3000
(215) 875-4604 (fax)

William Isaacson (D.C. Bar No.414788)
Tanya Chutkan (D.C. Bar No. 420478)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W., Suite 800
Washington, D.C. 20015
(202) 237-2727
(202) 237-6131 (fax)

21

Richard B. Drubel (D.C. Bar No. 334359)
Kimberly H. Schultz
BOIES, SCHILLER & FLEXNER LLP
26 South Main Street
Hanover, NH 03755
(603) 643-9090
(603) 643-9010 (fax)

Bruce E. Gerstein
GARWIN GERSTEIN & FISHER LLP
1501 Broadway, Suite 1416
New York, New York 10011
(212) 398-0055
(212) 764-6620 (fax)

Dianne M. Nast
RODA NAST P.C.
801 Estelle Drive
Lancaster, Pennsylvania 17601
(717) 892-3000
(717) 892-1200 (fax)

David Nalven
HAGENS BERMAN SOBOL & SHAPIRO LLP
One Main Street, Fourth Floor
Cambridge, Massachusetts 02142
(617) 482-3700
(617) 482-3003 (fax)
*Executive Committee for Direct Purchaser Class Plaintiffs*

Certificate of Service

I hereby certify that, on July 12, 2007, a true and correct copy of the foregoing was electronically filed with the Clerk of Court and served on counsel of record via CM/ECF.  I further certify that, on July 12, 2007, a true and correct copy of the foregoing was hand-delivered to:

Karen N. Walker, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Counsel for Barr Pharmaceuticals, Inc.


/s/ Scott E. Perwin

301992.1