UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MEIJER, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| WARNER CHILCOTT HOLDINGS CO., III, LTD., *et al.*, | ) ) ) | Civil Action No. 1:05-CV-2195 (CKK/AK) |
| | ) | |
| Defendants. | ) ) | |
| WALGREEN CO., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WARNER CHILCOTT HOLDINGS Co, III, LTD., *et al.*, | ) ) ) | Civil Action No. 1:06-CV-00494 (CKK/AK) |
| Defendants. | ) ) ) | |

**MEMORANDUM OPINION**

Pending before the Court are Defendant Barr Pharmaceutical Inc.'s Motion to Compel Answers to Interrogatories and the Production of Documents ("First Motion to Compel") [55/28]; Direct Purchaser Class Plaintiffs' Response to the First Motion to Compel, filed on behalf of the *Meijer* Plaintiffs ("*Meijer* Opposition") [59]; Walgreen Plaintiffs' Memorandum in Opposition to First Motion to Compel ("*Walgreen* Opposition") [29]; and Defendant Barr Pharmaceutical Inc's ("Barr") reply to the Opposition to First Motion to Compel ("Reply to First Motion") [74/40]. Also pending before this Court are Defendant Barr's Motion to Compel Answers to Interrogatories and the Production of Documents from Direct Purchaser Plaintiffs

("Second Motion to Compel") [115/69]; Plaintiffs' Statement of Points and Authorities in Opposition to Barr's June 28, 2007 Motion to Compel Discovery ("Opposition to Second Motion") [118/70]; and Barr's reply to the Opposition to Second Motion ("Reply to Second Motion") [123/74]. The Court held a hearing on both motions on July 31, 2007.[1] Barr moves to compel the Direct Purchaser Plaintiffs (comprised of the *Meijer* Plaintiffs and the *Walgreen* Plaintiffs, and hereinafter jointly referred to as "Plaintiffs" ) to "produce documents and information responsive to its discovery requests, including: (1) documents and information regarding Combined Hormonal Contraceptives ("CHCs") other than Ovcon 35 and its generic equivalents, and (2) documents and data regarding Ovcon 35 and its generic equivalents," including "sales and pricing data" for these drugs/categories of drugs. (Second Motion at 1, First Motion at 2.)[2]

Background

Discovery pursuant to Fed. R. Civ. P. 26(a)(1) commenced on March 15, 2006, in the

---

[1] Plaintiffs' underlying assertion in both cases is that Defendants Warner Chilcott Holdings Co. III, Ltd. ("Warner Chilcott") and Barr entered into an agreement whereby Warner Chilcott agreed to pay Barr $20 million and Barr agreed, *inter alia*, not to launch its FDA-approved generic version of the oral contraceptive Ovcon 35 for five years. (Opposition to Second Motion to Compel at 2.) In September 2006, approximately twenty-nine months after the agreement was made, Warner Chilcott allowed Barr to launch the generic version of Ovcon 35, which was marketed under the trade name Balziva. (*Id.*) The [Direct Purchaser] Plaintiffs allege that Defendants' actions "artificially inflated the price of [Ovcon], forcing direct purchasers to pay higher prices for Ovcon products than they would have, had generic versions been sold." (*Meijer* Opposition at 2.) Plaintiffs seek damages in the "form of overcharges (trebled) they paid, and continue to pay for, Ovcon products . . . ." (*Id.*)

[2] In both Motions, Barr notes that there are a number of specific discovery responses in dispute. In order to expedite a decision on this matter, this Memorandum Order will not address the contested responses individually but will instead address the discovery issues as they were summarized at the oral hearing and in the briefs.

*Meijer* case, Civil Action No. 05-2195 (CKK) (D.D.C. 2005). (First Motion to Compel at 3.) On May 23, 2006, Barr served the *Meijer* Plaintiffs with its First Request for Production of Documents and First Set of Interrogatories, and Plaintiff responded on June 26, 2006. (*Id.*) Barr indicates that the *Meijer* Plaintiffs, in their Answers and Objections, ¶9, generally objected:

> to the instructions, definitions and Document[ ] Requests to the extent they request information concerning the resale of pharmaceutical products below the manufacturer level as not being relevant, nor reasonably calculated to lead to the discovery of admissible evidence. Because Plaintiffs have alleged an overcharge theory of damages and are not seeking any damages relating to lost profits, any sales, profit, loss, or other "downstream" information is not relevant to this case.

(*Id.*)

Barr and the *Meijer* Plaintiffs met and conferred on August 21, 2006, regarding the disputed discovery, but they were unable to reach a compromise, (*id.* at 4), and accordingly, Barr filed its First Motion to Compel on September 13, 2006, requesting, *inter alia*, downstream sales data for Ovcon 35 ("Ovcon").

Discovery in the *Walgreen* case, Civil Action No. 06-494 (CKK) (D.D.C. 2006), commenced on April 20, 2006, with exchange of initial disclosures in accord with Fed. R. Civ. P. 26(a)(1). (*Id.*) On May 23, 2006, Barr served the *Walgreen* Plaintiffs with its First Requests for Production of Documents and First Set of Interrogatories, to which the Plaintiffs responded and raised specific objections on June 23, 2006. (*Id.*) On August 25, 2006, Barr met with the *Walgreen* Plaintiffs to confer about contested discovery but no compromise was reached, and thus, the First Motion to Compel was also directed at the *Walgreen* Plaintiffs.

On June 28, 2007, Barr filed its Second Motion to Compel, directed at both groups of Direct Purchaser Plaintiffs, alleging that "Plaintiffs refuse to produce any documents regarding CHCs other than Ovcon 35 and its generic equivalents . . . [even though] data regarding CHCs

other than Ovcon 35 are directly relevant to this case." (Second Motion to Compel at 2.) Barr asserts that information about Ovcon 35 and other CHCs is relevant to its affirmative defenses relating to Defendants' alleged lack of market power, and further, such information will "permit Barr to assess the impact of Plaintiffs' hypothetical generic version of Ovcon 35." (*Id.*) Barr further requests information about Plaintiffs' purchases of Ovcon 35 and its generic equivalents, including the contracts and agreements under which such purchases were made. (*Id.* at 3.)

Legal Standard

Fed. R. Civ. P. 26(b)(1) authorizes discovery "regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any . . . documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter." Fed. R. Civ. P. 26(b)(1). "Relevance for discovery purposes is broadly construed." *Doe v. District of Columbia*, 231 F.R.D. 27, 30 (D.D.C. 2005). "A showing of relevance can be viewed as a showing of need; for the purpose of prosecuting or defending a specific pending civil action, one is presumed to have no need of a matter not 'relevant to the subject matter involved in the pending action.'" *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1341 (D.C. Cir. 1984) (citing Fed. R. Civ. P. 26(b)(1)). Once a relevancy objection has been raised, the party seeking discovery must demonstrate that the information sought to be compelled is discoverable. *See Alexander v. Federal Bureau of Investigation*, 194 F.R.D. 316, 325 (D.D.C. 2000).

Pursuant to Fed. R. Civ. P. 26(b)(2)(iii), the court may limit discovery on its own initiative, if it determines that the "burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties'

resources, the importance of the issue at stake in the litigation, and the importance of the proposed discovery in resolving those issues." *See Hammerman v. Peacock*, 108 F.R.D. 66, 67 (D.D.C. 1985) (Rule 26(b)(1) was amended to give the court the power, *sua sponte*, to limit discovery.) *See also United States v. Krizek*, 192 F.3d 1024, 1029 (D.C. Cir. 1999) (A trial court has considerable discretion over discovery matters); *Food Lion, Inc. v. United Food and Commercial Workers Int'l. Union,* 103 F.3d 1007, 1012 (D.C. Cir. 1997) ("[A] district court's decision to permit or deny discovery is reviewable only for an abuse of discretion.") (citation omitted).

In drafting discovery requests, the party who seeks discovery "bears the burden of fashioning such requests appropriately." *Washington v. Thurgood Marshall Academy*, 232 F.R.D. 6 (D.D.C. 2005) (quoting *Peterson v. Hantman*, 227 F.R.D. 13, 17 (D.D.C. 2005.)  In turn, the party objecting to discovery requests must justify its objections by explaining them in detail as opposed to relying on general assertions.  *See United States ex rel. Pogue v. Diabetes Treatment Centers of America*, 235 F.R.D. 521, 523-24 (D.D.C. 2006) (citing *Alexander v. FBI*, 192 F.R.D. 50, 53 (D.D.C. 2000) ( "[A] party objecting to an interrogatory on [the] basis [of undue burden] must explain in detail how the interrogatory is burdensome.")

Analysis of Motions to Compel
Second Motion to Compel

As a preliminary matter, the Direct Purchaser Plaintiffs argue that Barr's Second Motion to Compel is untimely because their responses and objections to Barr's discovery requests were served in June 2006, and Barr waited until a year later to file this Second Motion to Compel, approximately one and one-half weeks prior to July 6, 2007 close of fact discovery, with the

effect that granting this Motion to Compel would effectively extend discovery.[3]  The Court notes that Plaintiffs' argument ignores the fact that Barr filed its First Motion to Compel in September 2006, and accordingly, the Plaintiffs were on notice of Barr's demands for discovery since at least fall of 2006.[4]  Furthermore, during the interim period between Barr's filing of the two motions to compel, there was a stay of discovery lasting several months, and the parties to this case and/or pending related cases resolved a number of discovery disputes and made mediation attempts, with the effect that the indirect purchaser cases settled and claims involving Warner Chilcott have now been resolved.  The Court thus finds that this Second Motion to Compel should not be denied on grounds of untimeliness because it was filed prior to the close of fact discovery, while the First Motion to Compel was pending before this Court, and furthermore, the trial court has not yet set a schedule for dispositive motions.

In its Second Motion, Barr requests that the Direct Purchaser Plaintiffs produce documents and purchase data concerning CHCs other than Ovcon 35 and its generic equivalents, on grounds that such information is relevant to its theory of market definition, wherein such product market involves interchangeability of products and/or cross–elasticity of demand. (Second Motion to Compel at 7.)  Barr acknowledges that the Direct Purchaser Plaintiffs contend that the relevant market consists only of Ovcon and its generic equivalents. (*Id.*, citations omitted.) Direct Purchaser Plaintiffs argue that information about oral contraceptives other than

---

[3] All discovery was to be completed by August 22, 2007. At the July 31, 2007 hearing, counsel for the *Meijer* Plaintiffs noted that the Motion(s) to Compel may be moot because both class certification briefing and expert discovery have closed.  Barr's counsel acknowledged that the class certification briefing is ripe and expert reports have been filed, but disputed that the record is closed.

[4] During the hearing, counsel for Barr indicated that there is overlap in the issues addressed in these two motions.

Ovcon 35 and its generic equivalents is irrelevant to this case and will not assist Barr in defining the market. Plaintiffs' argument is premised on the presumption that the trial court will decide that the agreement between Warner Chilcott and Barr is a "horizontal market-allocation agreement and therefore a *per se* violation of the Sherman Act," and thus, "[m]arket power and market definition are not relevant to that determination." (Opposition to Second Motion at 8.) Plaintiffs include a six page argument on this issue in their Opposition but this Court notes that the application of *per se* violation analysis [as opposed to "rule of reason" analysis, which focuses on the impact of a challenged practice on competition within a particular product market] is an issue indisputably within the province of the trial court to decide and accordingly, until the trial court rules on this issue, Plaintiffs' application of a *per se* analysis is premature.[5] Plaintiffs' argument that market power and definition are not relevant at the discovery stage may even be disingenuous in light of the fact that "[P]laintiffs themselves raised the question of market definition **in their Complaints**" and "Barr affirmatively raised market definition as a defense to [P]laintiffs' claims." (Reply to Second Motion at 8) (emphasis in original.) *See also Alexander v. F.B.I.*, 194 F.R.D. 316, 325 (D.D.C. 2000) ("a request for discovery should be considered relevant if there is **any possibility** that the information sought [such as market definition] may be relevant to the subject matter of the action.") (*Id*) (emphasis supplied.)

Plaintiffs argue that even if the trial court were to apply a rule of reason analysis, documents and purchase data about other oral contraceptives are not relevant since these contraceptives are not economic substitutes for Ovcon 35. "The issue of whether two products

---

[5]On June 5, 2007, the trial court denied without prejudice Plaintiffs' motion for partial summary judgment, noting that "dispositive motions are not to be filed until discovery is complete and the Court sets a briefing schedule." (June 5, 2007 Minute Entry Order.)

are economic substitutes comes into play in resolving issues of market power." (Opposition to Second Motion at 14.) Plaintiffs conclude that because "Ovcon 35, . . ., is priced at many times its marginal cost [and] [o]nce it is determined that a product is priced substantially above its marginal cost, it follows that the seller has market power and any further efforts at market definition are unnecessary." (Opposition to Second Motion at 15; string citation omitted.) The Court notes that while Plaintiffs' arguments about market power and economic substitutes assume (and challenge) Barr's intended use of the information sought, such arguments do not bear on the relevance of the information for purposes of discovery but rather may weigh on the admissibility of such information at trial. *See Alexander v. FBI*, 194 F.R.D. 316, 326 (D.D.C. 2000) ("Discovery is not to be denied because it relates to a claim or defense that is being challenged as insufficient.")[6] Barr responds to this challenge by noting that not only have Plaintiffs made incorrect assumptions about Barr's intended use of the data ["to perform market-wide studies of the cross-elasticity of demand between Ovcon 35 and other CHCs"] but even assuming *arguendo* that their assumptions were correct, Plaintiffs assessment of the fruitfulness of Barr's analysis is not relevant. (Reply to Second Motion at 6.) This Court's analysis of the pending motion to compel involves determining whether the information sought by Barr is relevant to the claims and defenses in this case and if so, whether Plaintiffs have demonstrated any burden that tempers the production of such information.[7]

---

[6]Assuming *arguendo* that these Motions are denied, Barr is not precluded from moving for additional discovery for the purpose of responding to the allegations in Plaintiffs' anticipated dispositive motion, pursuant to Fed. R. Civ. P. 56(f).

[7]Barr notes that "plaintiffs have not offered any estimates of potential costs, time demands, or any other objective facts relevant to this analysis [although] Plaintiffs claims that responding to Barr's requests will require '[t]racking down and producing data showing every purchase of every

Plaintiffs concede that " no one denies that it is possible to model generic discounts and substitution rates using other drugs which have faced generic competition in the past," but contend that they "have already produced whatever documents they have showing generic substitution rates in general, or for particular classes of drugs." (Opposition to Second Motion at 20.) Barr contests this assertion by stating that "none of the documents produced by plaintiffs outline the generic substitution rates in general, or for particular classes of drugs.'" (Reply to Second Motion at 10.) Plaintiffs further argue that information about these other CHCs is "irrelevant to assessing damages" but that argument is based on their assertions that: 1) expert reports have already been exchanged, and 2) "actual data regarding Balziva's entry in 2006 is the best means of estimating competitive benefits that generic entry would have brought in 2004 (and none of Defendants' experts argues otherwise.") (*Id*.) Plaintiffs again attempt to impose their theory of the case on Barr, to justify their proposed limitation on discovery.

In explaining the relevance of information relating to other CHCs, Barr notes that "Plaintiffs' entire case is founded on a 'but-for' world in which a generic version of Ovcon 35 would have been available for their purchase and resale beginning in 2004" and therefore, Plaintiffs' damages will depend on the price of a hypothetical generic version of Ovcon 35, the percentage of Ovcon 35 purchases that would have been replaced with generic Ovcon 35, and those that would have been replaced by purchases of other branded and generic CHCs. (Second Motion to Compel at 8.) Barr references one of Plaintiff's expert reports, which notes that sources for data for this hypothetical "but-for" world include:

---

oral contraceptive stocked by Plaintiffs and that a 'program needs to be written to search the relevant files and extract information on purchases of the relevant drugs.'" (Reply to Second Motion at 5, n.5, quoting Opposition to Second Motion at 19.)

"(1) economic literature and empirical data regarding the effect of generic entry on **other brand name drugs**, (2) Defendants' generic penetration models and forecasts (which are based on data regarding **other CHCs**), and (3) data for **other branded products** that have experienced generic competition." (Second Motion at 9, n.3, citing March 12, 2007 Expert Report of Jeffrey J. Leitzinger, Ph.D. at 17-28) (emphasis added by Barr).[8]  Dr. Leitzinger further noted that "[w]hile data reflecting actual prices, market shares and purchase volumes following Balziva's October 2006 entry] are available, **these same quantities have to be estimated in the but-for world involving earlier generic entry dates**," (Second Motion at 8, n.2, citing May 18, 2007 Leitzinger Report at 29) (emphasis added by Barr.)

The Court finds Barr has demonstrated, that for purposes of discovery, information about other CHCs is relevant to the claims and defenses at issue. Barr's need for this information must now be balanced against the burden imposed on Plaintiffs in obtaining it. In their Opposition to the Second Motion, Plaintiffs concede that data regarding other oral contraceptives has "limited relevance" but they argue that "[t]racking down and producing [such] data showing every purchase of every oral contraceptive stocked by Plaintiffs is an extraordinary burden." (*Id.*)  *See Vitamins Antitrust Litigation*, 198 F.R.D. 296, 301-02 (D.D.C. 2000) (plaintiffs' transaction data, while marginally relevant, need not be produced because the benefit to defendants of having the data was outweighed by the burden to plaintiffs of producing it.)[9]

---

[8] At the July 31, 2007 hearing, counsel for the *Meijer* Plaintiffs indicated that their expert, Dr. Leitzinger did not use sales data for Plaintiffs but instead analyzed purchase data derived from Barr and Warner Chilcott sales data, and "backcasted" this data to derive overcharge damages.

[9] Plaintiffs suggest that Barr could obtain this information from third party subscription services but Barr responds by noting that "plaintiffs' own experts do not rely on such third party data to conduct their analyses and, indeed, conclude that such data would not be adequate." (Reply to

Barr argues that Plaintiffs' allegations regarding burden fail to meet the standard that "the party opposing discovery based on burden 'must make a specific showing, **supported by declaration**, as to why the production sought would be unreasonably burdensome.'" (Reply to Second Motion at 4-5, citing *Peskoff v. Faber*, No. 04-526, 2006 WL 1933483, at *2 (D.D.C. July 11, 2006)(emphasis added by Barr.)) Barr distinguishes *Vitamins, supra.* on grounds that the defendants there "sought to compel the production of data regarding 'thousands of different products' sold by plaintiffs , data which would consist of 'literally every document relating to the businesses of the plaintiffs selling those products.'" (Reply to Second Motion at 5, citing *Vitamins*, 198 F.R.D. at 298-99.)  In contrast, Barr "seeks production of documents and information regarding only Ovcon 35 and its generic equivalents (which have, for the most part, already been produced), and other CHCs." (Reply to Second Motion at 5.)

Plaintiffs fail to demonstrate that the burden of producing documents outweighs Barr's need for these documents to be able to defend against Plaintiffs' claims in this litigation. The Court will however impose certain restrictions on the amount and type of information that the Plaintiffs are responsible for producing.  Plaintiffs will produce pricing and sales data for four (4) CHCs (other than Ovcon and its generic equivalents), to be selected by Barr, for the period of time beginning when the agreement between Warner-Chilcott and Barr became effective through the date when Balziva became available to the public.  The format of such sales and pricing data shall be more specifically defined by the parties at a meet and confer.  The production of such

---

Second Motion at 6, referencing May 18, 2007 Expert Report of Keith Leffler, at 12  n.26.)  Barr further argues that it has requested more than CHC purchasing data; it also requested documents and information regarding how Plaintiffs decide which CHCs to sell and how to price them.) (Reply to Second Motion at 6.)

data shall be made within 30 days after the meet and confer between the parties.

In its Second Motion to Compel, Barr demands that several individual Plaintiffs produce documents and data regarding Ovcon 35 and its generic equivalents, including purchase data; contracts and agreements relating to such purchases; and forecasts and analyses regarding both. Barr asserts that this information is relevant to the subject matter of this litigation to show, *inter alia*, the amount of Ovcon purchased by Plaintiffs, the terms of such purchases, including net price and how the October 2006 entry of Balziva impacted these purchases. (Second Motion to Compel at 10.) A summary of this requested information is included in Barr's Appendix A, and Plaintiffs incorporate their responses in an Appendix A attached to their Opposition. Plaintiffs' responses to these requests do not challenge the relevance of such information, but instead indicate certain "obstacles" to production. To the extent that Plaintiffs indicate that certain data will be produced, or will be produced "if it exists," Plaintiffs should undertake a good faith effort to obtain this information within 20 days from the date of this Memorandum Opinion and to promptly convey this information to Barr, or alternatively, to confirm to Barr that the information sought does not exist. To the extent Plaintiffs have indicated that certain information is cumulative and has "already been produced," the Plaintiffs should clearly identify the responsive information that has been produced. The Plaintiffs need not produce information that is not in their possession, custody or control.

<u>First Motion to Compel</u>

Barr's First Motion to Compel focuses on the production of "downstream" sales and profitability data from the representative Direct Purchaser Plaintiffs for use in performing Barr's

damage calculation.[10]  The *Walgreen* Plaintiffs clarify that Barr "already has sales and pricing data regarding sales transactions that are downstream <u>from the wholesaler</u>" but what it seeks is "sales and pricing data regarding sales transactions that are downstream <u>from the retailer</u>. . . ." (*Walgreen* Opposition at 4.)[11]  In their briefs and at the hearing, counsel for both the *Meijer* and the *Walgreen* Plaintiffs represented that the damages sought are solely in the form of overcharges, which is the difference in price between branded Ovcon 35 and the generic version of Ovcon.  The *Walgreen* Plaintiffs assert that the damages calculation accordingly "requires three numbers: (1) the price that Plaintiffs actually paid for branded Ovcon: (2) the lower price Plaintiffs would have paid for generic Ovcon; and (3) the percentage of Plaintiff's Ovcon purchases that would have been replaced with the cheaper generic had it been available (i.e., the generic substitution rate)."  (Walgreen Opposition at 1.)  Walgreen goes on to explain that "[t]he first of these numbers is an actual number and is being provided in discovery; the second and third numbers will have to be estimated and, since there is still no generic version of Ovcon on the market [as of the date their Opposition was filed] . . . , they will have to be estimated using information other than sales of generic Ovcon."  (*Id.*)

During the hearing on these Motions, counsel for the *Walgreen* Plaintiffs indicated that their expert used aggregate dispensing data [versus sales transaction data] to show the substitution rate that the generic drug would have achieved with market entry.  There is no

---

[10]Barr proffers no explanation or affidavits showing how it will make use of the "downstream" sales data.

[11]The *Walgreen* Plaintiffs assert that they are retailers although some of them are proceeding under an assignment from their wholesaler.

dispute that this dispensing data was provided to Barr.[12] In contrast, the *Meijer* Plaintiffs' expert made no use of sales data from Plaintiffs but instead used [upstream] purchase data; *i.e.*, Defendants' own sales data, "which reflects the prices direct purchasers **pay** (and permits estimates of what they would have paid absent the challenged conduct)." (*Meijer* Opposition at 4) (emphasis in original.)[13]

The Direct Purchaser Plaintiffs assert that Barr may not use "downstream" pricing and sales data for purposes of asserting a "pass on" defense to Plaintiffs' overcharge claim. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp*, 392 U.S. 481 (1968) (holding that an antitrust plaintiff who proves that the price it paid for goods or services was artificially higher than it should have been due to an antitrust violation is entitled to recover the difference in price even if the plaintiff has suffered no actual injury.) Plaintiff "prove[s] injury and the amount of its damages" when it shows that the defendant obtained a higher price from the plaintiff that the plaintiff would have paid if there was no violation. *Id.* at 494  *See also Illinois Brick Co. v. Illinois,* 431 U.S. 720, 724-5 (discussing *Hanover Shoe*, 392 U.S. 494, noting that the Court held that usually a direct purchaser is injured "by the full amount of the overcharge paid by it and that the antitrust defendant is not permitted to introduce evidence that indirect purchasers were in fact injured by illegal overcharge.")

Direct Purchaser Plaintiffs assert that "downstream *resale* data" is not relevant in an action brought by a direct purchaser plaintiff pursuing a federal antitrust cause of action. (*Meijer*

---

[12]Barr's counsel claims that *Walgreen's* expert used sales data for 5 of 8 opt-out Plaintiffs, for a period of less than one year to calculate damages by "backcasting," and Barr wants the "universe of sales data." (July 31, 2007 Hearing.)

[13]This expert also "backcasted" the data to calculate damages.

Opposition at 3.)[14] *See also* Walgreen Opposition at 3, citing *In re Vitamins Antitrust Litigation*, 198 F.R.D. 296, 301 (D.D.C. 2000) ("'no court has ever allowed production of individualized downstream data,' even in cases where antitrust claims of direct and indirect purchasers are consolidated.")  Barr disputes Plaintiffs' contention that the *Vitamins* decision found that "downstream data" is not relevant to a damages determination.  *See Vitamins,* 198 F.R.D. at 301 (direct purchaser' sales data were "relevant" to the issue of damages.")  Nor did the *Hanover Shoe* decision hold that "inquiry into [a] direct purchaser's sales and profits is irrelevant to an antitrust action as a matter of law." (Reply to First Motion at 4 n.1, citing *Meijer* Opposition at 7.)  Barr notes that "*Hanover Shoe* and its progeny did not render irrelevant plaintiffs' individualized [sales] data because defendants are not seeking discovery of this data in order to assert a pass-on defense . . . ." (Reply to First Motion at 4 n.1, citing *Vitamins, supra.,* 198 F.R.D. at 299.)

  Barr argues that even if "downstream data" may not be used to assert a "pass-on" defense, such information is relevant to: 1) a determination  whether the "cost-plus" exception to *Shoe* applies, and 2) calculation of Plaintiffs damage claims.

  The *Walgreen* Plaintiffs assert that retail pharmacies do not have "cost plus" contracts (*Walgreen* Opposition at 5) and the *Meijer* Plaintiffs note that no court has ever found that this exception applies in a pharmaceutical antitrust suit, and further, Barr has not cited any "reason to believe that any direct purchaser of pharmaceuticals employs such contracts . . . ." (*Meijer* Opposition at 5.)  Barr contends that it should be allowed to discover Plaintiffs' sales and pricing data in order to "determine whether plaintiffs sell Ovcon on a cost-plus basis to indirect

---

[14]The arguments relating to use of downstream data in connection with indirect purchaser claims are now moot, in light of the fact that the related indirect purchaser cases have settled.

purchasers." (Reply to First Motion at 7.) The Court notes that none of the parties proffer more than a cursory explanation as to why or why not the "cost plus" exception may be allowable, and accordingly the Court is not sure whether Barr asserts that it needs actual sales data to determine the applicability of the cost-plus exception or alternatively, more detailed information about the pricing formulas employed by Plaintiffs.[15] The Court finds that Barr is entitled to explore the applicability of a cost plus exception and therefore, the Court directs the parties to meet and confer to compromise on the limited production of some additional information that will aid Barr in this inquiry. If Plaintiffs determine that the data requested by Barr is unavailable or it is overly burdensome to produce, they may seek further intervention by this Court. The Court, however, strongly urges the parties to make a good faith effort to compromise on production of some of the data being sought by Barr, whether it is produced in the format suggested by Barr, or in an alternative, less burdensome format.

DATED: September 21, 2007                                 _____/s/_____
                                                          ALAN KAY
                                                          UNITED STATES MAGISTRATE JUDGE

---

[15] During the hearing, Barr indicated that it has received some general information regarding pricing formulas utilized by Plaintiffs but Barr noted gaps in this information.