IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEIJER, INC., MEIJER DISTRIBUTION, INC., LOUISIANA WHOLESALE DRUG CO., INC., ROCHESTER DRUG CO-OPERATIVE, INC., AMERICAN SALES COMPANY, INC., SAJ DISTRIBUTORS, INC., and STEPHEN L. LaFRANCE HOLDINGS, INC., on behalf of themselves and all others similarly situated, | No. 05 Civ. 2195 (CKK) ORAL ARGUMENT REQUESTED |
| Plaintiffs, | |
| v. | |
| WARNER CHILCOTT HOLDINGS COMPANY III, LTD., WARNER CHILCOTT CORPORATION, WARNER CHILCOTT (US) INC., WARNER CHILCOTT COMPANY, INC., GALEN (CHEMICALS), LTD., and BARR PHARMACEUTICALS, INC., | |
| Defendants. | |

DIRECT PURCHASER CLASS PLAINTIFFS' REPLY BRIEF
IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION

COUNSEL LISTED ON SIGNATURE PAGE

Dated: May 21, 2007

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii-iv

I.     OVERVIEW/SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       A.    Plaintiffs Properly Claim Injury and Damages in the
           Form of Overcharges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       B.    Plaintiffs Have Demonstrated Abundant Class-Wide
           Proof of Impact in the Form of Overcharge . . . . . . . . . . . . . . . . . . . . . . . 9

             1.    Common Evidence Shows that All or Nearly All
                    Class Members Would Have Bought Less
                    Expensive Generic Ovcon 35 Earlier Absent the
                    Alleged Delay in Generic Entry . . . . . . . . . . . . . . . . . . . . . . . . . . 11

             2.    Slight Variations in Pricing Among Class
                    Members Are Immaterial To Proof of
                    Classwide Impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

             3.    Defendants' Speculation About the Applicability
                    of a Standing Defense to Certain Absent Class
                    Member Claims Is Without Merit . . . . . . . . . . . . . . . . . . . . . . . . . 16

       C.    Plaintiffs' Proposed (And Actual) Damages Methodology
           is More than Sufficient for Class Purposes . . . . . . . . . . . . . . . . . . . . . . . 17

       D.    Named Plaintiffs Satisfy Adequacy and Typicality Tests:
           There is No Intra-Class Conflict, Let Alone a
           Fundamental One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

       E.    The Proposed Class is Sufficiently Definite
           and Numerous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

       F.    Class Treatment is the Superior Means of
           Litigating this Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

## TABLE OF AUTHORITIES

*Aliotta v. Gruenberg,*
    237 F.R.D. 4 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 24

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Ampicillin Antitrust Litig.,*
    55 F.R.D. 269 (D.D.C. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Arnold v. Postmaster General,*
    667 F. Supp. 6 (D.D.C. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Auction Houses Antitrust Litig.,*
    193 F.R.D. 162 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Bigelow v. RKO Pictures, Inc.,*
    327 U.S. 251 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Bogosian v. Gulf Oil Corp.,*
    561 F.2d 434 (3d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Bridgestone/Firestone,*
    288 F.3d 1012 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Bulk Extruded Graphite Products Antitrust Litig.,*
    2006 WL 891362 (D.N.J. April 4, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Buspirone Patent & Antitrust Litig.,*
    210 F.R.D. 43 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Bynum v. District of Columbia,*
    214 F.R.D. 27 (D.D.C. 200) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

*In re Cardizem CD Antitrust Litig.,*
    200 F.R.D. 297 (E.D. Mich. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Citric Acid Antitrust Litig.,*
    1996 WL 655791 (N.D. Cal. Oct. 2, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Clements v. Airport Auth. of Washoe County,*
    69 F.3d 321, 328 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Corrugated Container,*
643 F.2d 195 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Dry Cleaning & Laundry Institute Of Detroit v. Flom's Corp.,*
1993 WL 527928 (E.D. Mich. Oct. 19, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Eggleston v. Chicago Journeymen Plumbers' Local Union Number 130,*
657 F.2d 890 (7th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.,*
392 U.S. 481 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 16

*In re Hypodermic Products Direct Purchaser Antitrust Litig.,*
2006 U.S. Dist. LEXIS 89353 (D.N.J Sept. 7, 2006) . . . . . . . . . . . . . . . . . . . . . 21

*Illinois Brick Co. v. Illinois,*
431 U.S. 720 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Industrial Diamonds Antitrust Litig.,*
167 F.R.D. 374 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*J.B.D.L. Corp. v. Wyeth-Ayerst Laboratories, Inc.,*
225 F.R.D. 208 (S.D. Ohio 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re K-Dur Antitrust Litig.,*
No. 01-1652 (JAG); MDL No. 1419 (D.N.J.). . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Kansas v. Utilicorp United,*
497 U.S. 199 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Klay v. Humana, Inc.,*
382 F.3d 1241 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Lorazepam & Clorazepate Antitrust Litig.,*
202 F.R.D. 12 (D.D.C.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17, 21, 24

*McCarthy v. Recordex Service,*
80 F.3d 842 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Metropolitan Life Ins. Sales Practices Litig.,*
1999 WL 33957871(W.D. Pa. Dec. 28, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Microcrystalline Cellulose Antitrust Litig.,*
218 F.R.D. 79 (E.D. Pa. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re NASDAQ Market Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Northwest Airlines Corp.*,
    208 F.R.D. 174 (E.D. Mich. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Relafen Antitrust Litig.*,
    218 F.R.D. 337 (D. Mich. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Relafen Antitrust Litig.*,
    346 F. Supp. 2d 349 (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Rezulin Products Liability Litig.*,
    210 F.R.D. 61 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Rubber Chemicals Antitrust Litig.*,
    232 F.R.D. 346 (N.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Scott v. Aetna Services*,
    210 F.R.D. 261 (D. Conn. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Sports Racing Services v. Sports Club Cars of America*,
    131 F.3d 874 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Sugar Antitrust Litig.*,
    73 F.R.D. 322 (E.D. Pa. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Taylor v. Christopher*,
    169 F.R.D. 224 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Tricor Direct Purchaser Antitrust Litigation*,
    No. 05-340 (KAJ)(D. Del.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
    350 F.3d 1181 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20, 21

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Vitamins Antitrust Litig.*,
    209 F.R.D. 251 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## I.    OVERVIEW/SUMMARY OF ARGUMENT

One year ago, Defendants[1] urged this Court to consolidate six separate lawsuits filed by direct purchasers of Ovcon 35 Products[2] into a single forum, arguing that the cases "centered on the same core of operative facts" and thus that it was more efficient to litigate one lawsuit rather than multiple ones.[3] All of the cases, Defendants noted, concerned an agreement alleged to have delayed entry of generic versions of Ovcon 35, thereby causing all purchasers to "pay more for the drug than they would absent the agreement."[4] Now, Defendants ask this Court to deny Plaintiffs' Motion for Class Certification, arguing that litigating up to thirty separate direct purchaser suits, each seeking the same form of damages, resulting from the same agreement, against the same Defendants, is preferable to a single, unified class action.

Not only is Defendants' Opposition to Class Certification ("Opp.") inconsistent with Defendants' previously-stated position, it also contradicts decades of class action and antitrust jurisprudence. Plaintiffs have prominently cited and relied upon several recent federal court decisions certifying direct purchaser classes – *just like this one* – involving largely the same class, composed of the same group of businesses, with many of the same named plaintiffs and absent class members, alleging antitrust injury in the form of overcharges resulting from impeded entry of

---

[1] The term "Defendants" refers to Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (US) Inc., Warner Chilcott Company, Inc., Galen (Chemicals), Ltd (collectively "Warner Chilcott") and Barr Pharmaceuticals, Inc. ("Barr").

[2] "Ovcon 35 Products" refers to Warner Chilcott's non-chewable brand-name drug Ovcon 35, an oral contraceptive containing 0.035 mg. ethinyl estradiol and 0.4 mg norethindrone, and its AB-rated generic equivalents, including Barr's generic version, Balziva, and the generic version sold by Watson Pharmaceuticals, Inc. ("Watson") as Zenchent.

[3] *See* Defendants' Joint Motion to Consolidate and Supporting Memorandum of Law at ¶¶ 12, 16.

[4] *Id.* at ¶ 11.

easy

generic drugs. Oddly, Defendants do not even mention these cases, let alone attempt to distinguish them.[5]

In fact, none of Defendants' arguments has any legal, logical or factual validity. Defendants have offered no reason to depart from these analogous decisions: All of Defendants' arguments have been considered and properly rejected — repeatedly — in the previous delayed generic entry class certification decisions.

*First,* implicitly conceding — as they must — that all issues regarding proving the alleged anticompetitive conduct (*e.g.,* the agreement and its anticompetitive effects) are common to the class as a whole, Defendants assert that Plaintiffs are relying upon mere "presumptions" and "assumptions" rather than an actual showing that common evidence is available to prove antitrust impact on class members. Yet, neither Plaintiffs nor the expert economist Plaintiffs retained, Dr. Jeffrey Leitzinger Ph.D.,[6] have assumed anything about the availability of common impact. Instead, Plaintiffs have repeatedly cited and referenced a mountain of *classwide evidence* directly showing that all or nearly all class members overpaid for Ovcon 35 Products as a result of the alleged delay in generic entry.[7]

---

[5] *See In re Buspirone Patent & Antitrust Litig.,* 210 F.R.D. 43 (S.D.N.Y. 2002) ("*Buspirone*"); *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 297 (E.D. Mich. 2001) ("*Cardizem*"); *In re Relafen Antitrust Litig.,* 218 F.R.D. 337 (D. Mich. 2003) ("*Relafen*"); *see also In re Lorazepam & Clorazepate Antitrust Litig.,* 202 F.R.D. 12 (D.D.C. 2001); *In re Ampicillin Antitrust Litig.,* 55 F.R.D. 269 (D.D.C. 1972).

[6] Dr. Leitzinger has submitted two Declarations in this case and, on May 18, 2007, submitted an expert report on the merits. *See Declaration of Jeffrey J. Leitzinger, Ph.D., dated March 12, 2007* ("*Class Decl.*"), *Rebuttal Declaration of Jeffrey J. Leitzinger, Ph.D. Concerning Class Certification Issues, dated May 21, 2007* ("*Reb. Decl.*") (attached as Exh. A); and *Expert Report of Jeffrey J. Leitzinger, Ph.D., dated May 18, 2007* ("*Leitz. Rep.*") (attached as Exh. 3 to Reb. Decl. (Exh. A).)

[7] *E.g.,* Leitz. Rep. at 4-5, 18-28, 30-37 (Exh. A.), and Exh. 2 thereto.

Indeed, most of the common evidence of impact is undisputed, including, for example: governmental and academic studies showing the dramatic effects of generic competition on prices and sales; Defendants' own internal projections of the effects of generic Ovcon 35 entry; and, actual economic data reflecting prices and sales to class members of what happened when generic Ovcon 35 came to market – all of which evidence shows the broad, dramatic, and market-wide price reductions that would have occurred earlier had Defendants not delayed generic entry. Ironically, even if Defendants were somehow correct that all of this common evidence of impact could be dismissed as "assumptions and presumptions," that argument could carry no weight *now*, given that Dr. Leitzinger has now completed his merits expert report in this case. *See* Leitz. Rep. (Exh. 3 to Exh. A). In it, Dr. Leitzinger, *inter alia*: (a) assesses impact (in the form of overcharge) to the class based entirely on common evidence and methods he has repeatedly used in prior cases (Leitz. Rep. at 16-28); and (b) computes aggregate overcharge damages to the class based on a methodology courts have repeatedly approved in similar cases. *Id.* at 28-44.

Furthermore, Defendants' own economist, Dr. Brian Palmer,[8] has actually endorsed or, at the very least, failed to refute the key elements of Plaintiffs' analysis of classwide evidence of impact. Dr. Palmer:

- concedes that generic drugs are typically sold at prices well below the corresponding brand and rapidly take sales directly from the brand (Palm. Dep. at 131-32);

---

[8] In contrast to Dr. Leitzinger, Dr. Palmer has little relevant background or experience in the pharmaceutical industry, class certification, and/or antitrust economics. He is not a member of any economic organization (Deposition of Brian L. Palmer, May 3, 2007 ("Palm. Dep.") (attached as Exh. B) at 12); is inexperienced with class issues (*id.* at 21); is not a specialist in pharmaceutical economics (*id.* at 27), or pharmaceutical distribution (*id.* at 30); has never published articles concerning branded or generic drugs or pharmaceutical products generally (*id.* at 33); has no prior experience analyzing oral contraceptives (*id.* at 35); and has never published on class certification or antitrust issues. *Id.* at 46.

3

- confirms that it is appropriate as an economic matter to measure a portion of the overcharge as the difference between the price class members paid for the brand and the (lower) price class members would have paid for the generic had entry not been delayed (Palm. Dep. at 161);

- agrees with Dr. Leitzinger that because Class members are mainly wholesalers and other resellers, class member demand for pharmaceutical products derives from the demand of entities downstream, and ultimately reflects prescriptions written by physicians and filled by pharmacists. *Id.* at 169-72.[9]

As Dr. Leitzinger explains based on this common evidence, if there is market demand for a product – like there indisputably would have been earlier for generic Ovcon 35 had its entry not been delayed – classwide evidence reveals that all or nearly class members would have needed to purchase *at least some* of the less expensive generic in place of the brand to serve their customers. Leitz. Rep. at 17-18 (Exh. 3 to Exh. A). Indeed, when generics actually entered, most class members necessarily and rapidly substituted most of the brand they had previously bought with a less expensive generic to satisfy downstream demand as the entire marketplace rapidly shifted from the brand to the generic. *Id.* at 17-18, 27-28. After analyzing only a few months of data showing actual purchases of generic Ovcon 35 since Barr's entry in October 2006, Dr. Palmer himself essentially confirms what the common evidence shows: that nearly all class members bought less expensive generic Ovcon 35 in place of the brand almost immediately after it became available, just as Dr. Leitzinger had predicted. Palm. Dep. at 321-25 (Exh. B); Class Decl. at 7-9, 16.; Reb. Decl. at 3, 07-14 (Exh. A). Moreover, as Dr. Leitzinger has now demonstrated, Dr. Palmer's inexperience with this market and distribution system led Dr. Palmer, erroneously, to inflate even this tiny group of class members he claims did not buy generic. Reb. Decl. at 11-13.

---

[9] *See* Class Decl. at 17; Reb. Decl. at 3 (Exh. A).

4

Further, Defendants' assertion that individual issues relating to proof of impact arise because of differing business models and pricing arrangements among class members is also without merit. As the courts in *Cardizem*, *Buspirone*, and *Relafen* have each found, because the generic price is so much less than the brand (the generic entered at a 20-30% discount to the brand, which has now become a 50% price discount),[10] the slight effects of "volume discounts" and other differential pricing arrangements to which Defendants refer (Opp. at 17-19) simply cannot and do not change the fact that all direct purchasing class members pay more on average for the brand than they do for the generic, and thus are overcharged when generic entry is delayed. *See* Leitz. Rep. at 26-27 (Exh. 3 to Exh. A); *Cardizem*, 200 F.R.D. at 311. Accordingly, Dr. Palmer's own analysis confirms what Plaintiffs' common evidence shows: all or nearly all Class members pay less for the drug when generics enter, and thus suffer antitrust injury when that entry is delayed. Palm. Dep. at 321-25.

**Second**, Defendants speculate that individual issues may arise in assessing economic impact because generic entry would allegedly affect class member profitability and sales volumes differently.[11] Some class members might "pass on" some or all of the overcharge, Defendants argue, and some might be differentially affected as a net economic matter by delaying generic entry. However, as the courts found in *Buspirone*, *Cardizem* and *Relafen*, where, as here, plaintiffs seek only overcharge damages, such evidence regarding net economic effect on direct purchasers is completely irrelevant as a matter of well settled law.[12] Significantly, at his deposition, Defendants'

---

[10] Leitz. Rep. at 26-27 (Exh. 3 to Exh. A).

[11] Opp. at, *e.g.*, 18; Declaration of Brian L. Palmer, Ph.D. dated April 12, 2007 ("Palm. Decl.") (attached to Opp. as Exh. 3) at, *e.g.*, ¶¶ 30-31; Palm. Dep. at 279-280.

[12] *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968) and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977); *see also Relafen*, 718 F.R.D. at 344; *Cardizem*, 200 F.R.D. at 309-10; *Buspirone*, 210 F.R.D. at 59-60.

expert was forced to concede this central point: overcharge (*i.e.*, paying more due to challenged conduct) constitutes cognizable antitrust injury to direct purchasers. Palm. Dep. at 166-67. What matters here, therefore, is proving that class members overpaid for Ovcon 35 Products as a result of delayed generic entry. Injury here is equal to the overcharge — no more and no less. Individual issues pertaining to the net effect of the conduct on class members are entirely irrelevant to proving impact or damages in this case, and thus are legally irrelevant to class certification.

**Third**, Defendants speculate that the interests of certain large Class members (mainly, three large "national wholesalers") conflict with the interests of named class representatives. Opp. at 38-40. Yet, all of the absent Class members whose interests Defendants claim to be protecting have now officially weighed in, affirming their support for the certification of this suit as a class action with the named Plaintiffs as class representatives.[13] The supposed conflict is purely chimerical. Moreover, as shown below, contrary to Defendants' assertions (Opp. at 35-37), the fact that certain of the named Plaintiffs themselves are proceeding based on assignments does not affect their adequacy under well settled law. All named Plaintiffs are seeking recovery of overcharge damages (and only overcharge damages) on behalf of themselves and members of the absent class. Because assessment of adequacy and typicality relates *solely* to whether the *asserted claims* of the named Plaintiffs are aligned with, and typical of, the claims of the absent class members, Defendants' arguments about adequacy and typicality also fail as a matter of law. Each named plaintiff and absent class member — whether proceeding on assignments, or having assigned a portion of its claims — has exactly the same interest in succeeding on the merits, and maximizing aggregate

---

[13] *See* Declaration of Saul D. Factor (McKesson) dated May 21, 2007 ("McKesson Decl."); Declaration of Brian Jones (AmerisourceBergen) dated May 14, 2007 ("AmerisourceBergen Decl."); and, Declaration of John Jay Flinn (Cardinal Health) dated May 18, 2007 ("Cardinal Health Decl.") (attached as Exhs. D to F).

overcharge damages. *See In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 -61(D.D.C. 2002).

Thus, the named plaintiffs satisfy Rule 23(a).

*Fourth*, Defendants' argument that a class of thirty geographically dispersed businesses is not sufficiently "numerous" to warrant class certification is contrary to accepted notions of judicial efficiency and the law of this district. In sum, Defendants have offered no reasonable basis for departing from the long line of cases supporting certification of direct purchaser classes in the antitrust context, and from the recent decisions certifying nearly the same class asserting analogous claims regarding delayed entry of generic drugs. Defendants have failed to show that class certification is anything but the superior means of litigating this case. The proposed Class should be certified.

## II. ARGUMENT

### A.    Plaintiffs Properly Claim Injury and Damages in the Form of Overcharges

In the Consolidated Class Action Complaint ("CAC"), Plaintiffs allege that they are seeking reimbursement for the overcharges they paid to purchase Ovcon 35 Products. *See CAC* at ¶ 81. Dr. Leitzinger summarized the claimed antitrust injury this way:

> All (or nearly all) Class members have been injured by overcharges on Ovcon 35 Products as a result of the alleged delay in generic entry caused by Defendants' conduct. The alleged delay in the availability of generic Ovcon 35 Products resulted in Class members *paying more for Ovcon 35 Products than they otherwise would have*.

Leitz. Rep. (Exh. 3 to Exh. A) at 5 (emphasis added); Reb. Decl. at 8-9. (Exh. A).

Following a long line of directly applicable Supreme Court precedents, courts have repeatedly held that overcharges, precisely as Plaintiffs and Dr. Leitzinger have defined them here, are the appropriate measure of injury and damages in impeded generic entry cases. *E.g., Relafen,*

7

218 F.R.D. at 344 ("[t]he direct purchaser plaintiffs here seek damages in the form of overcharges, rendering [Defendants'] arguments regarding actual economic harm irrelevant"); *see also In Vitamins Antitrust Litig.*, 198 F.R.D. 296, 301 (D.D.C. 2000) ("[w]hether certain [direct] buyers made profits is irrelevant to the question of whether those buyers actually paid higher prices as a result of a conspiracy to fix prices"). Consequently, what matters in an overcharge case is the effect of the challenged conduct on the *sale price* to the direct purchasers. Thus, questions about actual economic harm and/or other effects of the challenged conduct are completely irrelevant as a matter of law and can have no effect on class certification. *Id.* Defendants' expert has effectively conceded this central point. *See* Palm. Dep. at 166-67.

Moreover, direct purchasers are entitled to recover the *entire amount* they were overcharged, regardless of whether some (or even all) of that overcharge was passed down the chain of distribution, or whether the direct purchaser somehow benefitted economically from the artificially inflated price or challenged conduct. *See Cardizem*, 200 F.R.D. at 309-17; *Relafen*, 218 F.R.D. at 343-44; *Buspirone*, 210 F.R.D. at 58-59; *see also Sports Racing Servs. v. Sports Club Cars of Am.*, 131 F.3d 874, 885 (10th Cir. 1997).

Finally, as multiple prior courts have determined in precisely this context, where as a result of challenged anticompetitive conduct, class members are blocked from substituting at least some amount of less expensive generic version for the brand (and/or are prevented from getting the brand at a lower price) that constitutes cognizable antitrust injury in the form of an overcharge for the entire amount of the price differential. *E.g., Relafen*, 218 F.R.D. at 344; *Cardizem*, 200 F.R.D. at 309. The bottom line is that overcharges are the proper measure of injury and damages here, and

as shown below, common evidence reveals that all or nearly all class members overpaid on at least *some* of their Ovcon 35 Product purchases due to the challenged conduct.

**B.    Plaintiffs Have Demonstrated Abundant Class-Wide Proof of Impact in the Form of Overcharge**

Plaintiffs have met their burden on class certification by showing that proof of antitrust injury, or fact of impact, can be shown through common, class-wide evidence.    Contrary to Defendants' allegations, Plaintiffs do not "presume" that Defendants' anticompetitive agreement caused classwide injury.    Rather, Plaintiffs engaged Dr. Leitzinger   who has extensive experience analyzing antitrust pharmaceutical issues and data, and who has served as an expert in numerous other delayed generic entry antitrust cases    to analyze whether common evidence is available to assess antitrust injury to the class.    *E.g.*, Class Decl. at 1-4; Reb. Decl. (Exh. A) at 1 & Exh. 1 thereto; Leitz. Rep. (Exh. 3 to Exh. A) at 1 & Exh. 1 thereto.

As he did in prior analogous cases, Dr. Leitzinger considered a great deal of evidence that applies equally to all Class members, including, governmental and academic research on the dramatic and marketwide effects of generic entry; Defendants' own internal analyses and projections of the effects of their scheme on sales, prices, and their own profits; and actual transactional data showing detailed Ovcon 35 Product sales and prices to all class members.    Leitz. Rep. at 18-29.

As Dr. Leitzinger has explained, by engaging in a scheme to delay generic entry, and thereby impede less expensive generic competition, Defendants caused all or nearly all direct purchaser class members to pay more for Ovcon 35 Products than they would have paid absent the alleged 2.5 year delay in generic entry occasioned by Defendants' agreement.    Leitz. Rep. at, *e.g.*, 16-18.    Indeed, given that class members are broad-line resellers with diverse customer bases, and in light of the common evidence of the dramatic market-wide effects of impeding generic competition, it is

9

implausible that any class member would not have paid lower prices on at least some (and likely most) of its Ovcon 35 Product purchases earlier in the but-for world. *See* Reb. Decl. (Exh. A) at 8-10 and Exh. 4 thereto; *see also* Leitz. Rep. at 17 (Exh. 3 to Exh. A).

Although Defendants *assert* that Plaintiffs cannot use common proof to assess antitrust impact, Defendants do not actually *refute* Dr. Leitzinger's main conclusions. For instance, Defendants do not dispute that in the few months since generic Ovcon 35 has been sold, it was priced substantially below branded Ovcon 35 just as Dr. Leitzinger had predicted it would be. *E.g.,* Palm. Dep. at 131-32 (agreeing that "[g]enerics generally enter at lower prices, and . . . once the generic enters . . . the branded [drug] often sells less product"). And, Defendants do not challenge Dr. Leitzinger's finding that if generic versions of Ovcon 35 had been available sooner, nearly all Class members would have paid less for Ovcon 35 Products, as Dr. Leitzinger also had predicted. *See* Class Decl. at 16-17; Palm. Dep. at 86-87; Reb. Decl. at 10 and Exh. 4 thereto.

Dr. Palmer frankly admits that he had *no opinion about Plaintiffs' ability to prove impact on a classwide basis if overcharge* were the legally applicable measure of damages. Palm. Dep. at 165-67, 180-81. Indeed, despite his protestations, Dr. Palmer effectively *agrees* with Dr. Leitzinger and the Plaintiffs that common evidence establishes widespread antitrust injury in the form of overcharge to class members. *E.g.,* Palm. Dep. at 323-25 ("substantial numbers of customers/patients switched their purchases from brand name to the AB generic"). Moreover, as shown below, Dr. Palmer's inexperience in this industry led him to err even as to the small handful of class members he says did not buy generic. Thus, Dr. Palmer's own analysis confirms what the common evidence shows: that all or nearly all Class members pay less for the drug when generics enter, and thus suffer antitrust injury when that entry is delayed.

10

Though irrelevant to class certification analysis, Defendants assert that prices of branded Ovcon 35 did not decrease following generic entry. Opp. at 20-21. Yet, Plaintiffs' overcharge analysis does not depend on a finding that brand prices decline. Rather, after generic entry, Plaintiffs pay less by substituting cheaper generic products *or* by getting a lower price on the brand, or both. Class Decl. at 30-31. While the blocked generic substitution constitutes the main form of injury and damages here, Dr. Leitzinger also shows, based on available common evidence, that branded Ovcon 35 prices would be lower due to post-generic entry (and thus that delayed generic entry delayed those lower prices as well). Class Decl. at 16-27, at 32-33; Leitz. Rep. at 42, n.103. Dr. Leitzinger also demonstrates that Dr. Palmer's attempt to refute that analysis failed. Reb. Decl. at 14-17.

### 1. Common Evidence Shows that All or Nearly All Class Members Would Have Bought Less Expensive Generic Ovcon 35 Earlier Absent the Alleged Delay in Generic Entry

In attempting to discredit Plaintiffs' abundant class-wide evidence of impact, Defendants' economist asserts, upon reviewing a very limited and incomplete set of data, that he saw no evidence that five out of the thirty class members bought generic Ovcon 35 from Barr in the first few months after generic entry. *See* Palm. Decl. at ¶¶ 26, 53. From this limited and incomplete data, he somehow concludes that this handful of entities would not have purchased any less expensive generic earlier in place of the higher-priced brand absent the 2.5 year delay in generic entry, and thus were not overcharged. *Id.* Rather than simply acknowledge that his data was too limited to draw any worthwhile conclusions, Dr. Palmer attributed his "findings" to "generic bypass," under which a small number of a wholesaler's customers, who had purchased the brand from the wholesaler,

11

begin buying the generic directly from the generic manufacturers, thereby "bypassing" the wholesaler. *See* Leitz. Reb. at 10-14 (discussing bypass) (Exh. A).

The first thing to note is that Dr. Palmer's analysis — limited though it was — effectively confirms Plaintiffs' point for the vast majority of class members: the common evidence was right that all or nearly all class members bought generic (indeed, bought it almost immediately), and thus overpaid due to the delay.

Yet, even taking Dr. Palmer's "analysis" at face value, Dr. Palmer is wrong. Dr. Leitzinger shows (Reb. Decl. at 12-14) that upon closer examination, two of Palmer's five completely bypassed entities are not actually Class members (they are Puerto Rican entities and thus not in the Class);[14] one is a subsidiary of a Class member who did buy the generic; and one, Rochester Drug Cooperative ("RDC"), a named plaintiff, began purchasing the generic more recently (but, nonetheless, still very early in the damages period), and thus its purchases did not show up in Dr. Palmer's limited data.[15] This leaves, at most, only one possible "completely" bypassed Class member who did not buy generic from Barr in the few short months for which Dr. Palmer possessed data.[16] Palm. Dep. at 201-05; Reb. Decl. at 12-14 (Exh. A).

Given that Dr. Palmer only reviewed very few months of data after Barr's entry in October 2006, as well as the fact that Dr. Palmer did not even look at the sales data of the second generic entrant, Watson, for class member purchases, even his extremely limited result proves nothing. Reb.

---

[14]Moreover, even if the Class did include these entities, Dr. Palmer should not have included them on his list of supposed non-generic purchasers because *Dr. Palmer did not know whether Barr's data included data reflecting sales to entities operating outside the fifty states.* Palm. Dep. at 204-06. Thus, Dr. Palmer has no way of knowing whether or not these entities have purchased generic Ovcon 35 from Barr.

[15]*See* Declaration of Lawrence F. Doud, III dated May 8, 2007 at 2 (attached as Exh. C).

[16]Defendants try to inflate the significance of the claimed bypass by attempting improperly to lump the plaintiffs in the opt-out litigation in with the Class. Reb. Decl. at 19; Leitz. Rep. at 44 n. 105 (Exh. 3 to Exh. A).

Decl. at 12-14. Defendants'"bypass" argument, therefore, reduces to a claim that, at worst, Plaintiffs' abundant class-wide evidence of overcharge injury applies to all but one class member. Even if true, this would be irrelevant as a matter of law, which requires that common evidence predominate, not that all evidence be common. *See In re NASDAQ Market Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) ("[e]ven if it could be shown that some individual class members were not injured, class certification, nevertheless, is appropriate where the antitrust violation has caused widespread injury to the class; ... [t]he fact that a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones").[17]

In sum, as Dr. Leitzinger rightly notes: "bypass ... relates to the question of damages, not the fact of impact." Reb. Decl. at 11; *see also* Palm. Dep. at 243-44; *Cardizem*, 200 F.R.D. at 317 ("Defendants' bypass and offsetting benefits arguments relate to the questions of damages; not the fact of injury.").

Moreover, even as to damages, generic bypass does not affect the class. First, "generic bypass" has been found to be irrelevant as a matter of law because taking it into account would improperly undermine the deterrence effect of the antitrust laws.[18] Additionally, as a factual matter, "generic bypass" predominantly affects the claims already assigned by absent class members to the

---

[17] *See also Cardizem,* 200 F.R.D. at 320-21 ("courts have routinely observed that the inability to show injury as to a few does not defeat class certification"); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 225 F.R.D. 208, 218 (S.D. Ohio 2003) (same); *In re Northwest Airlines Corp.*, 208 F.R.D. 174, 225 (E.D. Mich. 2002) (same); *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 166 68 (S.D.N.Y. 2000) (same); *In re Sugar Antitrust Litig.*, 73 F.R.D. 322, 347 (E.D. Pa. 1976) (same).

[18] To effectuate the principles behind awarding antitrust damages — including disgorging ill-gotten gains and deterring anticompetitive conduct — impact and damages must be assessed on the total branded volume purchased without regard to the generic bypass. *See In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 367-71 (D. Mass. 2004) (rejecting application of generic bypass to reduce damages, and holding that overcharges should be computed on total actual volume of brand drug purchased because otherwise antitrust defendant would improperly keep ill-gotten gain).

opt-out chain drug stores, and thus would not, as factual matter, materially affect the class or class

damages. Leitz. Rep. at 44 n.105; Reb. Decl. at 19.[19]

The bottom line is that overcharges are the measure of damages here and the undisputed

common evidence shows that *all* class members overpaid on at least *some* (and likely most) of their

Ovcon 35 purchases. Whether class members can recover overcharges on each of the units they

actually purchased, or only some substantial fraction of those purchases, is a quantum of damages

question, irrelevant to class certification.[20]

### 2.   Slight Variations in Pricing Among Class Members Are Immaterial To Proof of Classwide Impact

Defendants argue that pricing practices are too variable to permit classwide proof. Opp. Br.

at 17-19.[21] Yet, courts have consistently *rejected* these arguments where, as here, Plaintiffs have

evidence that the entire price range was inflated generally. *E.g.*, *Vitamins*, 209 F.R.D. at 264;

*NASDAQ*, 169 F.R.D. at 523 ("[n]either a variety of prices nor negotiated prices is an impediment

---

[19]This is because certain wholesalers have assigned some of their claims to chain drug stores who have opted out and are proceeding separately. The assigned claims are for Ovcon 35 purchases resold to the chains. Because the opt out chains buy most of their brand from wholesalers but buy generic directly, the opt outs are "bypassing" their own assigned claims. Reb. Decl. at 19.

[20]*See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977) ("the necessity for calculation of damages on an individual basis should not preclude class determination"); *Bynum v. District of Columbia*, 214 F.R.D. 27, 39 40 (D.D.C. 2003) (same); *Vitamins*, 209 F.R.D. at 268 (same).

[21]Tellingly, most of the cases Defendants rely upon (Opp. at 16) relating to common proof of impact are not antitrust cases at all, but rather product liability and fraud cases where individual questions of individual harm and causation are far more significant. *See Moore v. PaineWebber, Inc.*, 306 F.3d 1247 (2d Cir. 2002) (RICO and common fraud case against insurance company based on representatives' individualized sales pitches); *In re Bridgestone/Firestone*, 288 F.3d 1012 (3d Cir. 2002) (product liability/warranty claims based on the laws of 50 different states); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61 (S.D.N.Y. 2002) (product liability/fraud/negligence/breach of warranty case involving individual physical injuries). The handful of antitrust cases Defendants do cite involve cases where there are multiple different products (here, of course, there is one underlying drug entity at issue), and uncertain market impact of the underlying conduct (here, of course, the marketwide impact of the challenged conduct is known, swift, and dramatic). *E.g.*, *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 384 (S.D.N.Y. 1996) (certifying main class of diamond purchasers but denying certification of subclass of purchasers who bought "distinct products" developed for specific customers using non-list prices); *Dry Cleaning & Laundry Inst. of Detroit v. Flom's Corp.*, 1993 WL 527928 at *4 (E.D. Mich. Oct. 19, 1993) (multiple products).

to class certification if it appears that plaintiffs may be able to prove at trial that . . . the price range was affected generally").[22]

Defendants point to volume-based and other pricing arrangements that, Defendants speculate, certain class members *may* have. They fail to demonstrate *or even explain* how any of that minor price variation could possibly negate (or even affect) the overcharges all purchasers pay when generic entry is delayed. Tellingly, despite knowing precisely what they charge class members (who are Defendants' customers) for Ovcon 35 Products before and after generic entry, neither Defendants nor their economist point to any actual evidence or provide *any* actual examples of *any* class member paying more for Ovcon 35 Products after generic entry than before.

The undisputed facts are: class members pay substantially less for generic Ovcon 35 Products than they did for the brand that is why there is such massive substitution of the latter for the former upon generic entry. One need only look at the chart prepared by Dr. Leitzinger showing the differential in price for Ovcon 35 Products before and after generic entry to the four different "classes of trade" that comprise the class. Reb. Decl. (Exh. A) at 10 & Exh. 4 thereto. It further confirms that prices for the generic are uniformly lower for all class segments and class members than prices paid for the brand. *Id.* Thus, price variation, to the extent it even exists, does not affect proof of common impact.

---

[22]*See also In re Bulk Extruded Graphite Products Antitrust Litig.*, 2006 WL 891362 at *14 (D.N.J. April 4, 2007); *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 353 (N.D. Cal. 2005); *In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79, 92-93 (E.D. Pa. 2003); *In re Citric Acid Antitrust Litig.*, 1996 WL 655791 (N.D. Cal. Oct. 2, 1996).

3.     **Defendants' Speculation About the Applicability of a Standing Defense to Certain Absent Class Member Claims Is Without Merit**

Defendants erroneously speculate that the abundant classwide evidence of impact may be outweighed by individual issues pertaining to the standing of certain absent class members to recover overcharge damages on some of their direct purchases. Specifically, Defendants argue that some class members might have one or more "cost plus/fixed quantity regardless of price" contracts that could fit an extremely narrow exception to *Hanover Shoe's* standing analysis. Opp. at 26-29. This argument is fatally defective in at least three ways. *First*, it is doubtful whether this exception to *Hanover Shoe* continues to exist as a practical matter (no court has *ever* seen a qualifying contract).[23] Every court to look at the issue of whether pharmaceutical wholesalers operate under pre-existing, fixed price, fixed quantity regardless of price contracts with their downstream customers – as the Supreme Court requires for the exception to apply (*See Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 217-18 (1990)) – has concluded that pharmaceutical wholesalers do not use them.[24] While Defendants misleadingly and erroneously assert that certain class members sell under "cost plus" contracts (Opp. at 27), they provide no evidence – *because there is none* – that these contracts have the critical fixed quantity regardless of price element. Contrary to Defendants' speculation, none of the national wholesalers has cost-plus contracts.[25] Without that element, the exception could not – and thus does not – apply.

---

[23] *McCarthy v. Recordex Service*, 80 F.3d 842, 855 (3d Cir. 1996) ("vitality of the 'pre-existing cost-plus contract' exception [to *Hanover Shoe*] is doubtful").

[24] *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1191 n.19 (11th Cir. 2003); *Buspirone*, 210 F.R.D. at 60-61 ("There is no evidence that the Big Three [national wholesalers] had cost-plus contracts that fell within the *Hanover Shoe* exception.").

[25] *See McKesson Decl.* (Exh. D) at ¶ 4; *AmerisourceBergen Decl.* (Exh. E) at ¶ 4; *Cardinal Health Decl.* (Exh. F) at ¶ 4.

16

*Second*, even if Defendants were correct that certain absent class members had qualifying contracts (or, assigned *portions* of their claims to downstream customers), this would not, even in theory, bear upon proof of common impact. Because not even Defendants argue that any wholesaler sells *all* of its product under qualifying "cost plus/fixed quantity" contracts, the only relevance this entire issue has is to the *quantity* of purchases subject to overcharge. That is, the argument could not affect the *fact* of injury (antitrust impact) as to any class member. *At most*, it is relevant to the quantum of damages to which the class member is entitled, and is thus irrelevant here. *Third*, as the court in *Buspirone* noted, class certification should not be denied because of the possibility of individualized defenses. 210 F.R.D. at 58-60.

In sum, Plaintiffs have satisfied Rule 23(b)(3): impact can and will be proven on a classwide basis.

### C.    Plaintiffs' Proposed (And Actual) Damages Methodology is More than Sufficient for Class Purposes

Overcharge damages in this case – as in prior, similar cases certified as class actions – are readily calculable on an aggregate, classwide basis. *E.g.*, *Lorazepam*, 202 F.R.D. at 30 ("damages can be calculated in the aggregate for the class as a whole, with allocation to particular class member to be accomplished after trial through an administrative claims procedure"); *Cardizem*, 200 F.R.D. at 324. Dr. Leitzinger proposes to utilize a methodology that he has employed successfully (and with court approval) in several recent cases on behalf of nearly the same class, involving damages flowing from delayed generic entry. Class Decl. at 1-4 (discussing cases); *id.* at 30-32 (discussing methodology). Dr. Leitzinger conducts a "before and after" method employing actual data regarding what actually happened with respect to prices paid and volumes of Ovcon 35 Products purchased by class members before and after generic entry. If Defendants' charge that Plaintiffs merely

17

provide "assurances of future solutions" regarding damages issues ever had any validity (and it did not), it is most certainly moot now *given that Dr. Leitzinger has now completed his merits report in which he actually computes classwide overcharge damages in this case as he has successfully done in multiple prior cases. See* Leitz. Rep. (Exh. 3 to Exh. A) at 32-46 & Exhs. D1-D3 thereto.

Moreover, Plaintiffs' burden with respect to damages is limited.[26]  And, courts have repeatedly held that, even if individual issues arise with respect to damages, that is no bar to certification.[27]  Finally, Defendants may not benefit from any difficulty or uncertainty in estimating damages that their own conduct has caused.[28]  In sum, nothing about Plaintiffs' damages analysis poses a problem for class certification.

### D.    Named Plaintiffs Satisfy Adequacy and Typicality Tests: There is No Intra-Class Conflict, Let Alone a Fundamental One

Defendants contend that the named plaintiffs are inadequate class representatives, and atypical, because their interests supposedly "conflict" with, and are distinct from, the interests of the large national wholesalers.  The Court should be skeptical of Defendants' claim to be motivated by concern for interests and objectives of the three large national wholesalers absent Class members.[29]  As the Seventh Circuit wryly observed in *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 895 (7th Cir. 1981), the prospect of defendants seeking to "protect" the

---

[26]*See* Direct Purchaser Class Plaintiffs' Memorandum of Law in Support of their Motion for Class Certification at 20-21.

[27]*See, e.g., Vitamins,* 209 F.R.D. at 268; *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 139-40 (2d Cir. 2001).

[28]*See Bigelow v. RKO Pictures, Inc.,* 327 U.S. 251, 264-65 (1946).

[29]Rule 23(a)(4) is solely concerned with safeguarding the rights and interests of the absent class members. *See* Fed. R. Civ. P. 23(a)(4) requiring only that "the representative parties will fairly and adequately protect the interests of the class," *see also Bynum,* 214 F.R.D. at 35.

18

interests of absent class members is "a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house." Defendants' argument is without merit because, *inter alia*: (a) in analogous cases, a similar group of named plaintiffs (many of whom have previously proceeded based upon assignments) has been repeatedly approved to represent the same absent class member wholesalers; and (b) the very absent class members at issue, themselves explicitly support certification of this class action and the appointment of the proposed class representatives.

All Defendants can muster in support of their "intra-class conflict" attack are the musing of their expert witness, Dr. Palmer, about how the three wholesalers — McKesson, AmerisourceBergen and Cardinal Health — *might* experience reduced profits when generic products enter the market. *See* Palmer Decl. at ¶¶ 59-62. Dr. Palmer's unsupported hypothesis contradicts direct evidence in this case, and makes no factual or legal sense. It thus fails to establish a cognizable conflict.[30]

Plaintiffs have submitted three Declarations, one from each of the three large national wholesalers. *See* McKesson Decl.; AmerisourceBergen Decl.; and Cardinal Health Decl. (Exhs. C to E). Each of the wholesalers expressly refutes Defendants' contention that any intra-class conflict exists. Each explains that in its company's considered business judgment:

- its interests would best be served if the Court were to certify the proposed class of direct purchasers, represented by the specified named plaintiffs;

- the named plaintiffs are fully capable of representing the national wholesalers' interests in this case;

- each has been adequately protected when they have been class members in similar prior antitrust cases with the same basic class representatives (including those proceeding on assignments), in which pharmaceutical companies were alleged to

---

[30]"Speculative suggestion(s) of potential conflict between class representatives and other class members is insufficient to defeat the adequacy requirement of class certification." *Aliotta v. Gruenberg*, 237 F.R.D. 4, 12 (D.D.C. 2006).

have delayed the entry of generic pharmaceutical products to the detriment of direct purchasers.

McKesson Decl. at ¶¶ 6-8; AmerisourceBergen Decl. at ¶¶ 6-8; Cardinal Health Decl. at ¶¶ 6-8. Thus, Defendants' theory of a conflict among the Class members is not only pure conjecture, it is also contradicted by undisputed facts.[31]

Moreover, Defendants speculate that the "conflict" involves the absent Class members' desire to keep generics off the market as long as possible. But because the generic is already being sold, as a matter of logic, nothing about the continued prosecution of this suit (which merely seeks reimbursement for overcharges on behalf of all Class members) could possibly harm the interests of absent class members even under Defendants' theory. *See* Palm. Dep. at 306-07.

Defendants' ground their argument on a single case: *Valley Drug Co. v. Geneva Pharm.*, 350 F.3d 1181 (11th Cir. 2003), whose reasoning is both distinguishable and in error. It has been repeatedly rejected by recent decisions. It is inapplicable because unlike here, the *Valley Drug* court had no evidence of class member repudiation of the conflict, and, as a result, simply speculated (erroneously) that the national wholesalers may have had no interest in, or even opposed, the prosecution of that class action. 350 F.3d at 1192-93. Further, in *K-Dur*, a court-appointed special master (former U.S.D.J. Orlofsky) rejected *Valley Drug's* reasoning, holding that any conceivable

---

[31] Dr. Palmer argues that class members could potentially disagree, at the end of the case, about the way in which damages are calculated because it could affect the allocation of damages among class members. *See Palm. Dep.* at 291-97. Dr. Palmer claims that some class members would receive a greater amount of damages and some less, if damages are allocated based on averages rather than actual purchase data. *Id.* This does not create a conflict. First, any time averages are used to allocate damages to individual class members, some will get more and some will get less. That is the nature of an average. If one could conjure up a cognizable conflict merely by intoning the word "average," no class would ever get certified. Second, when assessing damages to the class in the aggregate, as plaintiffs are permitted to do at trial, the method of allocation is irrelevant. All class members have an interest in maximizing aggregate damages, and, under Dr. Palmer's example, aggregate damages are the same. Reb. Decl. at 17-20; Palm. Dep. at 251-93. Finally, the sales data showing what individual class members actually bought is available and can be consulted when it comes time to allocate damages among the class members. There will be no need to utilize averages.

20

benefit obtained by the national wholesalers from delayed generic entry is legally irrelevant in an overcharge case, and thus could not create a cognizable conflict.[32]

Relatedly, Defendants argue that the named plaintiffs are not "adequate" or "typical" because of differences in business models among class members and the presence of assignments. But, Defendants' arguments are legally irrelevant because adequacy *and* typicality under Rule 23(a) are satisfied where, as here, "each class member's *claim* arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." *In re Vitamins,* 209 F.R.D. at 260, *quoting Lorazepam,* 202 F.R.D. at 27 (internal citations omitted) (emphasis added); *see also Barnes v. District of Columbia,* 2007 WL 896282 (D.D.C. Mar. 26, 2007) at *10; *In re Metropolitan Life Ins. Sales Practices Litig.,* 1999 WL 33957871, (W.D. Pa. Dec. 28, 1999) at *21 quoting *In re Corrugated Container,* 643 F.2d 195, 208 (5th Cir. 1981) ("so long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes").

The fact that one or more named plaintiff is proceeding based on an assignment is immaterial.[33] In *Cardizem,* the court rejected precisely the same argument. 200 F.R.D. at 305. All

---

[32]*In re K Dur Antitrust Litig.,* MDL No. 1419, Special Master's Report and Recommendation Regarding the Appeal of Magistrate Judge G. Donald Haneke's Discovery Order of March 24, 2005 [Docket No. 387], at 21-22 (D.N.J. Jan. 2, 2007) (attached as Exh. G); *see also In re Tricor Direct Purchaser Antitrust Litig.,* No. 05-340-KAJ, Transcript of March 3, 2006 Telephone Conference at 34-35 (D. Del. Mar. 3, 2006) (rejecting relevance of the same "conflict" argument, and stating that "antitrust injury occurs when you overcharge . . . And it doesn't make a whit of difference what they [direct purchasers] do with that product they get from you afterwards.") (attached as Exh. H); *In re Hypodermic Products Direct Purchaser Antitrust Litig.,* 2006 U.S. Dist. LEXIS 89353, *20 (D.N.J Sept. 7, 2006) at 11, *citing,* Joshua P. Davis and David F. Sorensen, *Chimerical Class Conflicts in Federal Antitrust Litigation: The Fox Guarding the Chicken House in Valley Drug,* 39 U.S.F. L. Rev. 141, 159-63 (2004) (describing the illogic of Defendants' "conflict" argument).

[33]Defendants' claim that Plaintiff Meijer's assignment was inappropriate is without merit and moot. Meijer has now produced the relevant Agreement to Defendants, and Defendants have not challenged it. *See* Letter from L. Nussbaum dated May 14, 2007, attaching the Agreement for Assignment of Claims relating to Meijer, Inc. (attached as

21

named plaintiffs, like the absent class members, have exactly the same interests in maximizing recovery of overcharge damages on each qualifying direct purchase or assigned claim. *See Cardizem*, 200 F.R.D. at 300 n.1; *Relafen*, 218 F.R.D. at 341.

Thus, the flaw in Defendants' argument is that it improperly focuses on irrelevant distinctions involving the claimants, rather than on *the claims* of those claimants, as the law requires. Where all class members are aligned in pursuing the *same legal rights* and maximizing their recovery of overcharge damages for past conduct, there can be no class conflict or lack of typicality. Given that all named plaintiffs are properly proceeding on claims for recovery of overcharges on behalf of themselves and absent class members, the fact that there might be differences *unrelated to the claims* is irrelevant as a matter of law. *Buspirone*, 210 F.R.D. at 57; *Relafen*, 218 F.R.D. at 343; *Cardizem*, 200 F.R.D. at 304-05. For the same reason, Defendants' arguments about the assignment of claims made by or to certain Class members are irrelevant. *Cardizem*, 200 F.R.D. at 305 (named plaintiff proceeding on assignment deemed adequate under Rule 23(a)).

Rule 23(a) is clearly satisfied here.

---

Exh. I). Further, Plaintiff SAJ's assignment from McKesson does not constitute claim splitting because Defendants will not face repetitive actions based on the same claim. *See Clements v. Airport Auth. of Washoe County*, 69 F.3d 321, 328 (9th Cir. 1995). Here, not only has McKesson endorsed the class action (thus mitigating the risk of McKesson opting out), but there is no "split" claim because each purchase of an overcharged unit constitutes an independent claim for relief.

E.     **The Proposed Class is <u>Sufficiently Definite</u> and <u>Numerous</u>**

Plaintiffs propose the following amended class definition:

> All persons or entities in the United States who purchased Ovcon 35 directly from Warner Chilcott at any time during the period April 22, 2004 through December 31, 2006. Excluded from the Class are Defendants and their officers, directors, management, and employees, subsidiaries or affiliates, and all governmental entities. Also excluded are hospitals, universities and clinics.

This definition reflects two minor alterations. First, Plaintiffs have now closed the class period on a date certain: December 31, 2006.[34] Second, Plaintiffs have now explicitly excluded certain university health systems and clinics, which both Plaintiffs and Defendants experts agree, are not properly in the class.[35] These changes resolve any prior ambiguity about class composition.

Further, the geographically dispersed class satisfies the numerosity requirement. Drs. Leitzinger and Palmer have both determined that there are thirty members of the proposed class (though, as Dr. Leitzinger notes, Dr. Palmer wrongly included some (Puerto Rican entities) and wrongly excluded others). *See* Leitz. Rep. at 32 (Exh. 3 to Exh. A); Reb. Decl. at 13 (Exh. A), *citing* Palm. Decl. at ¶ 41.

Binding law holds that classes composed of fewer than fifty members may satisfy Rule 23. *Arnold v. Postmaster General*, 667 F. Supp. 6, 15 (D.D.C. 1987) (ruling that class of only 39 members would be sufficient to certify class action), *rev'd on other grounds*, 863 F.2d 994 (D.C. Cir. 1988); *see also Taylor v. Christopher*, 169 F.R.D. 224, 237 (D.D.C. 1996), *aff'd in part*, 139

---

[34] Although the Class period ends on December 31, 2006, the damages period in this case extends until the spring of 2007 given that class members suffered overcharges even after Barr began selling generic Ovcon 35. *See* Leitz. Rep. at 37. As Dr. Leitzinger concluded: "The delay in generic entry will continue to infiltrate purchaser prices until sufficient time has passed for the delayed entry that has actually occurred to reach the same competitive equilibrium that generic entry in the but-for-world would have reacted at an earlier date." *Id.*

[35] Reb. Decl. at 6-7(Exh. A); Palm. Decl. at 9¶; Leitz. Rep. at 30 n.75 (Exh. 3 to Exh. A).

23

F.3d 227 (D.C. Cir. 1998) (class of forty presumptively sufficient); *Equal Employment Opportunity Commission v. Printing Indus. of Metro Washington D.C., Inc.*, 92 F.R.D. 51, 53 (D.D.C. 1981) ("as few as 25-30 class members should raise a presumption that joinder would be impracticable"). Here, the same efficiency reasons that support certification of a class of forty, support certification where: (a) class members are geographically dispersed, making joinder more difficult (*e.g., Lorazepam*, 202 F.R.D. at 26); and, (b) numerous other courts have successfully litigated cases using similar of class purchasers in antitrust cases involving theories of delayed generic entry. *See generally Cardizem, Relafen* and *Buspirone.*

### F.    Class Treatment is the Superior Means of Litigating this Case

As set out in the opening brief, and as Defendants noted in their Motion to Consolidate over a year ago, where there are core factual and legal similarities, having one action and not several promotes judicial efficiency. The *Lorazepam, Cardizem, Buspirone*, and *Relafen*[36] courts all concur: class treatment is the superior means of litigating a delayed generic entry case. *See also Barnes,* 2007 WL 896282 at *12 ("[i]n cases . . .involving many extremely similar claims against the same defendant, class certification promises greater efficiency and consistency than serial litigation of nearly identical individual cases").

Defendants are wrong to suggest that because a few absent class members have sizable claims that class treatment is not superior. Not all absent class members have large claims, and given the high costs of litigating a case like this, even large claims may only be worthwhile if litigated as a class. *See Aliotta*, 237 F.R.D. at 13 n.5 (finding that efficiency of judicial process

---

[36]*See, e.g.,* Cardizem, 200 F.R.D. at 326; *Relafen,* 218 F.R.D. at 347.

24

compelled certification even in a case with potentially large claims); *Scott v. Aetna Services,* 210 F.R.D. 261, 268 (D. Conn. 2002) (same).[37]

Finally, Defendants' proposed piecemeal approach is rife with shortcomings and entirely unnecessary. The class action mechanism offers substantial economies of time, effort and expense for the litigants as well as the Court, and Defendants do not suggest a superior alternative. Repeatedly litigating the same issues in individual suits, and bringing in two dozen more parties, would produce duplicative efforts, unnecessarily increase litigation costs, impose unwarranted burden on this Court and possibly others, and create a risk of inconsistent results. *See Cardizem,* 200 F.R.D. at 325-26 (finding that class action is superior because it ensures fair and efficient adjudication).[38]

## III.   CONCLUSION

For the reasons set out in Plaintiffs' opening class papers, set forth above and in Dr. Leitzinger's Declarations and Report, the Court should grant Plaintiffs' Motion for Class Certification, certify the class as defined herein with the named plaintiffs as class representatives, and appoint the Executive Committee Members (listed below) as Class Counsel under Rule 23(g).

---

[37] *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 617 (1997) ("the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high").

[38] Defendants cite *Klay v. Humana, Inc.,* 382 F.3d 1241, 1247 (11th Cir. 2004) (Opp. at 31-32), but that court *affirmed* class certification, rejecting the "enormous potential liability" argument. Defendants assert on the ground, equally applicable here, that the claimed conduct was not an "accidental blunder" or a "technical violation" but involved "willful" violation of a "serious" federal law.

Dated: May 21, 2007.

Respectfully submitted,

_____

William Isaacson (D.C. Bar No. 414788)
Tanya Chutkan (D.C. Bar No. 420478)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W., Suite 800
Washington, D.C. 20015
(202) 237-2727
(202) 237-6131 (Fax)

Richard B. Drubel (D.C. Bar No. 334359)
Kimberly H. Schultz
BOIES, SCHILLER & FLEXNER LLP
26 S. Main Street
Hanover, NH 03755
(609) 643-9090
(609) 643-9010 (Fax)

Daniel Berger
Eric L. Cramer
Ellen T. Noteware
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4604 (Fax)

Linda P. Nussbaum (D.C. Bar No. 483254)
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, NY 10022
(212) 687-1980
(212) 687-7714 (Fax)

26

Bruce E. Gerstein
Barry S. Taus
Kevin S. Landau
GARWIN GERSTEIN & FISHER, L.L.P.
1501 Broadway, Suite 1416
New York, NY 10011
(212) 398-0055
(212) 764-6620 (Fax)

Thomas M. Sobol
HAGENS BERMAN SOBOL
  & SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, MA 02142
(617) 482-3700

Dianne M. Nast
RODA NAST, P.C.
801 Estelle Drive
Lancaster, PA 17601
(717) 892-3000
(717) 892-1200

**Executive Committee Members for Direct
Purchaser Class Plaintiffs**

27