**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MEIJER, INC., *et al.*,

      Plaintiffs,

    v.

WARNER CHILCOTT HOLDINGS
COMPANY III, LTD., *et al.*,

      Defendants.

Civil Action No. 05-2195 (CKK)

**MEMORANDUM OPINION**
(October 22, 2007)

Currently pending before the Court is Plaintiffs' [92] Motion for Class Certification, as well as a number of motions to strike stemming from that Motion, which were filed by Defendants–Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (US) Inc., Warner Chilcott Company, Inc., Galen (Chemicals), Ltd. (together "Warner Chilcott"), and Barr Pharmaceuticals, Inc. ("Barr") (collectively with Warner Chilcott, "Defendants"). Plaintiffs are direct purchasers of Ovcon 35, a brand-name oral contraceptive marketed by Warner Chilcott, as well as certain indirect purchasers of Ovcon 35 who bring suit as assignees of direct purchasers of Ovcon 35. Plaintiffs' Amended Complaint alleges that Warner Chilcott and Barr entered into an illegal agreement to delay the market entry of Barr's FDA-approved generic version of Ovcon 35, and that this delay in generic competition forced direct purchasers to overpay for "Ovcon 35 Products."[1] Plaintiffs allege that Defendants'

---

[1] "Ovcon 35 Products" refers to Warner Chilcott's brand-name Ovcon 35 contraceptive and any AB-related generic equivalents (defined, *infra*, at 4-5) including Balziva–Barr's generic version of Ovcon 35–and Zenchent, a generic version sold by Watson Pharmaceuticals, Inc. ("Watson") pursuant to an agreement with Warner Chilcott.

conduct violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and seek damages in the form of overcharges (trebled) paid for Ovcon 35 Products during the proposed class period, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

In addition to opposing Plaintiffs' Motion for Class Certification, Defendants have filed two motions to strike materials submitted by Plaintiffs in connection with their Reply brief in support of their Motion for Class Certification. Defendants' first [111] Motion to Strike relates to references to an expert report submitted by Dr. Jeffrey J. Leitzinger, which are contained in Plaintiffs' Reply and in Dr. Leitzinger's Rebuttal Declaration in support of that Reply; Defendants' second [116] Motion to Strike relates to three declarations executed on behalf of companies that are absent members of the class that Plaintiffs seek to have certified. Finally, also pending before the Court are two non-class actions filed by direct purchasers of Ovcon 35 who have preemptively opted out of the instant putative class action: *Walgreen Co. v. Warner Chilcott Holdings Co. III, Ltd.*, Civil Action 06-494, and *CVS Pharmacy Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, Civil Action No. 06-795. The *Walgreen* and *CVS* plaintiffs (collectively the "Non-Class Plaintiffs") have filed a "Memorandum Responding to Defendants' Opposition to Class Certification" in their respective actions, in order to bring to the Court's attention a legal issue raised in Defendants' Opposition that they believe could impact the non-class actions. Defendants have moved to strike the Non-Class Plaintiffs' Memorandum.

Upon a searching review of the filings submitted by all parties in connection with the pending Motion for Class Certification and the three Motions to Strike, the exhibits attached thereto, the relevant statutes and case law, and the entire record herein, the Court shall grant Plaintiffs' Motion for Class Certification [92], shall grant Defendants' [111] Motion to Strike the

2

references to Dr. Leitzinger's Expert Report, shall grant-in-part and deny-in-part Defendants'

[116] Motion to Strike the declarations submitted on behalf of absent class members, and shall

deny Defendants' Motion to Strike the Non-Class Plaintiffs' Memorandum.

## I. BACKGROUND

Plaintiffs–Meijer, Inc., Meijer Distribution, Inc., Louisiana Wholesale Drug Co., Inc.,

Rochester Drug Co-operative, Inc., American Sales Company, Inc., SAJ Distributors, Inc., and

Stephen L. LaFrance Holdings, Inc.–bring this putative class action pursuant to Federal Rule of

Civil Procedure 23 on behalf of themselves and a class of direct purchasers of Ovcon 35 during

the period April 22, 2004 through December 31, 2006.[2]  In their Amended Complaint, Plaintiffs

allege that they either purchased Ovcon 35 directly from Defendants during the proposed class

period, *see* Am. Compl. ¶¶ 10-11, 13, or that they are assignees of drug wholesalers that

purchased Ovcon 35 directly from Defendants during the class period, *id.* ¶¶ 12,14.[3]

---

[2] As discussed in greater detail below, Plaintiffs originally proposed a class period from "April 22, 2004, through the present and continuing until the effects of Defendants' anticompetitive conduct have ceased," Am. Compl. ¶ 61, but have since proposed the amended class period described above.

[3] Defendants' Opposition attempts to challenge Plaintiffs' claims that they were direct purchasers of Ovcon 35 during the putative class period, but does not demonstrate that any Plaintiff cannot maintain suit as a direct purchaser of Ovcon 35.  Specifically, Defendants' assertion that Plaintiff American Sales Company, Inc. ("American Sales") is the distribution arm of grocery chain Ahold USA, and "stopped purchasing Ovcon directly from Warner Chilcott in 2005," Defs.' Opp'n at 4, is irrelevant because the proposed class period runs from April 22, 2004.  With respect to Plaintiffs Louisiana Wholesale Drug Company, Inc. ("Louisiana Wholesale") and Rochester Drug Co-operative, Inc. ("Rochester Drug"), Defendants attempt to downplay their claims, asserting that both made only small purchases of Ovcon 35 directly from Warner Chilcott.  *Id.*  These statements, however, simply confirm that Louisiana Wholesale and Rochester Drug were direct purchasers of Ovcon 35 during the proposed class period.  *Id.* Furthermore, while Defendants claim that Louisiana Wholesale "also purchased Ovcon from a national wholesaler," they do not assert that Louisiana Wholesale seeks recovery as an indirect purchaser *in this action*.  *Id.*  Finally, Defendants note that Plaintiffs Meijer, Inc. and Meijer

A company seeking to market a new drug in the United States must obtain approval from the United States Food and Drug Administration ("FDA") by filing a New Drug Application ("NDA"), demonstrating the safety and efficacy of its product.  Am. Compl. ¶¶ 24, 26; 21 U.S.C. § 355(b).  The NDA process is typically time-consuming and expensive, Am. Compl. ¶ 26, and in 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act"), which accelerated the approval process for generic drugs, *id.* ¶ 27. The Hatch-Waxman Act permits a manufacturer seeking FDA approval for a generic drug to file an Abbreviated New Drug Application ("ANDA"), which relies on the safety and efficacy data previously provided in the NDA for its branded counterpart.  *Id.* ¶ 27; 21 U.S.C. § 355(j). Accordingly, FDA approval of an ANDA takes, on average, about 18 months.  Am. Compl. ¶ 27.

FDA-approved generic drugs are certified by the FDA as bioequivalent to the branded drug whose NDA the generic drug relied upon in its ANDA, and are completely interchangeable with that branded drug.  *Id.* ¶ 28.  The FDA refers to such drugs as "AB-rated," and pharmacists may dispense AB-rated generic drugs in lieu of their branded counterparts.  *Id.*  According to Plaintiffs, upon their introduction, generic drugs generally enter the market at prices 30 to 50%

---

Distribution, Inc. (collectively "Meijer"), Stephen L. LaFrance Holdings, Inc. ("LaFrance") and SAJ Distributors, Inc. ("SAJ") are indirect purchasers of Ovcon 35, who are suing as assignees of drug wholesalers.  *Id.*  However, as Defendants themselves admit elsewhere in their Opposition, "an assignee stands in the shoes of his assignor, deriving the same but no greater rights and remedies than the assignor then possessed."  *Id.* at 28 (quoting *Fox-Greenwald Sheet Metal Co. v. Markowitz Bros.*, 452 F.2d 1346,1358 n.69 (D.C. Cir. 1970)).  It therefore appears that Meijer, LaFrance and SAJ may properly assert claims as direct purchasers on behalf of their assignors, and that they do not assert claims on their own behalf as indirect purchasers in this action. The Court further notes that in addition to the foregoing Plaintiffs, this action was originally brought by Plaintiff Valley Wholesale Drug Company, Inc., which was dismissed with prejudice from this action on October 2, 2006.  *See Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, Civil Action No. 05-2195, Stipulation, Docket # 60.

(or more) below the price of their brand-name equivalents and, because generic and branded drugs are fully interchangeable in terms of safety and efficacy, the vast majority of patients switch to the less expensive generic in place of the brand-name drug. *Id.* ¶ 29.  Furthermore, almost all states and the District of Columbia encourage generic competition through laws that allow pharmacists to substitute brand-name drugs with their AB-rated generic equivalents, unless a physician directs or the patient requests otherwise. *Id.* ¶ 30.  In addition, many third-party payors of prescription drugs (*e.g.*, health insurance plans) have adopted policies to encourage the substitution of available AB-rated generic drugs for their branded counterparts. *Id.* ¶ 31.

Ovcon 35 is an oral contraceptive containing the formulation 0.035 mg of ethinyl estradiol and 0.4 mg norethindrone, which has been available to the general public since 1976 and is not subject to patent protection. *Id.* ¶ 32; Pls.' Mem. of Law in Support of their Mot. for Class Cert. (hereinafter "Pls.' Mem.") at 1; Defs.' Opp'n at 4 n.3.  Warner Chilcott has been the exclusive marketer of Ovcon 35 since January 2000, when it purchased certain rights, title, and interest in Ovcon 35 from Bristol-Myers Squibb Company ("BMS").  Am. Compl. ¶¶ 34-35. Plaintiffs assert that Ovcon 35 is highly profitable, has been one of Warner Chilcott's highest revenue-producing products, and that Ovcon 35's net dollar sales have more than doubled since 2000, even as Warner Chilcott has raised Ovcon 35's price. *Id.* ¶ 36.

In September 2001, Barr filed an ANDA with the FDA for approval to market an AB-rated generic version of Ovcon 35. *Id.* ¶ 37.  In January 2003, Barr publicly announced its intention to launch a generic version of Ovcon 35 by the end of that year. *Id.* ¶ 38.  Plaintiffs assert that Barr intended to sell its generic version of Ovcon 35 at an initial price approximately 30% below the price Warner Chilcott charged for Ovcon 35, and that Warner Chilcott expected

Barr to do so. *Id.* ¶¶ 39-40. Plaintiffs further allege that both Barr and Warner Chilcott projected

that within its first year of introduction, Barr's generic version would capture approximately 50%

of Warner Chilcott's branded Ovcon 35 sales. *Id.* ¶¶ 41-42. In addition, according to Plaintiffs,

Warner Chilcott calculated that, as a result of lost prescriptions, its net revenues from the sale of

branded Ovcon 35 would decline by at least $100 million over a three-year period. *Id.* ¶ 42.

Plaintiffs allege that Warner Chilcott planned a "line extension" strategy to protect its Ovcon 35

revenues from generic competition, which involved introducing a chewable form of the product

("Ovcon 35 Chewable"), converting Ovcon 35 patients to Ovcon 35 Chewable, and then ceasing

sales of Ovcon 35 before generic entry occurred. *Id.* ¶ 43. Significantly, prescriptions for

Ovcon 35 Chewable would not be able to be filled with a generic version of Ovcon 35 because

the generic would not be AB-rated to Ovcon 35 Chewable. *Id.* ¶ 44. However, according to

Plaintiffs, by mid-2003 Warner Chilcott's line extension strategy was in jeopardy because FDA-

approval of Barr's generic version of Ovcon 35 appeared imminent and Ovcon 35 Chewable had

not yet obtained FDA approval. *Id.* ¶ 45.

As a result, Plaintiffs allege, Warner Chilcott and Barr engaged in discussions regarding

potential business arrangements under which Barr would refrain from competing with branded

Ovcon 35. *Id.* ¶ 48. On September 10, 2003, Defendants signed a Letter of Intent to enter into

an agreement in which Warner Chilcott would pay Barr $20 million not to compete in the United

States, but instead to be available as a second supplier of Ovcon 35 to Warner Chilcott, for a term

of five years following Barr's final FDA approval for its generic version of Ovcon 35. *Id.* ¶ 49.

On March 24, 2004, Defendants executed the Agreement contemplated by their Letter of Intent,

and Warner Chilcott paid Barr $1 million. *Id.* ¶ 50. Under the Agreement, within 45 days after

the FDA's approval of Barr's generic Ovcon 35 ANDA, Warner Chilcott could elect to pay Barr the remaining $19 million to secure Barr's commitment to refrain from marketing generic Ovcon 35 in the United States. *Id.* ¶ 51.

The FDA granted final approval of Barr's ANDA for generic Ovcon 35 on April 22, 2004, and the next day, Barr announced that it intended to begin marketing generic Ovcon 35 under the name "Balziva" unless Warner Chilcott exercised its option under the Agreement. *Id.* ¶¶ 52-53. On May 6, 2004, Warner Chilcott exercised its option and paid Barr the remaining $19 million. *Id.* ¶ 54. Plaintiffs allege that, absent Defendants' Agreement, Barr would have begun marketing Balziva soon after it received FDA approval of its ANDA on April 22, 2004, and that as a result, Plaintiffs would have substituted Barr's lower-priced Balziva for all or a portion of their purchases of branded Ovcon 35, and/or would have paid substantially less for branded Ovcon 35 because Warner Chilcott would have lowered net Ovcon 35 prices in response to competition. *Id.* ¶ 57.

Plaintiffs filed their Amended Complaint in this action on April 14, 2006, alleging that Defendants' Agreement is a contract, combination, or conspiracy in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *Id.* ¶ 72. Subsequent to Plaintiffs' filing of the instant action, on September 25, 2006, Warner Chilcott announced that it had waived the exclusivity provision of the Agreement, thereby allowing Barr to launch its generic version of Ovcon 35, Balziva. Pls.' Mem. at 8. Barr launched Balziva in October 2006, and in January 2007, Warner Chilcott entered into an agreement with Watson to launch a generic version of Ovcon 35 called Zenchent, which launched the same month. *Id.*

7

## II. LEGAL STANDARD

As the party moving for class certification, Plaintiffs have the burden of establishing that

each of the requirements for class certification set forth in Federal Rule of Procedure 23 have

been met. *See Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 614 (1997). To obtain class

certification, Plaintiffs must show that the requirements of Rule 23(a) are met and that the class

is maintainable pursuant to one of Rule 23(b)'s subdivisions. *Id.*; Fed. R. Civ. P. 23; *Richards v.*

*Delta Air Lines, Inc.*, 453 F.3d 525, 529 (D.C. Cir. 2006). The four prerequisites to a class action

lawsuit under Rule 23(a) are: (1) the class is so numerous that joinder of all members is

impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

defenses of the representative parties are typical of the claims and defenses of the class; and (4)

the representative parties will fairly and adequately protect the interests of the class. *See* Fed. R.

Civ. P. 23(a). These four requirements are referred to as numerosity, commonality, typicality,

and adequacy of representation.

In addition, Plaintiffs must demonstrate that the class is maintainable under Rule 23(b).

In the instant case, Plaintiffs seek certification under Rule 23(b)(3) and, as such, must show that

"questions of law or fact common to the members of the class predominate over any questions

only affecting individual members, and that class action is superior to other methods for the fair

and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are

referred to as predominance and superiority. Rule 23(b)(3) further provides that matters pertinent

to the findings include:

> (A) the interest of members of the class in individually controlling the prosecution
> or defense of separate actions; (B) the extent and nature of any litigation
> concerning the controversy already commenced by or against members of the

class; (C) the desirability or undesirability of concentrating the litigation of the
claims in the particular forum; and (D) the difficulties likely to be encountered in
the management of a class action.

*Id.*

"In order to make the required findings of predominance and superiority to certify a class

under Rule 23(b), it is necessary to identify the substantive law" that will control the outcome of

the litigation. *In re: Vitamins Antitrust Litigation*, 209 F.R.D. 251, 256 (D.D.C. 2002); *see also*

*McCarthy v. Kleindienst,* 741 F.2d 1406, 1413 n.6 (D.C. Cir. 1984) (a court will "scrutinize[e]

plaintiffs' legal causes of action to determine whether they are suitable for resolution on a class

wide basis" and "such scrutiny is ordinarily an essential ingredient of the determination whether

to allow a case to proceed as a class action."). However, at this stage of the litigation, Plaintiffs

need only show that the requirements of Rule 23 have been met by showing that common or

general proof will predominate with respect to each of the elements of their antitrust claim.

*Vitamins*, 209 F.R.D. at 257 (citing *Wagner v. Taylor*, 836 F.2d 578 (D.C. Cir. 1987) and

*Littlewolf v. Hodel*, 681 F. Supp. 929, 938 (D.D.C. 1988)). The Court will not–and cannot–make

a preliminary inquiry into the merits of Plaintiffs' claim in determining whether to certify the

class. *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177 (1974); *Richards*, 453 F.3d at 531 n.5.

Nevertheless, "the class determination generally involves considerations that are 'enmeshed in

the factual and legal issues comprising the plaintiff's cause of action.'" and the Court is required

to conduct a "rigorous analysis" of the Rule 23 requirements. *Gen. Tele. Co. of the SW v.*

*Falcon*, 457 U.S. 147, 160-61 (1982) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469

(1978)); *see also Richards*, 453 F.3d at 531 n.5. Therefore, while the Court accepts the

substantive allegations contained in Plaintiffs' Amended Complaint as true, *see Vitamins*, 209

F.R.D. at 257, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."  *Falcon*, 457 U.S. at 160-61; *see also McCarthy*, 741 F.2d at 1413 n.8.[4]

### III. DISCUSSION

Plaintiffs seek certification of the following class pursuant to Federal Rule of Civil Procedure 23(b)(3):

> All persons or entities in the United States who purchased Ovcon 35 directly from Warner Chilcott at any time during the period April 22, 2004 through December 31, 2006.[5]  Excluded from the Class are Defendants and their officers, directors, management, and employees, subsidiaries or affiliates, and all governmental entities.  Also excluded are hospitals, universities and clinics.

Pls.' Reply at 23.  Before considering whether Plaintiffs have met the requirements of Rule 23,

---

[4] Defendants assert that in resolving the instant motion for class certification, the Court is required to "conduct an intense factual investigation" and "probe the factual and legal underpinnings of each of [Plaintiffs'] claims."  Def.'s Opp'n at 10 (quoting *Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 420 (5th Cir. 2004), *cert. denied*, 544 U.S. 949 (2005) and citing *Newton v. Merrill Lunch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 166 (3d Cir. 2001), *cert. denied*, 534 U.S. 951 (2001)).  The Court notes that recent cases cited by Defendants "question the continuing vitality of *Eisen* by suggesting that courts should make whatever legal and factual inquiries [as] are necessary under Rule 23," and should resolve factual disputes as required, even if such findings overlap with the merits of the class action.  *Vitamins*, 209 F.R.D. at 257 n.9 (citing *Newton*, 259 F.3d 154; *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672 (7th Cir. 2001)); *see also Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004); *In re Initial Public Offering Secs. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).  However, the D.C. Circuit has not taken that step, and *Eisen* remains good law.  *Vitamins*, 209 F.R.D. at 257 n.9.  The Court does not decide whether to adopt the standard for class certification motions operative in other circuits.  Instead, the Court avoids any inquiry into the merits of Plaintiffs' claims that is not required to resolve the instant motion for class certification, and notes that that resolution does not involve significant factual disputes.

[5] Plaintiffs assert that the class period correctly closes on December 31, 2006, notwithstanding the fact that Balziva entered the market in October 2006, because "class members suffered overcharges even after Barr began selling generic Ovcon 35."  Pls.' Reply at 23 n.34.  Defendants have not objected to Plaintiffs' revision, and the Court notes that Plaintiffs' proposed end date appears reasonable in light of the nature of their claims.

the Court notes that Plaintiffs originally proposed a class period running from "April 22, 2004,

through the present and continuing until the effects of Defendants' anticompetitive conduct have

ceased." Am. Compl. ¶ 61.[6]  As a result, in their Opposition, Defendants argued that Plaintiffs'

proposed class period rendered the class insufficiently ascertainable.  *See* Defs.' Opp'n at 41-43.

While Federal Rule of Civil Procedure 23 does not contain a requirement that a class be

"ascertainable" or "clearly defined," such a requirement has been "routinely require[d]" in order

to "help the trial court manage the class."  *Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C.

1998).  The Court agrees that Plaintiffs' original proposed class period lacked sufficient

definition because the Court would have been required to engage in a detailed factual inquiry in

order to identify the proposed class members, but finds that Defendants' concern is obviated by

Plaintiffs' revised proposed class period.

    A.     *Rule 23(a) Requirements*

        1.     *Commonality*

Rule 23(a)(2) requires that there are questions of law or fact common to the class.  Fed.

R. Civ. P. 23(a)(2).  "The commonality test is met when there is at least one issue, the resolution

of which will affect all or a significant number of the putative class members."  *In re Lorazepam*

*& Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 26 (D.D.C. 2001) (quoting *Lightbourn v. County*

*of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997)); *see also Garcia v. Johanns*, 444 F.3d 625, 631

(D.C. Cir. 2006).  "The commonality requirement is often easily met," *Vitamins*, 209 F.R.D. at

---

    [6] In addition, Plaintiffs' original proposed class definition did not exclude hospitals,
universities, and clinics, Am. Compl. ¶ 61; however, Plaintiffs opted to remove those entities
from their revised definition, noting that "both Plaintiffs and Defendants [sic] experts agree [such
entities] are not properly in the class" because they paid significantly less for Ovcon 35.  Pls.'
Reply at 23; *see also* Leitzinger Reb. Decl. at 6-7; Palmer Decl. ¶ 57.

259, and "numerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)," *Lorazepam*, 202 F.R.D. at 27 (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 510 (S.D.N.Y. 1996)).

Plaintiffs correctly assert that their claims raise numerous common issues of fact and law, including: (1) whether Defendants entered into an agreement not to compete in the sale of Ovcon 35 Products; (2) whether Defendants' Agreement is lawful; (3) whether Defendants' activities have substantially affected interstate commerce; (4) whether, and to what extent, Defendants' conduct caused direct purchasers to pay more for Ovcon 35 Products than they would have absent Defendants' conduct; and (5) the appropriate measure of damages. Pls.' Mem. at 13. Defendants do not contest that Plaintiffs' claims raise questions of law and fact common to the putative class, and the Court notes that Defendants themselves identified the very same common issues of law and fact in their pleadings before the Judicial Panel of Multidistrict Litigation related to this case. *See* Pls.' Mem., Ex. B (Br. in Supp. of Defs.' Joint Mot. to Consol. and Trans. for Pretrial Proceed. Pursuant to 38 U.S.C. § 1407). The Court therefore has no difficulty finding that the commonality requirement has been met.

### 2. *Typicality*

Rule 23(a)(3) requires a finding that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement aims at ensuring "that the class representatives have suffered injuries in the same general fashion as absent class members." *Vitamins*, 209 F.R.D. at 260 (quoting *Thomas v. Albright*, 139 F.3d 227, 238 (D.C. Cir. 1998)). The facts and claims of each class member do not

12

have to be identical to support a finding of typicality, *see Thomas*, 139 F.3d at 238, rather the

requirement goes to "whether the named plaintiff's claim and the class claims are so interrelated

that the interests of the class members will be fairly and adequately protected in their absence,"

*Falcon*, 457 U.S. at 158 n.13.  The typicality requirement is satisfied "if each class member's

claim arises from the same course of events that led to the claims of the representative parties and

each class member makes similar legal arguments to prove the defendant's liability."

*Lorazepam*, 202 F.R.D. at 27 (quoting *Pigford*, 182 F.R.D. at 349).  The "requirement has been

liberally construed by courts . . . [and] in the antitrust context, typicality 'will be established by

plaintiffs and all class members alleging the same antitrust violations by defendants.'"  *Vitamins*,

209 F.R.D. at 260 (quoting *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 241 (E.D.N.Y.

1998)).

　　　Plaintiffs assert that the typicality requirement is met in this case because "Plaintiffs'

claims rely on facts and legal theories identical to those of the Class [and] [a]ll Class members'

claims arise out of the same 'core pattern' of alleged anticompetitive conduct."  Pls.' Mem. at 14.

Defendants disagree, asserting that Plaintiffs "ignore key factual and legal differences among the

purported class 'representatives' and the proposed class."  Def.'s Opp'n at 35.  First, Defendants

argue that Plaintiffs are not typical of the proposed class because they are smaller wholesalers

who "account for a minute share of Ovcon purchases" and are thus not representative of the three

large national wholesalers (McKesson, Cardinal Health, and AmerisourceBergen, collectively the

"Big Three") who collectively purchased 80% of all Ovcon 35 sold during the proposed class

period.  *Id.*  This argument is inapposite, however, because "[t]ypicality refers to the nature of the

claims of the representative, not the individual characteristics of the plaintiff."  *In re Cardizem*

13

*CD Antitrust Litig.*, 200 F.R.D. 297, 304 (E.D. Mich. 2001) (certifying class of direct purchasers

in action alleging that manufacturers of branded drug and generic counterpart illegally agreed to

delay generic entry) (quoting *Playmobil*, 35 F. Supp. 2d at 242); *see also Vitamins*, 209 F.R.D. at

261 ("There is nothing in Rule 23(a)(3) which requires the named plaintiffs to be clones of each

other or clones of the class members . . . as long as the substance of the claim is the same as it

would be for other class members, then the claims of the named plaintiffs are not atypical.")

(quoting *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1036 (N.D. Miss. 1993)).

Next, Defendants claim that certain Plaintiffs are atypical because they are indirect

purchasers purporting to represent a class of direct purchasers, Defs.' Mem. at 35; however,

Defendants' assertion is unavailing for reasons discussed above. Specifically, Defendants'

assertions that American Sales purchased Ovcon 35 from Cardinal Health–rather than directly

from Warner Chilcott–*after 2005*, and that Louisiana Wholesale purchased Ovcon 35 from

AmerisourceBergen *in addition* to making small purchases directly from Warner Chilcott, *see*

Defs' Opp'n at 4, 35, simply confirm that each Plaintiff made *some* purchases of Ovcon 35 from

Warner Chilcott during the class period. Moreover, while Meijer, SAJ, and LaFrance were in

fact indirect purchasers, they sue as assignees of, and thus stand in the shoes of, direct purchaser

drug wholesalers.[7]

Defendants also argue that "the assignments themselves give rise to unique defenses that

belie the typicality of the named plaintiffs' claims," and assert that other Plaintiffs are susceptible

to individualized defenses as well. Defs.' Opp'n at 36-37. However, the "presence of a unique

---

[7] As Defendants themselves stress, SAJ and LaFrance sue as partial assignees of
McKesson. *See* Defs.' Opp'n at 4. The Court notes that this assignment undermines Defendants
arguments that the named Plaintiffs are not representative of the Big Three.

defense will not . . . destroy typicality [unless it] will 'skew the focus of the litigation' and create 'a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Cardizem*, 200 F.R.D. at 304-05 (quoting *In re Synthroid Mktg. Litig.*, 188 F.R.D. 287, 291 (N.D.Ill. 1999) and *Alaska v. Suburban Propane Gas Corp.*, 123 F.3d 1317, 1321 (9th Cir. 1997)). The Court does not reach herein the merits of the allegedly unique defenses identified by Defendants, i.e., the validity of Meijer's assignment, whether McKesson (the assignor of SAJ and LaFrance) has standing to sue in light of its purported use of "cost-plus contracts", and whether American Sales "passed on" any overcharges it suffered. Rather, the Court simply notes that each of these unique defenses "present[] a question of law that can readily be resolved by the Court without skewing the focus of the litigation or creating a significant danger of distracting [Plaintiffs'] ability to pursue the interests of the absent class members." *Cardizem*, 200 F.R.D. at 305.

Finally, Defendants argue that Plaintiff Rochester Drug is not typical of absent class members because Rochester Drug is not alleging that it was overcharged for Ovcon 35, but rather that if there was a competitor in the marketplace, Rochester Drug would not have carried as much inventory as it did. *See* Defs.' Opp'n at 37 (citing deposition testimony of Rochester Drug's President). However, the *Cardizem* court rejected an almost identical argument, based on reasoning that is equally applicable here.

> [Rochester Drug], just like all members of the class, asserts an overcharge theory of damages. The fact that [Rochester Drug]'s president testified that he believes Defendants' illegal agreement may have also caused the company to incur higher inventory costs in no way renders [Rochester Drug]'s overcharge claim inconsistent with those of the class. Neither [Rochester Drug] nor any member of the class is seeking damages related to higher inventory costs . . . . Accordingly, a 'belief' held by a corporate representative regarding damages not sought here is

15

simply irrelevant.

*Cardizem*, 200 F.R.D. at 306.

Notwithstanding Defendants arguments to the contrary, the Court concludes that

Plaintiffs claims arise from the same course of events that led to, and rely on the same legal

arguments as, the claims of absent class members. *See Lorazepam*, 202 F.R.D. at 27. As the

factual circumstances and legal claims of the named Plaintiffs are thus sufficiently typical of the

absent class members, the Court finds that the typicality requirement is satisfied.

     3.  *Adequacy*

Rule 23(a)(4) requires a finding that "the representative parties will fairly and adequately

protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Two criteria for determining the

adequacy of representation are generally recognized: (1) the named representative must not have

antagonistic or competing interests with the unnamed members of the class, and (2) the

representative must appear able to vigorously prosecute the interests of the class through

qualified counsel." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir.

1997) (internal quotation omitted). Defendants do not dispute the quality of class counsel, and

the Court notes that class counsel have extensive experience in antitrust, class action, and

complex civil litigation and have successfully prosecuted similar antitrust class actions on behalf

of direct purchaser classes alleging anticompetitive conduct in the pharmaceutical industry that

resulted in the delayed or impeded entry of generic drugs. Pls.' Mem. at 16-17, n.12. Moreover,

proposed class counsel have demonstrated that they are willing and able to vigorously pursue this

16

action.[8]

Defendants do, however, argue that Plaintiffs–the proposed class representatives–will not adequately represent absent class members due to antagonistic interests. Specifically, Defendants assert that a "fundamental class conflict" exists because the record evidence demonstrates that the Big Three (McKesson, Cardinal, and AmerisourceBergen, all putative class members) benefitted from the same conduct that Plaintiffs allege caused them injury. Defs.' Mem. at 39. According to Defendants, the Big Three may actually make more money from the sale of branded drugs than the sale of generic drugs because they sell products on a cost-plus basis for which they charge the same percentage markup for brand and generic drugs. *Id.* In addition, Defendants argue that large wholesalers are often bypassed in the distribution chain for generic sales, and that the record evidence here demonstrates that the Big Three have, in fact, lost substantial sales volumes since the entry of Balziva due to so-called "generic bypass." *Id.*

Defendants' arguments are based primarily on *Valley Drug Company v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181 (11th Cir. 2003). In that case, the Eleventh Circuit found

---

[8] On April 4, 2006, the Court granted Plaintiffs' Joint Motion for the Establishment of a Plaintiffs' Executive Committee consisting of the six law firms that had been retained by the representative Plaintiffs: Berger & Montague, P.C.; Boies, Schiller & Flexner LLP; Cohen, Milstein, Hausfeld & Toll, P.L.L.C.; Garwin, Gerstein & Fisher, L.L.P.; Hagens Berman Sobol & Shapiro LLP and Roda Nast, P.C. *See Meijer, Inc. v. Warner Chilcott Holdings Company III, Ltd.*, Civil Action No. 05-2195, Order (D.D.C. Apr. 4, 2006). In their Motion for Class Certification, Plaintiffs request that the law firms serving as the Executive Committee in this case be designated as class counsel. Pls.' Mem. at 16. In addition, Plaintiffs note that Linda Nussbaum, counsel for Meijer, has recently changed firms from Cohen, Milstein, Hausfeld & Toll, P.L.L.C. to Kaplan Fox & Kilsheimer LLP ("Kaplan Fox"). *Id.* at n.10. Plaintiffs state that Ms. Nussbaum continues to act as counsel for Meijer at her new firm, and request that Kaplan Fox be added as a member of the Executive Committee and one of proposed class counsel for this action. *Id.* Defendants have not opposed this request, and the Court shall grant it in the Order accompanying this Memorandum Opinion.

that proposed named plaintiffs could not adequately represent the interests of a class of direct

purchasers, including the Big Three, because the Big Three "appear to benefit from the effects of

the conduct alleged to be wrongful by the named plaintiffs because their net economic situation

is better off when branded drugs dominate the market." *Id.* at 1191.  The Court respectfully

disagrees with the Eleventh Circuit's conclusion, however, because it conflicts with the Supreme

Court's decisions in *Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968) and

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).[9]  Under those decisions, "[a]ntitrust injury is

considered complete when the direct purchaser pays an illegal overcharge and whether he was

able to pass through the overcharge to indirect purchasers is irrelevant to the inquiry." *J.D.B.L.*

*Corp. v. Wyeth-Ayerst Labs., Inc.*, 225 F.R.D. 208, 216 (S.D. Ohio 2003) (certifying class of

direct purchasers of drug on overcharge theory of damages where plaintiffs alleged that

defendants' behavior prevented the sale of a lower-priced competitor drug) (citing *Hanover Shoe*,

392 U.S. at 489; *Illinois Brick*, 431 U.S. at 724-25).  As the Supreme Court explained in *Illinois*

*Brick*, under the *Hanover Shoe* rule "direct purchasers are not only spared the burden of litigating

the intricacies of pass-on but are also permitted to recover *the full amount of the overcharge*."

431 U.S. at 745-46 (emphasis added).

Moreover, *Hanover Shoe* "precludes not only the 'passing on' defense, but also the subtle

variation asserted here, which might be termed the 'otherwise benefitting' defense." *Relafen*,

---

[9] In addition, the Court notes that Eleventh Circuit's conclusion in *Valley Drug* was
explicitly rejected as inconsistent with Third Circuit precedent in *In re Hypodermic Product
Direct Purchaser Antitrust Litigation*, Civil Action No. 05-CV-4465, 2006 U.S. Dist. LEXIS
89353, at *17-20 (D.N.J. Sept. 7, 2006), and that *Valley Drug*'s reasoning was implicitly rejected
in *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 369 (D.Mass. 2004) (rejecting argument
that national wholesalers' overcharge claims were limited because of generic bypass).

346 F. Supp. 2d at 369 (citing *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 884-85 (10th Cir. 1997)); *see also Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 264 n.14 (1972) ("[D]amages are established by the amount of the overcharge [and] [u]nder § 4, courts will not go beyond the fact of this injury to determine whether the victim of the overcharge has partially recouped its loss in some other way.").  The Eleventh Circuit purports to recognize this proposition, and to distinguish *Hanover Shoe* and *Illinois Brick* on the grounds that those cases did not address "a party's burden to satisfy the class certification prerequisites established by Rule 23(a)."  *Valley Drug*, 350 F.3d at 1192.  However, the Eleventh Circuit's holding fails to appreciate the true import of the *Hanover Shoe* rule that a direct purchaser may recover the full amount of the overcharge, even if he is otherwise benefitted, because the antitrust "injury occurs and is complete when the defendant sells at the illegally high price." *Cardizem*, 200 F.R.D. at 313 (citing *Sports Racing Servs., Inc.*, 131 F.3d at 883); *see also Relafen*, 346 F. Supp. 2d at 369.[10]  As such, Defendants' arguments that the Big Three actually benefitted from the delayed entry of Balziva into the market due to the generic bypass phenomenon are irrelevant as a matter of law, and cannot serve to demonstrate that a conflict exists between Plaintiffs'

---

[10] The Court notes that in *Phillips v. Klassen*, 502 F.2d 362 (D.C. Cir. 1974), the D.C. Circuit stated that intra-class conflicts may prevent a finding of adequacy of representation because "[u]nless the relief sought by the particular plaintiffs who bring the suit can be thought to be what would be desired by the other members of the class, it would be inequitable to recognize plaintiffs as representative. . . ." *Id.* at 366.  In that case, however, the relief sought by the named plaintiffs could have been beneficial to some class members while detrimental to others.  *Id.* at 366-67.  In contrast, in the instant case, Balziva and Zenchent have already entered the market, and Plaintiffs seek to recover any overcharges that were paid for Ovcon 35.  Plaintiffs do not seek relief that could have varied prospective impacts on members of the putative class. Significantly, Plaintiffs do not, and obviously cannot, seek to force a generic entry that might be harmful to the pecuniary interests of the Big Three.

interests and those of the Big Three with respect to this litigation.[11]

In addition to arguing that the generic bypass phenomenon creates a fundamental class conflict, Defendants speculate that the phenomenon may lead class members to have antagonistic economic interests because they will disagree as to how any bypass should be accounted for in calculating damages. Defs.' Opp'n at 40-41. However, Plaintiffs seek damages in the amount of alleged overcharges resulting from Defendants' Agreement and because all direct purchasers are entitled to recover such overcharges, Plaintiffs and the absent class members "have exactly the same interests in maximizing recovery of overcharge damages on each qualifying direct purchase or assigned claim." Pls.' Reply at 22; *see also* Pls.' Mem. at 15. Insofar as Defendants argue that the Big Three and Plaintiffs may have opposing views as to how to account for generic bypass, that alleged conflict "relates only to the apportionment of damages as between [class members]. Such hypothetical conflicts regarding proof of damages are not sufficient to defeat class certification at this stage of the litigation." *NASDAQ*, 169 F.R.D. at 513.

Finally, Defendants' speculative arguments regarding possible intra-class conflicts are substantially undermined by the record in this case. In essence, Defendants suggest that either

---

[11] As noted above, the Non-Class Plaintiffs in the *Walgreen* and *CVS* matters–other direct purchasers of Ovcon 35 who preemptively opted out of this putative class action–filed a joint Memorandum Responding to Defendants' Opposition to Class Certification, in which they argue that Defendants' Opposition presents an erroneous analysis of the generic bypass phenomenon. Although not framed as such, the Non-Class Plaintiffs' Memorandum appears to be in the nature of an *amicus* brief, because it aims at alerting the Court that the generic bypass issue is relevant to the *Walgreen* and *CVS* actions as well as the instant action. While the Non-Class Plaintiffs should have formally moved to file an *amicus* brief in this matter, the Court will nevertheless consider their Memorandum as such, and shall therefore deny Defendants' Motion to Strike the Non-Class Plaintiffs' Memorandum. *See Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 846 (D.D.C. 1996) ("The decision whether to allow a non-party to participate as an *amicus curiae* is solely within the broad discretion of the Court").

the Big Three or the smaller, regional wholesalers included in the putative class might be

disadvantaged in this litigation by the other's presence in the class. However, to the extent that

Plaintiffs are "mostly regional wholesalers[ who] account for a minute share of Ovcon

purchases," Defs.' Opp'n at 35, it is clear that they do not perceive themselves as potentially

disadvantaged by the Big Three's inclusion in the proposed class. *See* Pls.' Mem. at 15-16

("There are no foreseeable intra-class conflicts and certainly no fundamental ones."). Moreover,

insofar as Defendants suggest that the Big Three might be disadvantaged by being included in the

proposed class, the Court notes that Plaintiffs have submitted a declaration signed by an

authorized representative of each of the Big Three, averring that the company "has determined, in

its considered business judgment, that its interests would best be served by the Court certifying

the proposed class of direct purchasers, represented by the Named Plaintiffs and their counsel,

and allowing this action to proceed as a class action with [the company] remaining a member of

the class." *See* Pls.' Reply, Ex. D (5/21/07 Decl. of Saul D. Factor, Senior Vice President,

Product Management, McKesson Corporation) ¶ 6; Ex. E (5/14/07 Decl. of Brian Jones, Vice

President, Generic Pharmaceuticals Product Development, AmerisourceBergen Corporation) ¶ 6;

and Ex. F (5/18/07 Decl. of John Jay Flinn, Senior Vice President, Healthcare Supply Chain

Services-Pharmaceutical, Cardinal Health, Inc.) ¶ 6.[12] As both Plaintiffs (smaller, regional

---

[12] Defendants have moved to strike the declarations submitted by Messrs. Factor, Jones, and Flinn, arguing that the declarants lack personal knowledge of the facts underlying the statements made in their declarations and are not competent to offer opinions regarding the antagonistic economic interests or conflicts within the putative class or Plaintiffs' adequacy as class representatives. Defs.' Joint Mot. to Strike Decls. at 2. In addition, Defendants argue that Messrs. Flinn and Jones' declarations should be stricken because during their depositions in this matter they refused to answer questions relevant to assertions made in their respective declarations regarding the types of contracts their companies use and the factors that influence the prices their companies charge for pharmaceutical products. *Id.* at 2-3, n. 1. Defendants are

wholesalers) and the Big Three have themselves disavowed a potential disadvantage from participating in the same proposed class, the Court lacks a basis for finding a significant risk of such disadvantage. The Court therefore concludes that the adequacy requirement is met.

### 4. Numerosity

The Court turns finally to the requirement of Rule 23(a)(1), that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)1). The numerosity requirement "imposes no absolute limitations," but rather "requires examination of the specific facts of each case." *Gen. Tele. Co. of the NW v. EEOC*, 446 U.S. 318, 330 (1980). Further, rule 23(a)(1) "gives courts discretion to decide whether using the class action mechanism would serve the interests of judicial economy and efficiency." *Int'l Union v. Clark*, Civil Action No. 02-1484 (GK), 2006 WL 2687005, *5 (D.D.C. Sept. 12, 2006) (citing *Council of and for the Blind of Delaware County Valley, Inc. v. Regan*, 709 F.2d 1521, 1544 n.8 (D.C. Cir. 1983) (Robinson, J., concurring in part and dissenting in part)).

---

correct that the Messers. Factor, Jones, and Flinn's declarations consist mainly of assertions regarding antagonistic economic interests, intra-class conflicts, and Plaintiffs' adequacy as class representatives, and that such assertions are legal conclusions rather than factual evidence. However, each declaration contains one paragraph–Paragraph 6, quoted above–in which the declarant asserts, on behalf of his company, that the company has determined in its business judgment that its interests would be served by the Court allowing this action to proceed as a class action with Plaintiffs serving as class representatives. *See* Factor Decl. ¶ 6; Jones Decl. ¶ 6; Flinn Decl. ¶ 6. Those paragraphs, in contrast to the remainder of the declarations, contain factual assertions regarding each company's perception of its own self-interest. Corporations must, by necessity, speak through their officers, and each declarant is a corporate officer who asserts that he has authority to execute his declaration on behalf of his company. *See* Factor Decl. ¶ 1; Jones Decl. ¶ 1; Flinn Decl. ¶ 1. The Court shall therefore grant-in-part and deny-in-part Defendants' [119] Joint Motion to Strike the Factor, Jones, and Flinn Declarations, shall admit only Paragraphs 1 and 6 of each declaration, and shall strike the remainder of each declaration. The Court notes that Messrs. Flinn and Jones' purported refusal to answer questions regarding contracts and factors influencing pricing is irrelevant to the paragraphs admitted by the Court.

Based on the declarations submitted by Plaintiffs and Defendants' experts, it appears that there are likely thirty members of the proposed class. *See* Pls.' Reply Mem., Ex. A (Leitzinger Reb. Decl.) at 7; Defs.' Opp'n, Ex. 3 (Palmer Decl.) at ¶¶ 5.1, 41, 57.[13]  Defendants argue that a class of thirty members does not meet the numerosity requirement and that Plaintiffs have not proven that joinder is impracticable in the instant case. Defs.' Opp'n at 34.  Although thirty is not a large number of class members, the Court nevertheless concludes that the numerosity requirement is satisfied in this case.  While courts in this Circuit have stated that the numerosity requirement "is generally satisfied by a proposed class of at least 40 members," *Thomas v. Christopher*, 169 F.R.D. 224, 237 (D.D.C. 1996), they have also noted that "as few as 25–30 class members should raise a presumption that joinder would be impracticable, and thus the class should be certified," *EEOC v. Printing Indus. of Metro. Washington, D.C., Inc.*, 92 F.R.D. 51, 53 (D.D.C. 1981).  Moreover, courts in other jurisdictions have certified similarly small classes.

---

[13] Plaintiffs' expert, Dr. Jeffrey J. Leitzinger, and Defendants' expert, Dr. Brian L. Palmer, each arrived at the estimated thirty putative class members by excluding from the class those direct purchasers who have joined the *Walgreen* and *CVS* actions, Valley Drug (which voluntarily withdrew from this litigation), and hospitals, clinics, universities, and government entities, and then accounting for common ownership of parent companies and their affiliates and subsidiaries. *See* Leitzinger Reb. Decl. at 6-7, Palmer Decl. ¶ 57.  In his April 12, 2007 Declaration, Defendants' expert, Dr. Palmer, asserts that although there are at most twenty-five potential members of the putative class because he has not seen any evidence that five of the thirty potential class members either purchased Ovcon 35 at a lower price after the entry of Balziva or purchased Balziva.  Palmer Decl. ¶ 58.  Dr. Leitzinger rebuts Dr. Palmer's assertion, arguing that two of the five direct purchasers identified by Dr. Palmer as not having purchased Balziva since its entry are not actually members of the putative class because they are based in Puerto Rico, that one of the five recently purchased Balziva, and that another one of the five is owned by Cardinal, which has purchased Balziva.  Leitzinger Reb. Decl. at 13.  In addition, Dr. Leitzinger notes that Dr. Palmer's conclusions were based on only four and a half months of sales data for Balziva, and did not include sales of Zenchent.  *Id.* at 12.  For purposes of the numerosity analysis, the Court shall assume that the putative class includes at least 29, and possibly 30, members.

*See, e.g., Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D. Ill. 1986) (certifying class of 29 members and citing cases certifying classes of 10-23 members); *Town of New Castle v. Yonkers Contracting Corp.*, 131 F.R.D. 38, 40-41 (S.D.N.Y. 1990) (certifying class of 36 members); *Alvarado Partners, L.P. v. Mehta*, 130 F.R.D. 673, 675 (D. Colo. 1990) (certifying class of 33 members).[14]

Significantly, "the test for impracticability of joinder is not simply a test of the number of class members. When the class is large, numbers alone are dispositive, but when the class is small, factors other than numbers are significant." *Riordan*, 113 F.R.D. at 62 (internal citations omitted). In particular, as Judge Thomas F. Hogan noted in *Vitamins*, "courts often take the geographical location of the proposed class members into consideration when deciding whether or not certification is appropriate." 209 F.R.D. at 259 (citing *Vargas v. Meese*, 119 F.R.D. 291, 293 (D.D.C. 1987); *Pigford*, 182 F.R.D. at 348). Here, based on a "preliminary review of Warner Chilcott's sales data," Plaintiffs assert that the putative class members are dispersed geographically across the United States. Pls.' Mem. at 12. Defendants decry this assertion as conclusory but–significantly–do not actually dispute that the putative class members are geographically dispersed. *See* Defs.' Opp'n at 34. The Court therefore assumes that the thirty putative class members are, in fact, geographically dispersed, such that joinder would be

---

[14] The Court notes that when courts in this Circuit have refused to certify small classes, they have done so based on findings that other elements of Rule 23(a) were not met, and not solely on a finding that the class lacked numerosity. *See, e.g., Marable v. District Hospital Partners, L.P.*, Civil Action 01-02361 (HHK), 2006 WL 2547992 (D.D.C. Aug. 31, 2006) (refusing to certify class based on lack of numerosity and commonality); *International Union*, 2006 WL 2687005 (refusing to certify class based on numerosity and named plaintiff's failure to exhaust administrative remedies); *Rodriguez v. United States Dept. of Treasury*, 131 F.R.D. 1 (D.D.C. 1990) (same). Here, as discussed above, Plaintiffs have demonstrated that the other requirements of Rule 23(a) are met.

impracticable. Even with thirty geographically dispersed members, "the size of the potential group of plaintiffs and the inconvenience of litigation weigh in favor of class certification." *Town of New Castle*, 131 F.R.D. at 40. Moreover, the Court notes that judicial economy may be considered by courts in evaluating numerosity, *see Primavera Familienstiftung v. Askin*, 178 F.R.D. 405, 410 (S.D.N.Y. 1998), and that the interest of judicial economy is clearly served by resolving the complex common issues raised by the instant action in a single action, rather than thirty individual actions.

Finally, another factor to be considered in evaluating numerosity is the nature of the action. *Town of New Castle*, 131 F.R.D. at 41. To that end, the Court notes that, as Judge Hogan recognized in *Vitamins*, "it has long been recognized that class actions play an important role in the private enforcement of antitrust actions." 209 F.R.D. at 258 (citing cases); *see also Town of New Castle* ("Since private enforcement of antitrust laws provides a supplement to governmental enforcement, it is our view that class action treatment of alleged antitrust violations is appropriate and desirable."). Indeed, "because of this important role for class actions in the private enforcement of antitrust claims, 'courts resolve doubts in favor of certifying the class.'" *Lorazepam*, 202 F.R.D. at 22 (quoting *Playmobil*, 35 F. Supp. 2d at 239). The Court therefore concludes that the numerosity requirement is met in the instant action, where the putative antitrust class contains thirty geographically dispersed members.[15]

_____

[15] The Court notes that if a significant number of direct purchasers opt out of the proposed class or it becomes apparent that the class is, in fact, substantially smaller than thirty, the Court may alter, amend, or decertify the class pursuant to Rule 23(c)(1)(C). *See Alvarado Partners*, 130 F.R.D. at 675 (certifying class of 33 members but noting "should underwriters in fact opt out on [a large] scale that proceeding as a class is no longer prudent, I can decertify the class.").

B.      *Rule 23(b) Requirements*

Plaintiffs seek to certify the proposed class pursuant to Federal Rule of Civil Procedure

23(b)(3).  Thus, having established that the proposed class meets the requirements of Rule 23(a),

the Court now turns to considering whether common questions predominate over non common

questions and whether class resolution is superior to other methods of adjudication.  Fed. R. Civ.

P. 23(b)(3).

1.      *Predominance*

In order to satisfy Rule 23(b)(3), Plaintiffs must show that the common issues identified

by the Court above as sufficient under Rule 23(a)(2) predominate over any non-common issues.

*Vitamins*, 209 F.R.D. at 262.  Significantly, the common issues need only be predominant, not

dispositive of the litigation.  *Lorazepam*, 202 F.R.D. at 29 (citing *In re Potash Antitrust Litig.*,

159 F.R.D. 682, 693 (D. Minn. 1995)).   "There is no definitive test for determining whether

common issues predominate, however, in general, predominance is met 'when there exists

generalized evidence which proves or disproves an element on a simultaneous, class-wide basis,

since such proof obviates the need to examine each class members' individual position.'"

*Vitamins*, 209 F.R.D. at 262 (citing *Potash*, 159 F.R.D. at 693).  Furthermore, the Court notes

that antitrust actions involving allegations of price-fixing have frequently been found to meet the

predominance requirement in class certification analyses.  *Id.* at 263 (collecting cases);

*Lorazepam*, 202 F.R.D. at 29.  Specifically, a number of courts have found the predominance

requirement satisfied (and certified classes) in class actions alleging antitrust injury in the form of

overcharges resulting from delayed entry of a generic or lower-priced drug.  *See Lorazepam*, 202

F.R.D. at 29-30; *J.D.B.L.*, 225 F.R.D. at 217-19; *In re Relafen Antitrust Litig.*, 218 F.R.D. 337,

343-46 (D. Mass. 2003); *In re Buspirone Patent Litig.*, 210 F.R.D. 43, 58 (S.D.N.Y. 2002);

*Cardizem*, 200 F.R.D. at 307-25.

     The predominance inquiry requires the identification of the elements of the substantive

law at issue. *Vitamins*, 209 F.R.D. at 263. Here, to ultimately prevail on their claim under

Section 1 of the Sherman Act, Plaintiffs must prove (1) a violation of the antitrust law, (2) direct

injury (or impact) from the violation, and (3) damages. *Lorazepam*, 202 F.R.D. at 29. Thus, in

order to meet Rule 23(b)(3), Plaintiffs must show that the evidence they propose to employ with

respect to each of those elements is common to the class as a whole. *Vitamins*, 209 F.R.D. at

263.[16] Defendants do not contest Plaintiffs' ability to demonstrate a violation of the antitrust

laws through common proof, and the Court notes that because the alleged violation here relates

"solely to Defendants' conduct . . . proof for [this] issue will not vary among class members."

*Lorazepam*, 202 F.R.D. at 29 (quoting *Potash*, 159 F.R.D. at 694); *see also Lumco*, 171 F.R.D. at

172 ("The fact-finder's focus of inquiry will be on the . . . Defendants' words and actions; it will

not vary among individual class members."); *Ampicillin*, 55 F.R.D. at 278 ("the existence of a

conspiratorial agreement among the defendants . . . as well as the activities which carried out the

---

    [16] In their Motion for Class Certification, Plaintiffs repeatedly reference the fact that other courts have presumed that common questions predominate and that the common impact element is met in antitrust cases. *See* Pls.' Mem. at 20, 23 (citing *Lumco Indust., Inc. v. Jeld-Wen, Inc.*, 171 F.R.D. 168, 172 (E.D. Pa. 1997); *In re Ampicillin Antitrust Litig.*, 55 F.R.D. 269, 278 (D.D.C. 1972)); *see also Vitamins*, 209 F.R.D. at 266 (citing *In re Master Key Antitrust Litig.*, 528 F.2d 5, 12 n.11 (2d Cir. 1975); *In re Auction House Antitrust Litig.*, 193 F.R.D. 162, 166 (S.D.N.Y. 2000). Not surprisingly, in their Opposition, Defendants challenge the application of any such presumption in this matter. *See* Defs.' Opp'n at 13-16 (citing, *inter alia*, *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 620 (N.D. Ga. 1997) (the "Court cannot presume that, simply because Plaintiffs have alleged a national price-fixing conspiracy, Plaintiffs' proof of antitrust impact will be common to all Plaintiffs and will predominate at trial.")). No such presumption is required in this case because Plaintiffs have established that common proof will predominate over individual issues.

alleged agreement and resulted in damage to the plaintiffs, are common items of proof which predominate over issues of damages peculiar to each claimant."). Plaintiffs assert that they will likewise be able to establish antitrust injury or impact and to estimate aggregate damages through common proof applicable on a class-wide basis. Defendants vigorously dispute both of these assertions, and the Court addresses each in turn.

a.     *Proof of Impact*

Plaintiffs assert that they will establish fact of damage, or antitrust "impact" through evidence and methods that are entirely common to the class by proving that direct purchasers paid overcharges for Ovcon 35 Products during the class period. Pls.' Mem. at 21-27. "At the class certification stage, plaintiffs need only demonstrate that they intend to use generalized evidence which is common to the class and will predominate over individualized issues with respect to proving impact." *Vitamins*, 209 F.R.D. at 266. The amount of the total overcharge is ultimately irrelevant to proving the *fact* of the alleged antitrust injury. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (antitrust plaintiff's "burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage."). Furthermore, "[t]o show impact is susceptible to class-wide proof, Plaintiffs are not required to show that the fact of injury actually exists for each class member." *Cardizem*, 200 F.R.D. at 307 (citing *Polypropylene Carpet*, 178 F.R.D. at 618).

Plaintiffs assert that Defendants' Agreement caused at least some injury to all direct purchaser class members because the Agreement deprived them of the ability to purchase either lower-priced generic Ovcon 35 or discounted brand-name Ovcon 35 during the class period.

28

Plaintiffs (and their expert, Dr. Leitzinger) propose to prove this alleged antitrust impact through the following common proof:

> (1)    Governmental and academic studies relating to the marketwide economic effects of generic competition, which universally conclude that purchasers derive substantial savings when generic companies are allowed to compete;

> (2)    Internal analyses and forecasts of Defendants themselves, predicting significant generic penetration and substantially lower prices for Ovcon 35 Products after generic entry;

> (3)    Pricing Data from several drug markets showing the predictable pattern of significant price erosion following generic entry; and

> (4)    Pricing data from generic Ovcon 35 Products since generic Ovcon 35 entry in October 2006.

Pls.' Mem. at 23 (citing Leitzinger Decl. at 17-27).  While Defendants challenge the types of evidence relied upon by Plaintiffs as "non-specific", *see* Defs.' Opp'n at 16-17, the Court notes that these are precisely the types of evidence that have been found sufficient to satisfy the predominance requirement with respect to proof of impact in other cases alleging delayed generic entry.  *See Cardizem*, 200 F.R.D. at 208; *Relafen*, 218 F.R.D. at 343-44; and *J.D.B.L.*, 225 F.R.D. at 217-18.

Defendants argue that Plaintiffs "cannot demonstrate common impact or 'fact of injury' given the heterogeneous business models, purchasing practices, and pricing among putative class members."  Defs.' Opp'n at 17.  However, as the *Cardizem* court noted, "neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that the price range was affected generally."  200 F.R.D. at 319; *see also Vitamins*, 209 F.R.D. at 266 ("It is not unprecedented that courts have found common impact in

cases alleging price-fixing despite individual negotiations, varied purchase methods and different amounts, prices, and types of products purchased."); *Lorazepam*, 202 F.R.D. at 30; *NASDAQ*, 169 F.R.D. at 523. Here, Plaintiffs assert that "prices for the generic are uniformly lower for all [segments of the putative class] and class members than prices paid for the brand." Pls.' Reply at 15. This statement is supported by Dr. Leitzinger's Rebuttal Declaration, and Exhibit 4 thereto, in which Dr. Leitzinger presents evidence that "average Ovcon 35 Product prices went down for all classes of trade in the proposed Class (including the [Big Three]) once generic Ovcon 35 became available." Leitzinger Reb. Decl. at 10, Ex. 4. The Court therefore concludes that Defendants' arguments regarding individualized business models, purchasing practices, and pricing do not undermine Plaintiffs' claim that they will be able to prove antitrust impact through the use of common evidence.

Defendants next argue that the evidence in this case demonstrates that many class members would not have purchased a generic version of Ovcon 35 during the class period, because at least five putative class members have not done so since Balziva was introduced in October 2006. Defs.' Opp'n at 19. As discussed above, *see supra* note 13, in his April 12, 2007 Declaration, Defendants' expert, Dr. Palmer, asserts that he has not seen any evidence that five of the thirty potential class members purchased Balziva after its entry. Palmer Decl. ¶ 58. Dr. Palmer's claim, however, is rebutted by Dr. Leitzinger's arguments that two of the five direct purchasers identified by Dr. Palmer as not having purchased Balziva since its entry are not actually members of the putative class because they are based in Puerto Rico, that one of the five recently purchased Balziva, and that another one of the five is owned by Cardinal, which has purchased Balziva. Leitzinger Reb. Decl. at 13. Thus, considering Dr. Leitzinger's rebuttal, it

appears that, at most one putative class member may not have yet purchased a generic version of

Ovcon 35. Furthermore, Dr. Leitzinger's Rebuttal Declaration suggests that Defendants'

Agreement may have led to less rapid and broad generic penetration than would have occurred

absent the agreement. Specifically, Dr. Leitzinger notes that, in the real world, Ovcon 35

Chewable was released at approximately the same time as Balziva, and opines that this has

slowed the growth of generic sales because pharmacists may not fill prescriptions for Ovcon 35

with Balziva. *Id.* In contrast, in Plaintiffs' "but for"world, Balziva would have entered the

market roughly two and a half years prior to Ovcon 35 Chewable. *Id.* Finally, as Dr. Leitzinger

points out, Dr. Palmer's conclusions regarding putative class members' purchases following the

entry of generic Ovcon 35 were based on only four and a half months of sales data for Balziva,

and did not include sales of Zenchent. *Id.* at 12. The fact that one putative class member did not

purchase Balziva within the first four and a half months following its entry simply does not

demonstrate that Plaintiffs cannot establish antitrust impact through common proof.[17]

Significantly, "courts have routinely observed that the inability to show injury as to a few does

not defeat class certification where the plaintiffs can show widespread injury to the class."

*Cardizem*, 200 F.R.D. at 320-21 (citing *NASDAQ*, 169 F.R.D. at 523); *see also J.D.B.L.*, 225

F.R.D. at 218.

---

[17] The Court recognizes that if a direct purchaser, in fact, does not purchase a generic version of Ovcon 35 or receive a discount on branded Ovcon 35 following generic entry, it may suggest that the direct purchaser would not have done so in Plaintiffs' "but for" world and thus may not have suffered an overcharge injury. As noted above, it appears that such a scenario applies to at most one direct purchaser. Nevertheless, if the evidence ultimately suggests that a putative class member has neither purchased a generic version of Ovcon 35 nor received a discount on branded Ovcon 35 since the entry of generic Ovcon 35, the Court can accommodate by amending the class definition to exclude such putative class members.

Defendants also claim that the "generic bypass" phenomenon has ramifications with respect to Plaintiffs' claim that common issues will predominate at trial.  Specifically, Defendants assert that since Balziva entered the market, the Big Three have been substantially bypassed by their customers, such that "substantial Ovcon purchases among the putative class members have not been converted to (generic) Balziva purchases."  Defs.' Opp'n at 19-20.  In support of this statement, Defendants cite to Dr. Palmer's Declaration, in which he asserts that the Big Three accounted for 67% of the direct purchases of Ovcon 35 in the twelve months prior to Balziva's entry, but less than 38% of the direct purchases of Balziva in the first five months since it has been available.  *Id.* (citing Palmer Decl. ¶ 55 & Ex. E).  However, Defendants do not claim that the Big Three have been entirely bypassed since the entry of generic Ovcon, and under Plaintiffs' overcharge theory direct purchasers suffered antitrust injury as long as they would have purchased *some* generic Ovcon earlier in the class period had it been available.

Finally, Defendants argue that Plaintiffs cannot demonstrate fact of impact through common proof because the price of Ovcon 35 has not been impacted by the entry of generic Ovcon 35.  Defs.' Opp'n at 20-22.  Defendants are correct that Plaintiff's Motion for Class Certification and Dr. Leitzinger's initial Declaration suggest that class members paid overcharges on Ovcon 35 Products either because they would have paid less for generic Ovcon 35 than for branded Ovcon 35, had the generic been available earlier, or because they would have received discounts on branded Ovcon 35 following generic entry.  *See* Pls.' Mem. at 23; Leitzinger Decl. at 30-31.  However, in their Reply, Plaintiffs assert that their "overcharge analysis does not depend on a finding that brand prices decline.  Rather, after generic entry, Plaintiffs pay less by substituting cheaper generic products *or* by getting a lower price on the brand, or both."  Pls.'

Reply at 11; Leitzinger Reb. Decl. at 16-17.  As a result, the effect of generic entry on the price

of Ovcon 35 appears to be irrelevant to Plaintiffs' ability to demonstrate proof of impact through

common evidence.  The Court therefore concludes that Plaintiffs have met their burden of

demonstrating that common issues will predominate over individualized issues with respect to

Plaintiffs' efforts to demonstrate antitrust injury.

>        *b.*      *Damages*

Defendants also contest Plaintiffs' assertion that they will be able to calculate and prove

damages on an aggregate, class-wide basis, arguing that Plaintiffs fail to present a "formulaic

methodology to calculate class-wide damages."  Defs.' Opp'n at 22-29.  Defendants' argument,

however, requires Plaintiffs to prove more than they are required to at the class certification

stage.  As Judge Hogan explained in *Vitamins* case:

> At the certification stage, the preliminary inquiry in assessing the proposed
> methods of proving damages [is] limited: The inquiry is not whether the methods
> are valid, but is only to assess whether the methods are available to prove
> damages on a class-wide basis.  In essence, the plaintiffs must show that there is a
> viable method by which to establish the "but-for" price as to the [Ovcon 35
> Products] in the alleged conspiracy.

209 F.R.D. at 268.  "Plaintiffs do not need to supply a precise damage formula at the certification

stage of an antitrust action.  Instead, in assessing whether to certify a class, the Court's inquiry is

limited to whether or not the proposed methods are so insubstantial as to amount to no method at

all."  *Lorazepam*, 202 F.R.D. at 30 (quoting *Potash*, 159 F.R.D. at 697).

Plaintiffs' Motion for Class Certification asserts that "it is feasible to estimate damages

on an aggregate, class-wide basis.  Pls.' Opp'n at 28.  As support for this assertion, Plaintiffs

point to Dr. Leitzinger's initial Declaration, in which he avers that based on his experience

performing similar analyses in other matters involving impeded or delayed generic competition, he is "confident that the calculation of aggregate overcharges for the Class in this case will be readily susceptible to formulaic analysis that does not require individualized inquiry as to each Class member." Leitzinger Decl. at 9. Specifically, Dr. Leitzinger explains that in past cases he has measured aggregate overcharges by developing "a benchmark for market performance–the 'but for' world–reflecting the world as it would have existed had generic competition not been restrained by Defendants' Agreement," using "much of the same common evidence that [he] would rely upon to establish class-wide impact." Leitzinger Decl. at 32. Dr. Leitzinger continues:

> After determining the benchmark, the next step involves ascertaining the sum of: (1) the difference between the generic Ovcon 35 price Class members would have paid in the but-for world and the Ovcon 35 brand price actually paid by Class members, multiplied by the volume of generic substitution by the Class that was forestalled by the impairment of generic competition; (2) the difference between the discounted brand price Class members would have paid in the but-for world had generic competition not been restrained and the actual Ovcon 35 brand price paid by Class members, multiplied by the branded volumes the Class would have continued to purchase after generic entry into the market; and (3) the difference between the prices Class members would have paid for generic Ovcon in the but-for world had generic competition not been restrained and the actual generic Ovcon 35 prices paid by class members multiplied by the generic volumes purchased.

*Id.* at 32-33.[18]

---

[18] In addition, in his Rebuttal Declaration, Dr. Leitzinger purports to address the challenges to his claim regarding the availability of a class-wide damages methodology raised by Defendants and their expert, Dr. Palmer. Dr. Leitzinger does so in large part by referring the Court to the Expert Report he submitted in this action on May 18, 2007. Defendants have jointly moved to strike all references to Dr. Letizinger's May 18, 2007 Expert Report contained in Plaintiffs' Reply Brief and in Dr. Leitzinger's Rebuttal Declaration, arguing that the Expert Report presents "wholly new and previously undisclosed 'expert' testimony and conclusions," about which Defendants have been unable to question Dr. Leitzinger. *See generally* Defs.' Joint Mot. to Strike [111]. Defendants argue that Plaintiffs' reliance on Dr. Leitzinger's Expert

Defendants argue that Dr. Leitzinger's declaration is not "sufficient in demonstrating a single, formulaic methodology to calculate damages," relying on two cases in which opinions offered by Dr. Leitzinger were found insufficient in demonstrating the existence of a class-wide methodology for calculating damages. Defs.' Opp'n at 22-24 (quoting *In re Medical Waste Services Antitrust Litig.*, No.2:03MD1546 DAK, 2006 WL 538927, *5-7 (D. Utah Mar. 3, 2006) and *Sample v. Monsanto, Co.*, 218 F.R.D. 644, 650 (E.D. Mo. 2003)). Those cases, however, are easily distinguished from the instant case because they involved industries other than pharmaceuticals, and allegations of antitrust conspiracies far more complicated than the

---

Report–served one business day prior to the filing of Plaintiffs' Reply brief–constitutes an impermissible attempt to "save it for the reply." *Id.* at 3. Plaintiffs respond that Dr. Leitzinger's Expert Report does not constitute previously undisclosed or new arguments or evidence, because the Expert Report "describes the results obtained by implementing analyses based on the exact same sources of classwide evidence of impact and damages and the same methods that Dr. Leitzinger previously identified in his earlier Declaration." Pls.' Opp'n to Defs.' Mot. to Strike at 1.

The Court rejects Defendants' suggestion that the timing of Dr. Leitzinger's Expert Report is in any way suspect, noting that Dr. Leitzinger's Expert Report was submitted pursuant to the operative scheduling Order in this matter. Nevertheless, the Court agrees with Defendant that the level of detail and analysis contained in Dr. Leitzinger's Expert Report goes far beyond that contained in his initial Declaration, and that it would be prejudicial to Defendants for the Court to consider such additional evidence and analysis without allowing Defendants the opportunity to respond. "If the movant raises arguments for the first time in his reply to the non-movant's opposition, the court will either ignore those arguments in resolving the motion or provide the non-movant an opportunity to respond to those arguments by granting leave to file a sur-reply." *Blaloch v. Norton*, --- F. Supp. 2d. ---, Civil Action No. 03-1207, 2007 WL 2774507, *1 n.2 (D.D.C. Sept. 25, 2007) (citing *Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C.Cir.2003); *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C .2001)). Here, the Court shall ignore the analysis and arguments raised in Dr. Leitzinger's Expert Report, and referenced in his Rebuttal Declaration and Plaintiffs' Reply, to the extent that they go beyond the analysis and arguments offered in Dr. Leitzinger's initial Declaration, and shall accordingly grant [111] Defendants' Joint Motion to Strike. Nevertheless, as discussed below, the striking of references to Dr. Leitzinger's Expert Report in his Rebuttal Declaration and Plaintiffs' Reply does not preclude the Court from concluding that Plaintiffs have demonstrated that a common methodology exists for estimating aggregate damages on a class-wide basis.

Agreement alleged herein. *See Medical Waste Services*, 2006 WL at *5-7 (action alleging

conspiracy to allocate customers and geographic territories, monopolize markets, restrain

competition and increase prices of collection, transport and lawful disposal of medical waste

products); *Sample*, 218 F.R.D. at 650-51 (noting the complexity of the market for genetically

modified seeds and the fact that they are not homogenous products). Significantly, a number of

courts have been satisfied that a common methodology for proving class-wide damages exists in

actions alleging delayed or impeded entry of generic pharmaceuticals, notwithstanding

challenges similar to Defendants' arguments in the instant case. *See Cardizem*, 200 F.R.D. at

321-25; *Buspirone*, 210 F.R.D. at 58; *J.D.B.L.*, 225 F.R.D. at 217-19. Here, Dr. Leitzinger's

initial Declaration describes–albeit vaguely–the methodology that he believes would allow him

to estimate aggregate class-wide damages. Significantly, in demonstrating that class certification

is appropriate Plaintiffs are not required to provide a specific damages formula or show that their

method of proving damages is viable. *See Lorazepam*, 202 F.R.D. at 30; *Vitamins*, 209 F.R.D. at

268. Applying the relevant standard used by courts in this jurisdiction and in cases factually

analogous to the instant case, the Court cannot conclude that the methodology proposed by Dr.

Leitzinger in his initial Declaration is "so insubstantial as to amount to no method at all."

*Lorazepam*, 202 F.R.D. at 30 (quoting *Potash*, 159 F.R.D. at 697).

    In addition to challenging the level of specificity of Plaintiffs' proposed damages

methodology, Defendants raise a number of other arguments, some of which the Court has

already considered and rejected above. Specifically, Defendants again assert that a single class-

wide damages formula cannot be developed in this case due to the "vast differences in pricing,

volumes, contracts, [and] other individualized factors." Defs.' Opp'n at 26.[19]  However, "many

courts have held that individual issues with respect to the amount of damages incurred by class

members will not defeat certification where common issues predominate with respect to the

alleged antitrust conspiracy and impact." *Vitamins*, 209 F.R.D. 251 (citing *Playmobil*, 35 F.

Supp. 2d at 246-47; *In re Sumimoto Copper Litig.*, 182 F.R.D. 85, 92 (S.D.N.Y. 1998)); *see also*

*J.D.B.L.,* 225 F.R.D. at 218.  As Plaintiffs correctly argue, the use of an aggregate approach to

measure class-wide damages is appropriate, and has been approved in similar cases.  *See*

*Cardizem*, 200 F.R.D. at 324 ("To the extent individual variations must be accounted for in

Plaintiffs' damage analysis, the historical data of class members' actual prices and penetration

rates, along with standard statistical techniques, can be used to estimate damages."); *NASDAQ*,

169 F.R.D. at 525 ("aggregate judgments have been widely used in antitrust, securities and other

class actions.").  Furthermore, "the precise damages faced by individual plaintiffs can be

determined individually if and when liability has been established." *Buspirone*, 210 F.R.D. at

59.[20]

---

[19] Specifically, Defendants argue that Dr. Leitzinger's proposed methodology is flawed because it assumes facts disproved by the evidence in this case, i.e., that a "source of overcharge" arises from a decrease in the price of (or the offering of discounts on) branded Ovcon 35 upon generic entry and that all class members would purchase generic Ovcon 35 upon entry.  Defs.' Opp'n at 25.  However, as discussed above, Plaintiffs have clarified that their overcharge theory does not depend on a decrease in the price of Ovcon 35 following generic entry, and it appears that all but one putative class member has purchased generic Ovcon 35 following its entry.

[20] Defendants also again raise their argument that individualized defenses preclude the estimation of aggregate damages using common proof.  Specifically, Defendants raise questions regarding the availability of a "pass-on" defense or standing challenge against putative class members that Defendants claim used "cost-plus" contracts, as well as the validity of certain Plaintiffs' assignments of claims by direct purchasing wholesalers.  Defs.' Opp'n at 26-29.  The Court does not address the merits of these alleged defenses herein because even if Defendants are correct as to the availability of such defenses, it does not preclude a finding of predominance.

The Court thus concludes that Plaintiffs have successfully demonstrated that generalized evidence exists, based on which Plaintiffs could prove each element of their antitrust claim on a simultaneous, class-wide basis. Accordingly, the Court finds that the predominance requirement of Rule 23(b)(3) is met.

### 2.    Superiority

Finally, the Court turns to the superiority requirement of Rule 23(b)(3), which is met when a court determines that a class action is superior to other available means of adjudication. Fed. R. Civ. P. 23(b)(3). The superiority requirement ensures that resolution by class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable consequences." *Amchem*, 521 U.S. at 615. In particular, Rule 23(b)(3) instructs that matters pertinent to a finding of superiority include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

Defendants argue that Plaintiffs have not met the superiority requirement, first asserting that the "'most compelling rationale' for class certification–a negative value suit–is completely

---

*See J.D.B.L.*, 225 F.R.D. at 218 (quoting *In re Northwest Airlines Corp.*, 208 F.R.D. 174, 225 (E.D. Mich. 2002) ("It is not necessary, at the class certification stage, for Plaintiffs to show that each and every class member could satisfy an individualized standing inquiry.")); *Cardizem*, 200 F.R.D. at 320-21 ("Even if Plaintiffs could not show injury-in-fact as to a few class members, this would not be fatal).

missing from this case" because the putative class purchased, collectively, millions of dollars of Ovcon 35 Products during the proposed class period and because the putative class members are "highly sophisticated entities with multi-million (if not billion) dollar balance sheets."  Defs.' Opp'n at 29.  However, "the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high." *Amchem*, 521 U.S. at 617; *see also Cardizem*, 200 F.R.D. at 325-26.  Furthermore, it is not clear that individual damages actually "run high" in this case because even Defendants do not suggest that all putative class members are large wholesalers with large claims.

Defendants also speculate that the large, nationwide retailers and wholesalers in the putative class have an interest in individually controlling the prosecution of their claims, suggesting that large retailers might prefer to obtain non-cash settlements as compensation for their claims.  With respect to the Big Three, Defendants' assertion is clearly undercut by the declarations of Messrs. Factor, Jones, and Flinn, discussed above, which indicate that the Big Three wish to participate in the putative class as absentee class members.  *See* Factor Decl. ¶ 6; Jones Decl. ¶ 6; Flinn Decl. ¶ 6.  Moreover, Defendants' speculation is belied by the fact that two groups of direct purchasers–the *Walgreen* and *CVS* plaintiffs–have preemptively opted out of this putative class action by commencing individual actions asserting the very claims asserted herein. Thus, to the extent that any direct purchasers had an interest in individually controlling the prosecution of their claims, they appear to have already asserted that interest.  While Defendants suggest that the *Walgreen* and *CVS* lawsuits are evidence of the inferiority of a class action, the plaintiffs in those cases are not members of the putative class in this action, such that those cases are not "litigation concerning the controversy already commenced by or against members of the

class." Fed. R. Civ. P. 23(b)(3)(B). Furthermore, like Judge Hogan in the *Vitamins* case, "the Court is at a loss to understand how adding additional individual actions, especially in view of a trial on the merits, will promote manageability." 209 F.R.D. at 270.[21]

Finally, Defendants again argue that this putative class action will involve a "multitude of individualized issues surrounding fact of damages (and the extent of damages) among each class member." Defs.' Opp'n at 31-32. The Court has already addressed this argument in multiple guises above, and finds it equally unconvincing in this iteration. "[I]f individual damage questions were a barrier to class certification, there would be little if any place for the class action device in the adjudication of antitrust claims." *NASDAQ*, 169 F.R.D. at 524 (internal quotations and citations omitted). Moreover, in the event that any complications in calculating damages in fact arise, the Court will be better positioned to address them based on the reality of the difficulties, rather than mere speculation that such difficulties may arise. *See Relafen*, 218 F.R.D. at 347; *Cardizem*, 200 F.R.D. at 326 (noting that the court may alter or amend its judgment pursuant to Rule 23(c)(1) or may bifurcate the liability and damages phase of the litigation, as appropriate). In sum, Defendants do not point to any specific manageability problems, and the Court is not aware of any. To the contrary, the Court is persuaded that a class

---

[21] Defendants argue that the third factor cited in Rule 23(b)(3)–"the desirability or undesirability of concentrating the litigation of the claims in the particular forum"–is not significant here because "defendants' potential liability would be enormous and completely out of proportion to any harm suffered by the plaintiffs," due to the treble damages and costs of suit available in antitrust actions. Defs.' Opp'n at 31 (citing *Klay v. Humana, Inc.*, 382 F.3d 1241, 1371 (11th Cir. 2004)). Defendants do not cite case law from this Circuit indicating that such a consideration dramatically cuts against the use of the class action mechanism and, in any event, the Court concludes that concentrating litigation of the putative class members' claims in this Court is desirable in light of the other actions arising out of Defendants' Agreement currently pending before the Court.

action approach in this litigation is superior to any possible alternatives.  The class action

mechanism not only benefits the interest of judicial economy by avoiding a significant number of

individual lawsuits, but also avoids the specter of inconsistent adjudications.  *See Lorazepam*,

202 F.R.D. at 30-31.  This action involves the resolution of numerous complex issues of law and

fact common to all putative class members.  As class certification provides the opportunity for an

efficient resolution of these substantial issues for the entire class in a single forum, *id.* at 31, the

Court concludes that the class action mechanism is a superior litigation approach in this case.

### IV.  CONCLUSION

For the foregoing reasons, the Court shall grant Plaintiffs' Motion for Class Certification

[92] and shall certify the class, pursuant to the modifications proposed by Plaintiffs in their

Reply.  In addition, the Court shall grant Defendants' [111] Motion to Strike the references to

Dr. Leitzinger's Report, shall grant-in-part and deny-in-part Defendants' [116] Motion to Strike

the declarations of Messrs. Factor, Jones, and Flinn, and shall deny Defendants' Motion to Strike

the Non-Class Plaintiffs' Memorandum.


Date:   October 22, 2007


                                           _____/s/_____
                                           COLLEEN KOLLAR-KOTELLY
                                           United States District Judge