## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEIJER, INC., *et al.*, | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civ. Action No. 1:05-CV-02195-CKK |
| | ) |
| WARNER CHILCOTT HOLDINGS | ) |
| COMPANY III, LTD., *et al.*, | ) |
| Defendants. | ) |
| | ) |
| WALGREEN CO., *et al.*, | ) |
| Plaintiffs, | ) Civ. Action No. 1:06-CV-00494-CKK |
| | ) |
| v. | ) Judge Colleen Kollar-Kotelly |
| | ) |
| WARNER CHILCOTT HOLDINGS | ) **FILED UNDER SEAL PURSUANT** |
| COMPANY III, LTD., *et al.*, | ) **TO PROTECTIVE ORDER DATED** |
| | ) **APRIL 4, 2006** |
| Defendants. | ) |

[caption continued on following page]

## BARR PHARMACEUTICALS, INC.'S MOTION FOR
## AND MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT ON
## STATE AND DIRECT PURCHASER PLAINTIFFS' FEDERAL ANTITRUST CLAIMS

CVS PHARMACY, INC., *et al.*,                                  )
                                                              )
                    Plaintiffs,                               )
                                                              )        Civ. Action No. 1:06-CV-00795-CKK
          v.                                                  )
                                                              )
WARNER CHILCOTT HOLDINGS                                       )
COMPANY III, LTD., *et al.*,                                   )
                                                              )
                    Defendants.                               )
                                                              )

STATE OF COLORADO, *et al.*,                                   )
                                                              )
                    Plaintiffs,                               )
                                                              )        Civ. Action No. 1:05-CV-02182-CKK
          v.                                                  )
                                                              )
WARNER CHILCOTT HOLDINGS                                       )
COMPANY III, LTD., *et al.*,                                   )
                                                              )
                    Defendants.                               )
                                                              )

Dated: November 14, 2007

Karen N. Walker (D.C. Bar # 412137)
Mark L. Kovner (D.C. Bar # 430431)
Patrick M. Bryan (D.C. Bar # 490177)
Eunnice H. Eun (D.C. Bar # 500203)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, DC 20005
Tel.  (202) 879-5000
Fax  (202) 879-5200

***Counsel for Barr Pharmaceuticals, Inc.***

## Table of Contents

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................6

    A.   THE LICENSE AND SUPPLY AGREEMENT BETWEEN WARNER CHILCOTT AND BARR. ...............................................6

    B.   BARR'S SUBMISSION OF THE AGREEMENT TO THE FTC FOR ADVANCE APPROVAL. ....................................................8

    C.   REASONABLY INTERCHANGEABLE NATURE OF ORAL CONTRACEPTIVES. ...........................................................10

    D.   COMPETITION WITHIN THE ORAL CONTRACEPTIVE MARKET. .........................................................................12

    E.   THE FTC'S RENEWED INVESTIGATION AND PLAINTIFFS' COMPLAINTS. ..........................................................14

    F.   BUT-FOR WORLD DECREASE IN OVCON 35 OUTPUT AND DISCOUNTING. .........................................................15

    G.   INCREASED OUTPUT AND DISCOUNTING WERE PRESERVED BY THE AGREEMENTS. .................................17

ARGUMENT ..................................................................................................19

    I.   DEFENDANTS' AGREEMENT CANNOT BE FOUND UNLAWFUL *PER SE* BECAUSE IT MUST BE ANALYZED UNDER THE RULE OF REASON. .........................................................................20

        A.   BARR'S CONDUCT CANNOT BE FOUND *PER SE* UNLAWFUL BECAUSE THE *PER SE* APPROACH IS LIMITED TO CERTAIN NARROW FORMS OF CONCLUSIVELY ANTI-COMPETITIVE CONDUCT, NOT PRESENT HERE. ..........................................................21

        B.   DEFENDANTS' LICENSE AND SUPPLY AGREEMENT WAS NOT "MANIFESTLY ANTI-COMPETITIVE" OR LACKING ANY REDEEMING VIRTUE. ..............................................23

        C.   BARR HAS OFFERED PLAUSIBLE EVIDENCE OF THE PRO-COMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT. ...............27

        D.   MIXED VERTICAL AND HORIZONTAL COMMERCIAL ARRANGEMENTS ARE ILL-SUITED FOR *PER SE* TREATMENT. ..........................................................28

    II.   UNDER THE RULE OF REASON, PLAINTIFFS' CLAIMS FAIL AS A MATTER OF LAW BECAUSE PLAINTIFFS CANNOT SHOW ANY ACTUAL ADVERSE EFFECT ON COMPETITION IN THE RELEVANT MARKET. ...............................................29

A.   PLAINTIFFS CANNOT SHOW AN ACTUAL ADVERSE
     IMPACT ON COMPETITION IN A PROPERLY DEFINED
     ANTITRUST PRODUCT MARKET..........................................30

     1.   State Plaintiffs' Claims Must Be Dismissed For Failure To
          Offer Any Evidence Of The Relevant Antitrust Product
          Market. ...........................................................30

     2.   Direct Purchaser Plaintiffs' Market Definition Is
          Inconsistent With "The Realities Of Competition" And
          Their Own Admissions. ..............................................31

B.   DEFENDANTS' LICENSE AND SUPPLY AGREEMENT
     INCREASED OUTPUT OF OVCON 35 PRODUCTS AND
     PRESERVED SUBSTANTIAL DISCOUNTING. ..................................35

C.   DEFENDANTS' LICENSE AND SUPPLY AGREEMENT DID
     NOT PRECLUDE ANY COMPETITOR FROM ENTERING
     THE MARKETPLACE. ...........................................................37

III.  THE PRO-COMPETITIVE BENEFITS OF THE SUPPLY
      AGREEMENT OUTWEIGH ANY POTENTIAL ANTI-COMPETITIVE
      EFFECTS. ..............................................................38

      A.   THE AGREEMENT RESULTED IN INCREASED OUTPUT OF
           OVCON 35 PRODUCTS AND PROMOTED INTER-BRAND
           COMPETITION. .......................................................38

      B.   THE AGREEMENT, BY PRESERVING FREE SAMPLING,
           LOWERED PRICES FOR CONSUMERS. .....................................40

IV.   DIRECT PURCHASER PLAINTIFFS LACK STANDING TO PURSUE
      THEIR CLAIMS. ..........................................................40

      A.   DIRECT PURCHASER PLAINTIFFS LACK EFFECTIVE
           ASSIGNMENTS OF CLAIMS BECAUSE THEIR PURPORTED
           ASSIGNORS WERE CONTRACTUALLY PRECLUDED FROM
           ASSIGNING THE CLAIMS AT ISSUE. ....................................41

      B.   THE MEIJER PLAINTIFFS DO NOT HAVE STANDING. ......................42

      C.   SEVERAL DIRECT PURCHASER PLAINTIFFS DO NOT
           HAVE STANDING BECAUSE THEIR PURPORTED
           ASSIGNORS RESOLD OVCON PURSUANT TO
           PREEXISTING "COST PLUS" CONTRACTS. ...............................43

CONCLUSION......................................................................44

## Table of Authorities

**Cases**

*Anesthesia Advantage, Inc. v. Metz Group,*
    759 F. Supp. 638 (D. Colo. 1991)..................................................................... 25

*ARCO v. USA Petroleum Co.,*
    495 U.S. 328 (1990)............................................................................... 29, 39

*Board of Trade of City of Chicago v. United States,*
    246 U.S. 231 (1918)................................................................................... 20

*\*Broadcast Music, Inc. v. CBS, Inc.,*
    441 U.S. 1 (1979)................................................................................ passim

*\*Business Elecs. Corp. v. Sharp Elecs. Corp.,*
    485 U.S. 717 (1988)......................................................................... 1, 2, 21, 22

*\*California Dental Ass'n v. FTC,*
    526 U.S. 756 (1999)..................................................................... 4, 23, 27, 28

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.,*
    996 F.2d 537 (2d Cir. 1993).......................................................................... 29

*CDC Techs., Inc. v. IDEXX Labs., Inc.,*
    186 F.3d 74 (2d Cir. 1999)........................................................................ 19, 38

*Chicago Prof'l Sports Ltd. P'ship v. NBA,*
    95 F.3d 593 (7th Cir. 1996) .................................................................... 35, 36, 37

*Continental T.V., Inc. v. GTE Sylvania Inc.,*
    433 U.S. 36 (1977)......................................................................... 20, 22, 29

*Craftsmen Limousine, Inc. v. Ford Motor Co.,*
    491 F.3d 380 (8th Cir. 2007) ......................................................................... 30

*Delacroix v. Lublin Graphics, Inc.,*
    993 F. Supp. 74 (D. Conn. 1997)...................................................................... 43

*Electronics Commc's Corp. v. Toshiba Am. Consumer Prods., Inc.,*
    129 F.3d 240 (2d Cir. 1997)........................................................................... 24

*Fox-Greenwald Sheet Metal Co. v. Markowitz Bros., Inc.,*
    452 F.2d 1346 (D.C. Cir. 1970)....................................................................... 43

*FTC v. Indiana Fed'n of Dentists,*
    476 U.S. 447 (1986)....................................................................... 22, 30, 35

*Generac Corp. v. Caterpillar Inc.*,
172 F.3d 971 (7th Cir. 1999) ................................................................................ 24, 28

*Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*,
201 F. Supp. 2d 236 (S.D.N.Y. 2002) ....................................................................... 2, 24

*GTE New Media Servs., Inc. v. Ameritech Corp.*,
21 F. Supp. 2d 27 (D.D.C. 1998) ................................................................................. 22

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
392 U.S. 481 (1968) .................................................................................................... 44

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) .................................................................................................... 44

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
363 F. Supp. 2d 514 (E.D.N.Y. 2005) ..................................................................... 25, 38

*\*In re Ditropan XL Antitrust Litigation*,
No. M:06-CV-01761-JSW, 2007 WL 2978329 (N.D. Cal. Oct. 11, 2007) ............... 41, 43

*In the Matter of Glaxo Wellcome, et al.*,
FTC Docket No. C-3990 ............................................................................................. 32

*In the Matter of Pfizer Inc. and Pharmacia Corp.*,
FTC Docket No. C-3957 ............................................................................................. 32

*Kansas v. UtiliCorp United, Inc.*,
497 U.S. 199 (1990) .................................................................................................... 44

*\*Leegin Creative Leather Prods. v. PSKS, Inc.*,
127 S. Ct. 2705 (2007) ......................................................................................... passim

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .................................................................................................... 43

*Microbix Biosystems, Inc. v. Biowhittaker, Inc.*,
172 F. Supp. 2d 680 (D. Md. 2000) ........................................................................... 28

*Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.*,
208 F.3d 655 (8th Cir. 2000) ..................................................................................... 24

*N. Pac. Ry. v. United States*,
356 U.S. 1 (1958) ........................................................................................................ 20

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
435 U.S. 679 (1978) .................................................................................................... 22

*Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.,*
   472 U.S. 284 (1985) ................................................................................ 2

*NYNEX Corp. v. Discon, Inc.,*
   525 U.S. 128 (1998) ......................................................................... 20, 29

*Oetiker v. Jurid Werke,*
   556 F.2d 1 (D.C. Cir. 1977) .................................................................. 23

*Oksanen v. Page Mem'l Hosp.,*
   945 F.2d 696 (4th Cir. 1991) ..................................................... 19, 30, 34, 35

*Paladin Assocs., Inc. v. Montana Power Co.,*
   328 F.3d 1145 (9th Cir. 2003) .............................................................. 40

*PepsiCo, Inc. v. Coca-Cola Co.,*
   315 F.3d 101 (2d Cir. 2002) ................................................................. 19

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
   124 F.3d 430 (3d Cir. 1997) ................................................................. 31

*Roland Mach. Co. v. Dresser Indus., Inc.,*
   749 F.2d 380 (7th Cir. 1984) ........................................................... 24, 38

*SCFC ILC, Inc. v. Visa USA, Inc.,*
   36 F.3d 958 (10th Cir.1994) ................................................................. 36

*Stamatakis Indus., Inc. v. King,*
   965 F.2d 469 (7th Cir. 1992) ................................................................ 35

*Standard Oil Co. of Calif. v. United States,*
   337 U.S. 293 (1949) ........................................................................ 3, 24

*Standard Oil Co. of N.J. v. United States,*
   221 U.S. 1 (1911) ............................................................................. 21

*State of New York v. Anheuser-Busch, Inc.,*
   811 F. Supp. 848 (E.D.N.Y. 1993) ...................................................... 36, 39

*SunCom Mobile & Data, Inc. v. FCC,*
   87 F.3d 1386 (D.C. Cir. 1996) .............................................................. 43

*Texaco Inc. v. Dagher,*
   547 U.S. 1 (2006) ..................................................................... 21, 23, 24

*Tops Mkts., Inc. v. Quality Mkts., Inc.,*
   142 F.3d 90 (2d Cir. 1998) .................................................................. 19

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)..................................................................................................... 31

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)..................................................................................................... 34

*Williamson v. Sacred Heart Hosp.*,
    No. 89-30084-RV, 1993 WL 543002 (N.D. Fla. 1993).................................................... 24

**Other Authorities**

Food and Drug Administration, 62 Fed. Reg. 8610
    (Dep't of Health & Human Servs., Feb. 25, 1997)..................................................... 10, 33

Hatcher, Robert A., *et al.*, *Contraceptive Technology* 423 (18th ed. 2007)........................... 10, 33

Pindyck, Roberts S. and Rubinfeld, Daniel L., Microeconomics (6th ed. 2005) ........................ 31

Sept. 11, 2003 Barr Press Release,
    *Galen to Receive Option to License Generic Ovcon (R) Oral Contraceptive* ............... 8, 9

Defendant Barr Pharmaceuticals, Inc. ("Barr") moves for summary judgment on the federal antitrust claims of the remaining plaintiffs in these actions — State and Direct Purchaser Plaintiffs (collectively, "Plaintiffs"). These Plaintiffs cannot establish as a matter of law that the exclusive Ovcon 35 supply agreement between Barr and Warner Chilcott was a naked restraint of trade subject to the *per se* rule under the antitrust laws, as they assert. Because the evidence fails to establish any *per se* restraint, and because plaintiffs have failed to prove (or even adequately plead) any illegal conduct under the Rule of Reason — the presumptive standard under which the Court must analyze any alleged anti-competitive behavior — Barr is entitled to summary judgment on Plaintiffs' federal antitrust claims.

## **INTRODUCTION**

Plaintiffs assert that the exclusive supply agreement between Barr and Warner Chilcott — a transaction submitted to the federal government for antitrust review *before* its execution — was *per se* illegal. But neither the law, nor the undisputed facts, support Plaintiffs' view. Barr is entitled to summary judgment because it is clear that the exclusive supply arrangement between Barr and Warner Chilcott regarding Ovcon 35 cannot, as a matter of law, be found to be a *per se* illegal restraint as Plaintiffs allege. Only "naked restraints of trade," such as price-fixing agreements, may be condemned as illegal under the *per se* rule. Likewise, Barr is entitled to summary judgment under the Rule of Reason because Plaintiffs have failed to meet their burden under a full Rule of Reason analysis.

***Under the per se rule***, Barr is entitled to summary judgment because the supply agreement here is not the type of agreement that has been deemed appropriate for *per se* treatment under the antitrust laws. ***First***, *per se* rules only apply to specific, narrow forms of conduct not present here. *See infra* I.A. The Supreme Court has repeatedly held that, "*per se* rules are appropriate only for conduct that is manifestly anticompetitive." *Business Elecs. Corp.*

*v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988).  Thus, departing from a full competitive evaluation under the — presumptive — Rule of Reason analysis is only appropriate once experience with a particular kind of restraint shows that such agreements "always or almost always" restrict competition.  *Id.* at 723 (citing *Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 289-90 (1985)).

      **Second**, the undisputed facts here, however, as well as the sworn testimony of Plaintiffs' **own experts**, all — overwhelmingly — confirm that the license and supply agreement at issue are not "manifestly anti-competitive." *See infra* I.B.  As an initial matter, any contention that defendants' supply agreement is facially anti-competitive or lacking any "redeeming virtue" and thus subject to *per se* treatment is belied by the undisputed fact that the FTC — the agency charged with enforcing the antitrust laws — had notice of the conduct at issue nearly **two years before filing suit**.  (*See* FTC Compl. ¶ 45.)  In fact,

**REDACTED**

      Had the FTC believed defendants' supply arrangement was a "naked restraint" or "facially" anti-competitive, surely the FTC would not have sat idle for nearly two years before taking any action.

      In any event, such supply agreements are not facially anti-competitive.  Rather, courts routinely recognize that there are pro-competitive aspects of exclusive supply agreements.  *See, e.g., Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, 201 F. Supp. 2d 236, 274 (S.D.N.Y. 2002) ("Exclusive supply contracts have been recognized as having procompetitive benefits and thereby serving legitimate business objectives.")  And, notably, Plaintiffs' own expert agrees that exclusive supply agreements, such as the one at issue here,

**REDACTED**

2

Plaintiffs in these actions complain that, by entering into the exclusive supply agreement with Warner Chilcott, Barr violated the antitrust laws because it thereby agreed not to market a competing generic Ovcon product.[1]  As with *any* such agreement, however, it goes without saying that a party who agrees to exclusively supply another will, in turn, not be marketing a competing product.  Thus, if Plaintiffs' theory were correct, then *every* exclusive supply contract would automatically be a *per se* violation of the antitrust laws.  This has never been the law. Indeed, the Supreme Court has long recognized that exclusive supply contracts can assure supply, enable long-term planning on the basis of known costs, and have pro-competitive benefits.  *See, e.g., Standard Oil Co. of Calif. v. United States*, 337 U.S. 293, 306-07 (1949). Here, the record shows that the Ovcon 35 supply agreement expanded output and preserved sampling (*i.e.*, lowered costs to consumers).[2]  Because the supply agreement here is not "manifestly anti-competitive," the *per se* rule simply has no application.

*Third*, it is clear that Barr has offered plausible pro-competitive benefits which defeat *per se* treatment.  *See infra* I.C.  For example:

- the agreement ensured a safe, stable, and reliable supply of Ovcon 35 for consumers;

- the agreement ensured continued, substantial sampling of Ovcon 35 by Warner Chilcott, resulting in low net prices to consumers;

- the agreement enabled Ovcon 35 to aggressively compete against the numerous other hormonal contraceptives in the marketplace;

---

[1]  It is important to note that any such complaint is now moot — once Warner Chilcott no longer needed to secure Barr as an exclusive source, it waived the exclusivity provision and Barr launched a competing generic product in October 2006.  Accordingly, any demands for injunctive relief by Plaintiffs are moot.  Barr launched its generic Ovcon product in October 2006 and has been marketing the product continuously ever since.

[2]  **REDACTED**

3

- the agreement enabled Barr to produce Ovcon 35 in the face of a possible line extension contemplated by Warner Chilcott that would have moved patients away from the Ovcon tablet Barr was able to produce;

- the agreement removed the potential that Ovcon 35 would exit from the market altogether; and,

- the agreement resulted in an overall increase in market share for Ovcon, *i.e.*, output, for Ovcon 35 products.

Regardless of whether there is any dispute regarding the pro-competitive benefits, where, as here, defendants have presented evidence of "plausible" pro-competitive benefits, a Rule of Reason analysis is required as a matter of law. *See California Dental Ass'n v. FTC*, 526 U.S. 756, 775 (1999).

*Finally*, agreements that have horizontal *and* vertical attributes have never been viewed as proper for *per se* treatment. *See infra* I.D. In short, Plaintiffs' *per se* (or alternative "quick look") allegations and evidence are simply insufficient to establish the unlawfulness of the Ovcon exclusive supply agreement. Because Plaintiffs have not properly pled or proven a *per se* violation of the antitrust laws, Barr is entitled to summary judgment.

**Under the Rule of Reason**, Barr is similarly entitled to summary judgment. Even if Plaintiffs had adequately pled or proven a Rule of Reason case here — which they have not — the undisputed evidence is sufficient to grant summary judgment to Barr under the Rule of Reason.

*First*, in order to prove that an agreement is unlawful under the Rule of Reason, Plaintiffs must allege and prove an injury to competition as a whole in the relevant market. *See infra* II.A. The State Plaintiffs have made no attempt whatsoever to plead and prove a relevant market (instead placing all their eggs in the *per se* basket). The Direct Purchaser Plaintiffs have likewise relied primarily on a *per se* theory, and, to the extent that they have tried to assert a "relevant

market" consisting *only* of Ovcon 35, their relevant market analysis is so clearly flawed and overly narrow that it must be rejected as a matter of law.

*Second*, it is clear that Plaintiffs have not met their burden of showing that the agreement at issue had an actual adverse effect on competition as a whole in the relevant market. *See infra* II.B.-II.C. The undisputed facts demonstrate that defendants' agreement preserved and expanded output and promoted inter-brand competition in a fiercely competitive marketplace — the antithesis of anti-competitive harm. Furthermore, it is undisputed that defendants' license and supply agreement preserved substantial discounting (*i.e.*, lowering of prices) of Ovcon 35. Nor did it block other competitors. As the Supreme Court has long held, conduct which (as here) benefits consumers and expands output is pro-competitive and precisely the type of conduct the antitrust laws are designed to promote. *See, e.g., Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 19-20 (1979) ("*BMI*"). Therefore, failing the threshold requirement of demonstrating an actual adverse impact on competition, Plaintiffs' claims must fail.

*Third*, even if Plaintiffs could proffer some evidence of actual adverse effect on competition (which they cannot), Plaintiffs' claims must still fail because the pro-competitive benefits of the license and supply agreement outweigh any potential anti-competitive effects. *See infra* III.A.-III.B. Specifically, the undisputed facts show that the agreement at issue had the obvious pro-competitive benefits of preserving promotion and free sampling (or discounting) of Ovcon 35. This, in turn, resulted in increased output of Ovcon 35 products, which alone is sufficient to find that the agreement were not anti-competitive, but pro-competitive; indeed,

**REDACTED**

[3]

Finally, even if Plaintiffs could demonstrate some adverse impact on competition as a consequence of defendants' supply relationship, let alone a lack of pro-competitive benefits justifying that relationship, many of the Direct Purchaser Plaintiffs' claims fail for a more basic reason: many lack standing to pursue their claims. *See infra* IV. Lacking standing, the Direct Purchaser Plaintiffs' claims must be dismissed.

In short, Plaintiffs cannot, as a matter of law, sustain their claims under either the *per se* rule or the Rule of Reason.[4] Accordingly, Barr is entitled to summary judgment on State Plaintiffs' and Direct Purchaser Plaintiffs' federal claims.[5]

## BACKGROUND

### A.      The License And Supply Agreement Between Warner Chilcott And Barr.

Warner Chilcott is a specialty pharmaceutical company that markets and sells women's health and dermatology products, including Ovcon 35, a combined hormonal contraceptive. Until recently, Warner Chilcott did not manufacture, or have the ability to manufacture, any of the products it sold. For that reason, it was wholly reliant on third parties for supply.

---

[3]   Unless otherwise noted, all *emphasis* herein has been added and all internal quotations and citations omitted.

[4]   Pursuant to this Court's October 1, 2007 Order that all motions for summary judgment in *State of Colorado, et al. v. Barr Pharmaceuticals, Inc.*, Civil Action No.1:05-CV-02182-CKK, be "limited to the federal law claims," Barr moves herein for summary judgment on State Plaintiffs' Sherman Act Section 1 claim only. However, Barr intends to move for summary judgment on all state law claims at a time to be determined by the Court.

[5]   In accord with Local Rules 7(h) and 56.1, Barr has separately filed herewith a Statement of Material Facts As To Which There Is No Genuine Issue ("Barr 7(h) Stmnt."). In order to facilitate this Court's review of Barr's summary judgment motion, Barr is also submitting an Appendix of the deposition testimony, expert reports, affidavits, and other non-docketed documents cited herein.

In February 2000, Warner Chilcott purchased Ovcon 35 from Bristol-Myers Squibb ("BMS"). **REDACTED** At the time of purchase, Ovcon had been off-patent and (*Id.*) Because Warner Chilcott lacked manufacturing capabilities of its own, it simultaneously entered into a supply agreement with BMS to manufacture Ovcon.

From the outset, BMS was unable to adequately supply Warner Chilcott with Ovcon. For example, as Plaintiffs' own expert concedes,

**REDACTED**

Furthermore, BMS's manufacturing problems resulted in severe shortages of Ovcon inventory.

**REDACTED**

Unable to obtain reliable supply from BMS (and, at the time, unable to manufacture Ovcon 35 on its own) Warner Chilcott sought an alternative source of supply. That source was Barr. Barr was an obvious choice because, as Plaintiffs' expert acknowledges,

**REDACTED** and was an accomplished manufacturer. Further, Barr had previously filed an Abbreviated New Drug Application ("ANDA") with the Food and Drug Administration seeking

7

approval to produce a generic version of Ovcon 35. Therefore, Barr had already demonstrated that it had the manufacturing capability to produce Ovcon 35.[6]

In the summer of 2003, seeking to alleviate the significant and continuous supply problems Warner Chilcott had been experiencing with BMS, Warner Chilcott approached Barr regarding manufacturing Ovcon 35. In September 2003, Warner Chilcott and Barr negotiated a letter of intent which outlined an agreement under which Barr would manufacture and supply Ovcon 35. Specifically, the letter of intent contemplated that Barr would grant Warner Chilcott an option to acquire a five-year exclusive license to its Ovcon 35 ANDA as well as a supply of that product. This letter of intent was publicized in a press release. (*See* Sept. 11, 2003 Barr Press Release, *Galen to Receive Option to License Generic Ovcon® Oral Contraceptive*, WC00109052 - WC00109054.)

### B.    Barr's Submission Of The Agreement To The FTC For Advance Approval.

Before Barr and Warner Chilcott entered into a definitive supply agreement,

**REDACTED**

In addition,

**REDACTED**

---

[6]    Drug manufacturers must file a New Drug Application ("NDA") with the FDA for approval to introduce a new drug in the United States. (State Pls.' Am. Compl. ¶¶ 22-23.) However, generic manufacturers like Barr may file an ANDA to obtain approval to market generic versions of "Reference Listed Drugs," that is, drugs for which an NDA has been approved. (*Id.* ¶ 26.) Through this ANDA process, a generic manufacturer must demonstrate that its generic drug is bioequivalent to the Reference Listed Drug. (*Id.* ¶ 27.)

**REDACTED**

In short, before executing the exclusive license and supply agreement, Barr

and Warner Chilcott            **REDACTED**

In addition to                                              Barr issued a public news

release which explained in detail the terms of the contemplated agreement:

> Under the terms of the exclusive option agreement, Barr would grant Galen
> [the predecessor company of Warner Chilcott] an option to acquire an
> exclusive license under Barr's ANDA for Ovcon® 35, which is currently
> pending at the U.S. Food & Drug Administration (FDA). Within 30 days of
> FDA approval of Barr's ANDA for Ovcon®, Galen would have the right to
> exercise its option. If Galen chooses to exercise the option, it would be
> granted a five-year exclusive license under Barr's ANDA to sell the product.
> At the end of the five-year term, Barr would grant Galen a non-exclusive
> license to continue selling the product. In consideration of this transaction,
> Galen would make a $1 million payment to Barr at the time of the grant of the
> option and a $19 million payment to Barr at the time the exclusive license
> agreement is signed.

(*See* Sept. 11, 2003 Barr Press Release, *Galen to Receive Option to License Generic Ovcon®*

*Oral Contraceptive*, WC00109052 - WC00109054.)

Defendants' letter of intent

**REDACTED**

In other words,

The        **REDACTED**          was not surprising: Ovcon 35 is one of over *80* oral

contraceptive products available on the market today.

**REDACTED**

9

Moreover, as discussed below, Ovcon 35 is readily interchangeable with virtually any other oral contraceptive on the market. Therefore, **REDACTED** their exclusive license and supply agreement was not likely to have any impact on competition, and **REDACTED** Certainly there was no indication that the agreement was an obvious or "naked restraint of trade" such that **REDACTED**

### C.    Reasonably Interchangeable Nature Of Oral Contraceptives.

According to the Food and Drug Administration as well as Plaintiffs' own experts, all oral contraceptives are equally effective.

*; see also*

**REDACTED**

Furthermore, oral contraceptives are equally safe when used properly. **REDACTED**

Because virtually all oral contraceptives are equally safe and effective, oral contraceptives are — as Plaintiffs' own experts concede —

**REDACTED**

---

[7]    *See also* Robert A. Hatcher, *et al., Contraceptive Technology* 423 (18th ed. 2007) ("All combined [oral contraceptive] pills with less than 50 mg of estrogen are effective and safe."); Food and Drug Administration, 62 Fed. Reg. 8610 (Dep't of Health & Human Servs., Feb. 25, 1997).

**REDACTED**

8

Ovcon 35, moreover, is not unique.  Several other branded and generic oral contraceptive products (including Aranelle, Leena, Modicon, Brevicon, Necon .5/35, Necon 1/35, Necon 10/11, Necon 7/7/7, Norinyl 1/35, Nortrel 0.5/35, Nortrel 1/35, Nortrel 7/7/7, Ortho Novum 1/35, Ortho Novum 7/7/7, and Tri-Norinyl) contain *identical* active ingredients as Ovcon 35.

**REDACTED**

Therefore, Ovcon 35 is, "relatively interchangeable" with a variety of other oral contraceptive products.

**REDACTED**

---

8

**REDACTED**

**D.     Competition Within The Oral Contraceptive Market.**

Because oral contraceptives, including Ovcon 35, are reasonably interchangeable for the same purpose (*i.e.*, to prevent pregnancy), manufacturers must look for ways to stand out within the crowed market and encourage physicians to choose their products over those of their competitors. This competition takes two forms: price and promotion.

Indeed, as Plaintiffs' own experts concede, the overwhelming evidence demonstrates that

**REDACTED**

This competition constrains the price of Ovcon 35 and other brand name oral contraceptives.

**REDACTED**

Thus, Warner Chilcott (like other oral contraceptive manufacturers) looks to the prices of oral contraceptive products of its competitors to determine the price at which it sells its oral contraceptive products, including Ovcon 35.

**REDACTED**

---
9

**REDACTED**

12

Brand name oral contraceptives marketers, like Warner Chilcott, moreover, compete through promotional efforts that attempt to

as well as create product awareness.

**REDACTED**                                          Oral contraceptive products are

that is, sales or output are driven primarily by these promotional efforts of the manufacturer.

**REDACTED**                    If promotion is curtailed, sales fall, and often dramatically.

This is especially true for Ovcon 35, a product with no patent protection.

For this reason, Warner Chilcott invested heavily in promotional efforts to compete with the numerous other brand name oral contraceptives available on the market. It did so primarily by distributing free samples of Ovcon 35 to physicians, who, in turn, distributed the free products to consumers. Indeed, as Plaintiffs' own experts acknowledge, Warner Chilcott engaged in

**REDACTED**

In fact, Warner Chilcott distributed one to two free packs of Ovcon 35 as samples for every pack it sold.    **REDACTED**

The reason for Warner Chilcott's "extreme" sampling is clear:    **REDACTED**

**REDACTED**            or the primary means of inter-brand competition.

In other words, sampling is the means by which Warner Chilcott competes with other brand

name oral contraceptive manufacturers to encourage physicians to write prescriptions for Ovcon 35 instead of its competitors' products.

Given the (undisputed) market realities described above, and given the

**REDACTED**                          , Barr and Warner Chilcott entered into a definitive license and supply agreement in March 2004.  Barr announced that it had reached a final license and supply agreement relating to Ovcon 35 with Warner Chilcott in a corresponding press release.  In April 2004, Barr announced that it had received FDA approval for its Ovcon ANDA. As Warner Chilcott's supply problems with BMS had not ceased, Warner Chilcott exercised the option to acquire the exclusive rights to Barr's Ovcon ANDA in May 2004.[10]

## E.    The FTC's Renewed Investigation And Plaintiffs' Complaints.

Shortly before Barr and Warner Chilcott finalized their license and supply agreement in February 2004, another office of the FTC informed Warner Chilcott and Barr that it intended not to condemn, but merely to re-review and re-investigate, the parties' license and supply agreement.  (*See* FTC First Am. Compl. ¶ 45.)  The FTC's investigation consisted of at least seven depositions (all of which have been re-taken in this litigation), numerous witness interviews, and the consideration of expert evidence.  In November 2005, after conducting an extensive factual investigation (spanning nearly two years), the FTC determined that it would file suit to enjoin the exclusivity provision of Barr's ANDA license to Warner Chilcott.[11]

---

[10]                    **REDACTED**

[11]  Warner Chilcott and Barr have both since settled with the FTC.  In connection with Warner Chilcott's settlement with the FTC, Warner Chilcott waived the exclusivity provision of its license agreement with Barr. As a result, in October 2006, Barr launched a generic version of Ovcon 35, Balziva®.

Shortly thereafter, thirty-four State Attorneys General, various drug wholesalers, and retailers filed separate suits alleging violations of Sherman Act Section 1. These Plaintiffs allege that but for defendants' exclusive license agreement, Barr would have launched a generic version of Ovcon 35 in 2004, and, as a result, Plaintiffs (and consumers) would have been able to purchase a lower-priced oral contraceptive product. In short, Plaintiffs allege that they and consumers were "overcharged" for Ovcon 35 products as a result of defendants' agreement, and contend that the agreement constitutes a "naked restraint of trade" that is a "*per se* violation" of the Sherman Act. (*See, e.g.,* States' 2d Am. Compl. ¶ 63; *Walgreen* Compl. ¶ 51.)

However, as discussed above, because Ovcon 35 is one of over 80 oral contraceptives on the market (products that are reasonably interchangeable with Ovcon 35), defendants' agreement could have no anti-competitive impact on a properly defined antitrust market. But more directly, the undisputed evidence shows that the agreement had, in fact, no "adverse effect on competition" — a prerequisite to any finding that the agreement was unlawful — because defendants' license and supply agreement actually increased output of Ovcon 35 products and preserved substantial discounting. In addition, once Warner Chilcott waived the exclusivity provision of its license and supply agreement with Barr, within weeks, Barr launched a competing generic version of Ovcon 35 with the trade name Balziva®. Consequently, Barr captured more of the market than would have existed absent the intervening exclusive supply arrangement, which permitted Warner Chilcott to "grow" the market.

## F.    But-For World Decrease In Ovcon 35 Output And Discounting.

Plaintiffs allege that defendants' license and supply agreement harmed competition because, absent the agreement, Barr would have launched a generic version of Ovcon 35 in 2004. Put differently, Plaintiffs contend that competition would be better off absent defendants' agreement. The facts, however, do not support Plaintiffs' view.

15

As Plaintiffs concede, had Barr launched a generic version of Ovcon 35 in 2004 — the "but for world" Plaintiffs posit — Warner Chilcott would immediately stop distributing free samples. (*See* CVS Pls.' RFA Resp. ¶ 106; Meijer Pls.' RFA Resp. ¶ 123; Walgreen Pls.' RFA Resp. ¶ 68;

**REDACTED**

[12] Thus, had Barr launched a generic version of Ovcon 35 in 2004, as Plaintiffs theorize in their complaints, consumers would no longer receive the benefits of free samples of Ovcon 35.

As a result, and as Plaintiffs' own experts concede, many consumers would

**REDACTED**

---

[12] Notably, generic oral contraceptive manufacturers, including Barr, do not distribute free samples of their generic oral contraceptive products. *see also* CVS Pls.' RFA Resp. ¶¶ 107-08; Meijer Pls.' RFA Resp. ¶¶ 124-25; Walgreen Pls.' RFA Resp. ¶ 70.)

**REDACTED**

,[13]

Plaintiffs' "but for" world has come to bear.  That is, shortly after Warner Chilcott waived the exclusivity provision of its license to Barr's ANDA, Barr introduced a generic version of Ovcon 35, Balziva®, in October 2006.  As a result, Warner Chilcott immediately stopped distributing free samples, ending a form of substantial discounting.  (*See* CVS Pls.' RFA Resp. ¶ 106;                                                          This, in turn, resulted in a rapid (and undisputed) decline in combined output of Ovcon 35 products.

**REDACTED**

**G.    Increased Output And Discounting Preserved By The Agreement.**

As Plaintiffs acknowledge, conduct is

**REDACTED**

Here, it is undisputed that absent defendants' allegedly unlawful agreement, output of Ovcon 35 products (brand plus its generics) would have declined.

**REDACTED**

)    In other words,

---

[13]    *See also*

**REDACTED**

; indeed,

Plaintiffs' experts concede this fact.

defendants' conduct — conduct that Plaintiffs wish to condemn as *per se* unlawful — did not

reduce output, but actually preserved and expanded it.

Moreover, it is undisputed that defendants' license and supply agreement preserved

Warner Chilcott's substantial free sampling of Ovcon 35. (*See* CVS Pls.' RFA Resp. ¶ 106;

Meijer Pls.' RFA Resp. ¶ 123; Walgreen Pls.' RFA Resp. ¶ 68;                              As

Plaintiffs' own experts acknowledge, Warner Chilcott's

**REDACTED**

In

fact, as Plaintiffs' experts concede, because Warner Chilcott

**REDACTED**

(*See also*

**REDACTED**

18

These undisputed facts demonstrate that defendants' license and supply agreement was not a naked restraint, and did not have an actual adverse effect on the relevant market, but in fact had significant pro-competitive benefits. Simply put, the exclusive supply agreement was not an unreasonable restraint of trade.

## ARGUMENT

Summary judgment is not only permissible in antitrust cases (including Rule of Reason cases), it is "particularly favored because of the concern that protracted litigation will chill pro-competitive market forces." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 104 (2d Cir. 2002); *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 708 (4th Cir. 1991) ("This court and others, both before and after *Matsushita*, recognized that summary judgment is an important tool for dealing with antitrust cases."). The issues here are ripe for resolution on summary judgment. The undisputed facts — taken overwhelmingly from the testimony of Plaintiffs' own experts, witnesses, and neutral third parties — show that the license and supply agreement cannot be classified as a *per se* illegal arrangement. Accordingly, Barr is clearly entitled to summary judgment on Plaintiffs' *per se* claims. To the extent Plaintiffs even attempted to assert a Rule of Reason case (which they fail to do in their complaints), Barr is likewise entitled to summary judgment. Courts have routinely approved the grant of summary judgment on the ground that plaintiffs could not demonstrate that the challenged agreement violated the antitrust laws under the Rule of Reason. *See, e.g., PepsiCo,* 315 F.3d 101; *CDC Techs., Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74 (2d Cir. 1999); *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90 (2d Cir. 1998).

Here, the record shows that the agreement between Warner Chilcott and Barr imposed no unreasonable restraint of trade. To the contrary, after nearly two years of discovery, the undisputed evidence demonstrates, *inter alia*, that the license and supply agreement resulted in higher output than would have existed but for the agreement and, moreover, preserved

substantial discounting of Ovcon 35. As discussed below, whether Plaintiffs assert a *per se* or Rule of Reason case, Barr is entitled to summary judgment.

## I.    DEFENDANTS' AGREEMENT CANNOT BE FOUND UNLAWFUL PER SE BECAUSE IT MUST BE ANALYZED UNDER THE RULE OF REASON.

Sherman Act Section 1 bans illegal contracts, combinations, and conspiracies that are "unreasonable" restraints of trade. *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 7-8 (1979) ("*BMI*"); *see also NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998). Traditionally, courts have assessed liability under Section 1 by applying either the Rule of Reason analysis — the presumptive standard focusing on the actual economic impact, if any, of the alleged restraint — or the categorical *per se* approach (applicable in only a narrow class or cases). Under the Rule of Reason, the fact finder must take into account a number of relevant factors such as the nature of the restraint, the history of the conduct, the purpose or intent of the conduct, and, most importantly, its overall effect on competition, condemning only those types of agreements that necessarily have an overall adverse effect on competition. *See Board of Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918); *see also Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977). In contrast, to find a *per se* violation of Section 1, the court must determine that "the practice facially appears to be one that would ***always or almost always*** tend to restrict competition and decrease output." *BMI*, 441 U.S. at 19-20. Specifically, the Supreme Court defined *per se* illegality under Section 1 of the Sherman Act as conduct constituting a "naked restraint of trade with no purpose except stifling of competition . . . ," *Id.*, or having a "pernicious effect on competition and lack[ing] any redeeming virtue," *N. Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958). Thus, only narrow classes of conduct which are always or almost always anti-competitive may be declared illegal without a full examination of the various competitive factors involved. *See BMI*, 441 U.S. at 20.

The type of license and supply agreement presented here has never been characterized as such a clearly naked restraint, lacking any "redeeming virtue" and serving no purpose but the "stifling of competition." *Id.* To the contrary, as is clear from Supreme Court precedent limiting the classes of conduct that may be deemed *per se* unlawful, as well as the economic analysis of Plaintiffs' own experts, the license and supply agreement at issue in this case does not remotely constitute conduct that "always or almost always" reduces competition. Thus, defendants' conduct cannot be condemned as unlawful *per se*; rather, a Rule of Reason analysis must be applied.

A.   **Barr's Conduct Cannot Be Found *Per Se* Unlawful Because The *Per Se* Approach Is Limited To Certain Narrow Forms Of Conclusively Anti-Competitive Conduct, Not Present Here.**

Tracing at least as far back as the Supreme Court's landmark decision in *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1 (1911), the preferred approach for analyzing conduct under the antitrust laws has been the Rule of Reason. *See Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) ("Ordinarily, whether particular concerted action violates § 1 of the Sherman Act is determined through case-by-case application of the so-called rule of reason . . . ."). Indeed, in two recent decisions, the Court stressed that "[t]he rule of reason is the *accepted standard* for testing whether a practice restrains trade in violation of § 1," *Leegin Creative Leather Prods. v. PSKS, Inc.*, 127 S. Ct. 2705, 2712 (2007), and should be "*presumptively applie[d]*" in antitrust cases by the courts, *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

Although certain activities, including horizontal price-fixing and some types of horizontal market division, have been subject to *per se* treatment, the Supreme Court has made clear that the conduct which falls into these categories is limited and that these exceptions to the presumptive Rule of Reason approach should be applied carefully, narrowly, and infrequently.

21

As the Supreme Court warned in *Business Electronics*, "'we have been slow . . . to extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious.'" 485 U.S. at 723 (quoting *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458-59 (1986)). Thus, "agreements are *per se* illegal only if their 'nature and necessary effect are so plainly anti-competitive that no elaborate study of the industry is needed to establish their illegality.'" *Id.* at 724 (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). As the Court recently explained, "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue, . . . and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason . . . ." *Leegin*, 127 S. Ct. at 2713. These cases all reflect a common theme: the *per se* rule should not be applied unless a court is certain that the conduct in question falls within a category which experience demonstrates will always restrict competition or decrease output.

Importantly, "because the economic effect of most alleged anti-competitive conduct is not immediately obvious" the "majority of agreements . . . [must be] assessed under the 'rule of reason.'" *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 43 (D.D.C. 1998); *see also Continental T.V., Inc.*, 433 U.S. at 58 n.29. Moreover, a departure from the presumptive Rule of Reason approach cannot be based on mere formalistic labels, such as "horizontal agreement." In this regard, the Supreme Court has warned, such "easy labels" "do not [] supply ready answers" and should not be invoked to artificially limit a trial court's examination of the factors necessary to assess the competitive impact of the conduct in question. *BMI*, 441 U.S. at 8-9. Rather, "a 'departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing.'" *Leegin*, 127 S. Ct. at 2713. *See*

*also California Dental Ass'n v. FTC*, 526 U.S. 756, 775 n.12 (1999) (cautioning that in assessing the competitive impact of alleged unlawful conduct "assumption alone will not do."); *Oetiker v. Jurid Werke*, 556 F.2d 1, 7 (D.C. Cir. 1977) ("[T]he area of *per se* illegality is carefully limited. We are reluctant to extend it on the bare pleadings and absent examination of market effect and economic consequences.").

As next discussed, notwithstanding Plaintiffs' (conclusory) labeling of defendants' conduct as a "horizontal market allocation," defendants' conduct does not fall with the narrow categories of conduct the Supreme Court has determined to warrant *per se* treatment.

**B.    Defendants' License And Supply Agreement Was Not "Manifestly Anti-Competitive" Or Lacking Any Redeeming Virtue.**

As noted above, the *per se* analysis applies only to well-established conduct that requires virtually no analysis for a pronouncement of illegality, *see, e.g., Dagher*, 547 U.S. at 5, because, by their very nature, such restraints "would always or almost always tend to restrict competition and decrease output," *Leegin*, 127 S. Ct. at 2713. The well publicized — and scrutinized — license and supply agreement challenged here cannot remotely be characterized as a demonstrably and conclusively anti-competitive category of conduct.

As an initial matter, any claim that defendants' license and supply agreement constituted a "naked restraint" with no redeeming virtue is belied by the fact that the Federal Trade Commission — the specialized agency charged with enforcing the antitrust laws — took nearly two years to study, investigate, and consider the effects of that agreement. In fact, as discussed above,                **REDACTED**

— rather than attack the proposed agreement as "manifestly anti-competitive" or lacking any redeeming virtue —                **REDACTED**

23

**REDACTED**                          Only after conducting an extensive investigation

involving numerous depositions of defendants and third party witnesses, did the FTC conclude

— after two years of study — that it wished to challenge the agreement. Thus, the conduct at

issue can hardly be characterized as "manifestly anti-competitive" or a "naked restraint" for

which no analysis is required to determine the economic impact.

The FTC's deliberate and fact intensive investigation of the agreement at issue is not

surprising: "Exclusive supply contracts have been recognized as having procompetitive benefits

and thereby serving legitimate business objections." *Geneva Pharm. Tech. Corp. v. Barr Labs.,*

*Inc.*, 201 F. Supp. 2d 236, 274 (S.D.N.Y. 2002).[14]  In short, an exclusive license or supply

agreement is simply not a "naked restraint" which can be denounced without analysis based on

long-standing experience with the particular conduct. *See, e.g., Dagher*, 547 U.S. at 5 ("*Per se*

liability is reserved for only those agreements that are 'so plainly anticompetitive that no

elaborate study of the industry is needed to establish their illegality"). To the contrary, exclusive

supply agreements of the sort at issue here have long been judged under the Rule of Reason.[15]

This is true even where the conduct can be facially characterized as a "horizontal" market

division. *See, e.g., Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 976-77 (7th Cir. 1999)

(refusing to apply *per se* treatment to arrangement whereby plaintiff and defendant, who were

---

[14]   *See also Standard Oil Co. of Calif. v. United States*, 337 U.S. 293, 306-07 (1949) (exclusive supply contracts can assure supply and afford protection against price increases); *Williamson v. Sacred Heart Hosp.*, No. 89-30084-RV, 1993 WL 543002 at *45 (N.D. Fla. 1993) ("[I]t is settled law that the mere existence of an exclusive contract is not evidence of an antitrust conspiracy.").

[15]   *See, e.g., Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 660 (8th Cir. 2000) ("Exclusive dealing contracts are analyzed under the rule of reason."); *Electronics Commc's Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997) (agreement between manufacturer and distributor was vertical and subject to the Rule of Reason, even though they competed at distributor level); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 393 (7th Cir. 1984) (exclusive dealing agreements "judged under the Rule of Reason, and thus condemned only if found to restrain trade unreasonably.").

selling same product, each had exclusivity over certain territories); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d 514 (E.D.N.Y. 2005) (applying Rule of Reason to brand-generic supply agreement despite plaintiffs' attempt to characterize it as a "market allocation"); *Anesthesia Advantage, Inc. v. Metz Group*, 759 F. Supp. 638, 646 (D. Colo. 1991) ("*Plaintiffs' market allocation allegation likewise does not require per se analysis.*").

Application of the Rule of Reason is especially appropriate here because, as discussed in more detail below, it is undisputed that the license and supply agreement allowed Warner Chilcott to continue to promote Ovcon 35. (*See* Barr 7(h) Stmnt. ¶¶ 28-29, 31.) Therefore, as a result of the agreement, output of Ovcon 35 products was higher than it would have been but for the agreement, *id.* ¶¶ 32-33 — the antithesis of anti-competitive harm. *See Leegin*, 127 S. Ct. at 2713 (observing that only those agreements "that would always or almost always tend to restrict competition *and decrease output*" are *per se* unlawful). Thus, far from being "manifestly anti-competitive" and lacking any redeeming virtue, the undisputed facts demonstrate that the agreement here had the significant pro-competitive effect of increasing output and fostering inter-brand competition. (*See*    **REDACTED**

ʽ

Equally important, defendants' agreement preserved substantial discounting of Ovcon 35, *i.e.*, as a direct result of defendants' agreement, Warner Chilcott continued to distribute free samples of Ovcon 35 to physicians and, ultimately, consumers until Barr's Balziva® entered the market in October 2006. (*See* Barr 7(h) Stmnt. ¶ 31.) As Plaintiffs' own experts concede,

**REDACTED**

(*See*

25

**REDACTED**

Tellingly, faced with these undisputed facts, Plaintiffs' own expert, Professor Daniel Rubinfeld, concedes that

**REDACTED**

Further, Professor Rubinfeld explained that

**REDACTED**

Q.

**REDACTED**

A.

\*        \*        \*

Q.

**REDACTED**

A.

**REDACTED**                    ; *see also*

26

In short, Professor Rubinfeld concludes that

**REDACTED**

Therefore, as Plaintiffs' own expert concedes,

**REDACTED**

## C.     Barr Has Offered Plausible Evidence Of The Pro-Competitive Effects Of Defendants' Conduct.

An essential threshold step in every antitrust inquiry is a determination of the nature of the restraint.  The Supreme Court's discussion of the proper application of the Rule of Reason analysis in *California Dental* highlights why application of formalistic labels — such as Plaintiffs advocate here — miss the mark.  *See* 526 U.S. at 775.  In *California Dental*, the Supreme Court rejected both *per se* treatment and even the Commission's abbreviated Rule of Reason approach.  In so doing, the Court expressly held that a more expansive analysis of the respondent's pro-competitive explanations for its conduct was required.

The Court then held that as long as defendants could proffer plausible arguments that their conduct might have pro-competitive effects, the antitrust laws demanded Rule of Reason analysis rather than a more abbreviated inquiry.  *See id.*  As the Court expressly stated in its opinion: "As a matter of economics [the respondent's] view may or may not be correct, **but it is not implausible**, and neither a court nor the Commission may initially dismiss it as presumptively wrong."  *Id.*  *California Dental* squarely prohibits *per se* treatment here.

Barr has clearly satisfied this lenient threshold.  Indeed, Barr has offered numerous plausible explanations of why the license and supply agreement was pro-competitive, including, *inter alia*:

27

- the agreement ensured a safe, stable, and reliable supply of Ovcon 35 for consumers;

- the agreement ensured continued, substantial free sampling of Ovcon 35 by Warner Chilcott, resulting in lower net prices to consumers;

- the agreement enabled Ovcon 35 to aggressively compete against the numerous other hormonal contraceptives in the marketplace;

- the agreement enabled Barr to produce Ovcon 35 despite the threat of Ovcon chewable;

- the agreement preserved the market for Ovcon 35; and,

- the agreement resulted in an overall increase in market share, *i.e.*, output, for Ovcon 35 products.

(*See, e.g.*, Barr 7(h) Stmnt. ¶¶ 10-11, 23-24, 28-29, 31-32, 34.)   Individually, each of these explanations satisfies *California Dental*'s standard of "plausibility," thus requiring further examination by this Court.   In the aggregate, they more than meet the minimal threshold showing that renders *per se* treatment inappropriate.

### D.   Mixed Vertical And Horizontal Commercial Arrangements Are Ill-Suited For *Per Se* Treatment.

Contrary to Plaintiffs' characterization of defendants' license and supply agreement as purely "horizontal," the agreement at issue here reflect a vertical commercial arrangement. Specifically, Barr and Warner Chilcott entered into a vertical supply arrangement; Barr agreed to supply Warner Chilcott's requirements of Ovcon 35.   Such mixed vertical and horizontal commercial arrangements are far from "naked restraints."   Rather, such arrangements, combining both vertical and alleged horizontal elements, are generally evaluated under the Rule of Reason because of the ambiguous economic impact of such agreements.   In other words, they cannot be categorically presumed to be anti-competitive.   *See, e.g., Generac Corp.*, 172 F.3d at 977; *Microbix Biosystems, Inc. v. Biowhittaker, Inc.*, 172 F. Supp. 2d 680, 691 (D. Md. 2000) ("This

rule [of reason] applies to cases that are not easily classified because they involve aspects of vertical restraints.").

Moreover, when an alleged allocation of territory or customers is made specifically in the context of a relationship between a manufacturer and a marketer, courts should apply the Rule of Reason. *See Continental T.V.*, 433 U.S. at 53. In short, Plaintiffs' conclusory allegation that defendants' agreement constitute a purely "horizontal" agreement neither makes it so, nor justifies application of *per se* rule.

## II.    UNDER THE RULE OF REASON, PLAINTIFFS' CLAIMS FAIL AS A MATTER OF LAW BECAUSE PLAINTIFFS CANNOT SHOW ANY ACTUAL ADVERSE EFFECT ON COMPETITION IN THE RELEVANT MARKET.

The reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market. *See ARCO v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990); *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (A plaintiff "must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself."). Therefore, under the applicable Rule of Reason, "the antitrust plaintiff [must] bear the initial burden of demonstrating that the defendants' conduct or policy has had a substantially harmful effect on competition" as a whole. *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 546 (2d Cir. 1993). Only if Plaintiffs pass this threshold test will the Court consider whether the pro-competitive effects outweigh the alleged restraint. *Id.* Plaintiffs, however, flunk the threshold test of the Rule of Reason: they cannot show that defendants' license and supply agreement had an actual adverse impact on competition in the relevant market. *First*, Plaintiffs have utterly failed to define or properly establish the relevant market. *Second*, the undisputed facts demonstrate that the agreement preserved and expanded output and promoted inter-brand competition in a fiercely competitive marketplace. *Finally*, nothing in defendants' license and supply agreement precluded other manufacturers from introducing or

29

launching competitive products.   For these reasons alone, Plaintiffs cannot show any actual adverse effect on competition and Barr is entitled to summary judgment.

A.   **Plaintiffs Cannot Show An Actual Adverse Impact On Competition In A Properly Defined Antitrust Product Market.**

Plaintiffs have failed to establish the relevant antitrust product market, a threshold requirement in a Rule of Reason case.   Indeed, it is axiomatic that a plaintiff "must prove what market . . . was restrained and that the defendants played a significant role in the relevant market." *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir.1991); *see also Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 388 (8th Cir. 2007) (An antitrust "plaintiff must define both the relevant product market, . . . and the relevant geographic market.").   The reason for this is clear:   only after properly defining the relevant market can a plaintiff "show that the restraint has 'detrimental effects' upon the competitiveness of the market." *Crafstman Limousine*, 491 F.3d at 388 (citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986)).   Failing to offer evidence of the relevant product market here, Plaintiffs' claims must be dismissed.

1.   **State Plaintiffs' Claims Must Be Dismissed For Failure To Offer Any Evidence Of The Relevant Antitrust Product Market.**

The State Plaintiffs ignore the threshold requirement in a Rule of Reason case and fail to offer *any* evidence regarding the relevant product market in this case.   Indeed, State Plaintiffs' economic expert, Professor Rubinfeld, expressly

**REDACTED**

Because State Plaintiffs have offered no evidence on the relevant antitrust product market, Barr is entitled to summary judgment on their claims. *See, e.g., Craftsmen Limousine, Inc.*, 491 F.3d at 390.

2.    **Direct Purchaser Plaintiffs' Market Definition Is Inconsistent With "The Realities Of Competition" And Their Own Admissions.**

The Supreme Court has held that a relevant antitrust product market must include all "commodities reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). Importantly, products need not be identical to be reasonably interchangeable:

> Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively. A person needing transportation to work could accordingly buy a Ford or a Chevrolet automobile . . . .

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997). Thus, under the Rule of Reason, a plaintiff's relevant product market definition must focus on the reasonable or practical alternatives consumers have in the marketplace.

As Plaintiffs' expert, Professor Rubinfeld, makes clear,

**REDACTED**                                         . such as all oral contraceptives, rather than a particular brand and its generic equivalents. Pindyck, Roberts S. and Rubinfeld, Daniel L., Microeconomics (6th ed. 2005) at 10. As Professor Rubinfeld explained, ;

**REDACTED**

Notably, Professor Rubinfeld confirmed that

**REDACTED**

31

**REDACTED**

.)[16]

Direct Purchaser Plaintiffs, however, ignore the Supreme Court's (and Plaintiffs' expert's) admonition that the relevant product market must include all products reasonably interchangeable for the same purpose, and, instead, contend that the relevant antitrust product market here is limited to only Ovcon 35 and its AB-rated generic equivalents.

Not only is such a definition inconsistent with Plaintiffs' expert's (Professor Rubinfeld's) conclusion that        **REDACTED**

Direct Purchaser Plaintiffs' proposed product market definition ignores undisputed evidence that consumers and physicians view most oral contraceptives as reasonably interchangeable. In fact, Direct Purchaser Plaintiffs' narrow market definition is belied by their (and their experts') own admissions, including:

- [17]

- **REDACTED**

---

[16] The FTC,                has also concluded that pharmaceutical product markets are determined by reference to therapeutic classes of drugs. *See, e.g., In the Matter of Glaxo Wellcome, et al.,* FTC Docket No. C-3990 (defining relevant markets as the research, development, and manufacture of all 5HT-3 antimetic drugs and, separately, all drugs for the treatment of irritable bowel syndrome); *In the Matter of Pfizer Inc. and Pharmacia Corp.,* FTC Docket No. C-3957 (defining relevant market as all hormone replacement therapy (HRT) drugs, products with the same hormone composition as oral contraceptive products).

[17] *See also* ⊺

**REDACTED**

- **REDACTED**
and,[18]

- several other branded and generic oral contraceptive products, including Aranelle, Leena, Modicon, Brevicon, Necon .5/35, Necon 1/35, Necon 10/11, Necon 7/7/7, Norinyl 1/35, Nortrel 0.5/35, Nortrel 1/35, Nortrel 7/7/7, Ortho Novum 1/35, Ortho Novum 7/7/7, and Tri-Norinyl, contain identical active ingredients as Ovcon 35, and contain similar dosages of these ingredients.[19]

Moreover, all oral contraceptives (with less than 50 mg of estrogen) are equally safe when used properly. **REDACTED** *See also* Robert A. Hatcher, *et. al.*, *Contraceptive Technology* 423 (18th ed. 2007) ("All combined [oral contraceptive] pills with less than 50 mg of estrogen are effective and safe."); Food and Drug Admin., 62 Fed. Reg. 8610 (Dep't of Health & Human Servs., Feb. 25, 1997).

Indeed, in light of this evidence, Plaintiffs' own experts concede that .

**REDACTED**

---

[18]    *See also* !

**REDACTED**

[19]    *See* CVS Pls.' RFA Resp. ¶¶ 109-15; *Meijer* Pls.' RFA Resp. ¶¶ 126-32; *Walgreen* Pls.' RFA Resp. ¶¶ 70-74.
*See also*

**REDACTED**

**REDACTED**                                    ) Thus, the

Direct Purchaser Plaintiffs' narrow product market definition is inconsistent with the undisputed

evidence and, indeed, their (and their experts') own admissions. For this reason alone, Plaintiffs'

proposed market definition should be rejected.

Plaintiffs' narrow product market definition should also be rejected because it "violates a

fundamental tenet of antitrust law that the relevant market definition must encompass the

realities of competition." *Oksanen*, 945 F.2d at 709 (citing *United States v. Grinnell Corp.*, 384

U.S. 563, 572-73 (1966)). The overwhelming evidence demonstrates that oral contraceptives,

including Ovcon 35 and other non-AB rated products, vigorously compete among each other for

market share. (*See*

**REDACTED**

; *see also*

.) In fact, the undisputed evidence shows that in setting the

prices for brand-name oral contraceptives, manufacturers consider the prices of other brand-

name oral contraceptives on the market. (*See*

**REDACTED**

.) Further, as Dr. Hausman demonstrates,

**REDACTED**

This and other evidence clearly demonstrates that Direct Purchaser Plaintiffs' proposed relevant market definition

**REDACTED**

is untenable and simply inconsistent with

As such, Direct Purchaser Plaintiffs' proposed product market definition should be rejected. Absent any evidence "prov[ing] what market . . . was restrained and that the defendants played a significant role in the relevant market," *Oksanen*, 945 F.2d at 709, Plaintiffs' claims are defective as a matter of law.

**B.     Defendants' License And Supply Agreement Increased Output Of Ovcon 35 Products And Preserved Substantial Discounting.**

Under the Rule of Reason, Plaintiffs have the burden of showing "proof of actual detrimental effects." *Indiana Fed'n of Dentists*, 476 U.S. at 461. The Supreme Court has long stressed that the touchstone of anti-competitive harm is evidence showing that the alleged unlawful conduct reduced output within a relevant market. *Id. See also Chicago Prof'l Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996) ("Unless a contract reduces output in some market, to the detriment of consumers, there is no antitrust problem."); *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992) ("[t]he antitrust injury doctrine . . . 'requires every plaintiff to show that its loss comes from acts that reduce output.'"). In contrast, conduct which, as here, preserves or expands output within a relevant market is, as Plaintiffs' Expert Professor Rubinfeld concedes,

**REDACTED**

Here, it is undisputed that absent defendants' allegedly unlawful license and supply agreement, output of Ovcon 35 products would have declined dramatically. (*See, e.g.,*

**REDACTED**

.)  Put differently, defendants' conduct actually preserved and *expanded* output of Ovcon 35 products.  (*See*

**REDACTED**

.)  Absent a showing that defendants' license and supply agreement restricted output, there can be no anti-competitive harm.  *See, e.g., Chicago Prof'l Sports*, 95 F.3d at 597.

Moreover, beyond preserving and expanding output of Ovcon 35 products, defendants' agreement also preserved Warner Chilcott's substantial free sampling of Ovcon 35. Plaintiffs' own experts acknowledge,

**REDACTED**

(*See, e.g.,*

Thus, far from showing competitive harm, Plaintiffs concede that the agreement preserved substantial, pro-competitive discounting which had a direct benefit to consumers.  *See SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 965 (10th Cir. 1994) ("To be judged anticompetitive, the agreement must actually or potentially harm consumers."); *State of New York v. Anheuser-Busch, Inc.*, 811 F. Supp. 848, 875 (E.D.N.Y. 1993) ("[A] court applying the Rule of Reason

asks whether a practice produces net benefits for consumers . . . .") (quoting *Chicago Prof'l Sports Ltd. P'ship v. NBA*, 961 F.2d at 674).  In short, because it is undisputed that defendants' agreement increased output and preserved substantial discounting, Plaintiffs cannot show any anti-competitive harm.

### C.  Defendants' License And Supply Agreement Did Not Preclude Any Competitor From Entering The Marketplace.

Just as Plaintiffs cannot demonstrate anti-competitive harm through a reduction of output, Plaintiffs similarly fail to demonstrate any facts showing that defendants' license and supply agreement created any barrier to competition within the marketplace.  Indeed, it is undisputed that nothing in defendants' license and supply agreement prevented or precluded another generic from entering the marketplace and competing with Ovcon 35.  (*See*

; *see also*

**REDACTED**

.)[20]

In fact, at least one other manufacturer,          , had sought regulatory approval to sell a generic version of Ovcon 35.              **REDACTED**

"[T]he fact that other generic drug manufacturers filed ANDA IVs despite the . . .

---

[20]  *See also*

**REDACTED**

Supply Agreement demonstrates that the agreements did not chill the attempts of other generic manufacturers to enter" the market. *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 243 (E.D.N.Y. 2003); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984) ("If there is no exclusion of a significant competitor, the agreement cannot possibly harm competition.").

Moreover, as discussed above, numerous other oral contraceptive products competed with Ovcon and there was no barrier to any other oral contraceptive product competing with Ovcon 35 either. Because defendants' license and supply agreement did not create "significant barriers to entry into the market," Plaintiffs cannot show any actual adverse effect on competition. *CDC Techs., Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 80 (2d Cir. 1999).

## III.    THE PRO-COMPETITIVE BENEFITS OF THE SUPPLY AGREEMENT OUTWEIGH ANY POTENTIAL ANTI-COMPETITIVE EFFECTS.

Even if Plaintiffs could overcome their failure to prove an actual adverse effect on competition (in a properly defined antitrust product market), the undisputed pro-competitive benefits of defendants' license and supply agreement outweigh any alleged restraint on intra-brand competition for Ovcon 35. In short, defendants' agreement ensured a safe and steady supply of Ovcon 35, increased output, and ensured the substantial discounting and continued promotion of Ovcon 35. Thus, any restraint of intra-brand competition was far outweighed by the direct benefits to consumers and invigorated inter-brand competition.

### A.    The Agreement Resulted In Increased Output Of Ovcon 35 Products And Promoted Inter-brand Competition.

As Plaintiffs' own expert concedes, conduct

## REDACTED

.) As described above, it is undisputed that once a

38

generic version of a brand name oral contraceptive is introduced, free sampling ceases. As a result, consumers switch to other branded oral contraceptives. In turn, the combined sales (or output) of the brand name oral contraceptive and its generic product — in this case all "Ovcon 35 products" — decline. (*See, e.g.,*                    **REDACTED**

) Because defendants' license and supply agreement preserved Warner Chilcott's promotional activities, the agreement had the effect of expanding output. As such, the agreement had substantial pro-competitive benefits that outweigh any restraint on intra-brand competition. *See BMI*, 441 U.S. at 19-23; *State of New York v. Anheuser-Busch, Inc.*, 811 F. Supp. at 877 ("Agreement enabled wholesalers to increase their promotion activities" and improved interbrand competition, and thus was pro-competitive).

Not only did defendants' license and supply agreement result in a pro-competitive increase in output, the agreement also invigorated interbrand competition — the primary concern of the antirust laws. *See Leegin Creative Leather Prods. v. PSKS, Inc.*, 127 S. Ct. 2705, 2718 (2007); *see also ARCO v. USA Petroleum Co.*, 495 U.S. 328, 344 n.13 (1990). Specifically, by ensuring Warner Chilcott's continued promotion and free sampling of Ovcon 35, Warner Chilcott (and Ovcon 35) could more effectively compete with Ortho-McNeil, Watson, Andrx and a host of other brand name oral contraceptive manufacturers. (*See, e.g.,*

**REDACTED**                    .) Quite simply, free sampling is the means by which Warner Chilcott competes with other brand name oral contraceptive manufacturers to encourage physicians to write prescriptions for Ovcon 35 instead of its competitors' products. Because defendants' license and supply agreement preserved sampling and output, the pro-competitive benefits of the agreement outweigh any alleged anti-competitive harm.

**B.    The Agreement, By Preserving Free Sampling, Lowered Prices For Consumers.**

Samples — free products that the manufacturer gives away to attract customers — represent a discount to third party payers as well as consumers.  (*See*

**REDACTED**

.)  The factual record varies in terms of how many samples patients actually receive.  (*Compare*

**REDACTED**

.)  But the factual record is undisputed that defendants' agreement preserved Warner Chilcott's continued distribution of free samples, and that these free samples constituted a discount to consumers.  By preserving free sampling (or substantial discounting) of Ovcon 35, defendants' agreement was clearly pro-competitive.  Simply put, "[l]ower prices are [] always procompetitive."  *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).

In sum, because defendants' agreement secured a higher output and lower prices for consumers, the pro-competitive benefits outweigh any alleged and unproven anti-competitive effects, and Barr is entitled to summary judgment as a matter of law.

## IV.    DIRECT PURCHASER PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS.

Even if Plaintiffs could demonstrate some adverse impact on competition as a consequence of defendants' supply relationship, let alone a lack of pro-competitive benefits justifying that relationship, many of Direct Purchaser Plaintiffs' claims fail for more direct reason:  most lack standing to pursue their claims.

A.    **Direct Purchaser Plaintiffs Lack Effective Assignments Of Claims Because Their Purported Assignors Were Contractually Precluded From Assigning The Claims At Issue.**

Nearly all of the so-called Direct Purchaser Plaintiffs are not, in fact, direct purchasers, but are assignees of direct purchasing national wholesalers (McKesson, Amerisource, and Cardinal). The sole basis for their standing to sue, therefore, is a contractual assignment. But it is undisputed that Plaintiffs' wholesaler-assignors were

**REDACTED**

Therefore, the very basis for the purported Direct Purchaser Plaintiffs' standing is defective.

This issue was recently addressed in *In re Ditropan XL Antitrust Litigation,* No. M:06-CV-01761-JSW, 2007 WL 2978329 (N.D. Cal. Oct. 11, 2007). There, American Sales (one of the so-called Direct Purchaser Plaintiffs here) sued Ortho-McNeil, a pharmaceutical manufacturer, for alleged antitrust violations in connection with sales of Ditropan. *See id.* at *1. American Sales, as here, sued on the basis of a purported assignment of claims from its direct purchasing wholesaler, Cardinal. Ortho-McNeil's distribution agreement with Cardinal, however, contractually barred Cardinal from assigning any claims arising from the distribution agreement without Ortho-McNeil's prior written consent. *See id.* at *2; *see also* JOM Pharm. Servs., Div. of Ortho-McNeil Pharm., Inc. Distr. Performance Agreement, Ex. __ § 12.4 ("Neither Distributor nor JOM may assign the Agreement or any of its rights or obligations hereunder without the prior written consent of the other party."). Because Ortho-McNeil did not consent to the assignment of claims by Cardinal to American Sales, American Sales' purported assignment of claims from Cardinal — the sole basis for its standing to sue — was null and void *ab initio. See In re Ditropan XL*, 2007 WL 2978329, at *2.

The same is true here. It is undisputed that the standing of plaintiffs Safeway, Albertson's, Rite-Aid, Maxi Drug (d/b/a Brooks), Steven L. LaFrance Holdings, SAJ

41

Distributors, Hy-Vee, and Eckerd is based on purported assignment contracts obtained from national wholesaler McKesson. (*See* CVS Compl. ¶ 3; Walgreen Compl. ¶¶ 3-4, 6-8; Meijer Compl. ¶ 14.)   Further, it is undisputed that Warner Chilcott's distribution agreement with

(*See*

**REDACTED**                                    .)[21]  Finally, it is

undisputed that

and these plaintiffs therefore lack standing.

**B.      The *Meijer* Plaintiffs Do Not Have Standing.**

Plaintiffs Meijer and Meijer Distribution also lack standing to sue because their purported assignment of claims is similarly defective.   Meijer and Meijer Distribution purport to sue as assignees of the direct purchasing wholesaler, Kerr.   But their assignment contract does not cover claims involved in this lawsuit; specifically, Kerr only assigned claims

**REDACTED**

Thus,

---

21

agreement

**REDACTED**                        Because Warner Chilcott's distribution

(*See*

at the time these plaintiffs filed suit, they were indirect purchasers with no effective assignment of claims. As such, Meijer and Meijer Distribution lacked standing.

Importantly, although Meijer and Meijer Distribution purport to have acquired an effective assignment of claims over one year *after* they filed suit, a plaintiff cannot acquire standing by contract after the fact. *See, e.g., SunCom Mobile & Data, Inc. v. FCC*, 87 F.3d 1386 (D.C. Cir. 1996); *Delacroix v. Lublin Graphics, Inc.*, 993 F. Supp. 74, 83 (D. Conn. 1997) ("The one remaining problem with plaintiff's assignment theory is that it is based upon an agreement entered into two years after this lawsuit was filed. ***To the extent that plaintiff seeks to establish his standing to bring this lawsuit based upon this assignment, it was too late to confer standing that did not already exist. Plaintiff must show standing at the time he filed his complaint.***") (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992)); *In re Ditropan XL*, 2007 WL 2978329, at *2 ("ASC attempts to cure this defect by submitting another assignment from Cardinal . . . Nevertheless, any such assignment ***post-dates SAC's filing of the SAC and is thus insufficient to confer standing.***"). Because Meijer and Meijer Distribution clearly did not have standing to sue at the time their suit was filed, they lack standing to sue and their claims must be dismissed.

### C. Several Direct Purchaser Plaintiffs Do Not Have Standing Because Their Purported Assignors Resold Ovcon Pursuant To Preexisting "Cost Plus" Contracts.

Even if the so-called Direct Purchaser Plaintiffs had obtained effective assignments of claims from their direct purchasing wholesalers, many still lack standing. As purported assignees, these indirect purchasers stand in the shoes of their wholesaler-assignors for purposes of this litigation and only have standing to the extent that their assignors have such. *See, e.g., Fox-Greenwald Sheet Metal Co. v. Markowitz Bros., Inc.*, 452 F.2d 1346, 1358 n.69 (D.C. Cir. 1970). But the national wholesalers resold Ovcon 35 pursuant to pre-existing "cost-plus"

contracts, *i.e.*, these wholesalers priced Ovcon for resale at their cost from Warner Chilcott plus a fixed markup. (*See, e.g.,*

<strong>REDACTED</strong>

Under a well-established Supreme Court precedent, McKesson did not suffer "antitrust injury" because any alleged "overcharge" was — by definition — not felt by McKesson but was "passed on." *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977); *see also Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990). Because national wholesalers such as McKesson would not have standing to sue under the antitrust laws, any of their assignees, including Albertsons, Brooks, Eckerd, Hy-Vee, and Safeway, do not have standing to sue and therefore are not proper plaintiffs in this litigation.

<strong><u>CONCLUSION</u></strong>

For the foregoing reasons, Barr's Motion for Summary Judgment should be granted.

Dated: November 14, 2007                         Respectfully submitted,

Karen N. Walker (D.C. Bar # 412137)
Mark L. Kovner (D.C. Bar # 430431)
Patrick M. Bryan (D.C. Bar # 490177)
Eunnice H. Eun (D.C. Bar # 500203)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, DC 20005
Tel. (202) 879-5000
Fax (202) 879-5200

*Counsel for Barr Pharmaceuticals, Inc.*

44

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of November 2007, I caused an unredacted copy of Barr's Notice of Filing Under Seal, Motion to File Under Seal, Motion For And Memorandum In Support Of Summary Judgment On State And Direct Purchaser Plaintiffs' Federal Antitrust Claims, Statement of Material Facts As To Which There Is No Genuine Issue, and accompanying Appendix Volumes I & II, to be served by e-mail and first-class mail upon the parties listed on the service list below.

Eunnice H. Eun

Devin M. Laiho
STATE OF COLORADO
1525 Sherman Street, 5th Floor
Denver, CO 80203
(303) 866-5079

Scott E. Perwin, Esq.
KENNY NACHWALTER, P.A.
110 Miami Center
201 South Biscayne Blvd.
Miami, FL 33131
(305) 373-1000

Linda P. Nussbaum
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, NY 10022
(212) 687-1980

Monica Rebuck
HANGLEY ARONCHICK SEGAL
    & PUDLIN, P.C.
30 North Third Street
Harrisburg, PA 17101-1701
(717) 364-1030